The Arbitration Institute of the
Stockholm Chamber of Commerce

19/12/2013

Arbitration no. V 2010/116

Doc. no. 2010/116-130

SCC Arbitration V (116/2010)
1.  **Anatolie Stati**
2.  **Gabriel Stati**
3.  **Ascom Group S.A.**
4.  **Terra Raf Trans Traiding Ltd.**
versus
**The Republic of Kazakhstan**

# AWARD

### Date of Award: 19 December 2013

**The Arbitral Tribunal:**

**David R. Haigh QC (Co-Arbitrator)**
**Prof. Sergei N. Lebedev  (Co-Arbitrator)**
**Prof. Karl-Heinz Böckstiegel  (Chairman)**

Ms. Katherine Simpson  (Secretary to the Tribunal)

| | |
|---|---|
| **Claimants:** | Anatolie Stati |
| | Gabriel Stati |
| | Ascom Group S.A. |
| | Terra Raf Trans Traiding Ltd. |
| **Claimants' counsel:** | Reginald R. Smith |
| | Héloise Hervé |
| | Kenneth Fleuriet |
| | King & Spalding |
| | Bulboaca Asociatii |
| **Respondent:** | Republic of Kazakhstan |
| **Respondent's counsel:** | Dr. Patricia Nacimiento |
| | Matthew Buckle |
| | Norton Rose Fulbright LLP |
| | Joseph Tiredo |
| | Winston & Strawn London |
| | Professor I. Zenkin |
| | Moscow Regional Collegium |
| | of Advocates |

**ARBITRATION INSTITUTE OF**
**THE STOCKHOLM CHAMBER OF COMMERCE**

Certified true copy of original

Natalia Petrik, Legal Counsel
Date 28 January 2014

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

# Table of Contents

| | | | |
|---|---|---|---|
| Abbreviations | | | 6 |
| A. | The Parties and Their Counsel | | 8 |
| B. | The Arbitral Tribunal | | 9 |
| C. | Short Identification of the Case | | 10 |
| | C.I. | The Claimants' Perspective | 10 |
| | C.II. | The Respondent's Perspective | 13 |
| D. | Procedural History | | 18 |
| E. | Relief Sought by the Parties | | 79 |
| | E.I. | Relief Sought by Claimants | 79 |
| | E.II. | Relief Sought by the Respondent | 80 |
| F. | Factual Background | | 80 |
| | F.I. | General Background Information | 80 |
| | F.II. | Timeline of Events | 82 |
| | F.III. | Respondent's Alleged "*Playbook*" / Campaign of Harassment and Interference | 128 |
| | | 1. Arguments by Claimants | 128 |
| | | 2. Arguments by Respondent | 135 |
| G. | Short Summary of Contentions | | 142 |
| | G.I. | Summary of Contentions by Claimants | 142 |
| | G.II. | Summary of Contentions by Respondent | 146 |
| H. | Preliminary Considerations and Conclusions of the Tribunal | | 151 |
| | H.I. | Jurisdiction | 151 |
| | | 1. The Parties' Consent to Arbitration before the SCC | 151 |
| | | a. Arguments by Claimants | 151 |
| | | b. Arguments by Respondent | 152 |
| | | c. The Tribunal | 153 |
| | | 2. Jurisdiction Ratione Personae | 154 |
| | | a. Arguments by Claimants | 154 |
| | | b. Arguments by Respondent | 157 |
| | | c. The Tribunal | 161 |
| | | 3. Jurisdiction Ratione Materiae – Existence of Investment | 162 |
| | | a. Arguments by Claimants | 162 |
| | | b. Arguments by Respondent | 169 |
| | | c. The Tribunal | 176 |
| | | 4. Jurisdiction – Compliance with Three-Month Waiting Period | 178 |
| | | a. Arguments by Claimants | 178 |
| | | b. Arguments by Respondent | 180 |
| | | c. The Tribunal | 182 |
| | | 5 Admissibility of Claimants' Claims Pursuant to ECT | 183 |
| | | a. Arguments by Claimants | 183 |
| | | b. Arguments by Respondent | 184 |
| | | c. The Tribunal | 185 |
| | H.II. | Applicable Law | 185 |
| | | 1. Arguments by Claimants | 185 |
| | | 2. Arguments by Respondent | 187 |
| | | 3. The Tribunal | 188 |

ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE 418

| | | | |
|---|---|---|---|
| | H.III. | **Considerations Regarding Arbitration Procedure** | 189 |
| | | 1. **Arguments by Claimants** | 189 |
| | | 2. **Arguments by Respondent** | 190 |
| | | 3. **The Tribunal** | 194 |
| **J.** | **Liability** | | 195 |
| | J.I. | Whether Kazakhstan Provided the Claimants' Investments with Fair and Equitable Treatment According to Art. 10(1) ECT | 195 |
| | | 1. **Arguments by Claimants** | 195 |
| | | 2. **Arguments by Respondent** | 202 |
| | | 3. **The Tribunal** | 209 |
| | J.II. | Whether Claimants' Interests were Expropriated (Art. 13 ECT) | 231 |
| | | 1. **Arguments by Claimants** | 231 |
| | | a. **Law on Expropriation** | 231 |
| | | b. **Exhaustion of Remedies** | 233 |
| | | c. **Indirect Expropriation** | 234 |
| | | i. General Principles and Jurisprudence Regarding Indirect Expropriation | 234 |
| | | ii. **Right to Regulate** | 235 |
| | | iii. Acts Allegedly Amounting to An Indirect Expropriation | 236 |
| | | d. **Direct Expropriation** | 240 |
| | | i. **Transfer of Title** | 240 |
| | | ii. **Exercise of Regulatory Powers** | 242 |
| | | 2. **Arguments by Respondent** | 244 |
| | | a. **Law on Expropriation** | 245 |
| | | b. **Exhaustion of Remedies** | 245 |
| | | c. **Indirect Expropriation** | 248 |
| | | i. General Principles and Jurisprudence Regarding Indirect Expropriation | 248 |
| | | ii. **Right to Regulate** | 249 |
| | | iii. Acts Allegedly Amounting to An Indirect Expropriation | 250 |
| | | d. **Direct Expropriation** | 255 |
| | | i. **Transfer of Title** | 255 |
| | | ii. **Exercise of Regulatory Powers** | 256 |
| | | 3. **The Tribunal** | 258 |
| | J.III. | Respondent's Provision of Domestic Legal Remedies (Art. 10(12) ECT) | 259 |
| | | 1. **Arguments by Claimants** | 259 |
| | | 2. **Arguments by Respondent** | 260 |
| | | 3. **The Tribunal** | 264 |
| | J.IV. | Whether Kazakhstan Provided the Most Constant Protection and Security to Claimants' Investments (Art. 10(1) ECT) | 264 |
| | | 1. **Arguments by Claimants** | 264 |
| | | 2. **Arguments by Respondent** | 268 |
| | | 3. **The Tribunal** | 270 |
| | J.V. | Whether Kazakhstan Impaired Claimants' Investment Through Reasonable and Non-Discriminatory Measures (Art. 10(1) ECT) (Alternative Claim) | 271 |



| | | 1. | **Arguments by Claimants** | 271 |
| | | 2. | **Arguments by Respondent** | 274 |
| | | 3. | **The Tribunal** | 280 |
| | J.VI. | **Respondent's Observance of Obligations It Entered Into with Respect to Claimants' Investments (Umbrella Clause in Art.10(1) ECT))** | 280 |
| | | 1. | **Arguments by Claimants** | 280 |
| | | 2. | **Arguments by Respondent** | 283 |
| | | 3. | **The Tribunal** | 287 |
| | J.VII. | **Whether Kazakhstan Violated Its Obligation to Permit Claimants to Employ Key Personnel of Their Choice (Art. 11 ECT)** | 287 |
| | | 1. | **Arguments by Claimants** | 287 |
| | | 2. | **Arguments by Respondent** | 288 |
| | | 3. | **The Tribunal** | 289 |
| K. | **Causation** | | | 289 |
| | K.I. | **Law on Causation** | 289 |
| | | 1. | **Arguments by Claimants** | 289 |
| | | 2. | **Arguments by Respondent** | 290 |
| | | 3. | **The Tribunal** | 290 |
| | K.II. | **Whether Respondent's Breaches of the ECT Caused Claimants' Alleged Damages** | 291 |
| | | 1. | **Arguments by Claimants** | 291 |
| | | 2. | **Arguments by Respondent** | 294 |
| | | 3. | **The Tribunal** | 295 |
| | K.III. | **Whether Claimants' Alleged Inexperience and Own Actions Led to the Demise of KPM and TNG (Intervening Cause)** | 307 |
| | | 1. | **Arguments by Claimants** | 307 |
| | | 2. | **Arguments by Respondent** | 310 |
| | | 3. | **The Tribunal** | 312 |
| L. | **Quantum** | | | 314 |
| | L.I. | **Preliminary Considerations** | 314 |
| | L.II. | **Valuation Date** | 314 |
| | | 1. | **Arguments by Claimants** | 314 |
| | | 2. | **Arguments by Respondent** | 319 |
| | | 3. | **The Tribunal** | 322 |
| | L.III. | **Arguments Regarding the Treatment of Debt: Enterprise vs. Equity Value** | 324 |
| | | 1. | **Arguments by Claimants** | 324 |
| | | 2. | **Arguments by Respondent** | 326 |
| | | 3. | **The Tribunal** | 329 |
| | L.IV. | **Quantum Related to Borankol Field and Tolkyn Field** | 331 |
| | | 1. | **Arguments by Claimants** | 331 |
| | | 2. | **Arguments by Respondent** | 342 |
| | | 3. | **The Tribunal** | 351 |
| | L.V. | **Quantum Related to Contract 302 Properties** | 353 |
| | | 1. | **Arguments by Claimants** | 353 |
| | | 2. | **Arguments by Respondent** | 358 |
| | | 3. | **The Tribunal** | 367 |
| | L.VI. | **Quantum Related to LPG Plant** | 368 |
| | | 1. | **Arguments by Claimants** | 368 |

|  |  | 2. | Arguments by Respondent | 373 |
|  |  | 3. | The Tribunal | 381 |
|  | L.VII. | The Parties' Arguments Concerning the Tristan Notes | | 382 |
|  |  | 1. | Arguments by Claimants | 382 |
|  |  | 2. | Arguments by Respondent | 385 |
|  |  | 3. | The Tribunal | 387 |
|  | L.VIII. | Moral Damages | | 387 |
|  |  | 1. | Arguments by Claimants | 387 |
|  |  | 2. | Arguments by Respondent | 389 |
|  |  | 3. | The Tribunal | 390 |
|  | L.IX. | Tax Claims | | 390 |
|  |  | 1. | Arguments by Claimants | 390 |
|  |  | 2. | Arguments by Respondent | 391 |
|  |  | 3. | The Tribunal | 392 |
|  | L.X. | Relevance of Cliffson SPA and Other Factors in Establishing Fair Market Value (FMV) | | 393 |
|  |  | 1. | Arguments by Claimants | 393 |
|  |  | 2. | Arguments by Respondent | 394 |
|  |  | 3. | The Tribunal | 398 |
|  | L.XI. | Credibility of the Parties Experts | | 398 |
|  |  | 1. | Arguments by Claimants | 398 |
|  |  | 2. | Arguments by Respondent | 399 |
|  |  | 3. | The Tribunal | 402 |
|  | L.XII. | Interest | | 402 |
|  |  | 1. | Arguments by Claimants | 402 |
|  |  | 2. | Arguments by Respondent | 403 |
|  |  | 3. | The Tribunal | 405 |
|  | L.XIII. | Summary of Tribunal's Conclusions Regarding Quantum | | 406 |
| M. | Arbitration Costs | | | 407 |
|  | M.I. | Arguments by Claimants | | 407 |
|  | M.II. | Arguments by Respondent | | 409 |
|  | M.III. | The Tribunal | | 412 |
| N. | Decisions | | | 414 |



# **Abbreviations**

| | |
|---|---|
| ¶ / ¶¶ | Paragraph / Paragraphs |
| § / §§ | Section or Clause / Sections or Clauses |
| ARNM | Agency for Regulation of Natural Monopolies |
| Ascom | Ascom Group S.A. |
| Art. | Article / Articles |
| Bcm³ | Billion cubic meters |
| BIT | Bilateral Investment Treaty |
| BOE | Barrels of Oil Equivalent |
| C | Claimants' Exhibit |
| C-0 | Claimants' Request for Arbitration |
| C-I | Claimants' Statement of Claim (18 May 2011) |
| C-II | Claimants' Reply Memorial on Jurisdiction and Liability (7 May 2012) |
| C-III | Claimants' Reply Memorial on Quantum (28 May 2012) |
| CAC Pipeline | Center Asia Center Pipeline |
| CAPEX | Capital Expenditure |
| CC RF | Criminal Code of the Russian Federation |
| CC RK | Civil Code of the Republic of Kazakhstan |
| CPC | Criminal Procedure Code of the Republic of Kazakhstan |
| CPHB 1 | Claimants' First Post-Hearing Brief (8 April 2013) |
| CPHB 2 | Claimants' Second Post-Hearing Brief (3 June 2013) |
| C Costs | Claimants' Request for Costs (1 July 2013) |
| C Costs Reply | Claimants' Reply on Costs (8 July 2013) |
| DCF | Discounted Cash Flow |
| ECOS | Economic Chance of Success |
| ECT | The Energy Charter Treaty |
| ECtHR | European Court of Human Rights |
| EPT | Excess Profits Tax |
| FDP | Field Development Plan |
| FET | Fair and Equitable Treatment |
| FMV | Fair Market Value |
| FTI | FTI Consulting |
| GCA | Gaffney, Cline, & Associates |
| GCOS | Geological Chance of Success |
| GPO | General Prosecutor's Office (Kazakhstan) |
| ICC | International Chamber of Commerce |
| ICSID | International Centre for Settlement of Investment Disputes |
| IPO | Initial Public Offering |



| | |
|---|---|
| JSC | Joint Stock Company |
| KMG | KazMunaiGas / KazMunaiGaz |
| KMG EP | KazMunaiGaz Exploration Production |
| KMG NC | KazMunaiGaz National Company |
| KMT | KazMunaiTeniz JSC |
| KNOC | Korea National Oil Company |
| KPM | Kazpolmunay LLP |
| Law on Oil | Law of the Republic of Kazakhstan of 28 June 1995, No. 2350 "*On Petroleum*" (as amended in 2003) |
| LLP | Limited Liability Partnership |
| LPG | Liquefied Petroleum Gas |
| ltr. | Letter |
| MBbls /MMBbl | Million barrels |
| MEMR | State of Kazakhstan Ministry of Energy and Mineral Resources |
| MES | Ministry of Emergency Situations |
| Mln | Million |
| MOG | Kazakh Ministry of Oil and Gas |
| NPV | Net Present Value |
| OJSC | Open Joint Stock Company |
| OTP | Oil Treatment Plant |
| p. / pp. | Page / Pages |
| PO | Procedural Order |
| R | Respondent's Exhibit |
| R-I | Respondent's Statement of Defence (21 November 2011) |
| R-II | Respondent's Rejoinder on Jurisdiction and Liability (13 August 2012) |
| R-III | Respondent's Rejoinder Memorial on Quantum (1 December 2012) |
| RPHB 1 | Respondent's First Post-Hearing Brief (8 April 2013) |
| RPHB 2 | Respondent's Second Post-Hearing Brief (3 June 2013) |
| R Costs | Respondent's Submission on Costs (1 July 2013) |
| R Costs Reply | Respondent's Comments on Claimants' Costs Submission (8 July 2013) |
| SCC | Stockholm Chamber of Commerce |
| SM Law | Law of the Republic of Kazakhstan of 5 March 1997 , No. 77-1 On the Securities Market |
| Subsoil Law | Law of the Republic of Kazakhstan "*On Subsoil and Subsurface Use*" |
| TNG | Tolkynneftegaz LLP |
| TOO | Limited Liability Partnership |
| USD | United States Dollar(s) |
| VCLT | 1969 Vienna Convention on the Law of Treaties |
| WS | Witness Statement |



## A. The Parties and their Counsel

**The Claimants**

Anatolie Stati
Gabriel Stati
Ascom Group S.A.
Terra Raf Trans Traiding Ltd.

*Represented by*

Héloise Hervé
Kenneth Fleuriet
King & Spalding
1100 Louisiana, Suite 4000
Houston, Texas 77002
**USA**

King & Spalding
12, cours Albert 1er
75008 Paris
**FRANCE**

Bulboaca & Asociatii
UTI Business Center, 9th Floor
31 Vasile Lascar Street, District 2
020492 Bucharest
**ROMANIA**

**The Respondent**

Republic of Kazakhstan

*Represented by*

Dr. Patricia Nacimiento
Norton Rose Fulbright LLP
Stephanstrasse 15
60313 Frankfurt
**GERMANY**

Matthew Buckle
Norton Rose Fulbright LLP
3 More London Riverside
London SE1 2AQ
**UNITED KINGDOM**

Joseph Tiredo
Winston & Strawn London
CityPoint
1 Ropemaker Street
London EC2Y 9HU
**UNITED KINGDOM**

Professor I. Zenkin
Moscow Regional Collegium of Advocates
Aviazionnaya Street, 79-1-37
123182 Moscow
**RUSSIA**



# B.    The Arbitral Tribunal

<u>Appointed as Chairman by SCC Letter dated 28 September 2010:</u>

Professor Dr. Karl-Heinz Böckstiegel, Chairman
Parkstrasse 38
D-51427 Bergisch-Gladbach
**GERMANY**

<u>Nominated by Claimants in their Request for Arbitration filed on 26 July 2010:</u>

David Haigh, QC
Burnett, Duckworth & Palmer LLP
2400, 525 – 8 Avenue S.W.
Calgary, Alberta T2P 1G1
**CANADA**

<u>Appointed by the SCC on behalf of Respondent by letter dated 23 September 2010
and confirmed on 15 December 2010:</u>

Prof. Sergei N. Lebedev
Staroalexeevskaya Str., 16/49
129626 Moscow
**RUSSIA**



## C.     Short Identification of the Case

1.     The short identification below is without prejudice to the Parties' full presentation of the factual and legal details of this case, and the Tribunal's considerations and conclusions.

### C.I.     The Claimants' Perspective

2.     Claimants summarize the main aspects of the dispute at C-I ¶¶ 2 – 24 and C-II ¶¶ 1 - 31, partially quoted and summarized below; CPHB 1 ¶¶ 2 – 42, CPHB 2 ¶¶ 1 – 8:

> 2.     *[...] In reliance on Kazakhstan's solemn commitments under international law, Claimants invested more than US$ 1 billion breathing new life into previously-neglected oil and gas fields, and constructing a state-of-the art LPG Plant that Kazakhstan itself described as having "great regional and industrial importance for development of the region." But just as those investments matured and began to generate returns, Kazakhstan launched a targeted campaign of intimidation and harassment designed to pressure Claimants into selling their investments to the state-owned oil company at a firesale price. Kazakhstan went so far as to imprison a senior KPM employee on patently bogus criminal charges, and to threaten other employees with the same fate, in furtherance of its strong arm tactics. When its plan failed — because Claimants defiantly refused to give in to Kazakhstan's pressure — the government simply seized the investments, deciding to take its chances in arbitration.*

> 3.     *Perhaps most shocking, this plan originated from the highest level of the Kazakhstan government, namely, President Nazarbayev himself. That fact would sound far-fetched if it were not admitted, but Kazakhstan concedes that President Nazarbayev personally issued the order that led to the expropriation of Claimants' investments.*

> 4.     *[...] Kazakhstan attempts to shroud its violations of international law in a cloak of legitimacy by focusing on each minute detail in isolation rather than the totality of its conduct as a whole. It argues that its extraordinary campaign of inspections was perfectly normal, and that its subsequent actions were appropriate responses to the information it discovered under arcane, Delphic, and often-misstated provisions of its own domestic law. These arguments, however, crumble under the weight of the evidence. Kazakhstan did not discover any wrongdoing by Claimants' companies, much less violations that would justify the extraordinary actions that followed. Viewing Kazakhstan's conduct in its entirety, it is evident that Kazakhstan's objective from the start was to devalue Claimants' investments by making it virtually impossible for Claimants to operate or sell the businesses, so that Claimants would sell to Kazakhstan at a firesale price. Moreover, Kazakhstan also anticipated this arbitration from the beginning, and cloaked its actions under mystifying interpretations of domestic laws and regulations in order to create an appearance of normalcy and legitimacy.*



5.      *Furthermore, Kazakhstan has continued its blatant disregard for its obligations under international law in its conduct of this arbitration. Kazakhstan consistently attempts to obstruct this Tribunal's consideration of Claimants' claims by raising utterly baseless arguments, flatly misstating facts and law, and engaging in procedural misconduct of the worst kind. [Kazakhstan hopes that through the sophistry of focusing on each small fact individually, the Tribunal will lose sight of the fact that Kazakhstan launched the investigations for the precise purpose of acquiring Claimants' investments for less than fair value.] (C-II ¶¶ 2 – 5, 7). [...]*

15.     *Moreover, while Kazakhstan publicly maintained that it would honor its earlier contracts, its practice has been quite to the contrary.    [...] Kazakhstan has become adept at pressuring foreign investors to sell equity stakes to KazMunaiGaz through a combination of Financial Police investigations, baseless criminal allegations, fines, and tax threats. Kazakhstan makes it essentially impossible to continue normal operations, and then makes it known that the sale of a substantial equity stake to KazMunaiGaz would resolve the company's various difficulties. Kazakhstan has run this "playbook" on foreign investors — and especially, investors in 100% foreign-owned projects — time and again. [That is precisely what happened here.  And when Claimants' refused Kazakhstan's below-average bid for Claimants' investments, Kazakhstan turned up the pressure.  After six months of government harassment, they offered USD 150 million less.   This is the Kazakhstan playbook to the letter.] (C-II ¶¶ 15 - 16). [...]*

17.     *Moreover, when Claimants rejected KazMunaiGaz's lowball offer in June 2009, Kazakhstan simply turned up the pressure. It interfered in the trial of Mr. Cornegruta to ensure a guilty verdict, then sentenced him to four years in Kazakhstan's notoriously dangerous prison system as punishment. It continued to threaten the same fate for KPM and TNG's other directors. It engineered a massive fine against KPM (which was not even a party to the criminal trial) that was large enough to bankrupt the company and provide a ground for seizing its assets. And it continued to interfere with the day-to-day operations of the businesses, including more inspections and audits, asset seizures, and apparent interference with TNG's access to gas markets that choked the company's cash flows. Then, in November 2009, KazMunaiGaz made another bid to buy the companies, this time attempting to circumvent the Claimants by negotiating with the companies' note-holders, and then offering even less to the Claimants than it had offered in June 2009.*

18.     *Despite all this, Claimants continued to resist Kazakhstan's coercion, and ultimately found a Kazakhstan-based buyer for the companies.    In February 2010, Claimants signed an agreement to sell their Kazakhstan investments to the Cliffson company for more than US$ 920 million — which was nearly 70% higher than KazMunaiGaz's lowball offer in June 2009.  And that presented a dilemma for Kazakhstan. Cliffson was owned by the wealthy and politically connected Assaubayev family. In the course of those negotiations, it became clear to all involved (and no doubt to*



*Kazakhstan as well) that Claimants intended to bring arbitration claims against Kazakhstan once the sale closed for the diminution in the sale price caused by Kazakhstan's harassment campaign. Thus, Kazakhstan faced the prospect of either allowing the companies to slip out of its hands or exercising its pre-emptive rights (which would have required it to match Cliffson's offer), while still facing arbitration claims for the diminution in value. Kazakhstan delayed approval of the transaction for several months with requests for additional details and documentation, but Claimants submitted everything the Government requested in June 2010. Within a week, on June 29, 2010, Kazakhstan launched the final inspection blitz that led to the outright seizure of the companies on July 21, 2010. Kazakhstan apparently concluded that if it was going to face arbitration claims anyway, it might as well take the assets for free and posture a termination basis for the coming arbitration fight. (C-II ¶ 18).*

19.     *This tale of conspiracy coordinated at the highest levels of government might seem contrived if it were not both a familiar pattern of behavior in Kazakhstan and admitted in this case that President Nazarbayev was personally involved. But viewed in the context of all the facts, this is a far more plausible explanation than Kazakhstan's suggestion that this was just the normal operation of law in Kazakhstan. Only Kazakhstan knows precisely why it chose this path: a favor to a regional ally, punishment for a 100% foreign-owned company that had refused purchase overtures in the past, an old-fashioned money grab, or some combination of all three. But it is beyond serious dispute that it occurred. [And, Kazakhstan's own documents and admissions in this proceeding confirm that it did. (C-II ¶¶ 19 – 20)]. [...]*

30.     *[In these proceedings, Kazakhstan's] conduct goes beyond zealous advocacy in a contentious arbitration.     [Kazakhstan has delayed proceedings, unfairly and obstructionistically submitted evidence, and has made meritless jurisdictional objections.] Kazakhstan seeks to obscure the truth from this Tribunal and make it as costly, time-consuming, and difficult as possible for Claimants to obtain justice, in furtherance of its strategy of harassment and intimidation. Indeed, if Kazakhstan can bully or mislead this Tribunal into an award favoring Kazakhstan — or even an award for Claimants that undervalues damages — then Kazakhstan will have accomplished its objective of seizing Claimants investments for less than fair value, and also can discourage other foreign investors from resisting its coercion in the future based on hope of obtaining redress in arbitration. (C-II ¶¶ 22 – 30).*

3.     Prior to the Hearing on Quantum, Claimants summarized the main aspects of the dispute at C-III ¶¶ 1-7, partially quoted and summarized below:

1.     *[...] Kazakhstan's harassment campaign had as its principal objective a devaluation of Claimants' investments in an effort to acquire them for far less than their fair market value. Kazakhstan saddled KPM and TNG with unfounded liabilities, interfered with the companies' cash flows, and obstructed the sale of the companies, all as part of its strategy to force Claimants to sell to KazMunaiGas at a firesale price. When that strategy*



     *failed, Kazakhstan seized the investments, deciding to take its chances in arbitration.*

2.    *Respondent has continued that strategy in this arbitration, making a series of disingenuous arguments about the value of Claimants' investments in an effort to enlist the Tribunal in accomplishing the objective Respondent could not accomplish in negotiations with Claimants — namely, acquiring Claimants' investments for far less than their actual worth. In summary, Kazakhstan argues that the value of Claimants' investments as of October 14, 2008 (the valuation date used by Claimants) was significantly less than Claimants calculate; that Claimants' investments were of de minimis value by the time of their final seizure in July 2010; and that, between October 2008 and July 2010, "there are other possible causes of a reduction in the value of the Claimants' investments that cannot possibly be attributable to the Republic and may even be attributable to the Claimants."*

4.    *Respondent purportedly arrives at a range for the total market value of Claimants' investments, as of its chosen July 21, 2010 valuation date, of US $161 to US $237 million on an enterprise value basis (i.e., without considering debt). To arrive at this exceedingly low value, Respondent fabricates capital costs, overstates operating costs, ignores existing reserves, fabricates artificially low gas prices, attributes no value at all to five of the six resource areas at issue in the Contract 302 Properties, relegates the LPG Plant to scrap value, and ignores entirely any attributes of the investments that would be of uniquely enhanced value to the State itself.*

## C.II.    The Respondent's Perspective

4.    Respondent summarizes the main aspects of the dispute at R-I ¶¶ 2 *et seq.*, and R-II ¶¶ 1 – 9, RPHB 2 ¶¶ 1 – 3, 59 partially quoted and summarized below:

1.    *[...] A claimant raising claims must state and prove his case. Stating one's case means that the claimant must present to a tribunal a complete, plausible and logical factual story without contradictions. Proving one's case means that the investor must prove that the tribunal has jurisdiction to hear the case and that the applicable treaty was breached by the state. The claiming investor must further prove causation, [...][i.e.] that he incurred damages as a result of such breach. And finally the claiming investor must prove and specify the precise amount of the damages he requests the tribunal to award based on a certain valuation date which also needs to be correctly determined by the claiming investor. [...]*

3.    *[...] [The]need for the claimant to fulfil its procedural duties cannot be replaced by mere reference to an alleged discretion of a tribunal. A claimant may not simply anchor the highest possible value and the earliest valuation date he could think of and leave it to the tribunal to award a portion of this maximum threshold established by a claimant. Rather, any claimant must submit a specified request for damages based on specific and proven facts. A claimant must further establish a causal link between the alleged breach by a respondent and the requested damages. And this*



*must be linked to a specific date for the valuation of the damages requested. Once the claimant has done so, he is bound by the choices he made as to facts, causation, amount requested and valuation date. Equally, the tribunal is bound by those choices and bound to verify whether the claimant has discharged its various procedural duties. Where this is not the case, the tribunal cannot put its own discretion to cover up for claimant's failure. Rather, if a claimant fails in any of the mandatory steps required of a claiming party, his claim must also fail. [...]*

59.     *Claimants have in many instances failed to coherently state their case. Where they did present a coherent set of factual allegations, they generally failed to provide proof of their contentions: Their witnesses are non-credible, many of their documents are tainted with procedural misconduct, and their experts lack independence as well as the competence necessary to provide useful opinions on valuation issues. The latter is evidenced not least by Claimants' ever changing prayers for relief. Ultimately, all of this does not matter, as Claimants have not presented a valuation corresponding to the facts of this case and the timing of the alleged breaches of the law. In summary, Claimants' claims must be dismissed (RPHB 2 ¶¶ 1 -3, 59).*

1       *Anatolie Stati is a Moldovan businessman [who] [...] claims to have acquired two relativley minor oil and gas companies in Kazakhstan, KPM and TNG. The mechanism of the supposed acquisition and holding of these companies is opaque, involving multiple intermediate entities outside Kazakhstan, some disclosed others not.*

2       *The rationale for this complex holding structure is unknown, but liabilities seemed to gravitate to KPM and TNG from their owners and their owner's afiliates, whilst cash flowed out to a number of afiliated companies outside Kazakhstan.*

3       *Tristan Oil, a BVI registered entity has no disclosed stake in KPM or TNG, but since the end of 2006, it has issued over half a billion dollars in debt, ostensibly for the purpose of funding KPM and TNG. Whilst KPM and TNG are apprently guarantors of this debt, it is by no means clear that they benefited from all of the funds this brought into Tristan Oil. As a BVI registered entity Tristan Oil does not benefit from the protection of the ECT.*

4       *In late 2008, when at a domestic level the Republic began to become aware of problems with KPM and TNG, it seems that KPM and TNG's precarious debt laden ownership structure was pushed to the brink by the financial crisis, resulting in yet more funds being stripped from the companies.*

5       *In late 2008 little of the above was known to the agencies of the Republic that regulated the performance of KPM and TNG. At that time their principal concern was a littany of breaches by KPM and TNG of their contractual and other legal obligations. There were also wider social consequences for the area in which the companies operated, caused by what, at the time, seemed an inexplicable decline in the companies' performance and indiference of their management.*



6       *The Republic was ultimately driven to terminate KPM and TNG's contract contracts and place their subsoil use assets into trust management to preserve them from decay. That was not the outcome that anyone wanted, least of all the Republic, which generates much of its income from active subsoil users. However, KPM and TNG's apparent disinterest in remedying their desructive poor performance made it unavoidable.*

7       *Since this Arbitration was commenced, the Republic has learned rather more about KPM and TNG and Mr Stati, though perhaps not enough fully to explain the decline of KPM and TNG. However, what it has learned has re-inforced its view that fundamentally the Claimants are seeking to use international arbitration to shield them from the consequences of their wrongdoing in Kazakhstan and perhaps from matters outside Kazakhstan as well.*

8       *In the Republic's respectful submission, the Tribunal should not allow its power to be abused either to protect the Claimants from the Republic's legitimate reaction to KPM and TNG's illegal conduct or from the apparent wider troubles of Mr Stati's buiness empire in which the Republic plays no part.*

9       *In dealing with this case, the Tribunal should keep four basic points in mind:*

        (a)     *First, the Claimants' illegal and bad faith conduct already excludes any protection under the ECT and any jurisdiction of the Tribunal. A foreigner breaching the laws of a state cannot expect protection under international law. Conversely, a state making promises in the expectation of (i) lawful investor conduct, (ii) mutual cooperation and (iii) mutual profiting of both the state and the investor from the investment cannot be held to such promises when the investor acts illegally and contrary to the purposes of admission of foreign investment.*

        (b)     *Second, Claimants claims are in any event completely without merit. Claimants suggest that they fell victim to a "harassment campaign" initiated by the President of the Republic for the purpose of expropriating the Claimants' assets and that this "harassment campaign" was based on a "Kazakhstan playbook". These are mere pretty words with which Claimants try to turn the case on its head. Claimants, as foreign subsoil use contractors in Kazakhstan, were not respecting the laws that Kazakhstan had enacted in order to safeguard its interests and ensure its subsoil use policies. The Republic's audits, inspections and investigations were the lawful reaction to Claimants' illegal conduct. This is not harassment but the legitimate measures any state in the position of the Republic would have taken.*

        (c)     *Third, Claimants are trying to blame the Republic for the demise of their companies, when it was in fact the Claimants' own conduct,*



as well as external circumstances, which made the Claimants' project companies KPM and TNG fail in the end. Claimants overburdened KPM and TNG with debt. This approach backfired when the global financial crisis hit the markets in 2008, energy prices took a dive and important local customers of KPM and TNG could no longer fulfil their contracts with Claimants. Yet, in this severe situation, instead of supporting the companies, Claimants decided to strip them of cash even more. The ultimate failure of the companies can come as no surprise against this background.

(d)     Fourth, Claimants also largely overstate the importance of their alleged investment within the Republic. Claimants' activities were of a rather minor scale compared to many other exploration and production projects in the Republic. This has two consequences: For one, this further undermines Claimants' spurious allegation of a "harassment campaign" initiated by the President of the Republic. Apart from all other reasons excluding this argument, Claimants' assets were simply not valuable enough to merit such action in the first place. Moreover, this also shows that Claimants' claim for compensation is artificially inflated. In fact, Claimants claim for compensation runs into billions, a sum which no interested third party ever offered to pay for KPM and TNG.

5.     Prior to the Hearing on Quantum, Respondent summarized the main aspects of the dispute at R-III ¶¶ 1 – 12, partially quoted and summarized below (citations omitted):

3       [T]he billions of USD claimed by Claimants in this arbitration, are reached by a blatant breach of universally accepted valuation standards. Moreover, they are reached by simply disregarding a whole range of inconvenient facts and substituting reality by wishful thinking. [...]

5       The largest part of Claimants' damages claim is taken up by the claim relating to Contract No. 302. Claimants demand a whopping USD 1.58 billion in compensation for the "loss of opportunity" to develop the Contract 302 Properties. However, as even Claimants' expert confirms, the chances of success were minimal and this must be reflected in the valuation. [Claimants disregard risk in their valuation.] [...]

10      The central element of Claimants' wishful thinking approach is Claimants' improperly early valuation date. Claimants set their valuation date to 14 October 2008, a date on which no state action had any actual effect on KPM and TNG and, moreover, a date which is months or even more than a year prior to many of the state measures Claimants complain of. By choosing 14 October 2008 as their valuation date, Claimants find a way to disregard many developments after that date[,] which drive down the value of their assets. In particular, Claimants ignore the sharp drop in oil prices, the sharp drop in demand for TNG's gas[,] and the failure to conclude the so-called tri-partite agreement with KazAzot. Taking into account these developments, as international law requires, Claimants' claims shrink decisively.



11      *There are also other instances throughout Claimants' case on damages in which Claimants completely disregard the existing facts or the legal framework surrounding KPM and TNG. For example, Claimants ignore that KPM and TNG were never able to export gas because they could not secure a contract for export. Claimants simply apply export prices – even though their own reserves reports from 2008 and 2009 reveal that at the time of events, they did not actually expect that they would be able to achieve export prices.*

12      *In a final attempt at inflating their damage claims, Claimants demand the compensation of moral damages in the amount of "at least" 10% of compensatory damages awarded. Since Claimants inflated damage claim comprises approximately USD 2.7 billion, their moral damages claim thus amounts to at least USD 270 million. This further inflation of Claimants' claim borders on the ridiculous as is reflected by the fact that the highest amount of moral damages ever awarded by an investment tribunal was USD 1 million. (R-III ¶¶ 1 – 12, partially quoted).*



## D.    Procedural History

6.     On **26 July 2010** Claimants filed of their **Request for Arbitration** (C-0) and
       appointed Mr. David R. Haigh, QC of Canada as arbitrator. (C-0 ¶ 112).

7.     On **23 September 2010**, Arbitration Institute of the SCC appointed Prof. Sergei
       Lebedev as an arbitrator.

8.     On **28 September 2010**, Prof. Karl-Heinz Böckstiegel accepted his appointment as
       Chairman of the Tribunal.

9.     On **10 November 2010**, the Chairman, on behalf of the Tribunal, issued his first
       email to the Parties and the Tribunal members, inviting the Parties to prepare for an
       in-person procedural meeting and to inform the Tribunal as to when and where to
       hold that meeting.

10.    Respondent's then-counsel, Curtis, Mallet-Prevost, Colt & Mosle LLP, advised
       that it had been retained on 8 November 2010 but had only received the file on 12
       November.

11.    On **22 November 2010**, the Chairman, on behalf of the Tribunal, sent the Parties
       an **Annotated Preliminary Agenda of Issues Regarding the Further Procedure**
       in preparation for the First Procedural Meeting with the Parties in Stockholm,
       scheduled for 15 December 2010.

12.    On **2 December 2010**, Respondent challenged the 23 September 2010 appointment
       of Prof. Sergei Lebedev as arbitrator. Respondent argued that, especially in light of
       the necessary translation issues and the fact that the arbitration involves a State as
       Respondent, the 21 and even 35-day time limits within which Respondent was to
       have filed its Answer were exceptionally short – even shorter than would have
       been demanded in a commercial arbitration. Respondent also noted that a member
       of the SCC Board is a Consultant in the King & Spalding firm, which is
       representing Claimants in this case, and indicated that this fact raises concerns
       about the undue haste. Respondent indicated that it has been prejudiced and that
       procedural fairness has been impaired by the hasty appointment.

13.    On **15 December 2010** and after considering comments from the Parties, the
       Arbitration Institute of the SCC dismissed Respondent's challenge of Prof.
       Lebedev, having found no ground for disqualification.

14.    On **20 December 2010**, the Chairman circulated the draft Procedural Order 1 (PO-
       1), which resulted from the First Meeting in Stockholm, to the Parties for their
       comment by 3 January 2011.

15.    On **27 December 2010**, Respondent wrote to the Secretary General of the
       Arbitration Institute of the SCC, expressing disappointment with the Decision of 15
       December and noting that no explanation had been provided for the decision.
       Neither the SCC nor Claimants' comments addressed whether Ms. Margrete
       Stevens of King & Spalding participated in any way in the consultations regarding
       the selection or appointment of Prof. Lebedev. Respondent again protested Prof.



Lebedev's appointment and argued that "*the SCC's own rules do not prescribe a specific time period for filing an Answer and appointing an arbitrator, and the short time given by the SCC was unreasonable and constitutes clear procedural unfairness.*"    Respondent maintained that the necessities of governmental procedures required due consideration in the setting of time limits. Respondent maintained its objections and indicated that it participates in these proceedings in good faith and with full reservation of all of its rights, defenses, and objections.

16.   The Arbitration Institute of the SCC responded by letter dated **29 December 2010** and stated that Ms. Margrete Stevens, a member of the SCC Board, did not take part in the decisions made by the SCC Board on this case.

17.   On **3 January 2011**, Claimants wrote to the Tribunal, indicating that they had no comments to the draft procedural order. They made two comments related to potential jurisdictional objections by Respondent and requested that the Tribunal "*clarify that, in the event Kazakhstan elects to make a jurisdictional objection, 1) it must do so in its Counter-Memorial, and 2) if Kazakhstan submits a reply on its jurisdictional objection in its Rejoinder, Claimants will be entitled to submit a brief rejoinder, on jurisdictional issues only, on 10 May 2012 (i.e., 30 days after receipt of Kazakhstan's Rejoinder).*"

18.   On **3 January 2011**, Respondent submitted comments to the draft procedural order, objecting to calling the second week of the hearing an "*extension.*" In response to Claimants' email of 3 January 2011, Respondent objected to any limitations on its right to assert jurisdictional objections. Respondent also objected to Claimants' request for an additional round of briefing on jurisdictional issues, explaining that Claimants had "*opposed bifurcation and agreed to the briefing schedule discussed at the December 15 meeting, fully aware that Respondent contemplated asserting jurisdictional objections. There is no reason to alter that arrangement.*"

19.   In a second email on **3 January 2011**, Claimants stated that they are merely seeking to ensure that both Parties have an equal opportunity to address jurisdictional objections and indicated that the issue of bifurcation had not been entirely decided at the meeting. Claimants then stated that, since the Tribunal had indicated that there would be no bifurcation, it would be appropriate to address the schedule for jurisdictional submissions.

20.   On **12 January 2011**, the Tribunal issued **Procedural Order No. 1** (PO-1) The operative text is provided below for convenience:

*<u>**Procedural Order (PO) No.1**</u>*
*<u>**Regarding the further procedure**</u>*

*<u>1.     Procedural Meeting Stockholm 15 December 2010</u>*

*The Procedural Meeting was attended by:*

*For Claimants:          Mr. Ken Fleuriet, Esq. (King & Spalding)*



| *For Respondent:* | *Ms. Miriam K. Harwood, Esq. (Curtis, Mallet-Prevost, Colt & Mosle LLP)* |
|---|---|
|  | *Ms. Aizhan Galimovna Irgaliyeva (Deputy Director, Legal Service Department, Ministry of Oil and Gas, Republic of Kazakhstan)* |
| *The Tribunal:* | *David R. Haigh QC*<br>*Prof. Sergei Lebedev*<br>*Prof. Karl-Heinz Böckstiegel (Chairman)* |

## 2.   *Results of Meeting*

2.1.   *This PO records the results of the discussion and agreements reached at the Meeting. A draft of this PO was sent to the Parties after the Meeting inviting comments by 3 January 2011, if a Party considered that a result was not correctly recorded. Taking into account comments received, the Tribunal examined whether any changes seemed appropriate and hereby issues the Order in its final version.*

2.2.   *At the beginning of the Meeting Respondent declared that it maintained its objections raised in its letter of 2 December 2010 regarding the appointment of Prof. Lebedev.*

## 3.   *Communications*

3.1.   *The Tribunal shall address communications to by e-mail to all Counsel of the Parties. In so far as such communications are confirmed by courier, such courier mail will be addressed to the lead counsel indicated by each Party.*

3.2.   *Counsel of the Parties shall address communications directly to each member of the Tribunal (with a copy to counsel for the other Party and to the SCC)*

\*     *by e- mail, to allow direct access during travel,*

\*     *and in addition, longer letters and substantial submissions as well as memorials shall be confirmed either by courier or by fax ( but fax communications shall not exceed 10 pages).*

3.3.   *Deadlines for submissions shall be considered as complied with if the submission is received by the Tribunal and the other Party in electronic form or by courier on the respective date.*

3.4.   *Longer submissions and memorials shall be preceded by a Table of Contents.*

3.5.   *To facilitate word-processing and citations in the deliberations and later decisions of the Tribunal, the e-mail transmission of*



*memorials and substantial or longer submissions shall be in Windows Word, or in a PDF document that can be word-searched and from which text can be copied and pasted into Windows Word.*

3.6.   *To facilitate that parts can be taken out and copies can be made, submissions of all documents including statements of witnesses and experts shall be submitted separated from Memorials, **unbound in A5 size binders** and preceded by a list of such documents, consecutively numbered with consecutive numbering in later submissions (C-1, C-2 etc. for Claimant; R-1, R-2 etc. for Respondents) and with dividers between the documents. In addition, documents shall also be submitted in electronic form on a CD or USB-device (preferably in Windows Word to facilitate word processing and citations).*

### 4.   <u>Particulars Regarding the Procedure</u>

4.1.   *The Procedure shall be in accordance with the SCC Rules of Arbitration in force as from 2010.*

4.2.   *As decided by the SCC Board according to SCC letter of 23 September 2010, the seat of arbitration for this case is Stockholm.*

4.3.   *The language of the arbitral procedure shall be English.*

4.4.   *In view of Art. 37 SCC Rules and in order to avoid the considerable delay caused by bifurcation, the procedure will not be bifurcated. It will deal with any jurisdictional objections, liability and quantum in one procedural phase.*

### 5.   <u>Timetable</u>

5.1.   **By 1 March 2011**, *the Claimant shall submit its Statement of Claim according to Art. 24 SCC Rules together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.2.   **By 1 September 2011**, *the Respondent shall file its Statement of Defence according to Art. 24 SCC Rules, including objections to jurisdiction if any, together with all evidence (documents, witness statements, expert statements) it wishes to rely on in accordance with the sections below.*

5.3.   **By 9 September 2011**, *the Parties may request disclosure of documents from the other Party (with a copy to Tribunal).*

5.4.   **By 23 September 2011**, *the receiving Party either produces the requested documents or replies by a reasoned objection to the other Party (with a copy to Tribunal).*



5.5.   **By 30 September 2011**, the Parties try to agree regarding the documents to which objections have been made.

5.6.   **By 10 October 2011**, insofar as they cannot agree, the Parties may submit reasoned applications in the form of Redfern Schedules to the Tribunal to order production of documents.

5.7.   **By 21 October 2011**, the Tribunal decides on such applications.

5.8.   **By 4 November 2011**, the Parties produce documents as ordered by the Tribunal.

5.9.   **By 16 January 2012**, the Claimant files its Reply Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production above.

5.10.  **By 10 April 2012**, the Respondent files its Rejoinder Memorial with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimant's Reply memorial or regarding new evidence from the procedure for document production above.

5.11.  Should Respondent's submission according to section 5.10. contain further arguments regarding objections to jurisdiction, Claimant may submit a brief Rejoinder on Jurisdiction, but only in rebuttal to these further arguments by Respondent, **by 23 April 2012**.

5.12.  Thereafter, no new evidence may be submitted, unless agreed between the Parties or expressly authorized by the Tribunal.

5.13.  **By 30 April 2012**, the Parties submit

*notifications of the witnesses and experts presented by themselves or by the other Party they wish to examine at the Hearing including any information which witness or expert cannot testify in English,

* and an updated list of all exhibits with indications where the respective documents can be found in the file and an electronic version on a CD or USBB-device of that list hyperlinked to the exhibits.

5.14.  **By 7 May 2012**, a Party may amend its notification of witnesses and experts, if it considers that necessary in view of the notification received from the other Party.



5.15.     *Thereafter, the Tribunal will send the Parties a draft of a Procedural Order regarding further details of the Hearing inviting comments from the Parties.*

5.16.     **Within 3 weeks later,** *at a date set by the Tribunal after consultation of the Parties, a Pre-Hearing Conference by telephone between the Parties and the Tribunal may be held, if considered necessary by the Tribunal.*

5.17.     *As soon as possible thereafter, Tribunal will issue a Procedural Order regarding details of the Hearing.*

5.18.     **Hearing from 23 (afternoon) to 27 July 2012,** *and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from* **30 July to 3 August 2012.**

5.19.     *Towards the end of the Hearing, the Tribunal will consult with the Parties whether the Parties shall submit Post-Hearing Briefs and further details of such briefs.*

## 6.     Evidence

*The Parties and the Tribunal may use, as an additional guideline, the 2010 version of the "IBA Rules on the Taking of Evidence in International Arbitration", always subject to the SCC Rules and changes considered appropriate in this case by the Tribunal.*

## 7.     Documentary Evidence

7.1.     *All documents ( including texts and translations into English of all substantive law provisions, cases and authorities) considered relevant by the Parties shall be submitted with their Briefs, as established in the Timetable.*

7.2.     *All documents shall be submitted in the form established above in the section on communications.*

7.3.     *New factual allegations or evidence shall not be any more permitted after the respective dates for the Rebuttal Briefs indicated in the above Timetable unless agreed between the Parties or expressly authorized by the Tribunal.*

7.4.     *Documents in a language other than English shall be accompanied by a translation into English.*

## 8.     Witness Evidence

8.1.     *Written Witness Statements of all witnesses shall be submitted together with the Briefs mentioned above by the time limits established in the Timetable.*



8.2. *In order to make most efficient use of time at the Hearing, written Witness Statements shall generally be used in lieu of direct oral examination though exceptions may be admitted by the Tribunal. Therefore, insofar as such witnesses are invited by the presenting Party or asked to attend the hearing at the request of the other Party, the available hearing time should mostly be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.*

**9. Expert Evidence**

*Should the Parties wish to present expert testimony, the same procedure would apply as for witnesses.*

**10. Hearing**

*Subject to changes in view of the further procedure up to the Hearing:*

10.1. *The dates of the hearing shall be as given in the Timetable above.*

10.2. *The hearing shall be held in Paris. (See Art. 20(2) SCC Rules) The chairman of the Tribunal will proceed with making appropriate reservations and then inform the Parties regarding further details and steps to be taken.*

10.3. *The Parties may present short opening statements of not more than two hours, unless decided otherwise by the Tribunal after receiving an application in that respect from a Party.*

10.4. *No new documents may be presented at the Hearing unless authorized in advance by the Tribunal. This also applies to documents regarding the credibility of a witness or expert. But demonstrative exhibits may be shown using documents submitted earlier in accordance with the Timetable.*

10.5. *Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest **by 25 April 2012**.*

10.6. *A live **transcript** shall be made of the Hearing. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. **23 May 2012**.*

10.7. *Should the Parties be presenting a witness or expert not testifying in English and thus requiring **interpretation**, they are expected to provide the interpreter unless agreed otherwise. Should more than one witness or expert need interpretation, to avoid the need of*



*double time for successive interpretation, simultaneous interpretation shall be provided. The Parties, who shall share the respective costs, shall try to agree on and make the necessary arrangements in this regard and shall inform the Tribunal accordingly two months before the time set for the Hearing, i.e. 23 May 2012.*

### 11. Extensions of Deadlines and Other Procedural Decisions

*11.1.   Short extensions may be agreed between the Parties as long as they do not affect later dates in the Timetable and the Tribunal is informed before the original date due.*

*11.2.   Extensions of deadlines shall only be granted by the Tribunal on exceptional grounds and provided that a request is submitted immediately after an event has occurred which prevents a Party from complying with the deadline.*

*11.3.   The Tribunal indicated to the Parties, and the Parties took note thereof, that in view of travels and other commitments of the Arbitrators, it might sometimes take a certain period for the Tribunal to respond to submissions of the Parties and decide on them.*

*11.4.   Procedural decisions will be issued by the chairman of the Tribunal after consultation with his co-arbitrators or, in cases of urgency or if a co- arbitrator cannot be reached, by him alone.*

*11.5.   In view of the expected volume and complexity of the file in this procedure, the Tribunal may appoint an Administrative Secretary. The Tribunal will inform the Parties of such an appointment and of the fees of the Secretary. The costs for the Secretary shall be treated as expenses of the arbitration.*

### 12. Other Issues

*At the Meeting, Claimants notified the Respondents and the Tribunal that they may in the future seek interim measures in the event that the Government of Kazakhstan seeks to dispose of some or all of the assets that it has seized and are subject to these proceedings.*

21.   On **18 January 2011**, Respondent requested that the Tribunal "*order Claimants to engage in amicable settlement discussions as required by Article 26 of the ECT, and that the proceedings be suspended during the three—month period in satisfaction of that jurisdictional requirement.*" Respondent argued that the Art. 26 ECT requirement that parties refrain from submitting a dispute to international arbitration unless and until three months have elapsed from the date on which a party requested amicable settlement of the dispute had not been met. Claimants asserted that Respondent breached its obligations on 21 July 2010 – five days before Claimants filed their Request for Arbitration. In addition, Claimants never gave notice that they intended to assert treaty claims under the ECT and this is in



violation of the requirements of the ECT. Claimants' reliance on two letters from 2009 was misplaced and did not satisfy the ECT requirements.

22. On **24 January 2010**, Claimants replied that they have observed the three-month notice period set forth in Art. 26(2) ECT. Claimants reject Respondent's arguments that there was insufficient notice of the dispute, and offered instances where, between 2008 and mid-2010, the Parties attempted to resolve their dispute. Claimants rejected Respondent's reliance on a recent decision, *Murphy Exploration and Production Co. Int'l. v. Republic of Ecuador*, calling it an aberration in terms of the weight of investment treaty case law on this subject. Alternatively, Claimants indicated that, although they would be willing to suspend the arbitration in order to attempt to achieve settlement, they are not willing to delay the merits hearing. Claimants would allow for a sixty-day extension of the proceedings if Respondent were to (1) agree to waive its objections to the notice period and (2) apportion the suspension time equally between the parties, and (3) make a settlement proposal or propose a settlement meeting, in a neutral location, within one week of the letter.

23. On **28 January 2011**, Respondent answered Claimants' letter.

24. The Tribunal responded to the Parties on **1 February 2011**. The Tribunal encouraged the Parties to make a good faith effort to agree on a solution, hopefully maintaining the agreed hearing dates. The Tribunal also indicated its willingness to select a new, later hearing date in October 2012.

25. On **2 February 2011**, Claimants responded to the Tribunal's letter of 1 February, and to Respondent's letters of 18 and 28 January 2011. Maintaining its objections to Respondent's points, Claimants proposed a 90-day suspension of the arbitration and proposed some changes to the submissions schedule, while maintaining the hearing date. Claimants indicated their agreement to this would be subject to Respondent's agreement that it will not use the suspension period to aggravate the dispute and requested a response by 4 February 2011 at 17:00 CET.

26. Respondent replied to Claimants' letter on **6 February 2011**, rejecting Claimants' arguments that there had been notice and that such notice had been sufficient under the ECT. Respondent proposed an alternative time table that would allow for a suspension of the hearing.

27. On **8 February 2011**, Claimants requested that that Tribunal advise the Parties as to its availability for a 2-week hearing in October 2012.

28. On **14 February 2011**, the Arbitration Institute of the SCC wrote to the Tribunal, stating that "*the final award in the above arbitration shall be rendered on 26 April 2011*" and that the Tribunal must request an extension of time for rendering the final award.

29. On **22 February 2011**, the Tribunal, in consultation with the Parties, created a revised time table for the dates in Section 5 of PO-1.

| Procedural Order | Event | Current Schedule | Revised Schedule |
| --- | --- | --- | --- |



| 5.1 | *Statement of Claim* | *March 1, 2011* | *May 16, 2011* |
|-----|----------------------|-----------------|----------------|
| 5.2 | *Statement of Defense* | *September 1, 2011* | *November 16, 2011* |
| 5.3 | *Document Requests* | *September 9, 2011* | *November 28, 2011* |
| 5.4 | *Responses/Objections to Document Requests* | *September 23, 2011* | *December 9, 2011* |
| 5.5 | *Agreement on Documents* | *September 30, 2011* | *December 20, 2011* |
| 5.6 | *Redfern Schedule on Document Objections* | *October 10, 2011* | *December 30, 2011* |
| 5.7 | *Decision on Document Objections* | *October 21, 2011* | *January 10, 2012* |
| 5.8 | *Produce Remaining Documents (if any)* | *November 4, 2011* | *January 23, 2012* |
| 5.9 | *Claimants' Reply* | *January 16, 2012* | *April 2, 2012* |
| 5.10 | *Respondent's Rejoinder* | *April 10, 2012* | *June 26, 2012* |
| 5.11 | *Rejoinder on Jurisdiction (if any)* | *April 23, 2012* | *July 9, 2012* |
| 5.13 | *Pre-Hearing Witness Notifications and Exhibit Lists* | *April 30, 2012* | *July 16, 2012* |
| 5.14 | *Amended Pre-Hearing Witness Notifications* | *May 7, 2012* | *July 23, 2012* |
| 5.16 | *Pre-Hearing Telephone Conference (if necessary)* | *By May 28, 2012* | *By August 13, 2012* |
| 5.18 | *Hearing* | *July 23-27, 2012 July 30-August 3, 2012* | *October 1-5, 8-12, 2012* |

30. In its **Statement of Defence** (R-I), Respondent characterized this as the Tribunal having awarded a stay of proceedings with the intention of providing a window for settlement on 22 February 2011. (R-I ¶ 7.2; C-II ¶ 72).

31. On **4 March 2011**, the Arbitration Institute of the SCC granted the Tribunal an extension until 31 July 2013 render an Award.

32. The Parties met on **10 March 2011** in London for a settlement negotiation. (C-I ¶ 40).

33. On **18 May 2011**, Claimants submitted their **Statement of Claim** (C-I) to the Tribunal.



34. On **16 June 2011**, Respondent retained the law firm Norton Rose to represent it in this dispute, in place of the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP. The SCC reacted on 20 June 2011, sending a *"Power of Attorney"* for Respondent's new counsel.

35. On **29 June 2011**, Respondent returned the completed Power of Attorney forms to the SCC and informed the Tribunal and Claimants that the interests of the Republic of Kazakhstan will be represented by the Norton Rose law firm and by Prof. I. Zenkin, Attorney of Moscow Regional Collegium of Attorneys.

36. On **21 November 2011**, Respondent submitted its **Statement of Defence** to the Tribunal.

37. In a separate writing on **21 November 2011**, Respondent proposed trifurcation of the proceedings.   Respondent argued that the Tribunal's reasons for refusing bifurcation were not compelling and that trifurcation would be necessary to re-balance the time table, especially in light of the size and complexity of the case.

38. On **8 December 2011**, Respondent submitted its **Request for Disclosure of Documents and the Explanatory Note thereto** to the Tribunal.

39. On **8 December 2011**, Claimants submitted their **Request for Production of Documents**. Claimants also requested production of the documents referred to and relied upon in the expert reports, which were not submitted with those reports. Claimants indicated that they would seek an order striking the so-called *"sleeper exhibits"* (witness statements disguised as exhibits) from the record.

40. Claimants produced 30 documents on **15 December 2011** and 14 documents on **22 December 2011**.

41. On **5 January 2012**, Claimants submitted their **Request for Production of Documents** and a cover letter detailing the request and responses to Respondent's production objections to the Tribunal.   Claimants objected to Respondent's provision of so-called *"sleeper"* witness statements.

42. On **5 January 2012**, Respondent submitted its **Redfern Schedule** to the Tribunal.

43. On **5 January 2012**, Claimants submitted their **Redfern Schedule** to the Tribunal, along with lengthy arguments refuting Respondent's position.

44. On **16 January 2012**, Respondent submitted its WORD version of the **Redfern Schedule** to the Tribunal.

45. On **26 January 2012**, the Tribunal proposed the appointment of Katherine Simpson as Administrative Secretary to the Parties and requested their comment by 2 February 2012.

46. On **2 February 2012**, the Tribunal, after consultation with the Parties, appointed Ms. Simpson as Administrative Secretary.



47. The Tribunal issued **Procedural Order No. 2 on Production of Documents** (PO-2) on **3 February 2012**. The operative parts of that PO, but not the attached completed **Redfern Schedules**, is provided below:

*Procedural Order (PO) No. 2*
*On Production of Documents*

*1. Introduction*

*1.1.* *The Tribunal has taken note of the submissions of the Parties regarding document production.*

*1.2.* *The Tribunal recalls Art. 26 SCC Rules regarding evidence.*

*1.3.* *The Tribunal further recalls section 5.6. of PO-1 providing for the submission of Redfern Schedules, and that, by the Chairman's mails of 5 and 12 January 2012, the Tribunal had asked Respondent to submit its Redfern schedule in WORD format so that the Tribunal can insert its decisions. The Tribunal notes that, only on 16 January 2012, Respondent provided such a submission. Due to this delay, the Tribunal could only issue the present decision today.*

*1.4.* *According to section 6 of PO-1, the "IBA Rules on the Taking of Evidence in International Arbitration" can be used as a guideline giving indications regarding the relevant criteria for what documents may be requested and ordered to be produced. The Tribunal will use the IBA Rules (as re-issued 29 May 2010), taking into account the relevant practice of their application in international arbitration. In this context, the Tribunal has taken note of the Parties' submissions regarding the applicable criteria and will take them into account insofar as they are not in conflict to the IBA Rules.*

*1.5.* *The Tribunal recognizes that, on the one hand, ordering the production of documents can be helpful for a party to present its case and in the Tribunal's task of establishing the facts of the case relevant for the issues to be decided. On the other hand, the process of disclosure may be time-consuming, excessively burdensome, and even oppressive. Unless carefully limited, the burden may be disproportionate to the value of the result. Further, the Parties may have a legitimate interest in confidentiality.*

*1.6.* *Further, the Tribunal notes that, insofar as a Party has the burden of proof, it is sufficient for the other Party to deny what the respective Party has alleged and then respond to and rebut the evidence provided by that respective Party to comply with its burden of proof.*

*2. Documents to be produced*

*All documents identified in requests to be "admitted" in the Annexes I and II attached to this Order shall be produced by 17 February 2012 to the other Party in this procedure, but not yet to the Tribunal, subject to the further qualifications and limitations in this Order. The receiving Party may then decide the extent to which it wishes to rely on such documents in*



*its further submissions to the Tribunal and may submit the respective documents with its next Memorial.*

**3.     Qualifications and Limitations of Document Production**

3.1.    *All documents produced under this Order may be utilized by the other Parties only in direct connection with the present arbitration procedure.*

3.2.    *Of the documents ordered by the Tribunal, the following documents or categories of documents **need not be produced, but the reason for the non-production must be identified.** If they:*

> *do not exist or do not yet exist,*
>
> *or are not in the possession, custody or control of a Party,*
>
> *or have already been sent or copied to the requesting Party,*
>
> *or contain commercially sensitive information,*
>
> *or include information regarding third parties for which the ordered Party has an obligation of confidentiality,*
>
> *or are subject to attorney-client privilege under the legal or ethical rules by which Counsel of the Parties are bound in their respective jurisdictions,*
>
> *or which reflect the seeking or rendering of a legal opinion by internal or external counsel.*

3.3.    *If a document or category of documents ordered by the Tribunal only contains some information or sections which do not have to be produced according to Section 3.3 above, the respective document **may be redacted** in such a way that those sections are excluded from the production. **But the reason** for non-production or redaction and the extent of such redaction **must be indicated** in a separate note or in the document.*

3.4.    *"Documents" should be understood to include permanent records in any form, including on paper and electronic.*

**4.     Adverse Inference**

*Insofar as documents ordered are not produced or are not produced as ruled in this Order, the Tribunal may take this into account in its evaluation of the respective factual allegations and evidence and may draw an inference against the Party refusing production.*

**5.     Tribunal's Decisions in attached Redfern Schedules**

*According to Section 2 above, as Annexes I and II, the following Redfern Schedules submitted by the Parties are attached in which the respective decisions of the Tribunal are added in the last column:*



*Claimants' Redfern Schedule dated 5 January 2012,*

*Respondent's Redfern Schedule dated 5 January 2012, but submitted in WORD format on 16 January 2012.*

**6.      Claimants' application dated 5 January 2012 regarding "Sleeper Expert reports and Witness Statements"**

*6.1.      The Tribunal has taken note of Claimants' earlier letter of 8 December 2011 and Claimant's applications in its letter of 5 January 2012, to which Respondent has not yet replied.*

*6.2.      The Tribunal invites both Claimants and Respondent, after having taken note of the Tribunal's decisions on their Redfern schedules, to submit any further comments in this regard by 17 February 2012.*

48.   The Chairman's email of **3 February 2012** is also provided for convenience:

*Dear colleagues,*

*1. Production of Documents*

*Attached please find Procedural Order No.2 (PO-2) together with its two Annexes containing the Tribunal's decisions on the Parties' Redfern Schedules.*

*Since, due to the delayed submission of the WORD version of Respondent's Redfern schedule, PO-2 could not be issued in time, as you see, the production is now ordered to be by 17 February which is the period of two weeks after the Tribunal's decisions originally provided in the agreed revised timetable confirmed by my mail of 2 December 2011.*

*2. New date for Claimant's Reply Memorial*

*In view of the above mentioned delay, the date by which Claimant is to submit its Reply Memorial is now set two weeks later, i.e. 16 April 2012. As, thereafter, Respondent's Rejoinder is only due by 26 June 2012, the remainder of the agreed timetable up to the hearing is maintained without prejudice to the further exchange under section 3 hereafter.*

*3. Respondent's Procedural Applications dated 21 November 2011*

*After the decisions on document disclosure have now been issued, Claimants are hereby invited to comment by 17 February 2012 on Respondent's procedural applications submitted by letter of 21 November 2011.*

*4. Communications to Tribunal's Administrative Secretary*

*In follow-up to my mail of 26 January 2012, the Parties are from now on invited to send copies of all electronic and hard copy communications, in*



*addition to each member of the Tribunal, also to the Administrative Secretary:*

*Katherine Simpson*
*Graeffstr. 1*
*Zi. 1908*
*50823 Köln*
*Germany*
*Ksimpson.llm@hotmail.com*

**5.  Correct Address of Prof. Lebedev**

*As communications to Co-Arbitrator Prof. Lebedev have been sent to different addresses, the Parties are invited to submit further communications only to his following address:*

*Moscow 129626, Staroalexeevskaya 16/49.*

49.  On **7 February 2012**, the SCC confirmed the appointment of Ms. Simpson.

50.  On **16 February 2012**, Claimants wrote to Respondent, requesting the production of the documents and data referred to and relied upon by its party-appointed experts, Deloitte and GCA.

51.  On **17 February 2012**, Claimants wrote to Respondent in response to PO-2. Claimants would provide Respondent's counsel 285 documents, in addition to those produced on 15 and 22 December 2011.  Claimants indicated reasons for non-production of some of the requested documents.

52.  On **17 February 2012**, Claimants requested that the Tribunal:

   •   *Order Kazakhstan to produce immediately all materials upon which Deloitte and GCA relied when preparing their expert reports;*

   •   *Clarify its decision with respect to Kazakhstan's "sleeper" expert reports and witness statements to the extent necessary;*

   •   *Order Kazakhstan to identify immediately all of the individuals who authored the twenty "sleeper" expert reports and witness statements;*

   •   *Reject Kazakhstan's application to trifurcate this proceeding;*

   •   *Reject Kazakhstan's request to "rebalance" the procedural calendar; and*

   •   *Reject Kazakhstan's request to extend the currently-scheduled 10 day hearing to 22 days in length.*

53.  On **21 February 2012**, Claimants requested that the Tribunal instruct Respondent to comply with its document production obligations, or suffer the consequences of its failure to comply with the Tribunal's document production decision.



54. On **22 February 2012**, the Tribunal invited the Parties to submit any comments to the other's submissions of 16 and 17 February by 12 March 2012.

55. On **12 March 2012**, Claimants wrote in response to the Tribunal's 22 February 2012 request for additional comments, reiterating its earlier arguments and urging the Tribunal not to allow Respondent to benefit from its obstructionism, while protecting Claimants' right to a fair hearing.

56. On **24 March 2012**, the Tribunal issued Procedural Order No. 3 (PO-3). The entire text of PO-3 is set out below:

### Procedural Order (PO) No. 3

#### I. Introduction

*1.1.* *The Tribunal has taken note of the recent submissions of the Parties regarding document production and regarding the further procedure. Since the Parties had the opportunity to file two rounds of submissions and since the arguments put forward in these submissions are well known to the Parties, the Tribunal sees no need to repeat the many arguments of the Parties.*

*1.2.* *Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

#### 2. Document Production

*2.1.* *The earlier rulings of the Tribunal, particularly in PO-2, its Annexes, and the Chairman's letter of 3 February 2012, are maintained and are hereby confirmed.*

*2.2.* *Due to a clerical error, Claimant's Request no. 48 in Annex 1 of PO-2 was not decided. It is now decided as follows:*

   *"Admitted in so far as documents are referenced or relied upon in Exhibit R-118."*

*2.3.* *Regarding supporting documents to the reports by Deloitte, GCA, and Neftegazconsult, as well as to other reports submitted by Claimants and Respondent, it is confirmed that these have to be produced now, in so far as they have not yet been produced. If a Party chooses not to produce them, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*

*2.4.* *Regarding what the Claimants refer to as "Sleeper" reports and statements, the Tribunal has already admitted the respective requests by Claimants in Annex 1 to PO-2, as explained in the last paragraph on the title page of Annex 1 to PO-2. It is clarified that the required disclosure includes the identification of the authors of such documents. And, it is confirmed that, if Respondent chooses not to produce, this will have the consequences mentioned in Section 4 of PO-2 and in the last paragraph on the title page of Annex 1 to PO-2.*



2.5.    *Insofar as the Parties in view of PO-2, in view of their further submissions
        thereafter regarding their own or the othe rParty's production up to now,
        and in view of the above clarifications in this PO, choose to still produce
        documents, they shall do so by **2 April 2012** in order to provide for the next
        procedural step according to the agreed timetable, i.e. to enable Claimant
        to take such documents into account in its Reply Memorial now due by 16
        April 2012 according to my letter of 3 February 2012. Otherwise it will be
        assumed that the Party has chosen not to produce with the consequences
        mentioned above.*

2.6.    *Finally, the Tribunal confirms that it is left to each Party whether or not it
        will produce documents. However the Tribunal stresses, that both the
        Parties and the Tribunal have an interest that all relevant evidence is
        available for an orderly discussion and for decisions by the Tribunal and
        also an interest that neither non-production leads to adverse inferences
        nor that submitted evidence may be considered of little or even no
        evidentiary value due to non-production of supporting documents or
        information.*

### 3.      **Further Procedure**

3.1.    *Regarding the **further procedure**, the Tribunal recalls Section 2.1 of PO-1:*

        *2.1.    This PO records the results of the discussion and agreements
        reached at the Meeting. A draft of this PO was sent to the Parties after the
        Meeting inviting comments by 3 January 2011, if a Party considered that a
        result was not correctly recorded. Taking into account comments received,
        the Tribunal examined whether any changes seemed appropriate and
        hereby issues the Order in its final version.*

3.2.    *The Tribunal notes that Respondent is well acquainted with international
        arbitration procedures from other earlier cases and was represented at the
        Stockholm meeting by counsel also regularly active in this field.*

3.3.    *It is further recalled that, in February 2011, the Parties submitted a joint
        proposal for a new timetable, which the Tribunal accepted by the
        Chairman's letter of 22 February 2011.*

3.4.    *The Tribunal considers that changing the agreed and so far implemented
        procedure at the present stage would considerably disrupt the procedure
        and would only be acceptable for mandatory and urgent reasons. The
        Tribunal does not see any such reasons in the present case.*

3.5.    *Therefore, the procedure shall proceed as established in PO-1 and later
        rulings of the Tribunal slightly adapting the timetable.*

3.6.    *According to the agreement recorded in Sections 4.3 and 7.4 of PO-1,
        English will remain the **language of this procedure**. However, while
        accordingly, the hearing shall also be conducted in English, the Parties
        may make arrangements at the hearing for simultaneous interpretation to
        Russian. Anyhow, if witnesses or experts are examined at the hearing who
        do not testify in English, such arrangement will have to be made by the*



Parties in accordance with Section 10.7 of PO-1. Therefore, it is suggested that the Parties when they contact the ICC Hearing Centre in accordance with the Chairman's mail of 4 April 2011 regarding the logistics of the hearing (it is suggested that they do so soon), they also request to use the logistics for simultaneous interpretation which are available at the Centre.

3.7.    Regarding the **length of the hearing**, the Tribunal recalls the agreement recorded in section 6.18 o fPo-1 which, taking into account the dates of the jointly proposed and accepted new timetable provides for the Hearing to be held from 1 to 5 October 2012, and, if found necessary by the Tribunal after consultation with the Parties, extended to continue from 8 to 12 October 2012.

3.8.    Further, the Tribunal recalls the agreement recorded in Section 10.5 of PO-1:

Taking into account the time available during the period provided for the Hearing in the Timetable, the Tribunal intends to establish equal maximum time periods both for the Claimants and for the Respondent which the Parties shall have available. Changes to that principle may be applied for at the latest by 25 April 2012.

3.9.    To clarify the intention of the Tribunal regarding the conduct of the hearing, though further details will have to be determined later according to Section 5.17 of PO-1 after consultation with the Parties, the Tribunal already now informs the Parties that it intends to include the following rulings, which have proved to be efficient and acceptable to the parties in similar cases:

A.    In order to make most efficient use of time at the Hearing, written Witness Statements or Expert Reports shall generally be used in lieu of direct oral examination though exceptions    may    be admitted by the Tribunal. Therefore, insofar as, at the Hearing, such witnesses or experts are invited by the presenting Party or asked to attend at the request of the other Party, the presenting Party may introduce the witness or expert for up to 10 minutes and add direct examination on issues, if any, which have occurred after the last written statement or report of the witness or expert has been submitted. The remaining hearing time shall be reserved for cross-examination and re-direct examination, as well as for questions by the Arbitrators.

B.    The following Agenda is intended to be established for the Hearing:

1.    Introduction by the Chairman of the Tribunal.

2.    Opening Statements of not more than total of two hours for each Party

First on jurisdiction



a) *Respondent up to 30 minutes*

b) *Claimants up to 30 minutes*

*Second on all other issues including the Merits*

a) *Claimants up to 90 minutes*

b) *Respondent up to 30 minutes*

3. *Unless otherwise agreed by the Parties: Examination of Claimants' fact witnesses:*

a) *Affirmation of witness to tell the truth.*

b) *Short introduction by Claimants*

c) *Cross-examination by Respondent.*

d) *Re-direct examination by Claimants, but only on issues raised in cross-examination.*

e) *Re-cross examination by Respondent but only on issues raised in re-direct examination.*

f) *Remaining questions by members of the Tribunal, but they may raise questions at any time.*

4. *Examination of Respondent's fact witnesses. For each: vice versa as under 3.a) to f) above.*

5. *Examination of experts as under 3.a) to f) above.*

6. *Any witness or expert may only be recalled for rebuttal examination by a Party or the members of the Tribunal, if such intention is announced in time to assure the availability of the witness and expert during the time of the Hearing.*

7. *Oral closing arguments of up to 2 hours (or longer if authorized by the Tribunal after consultation with the Parties during the hearing) each for the*

a) *Claimants,*

b) *Respondent.*

8. *Remaining questions by the members of the Tribunal, if any.*

9. *Discussion regarding the timing and details of post-hearing submissions and other procedural issues.*

3.10. *Taking into account the above rulings and intended conduct of the hearing, and also taking into account, from the submissions already received, the*



> *volume and complexity of the issues to be dealt with at the hearing, the Tribunal concludes that the period blocked for the hearing in accordance with the agreed timetable is sufficient.*

> 4.     *Beyond the above observations and rulings, the Tribunal does not consider any action necessary from its side.*

57.    On **2 April 2012**, Respondent confirmed that it had sent Claimants approximately 32,000 pages of requested documents. Respondent also contacted the ICC Hearing Center. Finally, Respondent stated that the time period for the oral hearing on jurisdictional matters is not sufficient and proposed devoting the period from 1 – 5 October to jurisdictional matters.

58.    On **4 April 2012**, Claimants requested an extension of six weeks for the preparation of their Reply, since that amount of time would be necessary to translate and read the 32,000 pages of documents sent by Respondent – sent 14 days prior to Claimants' deadline to submit the Reply.

59.    On **10 April 2012**, the Tribunal wrote to the Arbitration Institute of the SCC. In light of changes in the case, it became necessary for the Tribunal to ask that its fees and the Security for Expenses be doubled.

60.    On **11 April 2012**, Respondent wrote to the Tribunal, objecting to Claimants' requests for extensions of time unless the same time period would be granted for Respondent's Rejoinder.

61.    On **21 April 2012**, the Tribunal circulated a draft of Procedural Order No. 4 (PO-4) to the Parties for their review and comment by 30 April 2012.

62.    On **23 April 2012**, the Arbitration Institute of the SCC forwarded the Parties the Tribunal's letter of 10 April 2012 and requested their response by 30 April 2012.

63.    On **24 April 2012**, Claimants provided their comments to draft PO-4. Claimants objected to moving the hearing date and proposed alternatives.

64.    On **4 May 2012**, the Tribunal issued **Procedural Order No. 4** to the Parties. The entire text is provided below, for ease of reference:

### *Procedural Order (PO) No.4*

*A draft of this PO was sent to the Parties for comments by 30 April 2012. Taking into account the comments received from the Parties, the Tribunal now issues the PO in its final form.*

#### *1.     Introduction*

> 1.1.    *The Tribunal has taken note of Claimants' Application of 4 April and letter of 24 April 2012 and of Respondent's comments of 11 April and letters of 30 April 2012, both with attachments and proposals for a new timetable. Since the arguments put forward in*



*these submissions are well-known to the Parties, the Tribunal sees no need to repeat them here.*

1.2. *Taking into account all the arguments presented by the Parties, the Tribunal comes to the following observations and conclusions.*

2. **Relevant aspects of the procedure up to now**

2.1. *The Tribunal recalls **Procedural Order No.3 (PO-3)**, particularly its Section 3. The respective rulings are confirmed, subject to changes hereafter in this PO.*

2.2. *The Tribunal notes that both Parties now agree that the timetable as confirmed by PO-3 should be changed. But they disagree in which way it should be changed.*

2.3. *The Tribunal recalls the second introductory paragraph of Annex I to PO-2 dated 3 February 2012:*

*Further, the Tribunal clarifies that, in so far as Respondent has submitted exhibits, in particular statements and reports (which Claimants refer to as "Sleeper" Reports and Statements), the Tribunal has admitted Claimants' requests that documents on which such exhibits rely, etc., shall be produced. However, if Respondent chooses not to produce such documents, this will be taken into account by the Tribunal regarding the evidentiary value of such exhibits. The same may apply, if persons who have produced such exhibits and who are called for cross-examination by Claimants, do not appear at the hearing for cross examination.*

2.4. *In their submissions dated 17 and 21 February 2012, Claimants identified and listed a number of such documents alleging that they had not been produced by Respondent and requested (pages 11 and 12 of the letter of 17 February 2012) that the Tribunal order Respondent to produce them "immediately."*

2.5. *The Tribunal understands that, rather than relying on the Tribunal's reaction concerning ordered but not produced documents identified in the paragraph quoted above from Annex I, Claimants considered the disclosure of these documents so essential for their Reply Memorial that they insisted on their production.*

2.6. *Taking into account Claimants' submissions and Respondent's further submissions, in Section 2 of PO-3, the Tribunal provided further clarifications and a further opportunity to the Parties to produce further documents by the new deadline of 2 April 2012.*

2.7. *By that date of 2 April 2012, Respondent submitted its letter of that date announcing the disclosure of a great number of documents which seem to include all those requested by Claimants.*



2.8.    By letter of 4 April 2012, Claimants submitted that they could not address this volume of documents now disclosed by Respondent by the deadline of 16 April set for their Reply Memorial. Therefore, they proposed a new timetable.

2.9.    By letter of 11 April 2012, Respondent submitted comments on Claimants' letter. Particularly, Respondent listed a number of documents which it alleged Claimants should have disclosed according to PO-3 and proposed a new timetable different from that proposed by Claimants.

2.10.   By letter of 24 April 2012, Claimants submitted comments on the draft PO and, particularly, declared themselves ready to submit their Reply Memorial on Jurisdiction and Liability by 7 May and their Reply Memorial on Quantum by 28 May 2012. On that basis, Claimants suggested new alternative timetables.

2.11.   By letters of 30 April 2012, Respondent submitted letters and appended comments on the draft PO-4 and on Claimants' letter of 24 April 2012.

### 3.    *The Tribunal's Conclusions*

3.1.    The Tribunal understands that the Parties prefer to have as many relevant documents as possible available for their final Memorials before the hearing on the merits.

3.2.    The Tribunal also feels that every effort should be made to have all relevant documentation on file in order to fully evaluate the Parties' submissions and evidence.

3.3.    The Tribunal agrees with the Parties that, therefore, the timetable should be changed. The Tribunal recalls that, in its draft PO-4, it already asked for the Parties' views regarding a bifurcation with an early hearing on jurisdiction. The Tribunal notes that both the Claimants (in their Alternative 2) and the Respondent now accept bifurcation, though they do not agree on its scope.

3.4.    Since the great majority of the large volume of documents which Respondent should have produced by 17 February 2012 according to the second introductory paragraph of Annex I to PO-2, but were produced only by 2 April 2012, concerns the quantum of the claims, the Tribunal finds that bifurcating the procedure into a first phase on jurisdiction and liability and a second phase on quantum, is the relatively best solution in order to avoid undue delay for the entire procedure under the present circumstances.

3.5.    In this context, the Tribunal finds it helpful that Claimants now accept 7 May 2012 as an earlier deadline for their Reply Memorial on jurisdiction and liability, and still the originally suggested



deadline of 28 May 2012 for their Reply Memorial on quantum, and also foregoes its Rejoinder on Jurisdiction. Insofar as, from the list of allegedly missing documents according to Respondent's letter of 11 April 2012, Claimants are ready to submit such documents, they should at the latest be submitted with these Memorials.

3.6.    While the Tribunal agreed with Respondent that the deadline originally suggested by Claimants for Respondent's Rejoinder Memorial, i.e. 6 August 2012, was not sufficient, bifurcation would allow different deadlines for Respondent's two Rejoinder Memorials in the two phases. Since Claimants' Reply Memorial on Jurisdiction and Liability can now be submitted **by 7 May 2012**, the Tribunal considers that Respondent can now be expected to submit its Rejoinder Memorial restricted to jurisdiction and liability **by 26 July 2012**.

3.7.    Thereafter, as Claimants have forgone their right to submit a Rejoinder on Jurisdiction, there will be sufficient time for the further procedural steps up to a hearing starting at the originally agreed date of 1 October 2012, but restricted to jurisdiction and liability.

3.8.    Regarding the procedure on quantum, a separate timetable could, thus, be set up leading to a shorter hearing on quantum only at a later time.

## 4.    New Timetable

4.1.    Taking into account its above conclusions, the Tribunal hereby sets the following new **Timetable** for the further procedure using and adapting the originally agreed procedural steps in Sections 5.9 to 5.19 of PO-1.

4.2.    **By 7 May 2012**, the Claimants file their Reply Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.

4.3.    **By 28 May 2012**, the Claimants file their Reply Memorial on quantum with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Respondent's Statement of Defence or regarding new evidence from the procedure for document production.

4.4.    **By 26 July 2012**, the Respondent files its Rejoinder Memorial on jurisdiction and liability with any further evidence (documents, witness statements, expert statements), but only in rebuttal to Claimants' Reply Memorial or regarding new evidence from the procedure for document production.

