205. Claimant Anatolie Stati is a natural citizen of Moldova and Romania who has invested in Turkmenistan since 1995. Based on his testimony and the testimony of Prof. Olcott at the Hearing on Jurisdiction and Liability, Respondent argues that Anatolie Stati was a "*novice*" in the oil and gas industry when he entered Kazakhstan. Respondent presents a history of the Stati family's involvement in Moldova's politics, as well as in the politics and businesses of other states. Claimants and Respondent agree that Anatolie Stati is not a political opponent of President Nazarbayev. (C-0 ¶ 10; C-II ¶ 79; R-II ¶¶ 24 – 33, 38 – 39, 267; RPHB 1 ¶¶ 21, 118).

206. Claimant Gabriel Stati is a natural citizen of Moldova and Romania and is the son of Anatolie Stati. (C-0 ¶ 11; C-II ¶¶ 79 - 80).

207. Claimant Ascom Group S.A. is a joint stock company incorporated under the laws of Moldova, with headquarters in Moldova. Ascom's operational subsidiaries were located in Kazakhstan. The Parties dispute whether Anatolie Stati owned 100% of Ascom, which owned 100% of KPM or that Ascom has substantial business activities in or is controlled from Moldova. Respondent argued that Anatolie Stati is Ascom's 100% shareholder. (C-0 ¶ 12; C-II ¶¶ 85, 86, 95, 128; R-II ¶¶ 51 – 54; RPHB 1 ¶ 124).

208. Claimant Terra Raf Trans Traiding Ltd. is a limited liability company incorporated under the laws of Gibraltar. (C-0 ¶ 13; C-II ¶ 96, 129; R-I ¶ 9.81, 14.9).

209. Respondent states that Tristan Oil Ltd. ("*Tristan*") is an affiliate of KPM and TNG and is 100 % owned by Anatolie Stati. Tristan was created as a special purpose vehicle with the purpose of issuing notes. (R-II ¶ 728).

210. Mr. Lungu is the Executive Vice President and CFO of Tristan and the Commercial Vice President of Ascom. (RPHB 1 ¶ 138).

211. TNG is a Kazakh company that owned the subsoil use rights to the Tolkyn field and the Tabyl Block pursuant to Contracts 210 and 302 on Exploration and Extraction of Hydrocarbons at the "*Tolkyn*" deposit and the Tabyl Block (Mangystau Oblast), executed between the Agency of the Republic of Kazakhstan on Investments and TNG, and dated 12 August and 31 July 1998, respectively. Contract Nos. 210 and 302 were issued pursuant to the Licenses for the right to explore and/or exploit the hydrocarbons, Series MG No. 242-D (oil) and MG No. 243-D (oil), both dated 4 December 1997 and issued by the Government. (C-0 ¶ 18, partially quoted, citations omitted; C-I ¶¶ 3, 47; R-I ¶ 13.55).

212. KPM owned the subsoil use rights to the Borankol field pursuant to Contract 305 on Exploration and Extraction of Hydrocarbons at the "*Borankol*" deposit (Mangystau Oblast), executed between the Agency of the Republic of Kazakhstan on Investments and KPM, and dated 30 March 1999. Contract 305 was issued pursuant to the license for the right to use subsoil, Series MG No. 309-D (oil) dated 23 May 1997, issued by the Government to KPM. (C-0 ¶ 16, quoted, citations omitted; C-I ¶¶ 3, 42; R-I ¶ 13.2).



213. Over 90% of KPM's and TNG's work force was comprised of local Kazakh citizens, nearly 1,000 of which were employed on a permanent basis. (CPHB 1 ¶ 123).

214. Respondent considers KMG to be two separate, distinct entities: KazMunaiGaz Exploration Production (KMG EP) and KazMunaiGaz National Company (KMG NC). Respondent explains that KMG EP is not a state entity, but is a commercial entity listed on the London Stock Exchange and the Kazakhstan Stock Exchange. KMG NC is a state entity that considers the social and economic implications of an acquisition to the Republic as a whole. (R-II ¶ 350 – 351; RPHB 2 ¶ 10).

215. Mr. Timur Kulibayev is President Nazarbayev's son-in-law and the Chairman of KMG NC, but not of KMG EP. (C-I ¶ 189, R-II ¶ 352).

### F.II. Timeline of Events

216. As will be seen later in this Award, in the present dispute the timeline of events is of particular importance to the considerations and conclusions by the Tribunal. It is, therefore, provided in much greater detail than would normally be necessary. The following timeline records events mentioned by the Parties in their submissions, without prejudice to the relevance the Tribunal may attach to each item.

217. The Borankol structure was discovered in 1959, with test drilling finalized in 1973. The Tolkyn field structure was discovered in 1992 (C-I ¶¶ 42, 46).

218. KPM was established as a closed JSC joint venture / non-commercial organization on 24 March 1997. The companies Polmak Sondazh Sanaii A.Şh. (from the Republic of Turkey) and CJSC Joint Kazakh-Estonian-Irish Company Aksai were the founders and equal 50% owners of the company. (R-I ¶¶ 13.1 – 13.3).

219. On 27 January 1999, Promtorgbank JSC Industrial and Trade Bank transferred 800 TNG shares to Kainar LTD. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

220. On 29 March 1999, Shagyrly-Shomyshty LLP transferred 1000 TNG shares to Kainar LTD. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

221. Claimants began investigating investment opportunities in Kazakhstan in 1999. (C-I ¶ 42).

222. On 18/19 November 1999, KPM submitted a request to the Agency of the Republic of Kazakhstan on Investment for consent to Ascom Group's acquisition of a 62% share of KPM. (C-I ¶ 45; C-II ¶¶ 169, 165; RPHB 2 ¶ 275).

223. On 9 December 1999, Ascom purchased the 62% share in KPM. Respondent disputes the legality of this purchase. (R-II ¶ 117).



224. On 13 December 1999, KPM was reorganized from a non-commercial to a commercial organization. Claimants dispute this and state that KPM was always a commercial entity. They suggest that the change could have been to remedy a registration error by the Republic. (R-I ¶ 13.12; C-II ¶ 155).

225. On 24 January 2000, KPM obtained a national identification number with respect to the initial issuance of its shares. (C-II ¶ 149).

226. Claimants' interest in TNG and the TNG Subsoil Use Contracts began with Ascom's acquisition of a 75% interest on 17 May 2000. Claimants requested and received consent for the transfer. The State believed its pre-emptive rights were inapplicable to the transfer. (C-0 ¶ 19).

227. Respondent acknowledges that, in relation to the TNG shares, Claimants have produced evidence of certain payments being made by Ascom to Kaihar TOO in the amounts of USD 421,000 and USD 1,137,000 at the time of the acquisition on 30 May 2000, but notes that this investment was made by Ascom and not Terra Raf. Respondent states that the formal shares themselves were purchased for USD 189,185 on 16 January 2009. Respondent states that this discrepancy has not been explained by Claimants. (R-I ¶ 14.3 (stating that the amount was USD 190,000); R-II ¶ 118).

228. On 30 May 2000, Kainar LTD transferred 3050 TNG shares to Ascom S.A. As a result, a controlling stake was acquired and permission for the transfer was required. Respondent never gave permission. (RPHB 2 ¶ 273 citing R-18).

229. As of July 2000, Claimants were the operators for both the Borankol and Tolkyn fields. (C-I ¶ 49).

230. The MEMR was created on 13 December 2000. (C-II ¶ 167).

231. KazRosGas LLP was created in 2001 pursuant to an agreement between the governments of Kazakhstan and Russia. It was designated as the single operator to buy, sell, and market Kazakhstan's export gas. Gazprom owns 50% of KasRosGas. Domestic producers that wish to export gas must contract with Gazprom. (R-I ¶ 49.13; R-III ¶¶ 253 - 262).

232. In 2001, NIPI Neftegaz issued the Borankol Raw Materials Base Project, a design of KPM's gathering and treatment facility as a single technological process. (CPHB 2 ¶ 74; RPHB 2 ¶ 204).

233. On 25 April 2001, State Expert Review of Projects approved construction of KPM's pipelines, including the 18 km pipeline that is at issue. (CPHB 2 ¶ 74).

234. On 4 March 2002, the State Inspection for Emergency Situations, the Fire Safety Supervising Agency, the State Sanitary Surveillance Department, the Ministry of Environmental Protection for the Mangystau Region, the State Inspection for Architecture and Construction, and NIPI Neftegaz approved the commissioning of KPM's 18-kilometer pipeline. No mention was ever made of that pipeline being a trunk pipeline. (C-II ¶ 272; CPHB 2 ¶ 74; RPHB 2 ¶ 214).



235. On 13 March 2002, Ascom transferred its 75% interest in TNG to its subsidiary, Gheso S.A. ("*Gheso*"). (C-0 ¶ 19; C-I ¶¶ 50, 140 et seq.) Claimants did not obtain consent from either the Government or MEMR for this transfer. (R-I ¶ 13.28; R-II ¶ 158; RPHB 2 ¶ 273).

236. On 30 April 2002, Kainar LTD transferred 950 shares of TNG to Gheso. Claimants state that they received consent, and provide the Tribunal with Exhibit C-134, which Claimants say TNG received from the MEMR, granting permission for the share transfer. (C-II ¶ 168). In response, Respondent states that consent should never have been granted without a waiver of the Republic's pre-emptive right and that Exhibit C-134 cannot be deemed as consent by the appropriate body, as Claimants allege. (R-I ¶ 13.28, RPHB ¶ 273).

237. On 3 May 2002, Production-Commercial Firm Bobro and Anavi respectively transferred 100 and 200 TNG shares to Gheso, resulting in Gheso becoming the 100% owner of TNG. Respondent states that Claimants did not obtain consent from either the Government or MEMR for these transfers. (R-I ¶ 13.28).

238. In September 2002, KPM and TNG applied to the MEMR for licenses covering its new gathering system. On 26 September 2002, MEMR issued the requisite licenses to KPM and TNG for their production, treatment, and transportation activities. (C-I ¶ 83; C-II ¶ 274; CPHB 2 ¶ 74).

239. On 12 May 2003, Gheso transferred its 100% interest in TNG to Terra Raf. (C-0 ¶ 20; C-I ¶ 50; CPHB 2 ¶ 117). Respondent states that Claimants did not obtain consent for this transfer. (R-I ¶¶ 13.28 – 13.29).

240. Claimants state that the transfer was complete on 28 May 2003 when TNG's share registrar, Zerde, registered the Gheso-Terra Raf share transfer. (CPHB 2 ¶ 117). Respondent disagrees – a transfer cannot be validly registered under Kazakh law without consent being obtained under Art. 53(1). (RPHB 2 ¶ 273).

241. Starting in 2004, Claimants conducted the initial seismic work on the Contract 302 properties. (C-I ¶ 66).

242. In 2004, Claimants had discussion with GazImpex, a gas-exporting company which Claimants allege is controlled by Mr. Kulibayev, about the sale of a 35% stake in TNG. The parties were never able to reach agreement because Claimants valued TNG at USD 567 million, while GazImpex valued it at USD 27.8 – 32.9 million. (C-II ¶ 375). Respondent states that Claimants have failed to prove that Mr. Kulibayev owned or controlled GazImpex and argue that these negotiations are irrelevant to this arbitration. (R-II ¶¶ 341 – 344).

243. Respondent states that Claimants have produced a document identified as C-514, dated 15 September 2004, which expressly refers to Ascom being the owner of TNG as of that date. Claimants provide no explanation of how this could be the case, given that by this point, Terra Raf had acquired TNG from Gheso. Respondent states that, according to Claimants at C-I ¶ 50, the last time Ascom owned TNG was in 2002. (R-II ¶ 173).



244. In November 2004, Ascom acquired the remaining 38% interest in KPM. Respondent acknowledges that Claimants have provided evidence of USD 9 million having been provided by Ascom and Terra Raf for this purchase. (C-I ¶ 45; C-II ¶ 184; R-II ¶ 117).

245. On 1 December 2004, Kazakhstan passed a law giving the State a pre-emptive right over certain transfers of subsoil users. (CPHB 2 ¶ 117).

246. The 8 December 2004 enactment of Law No. 2-III, which amended Art. 71 of the 1996 Subsoil Use Law, gave Kazakhstan a pre-emptive right to acquire shares in subsoil users. (C-II ¶ 184).

247. In May 2005, KPM was reorganized from an OJSC to a LLP. Claimants state that the Government approved of this change by letter. (C-I ¶¶ 45, 51).

248. On 16 May 2005, Terra Raf reorganized TNG from an OJSC to a LLP. Claimants notified MEMR of this reorganization, and the change from TNG OJSC to TNG LLP was memorialized in the State-executed 2006 Supplements to the TNG Subsoil Use Contracts. (C-0 ¶ 20; C-I ¶ 50; CPHB 2 ¶ 117). Respondent states that when TNG was reorganized from an OJSC to a LLP in 2005, there was an error: Terra Raf never was a lawful shareholder of TNG and could not carry out its reorganization from an OJSC to a LLP. (R-I ¶¶ 13.32; 13.45).

249. After the alleged reorganizations, KPM and TNG applied to re-license their pipelines. MEMR re-issued licenses on 5 August 2005. (C-I ¶ 82; C-II ¶ 274; CPHB 2 ¶ 74).

250. In 2006, TNG contracted with Vitol to construct and operate the LPG Plant. The Parties dispute the amounts invested. (C-I ¶¶ 62, 64; R-II ¶ 123).

251. In May 2006, Claimants halted construction on the LPG Plant for financial reasons. (C-I ¶ 64).

252. On 31 July 2006, the exploration period for Contract 302 was extended. Flooding in the Caspian Sea basin, however, suspended exploration work for two years and eight months. The MEMR extended the exploration period until 30 March 2009, without counting this *force majeure* against the two permissible contractual extensions. (C-I ¶ 47; R-I ¶ 14.20).

253. On 19 October 2006, the State asked TNG whether Ascom had transferred any of its interest in TNG during the period of 1 December 2004 to 19 October 2006. TNG replied that Terra Raf was the sole interest holder in TNG since May 2003. (C-0 ¶ 21; C-I ¶ 143; CPHB 2 ¶ 117).

254. In 2006, Claimants began the "*Bonds Project*", under which Tristan Oil (a company under the control of Claimants), issued 3 tranches of bonds with maturity of 1 January 2012, for a total amount of USD 531 million. The bonds were issued at the EURO MTF Market of the Luxembourg Stock Exchange and were guaranteed by KPM and TNG. The charter capital of each company at the date of issuance of guarantees amounted to USD 50,000, *i.e.* 0.018% of the par bond issue. (R-I ¶¶ 9.59 – 9.62).



255. The first tranche of the Bonds Project was issued on 20 December 2006. (R-I ¶ 9.59).

256. On 11 January 2007, Kazakhstan adopted a new Law on Licensing, pursuant to which the MEMR would remain the licensing authority for production activities and operation of pipelines other than "*main*" or "*trunk*" pipelines. (C-II ¶ 275; CPHB 2 ¶ 74). Since the Parties have used the terms "*main*" and "*trunk*" pipelines interchangeably, so too shall this Award.

257. In early 2007, Kazakhstan approached Claimants with a proposal for the provision of gas to KazAzot as part of a project of national priority to allow the Republic to develop an Ammonia-Carbamide project, which required a secure gas supply. (C-I ¶ 58; R-I ¶ 15.5 et seq.). Claimants state that they agreed to provide specific volumes of gas to KazAzot, provided that Claimants would be allowed to export specific volumes of gas at international market prices. (C-I ¶ 58).

258. On 13 February 2007, Respondent notified Claimants that they had failed to obtain consent for the 2003 transfer of Gheso's 100% interest in TNG to Terra Raf and that Claimants had not notified the Republic that Ascom's shares had been transferred to Gheso. Respondent notified Claimants that they had failed to give the Republic the opportunity to exercise its pre-emptive right to purchase TNG. (R-I ¶ 13.47; RPHB 2 ¶ 277). Respondent requested that TNG apply for retroactive permission for the 2003 transfer and TNG complied. (C-I ¶ 143; CPHB 2 ¶ 117). Claimants state that MEMR also notified Claimants that the transfer had been proper and the pre-emptive right was not applicable. (CPHB 2 ¶ 117).

259. On 19 February 2007, TNG informed the MEMR that the Republic's pre-emptive right did not apply in February 2007. (RPHB 2 ¶ 277).

260. On 21 February 2007, Terra Raf noted KazRosGas's interest in acquiring a stake in TNG, and asked KazRosGas to send a written offer. (C-II ¶ 376). Respondent states that this is irrelevant to this arbitration, and there is no link to the Republic. Likewise, Claimants have not proven that Mr. Kulibayev controls this company. (R-II ¶¶ 341, 345).

261. On 7 May 2007, Claimants, the MEMR, the Governor of the Mangystau Region, the operator of the main gas pipeline KazTransGas (a subsidiary of the national oil company KMG), and the owner KazAzot agreed to enter into gas supply and transport arrangements and signed a Memorandum of Understanding. Pursuant to these arrangements, Claimants would sell certain volumes of gas at a price substantially above the discounted prices to KazAzot (first at near-market prices, then at the international market price after two years), and TNG, through KazTransGas, would be allowed to export certain volumes of gas at international market prices. Over the following year, Claimants conducted extensive negotiations to conclude the prices, volumes, and conditions of the agreement. (C-I ¶ 59). Respondent disputes that there was any reference to the ability to sell oil in the Memorandum of Understanding. (R-I ¶ 15.7).

262. On 14 June 2007, the second tranche in the Bonds Project was issued for USD 120 million. (R-I ¶ 9.59).



263. On 19 June 2007, President Nazarbayev issued a Presidential decree that transferred authority for licensing the operation of trunk pipelines from the MEMR to the ARNM – the regulator and controller of activities of natural monopolies and regulated markets. (R-II ¶ 589). Claimants state that the MEMR (later called the Ministry of Oil and Gas or "*MOG*") remained the licensing authority for activities related to production and to operation of pipelines other than trunk pipelines. (C-II ¶ 275). Respondent, however, states that the ARNM has the power of issuing licenses to operate transfer gas pipelines, oil pipelines, trunk pipelines, and oil product pipelines. It neither polices who owns trunk pipelines nor does it classify whether a pipeline was trunk. (R-I ¶ 25.2; R-II ¶¶ 544, 589; CPHB 2 ¶ 74). The Parties have acknowledged that, since 2007, competency to issue licenses in relation to trunk pipelines lies with the ARNM. The Parties are aware that anyone wishing to operate a trunk pipeline needs to apply for a license. (CPHB 1 ¶ 155, R-I ¶ 26.9; R-II ¶¶ 464 – 465, CPHB 2 ¶ 61; RPHB 1 ¶¶ 198 – 202).

264. On 6 December 2007, KPM and TNG each applied to the MEMR for permits to allow the transfer of their ownership interests to Tristan Oil for the purpose of conducting an IPO on the London Stock Exchange. (C-0 ¶ 22; C-I ¶ 144; R-I ¶ 9.70).

265. On 26 December 2007, the Kazakh Inter-institutional Committee recommended that the MEMR (1) grant permission for the transfer and (2) waive the State's pre-emptive rights to purchase 100% of KPM and TNG. (C-I ¶ 144; CPHB 2 ¶ 117).

266. By letters to KPM and TNG dated 29 December 2007, the MEMR granted permission for the transfers and expressly waived its pre-emptive rights. According to Claimants, the State indicated that it was interested in purchasing the assets within the IPO. (C-0 ¶¶ 22, 79; C-I ¶ 144; CPHB 2 ¶ 119).

267. Production in the Tolkyn Field declined from 2005 – 2007, until there was a jump in production from 2007 – 2008. This sudden increase in gas production led to an associated increase in water production ("*water cut*"), which led to a significant and sustained reduction in gas production, a situation that continues to date. In relation to the Borankol field, liquid production declined beginning in 2005 and gas production declined beginning in 2004. (R-I ¶¶ 15.2, 16.1, 46.13).

268. In April 2008, Claimants received the Miller & Lents reserves report, which showed that their estimates for production from Borankol had been overstated by 300%. (RPHB 2 ¶ 61).

269. On 8 April 2008, Kazakhstan amended its 2005 laws regarding the payment of export taxes. Pursuant to the 2008 amendments, a USD 109.91/ton duty was imposed on exported crude oil. The 2008 amendments contained specific provisions, pursuant to which no export tax would be applied to exported crude oil that had been extracted under Subsoil Use Contracts containing specific exemptions from the Crude Oil Export Tax. (C-I ¶ 162).

270. On 28 April 2008, the MEMR, TNG, KazAzot, and KazTransGas entered into a first agreement setting out their understanding, entitled "*Agreement for the Implementation of the Memorandum of Understanding of 7 May 2007*." (C-I ¶ 60).



271. On 5 May 2008, Mr. Cornegruta of KPM wrote to the MEMR for the re-issue of KPM's license for the performance of certain activities. The operation of trunk pipelines was not mentioned, but the exploitation and storage of gas were. Respondent states that, objectively, the letter specifically and deliberately requested a license for the operation of trunk pipelines. (RPHB 2 ¶ 162)

272. On 16 May 2008, the Prime Minister of Kazakhstan, the MEMR, KMG, KazTransGas, KazAzot, and TNG agreed that the parties should enter into tri-partite agreements to resolve the outstanding issues. (C-I ¶ 60).

273. On 26 May 2008, the MEMR wrote to KPM, directing KPM to apply to the ARNM for other licenses it may need, pursuant to the change of law and ARNM's new authority. (C-II ¶ 313, CPHB 2 ¶ 74; RPHB 1 ¶ 204).

274. On 29 May 2008, the MEMR re-issued KPM and TNG their licenses for various operations, including "*oil, gas, and oil products production*", pursuant to the 2007 Law on Licensing. (C-II ¶ 275; CPHB 2 ¶ 74).

275. On 13 June 2008, Mr. Cornegruta wrote to ARNM, requesting permission to carry out activities. The Parties dispute whether this letter was an admission that KPM operated a trunk pipeline. This is later referred to as the "*confession*" letter and was relied on by the Republic as the admission of certain facts. (C-II ¶¶ 313 – 317, R-I ¶¶ 9.83; 21.9, 25.11, 27.55 - 27.56; R-II ¶ 633, RPHB 1 ¶¶ 205 – 208). Respondent explains that the letter was clearly an incomplete application for a license and that it was only one piece of evidence of much more showing that the KPM Pipeline was trunk. (RPHB 1 ¶¶ 205, 209; RPHB 2 ¶ 215). Claimants state that KPM wrote to ARNM inquiring as to whether it needed to have its license re-issued by the ARNM in light of the changes in the new Law on Licensing. (CPHB 2 ¶ 74).

276. KPM's 13 June 2008 application was rejected in July 2008 because the submitted package of documents did not meet the requirements of the legislation. The ARNM suggested that KPM submit the documents in accordance with the legislation. KPM did not submit any documents after that. (R-I ¶¶ 21.9, 25.12; RPHB 1 ¶ 202; RPHB 2 ¶ 218).

277. On 3 July 2008, after KPM had notified the Customs Committee of its contractual exemption from specific export taxes, the Customs Committee notified KPM that "*Contract no. 305 contains no regulations as to the exemption from export tax and, thus, export tax shall be applicable to the crude oil exported under the foregoing contract.*" Pursuant to this notice from the Customs Committee, KPM was prohibited from exporting 22,000 tons of crude oil for August 2008 without payment of the Crude Oil Export Tax. KPM conditionally paid these export taxes and concurrently commenced a legal action challenging imposition of the tax. (C-0 ¶¶ 69 – 70; C-I ¶ 19).

278. In summer 2008, Claimants made an "*independent business decision*" to explore a sale of KPM, TNG, and the LPG Plant, excepting the Contract 302 properties (the so-called Tabyl Block). This was nicknamed "*Project Zenith*" and Claimants retained Renaissance Capital to facilitate the sale process. (C-I ¶¶ 69, 184, C-II ¶ 397; R-I ¶ 9.67).



279. On 14 July 2008, the ARNM responded to Mr. Cornegruta's letter of 13 June 2008, and stated that further documentation needed to be submitted. Both Parties accept that none was ever received. (RPHB 1 ¶¶ 210 – 211). Claimants state that the ARNM responded by informing KPM that the type of activities listed in KPM's 2005 license to not require separate licensing from the ARNM. (CPHB 2 ¶ 74).

280. On 18 July 2008, Renaissance Capital sent a "*teaser*" offer to 129 potential purchasers, including KMG. (C-I ¶ 69; R-II ¶ 775, RPHB 1 ¶ 82).

281. On 20 July 2008, TNG discovered gas and condensate deposits in the East Munaibay structure of the Tabyl Block. Productivity testing demonstrated a commercial flow of 120,000 cm/day and 150,000 cm/day of rich gas in the Asselian and Artinskian strata, respectively, without any treatment for productivity enhancement, and 3D seismic interpretation of the structure is commensurate with a substantial find. (C-0 ¶¶ 23, 57; C-I ¶ 13).

282. By letter dated 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay No. 1 well in Contract 302. (C-I ¶ 67 CPHB 1 ¶ 129; CPHB 2 ¶ 151).

283. Later in the summer of 2008, a tri-partite agreement between TNG, KazAzot, and KazTransGas containing the formula for the price calculation, the volumes of gas concerned, and the conditions of supply and export was created ("*KazAzot Tripartite Agreement*"). Subsequently, Kazakhstan replaced KazTransGas with its parent company, KMG. (C-I ¶ 60).

284. On 11 August 2008, TNG filed an application for the evaluation/appraisal phase for Munaibay No. 1. (C-I ¶ 67; CPHB 2 ¶ 151).

285. In mid-August 2008, Renaissance Capital distributed the Information Memorandum to 41 parties that had expressed an interest in the properties and signed a confidentiality agreement, including KMG. (C-I ¶ 70; RPHB 1 ¶ 82).

286. On 29 August 2008, KPMG issued a complete Vendor Due Diligence presentation for Project Zenith. (C-I ¶ 69).

287. On 25 September 2008, based on information provided by Claimants and upon invitation by Claimants, KMG EP tendered an indicative offer of USD 754 million in Project Zenith. Respondent states that, prior to Claimants' invitation, KMG EP was not interested in investing. Claimants state that this was among the lowest of the bids received, amounting to less than half the highest indicative offer (KNOC's offer of USD 1.55 billion), and more than 25% below the average of all eight indicative offers (USD 1.05 billion). Respondent alleges that Renaissance Capital "*tweaked*" the numbers by conditioning access to the data room on higher offers. (C-I ¶¶ 12, 16, 71; C-II ¶ 378; R-II ¶¶ 356 – 357, 781).

288. On 26 September 2008, KNOC submitted an indicative bid, based on the assumption that higher export prices could be achieved as a result of the KazAzot Tripartite Agreement. (RPHB 1 ¶ 95)



289. Based on Tristan's financial statements, on 30 September 2008, the cash on hand and cash equivalents of the Tristan group (KPM, TNG, and Tristan) were USD 9.7 million, despite the issuance of notes in mid-2006 for USD 300 million and at the beginning of 2007 for USD 120 million. (RPHB 1 ¶ 47)

290. By 1 October 2008, Claimants had received 8 non-binding indicative offers in Project Zenith. (C-I ¶ 12, 71; R-I ¶ 16.9; R-II ¶ 775).

291. On 6 October 2008, then-President of Moldova, Vladimir Voronin, wrote a letter to President Nazarbayev of Kazakhstan, stating that Mr. Anatolie Stati was using proceeds from Kazakhstan's mineral resources to invest in areas subject to UN sanctions, in particular, in South Sudan. At the time, Claimants did not view the letter as particularly problematic, since Anatolie Stati had frequently sparred with President Voronin over Moldova's democratic transformation. Claimants state that letter contained false and defamatory personal accusations against Anatolie Stati. Claimants state that Anatolie Stati is not funding terrorist groups in South Sudan. Claimants admit that Anatolie Stati has normal, commercial investments in the oil and gas industry in South Sudan and has contributed enormously to the well-being of the population of South Sudan by making substantial investments in oil and gas exploration and by building schools, a hospital, medical clinics, and means of transportation in the region where his investments are located. Claimants maintain that Anatolie Stati's investments in South Sudan have never been a secret and have never violated UN sanctions. Respondent states that there is no evidence that Stati's investments contribute to the well-being of the population of South Sudan. Respondent states that Claimants' insinuation that President Nazarbayev asked President Voronin to write the letter is ludicrous. (C-0 ¶ 25; C-I ¶ 74; C-II ¶ 194, 211; R-I ¶¶ 9.56, 19.21; R-II ¶¶ 43 – 44; RPHB 1 ¶¶ 188, 374 – 376; RPHB 2 ¶ 156).

292. On 7 October 2008, the MEMR acknowledged TNG's August 2008 application for evaluation of the discovery on the Contract 302 property. (C-I ¶¶ 13, 67).

293. On 10 October 2008, Claimants withdrew their statement of intention filed on 11 August 2008 because they felt it was still too early in the exploration stage to commence evaluation. (C-0 ¶ 57). In its Post-Hearing Brief, Claimants explained that TNG informed Kazakhstan that it was withdrawing its August 2008 application to move to the appraisal phase for Munaibay because it intended to fully and thoroughly explore the contractual territory because the Munaibay 1 well suggested "*a high probability of additional discovery of more deep-lying raw hydrocarbon reservoirs on Munaibay area.*" (CPHB 1 ¶¶ 129, 234; CPHB 2 ¶ 151).

294. On 14 October 2008, Claimants applied to MEMR to extend the exploration period in the Tabyl Block by two years. (C-II ¶ 175, CPHB 1 ¶ 129, CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416). In October 2008, Claimants commenced an exploratory well in the Tabyl Block's Bahyt structure, which had shown evidence of gas in the lower Triassic stratus. Through October 2008, Claimants had invested USD 43 million in exploration work in the Contract 302 properties. (C-0 ¶ 57, C-I ¶¶ 66 – 68).



295. As of 14 October 2008, the yield to maturity of the Tristan notes stood at 26.319%, meaning that the Tristan note course stood at USD 65.125 for a nominal value of USD 100. (RPHB 1 ¶¶ 48, 77)

296. On 14/16 October 2008, President Nazarbayev issued a document (Exhibit C-8), which contains both the dates of 14 and 16 October 2008 in the Russian original and in the English translation. (The Tribunal decided not to address these two different dates as the difference has no impact on the present dispute. Both dates are used in the Parties' submissions and in various parts of this Award.) In the document, the President instructed Kazakh Deputy Prime Minister, Umirzak Shukeyev, and the head of the Financial Police, Sarybai Kalmurzayev, to "*thoroughly investigate*" / "*thoroughly check[]*" all of Claimants' business activities in Kazakhstan. (C-0 ¶ 25; C-I ¶ 75; C-II ¶ 16 CPHB 2 ¶¶ 38, 61, 115, 117, 128; RPHB 1 ¶¶ 188, 377; RPHB 2 ¶ 10). Respondent disputes the translation of this order, and states that Claimants' ability to obtain this internal government document, points to serious corruption on behalf of Claimants. (R-I ¶¶ 19.22 – 19.23; R-II ¶ 214). Respondent nonetheless explains that the note is nothing more than a pro-forma document by which a complaint from one head of state is forwarded to the competent authorities, as is the etiquette of dealings between CIS leaders. As explained at the hearing, the letter received no special treatment from the Financial Police by virtue of the fact that it came from the President. Respondent stated that the fact that President Nazarbayev does not have any specific interest in Claimants' operations in Kazakhstan was confirmed by Minister Mynbayev during cross-examination. (RPHB 1 ¶¶ 377 – 383; RPHB 2 ¶¶ 42 – 44).

297. On 16 October 2008, the Deputy Prime Minister issued order No. 6497, pursuant to which the Financial Police, under the supervision of that office, ordered the MEMR and the Tax and Customs Committees to conduct comprehensive or complex audits of KPM and TNG, which commenced on 28 October, 10 November, and 18 November 2008, respectively. Claimants report that the (1) MEMR, (2) Tax Committee, (3) Customs Committee, (4) National Bank of Kazakhstan, (5) Geology Committee, (6) Ecology Committee, and (7) MES were ordered to conduct audits and investigations of KPM and TNG. (C-0 ¶ 25, C-I ¶ 76; CPHB 2 ¶¶ 38, 128). Respondent states that Claimants have exaggerated the nature of the audits and that there has been no evidence that audits by the Customs Committee, the Ecology Committee, or the MES occurred. (R-I ¶¶ 20.3 – 20.6).

298. On 18 October 2008, the Financial Police instructed the Customs Committee to audit KPM's and TNG's compliance with export tax laws. (C-I ¶¶ 161 – 163, CPHB 2 fn. 209).

299. On 18 October 2008, the Financial Police wrote to the Customs Committee regarding Anatolie Stati's travel through Kazakhstan. (CPHB 2 ¶ 38, C-11).

300. On 19 or 20 October 2008, after deciding not to proceed to the firm bidding phase of Project Zenith, Mr. A. Stati learned of President Nazarbayev's 14 October 2008 Order. (Stati 2nd p. 4).

301. On 20 October 2008, the Financial Police wrote to the MEMR and an official in Moldova requesting information on Anatolie Stati, KPM, and TNG. (CPHB 2 ¶ 38).



302. On 24 October 2008, the Chief Inspector of the Financial Police, Mr. Turganbayev, reported that "*with respect to the companies controlled by A. Stati,[...] inspections regarding the completeness of payment of taxes, compliance with labor legislation, environmental protection legislation, as well as legislation in the sphere of subsoil use and industrial safety have been [initiated]*." He requested that the Deputy Head of the Department for Investigations of the Financial Police extend the inspection term two months to 16 December 2008. (C-430; C-II ¶ 213; CPHB 2 ¶ 38, 128).

303. On 24 October 2008, the Financial Police ordered comprehensive tax inspections of KPM and TNG. (CPHB 2 ¶¶ 38, 128).

304. On 24 October the MEMR responded to the Financial Police request for KPM's and TNG's corporate documents showing their shareholdings. (CPHB 2 ¶ 117).

305. By letter of 27 October 2008, Gazprom refused to accept KazTransGaz as the exporter. (RPHB 2 ¶ 499).

306. On 28 October 2008, the Financial Police ordered the Geology Committee, the Ecology Committee, the National Bank of Kazakhstan, the Tax Committee, and the MES to carry out inspections of KPM and TNG and insisted that Financial Police be permitted to participate. (C-0 ¶ 36, CPHB 2 ¶¶ 38, 61, 128).

307. On 30 October 2008, the Financial Police issued a finding that Anatolie Stati is not a registered businessman in Kazakhstan, but that he carries out his business through Ascom. They found that "*ASCOM SA owns 100% of the participation share in KPM.*" (C-II ¶ 86; CPHB 2 ¶ 38).

308. On 30 October 2008, the Financial Police reported on KPM's and TNG's activities and noted specific items to inspect, but found that KPM and TNG were compliant with their investment obligations. (CPHB 2 ¶ 38).

309. In the fall of 2008, TNG's largest non-local customer, Kemikal, failed to post bank guarantees that were part of its required payment terms. Claimants state that, because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. (C-II ¶ 382, partially quoted; R-II ¶¶ 751 - 752). Respondent notes that Kemikal is a commercial entity that cannot be attributed to the state. Likewise, KazRosGas is a joint venture under equal participation of Gazprom and KMG and the Republic is not responsible for its actions. Kemikal stopped payments toward the end of 2008 because of "*liquidity and insolvency*" issues, per the PwC Due Diligence Report. (R-II ¶¶ 757 – 758; RPHB 2 ¶¶ 21 – 23, 61, 124).

310. In November 2008, Renaissance Capital asked KNOC to revise their bid. (RPHB 1 ¶ 95).



311. By 1 November 2008, Financial Police informed the Deputy Prime Minister of Kazakhstan that it had discovered that Anatolie Stati left Kazakhstan in 2007. (C-II ¶ 212).

312. On 1 November 2008, Financial Police reported to Deputy Prime Minister, confirming the ownership of KPM and TNG and informing him that inspections were being carried out. (CPHB 2 ¶ 38).

313. On 4 November 2008, the Committee of Geology and Subsoil Resources Use of the MEMR commenced an audit of KPM and TNG regarding compliance on legislation on industrial safety. This inspection was organized and attended by the Financial Police and was scheduled to last until 15 November 2008. (C-I ¶ 89; CPHB 2 ¶¶ 38, 61; RPHB 2 ¶ 157).

314. On 7 November 2008, the Tax Committee initiated a targeted audit of KPM and TNG at the request of the Financial Police regarding transfer pricing ("*Transfer Price Audit*"). (C-I ¶ 172; CPHB 2 ¶¶ 38, 128). Respondent does not admit that the audit was instructed by the Financial Police. (R-I ¶ 30.62).

315. On 7 November 2008, Anatolie Stati wrote to President Nazarbayev, assuring him that there were no reasons to investigate KPM and TNG. (CPHB 2 ¶¶ 38, 142).

316. On 7 November 2008, the Financial Police ordered the Customs Committee to inspect KPM and TNG for compliance with payment of export duties. (CPHB 2 ¶¶ 38, 128).

317. The comprehensive tax audits of KPM and TNG began on 10 November 2008. The audits covered the period from 1 January 2005 through 31 December 2007 for KPM, and 1 January 2003 through 31 December 2007 for TNG. The audits pertained to corporate income tax, royalties, individual income tax, social tax, property tax, land tax, tax on vehicles, excise taxes, corporate income tax on non-resident legal entities, and payment for use of natural and other resources. (C-0 ¶ 60; C-I ¶ 156; CPHB 2 ¶¶ 38, 128).

318. On 11 November 2008, the MEMR's Geology Committee concluded its audit (4 days ahead of schedule) and found that KPM and TNG were in compliance with their obligations. (C-I ¶ 89; CPHB 2 ¶¶ 38, 61). Respondent reports that an inspection was carried out to assess whether KPM and TNG were acting in compliance with their licenses. Reports were written after the inspection and were signed by Mr. Cornegruta (KPM) and Mr. Cojin (TNG). (RPHB 1 ¶ 192). The Financial Police attended this meeting, but the ARNM did not. (R-I ¶ 26.8; R-II ¶ 455). The Financial Police found that KPM did not have a trunk pipeline license. (C-II ¶¶ 16, 380). .

319. On 12 November 2008, following the site visit, the Financial Police asked ARNM whether KPM, TNG, and another Stati company called "*Kok Mai*" held a license for a trunk pipeline. (CPHB 1 ¶ 155; CPHB 2 ¶ 61; R-I ¶ 26.9; R-II ¶¶ 464 – 465; RPHB 1 ¶¶ 198 – 202).

320. On 12 November 2008, the Financial Police ordered the Customs Committee to inspect KPM's and TNG's import/export volumes. (CPHB 2 ¶ 38).



321. On 13 November 2008, the Tax Committee noted that including the Financial Police in inspections would be illegal and proposed that a working group be established instead to review inspection results. (CPHB 2 ¶¶ 38, 128).

322. On 14 November 2008, the MEMR reported to the Financial Police on KPM's and TNG's export volumes. (CPHB 2 ¶ 38).

323. On 14 November 2008, the ARNM replied to a request for clarification by Mr. Turganbayev that KPM and TNG had each applied for – but neither held - licenses to operate main pipelines, and that operation of a trunk pipeline requires such a license. (C-I ¶ 90, CPHB 2 ¶ 61; R-I ¶ 26.10; R-II ¶ 466; RPHB 2 ¶ 164).

324. Claimants allege that, on 14 November 2008, Financial Police insisted that Mr. Cojin and Mr. Cornegruta sign inspection reports "*admitting*" that KPM and TNG do not hold licenses to operate "*main*" pipelines. (CPHB 2 ¶ 61). Respondent contests this allegation and states that it is only supported by the incredible testimony of Mr. Cojin. (RPHB 2 ¶¶ 158 – 160).

325. On 17 November 2008, the Financial Police determined that the pipelines were trunk pipelines, and then discovered that KPM and TNG did not have the necessary licenses. (R-I ¶ 38.22; RPHB 2 ¶¶ 165 – 172). Claimants refer to this as the "*reclassification*" and Respondent calls it a "*discovery*." (C-II ¶ 249; R-I ¶¶ 22.6, 23.19, 38.22; R-II ¶¶ 451, 542).

326. On 17 November 2008, the Financial Police ordered a new audit of KPM and TNG to determine the income from its trunk pipeline operations, as well as KPM's entire revenue for onward sales of oil. (C-0 ¶ 42; C-I ¶ 92; CPHB 2 ¶¶ 38, 61, 81; R-II ¶ 469; RPHB 2 ¶¶ 172 – 173). .

327. A 17 November 2008 agreement memorialized the TNG, KazAzot, and KazTransGas (later replaced with its parent company KMG) tri-partite terms on price, volumes, and conditions. TNG and KMG signed the agreement and it was hand-delivered to KazAzot for signature, but KazAzot never signed the agreement. (C-I ¶ 60; CPHB 1 ¶ 130).

328. On 18 November 2008, the Financial Police issued a resolution for the inspection of unpaid customs taxes by TNG. (CPHB 2 ¶¶ 38, 128).

329. On 18 November 2008, the ARNM replied that TNG and KPM did not hold licenses for trunk pipelines and that Kok Mai had never been asked about such licenses, previously. (RPHB 1 ¶ 198).

330. KPM and TNG first made contact with the MES, the state authority responsible for the supervision and control of industrial safety of in-field and main pipelines, on 19 November 2008. (R-I ¶ 28.10).

331. On 19 November 2008, the Tax Committee, at the request of the Financial Police, determined that the amount of "*illegal profit*" from operation of the trunk pipeline was 41.8 billion Tenge (USD 348 million as of November 2008) for KPM, and 37.7 billion Tenge (USD 314 million as of November 2008) for TNG. (C-0 ¶ 42; C-I ¶ 92 (stating 2 December 2008); C-II ¶ 330; CPHB 1 ¶ 160; CPHB 2 ¶¶ 61,



81). Claimants state that these were crude calculations that amounted to all of KPM's and TNG's oil and gas production revenues from the Borankol and Tolkyn fields for the audited period 2005-2007. (C-0 ¶ 42). Claimants provide the Tribunal with a detailed explanation as to how the Tax Committee erred in its calculation at C-II ¶¶ 330 – 331, which Respondent contests at R-II ¶ 620. Respondent states that these calculations were based on TNG's own tax filings and were based on the underlying materials of KPM. (R-I ¶ 26.19).

332. On 19 November 2008, the Specialized Interdistrict Court of Mangystau Region delivered a judgment in KPM's favor in response to KPM's challenge of export duties. The Court ruled that the imposition on KPM of the Crude Oil Export Tax was illegal. (R-I ¶ 30.56; R-II ¶ 743; C-I ¶ 164).

333. On 19 November 2008, KPM and TNG obtained written confirmation from the MES that "*all pipelines operated by your enterprise, from the place of extraction to the point of transferring the hydrocarbons to the oil and gas main pipelines are not main pipelines. We would also like to communicate that the extraction of oil (crude oil, gas condensate, and natural gas) to the surface, treatment and transportation of oil to the place of transfer into a main pipeline and (or) another means of transport form a single technological process of oil production.*" (C-II ¶ 283, partially quoted, emphasis maintained; CPHB 1 ¶ 172; CPHB 2 ¶¶ 38, 61, 98).

334. Respondent clarifies that the 19 November 2008 letter from the MES states that only some of Claimants' pipelines are not trunk pipelines. In any event, the letters were beyond the competence of the MES. (R-I ¶¶ 28.11 - 28.13).

335. On 20 November 2008, the Financial Police commenced an investigation concerning KPM's contractual export tax exemption. (C-0 ¶ 72). They ordered an economics expert from the Ministry of Justice to confirm Tax Committee calculations and instructed that the calculation include transport fees received from TNG's and KPM's revenues from sales of oil. (CPHB 2 ¶ 81).

336. On 21 November 2008, Financial Police ordered the MES to withdraw its statements confirming that KPM's and TNG's pipelines are not "*main*" on the basis that the MES is not competent to provide that conclusion. (CPHB 2 ¶¶ 38, 61, 98; R-I ¶ 26.12).

337. On 25 November 2008, Financial Police wrote to Ministry of Finance inquiring into why the Customs Committee "*exonerated*" KPM from oil export duties, given that KPM had provisionally paid the disputed duties. (CPHB 2 ¶¶ 38, 128).

338. In late November 2008, KazAzot requested that KMG perform another audit of the ammonia-carbamide complex project, especially regarding the delivery prices of gas, which KazAzot allegedly wanted reconsidered. KazAzot indicated that it would sign the 17 November 2008 agreement within six months, subject to the audit. (C-I ¶ 61).

339. On 28 November 2008, the Ministry of Justice economics expert confirmed the Tax Committee's calculation and concluded that KPM's illegal profits exceeded 41 billion Tenge. (CPHB 2 ¶ 81).



340. By a correspondence stamped with the date 28 November 2011, the National Bank acknowledged letters from the Financial Police dated 28 October and 31 October 2008 by which the National Bank was directed to conduct exceptional inspections and to include members of the Financial Police in the control team. The National Bank stated that although it could not comply with the request to include the financial police employees among the auditors, it would issue conclusions regarding the compliance by the companies with current legislation. The letter informed that an extraordinary inspection of KPM had occurred, while extraordinary inspections of TNG and Kok Mai had not occurred. (C-15).

341. On 2 December 2008, Financial Police sent an internal report confirming that KPM operated a "*main*" pipeline without a license and had gained illegal income of over 41 billion Tenge. (CPHB 2 ¶¶ 38, 61).

342. Claimants attempted to obtain a bridge loan to provide additional working capital in connection with their decision to put the companies on the market. On 5 December 2008, Credit Suisse sent Claimants a term sheet for a USD 150-175 million facility. (C-II ¶ 381).

343. On 10 December 2008, Mr. Turganbayev (Financial Police) reported to the Prime Minister that KPM and TNG were operating trunk oil and gas pipelines, but further inquiries were necessary since the Financial Police are not competent to classify pipelines. (C-II ¶ 220, CPHB 2 ¶¶ 38, 61; R-II ¶ 473).

344. The Transfer Price Audit was suspended on 12 December 2008. (R-II ¶ 407).

345. On 15 December 2008, the Financial Police opened a criminal investigation against KPM based on suspicions that KPM was operating a truck pipeline without a license, due to the following findings: (1) on 13 June 2008, KPM applied to the ARNM for re-issuance of a license, indicating that it believed it was operating a trunk pipeline, (2) on 14 July 2008 ARNM informed KPM that it needed to submit documents for the license to operate a trunk pipeline, (3) a 4 December 2008 MEMR report confirming that neither KPM nor TNG had been issued licenses for the operation of trunk pipelines, (4) confirmation that KPM had been operating the pipeline at least since 2005, (5) an expert report stating that TNG's pipeline was a trunk pipeline, and that this one was similar to KPM's, and (6) a 28 November 2008 report stating that KPM's income from operating the pipeline without a license amounted to 41,166,014,544 Tenge. (R-II ¶¶ 294; 475; RPHB 1 ¶ 222, RPHB 2 ¶¶ 177 – 179; CPHB 1 ¶¶ 168, 346; CPHB 2 ¶¶ 38, 61). Respondent concedes that the investigation phase started in December 2008 without a conclusive finding that the pipeline was trunk. (RPHB 2 ¶ 178).

346. On 18 December 2008, the yield to maturity on the Tristan notes increased from 26.319% to 45.666%. (RPHB 1 ¶¶ 77, 78).

347. On 18 December 2008, notified TNG of irregularities in the 2003 Gheso transfer and the corresponding potential violation of the State's pre-emptive right. The MEMR informed TNG that it was "*cancelling*" the State's explicit ruling of 20 February 2007 that allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice required TNG to submit all documentation regarding Terra Raf's ownership



within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (C-0 ¶ 27; C-I ¶¶ 19, 145, 276; C-II ¶¶ 16, 189, 228, 380, 402, CPHB 1 ¶ 214; RPHB 2 ¶ 281).

348. On 18 December 2008, INTERFAX issued a report accusing Claimants of having altered documents in order to defraud the State of its pre-emptive right to purchase the companies. The Parties dispute whether the Tribunal should view this as a MEMR press release (Claimants) or whether this was an independent press item that cannot be attributed to Respondent (Respondent). Respondent states that INTERFAX received the information from unofficial sources. (C-II ¶¶ 400, 402; CPHB 1 ¶¶ 137, 215, 347 – 348, 350; CPHB 2 ¶¶ 38; 117; R-II ¶¶ 171, 747 – 749, 796; RPHB 2 ¶¶ 7, 97).

349. On 18 December 2008, Credit Suisse sent Mr. Lungu of Ascom the INTERFAX press release and requested an explanation. After discussions, Credit Suisse informed Claimants that it would not provide the bridge loan until Claimants resolved their disputes with the Kazakhstan government. (C-II ¶ 381; CPHB 2 ¶¶ 117, 210 – 211). Respondent states that Claimants have not provided any proof that the news agency piece caused Credit Suisse to step back from providing the bridge loan. (R-II ¶¶ 747 – 749; RPHB 2 ¶¶ 95 – 99).

350. On 20 December 2008, the Financial Police began interrogation of KPM and TNG employees. (CPHB 2 ¶ 38).

351. On 22 December 2008, TNG refused to submit the required application before the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117).

352. On 23 December 2008, the Board of Appeal of the Mangystau Regional Court accepted an appeal by the Aktau territorial customs body of the 19 November 2008 court ruling in favour of KPM. Subsequent appeals of the Mangystau Regional Court's decision were dismissed. (C-0 ¶ 72; C-I ¶ 165, CPHB 2 ¶ 128).

353. Claimants received a letter dated 24 December 2008 from the Financial Police, but disagree as to the legal content of the letter. The letter requested information regarding (a) the level of protection of the company, and (b) sales made by KPM to agents, individuals, and other businesses. (R-I ¶ 26.20; CPHB 2 ¶ 38). Claimants state the letter notified KPM that it was the subject of a criminal investigation for operating a main pipeline without a license. (C-0 ¶ 43; C-I ¶ 94). Respondent reports that this was not a notice of criminal investigation. (R-I ¶ 26.20).

354. On 24 December 2008, the Financial Police issued a summons for Anatolie Stati, Mr. Cojin, Mr. Salagor, and Mr. Cornegruta. (CPHB 2 ¶ 38).

355. On 24 December 2008, the State issued a decision that the Crude Oil Export Tax would not be applicable to crude oil exports subject to the Rent Tax, starting on 1 January 2009. (C-0 ¶ 73; C-I ¶ 166).

356. On 25 December 2008, Mr. Rakhimov of the Financial Police summoned and questioned KPM's General Manager, Mr. Cornegruta. Mr. Cornegruta was



considered a witness at the time. (C-I ¶ 95; R-I ¶¶ 26.21, 27.38). Claimants state that he was not allowed to be accompanied by counsel. (C-I ¶ 95). Respondent denies this and states that he was entitled to be accompanied by counsel. (R-I ¶ 27.39).

357. On 26 December 2008, Mr. Rakhimov summoned and questioned the then-Deputy Manager General for Finance of KPM and TNG, Mr. Veaceslav Stejar. (C-I ¶ 95; R-I ¶ 26.21).

358. On 26 December 2008, Financial Police ordered the seizure of TNG documents regarding contracts with third parties and the construction of pipelines. (CPHB 2 ¶ 38).

359. On 29 December 2008, the MEMR requested that TNG provide notarized documents evidencing the 2003 change in ownership of TNG. (C-I ¶ 147; CPHB 2 ¶ 117).

360. On 30 December 2008, KPM submitted a declaration for the quantities of crude oil to be exported by it in January 2009 (c.a. 21,000 tons) to the Aktau territorial customs body. KPM did not pay the Crude Oil Export Tax for these January 2009 exports and instead paid the newly applicable Rent Tax for Export. (C-0 ¶ 74; C-I ¶ 167).

361. On 30 December 2008, the Financial Police conducted an on-site investigation at the Borankol and Tolkyn Fields. (C-I ¶ 95; CPHB 2 ¶ 38). Respondent says that the purpose of the inspection was to specify the process of production, refining, and further transportation of hydrocarbon material, and to make sure that the pipelines matched the documents describing their construction, placement, and other physical features. (R-II ¶ 481).

362. Oil and gas prices were severely depressed in December 2008 and January 2009. (R-II ¶ 738). Respondent states that Tristan Oil's Annual Report for the Financial Year 2009 revealed a decrease in sales of 65.4%. (R-II ¶ 740).

363. On 30 December 2008, the Tax Committee issued an Act of Inspection, claiming that TNG cannot deduct 100% of drilling expenses the year they are incurred for corporate income tax purposes. (CPHB 2 ¶ 128).

364. The EPT for the year ending 31 December 2008 was USD 11.2 million for KPM and USD 20.8 million for TNG. Claimants have not contested the imposition of these tax payments. (R-II ¶¶ 761 – 762).

365. In January 2009, the second phase of Project Zenith began. Potential bidders, including KMG EP, were given access to the data room. (R-I ¶ 16.10; R-II ¶ 358).

366. On 5 January 2009, Mr. Rakhimov asked the MEMR to ascertain whether KPM's 17.9 km pipeline was a main pipeline. (CPHB 1 ¶ 171, CPHB 2 ¶ 61).

367. On 5 January 2009, the research and design institute of KMG NC concluded that the KPM and TNG pipelines are not main pipelines. (CPHB 1 ¶ 173; CPHB 2 ¶¶ 61, 98).



368. On 8 January 2009, the National Scientific and Research Centre on Industrial Safety of the MES confirmed that the relevant KPM and TNG pipelines were field pipelines and not main pipelines. (CPHB 1 ¶ 172, CPHB 2 ¶¶ 61, 98).

369. On 9 January 2009, NIPI Neftegaz confirmed that KPM's and TNG's pipelines are not "*main*." (CPHB 2 ¶¶ 61, 98).

370. On 14 January 2009, the Fitch ratings agency issued a rating watch for Tristan's long-term default rate, due to the cloud on TNG's title and the criminal investigation of KPM. (CPHB 1 ¶¶ 219, 349; CPHB 2 ¶¶ 38, 117).

371. On 14 January 2009, the Financial Police issued a resolution to appoint three investigators to the criminal investigation. (CPHB 2 ¶ 38).

372. On 15 January 2009, Moody's reported a downgrade review, as a result of the criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117).

373. The 16 January 2009 JSC Registrar Zerde for TNG shows 8 share transfers involving TNG. (RPHB 2 ¶ 273).

374. On 19 January 2009, KPM and TNG submitted complaints against the actions being taken by the Financial Police with the GPO, the Ministry of Justice of the Republic of Kazakhstan, the Financial Police itself, the MEMR, and the Western Regional Transport Prosecutor. They nevertheless complied with the request for documents. (C-I ¶¶ 96, 332; CPHB 2 ¶¶ 38, 117, 142).

375. On 20 January 2009, KPM and TNG submitted complaints to the Transport Prosecutor for Mangystau region, describing the illegal actions of the Financial Police and the fact that their pipelines are not "*main*" pipelines. (CPHB 2 ¶ 142).

376. On 20 January 2009, TNG complied with the MEMR's 29 December 2008 requested for notarized documents evidencing the change in ownership of TNG. (C-I ¶ 147).

377. On 21 January 2009, the Transport Prosecutor of the Mangystau Region forwarded KPM's and TNG's complaints to prosecutor for the Western Region. (CPHB 2 ¶ 142).

378. On 22 January 2009, Financial Police requested corporate documents from KPM. (CPHB 2 ¶ 38).

379. On 23 January 2009, Financial Police requested corporate documents from TNG. (CPHB 2 ¶ 38).

380. On 22 – 23 January 2009, the GPO forwarded KPM's and TNG's complaints to the Regional Prosecutor. (CPHB 2 ¶ 142).

381. On 26 January 2009, the GPO sent KPM, through Mr. Cornegruta, a letter (C-629). (CPHB 2 ¶ 38).



382. On 27 January 2009, the Transport Prosecutor forwarded KPM's and TNG's complaints to the prosecutor for the Western Region. (CPHB 2 ¶ 142).

383. On 29 January 2009, KPM and TNG sent complaints to the Financial Police regarding seizure orders and requested a copy of the order that was serving as the basis for the criminal investigation. (CPHB 2 ¶ 142).

384. On 30 January 2009, the Deputy Transport Prosecutor for the Western Region informed KPM and TNG that the complaints are under investigation pending responses from the Financial Police. (CPHB 2 ¶ 142).

385. On 2 February 2009, the Financial Police notified Claimants that their complaints were rejected and that TNG was the subject of a criminal investigation on the same basis, which led to criminal charges against the in-country manager of TNG from 2002 to 2009. The charges were later suspended. The Financial Police rejected the request to provide the order on the ground that no person was the subject of the investigation. (C-0 ¶¶ 43, 54; C-I ¶ 96; CPHB 2 ¶¶ 38, 61, 142). Respondent accuses Claimants of submitting a misleading translation of C-98. (RPHB 1 ¶ 1065).

386. On 4 February 2009, KPM and TNG wrote to the ARNM and asked to be included in the analysis for the classification of the pipelines. (CPHB 2 ¶ 142).

387. On 4 February 2009, the GPO forwarded complaints from KPM and TNG to the Transport Prosecutor of the Mangystau Region. (CPHB 2 ¶ 142).

388. On 4 February 2009, Financial Police interviewed Mr. Cojin (General Manager of TNG) to determine whether he or Mr. Cornegruta would be the appropriate defendant in any criminal proceedings. (R-II ¶ 480).

389. On 4 February 2009, the MEMR wrote to the Financial Police that the KPM pipeline "*belongs to pipelines working as a gathering manifold and is not a main pipeline.*" (CPHB 1 ¶ 171; CPHB 2 ¶¶ 38, 61, 98). Respondent states that this MEMR letter was withdrawn on the MEMR's own accord on the basis that it had not been reviewed by the legal department. (RPHB 1 ¶¶ 229 – 230; RPHB 2 ¶ 183). The 4 February 2009 letter is an internal government document which was not included in Mr. Cornegruta's criminal file. In this regard, Respondent reiterated its concerns about Claimants' access to internal documents. (RPHB 2 ¶ 186).

390. On 5 February 2009, KPM and TNG wrote to the MEMR asking to be included in the analysis regarding the classification of the pipelines. (CPHB 2 ¶ 142).

391. On 5 February 2009, the Transport Prosecutor of Mangystau Region forwarded complaints of KPM and TNG to First Deputy Transport Prosecutor of the Western Region. (CPHB 2 ¶ 142).

392. On 9 February 2009, the Financial Police ordered the College of Experts of the MOJ to produce an expert report to classify the KPM pipeline. (C-I ¶ 104; C-II ¶ 249; CPHB 1 ¶ 181; CPHB 2 ¶¶ 38, 61). Respondent states that the cover letter to the 9 February 2009 Order explained that the Financial Police were under time



pressure and required determination of the issue. Mr. Baymaganbetov stated that these resolutions were received frequently by the department in respect of investigations of companies. (R-II ¶ 553).

393. On 10 February 2009, Mr. Baymaganbetov met Mr. Turganbayev, who had previously been in charge of the inspection and of procuring a preliminary report on the classification of pipelines. (R-II ¶ 554). The two men set out the four documents that had been given to Mr. Baymaganbetov. (CPHB 2 ¶¶ 38, 61; RPHB 2 ¶ 195). Mr. Baymaganbetov was entitled to seek out as much further information as he needed. Respondent states that the four other so-called "*expert*" opinions procured by Claimants were not shown to Mr. Baymaganbetov because they could have unfairly tainted his opinion. (RPHB 2 ¶¶ 195 – 196).

394. The comprehensive tax audits of KPM and TNG lasted until 10 February 2009. (C-0 ¶ 61). On that date, the State sent notices/Acts of Inspection to KPM and TNG that the Article 23 amortization rate, and not the Article 20 rate, was applicable to the companies' well drilling costs for the years 2005 to 2007 and assessed approximately USD 62 million in back taxes and penalties against the companies. (C-0 ¶ 61 and 53 partially quoted, cites 69 million; C-I ¶¶ 19, 159; C-II ¶¶ 16,223, 380; CPHB 1 ¶¶ 139, 243; CPHB 2 ¶¶ 38, 128).

395. On 11 February 2009, the letter prepared on 4 February was replaced by a letter dated 11 February, in which the MEMR wrote to KPM and TNG stating that it was not competent to resolve their complaints. (RPHB 1 ¶ 229).

396. On 13 February 2009, MEMR wrote to KPM and TNG stating that it is not competent to resolve their complaints regarding the criminal prosecution and suggested that they write to the GPO. (CPHB 2 ¶ 142).

397. On 13 February 2009, the MEMR wrote to the Financial Police and provided them information on how the definition of "*trunk pipeline*" in Art. 1 of the Law on Oil should be interpreted. The MEMR noted that an expert would need to be appointed to determine the status of the pipelines. (RPHB 2 ¶ 183).

398. On 13 February 2009, Mr. Baymaganbetov issued the expert decision that KPM's pipelines were trunk pipelines. He based this decision only on the documents received from Mr. Turganbayev. Respondent states that Mr. Baymaganbetov came to his decision quickly because the matter at hand was not unduly complex and he had time to devote to the issue, which fitted with the Financial Police's need for a prompt opinion. In any event, Mr. Baymaganbetov required at least three times as long to issue his opinion than did Claimants' purported expert, Mr. Idrisov. (R-II ¶¶ 554 – 555; CPHB 2 ¶¶ 38, 61, 98; RPHB 2 ¶¶ 188, 193).

399. On 16 February 2009, TNG provided the 12 May 2003 SPA between Gheso and Terra Raf to the MEMR. (CPHB 2 ¶ 117).

400. On 18 February 2009, Moody's downgraded the Tristan debt due to the "*amplified regulatory and operational risk*" posed by the unresolved criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE **517**

401. In mid-February 2009, Turkish Petroleum Corporation and PSA Energy Holding SPC were granted access to the Project Zenith data room containing over 2,000 reports, agreements, surveys, maps, and other documents relating to KPM's and TNG's geological data, operations, and financial, tax, and legal matters. The geological data contained in the data room included 3D seismic data, interpreted seismic horizons, faults (cuts and boundaries), and well tops and coordinates. These companies later withdrew from the bid process. (C-I ¶ 186; R-II ¶ 763).

402. On 24 February 2009, Financial Police seized KPM's corporate documents. (CPHB 2 ¶ 38).

403. On 24 February 2009, TNG complained to MEMR regarding the negative effects of the December 2008 publication on its business and reputation. (CPHB 2 ¶ 117).

404. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State demanded that TNG submit a new application for the consent to the transfer and waiver of the State's pre-emptive purchase right and that failure to do so would result in termination of TNG's Subsoil Use Contracts. (C-0 ¶ 28, partially quoted; C-I ¶ 148; CPHB 2 ¶¶ 38, 117). This was the last action from the MEMR with regard to the pre-emptive rights claim. (CPHB 2 ¶ 117).

405. On 27 February 2009 and 2 March 2009, respectively, KPM and TNG filed separate complaints before the Tax Committee requesting cancellation of the 10 February 2009 notices. The Tax Committee refused to consider the complaints and Claimants spent the next 1.5 years litigating the matter before Kazakh courts. (C-0 ¶ 63; C-I ¶ 159; CPHB 2 ¶¶ 128, 142).

406. Claimants report that, in February 2009, Claimants made a management presentation for TOTAL. After examining the data room and the management presentation, TOTAL stated that they were going to speak with the Kazakh authorities about the properties before they would be willing to move ahead with a binding proposal. Claimants state that TOTAL spoke with the Kazakh authorities in late February or early March 2009, and withdrew from the bid process, allegedly for technical reasons relating to the properties, but likely because Kazakh authorities discouraged them. (C-I ¶ 187). Respondent states that Claimants have not provided substantiation of their claim that Kazakh authorities spoke to TOTAL. (R-II ¶ 799).

407. On 3 March 2009, NIPI Neftegaz and the Kazakh Research and Design Institute of KMG confirmed to TNG that drilling wells amounts to construction and, thus, drilling expense can be deducted 100% in the year incurred as expenses for own-account construction. (CPHB 2 ¶ 128).

408. On 3 and 4 March, 2009, Financial Police seized KPM's and TNG's corporate documents. (CPHB 2 ¶ 38).

409. On 5 March 2009, Moody's downgraded the Tristan debt again, based on the worsening treatment of KPM and TNG by Kazakhstan and, in particular, the opening of a formal criminal investigation against TNG. (CPHB 2 ¶ 38).



410. On 9 March 2009, Claimants re-filed their notice of discovery in the East Munaibay structure and filed a notice of discovery in the Bahyt structure with the MEMR. Claimants also re-notified the MEMR of their intention to exercise their contractual right to extend the exploration period in the Tabyl Block by two years. (C-0 ¶ 58, partially quoted; C-1 ¶ 176). Because there had been no response to the extension request, Claimants declared their intention to appraise those discoveries. (CPHB 2 ¶ 151).

411. On 11 March 2009, the MEMR confirmed to KPM that the drilling of wells amounts to construction and that, thus, drilling expenses can be deduced 100% in the year incurred as expenses for own-account construction. (CPHB 2 ¶ 128).

412. On 18 March 2009, TNG responded to the State's 27 February 2009 notice of breach and offered the State three alternatives: (1) revocation of the notice that purported to "*reverse*" the State's February 2007 decision; (2) TNG's reapplication for a transfer permit, if the State would agree to pay USD 1.347 billion in compensation if the permit was denied, or (3) referral of the dispute to the Arbitration Institute of the SCC and maintenance of TNG's status quo rights under the TNG Subsoil Use Contracts, pending a final arbitral decision. (C-0 ¶ 29; C-1 ¶¶ 38, 149; CPHB 2 ¶ 117). Respondent cites this letter as an attempt to provoke the Republic. (R-I ¶ 9.76).

413. On 18 March 2009, KPM and TNG filed a complaint against initiation of criminal cases undertaken by the Financial Police, with the GPO. (C-I ¶¶ 96, 332; CPHB 2 ¶¶ 38, 142).

414. On 19 March 2009, a meeting chaired by the MEMR Executive Secretary, Mr. A. B. Batalov, and attended by representatives of Terra Raf, TNG, Ascom, and KPM was held at the MEMR offices. All of the State's actions against Claimants since President Nazarbayev's 14 October 2008 investigative directive were discussed. Claimants state that Mr. Batalov assured Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG simply submitted a new application for its transfer to Terra Raf and permitted the State to re-evaluate its prior consent. Mr. Batalov also stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. Claimants state that the MEMR assured them that the pre-emptive right claim would be resolved in their favour. (C-0 ¶¶ 30 – 31, 82; CPHB 2 ¶¶ 38, 117, 151). Claimants also report that Mr. Batalov and his deputy indicated that the reclassification of sections of TNG's and KPM's in-field pipelines as trunk pipelines was, in the MEMR's view, due to a defect in the applicable legislation. Finally, Claimants state that the MEMR also indicated that the Financial Police ought to rely on opinions of experts. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. (C-I ¶¶ 106, 150, 152, 177). Respondent agrees with the above, but states that "*it is simply not the case*" that Mr. Batalov assured the Claimants that all outstanding issues in relation to TNG and KPM would be resolved in Claimants' favour, or that there was any "*reclassification*" of pipelines. (R-I ¶¶ 13.47(e)(v), 21.1).



415. On 24 March 2009, TNG applied for permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332).

416. On 24 March 2009, TNG applied to MEMR for the inclusion of the issue of the extension of the exploration period of Contract 302 for 2 years into the agenda of the next meeting of the Expert Commission. (R-I ¶ 31.69).

417. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142).

418. On 25 March 2009, TNG sent the State a request for a written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations. No response was ever received. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332).

419. On 27 March 2009, Financial Police order KPM and TNG to submit originals of their corporate documents. (CPHB 2 ¶ 38).

420. On 30 March 2009, KPM responded to the Financial Police's request for documents and requested copies of the criminal investigation order. The Financial Police ordered TNG to submit additional original company documents. (CPHB 2 ¶ 38).

421. On 30 March 2009, the Transport Prosecutor for the Western Region wrote to KPM and TNG stating that complaints were under investigation and noted that it had received nothing from the Financial Police in response to inquiries. (CPHB 2 ¶ 142).

422. On 30 March 2009, Contract 302 expired. (R-II ¶ 411).

423. In April 2009, KMG received access to the complete Project Zenith data room. (C-I ¶ 191; C-II ¶ 383).

424. Claimants removed CASCo, a Stati-owned service company that was doing the service work in the fields, from the field in 2009. (C-II ¶ 409; R-I ¶ 9.70; R-II ¶ 791). Respondent notes that Anatolie Stati's testimony regarding ownership of CASCo was inconsistent with and, indeed, was contradicted by other witnesses, his previous statements, and Claimants' own due diligence of 29 August 2008. (RPHB 1 ¶¶ 117 – 136).

425. Respondent reports that, in April 2009, Gabriel Stati was arrested following elections in Moldova, amid allegations that he was involved in the organization and financing of civil unrest and attempting to overthrow the Moldovan government. Moldovan authorities extradited him from the Ukraine. (R-II ¶ 35).

426. On 2 April 2009, the Expert Commission passed the Decision, recommending the extension of Contract 302 for 2 years. (R-I ¶ 31.70; CPHB 1 ¶ 236, CPHB 2 ¶ 151).



427. On 6 April 2009, Financial Police requested information on TNG's costs for oil and condensate in relation to the criminal case against KPM. (CPHB 2 ¶ 38).

428. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which Claimants state that they requested on 9 March 2009, and which Respondent states was requested on 24 March 2009. Claimants state that MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. (C-0 ¶ 58; C-I ¶¶ 22, 178; C-II ¶ 241, CPHB 1 ¶ 224, CPHB 2 ¶ 151; R-I ¶ 31.71). Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension. (R-I ¶¶ 31.72 - 31.73; R-II ¶ 414). Respondent states that the true translation of the decision highlights that actual prolongation of the contract remains to be undertaken. (R-II ¶¶ 413, 419 – 424). Since TNG did not apply for a renewal license No. 243-D in conjunction with the application for the extension, the competent authority had no right to extend the term of the Contract 302. (R-I ¶ 31.79; R-II ¶ 436). To add context, Respondent states that, in 2008, the competent authority received 152 applications for extension of exploration periods. Of these, 31 were refused. In 2009, the competent authority received 139 applications, of which 38 were refused. (R-I ¶ 31.81).

429. On 13 April 2009, five experts from the Russian Science and Research Institute for the Construction and Operation of Pipelines and Energy Facilities issued expert opinions affirming that the pipelines in question were not trunk pipelines. (C-I ¶ 101; C-II ¶ 289; CPHB 2 ¶¶ 61, 98).

430. On 20 April 2009, Mr Rakhimov decided to detain KMG's general manager, Mr. Cornegruta, and opened criminal proceedings against him for the crime of illegal entrepreneurial activity under Art. 190(2)(b) of the Criminal Code of the Republic. At that time, Mr. Cornegruta was named as a potential defendant. (R-II ¶ 487; RPHB 1 ¶ 230, RPHB 2 ¶ 189).

431. On 22 April 2009, the Financial Police ordered additional documents from KPM. (CPHB 2 ¶ 38).

432. On 25 April 2009, the Financial Police arrested Mr. Cornegruta and took him in for interrogation. (CPHB 2 ¶¶ 38, 61).

433. On 26 April 2009, Claimants filed complaints against the Financial Police, including its head investigator, Mr. Rakhimov. The same day, 900 employees of KPM, TNG, and CASCo that were on shift addressed and signed a letter to the Governor of the Mangystau Region expressing their concerns. (C-I ¶¶ 109).

434. On 27 April 2009, Mr. Batalov was fired as Executive Secretary of MEMR. (C-I ¶¶ 106, 332).

435. On 27 April 2009, the court of Aktau considered and rejected a petition against Mr. Cornegruta's arrest. (RPHB 1 ¶ 244).

436. On 28 April 2009, KazAzot explained that it did not sign the 17 November 2008 Tri-Partite Agreement because, among other things, an audit that it had carried out,



particularly in light of the impact that the global financial crisis had had on the mineral fertilizers market, had demonstrated the unfeasibility of the project. (R-I ¶ 15.7).

437. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. (R-I ¶ 29.2). Claimants report that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline, and the companies' other property. Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; C-II ¶ 335; CPHB 1 ¶ 140; CPHB 2 ¶¶ 38, 61).

438. On 30 April 2009 and on 4 May 2009, TNG submitted Addendum No. 9 of TNG's Tabyl Block Subsoil Use Contract to the MEMR for execution. TNG never received the MEMR's signature to the addendum extending TNG's exploration rights. (C-0 ¶ 58; C-I ¶¶ 22, 178; CPHB 2 ¶ 151).

439. On 30 April 2009, the Deputy Minister of the MES wrote to Claimants and asked them to withdraw his previous letters of 19 November 2008, as their issuance was beyond his competence. (R-I ¶ 28.13).

440. On 1 May 2009, the decision to detain Mr. Cornegruta was confirmed on appeal. (R-II ¶ 487; RPHB 1 ¶ 244).

441. Claimants and Respondent report that construction of the LPG Plant was halted in May 2009 due, at least in part, to "*cash constraints*." (C-I ¶ 64; R-I ¶ 19.24).

442. On 4 May 2009, Mr. Rakhimov of the Financial Police ordered an unscheduled inspection to determine the amount of income KPM had obtained by operating a trunk pipeline without a license. (RPHB 2 ¶ 190).

443. On 6 – 7 May 2009, pursuant to a search warrant dated 30 April 2009, the Financial Police conducted an overnight search of KPM's and TNG's offices for the other General Managers of KPM, Messrs. Salagor and Spasov, and the General Manager of TNG, Mr. Cojin, as well as information on their whereabouts. (C-I ¶ 111, CPHB 2 ¶ 38; R-I ¶ 27.47; R-II ¶ 486; RPHB 1 ¶ 233). The three in-country managers had been charged with the same offense as Mr. Cornegruta. The initial phase of the search started at 4:20 p.m. on May 6 and ended at 4:15 a.m. on May 7, 2007. (C-I ¶ 111). The search was carried out in the presence of Deputy Director General for Economic and Financial Affairs of TNG, Mr. Stejar. (R-I ¶ 27.47). Respondent states that the Financial Police procured human resources and financial records from KPM and TNG. (R-II ¶ 483). Respondent states that it became clear during the course of the investigation that most senior managers had left Kazakhstan. (R-II ¶ 486). The Parties dispute the level of inconvenience caused by the search. (C-I ¶ 111; R-II ¶¶ 301 *et seq.*). Claimants state that the Financial Police seized other documents not listed in the warrant and searched Mr. Cornegruta's flat. (C-I ¶ 112). Respondent makes no admission as to C-I ¶ 112, but notes that no complaints were made at the time. (R-I ¶ 27.48).



444. On 7 May 2009, Mr. Anatolie Stati, on behalf of Claimants, wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. (C-I ¶¶ 39, 113, 332, C-43; CPHB 2 ¶¶ 38, 142). Anatolie Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol. (CPHB 2 ¶ 38). Claimants also state that this letter made clear that Claimants intended to bring arbitration claims against Kazakhstan for the diminution of value of their investments once the sale to Cliffson closed. (C-II ¶ 392). While Respondent makes no admission as to whether any letter was written or sent to or received by President Nazarbayev, Respondent confirms the existence of the letters. (R-I ¶ 27.49; R-II ¶ 226). Respondent also notes that the Cliffson transaction, at earliest could have started in February 2010. (RPHB 2 ¶ 7).

445. On 13 May 2009, the Mangystau Regional department of the MES withdrew its letters about whether the pipelines were trunk pipelines. Respondent states that this was in response to the 30 April 2009 letter from the Deputy Minister of the MES and not to the letter from the Financial Police, dated 21 November 2009, as asserted by Claimants at C-I ¶ 91. (R-I ¶ 28.14).

446. On 15 May 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts and requested additional documents from KPM. (R-I ¶ 29.2; CPHB 2 ¶ 38).

447. On 15 May 2009, the Financial Police notified KPM and TNG that it had seized Claimants' equity interests in KPM and TNG two days before, on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). While Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009, Respondent states that such a seizure would seem entirely appropriate in the circumstances, and if the Financial Police moved to gain interim measures of security over KPM and TNG pending the resolution of a *bona fide* underlying dispute, this would not be surprising. (R-I ¶ 26.26).

448. On 18 May 2009, the College of Experts of the Ministry of Justice calculated KPM's purported "*illegal profits*" from oil and gas transportation services at 5.9 million Tenge (approximately USD 48,300) for the period from 2002 through 2008. (C-I ¶ 92). This calculation also showed "*illegal profits*" of approximately 1,935,547 Tenge (approximately USD 15,000) for March 2007 – May 2008. (C-I ¶ 119). Respondent denies this and states that that expert considered that the value of income from illegally operating the trunk pipeline amounted to 65,479,414,197 Tenge for the period from April 2002 – 2008, and that its income during the relevant period in 2007 and 2008 was 21,673,919,031 Tenge. (R-I ¶¶ 26.23; 26.26; R-II ¶ 484; RPHB 2 ¶ 190). Respondent states that this calculation was necessary to determine whether the crime of illegal entrepreneurship had been triggered. (R-II ¶ 484). Respondent admits that the Court relied on this document when determining the amount of fine to be imposed on KPM. All of Claimants' other assertions concerning this report are denied. (R-I ¶ 27.60).

449. On 18 May 2009, the Financial Police issued an order on the refusal to initiate a criminal case. According to this, the Financial Police declined to initiate a criminal



case against Mr. Cornegruta based on the checks carried out by the MES, the Ministry of Environmental Protection, the Customs Control Committee of the Ministry of Finances, or the MEMR. (RPHB 2 ¶ 191).

450. On 18 May 2009, Mr. Rakhimov issued application to exclude Claimants' expert opinions about the classification of the pipelines. (R-II ¶¶ 631 - 632). The expert reports included a report dated 5 January 2009 from the Kazakh Scientific, Research, and Design Institute of Oil and Gas (a division of KMG) that found the pipelines owned by KPM and TNG "*do **not** belong to the category of **main** pipelines and are designated to ensure the process of hydrocarbons production*." (C-I ¶ 98, emphasis maintained). The expert reports also included a report that the Scientific, Research, and Design Institute of Oil and Gas Industry of NIPI Neftegaz concluded on 9 January 2009 that the pipelines owned by KPM and TNG were correctly "*classified as **in-field** pipelines*." (C-I ¶ 99, emphasis maintained). The court later deemed the Claimants' expert opinions to be inadmissible. (R-II ¶¶ 631 - 632). These so-called "*expert*" opinions did not evidence KPM and TNG's requests for those opinions, making it impossible to divine the scope of the request. There was no indication that the bodies were independent of Claimants, and some of the experts whose reports were excluded had a role in the construction of the pipelines and in the legal amendments regarding their status. In any event, they were not qualified to issue such opinions and had not been appointed pursuant to Art. 243 of the CPC. (RPHB 2 ¶¶ 203 – 207).

451. On 18 May 2009, the Kazakh Financial Police expressly determined that Anatolie Stati could "*not be held liable for performance of illegal business activities*" with respect to his companies in Kazakhstan. (C-II ¶ 213).

452. On 19 May 2009, the Financial Police ordered KPM and TNG to provide a valuation of all the property that it had seized. (C-II ¶ 335; CPHB 2 ¶ 38).

453. On 19 May 2009, Mr. Rakhimov announced the completion of the investigation and allowed Mr. Cornegruta and his lawyer to study the files of the criminal case. (R-II ¶ 488).

454. On 20 May 2009, Mr. Cornegruta's lawyers submitted a complaint to the Regional Prosecutor's office regarding his illegal arrest. (CPHB 2 ¶ 142).

455. Beginning on 25 May 2009, Mr. Cornegruta had access to lawyers who reviewed the file with Mr. Cornegruta. A defendant is entitled to an unlimited amount of time to consider the evidence put against him, as explained by Mr. Kravchenko at the Hearing on Jurisdiction and Liability. Mr. Cornegruta and his attorneys had access to the file until 30 July 2009. (RPHB 1 ¶ 245).

456. In May 2009, the Financial Police declared the reports from the KMG institute, the MES research center, NIPI Neftegas, and the Russian institute inadmissible in the criminal proceeding. Without making her own independent assessment, the judge also declared them inadmissible. (CPHB 2 ¶ 98).

457. At least by 5 June 2009, the Prime Minister, the MEMR, the Ministry of Justice, the Ministry of Finance, and Samruk-Kazyna contemplated a "*buyout*" of KPM and TNG and/or a termination of their Subsoil Use Contracts. (CPHB 2 ¶ 38).



Respondent notes that C-293, upon which this allegation is based, was obtained in violation of the law, and it is unclear what reliability it could have. (RPHB 1 ¶¶ 1120 – 1138).

458. On 12 June 2009, Terra Raf and Ascom filed petitions to lift the seizures. (C-0 ¶ 45; C-I ¶ 122).

459. On 15 June 2009, Mr. Cornegruta submitted a petition to stop the criminal proceedings against him. (CPHB ¶ 142).

460. On 15 June 2009, the Financial Police investigation team presented the indictment dated 15 June 2009 to the prosecution department of the Ministry of Justice. (R-II ¶¶ 446, 490).

461. Claimants state that they were only able to weather the liquidity storm in the summer of 2009 by obtaining emergency bridge financing from a group of venture capitalists (the "*Laren Facility*") on 16 June 2009. The Parties agree that the terms of the Laren Facility were terrible for Claimants (35% interest on a USD 60 million note, plus the issuance of USD 111 million of new Tristan notes). (C-II ¶ 384, CPHB 2 ¶ 117 (stating 11 June), R-II ¶¶ 765 – 766; R-268; RPHB 1 ¶¶ 58 – 61).

462. On 16 June 2009, TOTAL E&P's geologist Philippe Mallard sent Radu Constantin of Ascom an email containing TOTAL E&P's findings and concerns about chances of development, based on the 3D and 2D seismic data received. He requested additional information, but Claimants never provided it. The email ends with a recommendation to abandon the Project Zenith. (RPHB 1 ¶¶ 99 – 103).

463. On 17 June 2009, the Financial Police publically announced that the investigative phase had concluded and that the four former and current managers of KPM and TNG would be prosecuted for having realized an "*illegal profit*" of 147 billion Tenge (approximately USD 980 million as of June 2009). (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38 (calling the 147 billion the potential fine); R-I ¶ 26.24).

464. On 19 June 2009, the third tranche of the 2006 Bonds Project was issued, for USD 111.11 million. (R-I ¶ 9.59).

465. On 23 June 2009, the Financial Police submitted the case to the Public Prosecutor of the Western Regional Transport for consideration. (R-I ¶ 26.24).

466. On 23 June 2009, KPM and TNG separately filed cases against the Tax Committee in the Astana Economic Court seeking cancellation of the 10 February 2009 notices. (C-0 ¶ 64).

467. On 27 June 2009, the Terra Raf and Ascom petitions to lift the seizures were denied. (C-0 ¶ 45; C-I ¶ 122).

468. On 27 June 2009, Mr. Cornegruta was indicted and the Regional Prosecutor's Office wrote to Ascom and Terra Raf noting that an international search was underway for Mr. Cojin. (CPHB 2 ¶ 38; RPHB 2 ¶ 191).



469. On 30 June 2009, Squire Sanders confirmed that the 2003 transfer to Terra Raf was valid, but in light of the MEMR's claim of violation, recommended that waiver of the State's pre-emptive right regarding the 2003 transfer be a condition precedent to a sale. (CPHB 2 ¶ 117). Respondent states that this is misleading. Squire Sanders considered it unlikely that MEMR would terminate Contracts 210 and 302 because of the issue, but stated that Claimants had breached Art. 71 of the Subsoil Law because TNG did not apply for the necessary pre-emptive rights waiver. (RPHB 2 ¶ 279).

470. On 30 June 2009, Mr. Cornegruta moved to stop the criminal proceedings. This motion was rejected the following day. (CPHB 2 ¶ 142).

471. By 30 June 2008, the current ratio for KPM and TNG had decreased from 5.74 at the year end 2007 to 3.06 and their quick ratios had decreased from 5.33 at the year end 2007 to 2.91. The cash ratio had decreased from 0.51 to 0.13 for the same period. (RPHB 2 ¶ 67).

472. On 2 July 2009, the self-imposed deadline to extend Contract 302 expired, without an extension of that contract. (CPHB 2 ¶¶ 38, 151).

473. On 2 July 2009, Prof. Suleymenov, author of Kazakhstan's Law on Oil, issued an expert legal opinion that KPM's pipelines are not "*main*." (CPHB 2 ¶¶ 61, 98).

474. On 10 July 2009, a Fitch Ratings Press Release indicated that market observers were concerned about "*weak corporate governance standards at Tristan*." (RPHB 2 ¶ 61).

475. The trial involving Mr. Cornegruta and KPM lasted from 30 July until 18 September 2009. (CPHB 2 ¶ 98 (trial until 14 September, verdict on 18 September). At the trial, the State introduced a letter Mr. Cornegruta had written on 13 June 2008 to the ARNM as its principal evidence that Mr. Cornegruta had "*confessed*" that KPM operated a trunk pipeline. (C-0 ¶ 47; C-I ¶¶ 115 – 116; CPHB 2 ¶ 38; R-I ¶ 27.5). In his defense at trial, Mr. Cornegruta's counsel argued that Mr. Cornegruta is not an entrepreneur, that he is an employee of KPM, that he does not own KPM, that his June 13, 2008 letter was not a "*confession*," and that the KPM gathering system pipelines are not "*trunk*" pipelines.

476. Respondent states that KMG EP withdrew from Project Zenith in July 2009 after deciding that it was not commercially sensible to purchase the assets due to the amount of debt involved. (R-II ¶¶ 359, 790).

477. Claimants state that, in July 2009, KNOC re-entered the bid process. Claimants state that KNOC examined the Project Zenith data room, conducted a management presentation for them in July, and that representatives of KNOC also went for a site visit of the properties in August of 2009. KNOC was only willing to proceed with a binding bid after it had spoken with the Kazakh authorities about the properties. Claimants later learned that KNOC had spoken with the Kazakh authorities in late August or early September 2009. After that conversation, Claimants never heard from KNOC again. (C-I ¶ 188; C-II ¶¶ 402 *et seq*.). Respondent disputes the above and submits that Claimants have not provided any proof of these contentions and argue that KNOC was not even involved in Phase II



of Project Zenith. (R-II ¶ 798). After the Hearing on Quantum, Respondent accepted that KNOC had visited Claimants in Bucharest for a meeting and presentation on KPM and TNG. During examination, Dr. Kim of KNOC stated KNOC had not re-entered negotiations. (RPHB 1 ¶ 95).

478. On 24 July 2009, TOTAL E&P informed Renaissance Capital that it had left Project Zenith. (RPHB 1 ¶ 104).

479. On 31 July 2009, RBS reported that it valued KPM and TNG (without Contract 302) at between USD 855 million and 1 billion, as of 1 October 2009. (CPHB 1 ¶ 38).

480. On 30 and 31 July 2009, Mr. Zlupacarov of the Financial Police had chased Mr. Cornegruta's attorneys and his wife, while driving after and filming them from his car. (CPHB 1 ¶ 203).

481. In August 2009, Starleigh, a Kazakh-owned company that Claimants believe to be owned and controlled by Mr. Kulibayev, contacted Claimants. Starleigh was represented by a middle man, Mr. Arvind Tiku, whom Claimants understand to be one of Mr. Kulibayev's business partners. Starleigh examined the Project Zenith data room. (C-I ¶¶ 189 - 190). Respondent states that Claimants have provided no evidence that Mr. Kulibayev is linked to Starleigh or that Starleigh is in any way linked to the Kazakh government. (R-II ¶¶ 341, 346 – 347).

482. On 6 August 2009, the second day of Mr. Cornegruta's trial, Mr. Cornegruta's defense counsel requested that the judge order Financial Police officer Zlupacarov, who was present, dismissed from the courtroom and the proceeding. (CPHB 1 ¶ 203; RPHB 2 ¶ 241). Although the hearing was public and Mr. Zlupacarov was permitted to attend, Mr. Cornegruta's request was considered and immediately granted. (RPHB 2 ¶ 241).

483. In a supplementary expert opinion on 25 August 2009, the Russian Science and Research Institute for the Construction and Operation of Pipelines and Energy Facilities confirmed that KPM's pipeline was a "*field pipeline*" and that the unfounded report of the Kazakh Ministry of Justice "*cannot serve as a ground to consider [KPM's pipeline] as a main pipeline.*" (C-II ¶ 289).

484. On 25 August 2009, the Russian Joint Stock company VNIIST concluded that KPM's pipeline is not "*main.*" (CPHB 2 ¶¶ 61, 98).

485. On 26 August 2009, Mr. Cornegruta's defense counsel moved for postponement of less than one week so that the judge and counsel could question the authors of the expert reports that contradicted the conclusions of Mr. Baymaganbetov. The motion was denied, without explanation. (CPHB 1 ¶ 201).

486. In August 2009, Kazakhstan, the Governor of the Mangystau Region, KazAzot, and Mitsubishi confirmed their intention to go forward with the ammonia-carbamide complex. (C-I ¶ 61).

487. Claimants report that, on 26 August 2009, the Governor of the Mangystau Region asked Prime Minister Massimov to accelerate the State's cancellation of TNG's



and KPM's Subsoil Use Contracts and to transfer TNG's assets to KazAzot. The Governor referred to instructions dated 5 June 2009 given by the Kazakh Prime Minister to the MEMR, the Minister of Finance, the Ministry of Justice, and the multi-billion sovereign wealth fund of Kazakhstan, Samruk-Kazyna. Claimants state that the Prime Minister instructed these Kazakh authorities to orchestrate the termination of Claimants' Subsoil Use Contracts. (C-I ¶ 61; CPHB 1 ¶ 316). Respondent states that the letter in question is a complaint concerning the failure by the MEMR to provide the necessary information concerning its investigations of KPM and TNG. The letter calls for action in light of the deteriorating condition of TNG and KPM. (R-I ¶ 19.25). Respondent challenges Claimants' characterization of this letter and says that Governor Kusherbayev was aiming at a regular purchase of the companies because of the problems that were surrounding them. (R-II ¶ 326). It in no way proposes an expropriation. (RPHB 1 ¶¶ 398 – 403). Respondent also states that Claimants' possession of this confidential and internal letter, identified as C-293, points to serious corruption on behalf of Claimants. (R-II ¶ 214).

488. Respondent states that the 27 August 2009 meeting referenced in exhibit C-294 is not an indication of a planned government taking. Claimants have confirmed that the state of TNG and KPM was dire in the summer of 2009, so it should be no surprise that the government was concerned about the companies and the potential social consequences. Claimants have produced no evidence for their contention that the meeting was a working group to discuss ways to *"finish off the planned taking."* (RPHB 2 ¶ 381).

489. On 29 August 2009, Mr. Baymaganbetov was cross-examined. (RPHB 2 ¶ 240).

490. On 8 and 9 September 2009, the Astana Economic Court ruled against KPM and TNG's 23 June 2009 filing and found that the tax assessments were proper. KPM and TNG appealed the ruling. (C-0 ¶ 64; R-I ¶ 19.24; CPHB 2 ¶ 128).

491. On 17 September 2009, TNG wrote to MEMR regarding the promised Contract 302 extension and requested execution of Addendum No. 9. (CPHB 2 ¶ 151).

492. On 18 September 2009, the Aktau City Court of the Mangystau Oblast rendered a guilty verdict against Mr. Cornegruta for illegally engaging in entrepreneurial activities by operating KPM trunk pipelines without a license. (C-I ¶ 118, CPHB 2 ¶¶ 38, 61, 74, 98; R-I ¶ 27.58; R-II ¶¶ 446, 645; RPHB 2 ¶ 266). In accordance with the Court Decision, KPM was ordered to pay the illegal revenue in the amount of 21,675,854,578.00 Tenge (approximately, USD 145,475,534.08) to the Kazakhstan state budget. (C-0 ¶ 50; C-I ¶ 119, C-II ¶ 318, CPHB 2 ¶¶ 38, 81, R-II ¶¶ 615, 645; RPHB 2 ¶¶ 246 -261). Mr. Cornegruta was sentenced to 4 years imprisonment, and Respondent reports that he escaped from prison. (C-0 ¶ 49; C-I ¶ 118; R-I ¶ 9.79; RPHB 1 ¶ 303).

493. On 21 September 2009, President Nazarbayev's Head of Administration issued an order regarding the *"free of charge transfer of [Claimants'] assets."* (CPHB 2 ¶ 38). Respondent notes that C-294, upon which this allegation is based, was obtained in violation of the law, and it is unclear what reliability it could have. (RPHB 1 ¶¶ 401, 1120 – 1138).



494. On 22 September 2009, Claimants requested an official copy of the verdict. (C-0 ¶ 51; CPHB 1 ¶ 208; CPHB 2 ¶ 98; RPHB 2 ¶ 269). The request was signed by "*Acting General Director of KPM Oskolkov V.V.*", and Claimants have provided no evidence that Mr. Oskolkov was properly appointed or was authorized to make the application. There is no evidence that the request was ever received by the court. (RPHB 2 ¶ 269).

495. A 28 September 2009 letter from MEMR to the Ministry of Industry and Trade noted the risk of arbitration as one of the reasons why it would be better to obtain KPM and TNG through an acquisition rather than a premature termination of the Subsoil Use Contracts. (C-II ¶ 392; CPHB 1 ¶ 321). Respondent explains that the MEMR was responding to the concern at the decline of the businesses of TNG and KPM and the resultant social problems, caused by Claimants' decision to wind down operations. The solution under consideration was the transfer of KPM and TNG into state control. (R-I ¶¶ 19.20, 19.26; RPHB 2 ¶ 381). Respondent states that the notion of a gratuitous transfer of assets was rejected by MEMR. (R-II ¶ 327). Respondent also states that Claimants' possession of this confidential and internal letter, identified as C-294, points to serious corruption on behalf of Claimants. (R-II ¶ 214).

496. On 30 September 2009, the Financial Police ordered the Aktau territorial customs body to conduct a new audit of KPM based on its failure to pay the Crude Oil Export Tax for its January 2009 exports. (C-0 ¶ 75; C-I ¶ 168; CPHB 2 ¶¶ 38, 128).

497. On 1 October 2009, Mr. Cornegruta appealed the criminal judgment of the Aktau City Court. (CPHB 2 ¶ 98).

498. In October 2009, Starleigh presented an initial bid of USD 450 million for Claimants' properties. (C-I ¶ 190).

499. 4 October 2009 was the last day that an appeal could be filed in the case against KPM and Mr. Cornegruta. KPM did not appeal the sentence of 18 September 2009 within the 15 days allowed. (R-II ¶ 636; RPHB 1 ¶ 304, RPHB 2 ¶ 268).

500. On 22 October 2009, the Financial Police interviewed Mr. Condorachi, the General Counsel of KPM and Deputy General Counsel of TNG, regarding KPM's alleged obligation to pay 2008 export taxes. (C-I ¶ 168; CPHB 2 ¶¶ 38, 128).

501. On 28 October 2009, the Civil Collegium of Astana Court reversed the Astana Economic Court's ruling of 10 February 2009 and remanded it for a new hearing at the Specialized Interdistrict Economic Court. (C-0 ¶ 64; CPHB 2 ¶ 128).

502. In November 2009, Starleigh dropped its offer from USD 450 million to USD 350 million, due to concerns about the USD 145 million fine that had been imposed on KPM in connection with criminal action brought by the State. (C-I ¶ 190).

503. Respondent states that KMG NC did not express an interest in purchasing TNG and KPM until November 2009, and explains that it took an interest in the assets in order to play a "*white knight*" role. (R-II ¶ 360).


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE **529**

504. In November 2009, Claimants were invited to attend a meeting with KMG in Amsterdam. When Anatolie Stati and Mr. Lungu arrived, they saw principals of Claimants' main noteholders leaving the meeting room. The noteholders told them that KMG had just offered 25 cents on the dollar to purchase their interests, which the noteholders refused. Anatolie Stati and Mr. Lungu then met with representatives of KMG, who presented them with an offer of USD 20 million for their equity interests, which they refused. (C-0 ¶ 84 (stating September 2009); C-I ¶ 192; C-II ¶ 386).

505. Claimants report that, in November 2009 (or in early 2010), they received an offer from Starleigh for USD 50 million and a buyout of the noteholders, which Claimants refused. (C-I ¶ 190; C-II ¶¶ 387, 415).

506. Claimants report that, on 3 November 2009, in an effort to pressure KPM into paying the Crude Oil Export Tax, the Financial Police interrogated and intimidated Mr. Cornegruta (in jail) and other employees of KPM. The interrogation of Mr. Cornegruta regarded KPM's alleged obligation to pay 2008 export taxes. The Aktau territorial customs body also informed KPM that it was required to pay the Crude Oil Export Tax for its January 2009 exports, amounting to USD 4 million. (C-0 ¶ 75; C-I ¶ 168; CPHB 2 ¶¶ 38, 128).

507. Mr. Cornegruta appealed his verdict with the Mangystau Regional Court. On 12 November 2009, the Regional Court upheld the Aktau City Court's verdicts against both Mr. Cornegruta and KPM. (C-0 ¶ 52; C-I ¶ 120, CPHB 2 ¶¶ 38, 98; R-I ¶ 27.60; R-II ¶ 446, 586, 646; RPHB 2 ¶ 266). Judge Ryskalieva's decision was scrutinized by three judges, all of whom agreed with her. (R-II ¶ 586). Respondent admits that KPM was not a named party in either the initial trial or the subsequent appeal. However, it is denied that KPM was not represented in either hearing. (R-I ¶ 27.60). Neither KPM (which was able to) nor Mr. Cornegruta appealed to the Supreme Court. (RPHB 2 ¶ 266).

508. Grand Petroleum offered to purchase KPM and TNG for USD 1.15 billion. (CPHB 2 ¶ 38).

509. In an instruction of the President of the Republic of Kazakhstan dated 19 November 2009, the President highlighted the inadmissibility of a production shutdown at the enterprises TNG, KPM, Borankol Gas Treatment Plant, TOO "*KASKO*" and the company "*Caspian Gas Corporation*" in connection with the conducted inspections. (R-I ¶ 18.7; CPHB 2 ¶ 38). The President instructed responsible authorities to revisit these issues in view of anti-crisis measures of the Government. (R-II ¶ 332).

510. The President issued a further instruction on 23 November 2009, which expressed the President's concern that the investigations of KPM and TNG might be interfering with the operation of those companies. (R-I ¶ 19.24).

511. On 23 November 2009, Mr. Cornegruta was transferred from a temporary detention facility in Aktau to the prison in Atyrau. (C-I ¶ 120).



512. On 23 December 2009, the 19 November 2008 decision of the Specialized Interdistrict Court of Mangystau Region was cancelled on procedural grounds by the Board of Appeal of the Mangystau Regional Court. (R-I ¶ 30.56).

513. On 25 December 2009, Astana Economic Court issued a new decision against KPM regarding the comprehensive tax audits notice issued 10 February 2009. (C-I ¶ 159).

514. On 25 December 2009, the Specialized Interdistrict Economic Court issued a consolidation decision, rejecting KPM's and TNG's challenges to corporate back taxes. (CPHB 2 ¶ 128).

515. On 28 December 2009, TNG wrote to MEMR again requesting execution of Addendum No. 9 to Contract 302. (CPHB 2 ¶ 151).

516. Prior to 29 December 2009, Claimants negotiated a major new gas supply and purchase agreement with MAEK SPA and two major new gas supply and purchase agreements with AktauGasServise SPA. (R-II ¶ 409).

517. On 29 December 2009, the Aktau City Court issued a writ of execution against KPM, in execution of the verdict of the Mangystau Regional Court of 12 November 2009. (C-I ¶ 123, CPHB 2 ¶¶ 81, 98; R-I ¶¶ 29.7; R-II ¶ 648). Claimants appealed this. (R-II ¶ 649).

518. Claimants state that the Tax Committee Transfer Price Audit lasted 13 months, ending in 29 December 2009. (C-0 ¶ 78; C-I ¶¶ 19, 173). Respondent states that it lasted only 30 working days. The audit commenced on 12 November 2008 and was suspended on 12 December 2008, recommenced, and was concluded on 29 December 2009. This audit did not involve more than 5 members of the Tax Committee at any one time. (R-II ¶¶ 368, 369, 407, 410).

519. In the Transfer Price Audit, all of the sales invoices of KPM and TNG from 1 January 2004 to 31 December 2007 were disclosed to the State and audited in the process. The State assessed approximately USD 5 million in back transfer price taxes and penalties. KPM's and TNG's appeals of this remained pending on 22 July 2010. (C-0 ¶ 78; C-I ¶¶ 19, 173; CPHB 2 ¶ 38). Respondent presents that the audit showed that KPM and TNG had underreported their taxable income for the period 1 January 2005 – 31 December 2007. Respondent states that the audit revealed, in relation to KPM, underpayments of 191,391,320 Tenge, to which a late payment charge of 196,254,044 was added. In relation to TNG, the audit revealed underpayments of 172,766,494, to which a late payment of 154,900,840 was added. Respondent presents that KPM owed additional corporate Income tax of 2,255,019,100 Tenge and a penalty of 1,002,105,500 Tenge. TNG owed an additional 4,007,519,000 Tenge and a penalty of 1,898,215,500 and a "*reduction in loss*" of 1,558,600,300 Tenge. (R-II ¶ 373). For KPM, the amount was USD 2,607,070.00, and for TNG USD 2,203,694.00. (R-II ¶ 402; CPHB 2 ¶ 128). Neither company, however, paid the taxes. (R-II ¶ 404).

520. On 31 December 2009, KPM declared a dividend of USD 52.9 million. (R-II ¶ 142). The audit also revealed that, for the year ending 31 December 2009, Mr.



Case 1:15-mc-00081-P1 Document 19-5 Filed 04/27/15 Page 36 of 40

Anatolie Stati received a bonus of USD 3,863,000, down from USD 4,435,000 that he received in 2008. (R-II ¶ 143).

521. In January 2010, KPM commenced a legal action concerning the illegal imposition of the Crude Oil Export Tax on its January 2009 exports. (C-0 ¶ 75; C-I ¶ 169).

522. In January 2010, KPM commenced new legal proceedings challenging the Financial Police's claim that it owed 2008 export taxes on oil exports. (CPHB 2 ¶ 128).

523. On approximately 5 January 2010, the Aktau Division of the Enforcement Officers of the Mangystau Oblast issued the Decree on Initiating of the Enforcement Proceedings against KPM on Recovery of the Revenue, for USD 145 million. (C-II ¶ 337; R-II ¶ 648; CPHB 2 ¶ 81). The relevant Claimants appealed. (R-II ¶ 649). Enforcement measures were taken from January – June 2000. (CPHB 2 ¶ 81).

524. On 6 January 2010, TNG and KPM successfully appealed the 25 December 2009 ruling by the Astana Economic Court. (C-0 ¶¶ 64 – 66).

525. On 10 January 2010, the Chief of the Aktau Territorial Department of Judicial Executors issued a court order attaching several of KPM's "*second-tier*" bank accounts. (C-I ¶ 125, CPHB 1 ¶ 212, CPHB 2 ¶ 38; R-I ¶ 29.7). The seized accounts included two settlement accounts with Kazkommertsbank in Bostandykskyi District, forty-one settlement accounts with Kazkommertsbank in Aktau City, and nine settlement accounts with Halyk Bank of Kazakhstan in Aktau City. The order included instructions to those banks to inform the judicial executor whenever it received any funds from KPM. The order also included a warning to KPM's General Manager and Chief Accountant that criminal responsibility could result from failing to comply. (C-I ¶ 125; CPHB 2 ¶ 38).

526. On 14 January 2010, KPM requested and received an official copy of the 19 September 2009 verdict. (C-0 ¶ 51; CPHB 2 ¶ 98).

527. On 14 January 2010, the MEMR invited KPM and TNG to a working group meeting to take place on 21 January 2010 to discuss agreements and terms of additional projects, as well as negotiations. (CPHB 2 ¶ 151).

528. On 21 January 2010, KPM challenged the court decisions dismissing its complaints against enforcement. (CPHB 2 ¶ 98).

529. On 21 January 2010, KPM and TNG were informed upon their arrival at the MEMR's office that the working group meeting had been cancelled due to the need to conduct an unscheduled inspection of their operations. (CPHB 2 ¶ 151).

530. On 22 January 2010, KPM submitted a new complaint against enforcement orders. (CPHB 2 ¶ 98).

531. On 22 January 2010, the Chief of the Aktau Territorial Department issued an order finding that KPM had "*not paid the debt to the state and [had] not fulfilled the requirements of the judicial executor in due time.*" As a result, the order attached



eighteen different motor vehicles belonging to KPM. It also instructed the Road Police Department to take notice of the vehicles' registrations and to seize and impound them in order to make a formal inventory of their value. KPM received a copy of this order on 1 February 2010. (C-I ¶ 126; R-I ¶ 29.7).

532. On 22 January 2010, Mr. Mynbayev ordered an unscheduled inspection. (CPHB 1 ¶ 273). Claimants provided the MEMR documents evidencing compliance with the working programs on this date. (C-I ¶ 209).

533. On 25 January 2010, the MEMR notified KPM and TNG that it would perform a week-long audit / inventory of KPM's assets, beginning 26 January 2010. The resulting inventory listed 2,186 different assets, including 63 oil drilling wells and 10 gas drilling wells. (C-I ¶¶ 127, 128, 196, C-II ¶ 244; R-I ¶ 29.7; C-171).

534. On 25 January 2010, the Committee on Judicial Administration - a division of the Supreme Court of Kazakhstan - wrote to Mr. Stejar of KPM to inform him that the judicial acts pertaining to the Writ of Execution for 21.6 billion Tenge remained unexecuted. Further, the Deputy Administrator of Mangystau Oblast courts, Mr. Tursynbayev, instructed the Chief of Aktau Territorial Department to execute enforcement procedures by 30 January 2010. The instructions included: (i) to visit the Borankol Village to confirm whether KPM was operating, and if so, to make an inventory of and attach its property; (ii) to demand all documentation from KPM; and (iii) to make note of and inventory any motor vehicles discovered that were previously attached. (C-I ¶ 127; C-124).

535. On 25 January 2010, KPM filed a request with the Aktau City Court to reinstate the missed time for the appeal of the verdict of 18 September 2009 and filed an independent appeal of that verdict with the Board of Appeals of the Mangystau Regional Court. (C-0 ¶ 53, CPHB 2 ¶ 98; R-II ¶ 647).

536. From 25 January – 5 February, the MEMR noted that it was still considering the draft Addendum No. 9 to Contract 302. (CPHB 2 ¶ 151).

537. From 25 January – 6 February 2010, the MEMR inspection team noted that Kazakhstan had delayed providing necessary protocols to KPM and TNG because of its failure to execute the extension. (CPHB 2 ¶ 151).

538. From 25 January 2010 – 6 February 2010, the Department for Direct Investments in Subsoil Exploitation, the Department for Development of Oil Industry, and the Inspection Department for Geology and Subsoil Exploitation of the MEMR conducted an unscheduled comprehensive audit of KPM and TNG regarding their historical compliance with the subsoil use contracts and Kazakh law. (C-0 ¶ 55; C-II ¶ 290; CPHB 2 ¶¶ 38, 61).

539. On 26 January 2010, the Ministry of Finance commenced bankruptcy proceedings against KPM. (CPHB 2 ¶¶ 38, 128).

540. On 29 January 2010, the Aktau City Court denied KPM's right to appeal the 18 September 2009 decision as untimely. Respondent explained that KPM's failure to appeal in time could not be attributed to failures by the Republic and that everyone



had knowledge of the appeals deadline. (C-0 ¶ 53; R-II ¶¶ 636, 647; RPHB 1 ¶ 305).

541. On 3 February 2010, the Ministry of Finance notified KPM that it was monitored for bankruptcy on 26 January 2010 for 3.8 billion Tenge, including interest. The back taxes and penalties regarding the corporate income tax represented 85% of the amount notified by the Ministry of Finance, or 3.2 billion Tenge (approximately USD 40 million). (C-0 ¶ 65; C-I ¶ 160, CPHB 2 ¶ 38; R-I ¶ 29.3). Respondent states that the bankruptcy proceedings were unsuccessful. (R-II ¶ 377).

542. The unscheduled inspection ended on 6 February 2010. MEMR concluded that KPM and TNG were in compliance with the Kazakh law, including with respect to the pipelines. (C-0 ¶ 55; C-I ¶ 18; C-II ¶ 290; CPHB 2 ¶¶ 38, 61). The MEMR report clearly states that the pipelines are part of a "*single technological process*" and are, therefore, not main pipelines. (CPHB 2 ¶¶ 61, 74). According to the 6 February 2010 Report of the MEMR on Unscheduled Inspection for KPM, and the 5 February 2010 MEMR Report on Unscheduled Inspection for TNG, Claimants invested more than USD 1.1 billion (USD 772 after deduction of taxes and administrative expenses). (C-II ¶ 121).

543. On 8 February 2010, KPM challenged the appeal court's refusal to reinstate the time period for appeal. The letter also challenged the court's refusal to provide a copy of the 18 September 2009 judgment. (CPHB 2 ¶ 98; RPHB 2 ¶ 269).

544. On 13 February 2010, Claimants negotiated the sale of 100% of the shares and participatory interests in KPM and TNG to Cliffson Company S.A. (C-0 ¶ 85 (stating 2 February); C-II ¶¶ 393 – 395). The total value of the agreement, including the buy-out of the companies' noteholders and payment for Claimants' equity interests and the assumption of liabilities, exceeded USD 920 million. (C-I ¶ 193 (stating USD 930 million); C-II ¶¶ 388; CPHB 2 ¶ 371 and 418; R-II ¶ 814). Claimants state that this was a reduced value taking the criminal judgment and its enforcement against KPM into account. (CPHB 2 ¶ 38). USD 267 million represented the equity interests in TNG, KPM, and Tristan. (C-II ¶ 418). One condition of this sale was that MOG would grant permission for the sale and waive the State's alleged pre-emptive right to purchase KPM and TNG. (C-I ¶ 194; R-II ¶ 815). MOG conditioned permission for the sale on removal of the attachment orders and on its receipt of information about the financial solvency of Cliffson Company and about its technical and managerial capabilities, and on the receipt of other additional materials. (C-I ¶ 194). Respondent states that it cooperated fully with Claimants, but that Claimants delayed their waiver application by 2 months and ultimately failed to provide the information necessary for an approval and a waiver. (R-II ¶¶ 816 – 817).

545. On 16 February 2010, KPM submitted a claim to suspend the enforcement measures. (CPHB 2 ¶ 98).

546. On 17 February 2010, the President of the Blagovest fund wrote to Minister Mynbayev to make a suggestion to "*resolve the question of nationalization of the assets posed in 2008.*" (CPHB 2 ¶ 38).



547. On 19 February 2010, the Chief of the Aktau Territorial Department issued a writ of execution, noting that prior collection orders had gone unfulfilled. This order formally attached the 2,186 assets listed in the 26 January 2010 inventory and it specifically warned KPM's General Manager, Mr. Stejar, that he could face criminal responsibility for embezzlement or alienation of that property. KPM received this order on 1 March 2010. (C-I ¶ 129; R-I ¶ 29.7).

548. On 23 February 2010, the Chief of Aktau Territorial Department issued an order prohibiting KPM from executing import and export formalities regarding the transportation of oil. It meant that KPM could not deliver oil from its gathering system to the main pipeline operated by KazTransOil. (C-I ¶ 130; R-I ¶ 29.7).

549. On 23 February 2010, in response to the Akim (Governor) of the Mangystau Region's proposal for TNG to borrow funds from State agencies to complete the LPG Plant (CPHB 2 ¶ 219). Anatolie Stati wrote to the Akim to seek his assistance in resolving the companies' legal problems. (CPHB 2 ¶ 142).

550. On 24 February 2010, the Regional Customs Committee notified KPM and TNG that the companies were liable for Crude Oil Export Tax on their January 2009 exports. (C-I ¶ 170; CPHB 2 ¶¶ 38, 128; R-I ¶ 30.56).

551. Akim Kusherbayev wrote to Prime Minister Massimov on 24 February 2010, in an effort to broker a compromise by submitting a proposal made by Mr. Stati to the Prime Minister. Under Anatolie Stati's proposal, Claimants were to complete construction of the LPG Plant if claims against KPM and TNG were dropped. (R-II ¶¶ 324 – 325; CPHB 2 ¶ 221). Respondent also states that Claimants' possession of this confidential and internal letter, identified as C-665, points to serious corruption on behalf of Claimants. (R-II ¶ 214).

552. On 25 February 2010, KPM appealed the decision dismissing its claim to suspend enforcement measures. (CPHB 2 ¶ 98).

553. On 25 February 2010, Anatolie Stati sent a second letter to the Akim of the Mangystau Region, seeking his assistance. (CPHB 2 ¶ 142).

554. On 26 February 2010, the Chief of Aktau Territorial Department dismissed KPM's challenge to the writ of enforcement and issued an order to "*attach the oil pipeline from [the] OTP to Opornaya CRMB [Commodities and Raw Material Base of Opornaya Station] of 18 kilometers long*" and KPM's accumulator oil tanks, in order to fulfill the previous execution orders. This order also prohibited KPM from transferring oil to the main pipeline operated by KazTransOil once its accumulator tanks reached capacity. (C-I ¶ 131, CPHB 2 ¶ 98; R-I ¶ 29.7).

555. On 3 March 2010, the Interdistrict Economic Court of Mangystau Region dismissed KPM's action of January 2010. (C-0 ¶ 75; C-I ¶ 169).

556. On 4 March 2010, the Chief of the Aktau Territorial Department appealed to the President of the Second Aktau City Court for a change in the method and order of execution. He noted that, despite attaching fifty-two settlement accounts and numerous assets, "*monetary resources by collection orders do not arrive to the deposit account.*" Claimants state that, as a result, he requested that the



enforcement procedure be changed to an in-kind transfer of land lots, including the three previously-attached plots of real property, the 18 kilometer pipeline, KPM's Contract 305 over the Borankol field, and KPM's subsoil use license No. 309. (C-I ¶ 133).

557. On 5 March 2010, KPM appealed the decision dismissing its challenge to the writ of enforcement. On the same date, KPM submitted a complaint regarding the enforcement measures. (CPHB 2 ¶ 98).

558. On 15 March 2010, the Chief of the Aktau Territorial Department issued orders for the valuation of KPM's assets, including three lots of property, eighteen motor vehicles, the 18 kilometer pipeline, the field camp, and the Borankol field that were attached in previous orders. (C-I ¶ 134; R-I ¶ 29.7).

559. On 16 March 2010, KPM moved to alter execution procedures so that production on the Borankol field could continue. (C-I ¶ 135).

560. On 17 March 2010, the Acting Head of Aktau Territorial Department of Judicial Executors complied with KPM's request and issued two orders that suspended execution of the orders of 23 and 26 February 2010, respectively. Both confirmed that suspension was necessary "*to avoid the suspension of production activity of 'Kazpolmunai' LLP*" / to ensure that KPM and TNG's business was not unduly affected by the execution orders. (C-I ¶ 137; R-I ¶ 29.7).

561. On 20 March 2010, the Acting Chief of Aktau Territorial Department of Judicial Executors proposed that the Prosecutor initiate a criminal case against Mr. Stejar, then-General Manager of KPM, for failing to enforce the 29 December 2009 writ of execution against KPM. (C-I ¶ 138).

562. On 26 March 2010, KPM appealed the criminal judgment to the Cassation Court. (CPHB 2 ¶ 98).

563. On 31 March 2010, the Central Customs Committee cancelled the 24 February 2010 notifications to KPM and TNG and stated that, pursuant to their Subsoil Use Contracts, KPM and TNG were not liable for export taxes from October 2008 onward. (C-I ¶ 170; CPHB 2 ¶¶ 38, 128; R-I ¶ 30.56; R-II ¶ 386). Respondent states that, in total, KPM paid USD 700,000 in respect of customs duties, and this payment was returned following the withdrawal of charges. (R-I ¶ 30.57). Respondent denies Claimants' positions that they paid USD 10 million or that they paid USD 12.77 million, USD 2.6 million of which was refunded. (C-0 ¶ 74; C-I ¶ 164; C-II ¶¶ 234 – 235; CPHB 2 ¶¶ 38, 128; R-II ¶¶ 387 – 391).

564. On 3 April 2010, Anatolie Stati's company, Komet, sent a notice of dispute to the Regional Government of Kurdistan to initiate arbitral proceedings. This notice was signed by Reginald Smith of King & Spalding. (RPHB 1 ¶ 137).

565. On 9 April 2010, KPM submitted a new complaint regarding enforcement measures. (CPHB 2 ¶ 98).

566. On 10 April 2010, Ascom and Cliffson conferred regarding the Cliffson SPA, specifically, the allocation among the four companies (TNG, KPM, CASCo,

