Tristan) in the sale for purposes of completing government applications. (CPHB 2 ¶ 374).

567. On 12 April 2010, Claimants submitted applications for approval of the Cliffson sale and waiver of Kazakhstan's pre-emptive rights to the MOG and Ministry of Industry and Technology, respectively. (C-II ¶ 389; R-II ¶ 817).

568. On 23 April 2010, the Astana appellate court reversed the 25 December 2009 decision against KPM and TNG by the Astana Economic Court and found that KPM and TNG properly deducted drilling expenses. The Tax Committee's appeal was dismissed. (C-0 ¶ 66; CPHB 2 ¶ 128).

569. In connection with the bankruptcy proceeding, the State filed a request with the Specialized Interdistrict Economic Court of Mangystau Region for external management of KPM (appointment of a bankruptcy administrator) on 26 April 2010. (C-0 ¶ 65; C-I ¶ 160). This request was dismissed by the Interdistrict Economic Court on procedural grounds, and a subsequent replacement request was withdrawn by the State. (C-0 ¶ 66).

570. On 30 April 2010, the MOG responded to Claimants' 12 April 2010 request by: (1) requesting additional information regarding the terms of the transaction and the financial and technical abilities of Cliffson, (2) noting that based on Kazakhstan's seizures of the companies' assets, transfers of the shares of KPM and TNG were forbidden, and (3) concluding that the transaction would only be approved if KPM and TNG satisfied the requirements necessary to release the attachment of their shares. (C-II ¶ 389, CPHB 2 ¶ 38; R-II ¶ 818). Respondent states that Claimants failed to respond to this letter. (R-II ¶ 820).

571. On 6 May 2010, Cliffson executed an amendment to the SPA extending the time for the transaction. (CPHB 2 ¶ 374).

572. On 6 May 2010, Respondent sent a notice of breach, stating that TNG had failed to comply with the annual working program in respect of Contract 302 and requested response by 20 May 2010. (R-I ¶ 31.137; CPHB 2 ¶ 151). TNG received this on 7 May 2010. (C-I ¶ 197).

573. On 7 May 2010, the MOG notified TNG of inadequate fulfillment of license and contract provisions for 2009 and requested that TNG "*remove delays*" in its 2009 Contract 302 work program and present to the Ministry a draft appendix for the 2010 work program within one month. (C-I ¶ 197; CPHB 2 ¶ 151).

574. On 11 May 2010, KPM appealed the decision regarding enforcement to the Cassation Court. (CPHB 2 ¶ 98).

575. On 18 May 2010, there was an order not to prosecute Anatolie Stati, since there were no grounds on which to prosecute him, personally. (CPHB 1 ¶ 312).

576. On 27 May 2010, TNG wrote to the MOG, explaining that it had submitted an application for a two-year extension of the exploration period in its Contract 302 properties and the corresponding work program, in October 2008. TNG explained that MOG had agreed to the extension by letter dated 9 April 2009, that TNG



submitted the addendum for execution dated 30 April 2009, and that TNG never received an executed extension from MOG. TNG explained that it, therefore, suspended its exploration operations in the Contract 302 properties. TNG argued that it had fulfilled all of its contractual obligations. (C-I ¶ 198).

577. On 1 June 2010, the MOG sent an additional request to KPM and TNG for information regarding the Cliffson transaction. (C-II ¶ 389; R-II ¶ 821).

578. On 9 June 2010, the Court Execution Body of the Mangystau Region - the Acting Chief of Aktau Territorial Department of Judicial Executors - ordered the sale of KPM's assets as a single lot, so as to avoid any suspension of activities. (C-0 ¶ 87; C-I ¶ 139; CPHB 2 ¶ 98; R-I ¶ 29.7).

579. On 15 June 2010, Claimants wrote to Cliffson regarding Cliffson's "*backing out*" of the so-called Cliffson transaction. (CPHB 2 ¶ 375).

580. On 15 June 2010, the Acting Chief of Aktau Territorial Department issued a "*repeated warning*" to Mr. Stejar of KPM, claiming that KPM operated and carried out oil and gas extraction, sold the products, and gained income, but did not voluntarily make any payments as ordered by the court decision. The notice instructed KPM to execute the court order by paying 21.6 billion Tenge in full or by transferring assets corresponding to the amount owed, within two weeks' time. (C-I ¶ 139; R-I ¶ 29.7).

581. On 18 June 2010, KPM challenged the valuation of its property and the actions of state executors. (CPHB 2 ¶ 98).

582. On 22 June 2010, the Kazakh Court of Cassation dismissed the Tax Committee's claims that KPM and TNG owed USD 62 million in corporate back taxes for allegedly improperly deducting drilling expenses. The Court affirmed the appellate court decision in favor of KPM and TNG. (CPHB 2 ¶¶ 38, 128).

583. On 23 June 2010, Claimants replied to the MOG requests of 30 April and 1 June 2010 regarding the proposed Cliffson transaction. (C-II ¶ 390). The Parties dispute whether Claimants provided all of the necessary information. (C-II ¶ 390; R-II ¶ 822). Claimants state that they received no reply from Kazakhstan. (C-II ¶ 390).

584. On 24 June 2010, a change in the Subsoil Use Law was approved, which allowed Kazakhstan to terminate contracts when a contractor failed to cure 2 or more contract violations. (CPHB 1 ¶ 278).

585. After receiving no reply from the MOG, Cliffson wrote to MOG, stating that it refused to purchase the interests in TNG and KPM. (C-I ¶¶ 193 – 195).

586. On 25 June 2010, KPM submitted its complaint to the 9 June 2010 enforcement order. (CPHB 2 ¶ 98).

587. From 25 – 29 June 2010, there were unscheduled inspections of KPM and TNG from at least 7 agencies, on the order of the Prime Minister and with the involvement of the Financial Police and the GPO. (CPHB 2 ¶ 38).



588. On 28 June 2010, the GPO received a complaint from Messrs. Sadyrbaev, Makashev, Esenov, and Sagindikov about KPM and TNG related to non-payment of salaries, mass dismissal of employees, and failure to comply with environmental legislation and legislation on subsoil use. The complaint requested that the GPO take measures to prevent the loss of deposits and to establish a stable social environment. According to the petition, the individuals who submitted it were residents of the Beyneu District of Mangystau Province, where the Tolkyn and Borankol oil deposits as well as the KPM & TNG oil exploitation infrastructure were situated. (R-II ¶¶ 305, 676; CPHB 1 ¶ 265; CPHB 2 ¶ 178 (referring to alleged receipt)).

589. On 28 June 2010, Claimants provided documents related to its working program to the MEMR. (C-I ¶ 209).

590. Claimants and Respondent dispute aspects of the June – July 2010 inspections. Claimants state that a dozen Government agencies sent notices that unscheduled inspections of KPM and TNG would commence. (C-I ¶ 200). Respondent states that only 5 ministries requested further inspections. (R-I ¶ 31.98; R-II ¶ 306). Contrary to Claimants' assertion, Respondent does not admit that the MOG covered the same issues 6 months previously. (R-I ¶ 31.98). Respondent admits that TNG's compliance with Contract 302 was investigated as part of the July 2010 investigations. (R-I ¶ 31.138). Respondent states that the inspections initiated with the GPO and had nothing to do with the Financial Police. (RPHB 2 ¶ 45).

591. On 29 June 2010, the Ministry of Industry and New Technologies' Geology and Subsoil Use Committee ordered a two-week inspection of KPM and TNG to determine whether the companies were in compliance with subsoil use legislation. The Chief State Ecological Inspector of Mangystau Oblast notified KPM and TNG that an unscheduled inspection regarding compliance with environmental protection legislation would take place beginning 30 June 2010. The State Labor Inspector sent notices to KPM and TNG that unscheduled inspections would take place. The Immigration Police sent notifications of inspections that were to take place from 1 – 29 July 2010, in order to ensure that neither KPM nor TNG was in violation of Kazakhstan's immigration legislation. (C-I ¶¶ 199 - 201). Finally, Kazakhstan ordered its second round of unscheduled inspections of KPM and TNG, to take place in the same time period, to assess compliance with their subsoil use contract obligations. (C-II ¶ 343; CPHB 2 ¶ 178).

592. On 30 June 2010, the Ecology Committee began its unscheduled inspection of KPM and TNG. (CPHB 2 ¶ 178).

593. From June – July 2010, the Department for Emergency Situation carried out unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

594. From 30 June – 15 July 2010, MOG carried out its unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

595. From 30 June – 16 July 2010, the Geology and Subsoil Use Committee of the Ministry of Industry and New Technology carried out its unscheduled inspection of KPM and TNG. (CPHB 2 ¶ 178).



596. From 30 June – 29 July 2010, the Labor Department carried out its unscheduled inspections of KPM and TNG.

597. By July 2010, the LPG Plant was over 90% complete. (C-I ¶ 64).

598. By July 2010, KPM and TNG were both in breach of the Minimum Work Programs. (R-II ¶¶ 657, 659, 660).

599. From 1 July – 29 July 2010 the Immigration Police carried out their unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

600. On 3 July 2010, the Ecology Department issued an act of inspection for its environmental audit of KPM and TNG. (CPHB 2 ¶ 178).

601. Claimants state that, on 4 July 2010, the Financial Police arrived on KMG / TNG premises to conduct their investigation. The Financial Police requested access to the Human Resources Department. Claimants state that they feared that a search through personnel files would lead to another arrest and ordered the middle-management of KPM and TNG to evacuate Kazakhstan. (C-I ¶ 203; CPHB 1 ¶ 270). Respondent puts Claimants to proof that this investigation occurred and that it caused Anatolie Stati to instruct the evacuation of middle management from KPM. (R-I ¶ 31.98).

602. Claimants state that, on 9 July 2010, a representative from Mangystau Oblast's Entrepreneurship and Industry Department, a division of the Regional Authority of Mangystau, called TNG to inform it that Kazakh Prime Minister K.K. Massimov planned to visit the LPG Plant during a working trip to the region. He instructed TNG to prepare and/or construct: (i) landing pads in the vicinity of the LPG Plant to support the arrival of three helicopters; (ii) a presentation of the LPG Plant project, including photographs, technological specifications, and remaining financing required; and (iii) a platform on which discussion of the project could take place. (C-I ¶ 204; CPHB 2 ¶¶ 38, 178).

603. According to Claimants, on 9 July 2010, Financial Police officer S. Rakhimov reported to the Chief of Financial Police referencing ongoing inspections. (CPHB 2 ¶ 178). Respondent states that, at the Hearing on Jurisdiction, Mr. S. Rakhimov denied writing the report. (RPHB 2 ¶ 46).

604. On 9 July 2010 and on 12 July 2010, KPM and TNG, respectively, challenged the 29 December 2010 transfer price tax assessment. (R-I ¶ 30.65).

605. Claimants state that, on 12 July 2010, the Governor's office again contacted TNG to request that it make its land cruiser (which had been seized earlier that year), other automobiles, and drivers available for the entire delegation. The members of the Government delegation would include the Prime Minister, the Minister of Oil and Gas, the regional Governor, and several other high-level officials. (C-I ¶ 205; CPHB 2 ¶ 178).

606. On 14 July 2010, the MOG sent notices to KPM and TNG that the companies were in violation of their Subsoil Use Contracts 210 and 305. (R-I ¶ 31.19; C-II ¶ 346, CPHB 1 ¶ 296, CPHB 2 ¶¶ 74, 178; RPHB 1 ¶ 360; RPHB 2 ¶ 354). The notices



from the MOG were dated 14 July 2010, but were not received by KPM and TNG until 16 July 2010. (R-I ¶ 31.54). The notices set out (1) the contract to which the notice related, (2) the contractual breaches by KPM and TNG, (3) a deadline within which to respond, and (4) the consequences for failing to respond to the notice. (R-I ¶ 31.107). The notices gave KPM and TNG until 19 July 2010 to "*submit explanations on reasons of non-execution of contract terms and all necessary documents, ascertaining removal of the above-mentioned violations, as well as to inform [the MOG] on measures taken in order to avoid violation of contract terms*." Respondent reports that the violations in the notices included "*admissions*" by KPM and TNG that they had operated trunk oil and gas pipelines without a license and 13 additional alleged violations for which Claimants state that the State had provided no prior notice to KPM or TNG. (R-I ¶¶ 31.103 *et seq*.). Claimants report that the notices listed 16 alleged violations. The notice further provided that "*[i]n case of failure to comply with the request set forth in this Notice within the established time limit, the Competent Body is entitled to terminate the Contract[s]*." (C-0 ¶ 88; C-I ¶¶ 20, 206 – 208, 332). Respondent states that the violations contained in the notice of 14 July 2010 were detected by the competent authority as a result of permanent monitoring of the compliance by the subsurface users of their contractual obligations. (R-I ¶ 31.42). The audits proved that production activities at KPM and TNG had virtually stopped; there was little chance of employee salaries being paid. (R-II ¶ 692). The Parties state that, by this time, the majority of TNG and KPM senior and middle management had left Kazakhstan. (R-II ¶ 698; C-1 ¶ 218).

607. On 14 July 2010, the MOG sent a notice of contract violations, which treated Contract 302 as still in force. (CPHB 2 ¶ 151).

608. Claimants allege that the inspections may have never been officially concluded. (C-II ¶ 346).

609. On 19 July 2010, Claimants submitted written answers and explanations concerning each violation alleged in the 14 July 2010 notice. (C-0 ¶ 89, CPHB 2 ¶ 178; RPHB 1 ¶ 361, RPHB 2 ¶ 354).

610. On 20 July 2010, the Ministry of Industry and New Technologies issued its acts of inspections for the unscheduled inspections of KPM and TNG. (CPHB 2 ¶ 178).

611. On 21 July 2010, the State delivered to KPM and TNG two written notices terminating KPM Subsoil Use Contract 305 covering the Borankol field, and terminating TNG Subsoil Use Contract 210 covering the Tolkyn field. (R-I ¶ 31.129; CPHB 2 ¶ 178). The State did not deliver a specific written notice terminating TNG Subsoil Use Contract 302 covering the Tabyl Block, which the State says expired on 30 March 2009. (C-0 ¶¶ 59, 89; C-1 ¶¶ 21, 217). On the same date, pursuant to the legislation, the MOG and KMG agreed to two trust management agreements over the subsoil areas for the Tolkyn and Borankol. (CPHB 2 ¶¶ 38, 178). Respondent stressed that these agreements transferred the property into temporary possession of KMG NC as a result of the termination of the contracts until a new subsoil user is found. (R-I ¶ 31.151; R-II ¶ 701). While terminating the contracts, the State made no claim that KPM and TNG owed outstanding corporate income taxes, transfer pricing taxes or export duties. (CPHB 2 ¶ 128).



612. Nine hundred employees of KPM and TNG resigned effective 21 July 2010. Many were rehired by KMG in the same positions they had held previously. (C-I ¶ 220; C-II ¶ 356). Respondent also does not dispute that many KPM and TNG employees joined KMG NC on their own volition. (R-II ¶ 713).

613. On 21 July 2010, the Kazakh Prime Minister, the MOG, and the Aktau Regional Governor, visited Claimants' LPG plant to personally carry out the transfer of ownership. (C-I ¶ 218). Claimants characterize this as the expropriation where they were told that they could either (1) sign an agreement to transfer operations, (2) become subcontractors, or (3) KMG would obtain a court order and obtain the business "*the hard way*." (C-0 ¶¶ 90- 91). Respondent states that the LPG Plant, which Claimants abandoned in May 2009, was never part of the property that was transferred to KMG trust management. It still remains the property of TNG. (R-I ¶ 31.152).

614. There was a phone call on 22 July 2010 between Mr. Calancea of TNG, Mr. Ongarbaev of MOG, and Mr. Utilgaliev of KMG in which all issues of the termination of the contracts and the management of the assets going forward were discussed. (R-I ¶ 31.155 *et seq*.; R-II ¶ 705; CPHB 2 ¶ 178).

615. Claimants state that the termination notices faxed to KPM and TNG on 22 July 2010 informed both that the territories involved in Contracts 210 and 305 were to be transferred to the Republic of Kazakhstan and into the temporary possession and use by KMG. (C-I ¶ 222; C-II ¶ 354; CPHB 2 ¶¶ 74, 117). KPM continued to exist as a legal entity that could have asserted its legal rights, notwithstanding the transfer of assets. (R-II ¶ 378, R-I ¶ 31.150).

616. On 22 July 2010, the MOG sent TNG a notice of termination of Contract 302, alleging that Contract 302 had expired in March 2009. (CPHB 2 ¶ 178).

617. KMG forwarded Claimants contracts providing for the transfer of infrastructure, operations, and economic benefits to KMG and the State — contracts that KMG has already executed. (C-0 ¶ 91; C-I ¶¶ 225 – 230). Respondent states that the terms of the contracts proposed to KPM and TNG in order to transfer the territories to KMG NC to hold in trust management mirrored the terms of the main trust agreements signed the day before and provided that the transfer was temporary until a new subsoil user was found. (R-II ¶ 706). Claimants state that they never signed a transfer agreement with KMG. (C-II ¶ 230).

618. On 22 July 2010, all revenues generated from oil and gas production were put into a separate escrow account held by KMG. (C-I ¶ 231; R-I ¶ 31.164).

619. The MOG issued its notification of termination of Contract 302 on 22 July 2010. (RPHB 1 ¶ 347).

620. On 23 July 2010, KPM and TNG received letters from the MOG stating that, due to the unilateral termination of the contract from 00 hrs. 00 min. of 22 July 2010 all products produced on the enterprise had been transferred to the ownership of the Republic of Kazakhstan. (C-I ¶ 232).


**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COM **542** -

621. On 24 July 2010, Claimants notified the State that it viewed the actions of KMG and the State as illegal takings of Claimants' rights and assets, and protested the revocations and seizures. (C-0 ¶ 91). Respondent confirms this conversation and points out that there was no one from Claimants left in Kazakhstan to run the companies. (R-I ¶ 31.156).

622. On 28 July 2010, Respondent employed the attorney provisions set out in Article 72(10) of the Subsoil Law and to arrange for an agreement to be entered into for the transfer of property to KMG. (R-I ¶ 31.160). The transfer of assets was finalized in Claimants' absence. (R-II ¶ 712).

623. Since being taken into trust management, KMG has delegated all immediate functions for the subsoil area trust management to the Aktau branch of its 100% affiliate KMT. (R-I ¶ 31.162).

624. On 26 August 2010, KPM and TNG wrote to the MOG to inquire about the status of their assets after the cancellation of the three contracts. (C-I ¶ 236).

625. A summons was issued for Mr. Stejar to appear at the transport prosecutor's office in or around September 2010. (C-I ¶ 138).

626. On 16 September 2010, the 29 December 2009 transfer price tax assessment decisions were upheld. (C-I ¶ 174; R-I ¶ 30.65).

627. On 3 November 2010, the Kazakh Supreme Court overturned the decisions of the appellate court and the Court of Cassation, thereby reinstating the trial court's findings that the corporate income tax assessment was proper. Claimants were unaware of this review until it was mentioned in the Statement of Defense filed in this arbitration. (CPHB 1 ¶¶ 255, 258; CPHB 2 ¶ 128; RPHB 2 ¶ 976).

628. On 24 January 2011, there was a TV interview of the former President of the Republic of Moldova. (C-78, minute 1:10:59). Claimants believe that this interview is an admission that former President Voronin composed the 6 October 2008 letter at the request of President Nazarbayev. (C-I ¶ 75). Respondent rejects this translation of the interview. (R-I ¶ 19.21).

629. On 29 April 2011, KMT obtained a license to operate main pipelines, including KPM's 18 km pipeline. (CPHB 2 ¶ 74).

630. In August 2011, former Ascom Vice President, Andrei Bastovoi, and his son were charged with misappropriating USD 185,000 of Ascom funds. Respondent states that Mr. Bastovoi defended himself by arguing that he was under orders to divert this funding from Sudan to another African country (Uganda) for corporate purposes. Respondent states that Mr. Bastovoi was rearrested in October 2011 for plotting the murder of members of the Stati family. (R-II ¶ 45).

631. On 17 December 2012, Claimants set up a so-called "*Sharing Agreement*" between them and the noteholders. The Sharing Agreement foresees that proceeds from an award be shared between Claimants and noteholders on a 30/70 basis. (RPHB 1 ¶ 1056).



632. As of January 2013, KMT trust manager Mr. Khalelov confirmed that no attempts have been made to recover allegedly outstanding taxes from KPM or TNG. (CPHB 2 ¶ 128).

633. Claimants state that, on 14 February 2013, the Sharing Agreement was accepted by 99.8% of the noteholders, effectively amending the notes and related security arrangements for all noteholders. The Sharing Agreement did not create or materially alter Claimant's obligations regarding the Tristan Debt. Instead, it was a renegotiation of Claimants' existing obligations and not a voluntary assumption of new liability. (CPHB 1 ¶¶ 626 – 630, 632; CPHB 2 ¶¶ 325 - 327).

## F.III. Respondent's Alleged "*Playbook*" / Campaign of Harassment and Interference

634. The Tribunal has considered all of the facts presented by the Parties, even if not explicitly stated herein. This section introduces the facts and events related to what Claimants call Kazakhstan's "*Playbook*." This section is without prejudice to the Parties' further submissions and arguments.

### 1. Arguments by Claimants

635. Claimants argue that Respondent runs a "*playbook*" of harassment to coerce investors and to enrich powerful Kazakhs. The playbook typically commences with an executive-mandated investigative onslaught and ends with a firesale of assets to the State or an outright seizure. Groundless tax claims are an important element of the playbook. Respondent used these harassing and intimidating tactics to coerce Claimants into selling their investments to KMG at a firesale price and, when that failed, seized the investments under the appearance of legitimacy. (C-II ¶ 363; CPHB 2 ¶¶ 40, 128 – 139).

636. Claimants urge the Tribunal to view Respondent's conduct for what it was: "*a concerted attempt to coerce Claimants to sell their successful investments to KMG (or some other company owned by Timur Kulibayev) at a firesale price*." (C-II ¶ 373). Kazakhstan has a long-standing goal of "*claw[ing] back some of the value it had negotiated away to foreign investors in earlier deals*." (C-II ¶ 365). It accomplishes that by "*attempting to renegotiate contracts with foreign investors, and by acquiring interests in foreign-owned companies through KMG at a discount to fair market value. If foreign investors did not go along voluntarily, Kazakhstan brought pressure in the form of harassing inspections, outrageous tax assessments, criminal prosecutions, fines, etc.*" (C-II ¶ 365). Claimants describe the "*playbook*" as follows:

> *[T]ax authorities and other regulators [in Kazakhstan] have been tasked to approach investors very aggressively in an effort to address the perceived unfairness of the deals struck with foreign investors in the republic's early years. The Financial Police have apparently been tasked a key role in implementing government policies designed to reverse these past "errors." Using methods similar to those often employed in neighboring Russia, the Kazakh government has become adept at harassing foreign companies with a barrage of fines, criminal allegations, and tax threats until it is able to extract from them whatever concessions it desires. Sometimes the tactics*



> *employed are designed to achieve a material modification of the economic essence of the transaction. On other occasions their intention seems rather more confiscatory, geared to driving the foreign investor away and seizing its investment. (C-II ¶ 365, CPHB 2 ¶ 129).*

637. This "*playbook*" typically involves three elements. First, there are the Financial Police. The Financial Police have powers to "*preempt, investigate, and prosecute economic, financial and corruption crimes and violations*." The Financial Police are closely controlled by President Nazarbayev and act as the "*President's instrument to coordinate multi-agency investigations and to ensure that other more independent agencies reach the desired conclusions*." (C-II ¶ 367). Second, there is the involvement of the judiciary. While the involvement of the judiciary may lend the appearance of normalcy and legitimacy to Kazakhstan's actions, it actually is just another tool through which the executive branch ensures a predetermined outcome. Kazakhstan has a weak and partial judiciary. Further, the use of criminal allegations and prosecutions puts tremendous pressure on investors and greatly enhances the bargaining position of the State: (C-II ¶¶ 367 – 369).

> *[...] First, it allows for dramatic pressure against individuals, who recognize that they may be held for protracted periods in investigative detention and subjected to aggressive interrogation in a country with a reputation for jailhouse torture and abuse and for ill-explained deaths in detention, which has no independent judiciary, and in which a conviction is a foregone conclusion in any case taken to trial. Second, it ratchets up pressure on those arrested to turn on their employer and provide information that may lead to the "discovery" of crimes or regulatory infractions, even when none were legitimately detected before. Criminal investigators offer immunity for employees who turn on an employer in this fashion. Third, the disruption produced by the criminal case can paralyze a business and bring it grinding to a halt. This can occur by distracting senior management from performing their jobs, through the seizure of business records which make the continuation of work all but impossible, through raids and searches of business premises which demoralize employees and stop work at critical junctures. The prosecution of a criminal case can thus destroy a business, even if no conviction results. (C-II ¶ 369).*

638. Third, Kazakhstan invariably makes it clear that the renegotiation of a contract or the sale of a substantial equity stake to KMG (or another Kazakhstan-owned entity) will make all these problems go away. This tactic has been used against at least four other investors in the oil and gas sector to date: (1) Tengizchevroil LLC (charged with "*illegal entrepreneurship*" for "*unauthorized overproduction*" of oil), (2) Agip KCO (publically accused of fraud), (3) Karachaganak Petroleum Operating BV (accused, among other things, of "*illegal entrepreneurship*" for "*profiting from oil output that was not approved by the state*", and (4) Caratube International Oil Company (repeated raids). (C-II ¶ 370).

639. Claimants state that observers have dubbed Kazakhstan's political system as an "*advanced kleptocracy or a 21st-century dictatorship*" and identify 2 motives for this. First, President Nazarbayev uses his tactics to enhance personal wealth and power of himself and his allies. His son-in-law, Timur Kulibayev, who has amassed a fortune of over USD 1 billion and holds the Chairmanship of KMG and



other positions, is one clear beneficiary of this. He controls an estimated 90% of the Kazakhstan economy. Second, Kazakhstan uses this "*playbook*" to weaken political opponents of President Nazarbayev by eliminating their sources of income. This motivation seems unlikely here, although Claimants were made vulnerable by the fact that Anatolie Stati was an adversary of Moldovan President Voronin. This was a vulnerability because it meant that no Moldovan diplomats would come to Anatolie Stati's rescue. (C-II ¶¶ 371 – 373).

640. Claimants argue that Respondent used its "*playbook*" to force Claimants to sell at a firesale price. Claimants have been refusing offers from companies controlled by Timur Kulibayev to purchase all or some of their Kazakhstan investments since at least 2004. In 2004, GazImpex – a company controlled by Mr. Kulibayev – attempted to purchase TNG. At the time, Claimants valued TNG at USD 567 million, but GazImpex valued TNG at USD 27.8 – 32.9 million. This was likely Mr. Kulibayev's first attempt to acquire Claimants' investments at a bargain price. In 2007, Claimants discussed the sale of TNG to another company controlled by Mr. Kulibayev – KazRosGas – a joint venture between KMG and Gazprom. KazRosGas wanted to purchase a 50% interest in TNG. But, when Terra Raf determined that selling a share in TNG of that size could trigger Kazakhstan's pre-emptive right to acquire the interest, it decided not to sell the partial stake to anyone. The message was that Claimants did not want to be in business with the Kazakhstan government (i.e., KMG). (C-II ¶¶ 373 – 376).

641. In summer 2008, Claimants marketed the 100% sale of their investments through Project Zenith. They included KMG in the potential purchaser targets, since they would not be in business with the buyer thereafter. Renaissance Capital sent KMG the Information Memorandum and the Due Diligence presentation, both of which contained substantial details about the companies and their assets. On 25 September 2008, KPM submitted an offer of USD 754 million, for KPM and TNG (minus the Contract 302 properties). This was the third lowest offer. Less than three weeks later, however, President Nazarbayev issued his order to investigate Claimants' companies, resulting in a "*barrage of investigations, false accusations, exorbitant tax assessments, and criminal prosecutions.*" Claimants argue that the "*timing alone supports a strong inference that President Nazarbayev issued his order to help tip the scales in KazMunaiGaz's favor in the Project Zenith. The events that unfolded over the next 20 months make that inference extremely clear.*" (C-II ¶ 376 – 380). In particular, Claimants highlight the following events:

- *On November 11, 2008, the Financial Police's issuance of a finding that KPM did not have a main pipeline license, paving the way for the criminal trial and US$ 145 million fine on KPM;*

- *On December 18, 2008, the MEMR's reversal of its pre-emptive rights waiver as to TNG, and issuance of a press release alleging forgery and fraud in connection with the registration of TNG;*

- *On February 10, 2009, the assessment of US$ 62 million in back taxes, disregarding stabilization guarantees in its Subsoil Use Contracts; and*

- *On April 29, 2009, the arrest of KPM's general director. (C-II ¶ 380).*



642. This harassment campaign caused a liquidity crisis within Claimants' companies that, combined with falling energy prices, forced Claimants to obtain a bridge loan for additional working capital. Claimants had already finalized the details of a loan from Credit Suisse on 5 December 2008, but Credit Suisse – after seeing the 18 December 2008 press release and accusations – refused to provide the capital until Claimants resolved their disputes with Respondent. (C-II ¶ 381). Claimants' description of its additional liquidity problems are best taken from their own words:

> 382.  *Without that additional working capital, KPM and TNG's cash position became very tight in early 2009. Moreover, Kazakhstan exacerbated that liquidity problem by choking off TNG's access to gas markets. In the fall of 2008, TNG's largest non-local customer — Kemikal, a company controlled by Mr. Kulibayev — inexplicably failed to post bank guarantees that were part of its required payment terms. Because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). When local demand declined in the spring of 2009, however, the absence of the Kemikal contract left TNG with a shortage of demand. TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. TNG had previously sold gas for export through KazRosGas and GasImpex (both companies that were controlled by Mr. Kulibayev), and those companies had made a substantial profit on those contracts. Thus, the decision of KazRosGas not to export TNG's gas in the spring of 2009 seems suspiciously like a conscious attempt to choke off TNG's revenues at a critical time.*

> 383.  *This liquidity crisis reached its peak in June 2009, when KPM and TNG owed significant tax payments as well as loan repayments to Tristan needed to fund Tristan's coupon payments to noteholders. Not coincidently, KazMunaiGaz returned at exactly that time to make another lowball offer for the companies. KazMunaiGaz knew the predicament that KPM and TNG were in. As a result of the "re-evaluation" of TNG that the MEMR ordered in March, KazMunaiGaz received access to the complete Project Zenith data room — including KPM and TNG financials — in April 2009. Then, in June 2009, KazMunaiGaz offered only US$ 50 million for Claimants' equity interests and indicated that it would "deal separately" with the companies' debts, without providing any further detail. Even assuming that KazMunaiGaz intended to pay face value for the US$ 550 million in outstanding debt (which seems unlikely, based on KazMunaiGaz's offer of 25 cents on the dollar to the Tristan noteholders in November 2009), the total value of [KMG's] "offer" had decreased to at most US$ 600 million — which was at least US$ 150 million less than its indicative offer from September 2008. It is no coincidence that KazMunaiGaz showed up with this opportunistic offer at just the right time. This is the Kazakhstan harassment playbook at work.*

> 384.  *Claimants were only able to weather the liquidity storm in the summer of 2009 by obtaining emergency bridge financing from a group of venture capitalists (the "Laren Facility"). The terms of the Laren Facility were*



> terrible for Claimants (35% interest on a $60 million note, plus the
> issuance of $111 million of new Tristan notes). Because of the substantial
> risks to lenders created by Kazakhstan's harassment campaign, those were
> the best terms that Claimants could obtain. They had no choice but to
> accept those terms while they continued to try to sell the companies to
> Total and KNOC in the summer of 2009. (C-II ¶¶ 382 – 384).

643. As time continued, Respondent simply turned up the pressure. Kazakhstan
interfered in the trial of Mr. Cornegruta to ensure a guilty verdict and then
sentenced him to four years' incarceration in a notoriously dangerous prison
system. Kazakhstan then threatened to do the same to KPM and TNG's other
directors. Kazakhstan levied a massive fine against KPM that was large enough to
bankrupt the company and provide a ground for seizing the assets. Through the
continued inspections, audits, and seizures, Kazakhstan continued to interfere with
the day-to-day operations of the business. Then, in November 2009, KMG made
another, even lower bid to buy the companies. (C-II ¶¶ 385 – 386).

644. At around the same time, Mr. Kulibayev clandestinely made another attempt to
purchase the companies, through a different company: the Starleigh Group. (C-II ¶
387).

645. On 7 February 2010, the President of the Blagovest Fund, Mr. Zakharov, wrote a
letter to the MEMR. (C-I ¶¶ 15, 181-2, CPHB 1 ¶ 335, CPHB 2 ¶ 38).
Accompanying this Blagovest letter was a 19 November 2009 personal instruction
from President Nazarbayev, which Claimants state indicates that he had wanted to
strip the companies of their assets while maintaining the assets operational. This
letter and the attached government instruction indicates that Kazakhstan planned a
take over as early as 2008. (C-I ¶ 182; CPHB 1 ¶¶ 335 – 341).

646. Despite the campaign of harassment, Claimants were able to find a buyer for KPM
and TNG in February 2010 – the Cliffson Company. The total value of this offer
exceeded USD 920 million. On 12 April 2010, Claimants submitted applications
for approval of the Cliffson sale and a waiver of Kazakhstan's pre-emptive rights.
On 30 April 2010 and 1 June 2010, the MOG requested additional information
about the transaction and Claimants provided all of the reasonably requested
information on 23 June 2010. Rather than respond, however, Kazakhstan initiated
the final inspection blitz that led to the ultimate expropriation of Claimants' assets
on 22 July 2010. (C-II ¶¶ 388 – 391, partially quoted).

647. Claimants state that, by this time, they had made it clear that they intended to bring
arbitration claims against Kazakhstan for the diminution in value of their
investments once the Cliffson sale closed. This had been an issue of concern
throughout the harassment campaign. Even the MEMR's 28 September 2009 letter
to the Ministry of Industry and Trade noted that the risk of arbitration was one of
the reasons why it would be better to obtain KPM and TNG through acquisition
rather than premature termination of the Subsoil Use Contracts. (C-II ¶¶ 392 - 394,
partially quoted).

648. In addition to completely interfering with Claimants' ability to use, manage, and
enjoy their investments, Kazakhstan's conduct made it impossible for Claimants to
sell their companies, as they had planned to do starting in mid-2008. Claimants do
not contend that Kazakhstan's actions motivated their initial decision to sell. What



is important, however, is that none of the interested bidders was willing to follow through with the sale after Kazakhstan commenced its targeted harassment of KPM and TNG in October 2008. (C-II ¶¶ 396 - 397).

649. In response to Kazakhstan's argument that "*the majority of potential bidders decided not to make a bid for reasons unrelated to governmental harassment or interference, such as the global economic crisis, perceived lack of transport links, and other reasons outlined in a presentation by Renaissance Capital to Claimants*", Claimants point out that all of these factors existed in September 2008, well before the campaign of harassment began. Despite all of these factors, eight bidders showed serious interest in Claimants' investments. (C-II ¶ 398).

650. In response to Kazakhstan's argument that Claimants provided bidders inaccurate or incomplete information masking the illegalities of their purchase of KPM and TNG, Claimants state that there were no such facts to disclose. Claimants' acquisition and reorganization of KPM and TNG were legal, and the companies had valid licenses for all the activities they conducted. It was not until Kazakhstan retroactively reversed its waiver of pre-emptive rights and publicized allegations of fraud in December 2008 (as part of this harassment campaign) that there was ever any question about the legal status of Claimants' investments.

651. With respect to the five bidders who chose not to go forward, Claimants state that some change in circumstances having nothing to do with the data room (which they did not see), must have caused them to lose interest in the investments. The two events that occurred between the bidding and their decision not to participate were (1) Kazakhstan's retroactive reversal of its waiver of pre-emptive rights with respect to Terra Raf's purchase of TNG and (2) Kazakhstan's assessment of USD 62 million in alleged back taxes and penalties, in blatant disregard of the stabilization guarantees in the Subsoil Use Contracts. With respect to the two bidders who chose not to continue after seeing the data room, their exit does not cast any doubt on the accuracy of information provided to bidders in the first phase of Project Zenith or on the reliability of those indicative offers. Instead, Claimants state that "*it is possible that these two potential bidders withdrew from Project Zenith after learning of Kazakhstan's allegations of such illegalities, which Kazakhstan publicized in a press release on 18 December 2008. But since those allegations were wholly unfounded and a part of Kazakhstan's targeted harassment campaign, this possibility only supports Claimants' position that the harassment campaign had its intended effect of deterring potential bidders for Claimants' investments*." (C-II ¶¶ 401 – 402).

652. The final two bidders, Total and KNOC, withdrew only after speaking with Kazakh authorities. These companies likely knew about the ongoing harassment and its effect on KPM and TNG. Total has been understandably quiet and diplomatic about its real reasons not to pursue acquisition of KPM and TNG, as it is already involved in long-standing joint activities with KMG in Kazakhstan. This ownership and management structure insulates Total from the kind of harassment that Claimants have experienced, harassment which Total as a 100% disfavored foreign owner could also experience. KNOC would not proceed without speaking to Kazakh authorities. Respondent has not presented any witnesses to dispute that its personnel met with representatives of Total and KNOC and persuaded them not to acquire TNG and KPM. The letters that have been provided should be



disregarded unless their authors are presented for cross-examination. The authenticity of these letters is in question, as they were plainly solicited by Kazakhstan for this arbitration. In addition, the four companies that purportedly wrote the letters (R-41, 41.2, 41.4) continue to have significant investments in Kazakhstan    (C-II ¶¶ 403 - 407).

653. Claimants state that the letter from KMG demonstrates how Kazakhstan's harassment campaign undermined the alienability of Claimants' investments. Of the six factors it states it discovered in the data room in March 2009, two were inaccurate and four were the direct result of Respondent's harassment campaign – and none were from any declines in KPM's and TNG's intrinsic worth. (C-II ¶¶ 407 – 410).

>   *409.    [...] As described above, the US$ 60 million Laren loan (issue 2), and the issuance of US$ 111.1 million in additional Tristan notes in connection with that loan (issue 4), were only necessary because of Kazakhstan's harassment campaign.    Moreover, the third issue referenced by KazMunaiGaz — the "other risks related to claims from Kazakhstan's government authorities" — refers presumably to the tax, duty, and criminal fine liabilities imposed wrongly on KPM and TNG as part of Respondent's harassment campaign.    Additionally, the final factor mentioned by KazMunaiGaz — Claimants' removal of Casco from the field in 2009 — resulted directly from Kazakhstan's harassment campaign. Because of the cash flow shortfall discussed above, and the increasingly hostile investment environment, Claimants prudently reduced their drilling and workover activities in Kazakhstan and removed Casco personnel from the country. (C-II ¶ 409).*

654. Turning to Respondent's dismissal of the effect that its actions had on KNOC, Total, and other Phase 2 Project Zenith companies, Claimants remind the Tribunal that, prior to the Aktau City Court's issuance of the USD 145 fine on 18 September 2009, Kazakhstan had (1) retroactively reversed its waiver of pre-emptive rights with respect to Terra Raf's acquisition of TNG and publicly accused Claimants of fraud and forgery; (2) assessed millions of dollars in back taxes, blatantly disregarding its contractual stabilization guarantees; and (3) jailed KPM's general director on charges that could be leveled against most oil and gas producers in Kazakhstan.    Each of these events was significant enough to deter foreign investors, making the timing of the bidder's withdrawals (prior to the fine assessment) less relevant. (C-II ¶¶ 412 – 414).

655. The KMG and Starleigh offers were significantly below FMV – not only because they valued equity at USD 50 million and because they promised to "*deal separately*" with the companies' debts – but because they were attempting to take advantage of Claimants' weakened position caused by Kazakhstan's harassment campaign. In light of the harassment, and with the knowledge that, because of it, Claimants were desperate to sell and that Kazakhstan could obtain the investments for KMG through expropriation, neither KMG nor Starleigh had any incentive to offer FMV for Claimants' investments. (C-II ¶¶ 415 – 417).

656. The Cliffson offer, which was for USD 267 million for all equity interests in TNG, KPM, and Tristan and for assumption of all of those companies' liabilities, was valued at USD 920 million. This offer was below the FMV because of the pressure



to sell, caused by Respondent's harassment campaign. Cliffson even indicated during negotiations that it was the only company that Kazakhstan would permit to purchase TNG and KPM. (C-II ¶¶ 418 - 422).

## 2.   **Arguments by Respondent**

657.   In its Post Hearing Briefs, Respondent explained:

(a)     *that there was nothing improper about President Nazarbayev's instructions based upon President Voronin's letter; [Indeed, to not investigate would have been an affront from a foreign policy perspective. (RPHB 2 ¶ 375)]*

(b)     *that no motive for harassment – be it political or financial – existed; and*

(c)     *that the Blagovest letter about which Claimants try to create a lot of confusion does not support their theories in any way;*

(d)     *that no "Playbook" exists and that the Financial Police and other authorities as well as the Kazakh courts acted independently and not as the extended arm of the executive. (RPHB 1 ¶¶ 371 – 373, partially quoted; RPHB 2 ¶ 375 et seq.).*

658.   Respondent's arguments with respect to Claimants' "*Playbook*" theory are best taken from their own words:

244.     *Claimants' account of the "Kazakhstan Playbook" is nothing more than a fairytale. There is no "Kazakhstan Playbook" and certainly no campaign to expropriate Claimants' investments by using these so-called "Playbook" tactics. [...] Claimants' Reply Memorial on Jurisdiction and Liability provides no evidence of a planned nor a concerted harassment of Claimants' business by the Republic or any person or entity associated with the Republic. Instead, the Republic legitimately investigated Claimants, uncovering substantial legal and contractual violations, ultimately leading to a rightful and lawful termination of the Contracts. Any conspiracy theory which Claimants concoct cannot circumvent these facts.*

245.     *Claimants' "Playbook" theory is completely unsubstantiated and wholly dependent on defamatory opinions of the Republic's oil and gas industry. Claimants fail to provide any factual evidence to support the existence or operation of a "Playbook". Notwithstanding this, Claimants still draw the most inconceivable conclusions to fabricate their conspiracy. The expert report they largely rely on from Scott Horton does not assist them in this regard. Notwithstanding this, Claimants still deem it appropriate to make ludicrous comments about the Republic, including describing its political system as an "advanced kleptocracy or a 21st-century dictatorship". These statements are not only irrelevant and inappropriate but also fundamentally incorrect.*



246. *The "Playbook" theory itself hinges on a misguided belief that the Republic harasses foreign investors by "inspections, outrageous tax assessments, criminal prosecutions, fines, etc" using the Financial Police and the Kazakh courts and through coercing the investors to renegotiate their contracts, to "make all these problems go away". Claimants state that the motives for the Republic's "conduct" are to enhance President Nazarbaev's "personal wealth and power of himself and his allies" including Timur Kulibayev and to "weaken political opponents of President Nazarbayev by eliminating their sources of income". For the reasons set out below, each of these alleged tactics of harassment employed and motives for doing so are completely unfounded. Furthermore, the farcical manner in which Claimants seek to associate this theory with the very legitimate action taken by the Republic against them is completely misleading. Although Claimants' various legal and contractual violations will be addressed in other parts of this Rejoinder Memorial on Jurisdiction and Liability, the Tribunal should not, in any event, be persuaded that this "Kazakhstan Playbook" that Claimants have concocted exists. (R-II ¶¶ 244 – 246; RPHB 1 ¶¶ 409 – 413).*

659. Claimants completely mischaracterize the purpose and role of the Financial Police. The Financial Police are obliged by law to investigate and prosecute financial crimes. This includes carrying out investigations of subsoil users having potentially committed such offenses. They do not set out to harass foreign investors. The Financial Police has become an accountable agency. It is headed by professional security officials and is independent from the executive. Claimants have provided no evidence for their contention that the Financial Police act as President Nazarbayev's instrument. (R-II ¶¶ 247 - 249).

660. Closer examination reveals that Claimants were not subject to a barrage of seemingly random inspections, but rather were subject to two principle phases of inspection, each initiated for unconnected reasons by different organizations for different purposes. In each case, the outcome was different. The first phase of inspections took place from October – November 2008 in response to the concerns of President Nazarbayev in light of the letter from President Voronin of Moldova. The purpose of these investigations was to determine whether there was any truth in President Voronin's allegations. The result of this first phase of inspections was the criminal prosecution of Mr. Cornegruta for illegal entrepreneurial activity and a number of assessments of taxes and duties. The inspections that took place between November 2008 and July 2010 were principally a continuation of processes set in motion in October and November 2008 and share the justification and objective of those initial inspections. The second phase of inspections was initiated by the GPO in June and July 2010 in response to complaints that KPM and TNG were not fulfilling their obligations to employees and were failing to comply with legislation and their Subsoil Use Contracts. This second phase discovered a string of infringements that ultimately led the MEMR to terminate KPM and TNG's Subsoil Use Contracts, prior to transferring the companies' subsoil assets into trust management. (R-II ¶¶ 247, 280 – 285; RPHB 2 ¶¶ 375 – 382).

661. Subsoil users are always subject to a high level of scrutiny, which is simply a feature of the subsoil industry. Claimants were aware of this high level of scrutiny. It was expressly disclosed in their contracts and licenses, which contain ongoing



disclosure and record maintenance obligations and even reference legislative rights of inspection and audit contained in law. KPM and TNG were not subject to any greater degree of scrutiny than were any other subsoil users. To the contrary, from 2001 to 2010, KPM was inspected 88 times, TNG was inspected 100 times while other companies were inspected more: Karazhanbasmunai was inspected 246 times, Mangistaumunaigaz 298 times, Uzenmunaygaz 390 times, and Emir Oil 76 times. Considering the statistics for subsoil users in Mangystau Province, such as KPM and TNG, for the period of 2001 – 2010, KPM and TNG were the second and third least audited companies, with the state company Uzemunaigaz being the most audited. (R-I ¶¶ 20.29 – 20.31; R-II ¶¶ 286 - 291).

662. The criminal inspections of KPM and TNG were, of course, outside of the scope of the routine inspections, but were nonetheless justified and lawful. These inspections were motivated by allegations of criminal behavior. The results of these inspections were reviewed by a separate department of the Financial Police – independent from the individuals who had undertaken the inspections – before any decision was taken as to whether to proceed. Review confirmed that there was sufficient evidence that a crime had been committed in some respects, but that there was insufficient evidence to pursue criminal investigation of other findings. Those investigations were terminated. (R-II ¶¶ 292 – 297).

663. The continuation into 2009 of the initial inspection was a structured attempt to gather evidence to develop the case – it was not "*an unguided capricious exercise of power*." These investigations were far from sinister or threatening. Employees at KPM and TNG's premises were helpful. The Financial Police conducted the searches while unarmed (KPM and TNG's security forces were armed) and while outnumbered by KPM and TNG's security forces. Respondent describes steps undertaken to help KPM and TNG employees feel at ease throughout the search, especially since by that time they knew that Mr. Cornegruta had been arrested. Claimants' descriptions to the contrary are wildly exaggerated. (R-II ¶¶ 298 – 302).

664. The second round of inspections (June/July 2010) was initiated by the GPO in response to complaints that KPM and TNG had infringed the rights of their employees and had breached a number of contractual and legislative obligations. The complaints included allegations related to non-payment of salaries, mass dismissal of employees, failure to comply with environmental legislation, and failure to comply with subsoil use legislation. The investigation had nothing to do with the introduction of new subsoil legislation. Each agency that participated in this complex/comprehensive audit was specifically instructed based on its particular expertise. A complex audit was found to be more appropriate and less intrusive than a "*drip, drip*" of inspections to address the issues raised in the complaint. These inspections were led by the GPO and revealed a number of infringements by KPM and TNG. The Ministry of Environment Protection, the MOG, the Ministry of Industry and New Technologies, the Ministry of Labor and Social Protection, the MES, and the Sanitary and Epidemiological Inspection authorities found extensive violations. No contemporaneous complaint was received in relation to the conduct of the complex investigation. Claimants' statements that this was a "*final inspection blitz*" or that this was somehow the culmination of a campaign of harassment by the Republic are unfounded. (R-II ¶¶ 305 – 310, 317 - 320).



665. The results of the GPO inspections were not required to be recorded in an Act of Inspection. In response to Claimants' complaint that the Acts of Inspection were received too late to avoid termination of the contracts, Respondent notes the following:

    (a)   *The issue of operating a main pipeline without a license, referred to in the MEMR's letters of 14 July 2010, had been known to the companies since at least 18 September 2009 when Mr Cornegruta was convicted of the offence of illegal entrepreneurial activity. Therefore ample time had been available to respond to the allegation;*

    (b)   *The issue of non payment of taxes, also referred to in the MEMR's letters, had been known about since at least 8 and 9 September 2009 when the Astana City Court ruled against their challenge to the Tax Committee's assessment of corporate back taxes;*

    (c)   *Claimants admit that they received the MEMR's Act of Acceptance several days prior to the 19 July 2010 deadline set by the MEMR to reply to its notices of breach and sufficiently in advance for Mr Calancea to conclude that "Kazakhstan's allegations were essentially groundless" and for KPM and TNG to each provide 5 to 6 page responses to the MEMR's notices. (R-II ¶¶ 311 – 312; see also RPHB 2 ¶¶ 339 - 374).*

666. Given the nature of the infringements discovered, it was proper for the MEMR to address the breaches to the Subsoil Use Contracts.

667. Claimants' allegation that Kazakh courts are dominated by the executive is quite simply wrong, though western observers have not sufficiently noted the major steps that have been undertaken in recent years to reform the judiciary. Kazakhstan's constitution expressly refers to the independence of the judiciary and to the separation of powers between the executive legislature and the judiciary. Claimants have provided no evidence that the executive in any way controlled or influenced the courts as part of the alleged harassment of KPM and TNG. The Republic's position is that there is nothing incorrect or improper about the Aktau Court's decision to prosecute Mr. Cornegruta for illegal entrepreneurship. The decision was valid, correct, and was confirmed on appeal. (R-II ¶¶ 250 – 254, 495 – 627).

668. As the backdrop to the "*playbook*" argument, Claimants argue that the Republic made it clear that "*renegotiation of a contract or the sale of a substantial equity stake to KMG (or another Kazakhstan-owned entity) will make these problems go away.*" First, there is nothing untoward with the Republic legitimately re-negotiating Subsoil Use Contracts and/or national companies acquiring interests in companies that had rights to exploit its subsoil. It certainly cannot be seen as part of some "*Playbook*" conspiracy against foreign investors. Instead, Respondent shows that the examples provided by Claimants involved companies that had very serious problems and had violated the terms of their contracts and Kazakh law, making contractual renegotiation and/or state assistance necessary. Second, there was likewise nothing untoward about the bids for TNG and/or KPM made by companies supposedly associated with the Republic or with Mr. Kulibayev. None of these bids confirm any alleged "*playbook*." Third, even if the Republic were to try to renegotiate contracts made in the 1990s which it believed to be too generous,



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE 554

there is nothing untoward about such action and it certainly is not part of any conspiracy against foreign investors. (R-II ¶¶ 255 – 260, 270 – 271).

669. Claimants' arguments that the Republic and Mr. Kulibayev wrongfully tried to acquire KPM and TNG is nothing more than a fanciful attempt to frame what was a rightful termination of the contracts and transfer of contractual territories into trust management as some sort of fictional conspiracy theory against them. With respect to Claimants' arguments that GazImpex, KazRosGas, and Starleigh have attempted to purchase KPM and TNG, Claimants have failed to prove that Mr. Kulibayev owned or controlled any of these companies. (R-II ¶¶ 338 – 342; RPHB 2 ¶ 375).

670. The 2004 GazImpex offer for TNG is irrelevant to this arbitration. Those negotiations fell apart when GazImpex did not value the company as highly as Claimants did. The 2007 offer by KazRosGaz is also irrelevant, and there were no official proposals or negotiations. There is no connection to the Republic and there is nothing coercive about one company bidding for another. (R-II ¶¶ 343 – 345).

671. The Starleigh offer is also irrelevant, as Claimants have not proven that Mr. Kulibayev is linked to the company or, even if he is, if Starleigh is linked to the Kazakh government or if Starleigh was involved in any conspiracy against Claimants. Claimants' argument also makes little sense. Respondent hypothesizes "*if Starleigh genuinely believed it could somehow obtain KPM and TNG for no money at all, it surely would not have made the very substantial bid it did at the time, which included dealing with the debt Claimants had amassed, which amounted to more than US$500m.*" (R-II ¶¶ 346 – 349, partially quoted).

672. With respect to the bids made by KMG EP and KMG NC, Respondent explains that these two distinct companies, which Claimants refer to misleadingly as KMG, made very different bids for KPM and TNG at very different stages. Claimants have provided no evidence that Mr. Kulibayev was the Chairman of KMG EP. Mr. Kulibayev was only the Chairman of KMG NC – a state entity that considers the social and economic implications of an acquisition. Mr. Kulibayev had no control over KMG EP and Claimants have provided no evidence that he had any role in KMG EP or KMG NC's bids for KPM and TNG, or that he was in any way influencing the Republic to coerce Claimants into selling KPM and TNG to KMG NC. Furthermore, a sale to KMG NC would not lead to a change in Mr. Kulibayev's wealth, as KMG NC is a state owned company. Finally, it is clear from the facts that neither KMG EP nor KMG NC were part of any alleged attempt by the Republic to force Claimants to sell KPM and TNG to entities allegedly owned or controlled by Mr. Kulibayev. In fact, KMG EP only bid on Claimants' companies after being invited to do so by Claimants themselves. Thereafter, Claimants invited KMG EP to participate in the second phase of Project Zenith – again, undermining the argument that the Republic was coercing it to sell to KMG EP. The bid was made based on information made available by Claimants – the bid was certainly not a form of harassment. KMG EP withdrew in July 2009 after deciding that it was not commercially reasonable to purchase the assets. KMG NC, on the other hand, only expressed an interest in purchasing TNG and KPM in November 2009, in order to play a "*white knight*" role in resolving the issues that Claimants had caused to its assets. (R-II ¶¶ 350 – 361, partially quoted).



673. Respondent explains that the motives that Claimants describe for the Republic to use a "*Playbook*" are entirely fictional. Turning first to the alleged motive of enhancing Timur Kulibayev's power and wealth, Respondent explains that Mr. Kulibayev is far from the omnipotent figure in the Kazakh regime that Claimants describe. Prof. Olcott explained that he had recently been dismissed from his position at Samruk-Kazyna. His role as a state servant in KMG NC is different and distinct from his separate business interests. In any event, Claimants have provided nothing beyond conjecture to support their argument that the Republic was trying to coerce them into selling to entities owned or controlled by Mr. Kulibayev. (R-II ¶¶ 261 – 264; RPHB 1 ¶¶ 384 – 385, 389 - 391; RPHB 2 ¶ 375).

674. Claimants have also failed to demonstrate that Mr. Kulibayev or any of the companies controlled by him was interested in acquiring KPM and TNG. With respect to KazRosGas, that is a Russian-Kazakh joint venture that is only 50% controlled by Kazakhstan. Accordingly, it is impossible that Mr. Kulibayev controls the company. Regarding GazImpex and Kemikal, Prof. Olcott was unable to find any proof that Mr. Kulibayev owned the companies. Claimants also lack evidence regarding Starleigh, and did not even mention it in the hearings in October 2012 or January 2013, making it likely that they have abandoned those contentions. Claimants' first allegation that KazAzot was controlled by Mr. Kulibayev was made at the Hearing on Jurisdiction and Liability. That allegation was denied by Minister Mynbayev. (RPHB 1 ¶¶ 392 – 397; RPHB 2 ¶ 375).

675. Kemikal did not "*inexplicably*" stop payment – Kemikal's "*liquidity and insolvency*" issues were the reason that Kemikal stopped making payments. The loss of Kemikal as a customer is not attributable to Respondent. (RPHB 2 ¶ 124).

676. With respect to governmental motives, Claimants rely on internal government correspondence, which they deliberately misinterpret. The correspondence confirms that government officials were worried about the social situation in the region. In particular, the letter from the Mangystau Governor Kusherbayev of August 2009 in no way proposes an expropriation. Instead, the idea of purchasing the assets was only considered as one method to address the problems surrounding the companies. (RPHB 1 ¶¶ 398 – 403).

677. Turning to the alleged political motives, Respondent states that Claimants have failed to provide any evidence to support their bold assertion that *"Kazakhstan frequently uses this harassment playbook to weaken political opponents of President Nazarbayev by eliminating their sources of income."* Claimants' own admission that Anatolie Stati is not a political opponent of President Nazarbayev, however, makes their attempts to twist the political dynamic to make it applicable to him is, at best, fanciful. That President Voronin of Moldova saw Anatolie Stati as an adversary is wholly irrelevant. The letter from President Voronin did not attempt to paint Anatolie Stati as an irresistible target, but was instead simply the kind of letter that required some sort of follow up.

678. To the extent that Claimants argue that the letter from President Voronin is proof of a campaign against Claimants, their argument fails for several reasons. First, the letter is a pro-forma document with which a complaint by one head of state is forwarded to competent authorities. Second, this letter received special attention because it was from another CIS head of state. Third, given post-soviet alliances, it



would be likely that President Nazarbayev would take the side of Anatolie Stati, rather than the side of President Voronin, due to their political connections prior to independence. Fourth, the letter accused Anatolie Stati of concealing profits from the states where those profits were being made, meaning potentially that taxes were being withheld from the Republic. Against this background, it would have been careless for President Nazarbayev not to inspect. The authorities indeed inspected the tax payments, and given the grave charges made by President Voronin, there was no reason to limit the inspections to taxes. The inspections turned up violations and the Financial Police were free to rely on other aspects proven by the inspections to open criminal investigations. Claimants are, therefore, incorrect when they argue that the accusations in President Voronin's letter were not investigated – they were, including the accusations of concealing profits from state authorities. Claimants attempt to use this "*playbook*" argument to district the Tribunal from this fact. (R-II ¶¶ 265 – 279; RPHB 1 ¶¶ 377 – 382; RPHB 2 ¶ 381).

679. Regarding Claimants' allegations of financial or strategic motives, Respondent also states the KPM and TNG were uninteresting targets with an equity value of 0 and an enterprise value of USD 186 as of 21 July 2010. (RPHB 1 ¶¶ 387).

680. Regarding the so-called Blagovest letter, that letter was from a private organization written on its own initiative. Claimants state that the Blagovest letter was written by Mr. Zakharov on the initiative of Mr. Andreyev, then-general director of KPM. The obscure circumstances surrounding this letter stem from the obscure action of KPM's general director at the time. There is no proof of any connection between the Republic and Mr. Zakharov, President of the Blagovest Fund. Testimony at the Hearing also demonstrated that Mr. Zakharov was "*far removed from the facts of real life.*" Allegations of a plan to expropriate cannot be based on his letter. (RPHB 1 ¶¶ 404 – 408; RPHB 2 ¶ 372, 381, 382).

681. Respondent explains that the Blagovest Fund is a non-commercial and non-governmental organization in Kazakhstan. It is a social foundation (i.e. a private entity that serves a specific public interest). (R-I ¶ 19.27; R-II ¶ 335). The Blagovest Foundation applied to the MEMR to assist in solving problematic issues connected with KPM and TNG. (R-I ¶ 19.27). The director of Blagovest was a former director of KPM. (R-I ¶ 19.32). Mr. Zakharov, who had been approached by then-general director of KPM, believed himself able to mediate the dispute, in part because of the similar religious missions of the Blagovest Fund – a Cossack charitable fund – and the Stati family. Mr. Zakharov, however, refused to appear to be examined at the Hearings. (R-II ¶ 336; RPHB 2 ¶ 375, 381). Respondent confirms that an internal government instruction, which was not supposed to be seen by or disclosed to the public, was attached to the Blagovest letter. Respondent states that it is very likely that KPM obtained this document through bribery or otherwise by corrupting Kazakh officials. (R-II ¶ 213).

682. Claimants' argument that all Kazakh authorities – except the MEMR, which tried to defend Claimants – conspired against Claimants contradicts its previous allegations that the MEMR fabricated the pre-emptive rights waiver issue in December 2008 to harass TNG. Claimants' construction of Minister Mynbayev's testimony that MEMR defended KPM and TNG "*against the other Kazakh authorities involved, in an effort to protect from a unilateral takeover*" is simply not in the transcript. Nor is the alleged statement that President Nazarbayev's



instruction of November 2009 was a starting point for the MEMR's alleged "*work*" to terminate KPM and TNG's Subsoil Use Contracts. (RPHB 2 ¶ 377, 380). Claimants have also failed to respond to the Republic's arguments that no motive for the alleged harassment exists. (RPHB 2 ¶¶ 377 – 378).

# G.    Short Summary of Contentions

## G.I.    Summary of Contentions by Claimants

683.    Claimants' contentions are taken from their own words, without prejudice to their further arguments:

    6.    *Kazakhstan does not have — and never did have — any credible jurisdictional objections. Claimants are indisputably "Investors" who made qualifying "Investments" protected by the ECT.*

    7.    *[...] According to Kazakhstan's own figures, between 2000 and 2009, Claimants invested US $473 million in KPM and US $693 million in TNG, a total in excess of US $1.1 billion [and] paid over US $350 million in tax revenues to the Kazakh State. KPM and TNG permanently employed nearly 1,000 Kazakh workers, and TNG employed some 3,000 additional contract workers to construct the LPG Plant.*

    8.    *Claimants' substantial investments transformed the previously fallow Borankol and Tolkyn fields into significant producers of oil, gas, and condensate. By 2010, Claimants had over 70 operational wells in the Borankol field and a total of 40 wells in the Tolkyn field and Contract 302 area. As of 2008, Claimants had produced 12 million barrels of oil and condensate ("MBbls") and 22 billion cubic feet ("bcf") of gas from the Borankol field, and 11 MBbls oil and condensate and 246 bcf of gas from the Tolkyn field. As a result of Claimants' investments, TNG became the fourth largest gas producer in Kazakhstan.*

    9.    *Claimants also invested more than US $240 million in construction of an LPG Plant, which was substantially complete before construction was halted as a result of the State's misconduct. Kazakhstan viewed the LPG Plant as a "strategic asset" for the Mangystau region. Claimants also conducted extensive exploration and production work on TNG's Contract 302 Properties, including drilling the "Munaibay 1" well, shooting 3D seismic, and acquiring a deep drilling rig to explore the considerable "Interoil Reef" prospect.*

    10.    *[...] [P]rior to President Nazarbayev's directive of October 14, 2008, Claimants and their companies had enjoyed eight years of positive, productive relations with the Kazakh Government. That changed abruptly in the weeks following President Nazarbayev's personal instruction to "thoroughly check" KPM and TNG. During the previous eight years, however, Kazakh agencies had routinely inspected and audited the*



companies' operations and accounts and had consistently given them "clean bills of health."

11.  Notably, there had never been any allegation that KPM's or TNG's field pipelines were "main" pipelines, because they obviously were not. And Kazakhstan had taken express positions on other issues that it would directly contradict after October 2008 (and in this case). A simple review of Kazakhstan's change of position before and after October 14, 2008, demonstrates that President Nazarbayev's order caused the harm Claimants suffered in this case.

12.  [...]The documentary record clearly indicat[s] that State agencies, led by the executive's Financial Police, had pursued KPM and TNG (and their personnel) on multiple fronts, including trumped-up [and contrived] charges of criminal wrongdoing, which caused immediate harm to Claimants' investments. [...]

17.  The campaign against Claimants' investments in KPM and TNG that Kazakhstan commenced in the final quarter of 2008 breached the ECT and international law in multiple respects. It clearly entailed indirect expropriation, because it materially interfered with Claimants' ability to manage, use, and dispose of their investments. The measures Kazakhstan adopted — interference with contractual rights, wrongful exercises of administrative and judicial authority, sequestration of the companies' assets and Claimants' shares, assessment of spurious tax penalties, and harassment and persecution of key personnel — all fall squarely within the bounds of indirect expropriation as understood in international law and treaty practice.

18.  Kazakhstan's campaign was equally a violation of the ECT's fair and equitable treatment and impairment provisions, as well as its "most constant protection and security" clause. Kazakhstan subjected Claimants' investments in KPM and TNG to severe harassment and coercion as well as inconsistent and contradictory conduct, and it created an environment that was thoroughly unstable and unpredictable (if not treacherous). Kazakhstan also flagrantly violated due process and committed "denial of justice" in relation to KPM and its general director. At the same time, Kazakhstan's state apparatus, led by the Financial Police, utterly failed to provide legal (and in some cases physical) protection and security to Claimants' investments and personnel, much less the "most constant protection and security" required by the ECT.

19.  Kazakhstan also breached key provisions of Claimants' Subsoil Use Contracts. For example, Kazakhstan imposed groundless and extra-contractual tax assessments on KPM and TNG, and perhaps most notably, it terminated those contracts in violation of their termination provisions. Those acts were breaches of the ECT's "umbrella clause."

20.  In July 2010, Kazakhstan directly expropriated Claimants' investments by terminating KPM's and TNG's Subsoil Use Contracts and seizing their assets outright. Like the campaign that preceded it, Kazakhstan's ultimate



*expropriation was thoroughly groundless and illegal. By that point, however, Claimants' investments had already suffered 20 months of indirect expropriation and other mistreatment that clearly violated the standards of protection afforded by the ECT and international law.*

*[October 14, 2008 is the correct valuation date because (1) Kazakhstan's campaign against Claimants' investments in KPM and TNG commenced immediately after the directive, in breach of the ECT and international law, (2) the 2008 campaign harmed Claimatns' investments almost immediately and the injuries continued thereafter, and (3) due to the vicious downward spiral caused and fueled by the State's campaign, October 14, 2008 is the last date on which the Tribunal could assign a value to the investments that was not diminished by the consequences of Kazakhstan's illegal conduct.]*

35.   *Claimants' valuations of their investments are fundamentally sound and credible, as demonstrated by the fact that they are supported by multiple contemporaneous valuations performed by sophisticated third parties. Furthermore, they have been "reality-checked" by Claimants' experts — all of whose work is backed up with underlying data and modeling — against other independent indicators of value. The 89-page RBS Asset Valuation of mid-2009, performed with full access to Claimants' data room, clearly supports the main planks of Claimants' valuation. So too do the numerous indicative offers received from sophisticated energy companies during Project Zenith, as well as the arms-length Cliffson transaction of early 2010. FTI has also analyzed the trading prices of comparable companies, the terms of comparable transactions, and the trading value of the Tristan debt — all of which likewise support Claimants' valuation. […]*

37.   *The "enterprise value" of Claimants' "Investments," KPM and TNG, is the appropriate measure of damages in this case, as it is in most treaty arbitrations involving "investments" in wholly–owned companies established in the host state. "Enterprise value" means the value of the companies' assets without deducting the companies' debts.*

38.   *Kazakhstan's argument that the Tribunal should award "equity value" — i.e., that it should deduct the debts of KPM and TNG — is wrong as a matter of fact and of law. Fundamentally, Kazakhstan's "equity value" argument is wrong because Kazakhstan seized all the assets of KPM and TNG, without assuming or extinguishing their debts. By seizing their assets, Kazakhstan left KPM and TNG unable to satisfy their debts, and Claimants remain responsible for doing so from the proceeds of any award in this case.*

39.   *The clear terms of the ECT as well as established treaty practice indicate that compensation should include the debts of KPM and TNG, especially in cases such as the present in which Claimants remain responsible for the debts. Indeed, Kazakhstan has conceded that if Claimants remain responsible for the debts of KPM and TNG — which they clearly do — an award of "enterprise value" would be appropriate. An award of*



*"enterprise value" is also necessary to prevent the unjust enrichment of Kazakhstan.*

40.    *Claimants have firmly established that Kazakhstan agreed to extend Contract 302 until March 30, 2011, but wrongfully failed to execute the required addendum to the exploration contract. Claimants have also conclusively demonstrated that they were actively in the process of exploring and drilling in the Contract 302 areas in late 2008 and early 2009 — until the State's refusal to execute the addendum and other misconduct stymied their exploration activities — and that they had the intent and the means to continue exploration through March 2011. Claimants were particularly active in relation to the substantial Interoil Reef prospect, in respect of which they had shot and interpreted 3D seismic and acquired a specialized deep drilling rig that was being prepared for transport to Kazakhstan.*

41.    *As a direct result of Kazakhstan's refusal to execute the addendum and its campaign against KPM and TNG, Claimants were prevented from advancing their exploration activities and drilling the wells necessary to determine if hydrocarbons were present in the Contract 302 areas, at what depths, and in what quantities and qualities. The only exception was Munaibay Oil, where sufficient drilling had been completed to confirm a significant discovery. For the other Contract 302 properties, however — including the Interoil Reef — the State's illegal conduct halted exploration prior to the point at which Claimants had obtained all the data necessary for their experts in this case to establish a fair market value. Claimants therefore had no choice but to submit a prospective valuation for the Contract 302 properties (except for Munaibay Oil).*

42.    *The Tribunal should nevertheless exercise its discretion to award a significant portion of the Contract 302 prospective valuation to Claimants under the "loss of opportunity" doctrine. That doctrine exists precisely for situations such as this in which claimants have been unable to demonstrate their losses with greater certainty as a direct result of the host state's illegal conduct. A number of treaty tribunals have relied on the doctrine in circumstances such as the present, and this Tribunal should do the same. Indeed, a failure to do so would reward Kazakhstan for its misconduct. (CPHB 1 ¶¶ 6 –42).*

684.    Claimants make the following contentions regarding compensation (CPHB 2 ¶ 396):

| Tolkyn | US $478,927,000 |
|---|---|
| Borankol | US $197,013,000 |
| Munaibay Oil | US $96,808,000 |
| LPG Plant | US $245,000,000 cost plus discretionary portion of US $84,077,000 |



| Contract 302 (other than Munaibay Oil) | US $31,330,000 cost plus discretionary portion of US $1,498,017,000 |
|---|---|

685. Claimants contend that they are entitled to (1) compound interest at an appropriate rate, (2) recovery of principal, interest, and penalties on the Tristan notes, (3) moral damages in the amount of 10% of the total compensatory damages awarded to Claimants, and (4) a full award on costs.

## G.II. Summary of Contentions by Respondent

686. Respondent's contentions are taken from its own words, without prejudice to their further arguments:

*11. The Republic is only prepared to offer the right to arbitrate to a certain pool of investors. The parameters of entitlement are framed by the provisions of the arbitration agreement in article 26 of the ECT, the rules of the Stockholm Chamber of Commerce, international law and the relevant rules of applicable law. The Republic has not consented to resolve any dispute with any of the Claimants under the ECT through arbitration.*

*12. The Republic's responses can be summarised as follows:*

*(a) The ECT should be interpreted in accordance with international law which includes the requirement to act in good faith in accordance with the general principle of pact sunt servanda.*

*(b) Anatolie Stati and Gabriel Stati, who allegedly own and/or control Ascom, Terra Raf, KPM and TNG, are not true investors and none of the Claimants is entitled to benefit from the ECT for the following reasons:*

* *Anatolie Stati is a political creature whose political connections, previous expertise and other international dealings strongly suggest that any investments he has made in Kazakhstan are not made as a commercial investor in energy resources with which the ECT are concerned. The same is true of Gabriel Stati who is more a playboy than a businessman.*

* *The benefits of the ECT are denied to Ascom under article 17 of the ECT.*

* *Gibraltar is not a party to the ECT and therefore Terra Raf cannot seek protection from the Treaty.*

*(c) No investments have in fact been made*

* *There is an inherent meaning of "investment" which has to include international law and national law. As such the inherent meaning includes (1) Salini characteristics (which are relevant if not exhaustive), and (2) compliance with the laws of the host State and good faith.*



• *There was no investment on the facts.*

      ⌐   *There is insufficient evidence of investments being made.*

      ⌐   *Claimants have not demonstrated that it has acted in good faith.*

      ⌐   *Moreover, the investments allegedly made by the KPM and TNG were in violation of Kazakh law.*

*(d)*   *In any event, even if (any of) the Claimants were entitled to benefit from the ECT (and can demonstrate to the relevant standard that investments had been made), Claimants did not comply with the cooling off period and therefore no jurisdiction vests in the tribunal.*

*13.*   *Lastly, Claimants have not discharged their burden of proof. Casting Claimants' arguments in the most flattering light, the case they now present is at best ambiguous and unclear. As set out in the recent award of ICS Inspection and Control Services Limited (United Kingdom) v. Argentine Republic, PCA Case No. 2010-9, Award on Jurisdiction, 10 February 2012, "a State's consent to arbitration shall not be presumed in the face of ambiguity." Where such consent is uncertain, no jurisdiction should be found, and the case against the Republic falls at the first hurdle. More likely, their assertions that their claims are entitled to any further consideration by the tribunal are simply unevidenced and unfounded. (R-II ¶¶ 11 – 14).*

*1053.*   *In their Reply Memorial on Jurisdiction and Liability, Claimants allege that the umbrella clause embodied in the last sentence of Article 10(1) of the ECT covers not only contractual but also statutory and regulatory obligations, that the Subsoil Use Contracts and Contract No. 302 are relevant under the umbrella clause and that the Republic has violated the umbrella clause. However, these arguments have no merit. (R-II ¶ 1053).*

*1108.*   *The guarantee under Article 10(12) of the ECT refers to the legislative obligation to provide a fair and efficient system of justice and does not encompass isolated failures of the judicial system in individual cases. Yet, the Claimants misconceive the meaning of the duty arising from Article 10(12) of the ECT. Instead of addressing the adequacy of domestic legislation, the Claimants focus on the judicial proceedings in one individual case. In fact, the Claimants have not even contended, let alone proven that the Republic has enacted legislation which does not provide a fair and efficient system of justice.*

*864.*   *Claimants allege that "in July 2010" the Republic directly expropriated Claimants' investment after already having indirectly expropriated it "over the October 2008-July 2010 period". Claimants go as far as claiming that in this period, the Republic took several measures and "any*



*number of them individually constitute an act of indirect expropriation". In making these assertions, Claimants effectively defeat their own argument. Simple logic prescribes that something that has been taken once cannot be taken again unless it has been returned. However, Claimants were not expropriated once, twice or even several times – they were not expropriated at all. (R-II ¶ 864).*

890. *The Republic has explained that neither of these actions constitutes a direct expropriation due to a lack of a transfer of title. Claimants sole ground of opposition to the Republic's argument is that the fact that no transfer of title took place was "immaterial as a matter of international law". They have thus conceded that no transfer of title to the Republic took place. Since, as explained above, there is no basis for Claimants' contention that transfer of title is not required for direct expropriation to occur, the only available conclusion is that the Republic did not directly expropriate Claimants investments. (R-II ¶ 890).*

993. *To reiterate the Republic's position, the standard of fair and equitable treatment needs to be considered against all the factual circumstances. In a situation where the state action that the injured party claims of is one which the aggrieved party has been granted a right to resolve at a local level, there can be no conclusion that the state has acted unfairly and inequitably if the aggrieved party has not actually pursued those rights. In other words, a state (acting fairly and equitably) may provide an opportunity (through the provision of contractual protection or through the court system) for the claimant to seek redress of actions taken by the state that may have been incorrect. This might apply to a decision of a first instance court or the actions of an administrative official. This is a fundamental part of providing a fair and equitable as well as stable and predicable environment for the investment. As set out in Helnan v Egypt, a treaty claim for the breach of fair and equitable treatment is likely to be less successful where the claimant has not been able to show that the system of investment protection in the host state has been unfair and inequitable vis-a-vis the aggrieved party.*

982. *[The] duty of most constant protection and security requires a host state to diligently implement reasonable mechanisms of protection. Claimants have not challenged that the Republic disposes of the necessary legal framework to provide protection to foreign investors and investments from physical damage or violence. Yet, it is Claimants who need to prove the absence of reasonable measures. Since they have failed to establish such absence, their claim fails on this ground alone.*

983. *Apart from this, the legal and administrative system of the Republic is indeed sufficiently developed and refined to the extent which can be expected from a vigilant state exercising due diligence. The Republic has enacted sufficient laws to protect nationals and foreign investors alike from any physical harm.*

984. *Even if the scope of Article 10(1) of the ECT was not restricted to the duty to implement reasonable measures for protection - which, as explained*



> *above, it is - Claimants still fail to establish that prerequisites of this provision have not been met in this case. In their Reply Memorial on Jurisdiction and Liability Claimants contend that the Republic violated the guarantee by not providing the necessary physical security of Claimants' assets. This reasoning is flawed. (R-II ¶¶ 982 – 984).*

1009. *[...] Claimants [...] begin their section by listing five cases in which the tribunals found the respective host state to have violated [the duty to refrain from unreasonable or discriminatory measures impairing the investments pursuant to Art. 10(1) ECT.] However, [...] the Republic has adhered to its obligations under Article 10(1) of the ECT at all times. Its measures were neither unreasonable nor discriminatory, nor was the management, maintenance, use, enjoyment or disposal of Claimants' investments impaired in any way. (R-II ¶ 1009).*

1145. *[...]Claimants allege that the Republic has failed to permit them to employ key persons of their choice contrary to their obligation pursuant to Article 11(2) of the ECT. However, Claimants content themselves with drawing the conclusion that the Republic violated this provision and do not bother subsuming any facts under Article 11(2) of the ECT. Such conclusion has no merit. [...] [The criminal proceedings and interrogations of KPM's and TNG's employees have not hindered Claimants from employing key personnel of their choice.] (R-II 1145, 1159, partially quoted).*

687. Respondent's contentions regarding causation are summarized in RPHB 2 ¶ 61:

(a) *Claimants mismanaged their assets on numerous occasions, for example by putting alarmingly incompetent personnel in charge of important tasks and by promising sales to business partners that they could have never made.62 The mismanagement went so far that market observers were concerned about "weak corporate governance standards at Tristan".63 The overall level of mismanagement comes as no surprise given that Claimants had no prior experience in oil and gas production and in the Kazakh or international markets.*

(b) *KPM's and TNG's business was very risky from the start, as was set out clearly in the Tristan note prospectus.*

(c) *KPM's and TNG's financing structure, which aimed at removing capital from the companies, made them vulnerable to situations of crisis.*

(d) *Claimants took business decisions aimed only at short-term profit. In particular the ramping up of production at the end of 2007 was short sighted, as it led to a loss of available gas production for the LPG Plant and the allegedly expected possibility of gas export (which the Republic denies).*

(e) *In April of 2008, Claimants found out that their estimates for production from Borankol had been overstated by 300%. At the time, Claimants received the new Miller&Lents reserves report68 which set out 2P reserves of 24.6 MMboe. The earlier report by Ryder Scott had provided for 2P*



> *reserves of 72.4 MMboe. 69 The effect of this loss was particular[ly] significant because Borankol is a predominantly oil producing field and oil production is much more valuable than gas production.*

> (f) *KPM and TNG were already in severe financial difficulties as of Claimants' valuation date, as is evidenced by the development of the Tristan notes price.*

> (g) *Severe drops in energy prices and in demand, in particular due to the loss of Kemikal as a customer, led to a very restricted cash position for KPM and TNG. At the same time, the need for capital expenditure increased markedly, putting further pressure on the companies.*

> (h) *Against this background, when uncontestedly legal tax demands were raised by the state in the summer of 2009, Claimants had to take out the horrendous Laren loan and issue new notes in the amount of USD 111.1 million in connection thereto.*

> (i) *Thereafter, Claimants deliberately chose to withdraw cash from KPM and TNG, all while not fulfilling the annual work programs. This was effectively the deliberate abandonment of the companies.*

688. Respondent's contentions in the case of quantum can be summarized as follows:

> 13 *[...] Claimants' claims fail for a lack of damage. In the following, the Republic will establish through serious and thorough experts that*

> > (a) *the asset value of Contract No. 302 is **zero**;*

> > (b) *the LPG Plant may at best have **salvage value** which Claimants failed to determine;*

> > (c) *the asset value of the Borankol field is **USD 62.8 million**;*

> > (d) *the asset value of the Tolkyn field is **USD 123.2 million***

> > (e) *debt under the Tristan notes in the amount of **USD 531.1 million** as well as other debt must be **deducted** from any asset value assigned to the assets in question.*

> > (f) *the final result after proper valuation and deductions is **zero**. (R-III ¶ 13, emphasis added).*

689. Respondent contends that (1) Claimants grossly inflated their damage claim, (2) 21 July 2010 is the proper valuation date, (3) the Cliffson SPA and the offers made in Project Zenith are irrelevant to damages, (4) Claimants are not entitled to moral damages, (5) the appropriate interest rate for compensation would not apply to Claimants' "*loss of opportunity*" claim, and (6) that the Respondent is entitled to a full award on costs.



## H. Preliminary Considerations and Conclusions of the Tribunal

690. The Tribunal has considered the extensive factual and legal arguments presented by the Parties in their written and oral submissions. The Tribunal's use of one Party's terms as opposed to another's is not a reflection of the Tribunal's legal interpretation of an issue – rather, effort has been made to use consistent terminology through this Award in order to facilitate understanding. Below, the Tribunal discusses the arguments of the Parties most relevant for its decisions. The Tribunal's reasons, without repeating all the arguments advanced by the Parties, address what the Tribunal considers to be the determinative factors required to decide upon the issues arising to decide on the relief sought by the Parties. The Tribunal considers, however, that brief repetition of certain aspects of its conclusions in the context of particular issues is necessary, or at least appropriate, in order to avoid misunderstanding.

### H.I. Jurisdiction

#### 1. The Parties' Consent to Arbitration before the SCC

##### a. Arguments by Claimants

691. The Tribunal's jurisdiction over this dispute arises from Art. 26 ECT, the language of which clearly points to the SCC as the proper forum for this dispute. The ECT entered into force for Kazakhstan on 16 April 1998. (C-0 ¶¶ 92 – 95; C-I ¶¶ 26 – 28; C-II ¶¶ 23 – 33; CPHB 1 ¶ 43; CPHB 2 ¶ 9).

692. After the Hearing on Quantum, Claimants argued that Respondent seemed to abandon its linguistic contentions regarding the ECT. (CPHB 1 ¶¶ 43 – 46).

693. Claimants reject Respondent's linguistic analysis of Art. 26. (C-II ¶¶ 43 – 48). There is no support for Respondent's argument that the capital "*A*" in "*Arbitration institute*" refers to the International Court of Arbitration of the ICC, and support to the contrary is found on the official Russian language website of the ECT. (C-II ¶ 44). Likewise, there is no support for Respondent's argument the use of the word "*international*" is determinative in meaning. (C-II ¶ 45). Claimants also state that the words "*in Stockholm*" do not denote a seat and point out that references to arbitral seats are notably absent in the other arbitration options in Art. 26(4) ECT. (C-II ¶ 46). As Respondent admits, all other authentic versions of the ECT clearly refer to the Arbitration Institute of the SCC as the forum. The Russian-speaking Contracting Parties to the ECT understood this. This is sufficient for the Tribunal to find that the SCC is the proper forum. (C-II ¶¶ 34 – 35). In addition, the publications of the ECT Secretariat consistently refer to Art. 26 ECT as providing for SCC, and not ICC, arbitration – to no state's objection. (C-II ¶ 51).

694. Even if Respondent's translation arguments are correct, the Russian ECT must be interpreted in conformity with the five others. (C-II ¶¶ 40 – 42). Claimants state that under the rule of treaty unity – a core principle of interpretation of plurilingual treaties enshrined in Art. 33(3) VCLT – treaty terms are presumed to have the same



meaning in each authentic text. Although the ECT is plurilingual in expression, it is one single treaty with a single set of terms. Indeed, even Art. 33(4) VCLT directs the Tribunal, to adopt the meaning that best reconciles the texts. Therefore, the Tribunal should make every effort to find a common meaning among the ECT texts, before preferring one to another. (C-II ¶¶ 38 – 39).

695. Other Kazakh documents, including a BIT between Kazakhstan, Belgium, and Luxemburg and the Law of Kazakhstan on Foreign Investment use the language "*in Stockholm*" as a reference to the SCC and not to an arbitral seat.  (C-II ¶ 46 – 48).

696. Claimants state that tribunals have accepted jurisdiction in all SCC arbitrations involving Russian-speaking states brought under the ECT to date.  None of the respondent states have raised any doubt as to whether Art. 26(4)(c) ECT referred to the SCC.  (C-II ¶¶ 50 – 52).  The commercial arbitration cases relied on by Respondent do not compel a different conclusion.

### b.    Arguments by Respondent

697. Respondent argues that it is not bound to arbitration under the ECT because the offer to arbitrate contained in Art. 26(4) ECT is ambiguous and, thus, pathological. (R-II ¶ 241).  The text in the Russian language refers to the Arbitration Institute of the ICC, while the equally authentic texts in other authentic languages (English, Spanish, Italian, German and French) refer to the Arbitration Institute of the SCC. Pursuant to Art. 50 ECT, consistent with Art. 33 VCLT, the Russian ECT is authentic, regardless of these differences.  (R-I ¶¶ 6.5 – 6.8; 6.31 – 6.32).  As a result, the offer contains indications for two different arbitration institutions. The ambiguity of the offer stems from the irremovable discrepancy between the Russian and other authentic texts of Art. 26 ECT.  (R-II ¶ 242).  Since the acceptance of an ambiguous offer cannot result in the conclusion of a valid arbitration agreement, the alleged arbitration agreement between the Republic of Kazakhstan and Claimants concerning dispute examination in the Arbitration Institute of the SCC does not exist.  (R-II ¶ 243).  Accordingly, the Tribunal should decline jurisdiction.  (R-I ¶ 6.2).

698. Kazakhstan and Moldova assumed obligations under the ECT on the basis of the Russian language text.  (R-I ¶¶ 6.33 – 6.36).  Turning to Art. 26(4)(c) ECT, the Russian text permits an investor to submit the dispute "*to an arbitral proceeding under the Arbitration institute of the international chamber of commerce in Stockholm.*"  Respondent argues that each word in the ECT must be given due consideration and submits that the key expressions for the Tribunal's consideration and analysis are "*under the Arbitration institute*" and "*in Stockholm.*"  (R-I ¶¶ 6.11, 6.24).

699. Regarding the term "*under the Arbitration institute*", Respondent submits that the term means that a dispute should be considered by an arbitral tribunal acting under the framework of a permanent arbitration centre – one with an institutional framework for the administration of proceedings, a list of arbitrators, and rules for proceedings.  (R-I ¶¶ 6.12 – 6.22).  One such institution would be the International Court of Arbitration of the ICC, and the use of the capitalized "*A*" lends credibility to the argument that that particular institute was intended. (R-I ¶¶ 6.21 – 6.23).



700. Regarding the language "*in Stockholm*", Respondent submits that the only correct interpretation of the Russian text is that "*disputes may be submitted for proceedings in Stockholm, and shall be considered by an arbitral tribunal constituted under the rules of the ICC.*" (R-I ¶¶ 6.24 – 6.30). Respondent highlights international arbitration cases that have considered similarly ambiguous arbitration agreements and where the tribunal or court also found that the city reference was merely to the place where arbitration was to occur, and not the institution. (R-I ¶ 6.28).

701. Respondent concedes that the clause may be simply ambiguous, lending itself to several alternative meanings, including that it refers disputes to the "*International Court of Arbitration of the International Chamber of Commerce in Stockholm*" (in which case, the words "*Arbitration Institute*" would be interpreted to mean "*International Court of Arbitration*") or the "*Arbitration Institute of the Stockholm Chamber of Commerce*" (and the words "*international*" should be replaced with "*Stockholm*"). (R-I ¶¶ 6.9 – 6.10). The first of these alternatives is, however, most plausible. (R-I ¶ 6.10).

702. Respondent presents that arbitration is based on consent. Here, the investor must accept the Art. 26(4)(c) ECT offer to arbitrate by submitting a request for arbitration to the relevant institution. (R-I ¶¶ 6.39 – 6.44). Here, the agreement to arbitration is void for uncertainty, as the Moscow Commercial Arbitrazh Court (R-95) and the Federal Supreme Court of Germany (R-96) have come to similar conclusions in similar circumstances. (R-I ¶¶ 6.44 – 6.47).

703. Respondent argues that Art. 26(4)(c) ECT violates the *jus cogens* norm of the sovereign equality of states and is, therefore, void. (R-I ¶ 6.49 – 6.61). All of the ECT texts, except the Russian version, allow an investor to commence arbitration proceedings in the SCC. (R-I ¶ 6.58). The consequence of this is that a Swedish investor could commence proceedings with a Swedish arbitration institute (the SCC) against a foreign state and potentially receive a ruling against that foreign state, as has already occurred. (R-I ¶ 6.59). This is a violation of the principle of sovereign equality, because it gives Swedish investors an inequitable right to commence proceedings in a (home) Swedish arbitration institute, which has a right that other investors do not have – i.e., a Kazakh investor cannot commence proceedings in a (home) Kazakh arbitration institute against Sweden. (R-I ¶¶ 6.58 – 6.61).

704. Based on the foregoing, Respondent argues that the Tribunal is under a duty to decline jurisdiction. (R-I ¶ 6.48).

### c.    The Tribunal

705. While Claimants have stated that the consent to arbitrate pursuant to Art. 26 ECT is no longer at issue (CPHB 2 fn 2), Respondent continues to incorporate its arguments relating to Art. 26 through the second post hearing brief. (RPHB 2 fn 714).

706. There is no dispute between the Parties that Art. 26 ECT is the provision ruling on jurisdiction. The ECT entered into force for Kazakhstan on 16 April 1998.



707. However, Respondent maintains its argument that the Russian text of the ECT does not provide for arbitration under the rules of the SCC. The Tribunal is not persuaded by Respondent's linguistic analysis. All other authentic versions of the ECT clearly refer to the Arbitration Institute of the SCC as the forum of jurisdiction. In addition, the publications of the ECT Secretariat consistently refer to Art. 26 ECT as providing for SCC, and not ICC, arbitration – to no state's objection.

708. As Respondent concedes (R-I ¶¶ 6.9 – 6.10), the clause may be simply ambiguous, lending itself to several alternative meanings, including that it refers disputes to the "*International Court of Arbitration of the International Chamber of Commerce in Stockholm*" (in which case, the words "*Arbitration Institute*" would be interpreted to mean "*International Court of Arbitration*") or the "*Arbitration Institute of the Stockholm Chamber of Commerce*" (and the words "*international*" should be replaced with "*Stockholm*"). However, Respondent argues that the first of these alternatives is most plausible. (R-I ¶ 6.10). The Tribunal disagrees. First, the Tribunal is not persuaded by Respondent's linguistic analysis of the Russian text of the provision, as the states ratifying the ECT were aware of the texts in the other languages referring to the SCC and not objecting thereto or to the respective publications of the ECT Secretariat. But, second, even if Respondent's translation arguments were correct, the Russian ECT must be interpreted in conformity with the five others under the rule of treaty unity, which is the core principle of interpretation of plurilingual treaties contained in Art. 33(3) VCLT: treaty terms are presumed to have the same meaning in each authentic text. Although the ECT is plurilingual, it is one single treaty with a single set of terms which should be interpreted as having one meaning. Respondent has not provided any evidence that the Russian text was intended to provide a different meaning regarding the jurisdiction.

709. Therefore, the Tribunal concludes that it has jurisdiction under Art. 26 ECT and under the Rules of the SCC.

## 2.    **Jurisdiction Ratione Personae**

### a.    **Arguments by Claimants**

710. The Tribunal's jurisdiction is governed by the express terms of the ECT. Each of the four Claimants qualifies as an investor under Art. 1(7) ECT. (C-I ¶¶ 29 – 32; C-II ¶¶ 76 – 78; CPHB 1 ¶¶ 47 – 49).

711. Under Art. 1(7) ECT, "*Investor means… (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law.*" Anatolie Stati and Gabriel Stati each hold the nationality of Moldova and Romania, which are Contracting Parties to the ECT. They are, therefore, qualified as "*investors*" under the ECT. That is the end of the inquiry. Their residence does not matter. Claimants have provided the Tribunal with *prima facie* proof of nationality for each, including identification cards and passports (C-II ¶¶ 79 – 80, CPHB 1 ¶¶ 47 – 49; CPHB 2 ¶ 10).

712. Respondent's arguments that neither Anatolie Stati nor Gabriel Stati is an "*investor*" are either wrong or irrelevant. Additionally, they are also contrary to



Kazakhstan's own internal documentation, which identifies Anatolie Stati as an investor. (C-II ¶ 81). Claimants explain as follows:

> 82.   *Second, to the extent that Kazakhstan's jurisdictional objections relating to Anatolie Stati and Gabriel Stati pertain to the legality of their investments, they are misplaced. The legality of an investment has no bearing on whether an individual qualifies as an "investor" under Article 1(7) of the ECT. [...]*

> 83.   *Third, Kazakhstan's contention that because "Ascom is not an investor, Anatolie Stati also cannot be considered as an indirect investor in the meaning of the ECT" is a non sequitur, and of no relevance to the definition of "investor" under the ECT. Ascom qualifies as an "investor" under the ECT on its own, as demonstrated below. Even if it did not, the ECT protects indirect investments, and does not require that any intermediary company qualify as an "investor" for an indirect owner to be an "investor."*

> 84.   *Fourth and finally, Kazakhstan's argument that "Anatolie Stati does not have the capacity to act as an investor in the Republic of Kazakhstan" is also beside the point. Nothing in the definition of "investor" under Article 1(7) of the ECT requires that the individual qualify as an "investor" within the meaning of the national law of the host state. Kazakhstan's attempt to add its own self-serving requirement to the definition of "investor" under the ECT is unavailing. (C-II ¶¶ 81 – 84, emphasis in original, citations omitted).*

713.   The accusations that have been made against Mr. Anatolie Stati by the President of Moldova are absolutely meritless. Claimants explain that *"Mr. Anatolie Stati's investments in South Sudan are normal, commercial investments in the oil and gas industry. He has contributed enormously to the well-being of the population of South Sudan by making substantial investments in oil and gas exploration and by building schools, a hospital, medical clinics, and means of transportation in the region where his investments are located."* (C-II ¶¶ 194 – 195).

714.   No legal authority exists that would allow Respondent to add additional requirements into Art. 1(7) ECT. Respondent's personal attacks on Claimants *"smack of desperation by a party with a losing* case." (CPHB 1 ¶¶ 47 – 48).

715.   Turning to Ascom, Claimants produced the Certificate of Incorporation of Ascom in Moldova as an exhibit to their Request for Arbitration and to their Statement of Claim, and Kazakhstan does not contest the authenticity of that document. Kazakhstan's arguments concerning whether Ascom is a 100% owner of KPM – a fact which has been recognized by the Financial Police – are irrelevant to establishing whether Ascom meets the definition of investor under Art. 1(7) ECT. (C-II ¶¶ 85 – 86).

716.   Respondent seeks to improperly and retroactively deny ECT benefits to Ascom on the basis of the so-called *"[denial] of benefits"* provision of Art. 17 ECT. Respondent contends that because Ascom is incorporated in Moldova and controlled by a Romanian national, Mr. Anatolie Stati, Ascom falls within the



denial of benefits provision in Art. 17 ECT. Kazakhstan's reliance on Art. 17 ECT is misplaced. Article 17 ECT only applies to Part III of the ECT, leaving unaffected the dispute resolution provision in Art. 26 ECT. Article 17 ECT concerns only the merits and not jurisdiction, and this view has been relied on by the tribunal in *Plama v. Bulgaria*, and was adopted by the *Yukos* tribunal. Regardless, however, Art. 17 ECT only applies if a state invoked that provision to deny benefits to an investor before a dispute otherwise arose. Since Kazakhstan did not exercise this right, Art. 17 ECT is completely irrelevant to this case. (C-II ¶¶ 87 – 90; CPHB 1 ¶¶ 50 – 52; CPHB 2 ¶ 13).

717. Article 17 ECT has only a prospective effect and, even if this Tribunal were to find that exercise of the "*denial of benefits*" could be retroactive, Art. 17(1) would still be inapplicable because the two elements of that article are not met, namely: i) that a legal entity be owned or controlled by citizens or nationals of a third state and (ii) that that entity has no substantial business activities in the Area of the Contracting Party in which it is organized. First, as is clear from the text of the ECT, a "*third state*" under the ECT is a state that is not a party to the ECT. Second, the second element is also missing, as Ascom's board of directors and management direct and control Ascom from its headquarters in Chisinau, Moldova. Even if Art. 17 could be applicable, Anatolie Stati is the sole shareholder and has dual Romanian and Moldovan citizenship. Both countries are parties to the ECT. Accordingly, neither of the cumulative requirements of Art. 17 ECT would be satisfied. (C-II ¶¶ 91 – 95; CPHB 1 ¶¶ 50 – 52; CPHB 2 ¶ 12).

718. Claimants state that Terra Raf was incorporated on 1 March 1999 by Southbridge Services Limited and Cresmount Services Limited. On 27 January 2000, Messrs. Stati acquired Terra Raf's two sole shares and replaced the former directors as Terra Raf's new directors. In September 2004, Messrs. Stati increased their shares to a thousand each, with each receiving an additional 999 shares. Claimants state that Terra Raf's certificate of incorporation clearly name Messrs. Stati as directors and sole shareholders, directly owning and controlling 50% of it and of TNG and its assets. (C-0 ¶ 13; C-II ¶ 96, 129).

719. In response to Kazakhstan's contention that this Tribunal does not have jurisdiction over Terra Raf because the ECT does not apply to Gibraltar, Claimants explain that, as the *Petrobart v. Kyrgyzstan* tribunal held, the ECT applies to Gibraltar by way of Art. 45(1) ECT, which addresses provisional application of the Treaty. (C-II ¶¶ 96 – 98; CPHB 1 ¶¶ 53 – 54; CPHB 2 ¶ 11). Kazakhstan argues that "*[p]rovisional application of the ECT will cease: (a) by virtue of the Treaty coming into force pursuant to Article 45(1); or (b) by virtue of a written notification pursuant to Article 45(3)(a)*" and that "*the provisional application was de facto terminated on that date in respect of the United Kingdom and all sovereign territories of the UK, including Gibraltar.*" (C-II ¶¶ 99 – 100, partially quoted). This argument ignores ECT's provisions which do not provide for *de facto* termination. Instead, Art. 45(3)(a) ECT requires that provisional application be terminated by written notification. This view was endorsed by the *Petrobart v. Kyrgyzstan* tribunal and this view was upheld when the Svea Court of Appeal declined to annul the award and found that the tribunal had correctly addressed the jurisdiction issue. This is the only tribunal to date that has considered the applicability of the ECT to Gibraltar. To date, no written notification has been made with respect to Gibraltar.



720. Kazakhstan's attempts to distinguish *Petrobart* are misplaced. First, with respect to the timing of the investment, that was not a consideration in the *Petrobart* tribunal's reasoning. That tribunal's reasoning solely concerned the analysis of Art. 45 ECT and the regime to terminate provisional application under that article, i.e., a notification under Art. 45(3) ECT. The text of Art. 45 ECT does not indicate that the timing of an investment should be of any relevance to termination of provisional application. The question turns solely on whether the United Kingdom or Gibraltar has made a declaration to terminate provisional application of the ECT to Gibraltar. Neither has done so. (C-II ¶ 103). Second, Kazakhstan's contention that "*the terms of the UK's ratification document were clear notice that the UK intended to end the application of the ECT to Gibraltar*" is wrong. The UK ratification document simply does not refer to Gibraltar at all. Furthermore, the notification and the note verbale indicate Gibraltar's intention to ratify the ECT later. Both indicate that ratification by the United Kingdom and by Gibraltar will be dissociated in time, thereby leaving intact the provisional application of the ECT in the meantime. (C-II ¶ 104). This interpretation is supported by Art. 40(2) ECT on the application of the treaty to overseas territories, which clearly anticipates the possibility of a dissociation between the date of entry into force for a state and an overseas territory, and which provides that "*[a]ny Contracting Party may at a later date [i.e., later than at the time of signature, ratification, acceptance, approval or accession], by a declaration deposited with the Depository, bind itself under this Treaty with respect to other territory specified in the declaration.*" (C-II ¶ 105). Finally, termination of provisional application of the ECT has not been noted on the Members' page of the Energy Charter Secretariat, though it has notes on the end date of Russia's provisional application. (C-II ¶ 106). With regard to Dr. Tietje's allegation that the treaty practice of the United Kingdom since 1967 is not to make a declaration regarding inclusion of an overseas territory at the time of signature since such would usually have to be reconfirmed a the time of ratification, it is clear that the United Kingdom did confirm that the ECT provisionally applied to Gibraltar. (CPHB 1 ¶¶ 53 – 56).

721. Alternatively, should the Tribunal find that the ECT ceased to apply provisionally to Gibraltar, the ECT nevertheless applies to Gibraltar on the basis that Gibraltar is a part of the European Community, which is itself party to the ECT. (C-II ¶ 108; CPHB 2 ¶ 11). Gibraltar's parliamentary reports indicate that the ECT applies to it on that basis. Pursuant to Art. 52 TEU and Art. 355 of the Treaty on the Functioning of the European Union, Gibraltar is a European territory. (C-II ¶¶ 108 – 110, CPHB 1 ¶ 56).

722. Finally, while there should be no doubt that Terra Raf is a qualified "*investor*" under the ECT, the issue is of little ultimate relevance, because Terra Raf is owned and controlled by Messrs. Anatolie and Gabriel Stati. The ECT protects their indirect investments in Kazakhstan. (C-II ¶ 112).

### b. Arguments by Respondent

723. Respondent agrees that the definition of "*investor*" is set out in Art. 1(7) ECT. If Claimants can provide evidence to discharge their burden of proof to the Tribunal, namely that Claimants Anatolie and Gabriel Stati are citizens, nationals or permanent residents of a contracting party, it is not for the Respondent to dispute it. (R-I ¶¶ 8.1 – 8.6, 8.62; R-II ¶ 19).



724. Nevertheless, the inquiry does not end there. Rather, when assessing jurisdiction, the question of nationality is one which the Tribunal, may examine from the standpoint of international law. Such an analysis, which mirrors the analysis to be undertaken with respect to whether an investment has been made, considers the overall nature of the Claimants and their general conduct. (R-II ¶¶ 20 – 23; RPHB 1 ¶¶ 420 – 422).

725. Turning first to Anatolie Stati, Respondent states that he cannot be seen as an investor under the ECT because (1) he has not made any direct investments in Kazakhstan, (2) his so-called investments are invalid under the laws of Kazakhstan, and (3) he is not an indirect investor in any firm, since he does not hold the legal capacity to act as an investor. (R-I ¶¶ 8.56 – 8.61).

726. Respondent argues that Anatolie Stati is a highly skilled political animal who is adept at converting long term assets into the short term aims of *"advancing political goals."* Anatolie Stati's background is in the corrupt construction sector in the former USSR. While his method of entry into the oil and gas industry is not clear from Claimants' submissions, it is clear that Anatolie Stati has established himself in a position of power by playing in the political field in Moldova. Anatolie Stati operates among a web of political figures who are engaged in corrupt practices and terrorism – and that these actors have direct interests in Anatolie Stati's investments in Kazakhstan. Indeed, it appears that Anatolie Stati pays politicians in return for political power, business connections, and opportunities. Equally, politicians pay him to act as a front for their business endeavours, as evidenced by Anatolie Stati's investments in Turkmenistan, where Anatolie Stati was involved in a document smuggling operation, for which his political ties helped him in avoid prosecution. (R-II ¶¶ 24 – 33; 38 – 39; RPHB 1 ¶¶ 420 – 427).

727. Claimants' activities in Sudan (1) have been regarded as non-beneficial to the local population, (2) have been questioned for a lack of transparency and (3) shed serious concerns as to whether Claimants are entitled to protection under the ECT. The statements made by both President Voronin and Mr. Andreyev in relation to Mr. Anatolie Stati's financing of illegal militant groups in Sudan in circumvention of UN sanctions are not *"defamatory."* There is nothing to suggest that both President Voronin (as a political adversary) and Mr. Andreyev (as a former employee) would not have had actual knowledge of Claimants' businesses in Sudan, given their respective relationships with Claimants. Their stories are consistent, even though they have not interacted with one another. Moreover, since the assets in Sudan are non-producing, it is likely that Claimants used money received from Kazakhstan to finance the illegal activities there. (R-I ¶ 9.57; R-II ¶¶ 40 – 46; RPHB 1 ¶¶ 430 – 431).

728. Gabriel Stati – the pampered son of Anatolie Stati – is more a playboy than a businessman. No stranger to controversy, he was arrested following the April 2009 elections in Moldova amid allegations that he was involved in the organization and financing of civil unrest and attempting to overthrow the Moldovan government. The Moldovan authorities attempted to extradite Gabriel Stati from the Ukraine. There is little to suggest that he has had any active involvement in Claimants' alleged investments in Kazakhstan. (R-I ¶ 8.62; R-II ¶¶ 34 – 36; RPHB 1 ¶¶ 428 – 429).



729. Respondent disputes legality of Ascom's 9 December 1999 purchase of the 62% interest in KPM. Claimants made no payments in relation to this initial purchase, but instead likely paid monies to a company called Telwin under a brokerage agreement. Respondent alleges that, pursuant to this brokerage Agreement, Telwin was obliged to find the owner of the rights in the exploration of the Borankol field and to assist in the acquisition of those rights for Ascom. Telwin, however, held 85% of the shares of Aksai at the time and, therefore, received USD 1.5 million in consideration for locating the owner of the rights, which it must have known that Aksai owned all along. Respondent also states that payment of the purchase price has not been proven. (R-II ¶ 117).

730. The benefits of the ECT to Ascom should be denied under Art. 17(1) ECT, pursuant to which a state can deny the benefits under the ECT if citizens or nationals of a third state own or control the investor and if the investor has no substantial business activity in the state in which it is organised. Presently, Ascom fulfils both parts of this test. First, Ascom is controlled by citizens of a third state. It is organized under the laws of Moldova, but is not controlled by citizens of Moldova (since "*third state*" means any state other than the state of incorporation). Thus, since Claimants state that Anatolie Stati and Gabriel Stati are controlling Ascom, the Tribunal would have to find that Anatolie and Gabriel Stati, as citizens of Romania, are citizens of a third state for the purposes of Art. 17(1) ECT. Although Claimants attempt to avoid this conclusion by arguing that "*third state*" in Art. 17(1) ECT means "*states other than contracting states of the ECT,*" this argument is contradicted by the ECT's use of the term "*third state*" in other provisions, such as Art. 7(10)(a)(i) ECT. As a result, third state can mean contracting and non-contracting states. Accordingly, Romania is to be treated as a third state, thereby fulfilling the first part of the text. (R-I ¶¶ 8.9 – 8.10; R-II ¶¶ 47 – 52; RPHB 1 ¶¶ 432 – 434).

731. Second, Claimants have only made the unsupported contention that Ascom's Board of Directors and management direct and control Ascom from Moldova. Claimants have not met their burden of proving that Ascom has substantial business activities in Moldova, leaving the second part of the test fulfilled. (R-I ¶ 8.10; R-II ¶¶ 53 – 54).

732. Since Ascom does not meet the requirements of Art. 17(1) ECT, Respondent can deny it benefits under the ECT. Contrary to Claimants' contention, the Republic can do this retrospectively and Claimants did not challenge this in the Hearings. The mere existence of Art. 17(1) ECT is a clear warning for a putative investor that protection can be denied if the prerequisites of the provision are fulfilled. The tribunals in the *Plama* and *Yukos* decisions erred when they based their findings on the argument that a retrospective application would undermine an investor's legitimate expectations regarding the existence of protection under the ECT. The *Plama* and *Yukos* decisions render Art. 17(1) inapplicable. These decisions are also in clear neglect of investment practice. Foreign investors often times do not even have to inform host states of their investment in the first place and investment is made "*under the radar*" of the host states. Under such conditions, an effective application of the denial of benefits clause would not be possible. Yet, tribunals have frequently held that the effective interpretation of treaty provisions is important. Thus, the tribunals in *Ulysseas Inc. V. Ecuador* and in *Pac Rim Cayman*



Page **160** of **414**

El Salvador were correct when they held that a denial of benefits clause could have retrospective effect. (R-II ¶¶ 55 – 61).

733. With respect to Terra Raf, Respondent does not admit that Terra Raf is validly incorporated in Gibraltar. Even if it were, however, Terra Raf would not be entitled to protection under the ECT because the ECT does not apply provisionally to Gibraltar, nor is Gibraltar a party to the ECT based on the EU's signature to the ECT. (R-I ¶ 8.11; RPHB 1 ¶ 440).

734. Regarding the provisional applicability, although the Parties agree that the ECT applied provisionally to Gibraltar prior to the United Kingdom's ratification thereof on 13 December 1996, the ECT no longer applies to Gibraltar on a provisional basis. Provisional application of the ECT is regulated by Art. 45 ECT, which provides for two methods of termination of the provisional application. Under the *de facto* method of Art. 45(1) ECT, the entry into force of the ECT automatically brings provisional application of the ECT to an end. The ECT entered into force in the United Kingdom on 16 April 1998, and provisional application was *de facto* terminated on that date in respect of the United Kingdom and all sovereign territories of the UK, including Gibraltar. Alternatively, under the notice method set out in Art. 45(3)(a) ECT, the entry into force of the ECT constituted notice of the United Kingdom's intention that Gibraltar would not be part of the ratification of the ECT, and that its provisional application would also terminate. The United Kingdom's practice since 1967 has been to expressly declare the specific territories to which a treaty shall extend, and Gibraltar was not included in the United Kingdom's declaration. Thus, to the extent that the ECT ever could have provisionally applied, that terminated with the United Kingdom's ratification of the ECT on 13 December 1996. (R-I ¶¶ 8.12 – 8.41; R-II ¶¶ 62 – 69; RPHB 1 ¶¶ 443 – 444).

735. The United Kingdom was within its rights to refuse to apply the ECT to Gibraltar, even without consulting it. Further, the United Kingdom's intention not to apply the ECT to Gibraltar is confirmed by a *note verbale* dated 27 July 2004, which made it clear that Gibraltar did not want the United Kingdom to ratify the ECT on its behalf. (R-I ¶¶ 8.27 – 8.30).

736. Respondent states that Claimants have seemed to drop their assertion that the ECT applied to Gibraltar *via* the EU's signature on the ECT and seemed only to maintain their position that the ECT applies provisionally. Nevertheless, Claimants' EU arguments rest on the incorrect assumption that the EU is a contracting party of the ECT. Respondent reminds the Tribunal that the EU is not a contracting party to the ECT. The United Kingdom signed the ECT as an EU Member State in a "*mixed agreement*." This means that, the Member State signed in respect of those matters where Member States align their policies with the EU. There is a strong presumption that mixed agreements are concluded in territorial areas which fall within the regulatory scope of the application of EU law. Respondent states that Gibraltar is a disputed territory as between the United Kingdom and Spain and, as a result, important aspects of EU policy do not apply to Gibraltar. (R-II ¶¶ 70 – 72; RPHB 1 ¶¶ 440 – 442).

737. Respondent denies that the case *Petrobart v. Kyrgyzstan* is a binding precedent or that it may even serve as guidance to this Tribunal, since it was decided on the


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE **576** -