basis of facts different to those of this case. Notwithstanding the absence of precedent in international arbitration, the Tribunal in *Petrobart* considered the application of the ECT to Gibraltar in the context of investments made during the period of provisional application of the ECT, but prior to its entry into force following ratification. The present case, however, involves alleged investments made several years after ratification of the ECT, by which time the ECT had ceased to have any effect in Gibraltar. It is also noteworthy that the Respondent in that case raised its objection to the ECT extending to Gibraltar at a very late stage in the proceedings. Further, the *Petrobart* decision has been criticized on the basis that the correct analysis should have been that Parties have to "*opt in*" on ratification, rather than "*opt out*." (R-I ¶¶ 8.11, 8.42 – 55).

738. Accordingly, Terra Raf is not an "*investor*", as defined in the ECT. Any Art. 1(6) ECT "*investments*" otherwise owned or controlled by it (100% of TNG, its assets and the LPG Plant) have no protection under the ECT. (R-II ¶ 72).

739. Respondent contests Messrs. Stati's ownership of Terra Raf. Respondent states that Claimants' evidence at C-32 does not contain any information about Messrs. Stati each owning 50% of the company and states that C-33 lists two British companies as the founders of Terra Raf Traiding Ltd. Respondent states that Claimants have not produced a single document that demonstrates their relationship to Terra Raf. Respondent states that it appears that Terra Raf is a shell company, existing only to hold shares of TNG. (R-I ¶ 9.81, 14.9). To the extent that Claimants seek to recover losses suffered by TNG, its assets and the LPG Plant, clearly no double recovery for the same loss should be available (if it is found that Terra Raf is an "*investor*" within the definition). (R-II ¶ 72).

### c.   The Tribunal

740. As is not contested between the Parties, the Tribunal's jurisdiction is governed by the express terms of the ECT and particularly the definition of "*investor*" in Art. 1(7) ECT. As is also undisputed, Claimants have the burden of proof that each one of them qualifies as an investor under this definition.

741. The Tribunal will, therefore, address this issue for each of the four Claimants.

742. Regarding **Messrs. Anatolie and Gabriel Stati**, as natural persons, Art. 1(7) ECT provides: "*Investor means [...] (i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law*."

743. Claimants have provided the Tribunal with *prima facie* proof of nationality for Messrs. Anatolie and Gabriel Stati, including identification cards and passports. (C-II ¶¶ 79 – 80, CPHB 1 ¶¶ 47 – 49; CPHB 2 ¶ 10). These show that each holds the nationality of Moldova and Romania, which are Contracting Parties to the ECT. Messrs. Anatolie and Gabriel Stati are, therefore, qualified "*investors*" under the ECT. Their residence would only matter, as is clear from the wording of the definition in Art. 1(7) ECT by the second alternative after the word "*or*", if they would not have the nationality of a Contracting State.



744. Regarding the third and fourth Claimants, Ascom and Terra Raf, the definition in Art. 1(7)(ii) ECT, according to which "*Investor means [...] a company or other organization in accordance with the law applicable in that Contracting Party*" applies.

745. To prove the Tribunal's jurisdiction over **Ascom**, Claimants have produced the Certificate of Incorporation of Ascom in Moldova (as an exhibit to their Request for Arbitration and to their Statement of Claim), and Respondent does not contest the authenticity of that document. Respondent's argument that Ascom falls within the denial of benefits provision in Art. 17 ECT is not relevant in the present context. Article 17 ECT, as clearly indicated by its introductory words "*of this part*", only applies to Part III of the ECT, leaving unaffected the dispute resolution provision in Part V with Art. 26 ECT (see tribunal in *Plama v. Bulgaria*). And further, Art. 17 ECT would only apply if a state invoked that provision to deny benefits to an investor before a dispute arose and Respondent did not exercise this right.

746. Turning to the fourth Claimant, Claimants state that **Terra Raf** was incorporated under the laws of Gibraltar on 1 March 1999 and that Terra Raf's certificate of incorporation name Messrs. Stati as directors and sole shareholders, directly owning and controlling 50% of it and of TNG and its assets. (C-0 ¶ 13; C-II ¶ 96, 129). Respondent argues that this Tribunal does not have jurisdiction over Terra Raf because the ECT does not apply to Gibraltar. In that regard, the Tribunal considers that it does not have to decide whether the ECT applies to Gibraltar by way of Art. 45(1) ECT, which addresses provisional application of the ECT. (C-II ¶¶ 96 – 98; CPHB 1 ¶¶ 53 – 54; CPHB 2 ¶ 11). In addition, the Tribunal need not consider whether, as Respondent argues, that provisional application of the ECT has ceased or whether the decision of the the *Petrobart v. Kyrgyzstan* tribunal provides guidance in this respect. For, in any case, the ECT applies to Gibraltar on the basis that Gibraltar is a part of the European Community, which is itself party to the ECT. According to Art. 52 of the Treaty on the European Union and Art. 355 of the Treaty on the Functioning of the European Union, Gibraltar is included in its territory.

747. For the above reasons, therefore, the Tribunal concludes that all four Claimants qualify as investors under the ECT.

### 3.   Jurisdiction Ratione Materiae – Existence of Investment

#### a.   Arguments by Claimants

748. All of the acts complained of occurred after the ECT entered into force for Moldova, Romania, and Kazakhstan on 16 April 1998. Claimants' investments fall clearly within the definition of "*Investment*" in Art. 1(6) ECT, which Claimants note is broader than the definition in many other investment treaties. This definition includes every kind of asset, owned or controlled by an investor, "*including tangible and intangible assets, a company or business enterprise, shares, equity participation, debt, claims to money or performance, returns, and any rights conferred by law or contract*." (C-I ¶¶ 33 – 35; C-II ¶¶ 119, 123 – 124; CPHB 1 ¶ 59; CPHB 2 ¶ 14).



749. To take from Claimants' words:

> 120. *KPM and TNG are energy companies that held Subsoil Use Contracts and Subsoil Use Licenses from Kazakhstan for the exploration and production of hydrocarbons. Claimants' tangible and intangible holdings in Kazakhstan included ownership of oil and gas wells, drilling equipment, gathering pipelines, treatment and storage facilities, vehicles, offices, an LPG plant, equity interests in KPM and TNG, and contractual rights conferred by Kazakhstan to KPM and TNG under the Subsoil Use Contracts and Licenses for the Borankol field, the Tolkyn field, and the Contract 302 Properties. These are "any investment associated with an economic activity in the energy sector" for the purpose of Article 1(6), and they are encompassed by subcategories (a), (b), (c), (e), and (f) of Article 1(6). (C-II ¶ 120, citations omitted; see also C-I ¶ 34).*

750. Claimants argue that the double-barreled *Salini* test, which requires establishing an investment under both the applicable investment treaty and the ICSID Convention, is not applicable here, as it only applies in ICSID cases. After the Hearing on Quantum, Claimants reminded the Tribunal that the controversial *Salini* test is applied in ICSID arbitrations because, unlike the ECT, ICSID does not define "*investment*." Furthermore, at best, ICSID applies the *Salini* test as a flexible guideline, rather than as a strict jurisdictional requirement. (CPHB 1 ¶¶ 60 – 62). The *Salini* test – and likewise all cases that rely on it – is irrelevant to this arbitration, and Respondent has not provided any ECT cases that apply the *Salini* criteria. Although Claimants' investments would clearly satisfy the *Salini* test, there is no basis for the Tribunal to apply criteria outside of the ECT to establish whether Claimants made a valid investment. The only relevant definition of investment is that found in Art. 1(6) ECT. (C-II ¶¶ 114 – 116, 118, 122; CPHB 2 ¶ 15).

751. Characterizing Respondent's contributions arguments as "*irrelevant*", Claimants explain that their investments resulted from substantial financial contributions, including the over USD 12 million purchase price for KPM's and TNG's shares, as well as investments in accordance with the working programs (which the MEMR recognized that Claimants exceeded, both in terms of investment values and financial obligations. Respondent has not contested that the amounts exceeded the companies' working program obligations by USD 400 million for KPM and USD 475 million for TNG. From 2000 until the end of 2009, Claimants invested more that USD 1.1 billion in KPM and TNG. (C-II ¶ 121; CPHB 1 ¶¶ 63 – 67; CPHB 2 ¶ 16).

752. After Hearings on Jurisdiction and Liability and on Quantum, Claimants explained that they initially funded the operations of KPM and TNG through shareholder loans, which are investments under Article 1(6) ECT. Furthermore, substantial contributions to KPM and TNG were made through the reinvestment of profits. By the end of 2008, KPM and TNG had nearly USD 400 million in retained earnings on their balance sheets. This is disregarded by Respondent. Reinvesting profits is an investment, as Art. 14(1) ECT guarantees Claimants the right to take the profits or "*Returns*" of KPM and TNG and to distribute them as dividends or to spend or invest them as they saw fit. (CPHB 1 ¶ 68 – 72; CPHB 2 ¶ 16).



753. Respondent's argument that the Tristan Loan financial structure deprives the Tribunal of jurisdiction because it shielded Claimants from risk in relation to the investments in KPM and TNG is factually and legally meritless. The Tristan note offering was a normal public debt offering in which sophisticated investors examined the business and financial status of KPM and TNG and found them creditworthy. The third party financing for KPM and TNG from Kazcommerzbank was approximately USD 145 million at the end of 2006. In 2006, the debt portion of the capital structure was refinanced through the Tristan note offering, in order to increase the available credit line and to obtain better credit terms. The notes were issued by Tristan and were secured entirely by the assets of KPM and TNG and pledges of Claimants' equity interests in KPM and TNG. Claimants' investments remained at risk at all times, since Terra Raf and Ascom pledged their entire equity interests in KPM and TNG to the Tristan noteholders as security. The pledge agreements provided that in the event of default, Ascom and Terra Raf would be required to provide any payments of any kind to the Tristan noteholders, including payments received as a result of this arbitration. This pledge is in and of itself an investment under Art. 1(6) ECT, which broadly defines investment as including pledges. The pledges also satisfy the inapplicable *Salini* requirements of substantial contribution, risk, duration, and benefit to the host State: "*They are substantial contributions to KPM and TNG in the form of legal obligations that enabled KPM and TNG to raise hundreds of millions of dollars from the Tristan noteholders. Those contributions entailed substantial risk, namely, Claimants' risk of losing their entire equity stakes in KPM and TNG and any payment received through arbitration. Those contributions had a lengthy duration; Claimants entered into the Pledge Agreements in 2006, and they remain in force today. And the contribution benefited Kazakhstan, because it enabled KPM and TNG to raise hundreds of millions of dollars to finance operations that provided jobs to hundreds of Kazakh citizens and significant tax revenues to the Kazakh treasury.*" This is analogous to the case *Enron v. Argentina*, where the tribunal observed that a guaranty could be treated as part of the investment. (CPHB 1 ¶ 72 – 80; CPHB 2 ¶ 17).

754. Claimants state that there is no "*origin of capital*" language in the ECT's broad definition of "*investment*." Thus, Respondent's contention that the "*real*" investor in KPM and TNG is Tristan Oil, and not Claimants, has no legal basis. Moreover, as is plain from the text of Art. 1(6) ECT, which refers expressly to "*every kind of asset, **owned or controlled** directly or **indirectly** by an Investor*" the ECT protects investments that are not only directly owned, but also investments that are indirectly owned or controlled. Claimants have demonstrated that Anatolie Stati indirectly owned and controlled KPM and its assets, and that he and Gabriel Stati each indirectly owned and controlled 50% of TNG and its assets. (C-II ¶¶ 125 – 129; CPHB 1 ¶ 67).

755. Regarding the benefit that Claimants' investments had for Kazakhstan, Claimants point out that Kazakhstan has even recognized the "*strategic role*" that Claimants' investment and development of the oil and gas fields has had for the Mangystau Region and for Kazakhstan. This disproves Respondent's allegations to the contrary. In addition, from 2000 – 2009, Claimants KPM and TNG paid USD 163 and 187 million in taxes and administrative expenses, respectively. They employed over 900 Kazakh citizens as permanent workforce and employed nearly 3,000 on a contract basis. (CPHB 1 ¶¶ 81 – 85; CPHB 2 ¶ 18).



756. Even though Claimants' investments were made in good faith and in accordance with Kazakh law, the ECT contains no such requirement that they be so made. Indeed, if the contracting states had intended there to be such a requirement, they could have written it into the text of the Treaty, as explained in the ICSID case of *Saba Fakes v. Turkey*. Neither the ECT nor customary international law requires that an investment comply with the minutiae of domestic and administrative legal requirements in order to qualify for protection. Furthermore, tribunals under other treaty regimes have only excluded an investment from protection in instances of calculated misconduct amounting to fraud. (C-II ¶¶ 130 – 131; CPHB 1 ¶¶ 86 – 87).

757. Regardless, even where a treaty requires that an investment be made in accordance with domestic law, it does not follow that any violation will preclude jurisdiction. Indeed, tribunals that have rejected jurisdiction based on illegality – like the *Phoenix* and the *Plama* tribunals - have done so when an investment amounted to fraud. At issue here, however, are allegations of technical, minute – and meritless – violations of formalities of Kazakh corporate law, coming nowhere close to fraud. Hyper-technical, formalistic allegations of "*illegality*" precluding jurisdiction have been uniformly rejected in treaty cases, including *Tokios Tokeles* and *Saluka*, and this Tribunal should likewise do the same. (C-II ¶¶ 132 – 137).

758. Respondent's allegations of illegal corporate formation are contrived and meritless. Despite benefitting from, inspecting, and monitoring the corporate structures for years, Respondent failed to allege that anything was illegal or improper prior to this arbitration. This suffices for the Tribunal to reject Respondent's formalistic claims of illegality in this case. Claimants argue that Respondent created these illegalities as part of its campaign of indirect expropriation, initiated in October 2008. (C-II ¶¶ 135 – 141; CPHB 2 ¶¶ 20 – 22).

759. Turning to the issue of KPM's formation and share issuance, even if KPM failed to submit appropriate documents, such failure does not result in a *per se* illegal formation. Rather, such a failure would merely give Kazakh officials the right to challenge the legality of KPM's formation before a Kazakh court, pursuant to Art. 16 of the SM Law. Kazakhstan never did so and, by the time of the transfer of KPM's shares to Claimants, the registration requirement had been abolished. Claimants concede that the previous shareholders of KPM failed to register KPM's initial share issuance as required by law. Kazakhstan and investment tribunals, such as *Saluka*, accept that there is a distinction to be made between former shareholders and failings by claimants in an arbitration. The alleged technical illegalities by former shareholders of KPM cannot taint Claimants' title to shares. Claimants state that Respondent is trying to create an issue where none. (C-II ¶ 142 – 143; CPHB 1 ¶¶ 88 – 91).

760. Further, Kazakh law does not recognize a concept of a transaction that was *void ab initio*. Rather, pursuant to Art. 157(1) CC RK, all transactions remain valid until voided by a court. Not only have there been no claims brought by Kazakhstan to challenge KPM's formation, but the 3-year statute of limitations for such claims, which runs from the date when the person knew or should have known about the violation, expired on 24 June 2000. (C-II ¶¶ 144 – 145).



761. Despite Respondent's arguments to the contrary, Ascom's acquisitions of KPM shares in 1999 and 2004 were lawful, despite not being registered, because JSCs were exempted from an obligation to register their initial issuance of shares in 1998 – before the transactions at issue here. Further, as part of the amendments to the law, the issuance of shares not subject to state registration required a national identification number. After completing its review, the National Securities Commission could either assign a national identification number, or refuse to do so if its review of the submitted documents revealed any violation of law by the issuer. KPM obtained a national identification number with respect to the initial issuance of its shares on 24 January 2000. If there had been any irregularities, the National Securities Commission was under a duty to notify KPM of these, rather than assigning a number. Therefore, KPM's initial issuance of shares duly complied with Kazakh law from at least that moment forward. Claimants cured any alleged defect in registration upon their acquisition of 62% of KPM's shares in 1999. (C-II ¶¶ 146 – 149; CPHB 1 ¶¶ 88 – 91; CPHB 2 ¶ 23).

762. Claimants also state that KPM has always been a commercial company – the so-called "*re-registration*" as a commercial entity was nothing more than Kazakhstan's correction of its own clerical error. This is plain from a review of KPM's Foundation Agreement, which explicitly calls KPM a commercial organization. KPM's Charter contains no provisions related to the non-profit goals of the company. Further, opposite of the goals of a non-profit, the explicit main goal stated in KPM's Foundation Agreement is that KPM is to obtain a profit. Finally, KPM has engaged in commercial activity since its establishment and its acquisition of a Subsoil Use License in May 1997 – 2 years before the alleged re-registration. This Subsoil License even explicitly states that KPM's main area of business is commercial activities. The same commercial orientation is noted in Contract 305. Indeed, if the registration authorities had correctly performed their obligations, they would have registered KPM as a commercial organization from the outset. Claimants state that they have no knowledge of the December 1999 re-registration or of the documents Respondent has submitted. (C-II ¶¶ 150 – 155; CPHB 1 ¶ 90 – 93).

763. Claimants present a history of Claimants' acquisitions of KPM and TNG and their development of these investments, and this is also contained in this Award in the Timeline, above. Importantly, Contracts 305, 302, and 210 each contained stabilization clauses stating that "*[c]hanges and additions to the legislation made after the signature of the Contract that deteriorate the position of the Contractor shall not be applicable to this Contract.*" (C-I ¶¶ 42 – 73). Claimants explain that all of their acquisitions in KPM and TNG occurred after the elimination of the licensing regime and authority. Moreover, Kazakh law required consent of the Competent Authority only for transfers of subsoil use rights from one user to another, not transfers of shares in a subsoil user. KPM's and TNG's subsoil use rights were valid, and TNG and KPM violated no provisions of Kazakh law when making amendments to their Subsoil Use Contracts without amending the respective subsoil use licenses. Claimants explain that the 1995 Law on Licensing did not apply to the issuance and emending of KPM's and TNG's subsoil licenses. The subsoil licenses were issued in 1997, and are subject to the Subsoil Use Law, enacted on 27 January 1996. This law and Government Resolution No. 1017 (16 August 1996) contained the licensing procedures for subsoil users. In August 1999, Kazakhstan abolished the dual licensing and contracting system with respect



to subsoil use, moving directly to a contract-only system. Amendments to Subsoil Use Licenses were effectively replaced by amendments to the subsoil use agreements after the 1999 Amendments Law. (C-II ¶¶ 173 – 182; CPHB 1 ¶¶ 93 *et seq.*). The specific arguments are best taken from Claimants' words:

158.    *In August 1999, Kazakhstan abolished its dual licensing and contracting system with respect to subsoil use and moved to a contract-only system of subsoil use ("1999 Amendments Law"). Pre-existing subsoil use licenses remained in force and their "suspension, revocation, termination, and invalidation" were still governed by the 1996 Subsoil Use Law in force prior to the 1999 Amendments Law.    The 1999 Amendments Law effectively "froze" the licenses, which could only be suspended or withdrawn—but not amended—by the state authorities. Thus, only the subsoil use contracts could reflect amendments to the terms of a subsoil user's rights and obligations.*

159.    *The 1999 Amendments Law also resulted in a number of sweeping changes to various legislative acts that largely eliminated references to a Licensing Authority and its powers. In particular, those amendments deleted Article 7 of the 1996 Subsoil Law (Transfer of Subsoil Use Rights), which had empowered the Government of Kazakhstan to issue and amend licenses for subsoil use. Additionally, Article 8(1) of the 1996 Subsoil Law, which previously stated that the Competent Authority "submits to the Licensing Authority proposals for revocation of a License or making amendments thereto," was amended to provide that the "[Competent Authority] issues consents for transfer of Subsoil Use Rights." Likewise, the amendments substituted the Competent Authority for the Licensing Authority in Article 14 of the 1996 Subsoil Law, which thereafter provided:*

> *The transfer of Subsoil Use Rights by the subsoil user to another party, made either against payment or for free, including by contributing to the charter capital of a new legal entity, except for the transfer of the subsoil use right as collateral, shall be permitted only with the consent of the Competent Authority [authorized government body]. (C-II ¶¶ 156 – 159)*:

764.  Claimants even sought clarification on the relationship between the licenses and subsoil use agreements in December 1999. The Agency on Investment – the then-competent authority – informed KPM by letter dated 18 January 2000 that, pursuant to the amendments to the Law on Subsoil Use (11 August 1999), that licenses for subsoil use shall no longer be issued, nor shall changes or amendments be introduced into earlier-issued licenses. This was confirmed by the Government of Kazakhstan on 14 May 2002 and by the MEMR in December 2008. (C-II ¶¶ 178 – 181; CPHB 1 ¶¶ 95 – 104).

765.  Turning to Respondent's argument under Art. 53 of the 1995 Law on Oil, while that statute technically existed, it did not apply as a result of Kazakh laws governing the hierarchy of statutory acts, pursuant to which in the event of contradictory statutory provisions, the latter enacted Act shall prevail. Here, the later amended 1999 Amendments were applicable. These required consent only for the transfer of a subsoil use contract and not for the transfer of shares in a subsoil user. (C-II ¶¶ 161 – 163; CPHB 95 – 96).



766. In spite of this, however, KPM and TNG twice sought consent for the transfers –
and they either received it or were informed that consent was not required. (C-II ¶¶
156, 164). Only after Kazakhstan commenced its expropriation campaign in
October 2008 did Kazakhstan contend that those share transfers lacked the required
consents. (C-II ¶ 156; CPHB 1 ¶ 96). It is simply not true that Claimants applied
to the wrong authority. On Respondent's own evidence, the Competent Authority
on 26 April 1999 was the Agency on Investment, and the MEMR did not even exist
until 13 December 2000. (C-II ¶ 166). It is also worth noting that on 20 February
2007, when the Appraisal Commission (responsible for deciding requests for
alienations of subsoil use agreements) allowed for the transfer of TNG shares from
Gheso to Terra Raf, and also expressly found that there was no deadline within
which TNG had to seek approval for the transfer of shares from Gheso to Terra
Raf. (C-II ¶ 167). Claimants state that exhibit C-134, which TNG received from
MEMR because it was the document granting permission for the share transfer,
shows that the appropriate governmental body consented to the transfer. Finally,
Claimants state that Respondent has conceded that it had approved the transfer,
stating that as part of its indirect expropriation campaign, it "*annulled the earlier
issued permit.*" (C-II ¶ 168).

767. Respondent's argument that the reorganizations of KPM and TNG from JSCs to
LLPs in 2005 were unlawful because Claimants were not the lawful shareholders,
is meritless. Ascom and Terra Raf were the lawful shareholders of KPM and TNG
(respectively) when the reorganization occurred. (C-II ¶¶ 169, 170). Registration is
deemed complete upon state registration, occurring here at the latest in May 2005,
when the Kazakh Ministry of Justice approved and registered KPM's
transformation from a closed JSC into a LLP. Respondent did not question these
reorganizations until filing its Statement of Defense. (CPHB 1 ¶ 92).

768. Nonetheless, even if the reorganizations were invalid, there is no "*domino theory*"
to chain transactions in Kazakhstan – a court's finding that one transaction in the
chain was invalid will not serve to invalidate all later transaction. Rather, every
transaction remains valid until voided by a court. (C-II ¶¶ 170 - 172).

769. Turning to Respondent's arguments that Claimants failed to apply for necessary
waivers of the Republic's rights to purchase KPM and TNG, Claimants state that
Respondent had no pre-emptive rights at the time that any of the transactions
occurred – the last of which being Ascom's acquisition of the remaining 38%
shareholding in KPM in November 2004. The state's pre-emptive right did not
arise until 8 December 2004, with the amendments to Art. 71 of the 1996 Subsoil
Use Law. It applied only prospectively. Further, any attempts to cure defects in the
transfers after December 2004 would not trigger the Republic's ability to exercise a
preemptive right. (C-II ¶¶ 183 – 186; CPHB 1 ¶ 106).

770. It is not disputed that Claimants twice obtained waivers of pre-emptive rights from
Kazakhstan – once in 2007 in preparation of an IPO on the London Stock
Exchange and again in February 2007 when TNG applied for permission for the
2003 transfer of TNG ownership to Terra Raf (which TNG did not believe was
required at the time). Claimants state that it was not until 18 December 2008 that
Respondent attempted to revoke the waiver of pre-emptive rights, baselessly
accusing Claimants of fraud and forgery in connection with that waiver.
Respondent never provided any evidence of fraud or forgery, and never acted on



the allegations. Respondent's only objective in that retroactive revocation must have been to cast a cloud on Claimants' title to TNG, making it impossible for Claimants to sell the business. (C-II ¶¶ 187 – 190, 228, CPHB 1 ¶ 105).

771. It was a surprise when Kazakhstan requested that TNG apply for retroactive consent for the 2003 transfer of TNG shares from Gheso to Terra Raf. Respondent had no pre-emptive right request to any acquisition or share transfer in TNG, since such prospective rights first arose on 8 December 2004 through the amendment to Art. 71 of the 1996 Law on Subsoil Use. Respondent's argument that the transfer was not "*completed*" until 16 May 2005 and that that is why consent was required has neither factual nor legal basis. Kazakhstan's witness, Mr. Ongarbaev confirmed that the transfer was completed at the latest on 28 May 2003. The only reason that the 16 May 2005 date is relevant is because that was when TNG was reorganized from an open JSC to an LLP, and that re-organization was re-registered with State authorities and had nothing to do with pre-emptive rights. Finally, Respondent only made this objection during proceedings and not even KMG's international counsel, Squire Sanders, raised any concerns about TNG's registration, even after analyzing the pre-emptive rights topic. Rather, and contrary to Respondent's selective quoting and mischaracterization of that report, international legal counsel to KPM E&P, Squire Sanders, considered that Terra Raf's ownership of TNG was proper and legal and issued an opinion to that effect in a due diligence report, which Respondent withheld from the Tribunal. (CPHB 1 ¶¶ 93 – 94, 106 – 110; CPHB 2 ¶¶ 25 – 26).

772. Each of Respondent's bad faith arguments – *i.e.* that (i) proceeds from those investments were used to fund terrorist activities in South Sudan; (ii) KPM and TNG guaranteed bonds issued by Tristan Oil, which "*diverted*" money from Kazakhstan; and (iii) Claimants tried to illegally sell an investment they did not legally own in the "*Project Zenith*" process – are frivolous and irrelevant. These complaints are supported by unsubstantiated statements made by a disgruntled former-employee in the context of a wrongful termination lawsuit, a defamatory letter from a political opponent of Anatolie Stati, former President Voronin of Moldova, and Respondent's own misstatements. First, it has never been shown that Anatolie Stati funded terrorist groups in South Sudan. Rather, Anatolie Stati's normal, commercial investments in the oil and gas industry have contributed enormously to the well-being of the population of South Sudan by building schools, a hospital, medical clinics, and means of transportation in the region. Second, President Voronin's letter merely demonstrates that he and President Nazarbayev teamed up to undermine Anatolie Stati's investments in one country and his pro-democracy movement in the other. Third, in relation to Respondent's puzzling claims with respect to KPM and TNG guaranteeing bonds for Tristan Oil, the bonds show no evidence of bad faith and the issue is irrelevant for whether KPM and TNG are valid investments under the ECT. Finally, turning to the bad faith allegations with respect to Project Zenith, Claimants state that they were completely within their rights to offer these companies for sale – Kazakhstan acted in bad faith and in breach of the ECT by interfering with Project Zenith and in making the sale of KPM and TNG impossible. (C-II ¶¶ 192 – 197).

## b. **Arguments by Respondent**



773. In order to receive protection under the ECT, the investments must meet the definition of investment as articulated in Art. 1(6) ECT. The term "*investment*" has a meaning in and of itself, and simply meeting one of the categories listed under Art. 1(6) ECT is not sufficient. Instead, there are gaps in the Art. 1(6) ECT definition of "*investment*", and there is evidence to suggest that the Treaty parties intended the term to mean more than "*any right property or interest in money or money's worth*." (R-I ¶¶ 9.11 - 9.15, R-II ¶¶ 73 – 85, 83; RPHB 1 ¶ 446; RPHB 2 ¶¶ 384 – 385).

774. The first step this analysis is Art. 31(1) VCLT, which establishes the need to interpret a treaty in good faith. (R-I ¶ 9.40; R-II ¶ 79; RPHB 2 ¶ 385). International law is applicable by virtue of Art. 26(6) ECT, which allows the Tribunal to apply applicable general principles of international law. (R-II ¶ 77). Cases, such as *Salini* and *Phoenix*, are also relevant, since they amount to an expression of international law. (R-II ¶ 79).

775. The Tribunal – like the tribunals in *Romak, Alps Finance and Trade AG v. Slovak Republic*, and *Compagnie International de Maintenance (CIM) v. Ethiopia* – should consider the term's ordinary meaning, in light of other ECT provisions and the ECT's object and purpose, and should also consider the use of the term in international law, as applied by other tribunals. (R-II ¶¶ 84 – 87). Accordingly, Respondent asks the Tribunal to consider a broader meaning of "*investment*." (R-II ¶¶ 80 – 82).

776. Contrary to Claimants' argument, the definition of "*investment*" is not institution-specific – indeed, to make it so would (1) encourage forum shopping within the ECT (where investors have a choice of commencing arbitration under three different institutions) and (2) would violate the principle endorsed in *CIM v. Ethiopia* that Parties should search for a consistent meaning across investment treaties. (R-II ¶¶ 97 – 100; RPHB 1 ¶ ¶ 448).

777. The test for an investment available in ICSID arbitrations is one that should and could equally apply in ECT arbitrations. This is because the ICSID and ECT treaties are each predicated on general principles of international law, which allows for a wider definition of "*investment*" than that set out in the text. Thus, it is entirely appropriate for this Tribunal to employ tests like the ICSID-originating *Salini* test, which has been employed in cases where Tribunals have had to construe the word "*investment*" in accordance with its inherent meaning. (R-I ¶ 9.5; R-II ¶¶ 95, 96, 99).

778. Pursuant to the *Salini* and *Phoenix* awards, an investment must have the following six characteristics: (a) a contribution of money or other assets; (b) a certain duration; (c) an element of risk; (d) a contribution to the host state's development that is made (e) in accordance with the laws of the host state and (f) in good faith in accordance with general principles of international law. It is Claimants' burden to demonstrate that these characteristics have been exhibited in this case. (RPHB 2 ¶ 389). (R-I ¶¶ 9.4 – 9.5, 9.10, 9.36 – 9.41, 9.45 – 9.47; R-II ¶¶ 100 – 108; RPHB 1 ¶¶ 449 – 450).

779. Regarding the financial contribution requirement (a), Respondent notes that, although some tribunals have adopted the approach that an investment need not be



substantial, the low purchase prices for the assets, placed in context of the arbitration, raises doubts as to whether Claimants made was a true economic contribution when making the investment. Claimants initially invested in the businesses by way of share purchases and work programs. While Respondent acknowledges that Ascom and Terra Raf provided USD 9 million for the purchase of 38% of shares in KPM, it notes the Ascom - and not Terra Raf - purchased the TNG shares for only USD 189,185. Claimants have not provided a share purchase agreement for the purchase of the other 62% of shares in KPM. Instead, they have only provided a brokerage agreement between Ascom and Telwin. For TNG, while excerpts of the share purchase agreements were provided, the parts providing the purchase price were withheld. All that was provided was Mr. Pisica's allegation that a total of USD 617,333 was paid for 100% of the TNG shares, which Respondent notes is ridiculous when compared with Claimants' claim of the alleged value. No additional specification was ever given for Claimants' assertion that, between 1999 and 2004, Claimants invested over USD 12 million to acquire KPM and TNG. (R-I ¶¶ 9.27, 9.29 – 9.30; R-II ¶¶ 109 – 110, 116 – 118, 127; RPHB 1 ¶¶ 450 – 456; RPHB 2 ¶¶ 391 – 393).

780. Respondent also notes that it appears that Tristan Oil was contributing to and getting value from the assets. Tristan Oil was the main financier of KPM and TNG, and that this is not disputed by Claimants, who state that the ECT contains no "*origin of capital*" requirement. (R-II ¶¶ 120 – 131).

781. Further, Respondent points out discrepancies in figures for amounts that Claimants state were invested in the LPG Plant, the Contract 302 properties, or Claimants' alleged own operating plant, as well as a huge disparity between the investment purportedly made and the amounts claimed in damages. (R-I ¶ 9.31; R-II ¶¶ 123 – 126).

782. Respondent has not submitted arguments with respect to the element (b) duration. Regarding the risk element (c), Respondent states that Claimants' description of their payments demonstrates that Anatolie Stati took on the least amount of risk possible and that there was a lack of risk undertaken by other Claimants. Claimants protected themselves from the companies' liability by creating the Tristan Oil structure and overexposing KPM and TNG to debt. This lack of risk devalues Claimants' arguments that they made investments in accordance with the inherent meaning of the word. (R-II ¶¶ 119, 128 – 132; RPHB 2 ¶ 394).

783. Respondent argues that financial gain may not have been the primary motivator for Claimants. (R-II ¶¶ 128 – 132).

784. Respondent states that there was a lack of contribution to the economy of Kazakhstan (d). First, Respondent notes that Claimants imported foreign labor into Kazakhstan, rather than using local resources. Claimants failed in their obligation to train Kazak specialists. Claimants' evidence is incomplete and that Respondent cannot assess whether USD 14,166,558 was in fact provided. Second, while Claimants contend that they can do what they wish with their profits, Respondent states that the entire structure of Claimants' investment was aimed at taking any money created by the investments off shore and not to making a contribution to the host state, resulting from the investment. In 2008 and 2009, money and profits were diverted from KPM and TNG into Montvale Invest – a Stati-owned BVI



company. Ascom responded to the financial crisis by stripping TNG and KPM of their assets – by declaring dividends and paying a large bonus to Anatolie Stati. At the same time, KPM and TNG paid little of the taxes due to the Republic. USD 62 million in corporate back taxes remain outstanding. The service agreements with Ascom were typical of contracts that are used to transfer money between two related companies without any actual services being performed. (R-II ¶¶ 122, 133 – 145; RPHB 1 ¶¶ 459 – 462; RPHB 2 ¶ 395).

785. Respondent states that there was an undue exploitation of Kazakhstan's assets and that this harmed the Kazakh economy. Claimants' increase of production in the Tolkyn gas field was inconsistent with the strategy of maintaining the long-term usefulness of the asset and resulted in falling reservoir pressure. Respondent alleges that this action could indicate the "*deliberate action of the shareholder, which could be the result of irreversible loss of much of recoverable hydrocarbons and growth capital expenditures of drilling new wells (each worth USD 15 million).*" Confirmation of the diminished value of the assets are confirmed by Claimants' attempted sale in "*Project Zenith*" where no interested buyer could be found once buyers discovered the value of the assets. At the Hearing on Jurisdiction and Liability, Mr. Ongarbaev described the treatment of the field as "*barbaric.*" (R-I ¶¶ 9.69 – 9.70; R-II ¶¶ 133 – 145).

786. Regarding the legality of the investment (e), investments must be made in accordance with the law of the host state. This is supported by both the *Plama* and the *Yallisoletana SL v. Republic of El Salvador* decisions. The *Phoenix* and *Plama* tribunals have agreed that national law forms part of the international legal principles to be applied. Further, providing protection for investments that contravene the laws of the host state undermines a broader compliance with international law. Claimants' investment was not made in accordance with Kazakh law. Claimants have admitted that they breached Kazakh law and this admission is enough to demonstrate that Claimants are not entitled to protection under the ECT. Their breaches were not of "*mere formalities*" – they were substantial. (R-I ¶¶ 9.5 – 9.10, 9.25 – 9.16, 9.74, 9.87, 10.3, 25.10 – 25.14; R-II ¶¶ 78, 100 – 108, 147 – 204, 209; RPHB 1 ¶ 465 – 466; RPHB 2 ¶¶ 396 – 398).

787. Article 53 of the 1995 Law on Oil states that consent is required from both the Licensing Authority and Competent Authority when there is a transfer of shares in a company with subsoil use rights. As Claimants admit, the 1995 Law on Oil was in existence when the share transfers occurred, and even when the law was amended in 1999, the requirement for obtaining consent under Art. 53 was maintained. In response to Claimants' argument that it only needed to comply with Art. 14(1) of the 1996 Subsoil law, as explained by Prof. Ilyassova, pursuant to both Art. 14(1) of the 1996 Subsoil Law and Art. 2 of the 1995 Law on Oil, the 1995 Law on Oil actually took precedence over the 1996 Subsoil Law in the event of any inconsistency. Accordingly, Art. 53 of the 1995 Law on Oil applied to the transfers. Claimants are wrong that the 1996 Subsoil Law would have been exclusively applicable – the laws had distinct scopes, one concerning oil and one concerning subsoil use. A company would need to comply with both. (R-II ¶¶ 152 – 157, 168; RPHB 1 ¶ 469, 470; RPHB 2 ¶¶ 399 – 403).

788. Claimants failed to obtain consent from the Licensing Authority and Competent Authority in relation to any of the eight transfers that involved TNG. Although



Claimants received one authorization 4 years after the last share transfer in TNG (from Gheso to Terra Raf), that consent does not "*heal*" the prior failures to obtain consent for the three preceding transfers in TNG. Each of those prior transfers was invalid under Art. 14 of the 1996 Subsoil Law. Further, the consent given was legally invalid – Claimants failed to provide pertinent information, and the Republic never granted a waiver of its pre-emptive right. There can be no doubt that Terra Raf's investment in TNG was not in accordance with Kazakh law – the necessary and late-obtained consent for Terra Raf's investment in TNG was validly revoked as a result of Claimants' provision of false and misleading information. (R-II ¶¶ 148 – 149; 150 – 167; RPHB 1 ¶ 468 – 471).

789. Even when making their application for retro-active consent to the transfer of TNG from Gheso to Terra Raf in February 2007, Claimants expressly conceded that Art. 53 of the 1995 Law on Oil was in force. Accordingly, Respondent had a right, under Art. 71 of the 1996 Law on Subsoil Use as amended on 8 December 2004, to purchase TNG. This made the purported transfer invalid if the Republic would not waive its rights. (RPHB 2 ¶ 404 - 407).

790. In 2008, when the MEMR realized that it had been misled by Claimants regarding the necessity of the waiver, the MEMR was obliged to revoke the waiver, pursuant to Art. 15(2) of the 1996 Subsoil Law. Respondent denies that the revocation had anything to do with alleged "*harassment*" and deny that there was an official MEMR press release regarding this. Respondent states that KPM and TNG were given the opportunity to dispute the charges, as evidenced through the correspondence and meetings held. Nevertheless, it is evident that the problems arising out of the transfer of TNG from Gheso to Terra Raf were caused by Claimants themselves, likely in an effort to avoid having to obtain a waiver of the Republic's pre-emptive right. (R-II ¶¶ 170 – 176).

791. Claimants have provided no evidence for their argument that they were led to believe that no consent was required for the transfer of TNG from Gheso to Terra Raf because they were affiliated companies, and they did not make this argument at the hearings. Mr. Pisica is not qualified to opine on Kazakh law. Further, any alleged "*affiliation*" did not prevent TNG from belatedly requesting consent to the transfer. Respondent argues that Claimants always believed that they needed consent but simply chose not to obtain it. (R-II ¶ 162 -163; RPHB 1 ¶ 472, 473).

792. In response to Claimants' statements during the Hearing on Jurisdiction and Liability, Respondent reminds the Tribunal that it was correct in questioning the transfer from Gheso to Terra Raf. Respondent notes that there have been additional irregularities in the many transfers involving TNG. Claimants have produced a document which refers to Ascom owning TNG as of 15 September 2004, and at the same time argue that the last time Ascom owned TNG was in 2002. Further, Respondent it never conceded that Terra Raf's acquisition of TNG took place in 2003 and was registered at that time. (R-II ¶ 173; RPHB 1 ¶¶ 474 – 475).

793. The waivers obtained in 2007 in relation to the transfer of TNG and KPM to Tristan Oil bear no relation to the TNG-Gheso-Terra Raf transfer. Nevertheless, the Republic would not have waived its right in regard to the proposed transfer to



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE **589**

Tristan Oil had it known that Claimants should have requested a waiver at the time of the TNG-Gheso-Terra Raf transfer. (R-II ¶¶ 178 – 180).

794. Since the start of this arbitration, Respondent has discovered other serious breaches of Kazakh law in relation to Claimants' investment, which were concealed from Respondent. Since Respondent was not aware of these, they were not grounds for termination of the subsoil contracts. These violations include:

    *(a)*    *Violations of Kazakh law in relation to the issuing of shares in KPM;*

    *(b)*    *KPM was transformed from a "non-commercial" entity into a commercial entity in breach of Kazakh law;*

    *(c)*    *The transfer of KPM's shares to Ascom was illegal due to the failure to obtain consent from the Licensing and Competent Authorities;*

    *(d)*    *The reorganisation of KPM and TNG into LLPs was illegal; and*

    *(e)*    *KPM and TNG failed to amend their licenses when amending their contracts. (R-II ¶¶ 181 – 182, citations omitted, see also R-II ¶ 148 – 149; RPHB 1 ¶ 477).*

795. Respondent argues that KPM's share issue was *void ab initio* – a concept that exists in Kazakh law. Claimants admit that KPM failed to submit the relevant documents to obtain state registration, meaning that it did not have a national identification number. It is unacceptable to describe this as a mere *"technical"* error. Instead, under Art. 15 of the SM Law, the documents needed to be submitted as part of the share issue – absent these, the share issue cannot be registered pursuant to Art. 17(1) SM Law and, therefore, shall be deemed invalid under Art. 17(2) SM Law. The Republic was not, as Claimants allege, required to pursue this issue in court to challenge the validity of the registration. Likewise, the matter is not time barred. Accordingly, being that the initial share issue in KPM was invalid and Claimants nonetheless purchased the company, they cannot be regarded as investing in accordance with host state law, as required under international legal principles. At the Hearing on Jurisdiction and Liability, Claimants addressed this issue and admitted that the shares were not registered pursuant to Art. 16 of the SM Law. Claimants continued to rely on Prof. Maggs's report. Prof. Ilyassova explained, however, that under Kazakh law, transactions can be considered invalid, without a court order. Likewise, the late registration of KPM's shares did not cure any defect with their registration. (R-II ¶¶ 183 – 188; RPHB 1 ¶ 478; RPHB 2 ¶¶ 408 – 411).

796. Regarding KPM's illegal transformation into a commercial company on 13 December 1999, Claimants have not provided any evidence that this was a mere correction of a prior error or that Claimants were unaware of the change. Accordingly, Respondent states, Claimants willingly invested in KPM as a non-commercial entity, knowing it was carrying out commercial activities in breach of Kazakh law. (R-II ¶¶ 189 – 192).

797. Regarding the unlawful transfer of KPM's shares to Ascom, Respondent states that this transfer required State consent under the 1995 Law on Oil. All that Claimants have presented to demonstrate their consent is a letter from the State showing that



further action needed to be taken to obtain consent. As it cannot be said that Ascom obtained consent to the transfer, Ascom acted in breach of Kazakh law by making its investment in KPM. (R-II ¶ 195).

798. Regarding the reorganization of KPM and TNG into LLPs, Respondent argues that, since neither Ascom nor Terra Raf were legal shareholders in KPM and TNG, the attempted reorganization of those companies into LLPs was ineffective and a further breach of Kazakh law. The change was void *ab initio* – therefore, Claimants' point regarding there being no "*domino theory*" under Kazakh law is misplaced. Further, Claimants cannot employ the statute of limitations to argue that it did not breach Kazakh law as a matter of fact. Respondent states "*[a]s to the alleged three year limitation period which now supposedly bars the Republic's claim, the Republic has already explained above that the majority of the illegalities came to light only after the commencement of this arbitration, by which point any scope for bringing a claim would have been useless (since Claimants had abandoned KPM and TNG).*" (R-II ¶¶ 196, 199).

799. Claimants failed to amend the licenses in accordance with the amendments to the contracts. Claimants' interpretation of Kazakh law that they did not need to amend the licenses is simply wrong. Under Art. 26 and 29 of the 1995 Law on Oil, they needed to extend their licenses as well as their contracts, just as other companies did. (R-II ¶¶ 200 – 204).

800. Respondent states that Claimants do not deny breaching fundamental aspects of Kazakh law throughout their investment, including:

    (a)    *Unlawfully investing in the Republic and illegally engaging in activity involving the Republic's subsoil resources;*

    (b)    *Illegally operating a trunk pipeline without a licence in order to exploit the subsoil area KPM and TNG operated in;*

    (c)    *Failing to pay legally imposed taxes as well as penalties it incurred; and*

    (d)    *Repeated violation of the Contracts resulting in their valid termination. (R-II ¶ 207).*

801. The *Salini* requirements (e) and (f) apply, even though not expressly mentioned, because it would be absurd to suggest that such fundamental principles of national and international law would be inapplicable. Good faith has been recognized as relevant for the ECT. Respondent's arguments concerning "*good faith*" are best taken from its own words:

    9.43    *An analysis of general principles of international legal practice and the doctrine suggests that an investor's behaviour is not considered to be in good faith if it:*

        (a)    *does not comply with local laws and contracts concluded by the Investor (specifically the local law and the concluded contracts upon which the legitimate expectations of the Investor are based, subject to the protection of international law);*



(b)     does not correspond to social and moral requirements (for
example if in violation of public order and justice); or

(c)     does not respect the rights of counterparties and other participants
in civil commerce (the equal status of the parties). (R-I ¶ 9.43,
citations omitted).

802. Claimants' attempt to counter the above has been limited to attempts to discredit
Prof. Olcott, who Claimants nevertheless quote when criticizing the quality of the
rule of law in Kazakhstan. This selective use of Prof. Olcott's work suggests that
Claimants' criticism of Prof. Olcott is superficial. (RPHB 2 ¶ 413).

803. Regarding (f) whether Claimants have made a *bona fide* investment, Respondent
highlights that there is no evidence that Claimants have made their investment in
good faith. Rather, Respondent presents that it is difficult to believe that Claimants
Anatolie and Gabriel Stati have behaved as normal, commercial investors and
instead accuses them of corruption and engagement in criminal and terrorist
activities and/or civil unrest groups. As evidence of their corruption, Respondent
points to Claimants' possession of confidential, internal government documents in
this case. At the Hearing on Jurisdiction and Liability, Claimants admitted to their
involvement in obtaining stolen documents. This is further evidence of Claimants'
corruption. (RPHB 1 ¶ 481). Their illegal activities also include those regarding
the unlawful transfers, described above. (R-I ¶ 9.51 – 9.59; R-II ¶¶ 210 – 214;
RPHB 2 ¶ 412).

804. Allowing a claim for damages based on the Tristan Notes to go forward would
enable the Claimants to circumvent the jurisdictional and substantive requirements
of investment arbitration. In particular, the noteholders would not need to
demonstrate either nationality or investment to bring the claim under the Kazakh
BIT. By claiming "*enterprise value*", which represents the net present value of the
operating cashflow of an entity and includes the cash flows to creditors, Claimants
are claiming their own alleged damage and the damage of the Tristan noteholders.
Thus, this is a claim by one party on behalf of a third party, the Tristan noteholders
and this is impermissible. (RPHB 1 ¶¶ 415 – 419).

## c.    The Tribunal

805. The ECT provides the following definition of "*Investment*" in Art. 1(6):

"*Investment" means every kind of asset, owned or controlled directly or indirectly
by an Investor and includes:*

(a)     *tangible and intangible, and movable and immovable, property,
and any property rights such as leases, mortgages, liens, and
pledges;*

(b)      *a company or business enterprise, or shares, stock, or other forms
of equity participation in a company or business enterprise, and
bonds and other debt of a company or business enterprise;*

(c)     *claims to money and claims to performance pursuant to contract
having an economic value and associated with an Investment;*



(d)     *Intellectual Property;*

(e)     *Returns;*

(f)     *any right conferred by law or contract or by virtue of any licences and permits granted pursuant to law to undertake any Economic Activity in the Energy Sector.*

*A change in the form in which assets are invested does not affect their character as investments and the term "Investment" includes all investments, whether existing at or made after the later of the date of entry into force of this Treaty for the Contracting Party of the Investor making the investment and that for the Contracting Party in the Area of which the investment is made (hereinafter referred to as the "Effective Date") provided that the Treaty shall only apply to matters affecting such investments after the Effective Date.*

*"Investment" refers to any investment associated with an Economic Activity in the Energy Sector and to investments or classes of investments designated by a Contracting Party in its Area as "Charter efficiency projects" and so notified to the Secretariat.*

806.  By this extremely broad definition, particularly extended by its section (f) quoted above, it stands in contrast to the ICSID Convention which contains no definition of "*investment*" and thus needs further interpretation as regularly done by ICSID tribunals. Guidelines and tests of criteria developed in this jurisprudence on the ICSID Convention and similar treaties, therefore, cannot be used as long as any right or activity is clearly covered by the wording of the above definition in ECT cases. Therefore, the so-called *Salini* test, controversial and much discussed both by the Parties in this case and otherwise in ICSID and similar arbitrations, even if applied as a flexible guideline rather than as a strict jurisdictional requirement, cannot be used for the definition of investment under the ECT or, likewise, in the present case. The Tribunal, thus, sees no need to examine the various criteria discussed for the *Salini* test.

807.  Further, the VCLT expressly provides in its Art. 31.1 that a treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to its terms. Article 32 VCLT provides that supplementary means of interpretation may only be used in order to confirm the meaning from the terms of the treaty or, if the Art. 31.1 interpretation leaves the meaning ambiguous or obscure or leads to a result which is manifestly absurd or unreasonable. These latter conditions for recourse to supplementary means of interpretation are clearly not fulfilled by the wide and highly detailed above definition of "*investment*" in the ECT.

808.  KPM and TNG are energy companies that held Subsoil Use Contracts and subsoil use licenses from Kazakhstan for the exploration and production of hydrocarbons. Claimants' tangible and intangible holdings in Kazakhstan included ownership of oil and gas wells, drilling equipment, gathering pipelines, treatment and storage facilities, vehicles, offices, an LPG Plant, equity interests in KPM and TNG, and contractual rights conferred by Kazakhstan to KPM and TNG under the Subsoil Use Contracts and Licenses for the Borankol field, the Tolkyn field, and the Contract 302 properties. These are encompassed by the subcategories (a), (b), (c), (e), and (f) of Art. 1(6) ECT and, further, by the language "*any investment*



*associated with an economic activity in the energy sector*" for the purpose of Art. 1(6).

809. Claimants' explanations as well as the evidence show that Claimants initially funded the operations of KPM and TNG through shareholder loans, which are investments under Art. 1(6) ECT, and that, later, substantial contributions to KPM and TNG were made through the reinvestment of profits. Reinvesting profits is also an investment, as Art. 14(1) ECT allowed Claimants to take the "*Returns*" of KPM and TNG and to distribute them as dividends or to spend or invest them as they saw fit.

810. The Tribunal is not persuaded by Respondent's argument that the Tristan Loan financial structure deprives the Tribunal of jurisdiction because it shielded Claimants from risk in relation to the investments in KPM and TNG. The Tristan note offering was a public debt offering in which investors examined the business and financial status of KPM and TNG and found them creditworthy. The Tribunal cannot see why this would prevent the investment from being covered by the definitions in the ECT.

811. Further, the Tribunal is not persuaded by Respondent's contention that the "*real*" investor in KPM and TNG is Tristan Oil, and not Claimants. It is clear from the text of Art. 1(6) ECT referring expressly to "*every kind of asset, owned or controlled directly or indirectly by an Investor*" that the ECT protects investments that are not only directly owned, but also investments that are indirectly owned or controlled. Claimants have demonstrated that Anatolie Stati indirectly owned and controlled KPM and its assets, and that he and Gabriel Stati each indirectly owned and controlled 50% of TNG and its assets. (C-II ¶¶ 125 – 129; CPHB 1 ¶ 67).

812. Respondent has also argued that Claimants' investments were either illegal from the beginning or became so at a later stage. First, the Tribunal notes that the ECT contains no requirement in this regard. Indeed, if the contracting states had intended there to be such a requirement, they could have written it into the text of the Treaty, as explained in the ICSID case of *Saba Fakes v. Turkey*. This consideration is even more valid in view of the extremely detailed definition of investment and other details regulated in the ECT. At least with regard to jurisdiction, the Tribunal does not see where such a requirement could come from. Whether that aspect is also relevant for the merits of the case, will have to be examined later in this Award. In addition the Tribunal notes that, as the timeline above demonstrates, while inspecting and monitoring Claimants' investments and their corporate structures for years, Respondent failed to allege that anything was illegal or improper prior to October 2008.

813. For the above reasons, the Tribunal concludes that it has jurisdiction over the investments made by Claimants.

### 4. Jurisdiction – Compliance with Three-Month Waiting Period

#### a. Arguments by Claimants


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE
594

814. After the Hearing on Quantum, Claimants asserted that, after the Hearing on Jurisdiction and Liability, it appeared that Respondent had abandoned its "*cooling off*" period arguments. In any event, Claimants satisfied any alleged duties during the three month stay of proceedings. (CPHB 1 ¶ 44, CPHB 2 ¶ 27).

815. While Claimants argue that they have complied with the three month waiting period under Art. 26(2) ECT, they also argue that this is not a jurisdictional requirement, but rather is a procedural hurdle. The procedural nature of the waiting period has been confirmed by the vast majority of arbitral tribunals called upon to decide upon the jurisdictional objections related to a claimant's alleged failure to comply with such a period. This solution is dictated by procedural economy, since denying jurisdiction would simply force a claimant to re-start proceedings a few months later – a solution that is in no party's interest. (C-II ¶¶ 53 – 57).

816. Claimants present cases where the tribunal has concluded that the waiting period is procedural and not jurisdictional. In the *Lauder* case, the tribunal found that the claimant had failed to comply with a six-month waiting-period under the applicable BIT by filing its Request for Arbitration 17 days after the notice letter, but did not consider that to be a bar to jurisdiction. Likewise, in *Wena v. Egypt*, in accepting the respondent's offer to withdraw its objection to jurisdiction based on Wena's alleged failure to comply with the three-month waiting period under the applicable BIT, the tribunal viewed the requirement as procedural. The tribunal in *SGS v. Pakistan* also chose to treat consultation periods as procedural rather than jurisdictional. In *Bayindir v. Pakistan*, the tribunal held that the claimant's failure to comply with a waiting period under the applicable BIT did not affect its jurisdiction. In *Occidental v. Ecuador*, the tribunal noted Ecuador's own acknowledgment at the hearing that "*this is not an objection to jurisdiction that has fared extremely well in many cases*," as well as Claimants' argument that the waiting-period requirement need not be respected if attempts at a negotiated solution have proven futile. The tribunal found that "*attempts at reaching a negotiated solution were indeed futile in the circumstances*," and as a result, it rejected Ecuador's objection. Most recently and with reference to the *SGS v. Pakistan* and *Lauder v. Czech Republic* decisions, the tribunal in the *Paushok* case held that "*[a]rguendo, even if they had failed to abide by the negotiating period, this would not go to jurisdiction, as that delay has long expired.*" Respondent has presented no reason for this Tribunal to stray from such a consistent line of case authority. (C-II ¶¶ 58 – 63, partially quoted).

817. Claimants two additional responses to Respondent's arguments are best taken from their own words:

> 64. Should the Tribunal consider that the requirement to observe a "waiting period" is not a procedural requirement, the most appropriate alternative characterization would be to regard the requirement as one of admissibility, not of jurisdiction. In the Western NIS case relied on by Kazakhstan in its correspondence with Claimants, the tribunal found that the claimant had not given notice to the respondent as required under the applicable BIT. The tribunal however concluded that this defect could be cured by a suspension of the proceeding for the duration of the "waiting



> *period." In doing so, the tribunal effectively treated the requirement as one of admissibility, not jurisdiction*

> 65.     *Kazakhstan disregards the well-established line of case law on this issue and relies on a distinctly minority view espoused in two cases, Murphy Oil v. Ecuador and Burlington v. Ecuador. Those cases are distinguishable from the present case on the facts, notably insofar as they did not involve a stay of the arbitration for the parties to conduct settlement negotiations. (C-II ¶¶ 64 – 65).*

818.  In any event, Claimants maintain that they had complied with the "*waiting period*" by the time they filed the Request for Arbitration on 26 July 2010. The waiting period runs from the date Kazakhstan became aware of the dispute, which Claimants (in an exercise of futility) raised on numerous occasions, starting at least in March 2009. (C-0 ¶¶ 109 – 110; C-I ¶¶ 38 – 39; C-II ¶¶ 66 – 68). This is similar to the *Paushok* case. In any event, Tribunals – such as the recent *Abaclat* tribunal which considered a similarly worded treaty, have emphasized that compliance with a waiting period is not required where it would be futile. (C-II ¶¶ 69 – 70).

819.  Claimants agreed to stay proceedings in February 2011 in order to give Kazakhstan an additional three month period.     If any doubt remains, Claimants have indisputably satisfied the "*waiting period*" requirement through their agreement to a suspension of the arbitration for three months in 2011. During that time, there were attempted settlement negotiations, which resulted in one meeting in London on 10 March 2011. Respondent even concedes that the procedural requirements of Art. 26(2) ECT have been met. (C-I ¶ 40; C-II ¶¶ 71 – 72). Claimants state: "*[h]aving demanded and agreed to the suspension of the arbitration for the express purposes of complying with the 'waiting period' in Article 26 of the ECT, it is preposterous for Kazakhstan now to contend that the Tribunal has no jurisdiction over the dispute because Claimants failed to comply with the 'waiting period' in Article 26.*" (C-II ¶ 73). Respondent's own statements confirm that the suspension would ensure even jurisdictional compliance with Art. 26 ECT. (C-II ¶ 74).

### b.     **Arguments by Respondent**

820.  Claimants have not fulfilled the waiting period prior to initiating arbitral proceedings, and this is fatal to Claimants' case.     The waiting period is a jurisdictional requirement under Art. 26(1) and (2) ECT. This was recognized as a safeguard in the case *Murphy v. Ecuador*. (R-I ¶¶ 7.11 – 7.14; R. ltr. of 18 January 2011; RPHB 1 ¶¶ 482 – 483).

821.  Respondent presents arguments applying Art. 31(1) VCLT (on giving words in a treaty their ordinary and natural meaning in light of the Treaty's object and purpose) to Art. 26(1) and (2) ECT.

> 219.     *Article 26(1) provides that disputes "shall, if possible, be settled amicably." The types of dispute that are to be settled amicably in compliance with Article 26(1) include alleged breaches of the obligations owed by a State under Part III of the ECT. Article 26(2) states that one of the dispute resolution mechanisms thereunder can be invoked if disputes arising under Part III "can not be settled...within a period of three months*



> *from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution…".*

220. *Therefore, the primary goal of the dispute resolution mechanism is settlement (disputes "shall…be settled amicably"). The word "shall" is not permissive, but mandatory and obligatory. This is clarified by the caveat ("shall, if possible"), which assumes that settlement may not always be forthcoming. In this case, where one party has requested amicable settlement and this has not been settled within three months of such notification, the Investor may submit the dispute for resolution in accordance with the terms of the remainder of the article. As to the nature of those settlement discussions, it is settled under international legal principles that they must be conducted in good faith. (R-II ¶¶ 219 – 220).*

822. The importance and mandatory nature of the three-month period, as well as the obligation to use that time to attempt settlement in good faith rather than simply "*wait it out*", is clear from the words of the ECT and this was noted by the tribunal in *Amto v. Ukraine*. (R-II ¶¶ 221 – 223).

823. Prior to the 26 July 2010 **Request for Arbitration**, the Republic had no notice (express or otherwise) of the imminent arbitration proceedings to be launched against it, nor of the dispute (as set out in Article 26(1) ECT) to be referred to arbitration. The events at issue occurred on 22 July 2010 – not five days before. Even if the cooling off period were to begin to run from the date on which Kazakhstan "*became aware of the dispute*", as Claimants contend, this was not prior to the Request for Arbitration. Finally, neither the letter dated 18 March 2009 nor the letter dated 7 May 2009 fulfilled the requirements of Art. 26(2) ECT. First, both letters predate the majority of events which Claimants state gave rise to this arbitration. Second, neither letter mentioned the ECT or contained an offer to arbitrate. Third, even if these constituted effective notice, they could not have constituted effective notices in respect of KPM, Gabriel Stati or Anatolie Stati, as they were sent by TNG and Ascom. (R-I ¶¶ 7.8 – 7.9; R-II ¶¶ 224 – 228; R ltr. of 18 January 2011).

824. Claimants cite decisions of other tribunals to support their contention that the cooling off period is procedural, rather than jurisdictional. These cases are irrelevant – not only because arbitration knows no precedent, but because these cases bear little resemblance to Art. 26(2) ECT. The *Lauder* case, for example, considered treaty provisions that were less strict and less specific than the ECT. In *Wena*, the tribunal considered a treaty provision that required neither notice, nor amicable settlement – and the respondent abandoned its jurisdictional objection in any event. *Western NIS* concerned a BIT that did not explicitly provide for notice (contrary to Claimants' assertions) and found that notice was not a jurisdictional requirement. It should be noted, however, that the tribunal in *Burlington* considered similar wording and came to a different conclusion. What is most important is that none of these cases concerned breaches of the ECT and are, therefore, wholly irrelevant to the interpretation of Art. 26(2) ECT. Unlike the definition of "*investment*" under Art. 1(6) ECT, this is not an instance where general principles of international law demand a wider meaning; the words are specific and sufficient. (R-I ¶ 7.15; R-II ¶¶ 229 – 236).


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE
597

825. If, however, the Tribunal is to consider comparisons with other investment treaties as instructive, Art. 26(2) ECT is similar to provisions in the BIT between Belgium and Burundi. Cases concerning that BIT have held that jurisdiction was not established where the cooling off period was not satisfied. (R-II ¶¶ 234 – 236).

826. Finally, the stay of arbitral proceedings cannot be conflated with a "*cooling-off*" period.

> *237.    The timing of any settlement discussions between the parties is key to establishing whether or not the "cooling-off" period is satisfied. In this case, the settlement discussions occurred after the Request for Arbitration was submitted and therefore cannot be considered to fulfill the requirement for the "cooling-off" period.*

> *238.    Claimants missed the "cooling off" period and no notice was given to trigger access to the dispute resolution mechanism in Article 26(2). Such failures cannot be cured retrospectively. The investor has all the time in the world to bring the claim. The waiting period is also supposed to allow the State to properly react and to properly prepare its defence. If the waiting period is ignored, there is an imbalance. This imbalance cannot be remedied by staying the proceedings at a later point in time. The defence needs to be strong from the start. If it is not, it might be too late. (R-II ¶¶ 237 – 238; see also R-I ¶ 7.5).*

827. The Republic has been willing to settle, and Claimants have not denied this. The Tribunal awarded by consent on 22 February 2011 a stay of proceedings with the intention of providing a window for settlement. In this order, the Tribunal acknowledged that the cooling off period was not satisfied. (R-I ¶ 7.10). While procedurally, the provisions of Art. 26(2) ECT have been met, the settlement period proposed by the Republic was without prejudice to the jurisdictional issues that this defect could later cause. (R-I ¶¶ 7.1 – 7.4, 7.16 – 7.18; R-II ¶ 239). Accordingly, the Tribunal does not have jurisdiction over this matter.

### c.    The Tribunal

828. Art. 26(1) ECT provides for a primary stage to settle a dispute amicably. And Art. 26(2) ECT provides for a three month waiting period for such settlement discussions, before the dispute may be submitted to arbitration.

829. By the express reference in subparagraphs (1) and (2), it is clear that the intention of Art. 26 ECT is to provide an opportunity of three months to the Parties to settle the dispute. In view of this obvious intention, the Tribunal considers that to be a procedural requirement rather than one of jurisdiction, at least as long as the Parties have indeed had such a three months opportunity.

830. The Respondent concedes that the Tribunal awarded on 22 February 2011, by consent with both Parties, a stay of proceedings with the intention of providing a window for settlement. (R-I ¶ 7.10). During that time, there were attempted settlement negotiations, which resulted in one meeting in London on 10 March 2011, but did not reach a settlement. According to Respondent, while procedurally, the provisions of Art. 26(2) ECT have been met, the settlement period proposed by the Republic was without prejudice to the jurisdictional issues that this defect could



later cause. (R-I ¶¶ 7.1 – 7.4, 7.16 – 7.18; R-II ¶ 239). The Tribunal does not agree. In view of the clear intention of Art. 26(1) and (2) ECT as indicated above, after the failed discussions during the granted three month period, there is no prejudice to either Party and there is no reason to deny jurisdiction.

## 5.     **Admissibility of Claimants' Claims Pursuant to ECT**

### a.     **Arguments by Claimants**

831.  Claimants' arguments that there is no merit to Kazakhstan's objection under Article 18(2) ECT are best taken from their own words:

> *200.     Kazakhstan alleges that it is clear from Article 18(2) that the provisions of the ECT – including the dispute resolution clause – do not apply to issues related to a State's rules governing the system of property ownership of energy resources. Respondent contends that, pursuant to Article 18(3) and 18(4), "facilitating access to energy resources through, inter alia, licenses and contracts forms part of the system of property ownership." Therefore, according to Kazakhstan, the Tribunal has no jurisdiction to hear claims relating to Kazakhstan's right to audit KPM and TNG, the operation of trunk pipelines, the tax proceedings, the enforcement proceedings, the refusal to extend the period of the Contract 302 Properties, and direct expropriation. These assertions are ludicrous.*

> *201.     Kazakhstan's contention that Article 18 limits Contracting Parties' obligations under Part III of the ECT has no merit, and Kazakhstan does not cite a single legal authority or case in which its interpretation of Article 18(2) has been accepted.*

> *202.     First, the plain text of Article 18 (Sovereignty over Energy Resources) does not limit in any way the obligation of Contracting Parties under Part III. It merely re-states the well established principle of sovereignty over natural resources.*

> *203.     Second, Kazakhstan fails to mention Declaration No. V (appended to the ECT) [which states in relevant part "The representatives declared that Article 18(2) shall not be construed to allow the circumvention of the application of the other provisions of the Treaty."] and the Chairman of the ECT Conference's Statement at the Adoption Session for the ECT on 17 December 1994:*

>> *Finally, I note that the representatives of Norway supported by the representatives of ... Kazakhstan, Moldova... have declared that the Treaty shall be applied and interpreted in accordance with generally recognized rules and principles of observance, application and interpretation of treaties as reflected in Part III of the Vienna Convention on the Law of Treaties of 25 May 1969. **In particular in the context of Article 18(2) they recalled that a party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.** The Treaty shall be interpreted*



> *in good faith in accordance with the ordinary meaning to be given
> to the terms of the treaty in their context and in the light of its
> object and purpose. (C-II ¶¶ 198 – 209, partially quoted, emphasis
> maintained).*

832. Claimants point out that Declaration V is the only Declaration made by all ECT
signatories. It was made to preclude the very argument put forward by
Respondent, namely that Art. 18(2) permits a state to evade its obligations under
Part III of the ECT. This conclusion is supported by recourse to supplementary
means of interpretation, like the *travaux préparatoire*. (C-II ¶¶ 206 – 209).

## b.    Arguments by Respondent

833. Respondent presents that the rights of the investor must be balanced against those
rights of the host State. As recognized in Art. 18 ECT, the State has the right to
regulate natural resources. (R-I ¶¶ 4.9 – 4.12). Respondent presents that "*the
failures of the Claimants to provide any meaningful return to the Republic for their
alleged investments (in particular in relation to the payment of taxes and the
failure to contribute to the technological information exchange key to development)
not only attracted legal consequences in the Republic, but importantly casts doubts
on the Claimants' suitability to benefit from investment protection at the
international level.*" (R-I ¶ 4.12).

834. Respondent argues that the Tribunal's ability to hear Claimants' claims is limited
by Art. 18(2) ECT, which states that the ECT "*shall in no way prejudice the rules
in Contracting Parties governing the system of property ownership of energy
resources.*" This applies to all articles of the ECT, including Art. 26 which
concerns the dispute resolution procedure. (R-I ¶ 11.1).

835. The Russian language text of the ECT is more restrictive than the English one.
Whereas the English text says that the ECT "*shall in no way prejudice*", the
Russian text says "*shall in no way affect*" or "*shall in no way concern.*" Although
the texts are equally authentic pursuant to Art. 50 ECT, Art. 33(2) VCLT
commands the Tribunal to apply the meaning that best reconciles the tests, having
regard to the object and purpose of the Treaty. Accordingly, the Russian text shall
apply in the present case, as it is narrower and reconciles both texts that, "*the ECT
shall not apply to the provisions of national legislation governing the system of
property ownership of energy resources.*" Likewise, Art. 26 ECT shall not extend
to issues related to the state's rules governing the system of ownership for energy
resources, making also claims under Art. 10 and 13 ECT are inadmissible. (R-I ¶¶
11.5 – 11.15)

836. The majority to Claimants' allegations fall within the Republic's right to govern
the system of property ownership for its energy resources and, therefore, pursuant
to Art. 18(2), the Tribunal lacks jurisdiction over these claims. These claims
include (1) The Republic's right to audit KPM and TNG, (2) the claims regarding
the operation of trunk pipelines, (3) tax proceedings, (4) execution proceedings, (5)
the extension of the period for exploration under the Contract 302 fields, and (6)
the direct expropriation. (R-I ¶ 11.16 – 11.28, 11:30, 13.48 – 13.63). Accordingly,
the Tribunal should decline jurisdiction.



### c. The Tribunal

837. Art. 18(2) ECT provides:

> *Without affecting the objectives of promoting access to energy resources,*
> *and exploration and development thereof on a commercial basis, the*
> *Treaty shall in no way prejudice the rules in Contracting Parties*
> *governing the system of property ownership of energy resources.*

838. In addition, as Claimants have correctly submitted in this context, this provision
must be interpreted together with Declaration No. V, which is appended to the ECT
and which states in relevant part:

> *The representatives declared that Article 18(2) shall not be construed to*
> *allow the circumvention of the application of the other provisions of the*
> *Treaty.*

839. In addition, the Chairman of the ECT Conference's Statement at the Adoption
Session for the ECT on 17 December 1994 is also relevant:

> *Finally, I note that the representatives of Norway supported by the*
> *representatives of [...] Kazakhstan, Moldova [...] have declared that the*
> *Treaty shall be applied and interpreted in accordance with generally*
> *recognized rules and principles of observance, application and*
> *interpretation of treaties as reflected in Part III of the Vienna Convention*
> *on the Law of Treaties of 25 May 1969. **In particular in the context of***
> ***Article 18(2) they recalled that a party may not invoke the provisions of***
> ***its internal law as justification for its failure to perform a treaty.** The*
> *Treaty shall be interpreted in good faith in accordance with the ordinary*
> *meaning to be given to the terms of the treaty in their context and in the*
> *light of its object and purpose. (emphasis added).*

840. Declaration V is the only Declaration made by all ECT signatories. From this
exceptional step, it is clear that it was adopted to preclude that Art. 18(2) would
permit a state to evade its obligations under Part III of the ECT. Therefore,
Respondent's argument that the Russian language text of the ECT is more
restrictive than the English one cannot change this interpretation.

841. In view of these considerations, Art. 18(2) ECT does not prevent or limit this
Tribunal's jurisdiction. Whether any of Respondent's arguments, particularly
referring to the licensing and contracting structure within Kazakhstan (R-I ¶ 11.16
– 11.28; 13.48 – 13.63), are relevant regarding the merits of this case will have to
examined later in this Award.

### H.II. Applicable Law

#### 1. Arguments by Claimants

842. Pursuant to Art. 22(1) SCC Rules, this Tribunal shall decide the merits of the
dispute based on the rules of law agreed upon by the Parties. Accordingly, since
the Parties consented to arbitrate under the ECT and Art. 26(6) ECT contains an



express choice of law provision providing that the Tribunal "*shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law,*" the Tribunal's task is to determine whether Kazakhstan violated the ECT and international law. (C-I ¶¶ 239 – 242; C-II ¶¶ 423 – 437).

843. A state may not invoke its domestic law to justify or avoid liability for a violation of its international obligations. This is incontestable. This is also true for investment law cases. Kazakhstan is not permitted to evade its international obligations to Claimants by contending that its subsoil use laws, its corporate laws, or any other domestic legal rule excused its conduct. If the Tribunal determines that Kazakhstan violated any of the substantive protections in the ECT or any applicable rule of international law, that is the end of the inquiry. At most, Kazakh law is relevant as a factual matter. No provision of Kazakh law alters that conclusion. (C-I ¶¶ 239 – 242; C-II ¶¶ 423 – 437, partially quoted).

844. Claimants' argument with respect to the Tribunal's approach with respect to the choice-of-law clauses in the Subsoil Use Contracts is best taken from its own words:

> 438.  [...Even] if the Tribunal were to consider the articles on applicable law of Contracts No. 305, 210, and 302 – which it should not – those articles would require the application of the ECT and international law:
>
> For the Contract as well as for other agreements signed on the basis of the Contract, the law of the State shall be applied, <u>unless otherwise stated by international treaties to which the State is a party</u>. (C-II ¶ 438).

845. Claimants also argue that Kazakhstan cannot justify its past conduct through "*new*" arguments under Kazakh law. Even though Kazakh law is irrelevant as far as governing law is concerned, Kazakhstan is making arguments that it never raised contemporaneously. New arguments include (1) claims regarding the alleged illegality of Claimants' investments in Kazakhstan, (2) Kazakhstan's assessment of export duties, (3) the reclassification of TNG's and KPM's filed pipelines as trunk pipelines, and (4) new termination grounds for the Subsoil Use Contracts. Even if Kazakhstan could rely on domestic law to evade its ECT obligations, Kazakhstan would not be permitted to excuse its prior unlawful conduct by retroactively conjuring up new legal arguments that allegedly might have justified its prior conduct, but did not actually motivate its conduct at the relevant time. Indeed, this is the same conclusion reached in *Wena Hotels Ltd. v. Egypt*, where the Respondent attempted to retroactively excuse its seizures by arguing that Wena had failed to comply with the leases. The same was true in *Siag v. Egypt*, where the Tribunal rejected Egypt's novel attempts to retroactively justify its expropriation of Mr. Siag's investments under Egyptian law. Indeed, in *Siag*, the tribunal rejected each of Egypt's *ex post facto* arguments and found that "*an illegal expropriation was carried out by Egypt, which may not be remedied by reference to Egyptian municipal law*." (C-II ¶¶ 440 – 447). Claimants' final point is best taken from its own words:

> 448.  Kazakhstan's new theories similarly ask the Tribunal to imagine that Kazakhstan had chosen to rely upon legal grounds that allegedly would have made its conduct legal under Kazakh domestic law, rather than adopt the outrageous and unlawful course of action that it actually employed.


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE

> *Beyond the fact that Kazakh domestic law cannot be used to excuse a Treaty breach, Kazakhstan's revisionist history is highly speculative and dubious. Kazakhstan has cited no principle of international law (and Claimants are aware of none) by which a State's blatantly unlawful conduct can be excused retroactively on the basis that the State supposedly could have accomplished the same end lawfully (but did not). The present Tribunal should refuse to entertain Kazakhstan's attempts to retroactively excuse its conduct. Whatever theories it now espouses, Kazakhstan cannot undo the fact that it blatantly violated the ECT and international law in its treatment of Claimants' investments. (C-II ¶ 448).*

## 2. Arguments by Respondent

846. Respondent's arguments related to applicable law are best taken from its own words:

> *834. As Claimants agree, pursuant to Articles 22(1) of the SCC Rules and 26(6) of the ECT, the arbitral tribunal shall decide the merits of a dispute in accordance with the ECT and applicable rules and principles of international law. However, many aspects of a complex investment arbitration case are not covered precisely enough by the ECT and international law. These lacunae need to be filled in by the host state's domestic law. [...]*

> *837. In investment treaty arbitrations, the body of law best suited for filling in the gaps of international law is the host state's domestic law because foreign investment always requires compliance with the domestic law of the host state. Private and public international law aspects are intrinsically linked:*

>> *"Investment disputes are about investments, investments are about property, and property is about specific rights over things cognisable by the municipal law of the host state."*

> *838. Since international law and domestic law are intertwined with respect to foreign investments, the host state's domestic law is highly relevant for determining any dispute. [...]*

> *841. The host state's domestic law is highly relevant to a number of issues. In particular, it is relevant to the question of whether an investment exists. Furthermore, as noted by Newcombe and Paradell, it is relevant to:*

>> *"whether the investment is held in the territory of the host State, its validity, the nature and scope of the fights making up the investment and whether they vest on a protected investor, the conditions imposed or assurances granted by national law for the operation of investment, as well as the government measures allegedly in breach of the investment treaty." (R-II ¶¶ 834 – 843).*



847. Respondent explains that the Subsoil Use Contracts explicitly provide that both Kazakh law and international law are applicable in relation to the relationship between Claimants and the Republic. Kazakh law is essential for assessing (1) whether an investment exists, (2) the legitimacy of the audits, inspections, criminal proceedings, (3) the termination of the Subsoil Use Contracts, and (4) the classification of Claimants' pipelines. (R-II ¶¶ 844 – 847). Respondent states that Claimants have admitted that Kazakh law is highly relevant, even alleging violations of the Kazakh constitution and Kazakh statutes in their memorials. (R-II ¶ 848).

848. In response to Claimants' irrelevant allegation that Respondent is relying "*on domestic legal arguments that it never made contemporaneously*", Respondent states that this is irrelevant for the determination of applicable law and, indeed, Claimants have failed to explain why this should have any impact on the applicable law pursuant to Art. 22(1) SCC Rules and Art. 26(6) ECT. New legal arguments for prior conduct do not change anything about the high relevance of the host state's domestic law in investment treaty arbitrations and the decisive significance of Kazakh law with respect to claims in the dispute at present. (R-II ¶¶ 849 – 850, partially quoted).

849. Likewise, since Respondent only became aware of many breaches after commencement of these proceedings, it is wholly logical that arguments about that past conduct could not have been made contemporaneously. (R-II ¶¶ 853 – 857).

850. With respect to the use of international law, Respondent encourages the Tribunal to recognize, as have other tribunals like the *S.D. Myers v. Canada* tribunal, that the determination on whether a state has acted unfairly or inequitably *"must be made in the light of the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders."* (R-II ¶ 860). There is no breach of international law if the state court's decisions are reasonably tenable and made in good faith. Accordingly, when addressing the conduct of the Republic from an international law perspective, the Tribunal should consider the policy reasons that generally guide the Republic in the regulation of subsoil use. The Republic has a reasonable expectation that foreign investors make and manage their investments in a lawful manner and in a manner which furthers the wealth of the Kazakh people. Through its laws and through the authorities applying its laws, the Republic implements a policy that aims to ensure that these expectations are being met by foreign investors. (R-II ¶¶ 858 – 863, partially quoted).

### 3.     The Tribunal

851. The Tribunal agrees with the Parties that pursuant to Art. 22 (1) SCC Rules and Art. 26(6) ECT, the Tribunal shall decide the merits of the dispute in accordance with the ECT and applicable rules and principles of international law.

852. The question of in which way and to which extent the domestic law of Kazakhstan becomes relevant will be discussed later in this Award in the context of the breaches of the ECT alleged by Claimants.



Case 1:15-mc-00081-P1 Document 19-7 Filed 04/27/15 Page 29 of 40

### H.III. Considerations Regarding the Arbitral Procedure

#### 1. Arguments by Claimants

853. Claimants argue that Respondent has obstructed these proceedings from the outset. It has attempted to "*railroad the Tribunal*" by (1) successfully requesting a 3-month extension in order to satisfy Art. 26 ECT, after which Respondent continued to argue that the same 3-month waiting period had not been met and that this deprived the Tribunal of jurisdiction, (2) raising five objections to jurisdiction, including the ludicrous one that the ECT is void because of an incomprehensible interpretation of the Russian text, (3) submitting "*sleeper*" witness statements, disguised as exhibits, that did not meet the requirements of Art. 4(5) IBA Rules on the Taking of Evidence in International Arbitration (IBA Rules), (4) withholding 30,000 pages of mostly Russian-language documents relied upon by sleeper witnesses, which was in contravention of Art. 5(2)(e) IBA Rules and the Tribunal's orders, until the Tribunal threatened evidentiary sanctions, and (5) accusing Claimants' counsel of withholding documents. In addition, Respondent has made exaggerations and misstatements of law that go beyond zealous advocacy. (C-II ¶¶ 21 – 31; CPHB 1 ¶ 4; CPHB 2 ¶ 28).

854. Claimants reject Respondent's allegations that they intentionally submitted misleading translations, illegally obtained documents, and obtained not genuine documents. The errors to which Respondent points in the translations, in particular the "*investigate*" and "*thoroughly check*", among others, are distinctions without difference – the expressions have the same meaning and Kazakhstan has not explained the difference that these words could have in this case. In contrast, however, Respondent has made numerous errors and omissions in its translations, in particular with regard to Mr. Ongarbaev's witness statement, where entire paragraphs were deleted and sentences were added. (CPHB 1 ¶¶ 111 – 114; CPHB 2 ¶ 28).

855. Respondent has provided no support for its allegation that C-520 was altered, and the incorrect registration number on that document is likely a clerical error. Nevertheless, Respondent bears the burden of proving that the error was intentional. (CPHB 1 ¶¶ 115).

856. Regarding the allegations of corruption in that Claimants presented internal government documents, Kazakhstan has not established that the documents were confidential or that they were obtained improperly. Their authenticity has never been questioned. (CPHB 1 ¶ 116; CPHB 2 ¶ 28).

857. Exhibit C-704 came from the Court and Claimants produced it exactly as they received it. It was a draft transcript that was prepared prior to the judge's amendments. As explained at the hearing, it is completely unremarkable that Claimants obtained a copy of the Blagovest letter, produced as Exhibit C-23. (CPHB 1 ¶¶ 117 – 118).

858. Respondent has provided no explanation for why Claimants would forge the Report from Mr. Rakhimov to the Chief of the Financial Police, produced as



Exhibit C-711. Mr. Rakhimov has also confirmed that such reports were created. (CPHB 1 ¶¶ 119).

859. Respondent has exacerbated the volume and complexity of this case by, in addition to the above, submitting an entirely new case on quantum shortly before the January 2013 Hearing on Quantum. This has led to the unprecedented situation that Claimants had to address an entirely new case in a post-hearing brief. (CPHB 1 ¶ 3).

## 2.    Arguments by Respondent

860. Respondent argues that it has acted properly throughout this arbitration procedure. Every example provided by Claimants is flawed.

861. Respondent's request for a stay of proceedings in order to attempt amicable resolution of the dispute was proper, and was agreed to by Claimants. Respondent's goal was to end the proceedings with a settlement agreement. Claimants' attempt to intertwine this stay with their failure to comply with Art. 26 ECT is, however, incorrect.    The Republic proposed the settlement period, *expressis verbis*, without prejudice to the jurisdictional issues that this defect could later cause.  (R-II ¶¶ 1160 – 1163).

862. Respondent's jurisdictional claims are meritorious and are made in good faith. Claimants ignore the fact that lack of jurisdiction is a very common and decisive issue in investment treaty arbitrations. In many prominent investor-state disputes under the ECT tribunals have held a preliminary hearing on jurisdiction. This is not obstructionism:    this is perfectly common and rightful behavior in an investment treaty arbitration. (R-II ¶ 1164).

863. With respect to the so-called "*sleeper*" reports, Claimants allege that the fact witness statements do not meet Art. 4(5) IBA Rules. The IBA Rules, per PO-6, are only guidelines. They are, therefore, not mandatory in this proceeding. The SCC Rules, which Respondent is following, do not set such narrow limits to the submission of witness statements. Thus, the allegation that the documents do not meet the IBA Rules is irrelevant. Moreover, PO-2 Annex I already outlined the next steps that the Republic needed to take with regard to the documents on which the "*sleeper*" reports rely. (R-II ¶¶ 1165 – 1169).

864. Respondent states that "[c]*onsidering this detailed roadmap on the production of documents on which the "Sleeper" reports rely and the adverse procedural consequences looming in case of disregard, the arbitration proceedings have not at all been obstructed. Quite the contrary, the Republic is committed to procedural transparency and has been advancing the proceedings by complying with its procedural duties in general and the aforementioned request of the Tribunal to produce the documents in particular. This is acknowledged by Claimants in their Reply Memorial on Jurisdiction and Liability, where they admit that the backup documents have been disclosed by the Republic on 2 April 2012.*" (R-II ¶ 1170).

865. As for Claimants' argument that the documents on which the "*sleeper*" reports rely were withheld, in violation of Art. 5(2)(e) IBA Rules, those rules do not apply and are only guidelines. Claimants' argument is irrelevant. (R-II ¶ 1171).



866. Claimants' complaints regarding the April 2012 document production are unfounded. The timely submitted documents were technical documents that were known to Claimants. Despite the large volume of documents, Claimants opposed extending the deadline. (RPHB 2 ¶ 1033). As for the withholding of documents, counsel explained in an email to the Tribunal on 11 April 2012 that, due to the pre-requisite coordination with public authorities to obtain documents, it was not feasible to produce those prior to 2 April 2012. Crucially, Respondent provided them before the expiration of the deadline set out in PO-3. This was not, as Claimants contend, a meticulous plan to force Claimants to seek extensions. Respondent met the deadline – Claimants only have themselves to blame for the extension. Furthermore, Claimants' counsel was ineffective in analysing the documents – documents which were largely already in Claimants' possession at that time. (R-II ¶¶ 1172 – 1175).

867. As another demonstration of Claimants' bad faith, Respondent argues that Claimants brought this present arbitration in an effort to avoid criminal liability in the US as a result of their bond issuances and their unwillingness to pay interest or to repay the amounts received. Respondent also accuses Claimants of submitting false information with the Statement of Claim. (R-I ¶¶ 9.71 – 9.72).

868. Respondent also presents that the procedural timetable in this matter has been unduly short for the issues at hand, and has been inherently biased in favor of Claimants. (R-I ¶ 3).

869. In Respondent's First Post Hearing Brief, Respondent accused Claimants and Claimants' counsel of procedural misconduct and encouraged the Tribunal to draw its own conclusions about the credibility of witnesses based thereon. First, Respondent alleged that some documents submitted by Claimants were obtained in violation of Kazakh law, notably exhibits C-293 and C-294, C-704, and also those listed in Respondent's opening presentation at slide 29 and that this has been conceded by Claimants and it remains unclear how these documents were obtained and what reliability they may have. In this regard, Claimants' C-704 is quite questionable. While it purports to be the hearing minutes of Mr. Cornegruta's Trial, it contains no stamps and no signatures – it is neither a draft nor a copy. In any event, it was not obtained lawfully. (RPHB 1 ¶¶ 1120 – 1138). Second, Respondent accuses Claimants of submitting forged documents, including C-495, C-520, C-702, C-704, and C-711.1. For the transcript of Mr. Cornegruta's trial (C-704), when compared to Respondent's official version (R-315.1 and R-315.2) contain differences. Claimants' transcript does not reflect a motion filed by Mr. Cornegruta. Testimony was also changed. Third, Claimants have submitted intentionally misleading translations in this arbitration, and the Republic has raised this issue previously, especially in regard to C-8, C-98, and the fact that Claimants have relied on these incorrect translations to create their claim. The correct English translations are essential in this arbitration. (RPHB 1 ¶¶ 1139 – 1175; RPHB 2 ¶¶ 39 – 49).

870. Further complaints relate to Deloitte GmbH and the allegedly new case on quantum. Claimants' FTI Report was severely flawed and then Claimants silently failed to produce Ms. Hardin, the main author of FTI 1 and FTI 2, for cross-examination. The Supplemental Expert Report of Deloitte does not exceed the



scope indicated by the Tribunal on 24 April 2013, and Claimants never requested to cross examine Mr. Gruhn again. (RPHB 2 ¶¶ 1034 – 1037, 1054, 1059).

871. The Republic was not authorized to disclose various due diligence reports prepared for KMG EP in 2009. KMG EP is not the state, but later consented to disclosure after the Hearing on Quantum. The content of these reports is excellent proof of the lack of procedural misconduct by the Republic. They contradict Claimants' allegations and support the Republic's position. There was no reason, beyond confidentiality, to withhold them. (RPHB 2 ¶ 1038 – 1039).

872. Claimants' argument that they were excluded from submitting further evidence or from cross-examining witnesses, like Mr. Suleymenov and Mr. Mynbayev is without merit – they never asked to do so and they did not hesitate to provide new evidence during the Hearing on Quantum. (RPHB 2 ¶ 1040).

873. Claimants' continuous changes of their requests and the underlying facts put Respondent at a considerable disadvantage. Claimants' inability to produce the main author or of the FTI Reports, Ms. Hardin, is one such example. It was obvious that Mr. Rosen was not familiar with the first and second FTI Reports. At the same time, he attempted to disregard the fact that Ms. Hardin had ever worked on the documents. The Tribunal should exclude the FTI Reports in their entirety. (RPHB 2 ¶¶ 1041 – 1048). In addition, to the extent that Claimants continue to move for exclusion of the Deloitte Reports, Respondent requests the exclusion of the FTI Reports. (RPHB 2 ¶¶ 1052 – 1053).

874. In addition, Claimants were disruptive prior to each of the three hearings in this case, thereby shortening and disrupting Respondent's preparation time. In the lead up to the Hearing on Jurisdiction and Liability on 1 October 2012, this included (1) the 14 September 2012 request to submit new documents, (2) the 20 September 2012 request to submit different new documents, the 28 September 2012 request to withdraw documents. In the time leading to the hearing on Quantum starting 28 January 2013, Claimants (1) made a midnight submission of the "*Sharing Agreement*", on 31 December 2012, (2) submitted a "*Request to compel production*" containing new arguments and statements on 2 January 2013, (3) submitted a further request regarding witnesses to the Tribunal on 2 January 2013, (4) moved to submit new documents, including 3D seismic data, on 18 January 2013, (5) submitted a revised calculation of FTI on 25 January 2013, (6) submitted the supporting materials for the revised FTI calculation and 27 January 2013. Then, on the third day of the Quantum Hearing and in violation of the Tribunal's order, Claimants submitted the new evidence relating to 3D data, anyway. Next, immediately prior to the First Post-Hearing Briefs and the Closing Hearing, Claimants opposed Respondent's request for an adequate, three-month, opportunity to digest the newly submitted materials. To date, Claimants have failed to explain their belated and clandestine submission of supporting documents to the Ryder Scott Third Report. Then, one week before the Closing Hearing, Claimants objected to the testimony of Mike Wood of GCA, since FTI's Mr. Rosen would not be present. (RPHB 2 ¶¶ 1050 - 1051).

875. Claimants often unfairly attempted to limit the Republic's defenses. (RPHB 2 ¶¶ 1054 – 1056). They delayed filing their May 2012 submission, as well, without excuse. (RPHB 2 ¶ 1057).



876. Claimants' experts were complicit in supporting Claimants' unfair procedural strategy, and helped Claimants to have a procedural and substantive advantage in having more time for the analysis of the 3D seismic data. (RPHB 2 ¶ 1058).

877. Respondent upholds its procedural objections and consideration must be made not only to the number of submissions, but also to whether sufficient time for preparation was granted. Respondent upholds its objection of 11 January 2013 and made orally on Day 1 of the Hearing on Quantum (objecting to the late submission of the Sharing Agreement and reserving the right to address it in writing, to submit expert opinions on it, and to request an additional hearing). Respondent also upholds its objection of 6 March 2013, which was also raised on Day 3 of the Hearing on Quantum (objecting to the revised report). Claimants' experts' testimony confirm that this objection is fully justified. Ryder Scott had been complicit with Claimants in misleading the Tribunal though the Joint Issue List and in submitting new and relevant evidence by surprise. These actions gave Ryder Scott significantly more time to review the 3D seismic data, thereby giving Claimants a procedural advantage over the Republic. Respondent's experts (GCA) confirmed that the time constraints had limited the scope of their work. While they knew that the work existed previously, they had not reviewed it. (RPHB 2 ¶¶ 31 – 37, 1160 – 1067).

878. The Final Hearing also made Ryder Scott's partiality apparent. Upon questioning by the Tribunal about Ryder Scott's role, Mr. Nowicki agreed that they had been engaged by the client and might have that role (as opposed to having the role of independently assisting the Tribunal). Repeatedly, Ryder Scott presented Claimants' counsels findings as its own. (RPHB 2 ¶¶ 35 - 37

879. Claimants have changed and amended their case on quantum, in the amount of USD 841 million (RPHB 2 ¶ 52):

|  | Statement of Claim (million USD) | Δ | Reply on Quantum (million USD) | Δ | Hearing on Quantum (million USD) | Δ | 1st PHB (million USD) |
|---|---|---|---|---|---|---|---|
| Borankol Field | 193 | + 38.5 | 231.5 | - 33.49 | 197.01 |  | 197.013 |
| Tolkyn Field | 561 | - 52.6 | 508.4 | - 29.47 | 478.93 |  | 478.927 |
| LPG Plant (cost) | 208.5 | + 36.5 | 245 |  | 245 |  | 245 |
| Contract 302 (prospective) | 1,766 | - 186 | 1,580 | - 132 | 1,448 | + 188.9 | 1,636.9 |
| LPG Plant (prospective) | 344 | + 64.3 | 408.3 | - 79.2 | 329.1 |  | 329.1 |



880. Claimants are not entitled to update their requests without the Republic being heard on those requests or to simply leave it to the Tribunal to decide for them. (RPHB 2 ¶¶ 50 – 55).

881. Claimants have alleged that the Republic has not produced certain government instructions in these proceedings, but that allegation is misleading since Claimants have not requested such production, outside of in their first post-hearing submission. (RPHB 2 ¶ 381).

## 3. The Tribunal

882. Throughout this procedure, the Parties have raised numerous objections to the procedural conduct of the other side. The Tribunal has addressed these by a great number of rulings in letters and procedural orders, all reflected in the summary of the Procedural History provided earlier in this Award.

883. As recorded in the transcript (page 100), at the end of the last Hearing on 3 May 2013, the Chairman of the Tribunal raised the following question:

> *The Tribunal has, of course, taken note of the procedural objections that were put on record at an earlier stage, and we take it that these will be maintained. So my usual question at the end of a hearing only is: are there any further procedural objections at this stage regarding the way the Tribunal has conducted this procedure?*

884. The Parties replied as follows:

> *For Claimant MR SMITH: None from the Claimants.*

> *For Respondent DR NACIMIENTO: And none from Respondent*

885. After the hearing, at the end of this procedure, the Tribunal notes that Claimants have not raised any further objections against the way the Tribunal conducted this procedure.

886. At the end of this procedure, in its 2nd Post-Hearing Brief, Respondent upheld its earlier procedural objections.

887. The Tribunal does not see any need to reiterate its many rulings recorded in the summary of the Procedural History provided earlier in this Award, all of which were made in an effort to grant the Parties the opportunity to present its case and to comment on the other side's submissions and keep up a high standard of due process.

888. The final hearing in May 2013 provided the Parties not only an opportunity for a further examination of the technical experts, but also two rounds of oral closing arguments.

889. Thereafter, as provided in PO-10, the Parties had and used the opportunity to submit 2nd Round Post-Hearing Briefs (without any page limit) by 3 June, cost claims 1 July, and comments thereon by 8 July 2013.



890. Taking all these procedural steps together, the Tribunal concludes that the Parties have had ample opportunities to present their case and comment on the other side's submissions and every aspect of the case.

## J.    Liability

### J.I.    Whether Kazakhstan Provided the Claimants' Investments with Fair and Equitable Treatment According to Art. 10(1) ECT

#### 1.    Arguments by Claimants

891. Article 10(1) ECT obliges Respondent to treat Claimants' investments fairly and equitably. As the term "*fair and equitable treatment*" (FET) is not defined in the ECT, the term must be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of the object and purpose of the treaty. Given the breadth of the terms "*fair*" and "*equitable*," their context in the ECT and the object and purpose of the ECT, the FET standard in the ECT prohibits a wide array of governmental misconduct and omissions. Thus, the Tribunal "*will have to decide whether in all the circumstances the conduct in issue is fair and equitable or unfair and inequitable.*" (C-I ¶¶ 337 – 339).

892. With respect to the ordinary meaning of the terms "*fair*" and "*equitable*", Claimants explain that the ICSID tribunal in *MTD v. Chile* concluded that the "*ordinary meaning*" of "*fair and equitable*" is "*just, even-handed, unbiased, legitimate.*" (C-I ¶ 340, partially quoted).

893. With respect to the context and the object and purpose of the ECT, the *Saluka* tribunal explained that the other provisions of the treaty, including the Preamble, are relevant. Claimants explain that, pursuant to the Preamble and Art. 2 and 10(1) ECT, the ECT was created to boost investor confidence and to increase investment flows. (C-I ¶¶ 341 – 343).

894. Claimants also state that the Tribunal should consider the manner in which the FET standard has been interpreted and applied under international law by the many international investment tribunals that have considered the standard in recent years. There is a considerable body of case law that has added specific meaning and content to the standard, making it clear that specific types of host state misconduct are prohibited. (C-I 344 – 348, C-II ¶ 501). The prohibited conduct includes:

- *Actions that violate an investor's legitimate expectations in relation to the investment;*

- *Conduct that creates an unstable or unpredictable legal framework or business environment for the investment;*

- *Conduct that violates due process or results in a "denial of justice," including (but not limited to) improper judicial or administrative proceedings as well as governmental interference in such proceedings;*



- *Interference with a contractual relationship;*

- *Actions that treat an investor or an investment inconsistently, ambiguously, or with a lack of transparency;*

- *Failure to sufficiently notify an investor in advance of impending acts that will impact the investment;*

- *Actions that are discriminatory;*

- *Harassment or coercive conduct; and*

- *Conduct that is in bad faith. (C-I ¶ 345).*

895. Investment case law, including *Waste Management v. Mexico*, confirms that the above list is an accurate representation of prohibited conduct. The *Tecmed v. Mexico* decision presents the most frequently quoted articulation of the FET standard, cited and applied by other Tribunals, including *CMS*, *Azurix*, *MTD*, *Occidental*, *LG&E*, *BG*, and *Suez*. (C-I ¶¶ 346 – 348). That description is as follows:

*[The FET standard] requires the Contracting Parties to provide to international investments treatment that does not affect the basic expectations that were taken into account by the foreign investor to make the investment. The foreign investor expects the host State to act in a consistent manner, free from ambiguity and totally transparently in its relations with the foreign investor, so that it may know beforehand any and all rules and regulations that will govern its investments, as well as the goals of the relevant policies and administrative practices or directives, to be able to plan its investment and to comply with such regulations... The foreign investor also expects the host State to act consistently, i.e. without arbitrarily revoking any preexisting decisions or permits issued by the State that were relied upon by the investor to assume its commitments as well as to plan and launch its commercial and business activities. The foreign investor also expects the State to use the legal instruments that govern the actions of the investor or the investment in conformity with the function usually assigned to such instruments, and not to deprive the investor of its investment without the required compensation. (C-I ¶ 347).*

896. There is no exhaustion of local remedies requirement in applying the FET standard. The *Helnan* Annulment Committee expressly annulled the part of the arbitral decision that had taken the view Kazakhstan wants this Tribunal to adopt. There, that Committee stated, "*claimant's prospects of success in pursuing a treaty claim based on the decision of an inferior official or court, which had not been challenged through an available appeal process, should be lower, since the tribunal must in any event be satisfied that the failure is one which displays insufficiency in the system, justifying international intervention. **But that is a very different matter to imposing a requirement on the claimant to pursue local remedies before there can be said to have been a failure to provide fair and equitable treatment***." Thus, pursuance of domestic remedies is a factor in determining whether the State's treatment was fair, but it is not a pre-requisite. In any event, such a requirement – even if it were to exist – would not be applied if



pursuance of remedies would have been futile. (C-II ¶¶ 498 - 500, partially quoted, emphasis maintained).

897. From October 2008 – July 2010, Kazakhstan violated nearly every aspect of the FET standard that has been articulated to date, and Claimants refer the Tribunal to their arguments concerning Kazakhstan's excessive campaign of harassment and interference with Claimants and their investments, and to the outright seizure of the investment in July 2010. Claimants present 6 categories of actions which they state violated the FET standard, summarized and partially quoted below. (C-I ¶¶ 349 – 351).

898. First, Respondent "*fabricat[ed] the grounds for criminal actions against Mr. Cornegruta, KPM, and TNG*" and that that was in violation of the FET standard. This was based on the unfair, arbitrary, and false re-classification of KPM and TNG's pipelines into trunk pipelines. This reclassification was administered unfairly, with even the Judicial Executor admitting that the segment at issue was a mere "*field*" – and not "*trunk*" pipeline. The Financial Police were not a competent authority to determine whether the pipelines in question were field or trunk pipelines. There was no change in the pipelines that led to the re-classification. Kazakhstan's own officials approved the design and construction of the pipelines. Respondent's allegation that none of KPM's or TNG's previous licenses were sufficient for the type of pipeline is preposterous. Further, "*key personnel were targeted as criminally responsible for the funds that corresponded to the dates of their respective tenures as General Directors*." The reclassifications were discriminatory – KPM and TNG were the only companies singled out for reclassifications, "*despite similar gathering systems being owned and operated by other oil and gas companies in the immediate vicinity and throughout Kazakhstan.*" Finally, these criminal actions violated Claimants' legitimate expectations toward proper and fair governmental conduct. (C-I ¶ 351, partially quoted; C-II ¶¶ 504 – 506; CPHB 1 ¶¶ 150 – 213 *et seq.*; CPHB 2 ¶¶ 71 – 79, 87, 97, 99 – 100).

899. According to Claimants, the segments of Claimants' pipes that are at issue extend from the principal joint where the KPM wellhead pipes converge to KPM's processing facility, and from the processing facility to TNG's storage tanks, where services are also provided to KPM. For the TNG gathering system, the segment extends from the principal joint where the TNG wellhead pipes converge to TNG's processing facility; from the processing facility directly to the CAC Pipeline for gas; and from the processing facility to TNG's storage tanks for condensate. Claimants state that identical gathering systems are owned and operated by other oil and gas companies in the immediate vicinity – and indeed throughout Kazakhstan – none of which are classified as trunk pipelines requiring licensure. Very few companies hold licenses for the operation of trunk pipelines. (C-0 ¶¶ 36, 39 – 40, partially quoted).

900. In any event, Claimants dispute that the pipelines are trunk pipelines. The segments of oil and condensate pipelines that are at issue carried oil and condensate to storage tanks, which are hardly another means of transport, processing, or consumption. Claimants also state that the pipelines are not trunk pipelines, because they are operated by contractors, and contractor's pipelines are not trunk pipelines as a matter of law. (C-II ¶¶ 258, 260).



901. The criminal allegation of "*illegal entrepreneurial activity in an especially large amount*" under Art. 190(2)(b) of the Kazakh Criminal Code was malicious and contrived. Respondent contrived the operation of the main pipeline to satisfy the "*illegal entrepreneurial activity*" element of the crime. The second element, "*in an especially large amount*" was manufactured by manipulating instructions to the Tax Committee and calculating the "*illegal profits*" by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. Kazakhstan assessed "*illegal profits*" from operating the trunk pipeline – and this fine amounted to more than 65 billion Tenge for KPM and more than 82 billion Tenge for TNG – reflecting all of the revenue that both companies had generate for oil, gas, and condensate production from 2002 – 2008. These calculations were unfair, did not consider expenses or costs, and did not correspond to the transportation fees that would have applied if the pipeline segment was truly a trunk pipeline. Importantly, the fine was contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The proper calculation would have yielded USD 12,000 – 13,000 in illegal profits – below the USD 17,000 threshold for the crime. (CPHB 2 ¶¶ 80 – 84, 87)

902. Under *Vivendi II*, which provides guidance on the types of measures that give rise to international liability for disproportionate measures, the USD 145 fine against KPM for a failure to get an USD 80 license is disproportionate. Likewise, *Occidential v. Ecuador* found that the loss of an investment worth hundreds of millions of dollars was disproportionate to the state goal of deterrence. (CPHB 2 ¶¶ 92 – 93).

903. The pipeline was not indispensible to KPM's ability to sell oil, as Kazakhstan alleges. Even if the calculation were correct, which Claimants deny, the USD 145 million fine was grossly disproportionate, especially compared to the USD 80 fee to obtain a main pipeline license or the USD 12,000 – 13,000 in actual profits earned from operating the pipeline. It was higher than the total profits earned by KazTransOil during 2007 and 2008. This fine would be in violation of international law as being disproportionate to the wrong that the state is trying to address. Here, no harm resulted from KPM's operation of the pipeline and there was no risk beyond those presented by other parts of KPM's extensive gathering system. The USD 80 license is not material, and was only issued to KMT in 2011, a year after it took over KPM's operations. (CPHB 2 ¶¶ 81, 85, 89, 91, 95).

904. Whether the opaque regulations were a violation of the FET standard is an alternative case that the Tribunal may not even need to consider, since the evidence that neither KPM nor TNG operated a main oil and gas pipeline is overwhelming. Kazakhstan has essentially defended the wrongful and unwarranted "*main pipeline*" conclusions of its Financial Police, Mr. Baymaganbetov, and the Aktau City Court by arguing that its regulatory regime in relation to main pipeline licensing was so lacking in transparency that only the country's prosecutor could provide the correct answer. Even if Kazakhstan's argument were credible — which it is obviously not — it would do Kazakhstan no good in terms of escaping liability under the ECT. The ECT's FET standard requires a consistent, transparent regulatory framework every bit as much as it precludes arbitrary prosecutions and denials of justice. (CPHB 2 ¶¶ 75 – 79).



905. Claimants state that "[i]t is simply no defense to Claimants' fair and equitable treatment claim for Kazakhstan to argue that its own laws were so confusing and unclear that multiple Kazakh officials applied them incorrectly for nearly a decade."

> 507. Kazakhstan is in a conundrum. Either it unlawfully and unfairly reclassified KPM's and TNG's field pipelines as trunk pipelines as a pretext for taking over Claimants' investments — as the evidence overwhelmingly demonstrates — or Kazakhstan's laws and its application of those laws were so confusing and non-transparent that they amounted to unfair and inequitable treatment. Either way, Kazakhstan violated the ECT's fair and equitable treatment standard. (C-II ¶ 507).

906. Second, Claimants allege that Respondent's prosecution "and conviction of Mr. Cornegruta in a sham trial that also delivered a verdict against the non-party KPM" was a violation of the FET standard. (C-I ¶ 351, partially quoted). They were "factually incorrect, politically motivated, and riddled with due process violations. KPM was convicted in that proceeding, when it was not even named as a party and could not be named a party under Kazakh law. KPM was not officially notified of the proceeding, nor was it represented by counsel or allowed to appeal." Mr. Cornegruta does not own KPM and that he was not an entrepreneur under Kazakh law. Rather, he was an employee of KPM. (C-0 ¶ 44, partially quoted; C-I ¶ 108; CPHB 1 ¶ 139). In addition, Kazakhstan "failed to provide Mr. Cornegruta access to the allegations and supporting evidence against him, and the court summarily rejected the evidence demonstrating his innocence." (C-II ¶ 509). This was an improper proceeding in the sense of Petrobart. Claimants' expert witnesses were compelled to withdraw their expert opinions, and "Kazakhstan's interference in the criminal proceeding and the conviction of non-party KPM ensured that Claimants would not have 'a real possibility to present [their] position' on Mr. Cornegruta's and KPM's behalf, which the Rumeli and Tecmed tribunals deemed contrary to due process and a breach of the fair and equitable treatment standard." KPM was never named or made a party to the criminal action for allegedly operating a trunk pipeline without a license, and KPM was consequently not represented by counsel during the criminal trial against Mr. Cornegruta. (C-0 ¶ 46; C-I ¶ 108). This proceeding also amounted to a denial of justice under international law. (C-I ¶ 351, partially quoted; C-II ¶¶ 508 – 511; CPHB 1 ¶¶ 188 et seq.; CPHB 2 ¶¶ 97 - 114).

907. Claimants argue that this judgment violated not only international norms and standards of due process, but also violated Kazakh law and due process. The Judge was not bound by the 18 May 2009 decision that the expert opinions were inadmissible (a decision that Mr. Cornegruta only learned of after conviction). Instead, the judge could evaluate their value on her own. Claimants state that defense counsel introduced seven expert opinions explaining that the KPM gathering system pipelines are not trunk pipelines (two of which were subsequently withdrawn after the experts who rendered them received threatening letters from the Financial Police). (C-I ¶ 117; C-II ¶¶ 300 – 305).

908. Kazakh law only permits recovery based on the extent of enrichment of the guilty person. Only income unjustly earned by Mr. Cornegruta (the guilty person) could be recovered. The damages calculation failed in numerous respects, not the least of which that the judge refused to hear testimony from Claimants' expert Mr.



Suleymenov (who drafted the Law on Oil) and ignored the obvious fact that the *"illegal profits"* allegedly earned by Mr. Cornegruta were not profits (they were revenues), were not earned by him (they were earned by KPM), and did not correspond to sums earned through operation of a pipeline (they were simply total revenues earned by KPM, over 99% of which corresponded to onward sales of oil). There could be no recovery from KPM and Kazakhstan identifies no provision of Kazakh law supporting its notion that Mr. Cornegruta's purported unjust enrichment amounted to all of KPM's revenues. There is also no theory of *"quasi-criminal"* liability in Kazakh law. (CPHB 2 ¶¶ 86, 97 – 109).

909. The threats against KPM and TNG's employees that they would face similar trials to Mr. Cornegruta if they did not cooperate and the Financial Police's efforts to follow and intimidate Mr. Cornegruta's wife and lawyers outside of court violate the FET standard. (CPHB 2 ¶¶ 49 – 51).

910. Third, *"Kazakhstan's refusal to approve TNG's contractual rights to continue exploration in the 302 Contract Properties comprises two distinct breaches of the [FET] provision."* First, by simply ignoring TNG's request for an extension for six months, Kazakhstan violated Claimants' right to be notified of acts or omissions that would impact its investment. Second, Claimants' legitimate expectations were frustrated when Kazakhstan failed to extend the contract, despite having assured TNG that it would do so. This *"wrongful refusal to execute the addendum extending TNG's exploration rights in the Contract 302 Properties prevented Claimants from proving the Contract 302 Properties' reserves, which in turn prevented them from establishing the market value of their Kazakh investments."* At best, this is gross negligence. It is more likely, however, that this *"[bad faith] conduct represents deliberate interference with Claimants' rights over their investments, including KPM's and TNG's contract rights, because Kazakhstan never communicated any change in its position to them and gave them no justification for its refusal."* The termination also frustrated Claimants' legitimate expectations because they breached the contractually-mandated 90 day notice period before termination would be effective. (C-I ¶ 351, partially quoted; C-II ¶¶ 514, 516; CPHB 2 ¶¶ 149 – 176).

911. Fourth, Claimants allege that Kazakhstan *"saddl[ed] KPM and TNG with ownership and title concerns that destroyed Claimants' ability to dispose of their investments at market value"* and that this was a violation of the FET standard. Kazakhstan acted inconsistently and without transparency by *"continually changing its position on KPM's and TNG's transfer prices, corporate taxes, export tax exemptions, amortization rates, the extension of TNG's exploration period, and the State's pre-emptive rights. The imposition of clearly improper tax rates is tantamount to extortion."* In particular, Kazakhstan incorrectly assessed USD 6 million in back transfer price taxes and penalties against the companies. In effect, and in the sense of *CME v. Czech Republic* ruling, this eviscerated the arrangements that induced the Claimants to invest, and upon which Claimants relied. Furthermore, in violation of specific contractual and legal provisions that exempted KPM from paying export taxes, KPM was prohibited from exporting 22,000 tonnes of crude oil without paying the tax. KPM paid, under protest, and has legally challenged these actions. Claimants' characterization of the tax issues are best taken from their own words:

