*The State then introduced a new tax provision that replaced crude oil export taxes with a Rent Tax for Export. When a court decision exempted KPM from paying the Crude Oil Export Tax for its January 2009 exports, but instead obliged KPM to pay the newly applicable Rent Tax for Export, the Financial Police intervened. The Aktau territorial customs body subsequently informed KPM that it was required to pay the Crude Oil Export Tax, amounting to USD 4 million, which led to KPM filing additional legal challenges. The Financial Police's interference in KPM's and TNG's contractual relationship with the Ministry amounts to a violation of Kazakhstan's duty to treat Claimants' investments fairly and equitably. The changes of opinion with respect to export taxes also frustrated Claimants' legitimate expectations that that they would benefit from a contractually agreed tax exemption. (C-I ¶ 351).*

912. In addition, "*Kazakhstan also refused to refund US$ 10 million that KPM and TNG paid under protest, after those taxes were found to have been improper.*" (C-II ¶ 514). The three tax claims – the USD 10 million for export duties, the USD 62 million for corporate income taxes, and the USD 5 million in transfer pricing taxes were structured in such that they were, in *RosInvest's* words, "*linked to the strategic objective of returning petroleum assets to the control of the [State] and in an effort to suppress the [an investor].*" The Tribunal should conclude that Respondent's actions have breached the FET standard. (CPHB 2 ¶¶ 127 – 139).

913. Inconsistently and non-transparently, Kazakhstan raised questions as to the true ownership of TNG and clouded Terra Raf's title when, on 18 December 2008, it retroactively revoked its prior, express consent for the transfer of TNG's ownership from Gheso to Terra Raf and its prior waiver of pre-emptive rights. It is now common ground that Kazakhstan did not have a pre-emptive right in 2003, when Gheso transferred TNG to Terra Raf. Even throughout this arbitration, Respondent has shifted its arguments. When Kazakhstan argued that the Gheso-Terra Raf transfer was not valid until it was registered, Claimants proved that it was registered in May 2003 and was, therefore, complete. When Kazakhstan then argued that the 2003 transfer was not complete until the relevant Kazakh authorities consented to it, Claimants showed that Kazakh law did not require consent to be complete in 2003 and that Respondent consented to the transfer in 2007. The manner in which Respondent protested the transfer and then made false public claims of fraud and forgery, which immediately clouded title to TNG, violated the FET standard. (CPHB 2 ¶¶ 115 – 126).

914. All of these measures furthered the State's goal, expressed in 2008, to take over Claimants' investments, as these measures prevented Claimants from selling their investments. (C-I ¶ 351, C-II ¶ 513).Claimants state that Kazakhstan does not dispute that harassment and coercion of an investor constitutes a breach of the FET provision. Kazakhstan initiated a campaign of harassment and coercion that endured for 21 months. This campaign was carried out in bad faith, for the purpose of acquiring Claimants' investments at firesale prices. (C-II ¶¶ 512 – 513, partially quoted).

915. Fifth, Respondent "*fabricat[ed] the grounds for the direct seizures of Claimants' investments in July 2010*" and that this was a violation of the FET standard. Taken from Claimants' own words:



*[...] The eleventh-hour allegations of breach were utterly without merit. For example, the Ministry of Oil and Gas raised its tired claim that TNG operated a main pipeline without a license as a ground for claiming breach of TNG's Contract No. 302, even though that contract for exploration in the area surrounding the Tabyl Block had nothing at all to do with KPM's or TNG's gathering systems. The Ministry later admitted that the violations it had alleged only days before were not the reasons for terminating Contract No. 302. (C-I ¶ 351)*:

916. Even if Respondent's allegations had been meritorious, they still violated the FET provision because Claimants were not given a meaningful opportunity to dispute or correct the alleged violations. The burdensome taxes and criminal prosecution described above, as well as the multiple inspections, raids, and interrogations of Claimants' personnel, *"destroyed the ability of KPM and TNG to operate normally"* and that was a violation of the FET standard. The asset seizures following the conviction forced KPM and TNG to spend valuable time and resources challenging the orders and protecting their business. Finally, the bad faith seizure, culminating *"the State's months-long, self-serving scheme to gain control and nationalize those investments [...] included the takeover of all of Claimants' investments in Kazakhstan. In no way can the seizure of Claimants' investments be in accord with Kazakhstan's duty to treat Claimants' investments fairly and equitably."* (C-I ¶ 351).

917. Sixth, Claimants filed dozens of complaints to various Kazakh authorities about the mistreatment they were suffering. Every plea fell upon deaf ears. The Tribunal could consider this bureaucratic blame shuffling and ultimate non-reaction to be a violation of the FET standard, as the Tribunal in *Wena Hotels v. Egypt* found when it considered that Egypt's failure to take any action to prevent illegal action by state authorities constituted just such a violation. (CPHB 2 ¶¶ 140 – 148).

918. Regarding the content of the Cliffson deal, Claimants present that during negotiations they made it clear that they intended to bring an arbitration against Kazakhstan for the diminution in value of the investment once the sale closed. They explain that they only agreed to drop the arbitration amendment in exchange for *"the family's"* use of their influence to obtain the release of Mr. Cornegruta from prison. (C-II ¶¶ 392 – 395).

919. Each action describe above violates every element of the UNCTAD's description of abusive conduct that violates the FET standard. (CPHB 2 ¶ 58).

## 2. Arguments by Respondent

920. Throughout its dealings with KPM and TNG, Respondent has acted in a manner that was consistent with the expectations of investors and consistent with any legitimate expectations that KPM and TNG could reasonably have had. Claimants' attempt to argue that Respondent's adherence to due process is part of a so-called *"strategy of obstructionism"* is a figment of Claimants' imagination. (R-II ¶¶ 990 – 991). Regardless, Respondent has treated Claimants and their investments fairly and equitably. As far as the typical elements of FET, Respondent agrees with the facts that Claimants' list at C-I ¶ 345 (protection against actions in bad faith, the protection of legitimate expectations, the reliance on a stable and predictable business environment, the expectation of due process and the protection against interference with contractual relationships, harassment or coercive conduct).



Respondent reminds the Tribunal, that it must assess each allegation on a case-by-case basis, and none of the above factors, alone, is sufficient for a finding that of a breach of the FET standard. (R-I ¶¶ 37.32 – 37.34). Respondent's position is best taken from its own words:

> 993.   *[The FET standard] needs to be considered against all the factual circumstances. In a situation where the state action that the injured party claims of is one which the aggrieved party has been granted a right to resolve at a local level, there can be no conclusion that the state has acted unfairly and inequitably if the aggrieved party has not actually pursued those rights. In other words, a state (acting fairly and equitably) may provide an opportunity (through the provision of contractual protection or through the court system) for the claimant to seek redress of actions taken by the state that may have been incorrect. This might apply to a decision of a first instance court or the actions of an administrative official. This is a fundamental part of providing a fair and equitable as well as stable and predictable environment for the investment. As set out in Helnan v Egypt, a treaty claim for the breach of fair and equitable treatment is likely to be less successful where the claimant has not been able to show that the system of investment protection in the host state has been unfair and inequitable vis-a-vis the aggrieved party.*

> 994.   *Claimants say that Helnan v Egypt does not support this contention. This is incorrect. The basic principle in international law is that the parties should exhaust local law remedies first prior to pursing rights through diplomatic protection. In investor-state arbitration <u>as a matter of jurisdiction</u>, the exhaustion of local remedies is often not required since the parties agree in advance to resolve their disputes through arbitration. Therefore, this rule is dispensed with unless the parties agree otherwise.*

> 995.   *However, the Republic's argument here is not (as Claimants seem to suggest) a question of jurisdiction, nor that the "exhaustion of local remedies" as such is required. Rather, this situation concerns circumstances where the claimant alleges that certain domestic laws have been breached, and that accordingly, the standard of fair and equitable treatment has been not been met. The Republic's contention is that the claimants have not established that a breach of the standard of fair and equitable treatment (judged at an international level) has occurred simply by alleging that there have been breaches of law at a domestic level. This is all the more the case when there are available to the claimant, avenues of recourse which have not in fact been pursued. [...] this is precisely the case here. (R-II ¶¶ 993 – 996, citations omitted, emphasis maintained).*

921.   Claimants have not pursued remedies against the Republic, and this bars their claims. Instead, Claimants "*dismiss [...] this issue as if it were a minor technical hitch and quickly go on to simply reiterate their grievances against the Republic.*" There is no legal basis recovery. In cases where there is an available remedy – via domestic law or through a contractual forum selection clause – the investor has a right to resolve a dispute. The granting of such a mechanism, if it works properly, must be considered as an action of the host state that is favorable to the investor and is aimed at ensuring a FET. If an investor fails to pursue such remedy, this counter-acts the allegation that the host state acted unfairly or inequitably. As a



host state cannot always guarantee that its officials will always act in accordance with the laws, the remedies available to rectify low level breaches are important. The analysis of FET must take the entire legal system of the host state and likewise, whether it was tested by the investor, into account. (R-I ¶¶ 37.3 – 37.12; R-II ¶ 997 – 999).

922. Other tribunals, such as *Parkerings v. Lithuania*, *MCI v. Ecuador*, and *Waste Management*, have held that, in cases of a sufficient domestic system of redress stemming from either domestic law or from the contractual forum selection clause, failure to pursue available remedies excludes the possibility of a breach of the FET standard. (R-I ¶¶ 37.12 – 37.17).

923. Furthermore, despite asserting that "*dozens of treaty tribunals*" have found violations in cases of "*less severe*" treatment, they have left unchallenged the Republic's observation that finding a breach of the FET standard is actually a very high bar. There is a high measure of deference that international law extends to the right of domestic authorities to regulate matters within their own borders. Only cases of blatant misconduct will support a finding of unfair and inequitable treatment. A mere breach of a host State's domestic law is not sufficient. The ECT, interpreted with due regard for its purpose, supports a restrictive understanding of FET, as an overly "*investor-friendly*" interpretation would prevent host states from admitting investors. This is a highly fact-specific analysis – it is simply not sufficient to "*trot out*" examples of whether other tribunals may have come to a finding that helps Claimants' arguments. (R-I ¶¶ 37.24 – 37.31; R-II ¶¶ 997 – 1000).

924. Initially, Claimants cited the following nine instances where they alleged Respondent breached the FET standard:

    *(a)*     *The determination that KPM was operating trunk pipelines;*

    *(b)*     *the trial and conviction of Mr. Cornegruta and the verdict against KPM;*

    *(c)*     *the decision of the Republic's authorities not to prolong the exploration rights under Contract No. 302;*

    *(d)*     *the imposing of corporate back taxes, export duties and rent taxes as well as the subsequent withdrawing of some tax charges;*

    *(e)*     *the alleged revocation of the Republic's purported consent to the transfer of TNG to Terra Raf;*

    *(f)*     *the series of inspections and audits in 2008 and 2010;*

    *(g)*     *the seizure of KPM's assets based on the verdict against KPM;*

    *(h)*     *the termination of KPM's and TNG's contracts, allegedly without giving enough time to respond and without keeping the contractually agreed notice period;*



    *(i)*    *the taking into trust management of KPM's and TNG's assets after the termination of the contracts. (R-I ¶ 37.19).*

925.  The actions listed under (c), (d), and (h) arise out of the Subsoil Use Contracts and Contract 302. The contractual remedy in respect of those allegations has not been pursued, and Claimants are therefore barred from invoking these allegations. The remaining allegations fail because Claimants have not pursued available domestic remedies for them to their full extent. (R-I ¶¶ 37.20 – 37.21).

926.  Over 100 enterprises hold licenses to operate trunk pipelines. (R-I ¶ 21.12). The term "*trunk pipeline*" is defined in Art. 14 of the Law on Oil, pursuant to which pipelines are classified according to how they operate. A trunk or main pipeline is an engineering structure intended for transportation of commercial oil (prepared in accordance with the requirements of technical regulations) from the points of intake (from Contractor's pipeline) to the places of: (a) transshipment to a different means of transport; (b) processing; (c) consumption; or (d) storage. (R-I ¶ 21.7). The length of a pipeline is irrelevant for the classification. The KPM Pipeline is not a gathering main mode pipeline (which would be excluded from the definition of "*trunk pipeline*"). Further, the KPM Pipeline shares oil with other contractors. Respondent states that the 1 km piece of pipeline at issue is located outside of the Contract Area, making it a trunk pipeline. (R-I ¶¶ 23 – 24; R-II ¶¶ 519 – 541). With respect to Claimants' comparisons between the KPM and the KazTurkMunai pipelines, Respondent finds this futile, since Claimants have not proven any like features between the two. Further, they have not established that the KazTurkMunai has a license for a trunk pipeline. (R-II ¶ 545).

927.  Each of the four instances upon which Claimants now focus (rather than the six initially alleged) fails for two reasons: "*Firstly, each is a case where Claimants could have and should have pursued the issue further using the official systems put in place by the Republic. Secondly, Claimants misconstrue the facts to create a distorted and fictional picture in their favour.*" (R-II ¶ 1001). Respondent's arguments are best taken from its own words:

    *1002.*  *Claimants allege that the "reclassification" of the KPM Pipeline breached fair and equitable standards. […] Claimants have misconstrued the events that comprised the Financial Police's inspection and investigation of the pipeline issue, suggesting, wrongly that the Republic had premeditated the outcome that resulted in the prosecution of Mr. Cornegruta on behalf of KPM. In any case, there was no "reclassification" and therefore it is not possible that this activity was unfair or inequitable. The pipeline was always a trunk pipeline.*

        *[The conclusion that the at-issue pipelines were indeed trunk pipelines is both legally and factually correct. The Parties' witnesses agreed on the legal definition of a trunk pipeline, which is provided in the Law on Oil. (RPHB 2 ¶¶ 219 – 236).]*

    *1003.*  *The Financial Police's inspection and investigation was carried out in accordance with due process and the laws prevailing at the time. The classification of pipelines is a legal question and one that in the case of a dispute should be resolved by reference to the judicial authorities. As such, classification decisions are not finally determined by industry specialists,*



technical court experts in pipeline design, the MEMR, ARNM, or, for that matter, TNG or KPM. Moreover, the Financial Police is not a competent authority for the classification of pipelines, nor as it ever held itself out to be such. This is why the Financial Police spent a number of months in late 2008 and early 2009 collating the necessary evidence regarding the pipeline and its operation by KPM. [see also R-II ¶ 457]

1004.   Claimants suggest that the Republic admits that its laws are confusing, citing reference to the Judicial Executor's decision. This misconstrues the Republic's assertion which was simply that the way in which the Judicial Executor referred to the pipeline did not make it clear whether the pipeline was trunk or field: there was no statement by the Judicial Executor that the law was confusing. On the facts of this case, it is accepted that there were different views as to the correct classification of the pipeline. Since the application of the law always depends on the facts, it is not uncommon for there to be disagreement as to whether or not a particular law does or not apply, or how it applies. However, this does not lead to the inevitable conclusion that the law is unclear. More importantly, it does not absolve KPM and Mr. Cornegruta from the consequences of their illegal operation of the KPM Pipeline. [Further, Respondent denies that the Judicial Executor made any admission that the pipe in question was a field pipeline. As for the argument that their licenses gave them a legitimate expectation – the licenses only informed them of what type of pipeline they could operate. The license did not tell them what pipes they were actually operating. None of the licenses have ever been sufficient for the pipelines Claimants were actually operating. (R-I ¶¶ 37.36 – 37.41)]

1005.   Claimants continue to contend that Mr. Cornegruta's conviction and the recovery of income from KPM was contrary to fair and equitable treatment standards. For the reasons set out in Section C.VI to C.VIII, this is not the case. In any event, Mr. Cornegruta could have appealed any decision against him to the Supreme Court. Similarly, KPM had an opportunity to challenge the recovery order and failed to do this within the correct time limits. Since he did not, Claimants are not now entitled to complain that the Republic's treatment of him was unfair. [Further, nothing in this proceeding constituted a "denial of justice", as alleged by Claimants. There was nothing shocking to judicial propriety.  The decision was consistent with domestic law and accorded with international standards. Further, the calculation of illegal profit was correct and in accordance with the law (although even if it were incorrect, more than incorrectness is required to bring that into a treaty violation. (R-I ¶¶ 37.38; 37.42 – 37.50); RPHB 2 ¶¶ 151 – 218, 265 - 271)]

1006.   In relation to the "harassment and coercion campaign" there simply was no such campaign against KPM or Claimants. [...]  In any case, Claimants' case is contradictory.  On the one hand, they say that there was a "Playbook" employed by the Republic and wheeled out against systemically every foreign investor. At the same time, they argue that the campaign was unfair. At the very least, it must be recognised that if there was such a "Playbook" that was employed by the Republic (which is



      *denied), its employment cannot, by definition, be "unfair" or "inequitable".*

1007. *Finally, with regard to the non-extension of Contract 302, Claimants' allegations equally amount to zero. It is not correct that the Republic ever agreed to an extension of the contract or that Claimants could rely on such an extension being granted. That is because the process for an agreement had simply not been gone through. The document that Claimants rely on as "proof" of a promise to extend the contract was a mere intermediate step in the process of reaching an agreement. It could not cause any reliance on the part of Claimants. Rather, the simple fact that no extension was agreed and signed created all the legal security that Claimants could expect, though to a different effect as they may have hoped for. [see also RPHB 2 ¶¶ 282 – 305]*

1008. *Claimants' further arguments with regard to the termination of Contract 302 are downright confusing. Claimants seem to allege that the MOG's notice of infringement of obligations prior to the contract termination somehow created reliance on the side of Claimants that the contract would be extended. It should be self-explanatory that a statement noting contract infringements cannot create any expectation of contract extension. (R-II ¶¶ 1002 – 1008, partially quoted; see also R-I ¶¶ 37.35 – 37.52).*

928. Regarding the criminal proceedings, Respondent states that the Aktau court was asked to rule on whether Mr. Cornegruta, on behalf of KPM, was guilty under Art. 190(2)(b) of the Criminal Code of the Republic. (R-II ¶ 498). Respondent states that Mr. Cornegruta was the General Manager of KPM and, as such the most senior executive of that company. Given Mr Cornegruta's position within KPM, it was trite that he would in theory carry responsibility under law for any criminal activity of KPM. (R-II ¶ 510). Respondent rejects Claimants' characterization that this was a trial of Mr. Cornegruta. Strictly, it was the trial of KPM, at which Mr. Cornegruta was its representative. (R-I ¶¶ 27.50, 27.54, 27.57). Respondent explained that the necessity of arresting Mr. Cornegruta arose because other potentially liable individuals, including Mr. Cojin, Mr. Spasov, and Mr. Salagar, had already left the country. (RPHB 1 ¶ 230).

929. Respondent denies Claimants' contention that KPM was not criminally indicted. It is admitted that no civil action had been brought against KPM. It is admitted that KPM was ordered to pay 21,675,854,578 Tenge, based on the assessment of the income received by KPM as a result of its illegal entrepreneurial activity dated 18 May 2009. It is not admitted that the sum constitutes all of KPM's oil and gas production revenues from March 2007 – May 2008. It is not admitted whether KPM had already paid taxes on such income. However, to the extent that taxes had been paid on that income, it is apparent that KPM neglected to provide evidence of this to the court. It is not admitted whether the above sum bears any relationship to transportation fees earned by a trunk pipeline operator or whether such fees represent the sole income of such an operator. However, the relevance of these assertions to the computation of the sums KPM was obliged to pay is denied. (R-I ¶ 27.59). Claimants' criticism that the recovery was disproportionate misses the mark: the goal is to address and negate the unjust enrichment that results from the crime, not to punish the crime. The unjust enrichment is not limited to the hypothetical income for providing crude oil transportation services. Squire



Sanders assessed the amount subject to recovery to be reasonably over USD 80,000,000. (RPHB 2 ¶¶ 262 – 264).

930. [Respondent's prosecution of Mr. Cornegruta on behalf of KPM and the subsequent appeal were conducted in a lawful manner that adhered to Kazakh and international standards of due process. Mr. Cornegruta examined evidence, requested further evidence, and had the advice of qualified counsel. While some of his motions were not granted, others were. He had the opportunity to ask questions of witnesses and only those experts whose evidence was admitted pursuant to Art. 243 CPC were heard. With respect to the refusal to allow Claimants' so-called experts to testify, since their testimony was outside of Art. 243, it would not have attracted evidentiary weight in any event. (RPHB 2 ¶¶ 237 – 242).] Respondent denies that the Financial Police threatened any of KPM's experts and states that there were 5, not 7, experts. (R-I ¶¶ 27.52, 27.57). The State introduced a single expert opinion containing a statement that the KPM gathering system pipelines trunk pipelines. Respondent admits that the prosecutor relied on a single expert opinion, dated 13 February 2009. (R-I ¶ 27.57). Respondent states that the Judge considered evidence presented by KPM, but found it to be unpersuasive. (R-I ¶ 27.57).

931. Respondent maintains that the executive branch did not interfere with the trial. Claimants have produced little more than conjecture to support this contention. While it is true that the initial inspection was connected with the President's instructions, instructions did not lead to the conviction of Mr. Cornegruta. A proper review of the chronology of events reveals that the process, if anything, was bottom up, starting with the inspection of KPM and TNG's pipelines and ending in the prosecution, following due process. The rejection of the Mr. Cornegruta's expert opinions – first by the Financial Police, and then separately by the Judge in Aktau, was also according to due process. Mr. Baymaganbetov's expert report and the Court's use of Mr. Cornegruta's "*confession*" letter were proper. (R-II ¶¶ 628 – 634; R-I ¶ 27).

932. Claimants never exhausted the appeals system within the Republic, which stood open to Claimants. KPM missed the deadline to appeal. It was the Court's view that KPM had notice of the decision against it, since its senior management was present at the hearing. (R-II ¶ 635 – 638).

933. The termination of the contracts and the seizure of KPM and TNG's assets were in accordance with due process. The terminations were based on breaches of those contracts, including non-fulfillment of work programs. Claimants had the opportunity to dispute or correct the Republic's arguments. Claimants were involved in the inspection process, they were aware of the breaches, they provided inadequate responses to the Notices of Breach, and they never requested additional time to prepare fuller responses. Regardless, even if there was no due process, this would not change the fact that the Republic could validly terminate the contracts and that Claimants, thus, stood to lose their contractual rights. It was Respondent's substantive right to terminate the contract in light of Claimants' misbehavior and that caused Claimants' losses. The seizure was legal under Kazakh law and was necessary for the continued gas production of the region. (R-I ¶¶ 37.59 – 37.64; RPHB 2 ¶¶ 339 – 374).



934. Respondent states, in response to paragraph 11 of Mr. Calancea's Witness Statement, that the Republic would never have been in a position to compensate Claimants for the transfer. (R-II ¶ 708). The transfer did not involve a transfer in title. (R-I ¶ 31.162). Accordingly, KMG NC's role was clearly as trust manager and therefore it had no business in taking on the debts and liabilities, which remained with KPM and TNG. (R-II ¶ 711).

935. Claimants' allegations regarding the tax assessments fail in their entirety, as they were also in compliance with domestic law. Claimants could not legitimately expect anything except a lawful tax assessment, or that there would not be back assessments in the event of an incorrect tax declaration. (R-I ¶¶ 37.53 – 37.55).

936. As for the transfer from TNG to Terra Raf, the alleged reversal does not harm Claimants' legitimate expectations, as the application for the alleged approval was based on a flawed and inaccurate application. (R-I ¶¶37.56 – 37.57; RPHB 2 ¶¶ 272 – 281).

937. Respondent's investigations were at all times lawful. Thus, the argument cannot stand that these investigations and proceedings – brought on by Claimants' own illegal behavior – can be the basis for a claim of unfair and inequitable treatment. Claimants always had a duty to apply for the appropriate licenses for their work, and even upon being notified that their application was incomplete, they chose not to. (R-I ¶ 37.58; RPHB 2 ¶¶ 151 – 218).

938. Claimants' argument that Respondent forced Mr. Cojin and Mr. Cornegruta to sign inspection protocols after the MEMR's 4 – 11 November 2008 inspection is only supported by the incredible testimony of Mr. Cojin. After the hearing, Respondent explained that, while initially Mr. Cojin had stated that he accompanied the Financial Police on behalf of TNG, he admitted in cross-examination that he did not actually attend the inspection. Respondent argues that, since Mr. Cojin has testified dishonestly, there is no proof that he was forced to sign the inspection protocols. Not even the minutes of the meeting signed by Mr. Cojin or Mr. Cornegruta reflect this event. (RPHB 1 ¶¶ 194 – 196; RPHB 2 ¶¶ 157 - 161). ,

939. At the Hearing on Quantum, Claimants alleged that the gas market in Kazakhstan amounts to a violation of the FET standard. Respondent states that Claimants are seeking not fair, but rather preferential treatment, something that is not guaranteed. Claimants received the same treatment as other investors and when they did not receive special treatment, they felt persecuted. The Republic was under no obligation to create or find a market for Claimants' oil and gas. The Republic reserves the right to submit further submission on this point. (RPHB 1 ¶¶ 612 – 618, 698 – 700).

940. Respondent states that Claimants' statements about the contract negotiations with Cliffson, especially those related to the investment arbitration clauses, are beyond Respondent's knowledge. (R-II ¶ 827).

### 3. The Tribunal

941. To a large extent, the Parties seem to be in agreement regarding the abstract definition of what fair and equitable treatment (FET) is and intends to protect. In



particular, they agree that the host state has to act in a manner that is consistent with the legitimate expectations of investors.

942. In view of the breadth of the terms "*fair*" and "*equitable*," their context in the ECT, and the object and purpose of the ECT, the Tribunal has to interpret the FET standard in the ECT. The two terms as such provide little guidance. The VCLT, however, provides such guidance:

- *Art. 31.1 requires an interpretation of a treaty provision in their context and in the light of its object and purpose,*

- *Art. 31.2 requires an interpretation of the purpose of a treaty including its preamble and annexes, and*

- *Art. 32 allows recourse to supplementary means of interpretation.*

943. In the latter context, the Tribunal may take into account that the FET standard has been interpreted and applied under international law by many international investment tribunals, thereby creating a considerable body of case law that has added specific meaning and content to the standard.

944. But the Parties also seem to agree, and the Tribunal agrees as well, that the FET standard needs to be considered against all of the factual circumstances. Indeed, the application of the FET standard can only be case specific, taking into account:

- *the specific factual circumstances of the present case, and*

- *that these have to be evaluated in the present case in the legal context of the ECT.*

945. In view of this approach, the Tribunal will now first consider the factual circumstances by summarizing the Respondent's conduct *vis-à-vis* Claimants' investment insofar as it is considered relevant. In doing so, the Tribunal considers that, at least in the present case, as the term "*treatment*" already indicates, not one particular action by the host state has to be considered, but rather Respondent's "*treatment*" of Claimants' investment over a longer period allows its legal evaluation. In view of that, above in this Award, the Tribunal has included a detailed timetable of all relevant actions of the Parties.

946. Regarding the events and steps of the Parties from the beginning of contacts in 1997 to 6 October 2008, the Tribunal refers to the timetable recorded above in a separate section of this Award. It needs not to be summarized or repeated here and shows what the Tribunal considers, with some exceptions described below, to be a normal sequence of contacts and cooperation between the Claimants and Respondent regarding the investments made. It provides no indication that Respondent considered major aspects of the investment or the conduct of the investors as illegal or that it intended to bring the investment to an end.

947. Hereafter, the Tribunal describes in detail the treatment after the above date, which in its view is relevant for the alleged breach of the FET standard.



948. On 6 October 2008, Mr. Vladimir Voronin ("Voronin"), then-President of Moldova, wrote to Mr. Nursultan Nazarbayev, the President of Kazakhstan ("President Nazarbayev"). There is some indirect evidence (based on an unverified 24 January 2011 Moldovan television interview transcript) that President Nazarbayev may have requested that Voronin, at a meeting of CSI, provide him information about Anatolie Stati. (C-78). Respondent denies every allegation that President Nazarbayev asked Voronin for the letter as a pretext to any investigation, and disputes the translation of the interview – an interview where the name "Stati" was not even mentioned. (R-I ¶¶ 18, 19.21; RPHB 1 ¶ 375). The Tribunal, however, need not decide whether the content or translations of the interview, as presented by either side, are accurate in order to reach the conclusions, below.

949. The 6 October 2008 Voronin letter (C-77), in the interest of "*strengthen[ing] trust [and] develop[ing] relations free of any suspicious businessmen,*" informed President Nazarbayev that Anatolie Stati conceals profits from the states where he has earned them and even "*use[s] of his profits from the deposits in Kazakhstan for investments in areas, for example, in Southern Sudan, that are subject to sanctions by international organizations, in particular the U.N.*" The letter warns that this activity is damaging to the reputations of both Kazakhstan (as the state where Anatolie Stati earns his income) and Moldova (as "*the state of origin of the businessman*"). The letter also accuses Anatolie Stati of "*interfere[ing] with the development of the external and personnel policy of Moldova, creating a corrupt lobby of supporters of the trade agreements concluded with states subject to the U.N. sanctions.*" (C-77, R-II ¶ 277).

950. What is undisputed is that, expressly based on the letter from President Voronin, President Nazarbayev issued an Order dated 14/16 October 2008 to the Kazakh Deputy Prime Minister, U. Sukeev, and the head of the Agency of the Republic of Kazakhstan for Fighting Economic and Corruption Crimes (the "Financial Police"), S. Kalmurzaev ("the Order"). (C-8). The Order used the terms "*[a]t the request of the Moldovan party,*" to "*thoroughly check company's work and to take decision on its further work in the best interests of the country.*" (C-II ¶ 213; R-II ¶ 283; RPHB 1 ¶ 1162; C-8 (partially quoted); Tr. Hr. 1 Day 1 Opening by Tirado (R) p. 35; Opening by Smith (C) pp. 94, 155; Mynbaev Day 3 p. 86).At approximately the same time as the Nazarbayev Order, on 14 October 2008, TNG notified the MEMR of its intention to exercise its contractual right to extend the exploration period by two further years pursuant to Contract 302. Among other things, this application refers to the "*[d]iscovery of new HC deposits on depths of over 5-6 km…*" and "*large deeply submerged reef fields…*" (C-67, partially quoted). The Claimants say these are unmistakable references to the Interoil Reef structure and that this application further indicated TNG's plans to complete the Munaibay-1 well. (C-I ¶ 67; CPHB 1 ¶ 129, 234 – 235; CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416; C-66; C-67; Lungu Tr. January 2013 Day 1 pp. 250 – 251). Prior to filing, On 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay-1 well in the Contract 302 area. Anatolie Stati testified that during the summer of 2008, TNG purchased a more robust drilling rig in Georgia with the intention of resuming the completion of the Munaibay-1 well and further exploration of the Contract 302 area. (Tr. January 2013 Hearing Day 2 pp. 84, 114 – 115). On 11 August 2008, TNG applied to move to the appraisal phase for Munaibay. TNG withdrew the appraisal



application on 10 October 2008 because it believed it was too early to begin appraisal. (C-0 ¶ 57; C-I ¶ 67; CPHB 1 ¶ 129; 234; CPHB 2 ¶ 151; C-66).

951. Shortly after it was issued, President Nazarbayev's instruction came to the attention of Major A. Rakhimov of the Financial Police ("Major Rakhimov"). In his testimony, he acknowledged that he had never received a personal directive from the President of Kazakhstan previously. (Rakhimov Day 5 pp. 81 – 83).

952. On 16 October 2008, the Deputy Prime Minister issued Order No. 6497 and, shortly thereafter, the Financial Police ordered the commencement of numerous audits and investigations of Anatolie Stati, KPM, and TNG (R-II ¶ 283), summarized by reference to the following events:

953. On 18 October 2008, the Financial Police wrote to the Customs Committee to enquire about Anatolie Stati's travel through Kazakhstan. (C-11).

954. By correspondence dated 20 October 2008, the Financial Police requested the Kazakh State Ministry of Energy and Mineral Resources ("MEMR") to investigate Anatolie Stati and his companies and to provide "*[c]opies of contracts, working schedules, LKU reports as well as the set of documents for obtaining the license,*" as well as "*[i]nformation on the volume of extractions and investments at the closing date of the contracts.*" (C-9). An internal request was also made for Mr. Turganbayev to provide information regarding Anatolie Stati's activities in Kazakhstan and off shore. (C-444).

955. On 24 October 2008, the Financial Police ordered the Tax Committee of the Ministry of Finance (the "*Tax Committee*") to conduct comprehensive or complex tax audits of KPM, TNG, and Kok Mai, which commenced on 28 October, 10 November, and 18 November 2008, respectively. Members of the Financial Police were to be included in the Tax Committee. (C-10).

956. On 24 October 2008, Mr. Turganbayev requested a prolongation of the inspection until 16 December 2008. (WS Turganbayev 2 ¶ 4.8; C-430).

957. On 28 October 2008 the Financial Police ordered the Committee of Geology and Subsoil Resources Use of the MEMR to commence an audit of KPM's and TNG's compliance with their subsoil use licenses and to involve the Financial Police in the audit. (CPHB ¶ 38; WS Turganbayev 2 ¶¶ 4.1 – 4.2).

958. By Order dated 28 October 2008, the Financial Police directed the Committee for Ecology Regulation and Control for the Ministry for Environmental Protection (the "*Ecology Committee*") to organize the inspection of KPM's and TNG's compliance with "*rational*" subsoil exploitation and petroleum operations (including burning gas over allowed limits) and to include members of the Financial Police in the inspection committee. (C-13; R-I ¶ 26.8).

959. On 30 October 2008, the Financial Police reported that Anatolie Stati was not a registered businessman in Kazakhstan, but carried on business through Ascom which, in turn, owned KPM. (C-366).



960. On 30 October 2008, the Financial Police reported on KPM's and TNG's activities, noting specific items to inspect, but finding that KPM and TNG were in compliance with all of their investment obligations. (C-438).

961. By correspondence dated 31 October 2008, the MES reported to the Financial Police on scheduling the examination of KPM's and TNG's compliance with industrial safety legislation for the years 2006 and 2007. (C-14).

962. Kemikal, which was TNG's largest non-local customer, which was under the control of the son-in-law of President Nazarbayev, Mr. Timur Kulibayev, through intervening entities he was said to control, namely, Gaz Impex and KazRosGas. Mr. Kulibayev was also the Chairman of KMG. In the Fall of 2008, Kemikal, failed to post bank guarantees that were part of its required payment terms. Claimants state that, because Kemikal had an erratic payment history, TNG chose not to renew that contract without the bank guarantees in place (and in fact, ended up pursuing Kemikal until June of 2009 to acquire the last of Kemikal's overdue payments). TNG approached KazRosGas about purchasing its excess gas for export, but KazRosGas never responded. (C-II ¶ 382; R-II ¶¶ 751 - 752).

963. On 1 November 2008, the Financial Police reported to the Deputy Prime Minister, confirming the ownership of KPM, TNG, and Kok Mai and informing him that inspections were being carried out. The letter also informed him that, based on the inspection, it had been ascertained that Anatolie Stati had left Kazakhstan on 29 March 2007. (CPHB 2 ¶ 38, C-600).

964. On 7 November 2008, the Tax Committee ordered a targeted audit of KPM and TNG regarding transfer pricing. Although the Respondent does not admit that the audit was instructed by the Financial Police, correspondence from the Tax Committee to the Financial Police, dated 11 November 2008 appears to acknowledge that such was the case. (C-38).

965. On 7 November 2008, Anatolie Stati sent a letter to President Nazarbayev assuring him that there was no reason to investigate KPM and TNG. (C-700). The President did not reply.

966. On 7 November 2008, the Financial Police ordered the Customs Committee to inspect KPM and TNG for compliance with payment of export duties. (C-440).

967. The comprehensive tax audits of KPM and TNG began on 10 November 2008. The audits covered the period from 1 January 2005 through 31 December 2007 for KPM, and 1 January 2003 through 31 December 2007 for TNG. The audits pertained to corporate income tax, royalties, individual income tax, social tax, property tax, land tax, tax on vehicles, excise taxes, corporate income tax on non-resident legal entities, and payment for use of natural and other resources. Respondent does not admit that the audit was instructed by the Financial Police, although C-38 shows that the Tax Committee disclosed information relating to the audit at the request of the Financial Police. (R-I ¶¶ 30.48, 30.62; RPHB 1 ¶ 1062; C-38; C-149; C-150).

968. From 4 to 11 November 2008, pursuant to Art. 37 of the Law on Oil and Art. 51 of the Law on Subsoil Use, the Geology Committee of the MEMR, with the



involvement of the Financial Police, carried out an inspection of KPM and TNG regarding compliance with legislation on industrial safety and their licenses. (R-I ¶ 26.8; R-II ¶ 455; RPHB 1 ¶ 192, RPHB 2 ¶ 157; WS Turganbayev 2 ¶ 4.2; C-86; C-87; C-14; C-439). Claimants state that the MEMR found that KPM and TNG were in compliance with their obligations. (C-I ¶ 89, CPHB 2 ¶¶ 38, 61; C-86; C-87).

969. On 12 November 2008, following the site visit, Mr. Turganbayev of the Financial Police asked the ARNM whether KPM, TNG, and Kok Mai held licenses for trunk pipelines. (R-I ¶ 26.9; R-II ¶¶ 464 – 465 (stating 14 November); RPHB 1 ¶¶ 198 – 202; WS Turganbayev 2 ¶ 5.1; C-441).

970. The Transfer Price Audit commenced on 12 November 2008. (R-II ¶ 407, WS Rahimgaliev ¶¶ 10.5, 10.6).

971. On 12 November 2008, the Financial Police ordered the Customs Committee to inspect KPM's and TNG's import/export volumes. (C-442).

972. On 13 November 2008, the Tax Committee noted that the inclusion of the Financial Police in inspections would be illegal and proposed that, instead, a working group be established to review inspection results. (C-38).

973. On 14 November 2008, the ARNM replied to a request for clarification by Mr. Turganbayev that KPM and TNG had each applied for, but neither held licenses to operate main or trunk pipelines, and that the operation of a trunk pipeline required such a license. (R-I ¶ 26.10; R-II ¶ 466; RPHB 2 ¶ 164; WS Turganbayev ¶ 5.3).

974. On 14 November 2008, the Financial Police met with Messrs. Cojin and Cornegruta. The Parties dispute whether the Financial Police insisted that each sign inspection reports admitting that KPM and TNG did not hold licenses to operate main pipelines.

975. On 14 November 2008, the MEMR reported to the Financial Police on KPM's and TNG's export volumes. (C-443).

976. KMG executed the 17 November 2008 Tripartite Agreement. The final signatory, KazAzot, however, never signed.

977. On 17 November 2008, the Financial Police determined that the pipelines were trunk pipelines, and then discovered that KPM and TNG did not have the necessary licenses. Claimants refer to this as the "*reclassification.*" (C-II ¶ 249; R-I ¶¶ 22.6, 23.19, 38.22; R-II ¶¶ 451, 542; RPHB 2 ¶¶ 165 – 172).

978. On 17 November 2008, Mr. Turganbayev of the Financial Police ordered the Tax Committee to conduct a new audit to calculate the profit that KPM and TNG received from operating a main pipeline without a license and to determine KPM's revenue for onward sales of oil. (R-II ¶ 469; RPHB 2 ¶¶ 172 – 173; C-89; WS Turganbayev 2 ¶ 5.4).

979. On 18 November 2008, the Financial Police issued a resolution for an audit of any unpaid customs taxes by TNG. (C-446).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF CO**630**

980. On 18 November 2008, the ARNM replied that TNG and KPM did not hold licenses for trunk pipelines and that Kok Mai had never been asked about such licenses, previously. (RPHB 1 ¶ 198; C-88).

981. On 19 November 2008, the Tax Committee, at the request of the Financial Police and based on accounting information provided by TNG, determined that the amount of "*illegal profit*" from operation of the trunk pipeline was 41.8 billion Tenge (USD 348 million as of November 2008) for KPM and 37.7 billion Tenge (USD 314 million as of November 2008) for TNG. (R-I ¶ 26.19, C-202; C-450);

982. On 19 November 2008, the Specialized Interdistrict Court of Mangystau Region delivered a judgment in KPM's favour in response to KPM's challenge of export duties. The Court ruled that the imposition of KPM on the Crude Oil Expert Tax was illegal. (R-I ¶ 30.56; R-II ¶ 743). Despite this ruling in KPM's favour, the Financial Police and the Customs Committee challenged the ruling, resulting in further litigation. New claims were raised against KPM and TNG. On 31 March 2010, the Customs Committee conceded that neither KPM nor TNG was obliged to pay export duties. (C-161).

983. On 19 November 2008, KPM and TNG contacted the MES for a second opinion regarding the pipelines. (R-I ¶ 28.10). The MES confirmed that KPM's and TNG's pipelines were not main pipelines, but "*form a single technological process of all production.*" (C-90; C-91). Respondent admits that this was the MES response, but states that the opinion only stated that some of the pipelines were not trunk and, in any event, the statement was outside of their competency. (R-I ¶¶ 26.12, 28.11 – 28.13; R-189).

984. On 20 November 2008, the Financial Police commenced an investigation concerning KPM's contractual export tax exemption. (C-0 ¶ 72).

985. On 21 November 2008, the Financial Police requested that the MES withdraw its statements confirming that KPM's and TNG's pipelines were not main pipelines, on the basis that the MES was not competent to provide that conclusion. (R-I ¶ 26.12; C-92; R-189).

986. On 25 November 2008, the Financial Police wrote to the Ministry of Finance inquiring into why the Customs Committee "*exonerate[d]*" KPM from oil export duties, given that KPM had provisionally paid the disputed duties. (C-162). The Customs Committee had, in fact, found that KPM was not contractually obliged to pay the export duty.

987. On 28 November 2008, a Ministry of Justice economics expert confirmed the Tax Committee's calculation and concluded that KPM's illegal profits exceeded 41 billion Tenge. (R-I ¶ 26.23, CPHB 2 ¶ 81; C-452).

988. By a correspondence stamped with the date 28 November 2011, the National Bank acknowledged letters from the Financial Police dated 28 October and 31 October 2008, by which the National Bank was directed to conduct exceptional inspections and to include members of the Financial Police in the control team. The National Bank stated that, although it could not comply with the request to include the financial police employees among the auditors, it would issue conclusions



regarding the compliance by the companies with current legislation. The letter informed that an extraordinary inspection of KPM had occurred, while extraordinary inspections of TNG and Kok Mai had not occurred. (C-15).

989. On 2 December 2008, the Financial Police circulated an internal report confirming that KPM operated a main pipeline without a license and had gained illegal income of over 41 billion Tenge. (C-85).

990. On 10 December 2008, the Financial Police reported to the Deputy Prime Minister that the Financial Police had determined that KPM and TNG were operating trunk oil and gas pipelines without licenses. They stated that the Financial Police, however, were not competent to make that decision, and reported that they had asked the ARNM to determine what type of pipelines KPM and TNG operated, taking their functions into account. Without a conclusion by the competent authority "*it is impossible to make a lawful procedural decision in respect of this case.*" (C-II ¶ 220; C-448, partially quoted). Although Respondent states that "*no decision had been reached as to whether or not the pipelines were trunk at this point*" (RPHB 1 ¶ 197), this statement is belied by C-448. The Tribunal believes Respondent's earlier statement acknowledging that the Financial Police had, indeed, concluded that KPM and TNG were operating trunk pipelines, even though they were not legally competent to make that classification. (R-II ¶¶ 473 – 474).

991. The Transfer Price Audit was suspended on 12 December 2008. (R-II ¶ 407; WS Rahimgaliev Exhibit 12).

992. On 15 December 2008, the Financial Police formally opened a criminal investigation against KPM for allegedly operating a main pipeline without a license. (CPHB 1 ¶¶ 168, 346; CPHB 2 ¶¶ 38, 61; R-II ¶ 294, 475, RPHB 1 ¶¶ 219 – 221; RPHB 2 ¶¶ 177 – 180; C-632; Rakhimov Day 5 p. 20 – 21, 24-25; WS Rakhimov 2 ¶¶ 3.5 – 3.8, 4.1, 4.3, 4.4). While Respondent has argued that this investigation was opened, but not in respect to a particular person, the Tribunal notes that KPM is expressly named in the order, which instructs "*[t]o initiate the criminal case under Article 190 Part 2 item "b" CC RK involving the illegal entrepreneurial activity carried out by Kazpolmunai LLP and to accept it for examination.*" (RPHB 1 ¶ 222, C-632; Rakhimov Day 5 p. 25).

993. On 18 December 2008, the MEMR informed TNG that it was cancelling the State's decision of 20 February 2007 that had further allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice further required TNG to submit all documentation regarding Terra Raf's ownership within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (CPHB 2 ¶¶ 38, 117; R-I ¶ 13.47; R-II ¶¶ 170 – 172; RPHB 1 ¶ 475 – 476; RPHB 2 ¶¶ 281, 377; C-134; C-140; C-424; Ilyassova (12 August 2012) ¶ 7; WS Ongarbayev ¶ 5.7).

994. The Parties are in agreement that an 18 December 2008 INTERFAX press release alleged that the State's pre-emptive rights had been violated and indicated illegal conduct by Terra Raf. They also agree that, on the same date, Credit Suisse sent Mr. Lungu of Ascom a copy of the INTERFAX press release and requested an explanation. (C-141). The Parties disagree as to where INTERFAX received its



information and whether that report is attributable to the Respondent. Respondent argues that the accusation that the INTERFAX report was somehow attributable to Respondent was not made contemporaneously. (R-II ¶ 171, *see e.g.* C-619; RPHB 2 ¶¶ 7). Indeed, while Mr. Lungu initially told Credit Suisse that "*there are a lot of errors in [the INTERFAX press release] which make us believe that this info is not from official sources,*" (C-625, partially quoted), Claimants now argue that the INTERFAX press release is attributable to Respondent, "*given the level of detail in the in the information that the INTERFAX article sources to the MEMR.*" (C-II ¶¶ 400; CPHB 1 ¶¶ 137, 215 – 216, 347 – 348, fn. 497 (partially quoted), 350; CPHB 2 ¶¶ 38, 117). Respondent dismissed Claimants' argument as speculative. (R-II ¶ 749). It provided evidence that the information did not originate in the Republic, including a 21 June 2012 letter from INTERFAX indicating that an inofficial source was used (R-264) and a 21 June 2012 letter from the MEMR that it did not provide the information (R-265). (RPHB 2 ¶¶ 7, 95 – 99). Respondent denies that the report was from official sources and Mr. Ongarbayev denied knowledge and stated that there was no official press release. (C-720, WS Ongarbaev (1 December 2012)). In this context, Respondent's argument that the INTERFAX item cannot be attributed to the Republic does not change the impact. Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication.

995. On 20 December 2008, the Financial Police began conducting repeated interrogations of TNG and KPM employees. (CPHB 2 ¶ 38; R-I ¶ 26.22; C-46; C-96; C-620; C-621; C-622; C-623; C-624; C-626; C-627).

996. On 22 December 2008, TNG refused to submit the required application to the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117; C-142).

997. On 24 December 2008, the Financial Police requested information from KPM and TNG on their gas and condensate outputs. In particular, the letter requested information regarding (a) the level of production of the company and (b) sales made by KPM to agents, individuals and other businesses. (R-I ¶ 26.20; CPHB 2 ¶ 38; C-94).

998. On 24 December 2008, the Financial Police issued summonses for Anatolie Stati, Mr. Cojin, Mr. Salagor, and Mr. Cornegruta. (C-654).

999. On 25 December 2008, Major Rakhimov of the Financial Police summoned and interviewed KPM's General Manager, Mr. Cornegruta. (R-I ¶ 26.21, 27.38; C-I ¶ 95). Mr. Cornegruta was considered a witness (R-II ¶ 480) and was, accordingly, not allowed to be accompanied by counsel (C-I ¶ 95). Respondent denies that Mr. Cornegruta was not permitted to have legal counsel in attendance for the interview. He was allowed to under Art. 82.3 CPC. (R-35). After the interview, Mr. Cornegruta was released and permitted to go about his business. (R-I ¶ 27.40).

1000. On 26 December 2008, Major Rakhimov summoned and interviewed the then-Deputy Manager General for Finance of KPM and TNG, Mr. Veaceslav Stejar; (C-I ¶ 95, R-I ¶ 26.21).



1001. On 26 December 2008, the Financial Police ordered the seizure of TNG documents regarding contracts with third parties and construction of pipelines. (C-605, C-606).

1002. On 29 December 2008, the MEMR requested that TNG provide notarized documents evidencing the 2003 change in ownership of TNG. (C-144).

1003. On 30 December 2008, the Financial Police conducted an on-site investigation at the Borankol and Tolkyn Fields. (C-I ¶ 95). The Respondent alleges that the purpose of the inspection was to specify the process of production, refining, and further transportation of hydrocarbon material, and to make sure that the pipelines matched the documents describing their construction, placement, and other physical features. (C-95). Mr. Turganbayev attended this inspection and confirms that it involved visiting KPM's pipeline. (R-I ¶¶ 13.47(e), 26.22; R-II ¶¶ 285, 481; WS Turganbayev 2 ¶ 6.3).

1004. On 30 December 2008, the Tax Committee issued an Act of Inspection, claiming that TNG could not deduct 100% of drilling expenses in the year they were incurred for corporate income tax purposes. (Maggs 2 Exhibit 2; CPHB 2 ¶ 128);

1005. On 5 January 2009, Major Rakhimov asked the MEMR to ascertain whether KPM's 17.9 kilometer pipeline was a main pipeline. (C-718, Rakhimov 3 ¶¶ 3.1 – 3.2; Rakhimov, Day 5 pp. 46 – 47).

1006. On 5 January 2009, the research and design institute of KMG NC concluded that the KPM and TNG pipelines were not main pipelines (C-99, C-100);

1007. On 8 January 2009, the National Scientific and Research Centre on Industrial Safety of the MES confirmed that the relevant KPM and TNG pipelines were field pipelines and not main pipelines (C-101; C-104);

1008. On 9 January 2009, NIPI Neftegaz confirmed that KPM's and TNG's pipelines were not main pipelines (C-101, C-102);

1009. On 14 January 2009, the Financial Police issued a resolution appointing three investigators to the criminal investigations of KPM and TNG. (C-453).

1010. In January-February 2009, KPM and TNG submitted various complaints regarding the illegality of the Financial Police's searches and seizures of documents and forwarded reports confirming that their pipelines were not main pipelines. (R-I ¶ 26.25; C-46, C-96, C-620, C-621, C-622, C-623, C-624, C-626, C-627, C-628, C-629, C-630).

1011. On 22 January 2009, the Financial Police requested corporate documents from KPM. (C-607).

1012. On 23 January 2009, the Financial Police requested corporate documents from TNG. (C-608).

1013. On 2 February 2009, the Financial Police informed TNG that, on 20 January 2009, they had formally opened a criminal investigation against TNG for the alleged



operation of main pipelines without a license. The Financial Police notified Claimants that TNG was the subject of a criminal investigation. The charges were later suspended. The Financial Police rejected a request to provide the order on the ground that no person was the subject of the investigation. (C-0 ¶¶ 43, 54; C-I ¶ 96; CPHB 2 ¶¶ 38, 61, 142; C-98 (translation disputed by Respondent); C-630; Condorachi ¶ 11).

1014. On 4 February 2009, the Financial Police interviewed Mr. Cojin, General Manager of TNG, to determine whether he or Mr. Cornegruta would be an appropriate defendant in any criminal proceeding; (R-II ¶¶ 298, 480; Rakhimov 2 ¶ 4.5).

1015. On 4 February 2009, MEMR wrote a letter to the Financial Police confirming that KPM's pipeline was part of its gathering system, and thus, was not a main pipeline. The Respondent alleges that this letter was later withdrawn as it was not reviewed by the legal department and/or because the MEMR has no authority to provide a classification regarding pipelines. (CPHB 1 ¶ 171; CPHB 2 ¶¶ 38, 61, 98; RPHB 1 ¶ 229; RPHB 2 ¶¶ 183 – 186; C-719; Rakhimov 3 ¶¶ 3, Rakhimov Tr. Day 5 pp. 47 – 49).

1016. On 9 February 2009, the Financial Police ordered the College of Experts of the Ministry of Justice ("MOJ") to appoint an expert to classify KPM's pipeline. (C-I ¶ 104; C-II ¶ 249; CPHB 1 ¶ 181; CPHB 2 ¶¶ 38, 61; R-II ¶¶ 549, RPHB 1 ¶ 226; C-109; R-245; R-362).

1017. On 10 February 2009, Mr. Turganbayev met with the MOJ expert, Mr. Baymaganbetov, and provided him with four documents on which to base his report. (R-II ¶ 554; Baymaganbetov. ¶¶ 3.2, 6.2; R-246).

1018. The comprehensive tax audits of KPM and TNG lasted until 10 February 2009. On that date, the State sent notices of an Act of Inspection to KPM and TNG that the Article 23 amortization rate, and not the Article 20 rate, was applicable to the companies' well drilling costs for the years 2005 to 2007 and assessed approximately USD 62 million in back taxes and penalties against the companies. (Exhibits 3, 4, 5, and 6 to Maggs 2; C-155). The corporate tax dispute embroiled KPM and TNG in litigation until 22 June 2010, when the Kazakh Court of Cassation dismissed the claim. (Exhibit 11 to Second Maggs Report; C-155). In the course of this arbitration, Claimants first learned that Respondent had appealed the Court of Cassation's decision. They were, therefore, unable to participate in the process that led to the 3 November 2010 decision of the Kazakh Supreme Court, which overturned the decisions at the lower instances and found that the corporate income tax assessment was proper. (CPHB 1 ¶ 258; Rahimgaliev Exhibit 6).

1019. On 11 February 2009, the MEMR withdrew the letter prepared on 4 February 2009, allegedly on the basis that it had not been reviewed by the legal department of the MEMR. (Rakhimov 3 ¶ 3.5). A replacement letter was issued on 11 February 2009. (RPHB 1 ¶ 229).

1020. On 13 February 2009, three days after receiving the file and without having reviewed any other documents or visited KPM's pipeline, Mr. Baymaganbetov



issued his report. (R-II ¶¶ 549 – 568; RPHB 2 ¶ 188; C-110; Baymaganbetov ¶¶ 3, 4.1, 4.2, 6).

1021. On 13 February 2009, the MEMR wrote to the Financial Police to provide them with information on how the definition of trunk pipeline in Article I of the Law on Oil should be interpreted. The MEMR noted that an expert would need to be appointed to determine the status of the pipelines in question. (Rakhimov 3 Exhibit 4; RPHB 2 ¶ 183).

1022. On 13 February 2009, the MEMR wrote to KPM and TNG and informed them that it was not competent to resolve their complaints. The MEMR suggested that they write to the GPO, instead. (C-629, C-630).

1023. On 24 February 2009, the Financial Police seized KPM's corporate documents. (C-609).

1024. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State demanded that TNG submit a new application for its consent to the transfer and a waiver of the State's pre-emptive purchase right Failure to do so would result in termination of TNG's Subsoil Use Contracts. (CPHB 2 ¶ 117; C-146).

1025. On 3 and 4 March 2009, the Financial Police seized KPM's and TNG's corporate documents. (C-610; C-611; C-612).

1026. On 18 March 2009, KPM and TNG complained to the GPO regarding the criminal investigations. (C-41; C-154; Condorachi ¶ 13).

1027. On 19 March 2009, a meeting chaired by the MEMR Executive Secretary, Mr. A.B. Batalov, and attended by representatives of Terra Raf, TNG, Ascom, and KPM was held at the MEMR offices. At this meeting, the State's actions against the Claimants since President Nazarbayev's 14 October 2008 Order were discussed. The Parties dispute whether Mr. Batalov assured the Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG would simply submit a new application for its transfer to Terra Raf, and would permit the State to re-evaluate its prior consent. Mr. Batalov also stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. The Claimants say the MEMR assured them that the pre-emptive right claim would be resolved in their favour. The Claimants also report that Mr. Batalov and his deputy indicated that the reclassification of sections of TNG's and KPM's in-field pipelines as trunk pipelines was, in the MEMR's view, due to a defect in the applicable legislation. Finally, the Claimants assert that the MEMR also indicated that the Financial Police ought to rely on the opinions of experts. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. The Respondent denies that Mr. Batalov assured the Claimants that all outstanding issues in relation to TNG and KPM would be resolved in the Claimants' favour, or that there was any



"*reclassification*" of pipelines. (C-1 ¶¶ 106, 150, 152, 177; R-1 ¶ 13.47(e)(v), 21.1); C-42; C-111; Lungu 43 – 45; Pisica ¶¶ 32 - 37, 43).

1028. On 24 March 2009, following the meeting with Mr. Batalov of the MEMR, TNG applied for a permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-1 ¶¶ 153, 332; C-147; Lungu ¶ 46; Pisica ¶ 38).

1029. On 24 March 2009, TNG applied to the MEMR for the inclusion of the issue of the extension of the exploration period of Contract 302 for two years into the agenda of the next meeting of the Expert Commission. (R-1 ¶ 31.69; R-162).

1030. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142; C-631).

1031. On 25 March 2009, TNG sent the State a request for a written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations. No response was ever received. (C-0 ¶ 32, partially quoted; C-1 ¶¶ 153, 154, 332; C-148; Pisica ¶ 38; Lungu ¶ 46).

1032. On 27 March 2009, the Financial Police ordered TNG to submit originals of their corporate documents with reference to the criminal case against KPM. Claimants also allege that the same request was made of KPM. (C-614; C-615);

1033. On 30 March 2009, Contract 302 expired. (R-II ¶ 411; C-53).

1034. On 30 March 2009, KPM responded to the Financial Police's request for documents and requested a copy of the criminal investigation order. (C-615).

1035. On 31 March 2009, the Financial Police ordered TNG to submit additional original company documents. (C-616).

1036. On 2 April 2009, the Expert Commission passed a Decision, which recommended the extension of Contract 302 for two years. (CPHB 1 ¶ 236; CPHB 2 ¶ 151; R-1 ¶ 31.70; R-163.2).

1037. On 6 April 2009, the Financial Police requested information on TNG's costs for oil and condensate in relation to the criminal case against KPM. (CPHB 2 ¶ 38; C-618).

1038. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which the Claimants allege that they requested on 9 March 2009, and which the Respondent states was requested on 24 March 2009. The Claimants allege that the MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension. (C-0 ¶ 58; C-1 ¶¶ 22, 178; R-1 ¶¶ 31.71 – 31.73; C-II ¶ 241; CPHB 2 ¶ 151; R-II ¶¶ 413, 419 – 424; 436; C-27; C-27.2, R-163.1; R-163.2, Ongarbaev ¶ 7.2; Ongarbaev Day 6 pp. 67 – 68; RPHB 1 ¶ 323 – 325). Respondent states that the Parties agree that



Respondent was under no obligation to extend prior to the 9 April 2009 letter, at least. (Compare RPHB 2 fn 526 with C-II ¶ 242; see also CPHB 1 ¶ 224 (Parties experts' debate on obligation to extend contract after 9 April)).

1039. On 20 April 2009, Major Rakhimov decided to detain KMG's general manager, Mr. Cornegruta, and opened criminal proceedings against him for the crime of illegal entrepreneurial activity under Article 190(2)(b) of the Criminal Code of Kazakhstan. At that time, Mr. Cornegruta was named as a potential defendant. (R-II ¶ 487; RPHB 2 ¶ 189; R-243, Rakhimov 2 ¶ 7.1 - 7.5). On 22 April 2009, the Financial Police ordered additional company documents from KPM. (CPHB 2 ¶ 38; C-617).

1040. On 25 April 2009, the Financial Police arrested Mr. Cornegruta. (C-I ¶ 44, partially quoted; R-I ¶ 27.2; C-117; Exhibit 1 and 3 to Rakhimov 2). Respondent admits that Mr. Cornegruta was denied bail, pursuant to Kazakh law. (R-I ¶ 27.45, R-35).

1041. On 26 April 2009, the Claimants filed complaints against the Financial Police, including its head investigator, Major Rakhimov. The same day, 900 employees of KMG, TNG, and CASCo that were on shift addressed and signed a letter to the Governor of the Mangystau Region expressing their concerns, particularly in relation to Mr. Cornegruta's welfare. (C-I ¶ 109; C-113; Condorachi ¶ 16, 19; Pisica ¶ 41; Romanosov ¶ 31; Stati ¶ 26).

1042. On 27 April 2009, Mr. Batalov was fired as Executive Secretary of the MEMR. (C-I ¶¶ 106, 332; Pisica ¶ 43).

1043. On 27 April 2009, a petition against Mr. Cornegruta's arrest was considered and rejected by the Court of Aktau. (RPHB 1 ¶ 244; Kravchenko ¶ 13.14; Exhibit 6 Kravchenko).

1044. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. The Claimants allege that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline and the companies' other property. (C-I ¶ 121; R-I ¶ 29.2; C-486; C-487; C-488; C-489; C-490; C-491; C-492; C-493; C-494; C-495; C-496; C-497; C-498; C-499; C-500; Condorachi ¶ 38). Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; CPHB 1 ¶ 140).

1045. The Claimants say that, on 30 April 2009 and on 4 May 2009, TNG submitted Addendum No. 9 of TNG's Tabyl Block Subsoil Use Contract to the MEMR for execution. TNG never received the MEMR's signature to the addendum extending TNG's exploration rights. (C-168).

1046. On 30 April 2009, the Deputy Minister of the MES wrote to the Claimants and asked them to withdraw his previous letters of 19 November 2008 (confirming that KPM's and TNG's pipelines were not main pipelines), as their issuance was beyond his competence. (R-189).



1047. On 1 May 2009, the decision to detain Mr. Cornegruta was confirmed on appeal. (R-II ¶ 487; RPHB 1 ¶ 244; Kravchenko 2 ¶ 13.15).

1048. On 4 May 2009, Major Rakhimov of the Financial Police ordered an unscheduled inspection to determine the amount of income KPM had obtained from operating a trunk pipeline without a license. (RPHB 2 ¶ 190; C-184).

1049. Pursuant to a search warrant dated 30 April 2009, on 6 and 7 May 2009, the Financial Police conducted an overnight search of KPM's and TNG's offices for the other General Managers of KPM, Messrs. Salgor and Spasov, and the General Manager of TNG, Mr. Cojin, as well as information on their whereabouts. The three in-country managers had by then been charged with the same offence as Mr. Cornegruta. The initial phase of the search started at 4:20 p.m. on 6 May 2009 and ended at 4:15 a.m. on 7 May 2009. The search was carried out in the presence of Deputy General for Economic and Financial Affairs of TNG, Mr. Stejar. The Respondent states that the Financial Police procured human resources and financial records from KPM and TNG and that it became clear during the course of the investigation that most senior managers had left Kazakhstan. The Parties dispute the level of inconvenience caused by the search. (R-I ¶ 27.47; R-II ¶ 301, 483, R-III ¶ 504 – 507, 511; RPHB 1 ¶ 170, 175 – 176, 233 – 238; C-114; Rakhimov 2 ¶¶ 4.09 – 4.20; Stejar ¶ 20; Pisica Day 2 p. 71; Rakhimov Day 5 pp. 1 - 6; Stejar Day 3 p. 35).

1050. On 7 May 2009, Anatolie Stati, allegedly on behalf of the Claimants, wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. Around this date, Mr. Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol. The Claimants also allege that this letter made clear that the Claimants intended to bring arbitration claims against Kazakhstan for the diminution in the value of their investments once the sale to Cliffson closed. Respondent admits that the letter was sent by Ascom and denies Claimants' allegations regarding notice. (R-II ¶ 226. The Respondent also notes that the Cliffson transaction, at earliest, could have started in February 2010. (C-43; Stati ¶ 28)

1051. On 13 May 2009, the Mangystau Regional Department of the MES withdrew its letters about whether the pipelines were trunk pipelines. (R-I ¶ 28.14; RPHB 2 ¶ 198; C-90; C-93).

1052. On 15 May 2009, the Financial Police notified KPM and TNG that they had seized the Claimants' equity interests in KPM and TNG two days before on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). In addition, the Financial Police requested additional documents from KPM. (C-668 and C-485). Respondent states that the Financial Police issued attachment orders. (R-I ¶ 29.2). Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009. If the allegation is that Claimants were prevented from transferring their interests during proceedings, then that would be appropriate under the circumstances. (R-I ¶ 26.26(c)).



1053. On 18 May 2009, the College of Experts of the Ministry of Justice calculated KPM's purported illegal profits from oil and gas transportation services at 5.9 million Tenge (approximately USD 48,300) for the period from 2002 through 2008. This calculation also showed "*illegal profits*" of approximately 1,935,547 Tenge (approximately USD 15,000) from March 2007 to May 2008. (C-I ¶ 92, C-184). The Respondent denies this and states that that expert considered that the value of income from illegally operating the trunk pipeline amounted to 65,479,414,197 Tenge for the period from April 2002 to 2008, and that its income during the relevant period in 2007 and 2008 was 21,673,919,031 Tenge. (R-I ¶ 27.59(c), (h); C-117, C-184). The Respondent states that this calculation was necessary to determine whether the crime of illegal entrepreneurship had been triggered. (R-II ¶ 484; C-184). The Respondent admits that the Court relied on this document when determining the amount of the fine to be imposed on KPM. In all other respects, the Claimants' assertions concerning this report are denied. (R-I ¶ 27.60).

1054. On 18 May 2009, Major Rakhimov issued an application to exclude Claimants' expert opinions about the classification of the pipelines. (R-II ¶¶ 632; RPHB 2 ¶ 206; Kravchenko 2 ¶¶ 11.13, 11.14, 11.22; Kravchenko 2 Exhibit 2). The expert reports included a report dated 5 January 2009 from the Kazakh Scientific, Research and Design Institute of Oil and Gas (a division of KMG) that found the pipelines owned by KPM and TNG "*do **not** belong to the category of **main** pipelines and are designated to ensure the process of hydrocarbons production.*" (C-I ¶ 98, emphasis maintained; C-99; C-100).The expert reports also included a report that the Scientific, Research, and Design Institute of Oil and Gas Industry of NIPI Neftegaz concluded on 9 January 2009 that the pipelines owned by KPM and TNG were correctly "*classified as in-field pipelines*." The Court later deemed the Claimants' expert opinions to be inadmissible on the grounds that these so-called expert opinions did not evidence KPM and TNG's requests for such opinions, making it impossible for the court to divine the scope of the request. There was no indication that the bodies were independent of the Claimants, and some of the experts whose reports were excluded had a role in the construction of the pipelines and in the legal amendments regarding their status. In any event, they were not qualified to issue such opinions and had not been appointed pursuant to Article 243 of the CPC. (RPHB 2 ¶ 203 – 207; Kravchenko 2 Exhibit 2).

1055. On 19 May 2009, the Financial Police requested the valuation of sequestered property from KPM. (C-500).

1056. On 15 June 2009, Kazakhstan indicted Mr. Cornegruta. (C-454).

1057. On 17 June 2009, the Financial Police issued a press release that announced that the investigative phase had concluded. The media reported on the ongoing criminal investigations and reported that KPM and TNG had obtained illegal profits of 147 billion Tenge and that the companies' assets had been sequestered. (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38; R-I ¶ 26.24; C-118).

1058. On 27 June 2009, the Regional Prosecutor's Office corresponded with Ascom and Terra Raf noting the international search underway for Mr. Cojin. (C-183).



1059. On 2 July 2009, the MEMR failed to execute the extension of the exploration period of Contract 302. (C-27; R-163.1);

1060. Mr. Cornegruta's trial was held between 30 July and 14 September 2009. (C-704; R-315.1 (in Russian); R-315.2 (in Russian); R-316; R-317; R-318; R-319).

1061. On 18 September 2009, Aktau City Court found Mr. Cornegruta guilty of "*illegal entrepreneurial activity in an especially large amount*" for operating a main pipeline without a license and ordered recovery of USD 145 million from KPM. (C-117) Respondent admits that KPM was not a party to the criminal proceeding against Mr. Cornegruta and explains that the Court was asked to rule on whether Mr. Cornegruta, on behalf of KPM, was guilty of the crime. Respondent denies that KPM was not represented in either the hearing or the appeal. (R-I ¶ 27.60; R-II ¶¶ 615, 645; RPHB 2 ¶¶ 246 – 261; C-117).

1062. On 21 September 2009, President Nazarbayev's Head of Administration issued an order regarding "*free of charge transfer of [Claimants'] assets*." (RPHB 1 ¶¶ 401; C-294; Mynbaev Day 3 pp. 159 – 167).

1063. On 30 September 2009, the Financial Police ordered a new audit of KPM regarding alleged failure to pay export taxes. (Condorachi WS ¶ 34).

1064. On 22 October 2009, the Financial Police questioned Mr. Condorachi regarding KPM's alleged obligation to pay export taxes. (C-0 ¶ 75; C-I ¶ 168; CPHB 2 ¶¶ 38, 128; Condorachi WS ¶ 35).

1065. On 3 November 2009, the Financial Police interviewed Mr. Cornegruta in jail regarding KPM's alleged obligation to pay export taxes. (Condorachi WS ¶ 36).

1066. On 12 November 2009, the Appeal Court upheld the criminal judgment of Aktau City Court finding Mr. Cornegruta guilty of illegal entrepreneurial activity in an especially large amount and ordering recovery of USD 145 million from KPM. (C-565).

1067. On 19 November 2009, President Nazarbayev issued an instruction to the Prime Minister, Minister Mynbayev, and Timur Kulibayev to look into and resolve the issue with respect to KPM and TNG. (R-II ¶ 332; C-23).

1068. On 29 December 2009, a Writ of Enforcement was issued against KPM for USD 145 million. (C-119).

1069. On 29 December 2009, the Tax Committee concluded an audit of transfer pricing and claimed that KPM and TNG owed approximately 700 million Tenge (US $5 million) in unpaid transfer prices and penalties. (R-I ¶ 30.63; C-137 and C-138).

1070. KPM and TNG commenced legal action challenging the transfer pricing claim (R-II ¶ 649). This was still pending as of the State's 21-22 July 2010 take-over. (CPHB 2 ¶ 128).



1071. On 10 January 2010, Kazakhstan froze the bank accounts of KPM to satisfy the USD 145 million judgment against it. (C-I ¶ 125; CPHB 1 ¶ 212; CPHB 2 ¶ 38; R-I ¶ 29.7; C-119; C-121).

1072. From 25 January to 6 February 2010, MEMR carried out unscheduled inspections of KPM and TNG regarding historical compliance with Subsoil Use Contracts and Kazakh law. (C-0 ¶ 55; C-II ¶ 290; CPHB 2 ¶¶ 38, 61; C-171, C-385, C-386, and C-599). Respondent states that the purpose was to ensure compliance with contractual obligations and legislation, not to assess legality from 1997 to present. (R-I ¶ 31.96; C-171; C-174). While Respondent states that the purpose was to ensure compliance with contractual obligations and legislation and not to assess legality from 1997 to present, this stands in contradiction to C-174, which Respondent has also cited.

1073. From January to June 2010, Kazakh enforcement officers took repeated measures to recover funds from KPM to satisfy the court's criminal judgment. (C-79; C-122; C-123; C-124; C-125; C-199; C-201; C-298; C-501; C-502; C-503; C-504; C-505; C-506; C-507).

1074. On 26 January 2010, the Ministry of Finance began bankruptcy proceedings against KPM. (CPHB 2 ¶¶ 38, 128; C-157).

1075. On 17 February 2010, the President of Kazakh social fund "*Blagovest*" wrote to Minister Mynbaev to make a suggestion to "*resolve the question of nationalization of the assets posed in 2008*". (CPHB 2 ¶ 38; RPHB 1 ¶ 404 (saying 7 February); C-23).

1076. On 24 February 2010, the Customs Committee informed both KPM and TNG that they were liable for unpaid export taxes. (C-44; C-479). One month later, on 31 March 2010, the Customs Committee retracted this claim and conceded that the Subsoil Use Contracts exempted KPM and TNG from export taxes. (C-I ¶ 170; CPHB 2 ¶¶ 38, 128; R-I ¶ 30.56; C-130).

1077. By mid-March 2010, Kazakhstan's court administrators had seized nearly every asset of KPM, including key oil production equipment, and had prevented KPM from importing equipment and exporting oil. Nevertheless, the Claimants continued to pay the salaries of KPM's workers through TNG's accounts. While Respondent disputes that salaries were paid, Respondent, despite having access to information that would suggest otherwise, has not provided any. (CPHB 2 ¶ 194; RPHB 2 ¶ 349).

1078. On 30 April 2010, MOG informed KPM and TNG that a sale to Cliffson was not possible because the companies' shares were sequestered / arrested. (C-528; C-529). It would only be approved if KPM and TNG satisfied the requirements to release the attachment of their shares. (R-II ¶ 818).

1079. From 25 to 29 June 2010, on the order of the Prime Minister and with the involvement of the Financial Police, the GPO ordered unscheduled inspections of KPM and TNG from no fewer than seven different Kazakh agencies. (CPHB 2 ¶ 38; C-174; C-175; C-177; C-178; C-180; C-181; C-182; C-185; C-315; C-647; C-648; C-649; C-650; C-651; C-687; C-688; C-689; C-711).



1080. On 9 July 2010, while inspections were underway, TNG was notified that the Prime Minister had planned to visit the field facilities and the LPG Plant. TNG was instructed to make preparations for his 20 – 21/23 July visit. (C-186; C-299).

1081. On 14 July 2010, the MOG sent notices to KPM and TNG that the companies were in violation of Subsoil Use Contracts 210 and 305. (R-I ¶ 31.19; C-II ¶ 346, CPHB 1 ¶ 296, CPHB 2 ¶¶ 74, 178; RPHB 1 ¶ 360; RPHB 2 ¶ 354). The notices from the MOG were dated 14 July 2010, but were not received by KPM and TNG until 16 July 2010. (R-I ¶ 31.54). The notices set out (1) the contract to which the notice related, (2) the contractual breaches by KPM and TNG, (3) a deadline within which to respond, and (4) the consequences for failing to respond to the notice. (R-I ¶ 31.107). The notices gave KPM and TNG until 19 July 2010 to "submit explanations on reasons of non-execution of contract terms and all necessary documents, ascertaining removal of the above-mentioned violations, as well as to inform [the MOG] on measures taken in order to avoid violation of contract terms." Respondent reports that the violations in the notices included "admissions" by KPM and TNG that they had operated trunk oil and gas pipelines without a license and 13 additional alleged violations for which Claimants state that the State had provided no prior notice to KPM or TNG. (R-I ¶¶ 31.103 et seq.). Claimants report that the notices listed 16 alleged violations. The notice further provided that "[i]n case of failure to comply with the request set forth in this Notice within the established time limit, the Competent Body is entitled to terminate the Contract[s]." (C-0 ¶ 88; C-I ¶¶ 20, 206 – 208, 332). Respondent states that the violations contained in the notice of 14 July 2010 were detected by the competent authority as a result of permanent monitoring of the compliance by the subsurface users of their contractual obligations. (R-I ¶ 31.42). The audits proved that production activities at KPM and TNG had virtually stopped; there was little chance of employee salaries being paid. (R-II ¶ 692). The Parties state that, by this time, the majority of TNG and KPM senior and middle management had left Kazakhstan. (R-II ¶ 698; C-I ¶ 218).

1082. On 19 July 2010, Claimants submitted written answers and explanations concerning each violation alleged in the 14 July 2010 notice. (C-0 ¶ 89, CPHB 2 ¶ 178; RPHB 1 ¶ 361, RPHB 2 ¶ 354). Claimants had, previously, on 22 January and on 28 June 2010, provided evidence of their compliance with the work program requirements. (C-I ¶ 209). In July 2010, they provided all that they had. KPM explained that it failed to pay costs costs amounting to US 114,809, because KPM this figure was a direct result of the Financial Police seizing KPM's assets in May 2009 and the judicial executor seizing bank accounts in January 2010. These seizures were a result of the state-initiated criminal investigation, which in and of themselves constituted a force majeure under the contract. KPM explained that it was unable to pay the USD 10,000 owed to the liquidation fund and various taxes because of the financial constraints caused by the criminal investigations. KPM also stressed that its pipeline was never a trunk or main pipeline. KPM responded to the allegation regarding its obligation to purchase goods, works, and services, by simply referring the Ministry to its previously submitted "*notes and objections*" explaining how this issue too, like all of the other claims, was groundless. TNG replied similarly, and submitted documentation showing that none of the Ministry's claims were proper. With respect to Contract 302, TNG documented its work and training programs, the purchase of goods, works, and services, and demonstrated that the re-classified pipeline was not trunk. (C-I ¶¶ 211 – 216). Respondent states



that Claimants' responses were inadequate and failed to address the violations. (R-154). For example, in response to the notice of KPM's and TNG's failure to instruct and train a Kazakh specialist, KPM and TNG referred to funding allocated for the training of all employees. In response to the notice of KPM's failure to pay costs according to the Additional Agreement of 13 June 2008, KPM simply denied liability based on "force majeure." KPM and TNG also argued force majeure to excuse their failure to contribute to the liquidation funds, as required by Contracts 305 and 210, and KPM used that argument to excuse its non-payment of taxes. Both tried to re-open the discussion on whether the pipelines were trunk. Importantly, Claimants refused to "*remove the violations of their obligations THI*" (R-I ¶ 31.121; RPHB 2 ¶ 354). R-I ¶ 31.122; R-154).

1083. Respondent, in any event, disputes that these responses were received on time and argues that they were received by the MOG after 21 July 2010. (R-I ¶ 31.54; RPHB 1 ¶ 362).

1084. Between 21 and 22 July 2010, the Prime Minister and the Minister of Oil and Gas publicly declared the takeover and abrogation of the Claimants' Subsoil Use Contracts, seized the assets of KPM and TNG, and caused them, in due course, to be transferred to KMG, which later appointed its subsidiary KazMunaiTeniz as "trust manager" for the companies. (R-I ¶¶ 31.129, 31.150 et seq.; R-II ¶ 701; C-3, C-4, C-5, C-189, C-190; C-194; C-195; R-152; R-153, R-200; R-257).

1085. Having considered all of the Parties submissions, even where not expressly stated herein, the Tribunal draws the following conclusions:

1086. The Tribunal considers that it need not find that there was a "playbook", as alleged by Claimants and as recorded above in this Award, to find that the conduct presented in the above timeline constitutes a violation of the FET. Indeed, for the Tribunal, the evaluation of the objective timetable is sufficient. While Respondent's explanations and justifications regarding some specific actions it has taken affecting Claimants' investments may perhaps at least be arguable, even if not convincing to the Tribunal, (1) the picture of them seen cumulatively in context to each other and (2) the difference of treatment of Claimants' investments before and after the Order of the President of the Republic on 14/16 October 2008, permit only the conclusion that Respondent's conduct after the President's Order was a string of measures of coordinated harassment by various institutions of Respondent and has to be considered as a breach of the obligation to treat investors fairly and equitably, as required by Art. 10(1) ECT.

1087. The Parties are in agreement, and the Tribunal agrees as well, that prior to November 2008, Respondent's authorities regularly inspected KPM's and TNG's pipelines. The Parties are in agreement, and the Tribunal agrees as well, that there was no change in the pipeline from the date that Kazakh authorities approved the design and construction of the pipelines until the 18 November 2008 inspection where the Financial Police – who Respondent agrees are not the competent authority to classify a pipeline – declared that the pipelines at issue were a "*trunk*" rather than field pipelines. (R-II ¶ 451). The Tribunal, however, is not persuaded by Respondent's argument that the Financial Police, in pursuit of their lawful obligations, simply made this discovery during an inspection – a discovery that was not made during any of the prior routine inspections that were made by agencies



who were competent to classify pipelines. Rather, it is far more likely that this alleged "*discovery*", as well as the events leading to it and those stemming from it, constitute violations of the FET and, in particular Claimants' legitimate expectations toward proper and fair governmental conduct.

1088. The Tribunal need not opine on whether the pipeline was a field or trunk pipeline in order to find that the procedure surrounding the discovery was in violation of the FET standard. The Parties have presented that Claimants operated a pipeline system that was approved by Kazakh authorities. During routine inspections from 2002 – until November 2008, there was no indication that anyone believed that the pipelines were trunk pipelines and Respondent has provided no indication that the proper authorities were in any way prevented from having made the same discovery sooner. Instead, the evidence demonstrates that, it was not until immediately prior to the "*discovery*", namely on 12 November 2008, that the Financial Police began to seek information on whether KPM and TNG held licenses to operate trunk pipelines. On Friday, 14 November 2008, the Financial Police received confirmation that neither company held such licenses. Immediately thereafter, on the following Monday, 17 November 2008, the Financial Police "*discovered*" that KPM and TNG operated a trunk pipeline and ordered the Tax Committee to calculate profit earned from operating that pipeline.

1089. Following the "discovery", Claimants received confirmation from numerous Kazakh authorities that the pipeline at issue was a field, rather than a trunk pipeline. Often, however, the Financial Police compelled these authorities, in particular the MES and the MEMR, to withdraw their statements. The evidence also indicates that even the Judicial Executor admitted that the segment at issue was a mere "*field*" – and not "*trunk*" pipeline.

1090. Accordingly, the Tribunal is persuaded by Claimants' argument which demonstrates that this was not a mere "*discovery*" but that, rather, this was a re-classification. As indicated, there were no changes to the pipelines prior to their change in designation. The segments of Claimants' pipes that are at issue extend from the principal joint where the KPM wellhead pipes converge to KPM's processing facility, and from the processing facility to TNG's storage tanks, where services are also provided to KPM. For the TNG gathering system, the segment extends from the principal joint where the TNG wellhead pipes converge to TNG's processing facility; from the processing facility directly to the CAC Pipeline for gas; and from the processing facility to TNG's storage tanks for condensate. Claimants state that identical gathering systems are owned and operated by other oil and gas companies in the immediate vicinity – and indeed throughout Kazakhstan – none of which are classified as trunk pipelines requiring licensure. (C-0 ¶¶ 39 – 40, partially quoted). The Tribunal is persuaded that the at-issue pipelines, likewise, were not trunk pipelines requiring licensure but were rather arbitrarily re-classified by Respondent. That the City Court of Aktau found that the pipes were trunk does not bind this Tribunal.

1091. The re-classification, viewed in light of President Nazarbayev's 23 November 2009 confidential instruction that was attached to the 7 February 2010 Blagovest letter (C-23), appears to have been an important step for the State to have obtained the assets of KPM and TNG, without sacrificing their working ability.



1092. While the Parties dispute many aspects of the June – July 2010 inspections, the Tribunal is satisfied that these sudden inspections, which involved no fewer than seven Kazakh agencies, unduly harassed Claimants. It appears from the evidence presented that these numerous agencies, each reacting to the same orders of the Prime Minister, the GPO, and the Financial Police, conducted inspections which, in some aspects, may have been duplicative of one another. In particular, the Tribunal notes that multiple agencies were tasked with reviewing KPM's and TNG's compliance with their Subsoil Use Contracts. These sudden inspections forced KPM and TNG to spend their time and resources addressing the inspections, rather than operating normally. Importantly, throughout this barrage of inspections, no remedies were available to Claimants. Despite filing complaints with relevant authorities, no help was forthcoming. Respondent's conduct and treatment of Claimants, therefore, violated the FET standard.

1093. The Tribunal is, finally, not convinced that Claimants violated Kazakh law. Even without determining whether the pipeline was trunk, the evidence indicates that the charge of "*illegal entrepreneurial activity in an especially large amount*" under Art. 190(2)(b) of the Kazakh Criminal Code did not comply with Kazakh law. Instead, the threshold calculation for "*illegal profits*" was only met by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. Kazakhstan assessed "*illegal profits*" from operating the trunk pipeline – and this fine amounted to more than 65 billion Tenge for KPM and more than 82 billion Tenge for TNG – reflecting all of the revenue that both companies had generated for oil, gas, and condensate production from 2002 – 2008. These calculations were unfair, did not consider expenses or costs, and did not correspond to the transportation fees that would have applied if the pipeline segment was truly a trunk pipeline. Importantly, the fine was contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The Tribunal is persuaded by Claimants' argument that the proper calculation could have yielded USD 12,000 – 13,000 in illegal profits – an amount below the USD 17,000 threshold for the crime.

1094. Respondent disputes whether Kemikal's actions are attributable to the state and argue that, per the PwC Due Diligence Report, Kemikal stopped making payments due to "*liquidity and insolvency*" issues. (R-II ¶¶ 757 – 758; RPHB 2 ¶¶ 21 – 23, 61, 124). Claimants argue that the evident relationships between President Nazarbayev and his son-in-law are reason enough to believe that the Kazakh State were the cause of the various difficulties they encountered in endeavouring to secure their gas sales and export rights commencing in the fall of 2008 and continuing into 2009. They point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement. They also point to their difficulties with Kemikal, and its failure, at the critical time in the fall of 2008, to continue supplying bank guarantees to secure payment of its accounts. The Tribunal finds that it is more probable than not that there was State influence at play with respect to the failure by KazAzot to sign the Tri-Partite Agreement. Similarly, the Tribunal finds that the relationship between Kemikal and Timur Kulibayev is established on the basis of Professor Olcott's evidence that Kemikal was managed by Samruk-Kazyna, which is the Kazakh state welfare fund and is 100% owned and controlled by Kazakhstan. Mr. Kulibayev was, as the Claimants



have submitted, close to Samruk-Kazyna, having served at one time as deputy manager of its holding company shortly after its launch in 2006 until 2007, later returning in 2008 as deputy CEO when Samruk's responsibilities increased. Considering these facts in the context of the familial ties between President Nazarbayev and Mr. Kulibayev, the Tribunal concludes that it is more probable than not that Kemikal's failure to provide the requisite bank guarantees to TNG in late 2008 was caused by Kazakhstan. While this evaluation of the evidence regarding non-implementation of the Agreement is by no means the sole reason for the Tribunal's conclusion, it does contribute to and confirm that it was part of and due to the Respondent's conduct found to be in breach of the ECT.

1095. Taking into account the above considerations, the Tribunal concludes that Respondent's measures, seen cumulatively in context to each other and compared with the treatment of Claimants' investments before the Order of the President of the Republic on 14/16 October 2008, constituted a string of measures of coordinated harassment by various institutions of Respondent. These measures must be considered as a breach of the obligation to treat investors fairly and equitably, as required by Art. 10(1) ECT.

## J.II.      Whether Claimants' Interests were Expropriated (Art 13 ECT)

### 1.      Arguments by Claimants

#### a.      Law on Expropriation

1096. Article 13 ECT prohibits direct and indirect expropriation, to the extent that expropriatory measures are not carried out in accordance with the requirements of Art. 13 ECT. (C-I ¶¶ 243 – 244). Under international law, as described in *Compañía del Desarrollo de Santa Elena, S.A. v. Costa Rica*, "*an expropriation occurs where the state takes measures which deprive the owner of title, possession or access to the benefit and economic use of his property. 'A deprivation or taking of property may occur under international law through interference by a state in the use of that property or with the enjoyment of its benefits, even where legal title to the property is not affected.*'" (C-I ¶ 246). Under Art. 13(3) ECT, expropriation may be of assets of a company that an investor owns, even as a shareholder. (C-I ¶¶ 246 – 247). Article 13 ECT expressly prohibits any measure of expropriation (direct or indirect) by Kazakhstan that does not cumulatively satisfy four distinct requirements: the expropriation must be "*(a) for a purpose which is in the public interest; (b) not discriminatory; (c) carried out under due process of law; and (d) accompanied by the payment of prompt, adequate and effective compensation.*" Respondent's actions have met none of these requirements. (C-I ¶¶ 286 – 288, partially quoted).

1097. The minimum requirement for an expropriation to be lawful under Art. 13 ECT is that it be carried out in the public interest / for a bona fide public purpose. As the Tribunal in *ADC v. Hungary* found, a mere reference to "*public interest*" will not satisfy this requirement. Nevertheless, Respondent has never alleged that the taking was for the public interest, not that it in any event could satisfy that requirement. Instead, Respondent's many actions served an entirely different purpose, namely



the diminution of value in Claimants' investments, until the state seized them outright. Accordingly, since none of the actions of either indirect or direct expropriation were for a purpose that was in the public interest, the Tribunal should conclude that Kazakhstan's expropriation of Claimants' investments was unlawful under Art. 13 ECT and international law. (C-I ¶ 289 – 296).

1098. "*Due process*" encompasses procedural and substantive fairness, and this has been recognized by international tribunals. Claimants explain:

> 300. *The failures of due process at issue in this case are markedly more numerous and severe than those at issue in ADC and Kardassopoulos. The Tribunal in both of those cases found that the host States had not given the investors a reasonable opportunity to be heard following an expropriation. In the present case, Claimants were given no chance at all to be heard or to object to the direct expropriation that occurred in July 2010. Furthermore, despite their many efforts to contest Kazakhstan's various measures of indirect expropriation during the October 2008 – July 2010 period, all of Claimants' objections, explanations, and appeals for assistance fell on deaf ears. Claimants vigorously contested the various audits, inspections, findings, criminal charges, fines, and seizures levied during that period, but all of their complaints fell upon deaf ears. (C-I ¶ 300).*

1099. Respondent's actions of indirect and direct expropriation were not carried out under due process of law, as required by Art. 13 ECT. The most blatant due process violations occurred in relation to the prosecution, trial, and conviction of Mr. Cornegruta and the conviction of non-party KPM. Claimants allege that the criminal charges and the substantive evidence were entirely fabricated and the court was obviously partial. Not only that, but KPM – a non-party to the criminal proceedings, an entity that could not even be prosecuted under Kazakh law – was convicted and ordered to pay a fine of more than USD 145 million. Among other things, this sum bore no relation to the charges and constituted all of KPM's oil and gas revenues for March 2007 – May 2008. The court made no effort to deliver the verdict to KPM or to provide KPM notice of its content. It was only after enforcement that KPM finally received a copy. Appeals were unsuccessful – KPM's appeal, filed after it finally received a copy of the verdict on 25 January 2010 – nine days after receiving a copy, was refused as untimely. (C-I ¶¶ 297, 301 – 306; CPHB 1 ¶¶ 188 – 213; CPHB 2 ¶¶ 97 – 114).

1100. The incessant criminal investigations against KPM and TNG starting in 2008 were baseless, unfair, politically motivated, and pursued without regard to due process. KPM and TNG's complaints to the relevant authorities regarding these were either ignored or served only to prompt more investigations. (C-I ¶¶ 307 – 309).

1101. Respondent also committed due process violations with regard to Claimants' rights to extend the exploration period for the Contract 302 properties and to confirm ownership of TNG to Terra Raf. Requests for action and assistance were ignored. Finally, Claimants were promised an extension, and then the Republic failed to issue it. (C-I ¶¶ 310 – 311) At the hearing, Respondent's witness Mr. Ongarbaev, formerly of MEMR, confirmed that the MEMR had decided to allow the extension. Documents that Claimants withheld, including the PwC Due Diligence Report, also confirmed the extension. (CPHB 1 ¶¶ 221 – 230, 237).



1102. The total take over to KPM and TNG in July 2010 was accomplished without reference to due process. KPM and TNG were given only 3 days to respond to and explain the multiple allegations of violation of the Subsoil Use Contracts before the contracts were repudiated. This lack of reasonable time alone is sufficient for a finding of violation of due process. In any event, the responses were wholly ignored and Kazakhstan unilaterally repudiated the contracts and physically took over KPM and TNG. (C-I ¶¶ 311 – 313).

1103. Claimants also allege that Respondent's expropriatory measures were discriminatory, and incorporate by reference its arguments regarding the ECT's FET standard and the ECT's impairment clause. (C-I ¶ 317, C-I ¶¶ 337 *et seq.*, ¶¶ 352 *et seq.*).

1104. Respondent has also failed in its obligation to pay prompt, adequate, and effective compensation, as required by Art. 13 ECT and as firmly grounded in international law. To date, no compensation has been paid. (C-I ¶¶ 314 – 316).

## b.    **Exhaustion of Remedies**

1105. Respondent's arguments that Claimants are precluded from bringing a claim of illegal expropriation under the ECT because they have failed to exhaust dispute resolution mechanisms or to exhaust domestic remedies available to them is simply wrong. Claimants' first argument in this respect is taken from their own words:

452.   *There is a fundamental distinction between Kazakhstan's obligations to Claimants as qualified "Investors" under the Treaty, including the duty not to expropriate Claimants' investments unlawfully, and Kazakhstan's obligations to KPM and TNG under the contracts, including the duty not to terminate those contracts in violation of the contracts' termination provisions or applicable law. The respective parties and causes of action are different in the two situations. In short, "[a] treaty cause of action is not the same as a contractual cause of action." There would have been nothing preventing KPM and TNG, at least in a theoretical sense, from raising breach-of-contract claims against Kazakhstan while the Claimants commenced separate Treaty claims against Kazakhstan. In fact, KPM and TNG have not lost the right to pursue their contract claims against Kazakhstan, and whether they did so at the time or do so in the future has no bearing on either Claimants' right to bring an expropriation claim under the Treaty or whether Kazakhstan's unlawful termination of the Subsoil Use Contracts and takeover of KPM and TNG amounted to a direct expropriation of Claimants' investments. Kazakhstan is mistakenly conflating two different types of legal claims, only one of which (Claimants' claims for Kazakhstan's breaches of the ECT) is before this Tribunal. (C-II ¶ 452).*

1106. The ECT does not contain a requirement for exhaustion remedies, and investment case law affirms that no such requirement exists. The tribunal in *Helnan v. Egypt* (which Respondent cites elsewhere) rejected any requirement to pursue available remedies as an element of showing a treaty breach, since doing so "*would empty the development of investment arbitration of much of its force and effect, if, despite a clear intention of States parties not to require the pursuit of local remedies as a*



*pre-condition to arbitration, such a requirement were to be read back in as part of the substantive cause of action.*" (C-II ¶ 453, partially quoted).

1107. The ECT contains a "*fork-in-the-road*" clause, under which Kazakhstan only consents to submit disputes under the ECT to international arbitration where an investor has not already submitted the dispute for resolution before local courts or tribunals or in accordance with other previously agreed upon dispute resolution procedures. Thus, if Claimants (as opposed to KPM or TNG) had chosen to challenge the expropriation before Kazakhstan's courts, they might have been precluded from bringing the present action. This makes it clear that no requirement of exhausting domestic remedies can exist in this case. (C-II ¶¶ 454 – 455).

1108. Moreover, the Subsoil Use Contracts precluded recourse to local courts and instead obliged parties to arbitrate disputes before the SCC. The logical extension of Respondent's argument would lead to the absurd result of requiring KPM and TNG to file one SCC claim before a new tribunal and then for Claimants to file a separate action before the SCC. (C-II ¶ 456).

1109. In any event, resort to local remedies would have been futile. This is not a matter concerning a single act of low level maladministration, but rather these cases stem from treaty violations perpetrated at the highest level of the Kazakh government. No Kazakh court would overturn an expropriation ordered at the highest levels of Kazakhstan's government. (C-II ¶¶ 457 – 458).

1110. In its Post-Hearing submission, Claimants argued that there is direct evidence that the executive mandated the takings at issue. This is true despite Minister Mynbayev's testimony that the MEMR was actually attempting to protect KPM and TNG against the Kazakh authorities. In his position having direct authority over KPM's and TNG's operations, he had in depth knowledge that the companies would need protection from higher authorities. The evidence and testimony before the Tribunal strongly suggests the direct involvement of Kazakhstan's political elite. (CPHB 1 ¶¶ 309 – 339).

### c.   **Indirect Expropriation**

#### i.   **General   Principles   and Jurisprudence   Regarding   Indirect Expropriation**

1111. "*Indirect expropriation*" is widely understood as interference with an investment that "*leaves the investor's title untouched but deprives him of the possibility to utilize the investment in a meaningful way*", i.e. depriving the investor of its rights or attributes of ownership, without physically seizing the property. (C-I ¶¶ 259 – 269; C-II ¶ 469). The present case does not concern a "*creeping*" expropriation where numerous small events cumulatively amounted to an indirect expropriation. Rather, the measures were extreme and any number of them individually constitutes an act of indirect expropriation under international law. Cumulatively, the conclusion that Kazakhstan indirectly expropriated Claimants' investments is inescapable. (C-I ¶ 285; CPHB 2 ¶ 36).



1112. Respondent substantially deprived Claimants of the rights of ownership of their investments. There is a generous amount of jurisprudence describing the kinds of acts that can amount to indirect expropriation, which is often defined as a substantial deprivation of the rights or attributes of ownership of an investment. The deprivations and impacts that resulted from Kazakhstan's mistreatment of KPM and TNG over from October 2008 – July 2010 resemble those summarized by the tribunal in *PSEG v. Turkey*, when it summarized these constitutive aspects of an indirect expropriation:

> *[T]here must be some form of deprivation of the investor in the control of the investment, the management of day-to-day operations of the company, interfering in the administration, impeding the distribution of dividends, interfering in the appointment of officials and managers, or depriving the company of its property or control in total or in part. (C-II ¶¶ 474 – 476, partially quoted).*

1113. Investment tribunals have routinely found that substantial interference with an investor's ability to manage its investment entails indirect expropriation. Contrary to Respondent's argument, Claimants were not at fault for the start of these investigations. Respondent never alleged that KPM or TNG had violated the law before that date. Rather, the investigations were a pretext for Kazakhstan to prosecute Claimants' companies and ultimately gain control over them. Kazakhstan invented those grounds as early as November 2008, when the Financial Police reclassified the pipelines and ordered calculation of KPM's "*illegal*" profits (i.e., all of its revenues over the previous several years). The Court ignored and declared inadmissible evidence in Mr. Cornegruta's favor, and ignored the obvious fact that the "*illegal profits*" calculated as the penalty were actually not profits at all but were revenues, and were not even earned by Mr. Cornegruta. There should be no question that Kazakhstan's actions, which were carried out in bad faith, amount to indirect expropriation under the ECT and international law (C-II ¶¶ 479 – 480, partially quoted; CPHB 2 ¶¶ 97 – 100).

## ii.    Right to Regulate

1114. Respondent's arguments that its actions from October 2008 – July 2010 were a proper exercise of its regulatory powers fail for the simple reason that its actions were not regulatory in nature. In this regard, Claimants state as follows:

> *470.    [...] Kazakhstan's actions amounting to an indirect expropriation [...] did not stem from enactment of new laws or regulations or the legitimate enforcement of existing regulations, and they were not designed to maintain "public order, health, or morality." Instead, they consisted of an egregious campaign of harassment and coercion designed to undermine and interfere with Claimants' management and control of KPM and TNG. The campaign involved a multitude of ministries led by the Financial Police, and it culminated in extraordinary denials of justice suffered by Mr. Cornegruta and KPM in the Kazakh courts. The campaign was carried out under an order from President Nazarbayev to investigate Mr. Stati. Far from being necessary to protect or promote a legitimate State interest, the Government's campaign intentionally interfered with Claimants' ability to manage, control, and dispose of their investments and*



*was designed to force Claimants to sell KPM and TNG (or parts of the companies) to the State at bargain-basement prices. [...]*

472. *Moreover, even if Kazakhstan could show a legitimate purpose for its so-called "regulatory" conduct, and that its conduct was necessary and proportional to achieving that purpose, Kazakhstan would still be required to pay compensation to Claimants for its expropriatory measures. [...]*

473. *Thus, even if Kazakhstan's measures could be said to fall within the scope of normal, regulatory actions — which is vehemently denied — their devastating impact on Claimants' investments was to such a degree as to require compensation from Kazakhstan. Kazakhstan's failure to compensate Claimants alone establishes the unlawful nature of its indirect expropriation. (C-II ¶¶ 471 – 473, partially quoted).*

1115. The case law cited by Respondent is inapplicable here, as those cases concern states that actually took regulatory measures that tribunals found to be tied to a legitimate state interest.

471. *[...] In Tecmed, Mexico refused to renew the claimants' landfill permit on environmental protection grounds, which the tribunal found to fall within the state's regulatory powers (but which the Tribunal nevertheless found to amount to expropriation). Further, the Glamis Gold case involved application of the U.S.'s environmental protection laws, which were designed to promote public health and safety and therefore were proper regulatory measures; the Methanex case dealt with a ban on the MTBE additive in gasoline, which was a necessary regulatory measure to maintain public health and safety; and the LG&E tribunal found that a measure that has a social or general welfare purpose may be accepted when it proportionally addresses an established need. Kazakhstan has not even articulated what public purpose was served by its complete devastation of Claimants' investments through its harassment campaign and denials of justice, much less demonstrated that its measures were necessary and proportional to achieve such a purpose. (C-II ¶ 471).*

1116. The Tribunal does not need to abandon common sense. All of the legal and regulatory problems faced by KPM and TNG arise in the context of President Nazarbayev's October 2008 order and had never been experienced previously. (CPHB 2 ¶ 40). The events following President Nazarbayev's 14 October 2008 Order were not a coincidence. To argue so is to state that none of Kazakhstan's regulatory bodies had successfully carried out their functions for nearly a decade, by missing all of these serious infractions. The Tribunal should recognize that the acts described below were designed to (and successfully did) discourage third party buyers from paying FMV for Claimants' assets and required an inordinate amount of time and expense to (unsuccessfully) challenge before Kazakhstan's various administrative and judicial bodies. (C-I ¶ 278; CPHB 2 ¶¶ 41 – 43, 52 – 57).

### iii. Acts Allegedly Amounting to An Indirect Expropriation

1117. Kazakhstan's measures from October 2008 to July 2010 interfered with Claimants' use and control of their investments and caused significant damage to the



alienability and economic potential of those investments. (C-I ¶ 270; CPHB 2 ¶ 38, 40).

> 271. *Kazakhstan's campaign of indirect expropriation commenced on October 14, 2008, when President Nazarbayev personally ordered the Kazakh Financial Police and a variety of other Governmental agencies to "fully investigate" Claimants' business activities in Kazakhstan. The Financial Police and seven other ministries and agencies started their harassment campaign in earnest on the heels of President Nazarbayev's directive. Kazakhstan's harassment campaign – which included a groundless criminal prosecution and conviction of KPM's in-country manager (and a similarly groundless criminal verdict against KPM), freezing KPM's assets, multiple assessments of improper taxes, reversal of prior State approvals and waiver of the State's pre-emptive rights, and refusal to execute the agreed exploration period extension – entail "indirect" expropriation under Article 13 of the ECT and international law.* (C-I ¶ 271; CPHB 1 ¶ 112, stating that the difference between "*thoroughly check*", as Respondent translates, and "*thoroughly investigate*" is a difference without distinction. Claimants later use "*thoroughly check*" in their memorial at CPHB 2 ¶ 115).

1118. The events following President Nazarbayev's 14 October 2008 Order were not a coincidence. The measures described below discouraged third party buyers from paying FMV for Claimants' assets and required an inordinate amount of time and expense to (unsuccessfully) challenge before Kazakhstan's various administrative and judicial bodies (C-I ¶ 278; CPHB 2 ¶¶ 41 – 43, 52 – 57):

> 273. *[The first measure taken against Claimants was Kazakhstan's refusal to extend the exploration for the Contract 302 properties. This wrongful refusal to execute prevented Claimants from proving the Contract 302 Properties' reserves and thereby affected the market value of that asset. This occurred after Claimants had begun to accept bids for the sale of KPM and TNG. To the extent that Kazakhstan argues that Contract 302 terminated on its own accord, Claimants state that it only terminated because of the State's refusal to extend, which was not in accordance with the contractual termination provisions. (see also CPHB 2 ¶¶ 149 – 176)]*
>
> *[[T]he Financial Police effectively commandeered KPM's and TNG's offices for months, from late October 2008 until March 2009, while they oversaw numerous inspections, intimidated employees, seized company documents, and prevented KPM's and TNG's personnel from carrying out their normal daily activities. Those inspections substantially interfered with the day-to-day management and operations of the companies. (C-II ¶ 476)]*
>
> 274. *[In] November 2008, [...] the Tax Committee initiated an audit of KPM and TNG and assessed approximately USD 6 million in back "transfer" price taxes and penalties. KPM and TNG spent the following months contesting this assessment in Kazakhstan's courts, legal actions that remained pending at the time Kazakhstan abrogated KPM's and TNG's Subsoil Use Contracts and directly expropriated Claimants' investments in July 2010.*



275. *[...] The February 10, 2009, refusal by Kazakhstan to apply amortization rates as contractually agreed in the KPM and TNG Subsoil Use Contracts raised additional concerns about the companies' financial health. The State wrongfully assessed against the companies approximately USD 69 million in back taxes on corporate income and associated penalties. In early 2010, the State pursued bankruptcy proceedings against KPM, further disrupting KPM's ability to operate and driving down the value of Claimants' investments.*

276. *On December 18, 2008, the State reversed its earlier position and cancelled its prior approval of the 2003 transfer of TNG to Terra Raf, as well as its prior waiver of pre-emptive rights to purchase 100% of KPM and TNG, all amidst threats of termination of the Subsoil Use Contracts. Despite the Government's verbal assurances, it never granted the permit to "re-allow" the transfer of TNG's ownership to Terra Raf. From December 2008 onward, the lingering transfer and pre-emptive rights issues consumed an extraordinary amount of time, attention, and resources, and severely affected the marketability of TNG and KPM. [Kazakhstan's arbitrary reversal of its pre-emptive rights waiver, as well as its false announcements of "irregularities" at the companies and its later seizures of KPM's and TNG's assets, deprived Claimants of their ability to dispose of their investments.]*

277. *[...] On September 30, 2009, the State revived a dispute with KPM regarding payment of the explicitly inapplicable Crude Oil Export Tax for KPM's January 2009 exports, resulting in a purported financial penalty of over USD 10 million. (C-I ¶¶ 273 – 277, partially quoted; C-II ¶¶ 476 – 478, partially quoted; CPHB 2 ¶¶ 115 – 139).*

1119. The measures described above pale in comparison to the criminal proceedings that Kazakhstan waged against KPM, TNG, and their personnel. Claimants' employees were harassed and intimidated. They were coerced into signing inspection reports. Their families were intimidated. This harassment was in violation of the ECT. The baseless reclassification of KPM's and TNG's pipelines into trunk pipelines was the basis for Kazakhstan's prosecution of Mr. Cornegruta, and for Kazakhstan's "*conviction*" of KPM. Numerous expert reports were generated that confirmed by common sense that these pipelines had been wrongfully reclassified, and these were all rejected by the court. (C-I ¶¶ 279 – 280; CPHB 2 ¶¶ 48 - 51).

1120. The harassment and coercion constituted an illegal indirect expropriation by depriving Claimants of their incidents of ownership of KPM and TNG. (CPHB 2 ¶ 59). The constant investigations and then the conviction of Mr. Cornegruta and KPM seriously impaired the value of Claimants' investments, in a manner similar to those considered in the *Biloune* case, though more severe. The criminal proceeding cost Claimants considerably and severely impaired Claimants' right and ability to manage their investments, in particular in light of the hours and resources spent preparing Mr. Cornegruta's defense, as well as his and KPM's appeals. Kazakhstan callously argues that the imprisonment of Mr. Cornegruta had no impact on the Claimants' ability to operate their companies. Despite the fact that the Kazakh court specifically found (as if such a fact were in doubt) that while Mr. Cornegruta was in jail he "*could not fulfill any obligations related to the*



*management of [KPM and TNG],*" his arrest and imprisonment also caused other high-level KPM and TNG managers and personnel to flee the country, forcing Claimants to manage KPM and TNG remotely. There is, therefore, no question that Kazakhstan substantially interfered with Claimants' ability to manage KPM and TNG. (C-I ¶¶ 282 – 284; C-II ¶ 477; CPHB 2 ¶¶ 52 – 56).

> 281.    *In conjunction with this case, the Financial Police issued seizure orders against (i) KPM's Subsoil Use Contract, oilfield pipelines, and vehicles; (ii) TNG's Subsoil Use Contracts, and oilfield gas and condensate pipelines; and (iii) Claimants' participatory interests in KPM and TNG. These seizures were designed to prevent KPM and TNG from selling or transferring their assets during the course of the criminal proceedings, thereby preventing Claimants from disposing of their investments in Kazakhstan.   Needless to say, those seizures and the criminal case massively interfered with Claimants' ability to enjoy or dispose of their investments, and they further diminished their market value.  (C-I ¶ 281, partially quoted).*

1121. Kazakhstan's attempts to enforce its "*fabricated*" USD 145 million fine against KPM also resulted in the inalienability of Claimants' investments. The seizure of Claimants' operations interfered with rights under the Subsoil Use Contracts, measures that the *CME* and *Alpha* Tribunals deemed to be expropriatory. Those execution measures also led to the flight of more key personnel and further paralyzed Claimants' operations in Kazakhstan. (C-I ¶ 284).

1122. Respondent's actions, described above, placed a "*cloud*" over Claimants' title to TNG. With KPM facing a pre-ordained conviction, a baseless USD 62 million back tax assessment, and this cloud hanging over TNG, no investor could be expected to purchase the companies.   Claimants also argue that Respondent maliciously defamed Claimants by disclosing information to INTERFAX. These public allegations of forgery and fraud exacerbated the above mentioned injuries, and made it difficult for Claimants to obtaining financing for their projects at reasonable rates. (CPHB 1 ¶¶ 138 – 145, 214 – 220, 346 – 357).

1123. Three baseless tax disputes — concerning assessments of back corporate income taxes, transfer pricing, and oil export duties — formed part of Kazakhstan's onslaught of harassment that commenced immediately after October 14, 2008. The "*comprehensive tax audit*" that the Financial Police ordered in October 2008 gave rise to no valid complaint regarding the companies' tax payments or filings. So at the urging of the Financial Police, the Tax and Customs Committees simply created baseless claims. First, in November 2008, the Customs Committee claimed that a previous, disputed assessment of oil export duties, in an amount exceeding USD 10 million, should be paid, despite both an initial court ruling and a previous concession from the Customs Committee that the companies were contractually exempt from such duties. Second, in February 2009, the Tax Committee claimed that KPM and TNG owed USD 62 million in corporate back taxes for failing to properly deduct drilling expenses. Third, in December 2009, it claimed that KPM and TNG owed USD 5 million in back transfer pricing taxes. None of these three claims had any merit, but were instead spurious assessment whose only purpose was to harass Claimants and to pressure them to sell KPM and TNG to the state at firesale prices. (CPHB 2 ¶¶ 127 – 134, 137).



1124. As of 21 July 2010, the Kazakh courts resolved the corporate back tax dispute and ruled that KPM and TNG owed no such taxes. Thus, Kazakhstan's assertion in its First Post-Hearing Brief that this claim continued to increase "until the valuation date of 21 July 2010" is patently wrong. To the contrary, as of July 21, 2010, KPM's and TNG's corporate back tax liability was zero (CPHB 2 ¶ 135). Kazakhstan revived the matter after July 2010 in bad faith, thereby ensuring that Claimants would have no ability to defend their position before the Kazakh Supreme Court (whose decision, in any event, was substantively incorrect). (CPHB 2 ¶ 136).

1125. Despite the Supreme Court ordering taxes due from KPM's and TNG's purported trust manager in November 2010, no collection efforts have been undertaken. Thus, it is likely that these tax actions were simply part of Kazakhstan's coordinated attack on Claimants' investments. Along with Kazakhstan's other acts of harassment and coercion, the tax assessments were measures that, in the words of the *RosInvest* tribunal, were "*linked to the strategic objective of returning petroleum assets to the control of the [State] and to an effort to suppress [an investor]*." Because that tribunal found that the State's measures were "*structured in such a way to remove [the investment company's] assets from the control of [the investors]*," it concluded that the State had committed an illegal, indirect expropriation. The Tribunal should not hesitate to reach the same conclusion here. (CPHB 2 ¶¶ 137 – 138).

1126. In order for the Tribunal to find that Kazakhstan breached the ECT and owes compensation to Claimants, the Tribunal need only be satisfied that the Kazakhstan's actions were unlawful and harmed Claimants' investments. While Kazakhstan's actions clearly demonstrated an intention to devalue, impair, and harm Claimants' investments from October 2008 onward, Respondent's intention is relevant for determining the valuation date. (CPHB 2 ¶¶ 44 – 45). The wrongful verdict against KPM and its assets was a measure of "*indirect expropriation*", since the enforcement destroyed what little remained of Claimants' "*incidents of ownership*" over KPM by that time. (CPHB 2 ¶¶ 97 – 114).

#### d.    **Direct Expropriation**

#### i.    **Transfer of Title**

1127. "*Direct*" expropriation refers to the overt seizure of a foreign investor's property or the title to such property by the host state. Respondent's argument that a formal transfer of title to the state or to a third party nominated by the state is "*the decisive element*" for the Tribunal in finding a direct, rather than an indirect, expropriation occurred is wrong as a matter of law. (C-I ¶¶ 249 – 252; C-II ¶ 459). Claimants' arguments are best taken from their own words:

> 460.    *The Santa Elena case, on which Claimants rely for this (undisputed) principle of international law, was cited with approval by the Telnor v. Hungary tribunal. It quoted the Santa Elena finding that "[t]here is ample authority for the proposition that a property has been expropriated when the effect of measures taken by the state has been to deprive the owner of title, possession, or access to the benefit and economic use of his property."    The Metalclad tribunal similarly found that expropriation*

