*includes "open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favor of the host State." Likewise, the Tecmed tribunal explained, "[u]nder international law, [direct expropriation occurs] where the use or enjoyment of benefits related thereto is exacted or interfered with . . . even where legal ownership over the assets in question is not affected. . . . " Thus, there is no requirement that Kazakhstan must have received title to Claimants' investments in order for this Tribunal to find that a direct expropriation occurred.*

461. *Kazakhstan admits that Claimants' legal ownership of KPM and TNG and their assets were substantially affected and transferred to State control. It explains that "[u]pon termination of the Subsoil Use Contracts, the ownership rights of KPM and TNG automatically ceased to exist" and "the assets then had to be transferred to [State-owned KazMunaiGaz] so that they would be taken into trust management." That alone is sufficient to establish expropriation. By Kazakhstan's own case, Claimants lost their contracts and all the assets of KPM and TNG. That is precisely the kind of taking the Sempra tribunal, on which Kazakhstan relies, had in mind when it held that a direct expropriation requires that "at least some essential component of the property right has been transferred to a different beneficiary." (C-II ¶¶ 460 – 461).*

1128. It is beyond dispute that Kazakhstan directly expropriated Claimants' investments on 21-22 July 2010 by seizing Claimants' rights under the Subsoil Use Contracts and by seizing legal and physical control of the assets held by Claimants through KPM and TNG. The act of transferring Claimants' KPM and TNG Subsoil Use Contracts to KMG, as well as the subsoil area subject to those contracts was a compulsory transfer of title to property to the State. (C-I ¶¶ 253 – 254, CPHB 2 ¶ 196). As Respondent has confirmed, from the moment of termination, Claimants' contractual rights to ownership over the produced oil, gas, and condensate was terminated. Further, the MOG's and KMG's occupation of Claimants' offices and transfer of personnel and assets totally deprived Claimants of physical possession and control of their revenues, assets, and means of production. Claimants' description of the transfer of legal title is as follows:

256. *Those seizures of legal title were personally instructed and overseen by the Kazakh Prime Minister, along with the Minister of Oil and Gas and the regional Governor, during their visit to Claimants' LPG plant to announce the seizures. The following day, Kazakhstan seized physical control of Claimants' investments. On July 22, 2010, Kazakhstan seized Claimants' offices, equipment, production, revenue, and other investments and operations, when a group of thirteen high-ranking officials from the MOG and KazMunaiGas arrived at Claimants' offices in Aktau, Kazakhstan. KazMunaiGas explained that government escrow accounts were being opened the same day, and "everything that has been extracted since [July] 22nd, extracted oil and payment for oil, gas and condensate - such income shall be deposited in the special account." The MOG's and KazMunaiGas' occupation of Claimants' offices and transfer of personnel and assets totally deprived Claimants of physical possession and control of their revenues, assets, and means of production. (C-I ¶ 256).*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE **657**

1129. Indeed, such an outright seizure of physical assets, contractual rights, and legal title are textbook examples of "*direct*" expropriation. Hence, it is indisputable that Kazakhstan directly expropriated Claimants' investments under Art. 13 ECT and international law in July 2010. (C-I ¶¶ 255 – 257; CPHB 2 ¶¶ 178 – 179).

## ii.    **Exercise of Regulatory Powers**

1130. Respondent's argument that the unilateral termination of the Subsoil Use Contracts and its takeover of the companies was merely a normal exercise of its regulatory powers is fanciful, at best. (C-II ¶ 462).

> *464.    Unilaterally terminating contracts and seizing rights and property are not the types of exercise of regulatory powers that normally exculpate a state from responsibility for harming investments protected by a treaty. Prima facie state measures comprising a lawful exercise of regulatory powers include taxation, trade restrictions, and/or measures of devaluation. But the outright taking of rights and property from an investor and transferring it to a State company — even if on a "trust management" basis until a third subsoil user can be found — is altogether different from regulating an interest of the state.*

> *463.    Kazakhstan claims that its expropriatory acts were regulatory because they were in accordance with its Subsoil Law of 2010, the purpose of which was "to balance the host State's legitimate interest in furthering the wealth and well-being of its population and the investors' legitimate interest in making a return on its investment."    Further, Kazakhstan contends that its regulatory powers under that Law require it to ensure that "investors [do not] take over the gas and oil production on a certain field forever but that production rights are tied to contracts which expire and have to be renegotiated regularly." (C-II ¶¶ 463 – 464).*

1131. Furthermore, the takeover was at odds with the interests allegedly expressed in the Subsoil Use Law. The takeover did not provide balance – like what may have been prior to 2008, when Claimants earned a return on their investments and paid taxes according to the Subsoil Use Contracts. After October 2008, there was no balance, as Respondent gradually took everything and left Claimants with nothing. The expropriation was aimed solely at expropriating the benefits of Claimants' production rights after Claimants had invested all the necessary time and money to make the fields productive. The July 2010 expropriation was largely a formality, formalizing Respondent's campaign of indirect expropriation. (C-II ¶¶ 465 – 468).

1132. In any event, Respondent cannot merely point to its domestic law to legalize its expropriation by way of the regulatory powers doctrine because Respondent would still be required to compensate Claimants for the taking. The Parties do not dispute that Respondent has paid no compensation to Claimants. (C-II ¶ 466).

1133. Respondent has been unable to point to any contemporaneously made allegation that would have supported its position.    Instead, the justifications for the expropriation are based on snippets of witness testimony, which are contradicted by the contemporaneous evidence. (CPHB 2 ¶¶ 179 – 180).



1134. First, Minister Mynbayev's testimony at the October 2012 Hearing confirmed that the public policy grounds alleged do not justify the termination. He admitted that the inspections concluded that Claimants were in compliance with their subsoil use contract obligations. The reports also confirmed that Claimants exceeded their minimum work program for 1999 – 2009 by 6.6 times. For 2010, the MEMR noted that TNG had exceeded its contractual obligations by 3.4 times. (CPHB 2 ¶¶ 178 – 184). In any event, the alleged "*violations*" did not merit termination of the contracts. Three of the seven alleged violations against KPM were that it failed to satisfy financial obligations toward Kazakhstan. At the hearing, Claimants corrected the Respondent that KPM was accused of owing USD 114 thousand to Kazakhstan – not USD 114 million. KPM was accused of owing USD 10,000 for the liquidation and a vague amount in taxes, which KPM disputed and would not have been able to pay since the accounts were frozen. The other four grounds were completely baseless. These included that (a) KPM failed to train Kazakh specialists (at the hearing, Minister Mynbayev could not explain why this would be a valid ground for termination), (b) that KPM failed to provide information about compliance with the work program, (c) that it had breached obligations regarding the acquisition of goods, works, and services, and (d) that it operated a main pipeline without a license. The six allegations against TNG for Contract 210 were likewise meritless:

> *288.* *[...] Like KPM, TNG explained that information regarding fulfillment of its work programs had been sent to Kazakhstan on multiple previous occasions. Kazakhstan also accused TNG of failing to provide annexes regarding the training of employees. TNG explained that those had been provided, along with its annual reports, and TNG provided them again in its July 19, 2010 response. TNG also explained that, like KPM, it had written to the Ministry of Oil and Gas to determine where to send its excess funds for training Kazakh specialists, which the Ministry ignored. In response to the claim that TNG owed some US $84,000 in historic costs, TNG explained and demonstrated that it properly paid its historic costs on a quarterly basis and that it had no arrears. TNG also explained, just as KPM had done, that it did not operate a main pipeline and that it had not breached any obligations for the acquisition of goods, works, or services.*

> *289.* *Amazingly, Kazakhstan also issued a notice of alleged violations with respect to TNG's Contract No. 302. Kazakhstan claimed that TNG had violated Contract No. 302 on five grounds: (i) the same alleged failure to provide information regarding its work program; (ii) the same supposed failure to provide annexes regarding employee training; (iii) the same contention that TNG had not trained Kazakh specialists; (iv) the false criminal allegation that TNG operated a main pipeline without a license; and (v) the same vague obligation that TNG had breached its obligations regarding the acquisition of goods, works, and services. (CPHB 1 ¶¶ 273 – 289, partially quoted).*

1135. Respondent's allegation that the Table 1-p in the English version of the MEMR inspection report, which was not provided due to a cut-off in printing, showed underperformance and mismanagement of the business is incorrect. The Russian version was provided and the missing English section does not provide any



evidence of non-compliance with contract obligations or Kazakh law. (CPHB 2 ¶¶ 184 – 185).

1136. Respondent's selective reliance on the PwC due diligence report is also unavailing. That report indicated that TNG had fallen behind on its 2008 and 2009 aspirational work programs. The MEMR also recognized that the company's aspirational working program was not the same as their minimum work obligations. Mr. Lungu admitted to no breach of the minimum work programmes, but was instead referring to the companies' own more aggressive annual work program. And this is consistent with Claimants' historic over-fulfillment of their minimum work requirements. (CPHB 2 ¶¶ 187 – 188).

1137. By summer 2009, TNG had reduced gas production in Tolkyn and this was noted by the MEMR – who did not find that the reduction amounted to a violation of contract or law. The reason for the reduction in production was due to the loss of Kemikal as a contractual partner (due to Respondent's harassment campaign) and the fact that the LPG Plant was not completed. In any event, the production slump was temporary and the production and sale of gas increased during winter 2009. (CPHB 2 ¶¶ 189 – 190).

1138. Even if there had been non-compliance with the minimum work obligations in 2009, it would be immaterial, since (i) MEMR expressly stated that there were no problems in the field as of February 2010 and that "*any falldown [or non-compliance] for certain years is compensated by the significant exceedings registered in the next or previous years;*" (ii) any failure to meet minimum work obligations would have been solely as a result of Kazakhstan's harassment and interference with Claimants' normal business operations; and (iii) any minimal "*falldown*" that may have existed was not sufficient to terminate the contracts, because it was not a reason the MOG gave for contract termination in July 2010. (CPHB 2 ¶¶ 191 – 193).

1139. Kazakhstan has provided no contemporaneous evidence that mass employee dismissals were a serious concern or that there was a risk of social tension. The opposite was confirmed in Mr. Calancea's, Mr. Condorachi's, and Mr. Ongarbayev's testimony. Payment was even made when the accounts were frozen. Upon the government's take over, 900 workers went to work for the state. (CPHB 2 ¶ 194).

1140. Kazakhstan's claims that Claimants were unwilling to cooperate with the State to cure contract breaches are misleading, given that Claimants had a mere 3 days to cure the alleged breaches and, as indicated above, by the time of the expropriation, Claimants had been appealing to multiple Government agencies since late 2008. Further attempts would have been futile. (CPHB 2 ¶ 195).

1141. Importantly, in Minister Mynbayev's testimony, it was revealed the allegations for breach of Contract 302 actually reveal that Kazakhstan considered that it had been extended, because otherwise it would have expired in March 2009. Furthermore, since it was an exploration contract, Claimants did not own or operate any transport pipelines. (CPHB 1 ¶¶ 290 – 292).

## 2. **Arguments by Respondent**



### a. Law on Expropriation

1142. Respondent agrees that expropriation is governed by Art. 13 ECT. (R-I ¶ 33.4).

1143. Respondent also highlights that expropriation needs to be differentiated from valid government activity. Respondent implies that, since no expropriation occurred, the four factors presented in Art. 13 ECT are irrelevant. Quoting *Marvin Feldman v. Mexico*, Respondent states that "*the essential determination is whether the actions of the Mexican government constitute an expropriation or nationalization, or are valid governmental activity. If there is no expropriatory action, factors a-d [i.e. (a) for a public purpose; (b) on a non-discriminatory basis; (c) in accordance with due process of law and article 1105(1); and (d) on payment of compensation] are of limited relevance, except to the extent that they have helped to differentiate between governmental acts that are expropriation and those that are not (...).*" (R-II ¶ 892).

1144. Respondent committed no due process violations with respect to the non-extension of Contract 302 and the 9 April 2009 letter did not oblige the MEMR to enter into an addendum for Contract 302. Claimants are incorrect to allege that Messrs. Mynbayev and Ongarbaev supported Claimants' interpretation of the 9 April 2009 letter. Mr. Ongarbaev never testified that MEMR had decided to extend Contract 302, but rather than the decision to recommend extension was made. (RPHB 2 ¶¶ 296 – 305). Minister Mynbayev's testimony was mistranslated:

> 304. *When Minister Mynbaev explained that the decision of the Export Commission had only recommendatory character, he was translated to have said that it gave recommendations as to whether the subsoil user may count on the extension or not. However, the Russian verb «раccгHTbIBaTb Ha» translated into English as "count on" was used by the witness in the ordinary meaning of «HageATbcA Ha», or English "hope for". And certainly, a decision of recommendatory nature may raise hopes but it cannot give rise to legitimate expectations. (RPHB 2 ¶ 304, emphasis in original).*

1145. Claimants created the irregularities in the title to TNG when they wrongly asserted that Respondent's pre-emptive rights did not apply to the Gheso – Terra Raf transfer. There were 8 transfers involving a majority interest in TNG, and the consequence of failure to obtain consent in any of those transfers is that none of the transfers involving Claimants' companies were completed. The belated consent to one transfer does not cure all previous failures to obtain consent. (RPHB 2 ¶¶ 272 – 281).

### b. Exhaustion of Remedies

1146. Respondent argues that Claimants' expropriation arguments are precluded by Claimants' failure to pursue available remedies in pursuance of their contractual claims or domestic legal claims. After every alleged action, KPM and TNG could have turned to the contractually agreed upon arbitral tribunals or to the Republic's domestic courts, and they chose not to do so. (R-I ¶ 33.6; R-II ¶ 865).



1147. Turning first to Claimants' contractual claims and citing *Waste Management and Parkerings v. Lithuania*, Respondent presents that an expropriation of contractual rights is not perfected until available remedies to address the alleged contractual breach have been pursued. (R-I ¶¶ 33.7 – 33.10; R-II ¶¶ 865 - 866).

1148. Claimants' claims for actions making up the direct expropriation and many claims regarding the indirect expropriation are contractual in nature. These actions include (1) the refusal to prolong Contract 302, (2) the termination of Contract 302, (3) the Republic's alleged refusal to apply contractually agreed amortization rates leading to an assessment of back taxes and penalties of USD 69 million, (4) the alleged non-application of a contractually agreed exemption to the Crude Oil Export Tax, and (5) the alleged revocation of the Republic's purported approval of the transfer of TNG to Terra Raf. These claims each fail for the simple reason that in each and every case, the Claimants – alone or through TNG and KPM – could and should have pursued these claims by way of arbitration, as agreed in the Subsoil Use Contracts and Contract 302. To be clear: the present arbitration does not satisfy the contractual requirements. (R-I ¶ 33.17 – 33.22; R-I ¶ 33.22 represents that KPM and TNG would be suing).

1149. In respect of domestic law, so long as the state provides effective remedies for breaches of domestic law, an expropriation cannot occur so long as the investor's attempts at pursuing those remedies have not failed. Respondent cites *Generation Ukraine v. Ukraine* and *EnCana v. Ecuador* in support of this position and summarizes that there have been several reasons that lead tribunals consider that a failure to pursue available remedies is fatal to an expropriation claim:

    *(a)*    *Non-performance of a contract - and thus also termination of a contract - does not amount to an expropriation of the rights stemming from the contract as long as the loss of the right is not final, i.e. ultimately determined by the appropriate forum.*

    *(b)*    *An act of maladministration at the lowest level cannot amount to an expropriation. Otherwise, investors could invoke any minor mistake at the local level and bring investment arbitration claims.*

    *(c)*    *Tribunals generally are less knowledgeable about domestic law than domestic courts. Thus, in the absence of a valid reason for a failure to bring the claim to the appropriate forum, such failure puts into doubt that a right was actually taken from the investor. (R-I ¶¶ 33.10 – 33.15; quoting ¶ 33.15).*

1150. Claimants' other indirect expropriation claims could have and should have been addressed in domestic courts, which were open to Claimants. Claimants never pursued all available appeals against lower-instance decisions. (R-I ¶¶ 33.23 – 33.26; RPHB 2 ¶¶ 265 – 271). With regard to the prosecution of KPM, Claimants never exhausted the appeals system within the Republic, which stood open to Claimants. KPM missed the deadline to appeal. It was the Court's view that KPM had notice of the decision against it, since its senior management was present at the hearing. (R-II ¶ 635 – 638). This excludes the notion of expropriation. (R-I ¶ 34.9).



1151. Claimants' position that the contracts precluded them from submitting breaches of contract to domestic courts is untenable. Claimants base their allegation that Contracts 210 and 302 provided for arbitration before the SCC was based on an alleged footnote in Maiden Suleymenov's chapter in "*Oil and Gas Law in Kazakhstan.*" Suleymenov, however, states the opposite of what Claimants allege. (R-II ¶¶ 870 – 873).

> *874.  Article 28 (2) of Contract No. 305 does indeed refer the parties, i.e. KPM and the Republic, to the SCC. However, the requirement for KPM to refer disputes to the SCC does not mean that "KPM and TNG would first have to commence arbitration proceedings at the Stockholm Chamber of Commerce for another international tribunal to determine whether Kazakhstan's actions amount to a breach of contract under Kazakh law". Firstly, only KPM is a party to Contract No. 305. Secondly, Claimants seem to suggest that the tribunal in the SCC proceedings would need to render a declaratory award in favor of KPM and on that basis, Claimants could then pursue their claim under the ECT. This is clearly not the case. Instead, there would only be two proceedings if KPM were unsuccessful in the SCC arbitration and Claimants then decided to pursue their claim under the ECT nonetheless. This is not at all "absurd". (R-II ¶ 874, emphasis maintained).*

1152. Respondent states that, having shown that remedies were available, it is for Claimants to prove their assertion that resort to local remedies would have been futile. Claimants have not even alleged that recourse to arbitration for the acts that they consider to be "*indirect*" expropriation would have been futile. The Republic refutes Claimants' contention that arbitration as a remedy against termination of the contracts would have been futile from the outset. Furthermore, Claimants have not explained why a tribunal constituted pursuant to the Subsoil Use Contracts would not have addressed their complaints. Finally, regarding Claimants' final futility argument regarding maladministration, Claimants cannot base any argument on their allegation that the termination notices were a result of a notification by the President of the Republic, which they were not. (R-II ¶¶ 875 – 878).

1153. Claimants misrepresent the contents of the decision taken in the *Helnan* annulment. *Helnan* was not an easy, one-way decision, but it was a quite nuanced ruling, striking a balance between an investor's interest in pursuing treaty arbitration and a state's interest in not being held liable for decisions of low-ranking officials. In pertinent part, that Tribunal stated "*Of course, a claimant's prospects of success in pursuing a treaty claim based on the decision of an inferior official or court, which had not been challenged through an available appeal process, should be lower, since the tribunal must in any event be satisfied that the failure is one which displays insufficiency in the system, justifying international intervention.*" (R-II ¶¶ 866 – 867).

1154. Claimants allege that the Republic has failed to differentiate between treaty claims and contract claims. In response, Respondent state that, "*[o]bviously, a claim under a treaty is something quite different to a claim under a contract. However, this in no way precludes the fact that available remedies have to be pursued.*" (R-II ¶ 869).



1155. In response to Claimants' fork-in-the-road argument, Respondent explains that TNG and KPM – as distinct parties from Claimants in this arbitration, needed to have pursued their own contractual remedies, prior to Claimants' initiation of proceedings. This would not have triggered the fork-in-the-road clause for Claimants, as was explicitly held in *CMS v. Argentina*.

### c.    **Indirect Expropriation**

#### i.    **General       Principles       and Jurisprudence   Regarding   Indirect Expropriation**

1156. Indirect expropriation describes the rare situation in which no transfer of title occurs but the host State's measures nonetheless are "*tantamount*" to expropriation or have an equivalent effect. (R-I ¶ 35.2). The main criterion for a finding of an indirect expropriation is the effect that a governmental measure has on the rights of the investor. As stated by the tribunal in *Tecmed v. Mexico*:

> *[…][M]easures adopted by a State, whether regulatory or not, are an indirect de facto expropriation if they are **irreversible and permanent** and if the assets or rights subject to such measure have been affected in such a way that "…**any form of exploitation thereof…" has disappeared; i.e. the economic value of the use, enjoyment or disposition of the assets or rights affected by the administrative action or decision have been neutralized or destroyed.*" (R-I ¶ 35.3, citing Tecmed v. Mexico, emphasis in original).

1157. In order to succeed in their allegation that the inspections from October 2008 – March 2009 amounted to an expropriation, Claimants must demonstrate that the interference was in fact equivalent to an expropriation. Respondent argues that it did not interfere with the day-to-day management of KPM and TNG. Rather, the inspecting agencies made every effort to not disrupt the business of KPM and TNG, and Claimants have not proven that their day-to-day business was seriously disrupted, despite requests that they meet this burden of proof. Occasional and legitimate inspections and audits, clearly, do not prevent investors from directing the day-to-day operations of the investments, and Claimants have not proven otherwise. (R-I ¶¶ 35.21 – 35.23; R-II ¶¶ 907 - 910).

1158. In addition, at the Hearing on Jurisdiction and Liability, then-General Director of TNG, Mr. Cojin, stressed that the Financial Police "*could not disturb us too often because we were very busy with production […]*." (RPHB 2 ¶ 23).

1159. It is noteworthy that the Claimants have not complained – and indeed cannot complain – that the laws in and of themselves were expropriatory. If the laws themselves are not expropriatory, only there misapplication can be. Hence, a showing of lawfulness under domestic law will preclude a notion of expropriation. (R-I ¶¶ 35.9 – 35.10, partially quoted).

1160. Finally, other tribunals have formulated further requirements for the State's right to regulate, including due process of law and non-discrimination. Respondent also cites *Azurix v. Argentina*, where the Tribunal held that no indirect expropriation had occurred because the impact on the investment due to the State's measures



was, in the aggregate, not attributable for the loss to the claimant, which still had control over the investment. Likewise, in *LG&E v. Argentina*, the tribunal found that there was no expropriation because the investor had not lost control over the investment. (R-II ¶¶ 901 – 903).

1161. Finally, the Republic's alleged reversal of its pre-emptive rights waiver (which Respondent denies) and its supposedly false announcement of irregularities did not deprive Claimants of their ability to dispose of their investment. (R-II ¶ 918). Respondent lawfully revoked its authorisation of the transfer from Gheso to Terra Raf. None of the alleged problems with Claimants' disposal of their assets were Respondent's doing. (R-II ¶ 919; RPHB 2 ¶ 272 – 281).

## ii. Right to Regulate

1162. Prominent scholars in international law, including Ian Brownlie, Prof. Sornarajah, and Prof. Böckstiegel also agree that legitimate regulatory actions do not constitute a compensable expropriation. Extensive practice in international investment arbitration has also shown that valid state regulation is non-compensable. (R-II ¶¶ 950 – 956).

1163. A determination of whether there has been an indirect expropriation, even in cases similar to *Tecmed*, is limited by a state's police powers. Losses incurred by the investor which are "*incidental to the normal operation of laws of the State*" may be non-compensable. (R-I ¶¶ 35.5 – 35.6).

1164. The sovereignty of the state over its natural resources includes the right to regulate, and this has been confirmed in the Preamble to the 1991 European Energy Charter, the 1975 Helsinki Declaration, as well as other treaties. The laws of the host state are highly relevant, and the investor is entitled to compensation only for those damages, actions, or omissions by state bodies or officials that are contrary to the host state's legislation. (R-II ¶¶ 922 – 926).

1165. Respondent explains that a regulatory action does not constitute compensable expropriation. The definition of expropriation as provided in the Convention that establishes the Multilateral Investment Guarantee Agency, to which 176 states are party, defines expropriation in general terms, excluding "*non-discriminatory measures of general application which the governments normally take for the purpose of regulating economic activities in their territories.*" (R-I ¶¶ 927 – 932).

1166. This is confirmed by Art. 1 of the Protocol 1 to the European Convention of Human Rights (1952), which states that the "*enforcement of laws, necessary to control the use of property in accordance with the general interest cannot constitute a compensable taking.*"

1167. The approach taken by the ECtHR should be of guidance to this Tribunal. Respondent presents cases under the ECtHR where compulsory alienation of property, the imposition of a duty, or the withdrawal of a license, tax sanctions for violations of tax legislation, was found to be non-expropriatory. (R-I ¶¶ 933 – 940). The case practice of the ECtHR is relevant here, as that Court hears investment claims and its cases demonstrate that a deprivation of property in the form of fines, taxes, etc., does not constitute an expropriation and does not require



compensation. States are given a wide margin of discretion in determining the public interest and the measures required in the pursuance of these interests. The ECtHR first considers whether the measures were lawful under the laws of the host state and evaluates whether the law was sufficiently available, specified, and predictable. The ECtHR emphasizes throughout that its competence for assessment of the lawfulness of state authorities' actions is limited. Second, the ECtHR assesses measures in respect of their proportionality, taking into account the wrongfulness of the applicant's conduct, the interests of the host state and the investor, the requirements of public interests, and the requirements of protection of fundamental freedoms. (R-II ¶¶ 940 – 949).

1168. All of the measures at issue concerned the lawful enforcement of laws that are necessary to regulate the hazardous and strategically important exploration and extraction of oil and gas. (R-II ¶¶ 904 – 905). Contrary to Claimants' assertion, there was no "*campaign of harassment and coercion designed to undermine and interfere with Claimants' management and control of KPM and TNG.*" Rather, the measures at issue were legitimate and the state was entitled to regulate. (R-I ¶¶ 35.15, 35.20; R-II ¶ 906).

### iii. Acts Allegedly Amounting to An Indirect Expropriation

1169. Claimants incredibly and wildly assert that various alleged treaty breaches, slowly and quickly, individually and/or in combination, breached the ECT. Respondent explains that Claimants have argued that the following actions individually and cumulatively amount to an indirect expropriation of Claimants' rights in KPM and TNG: (1) the Republic's refusal to prolong the exploration rights under Contract 302, (2) the assessment of back transfer price taxes and back taxes on corporate income, (3) the alleged revocation of the purported approval of the transfer of TNG's shares to Terra Raf, (4) the dispute about the application of the Crude Oil Export Tax, (5) the classification of KPM's and TNG's pipelines as trunk pipelines, (6) the ensuing trial and conviction of Mr. Cornegruta and the verdict against KPM, and (7) the seizure orders against KPM and TNG. (R-I ¶ 35.11). The assertions have changed so frequently that they are not credible. (RPHB 2 ¶¶ 419 – 423).

1170. Respondent also notes that "*Claimants have clandestinely dropped all relevant tax measures from the list of alleged expropriations and only mention them in a footnote in this section in which they claim that they had been deprived of their ability to dispose of the investment. Apparently, Claimants have come to the conclusion that the tax measures cannot constitute an expropriation and quite rightly so. The taxation measures do not fall within the jurisdiction of the Tribunal. In any event, the tax measures do not constitute expropriations under Article 13 ECT.*" Further as has been demonstrated, the Tax Committee's assessment of corporate back taxes was legitimate, the 2008 crude oil export duties were lawful and were not paid by TNG, and the 2009 duties were withdrawn before either KPM or TNG made any payment. Respondent further states that "*the taxation measures were not expropriatory because neither was an 'acquired right' taken from Claimants nor could the tax measures be said to 'frustrate the complete operation of [Claimants'] activities in [Kazakhstan].*'" (R-II ¶ 920 - 921).



1171. Respondent's arguments and points on indirect expropriation are best taken from its own words:

> 899. *The Republic did not indirectly expropriate Claimants. Even Claimants do not seem to be certain which measure is supposed to have indirectly expropriated them when they refer to "expropriatory conduct over the October 2008-July 2010 period". They later enumerate four allegedly expropriatory measures taken by the Republic but remain very elusive as to whether each of these measures is supposed to have constituted an expropriation or whether they collectively expropriated Claimants: Firstly, the Republic allegedly interfered with the day-to-day management of KPM and TNG when the Financial Police "commandeered" their offices from October 2008 - March 2009, secondly, the Republic allegedly deprived Claimants of their ability to manage their companies by arresting KPM's General Director in April 2009 and "hunting" other KPM and TNG senior officials, thirdly, the cumulative effect of Kazakhstan's alleged harassment campaign, including the refusal to execute the extension of Contract No. 302 supposedly deprived Claimants of their ability to prove their reserves and finally, the Republic's alleged reversal of its pre-emptive rights waiver and its supposedly false announcement of irregularities are said to have deprived Claimants of their ability to dispose of their investment.*

> 900. *Claimants mischaracterise the Republic's actions in each of the above cases. Ironically, in the first two cases, the Republic's actions related to the need to investigate and later to punish the Claimants own misdeed or that of KPM and TNG and their employees. In each case, all measures taken by the Republic were legitimate and a legal applications of Kazakh law which were not expropriatory in nature. In any event, none of the measures even came close to the effect of a taking. (R-II ¶¶ 899 – 900; see also R-I ¶¶ 35.11 – 35.12 listing Claimants' claims).*

1172. Claimants operated trunk pipelines without a license, at least since 2002. Mr. Cornegruta wrote to the MEMR in May 2008 to apply for a trunk pipeline, but the application was incomplete. The investigation that led to this conclusion demonstrates clearly that nothing about the criminal charges against Mr. Cornegruta was premeditated – the relevant agencies (MEMR and the Financial Police) operated independently of one another and, on 15 December 2008, the Financial Police opened a criminal investigation based on reasonable suspicions that KPM was operating a trunk pipeline without a license. This investigation was based on the following evidence: (1) letters from KPM and TNG to the MEMR requesting the re-issue of a licence, (2) a letter from KPM to ARNM requesting the re-issue of a licence, (3) a geological committee report, (4) a letter from ARNM confirming that KPM and TNG held no licenses for trunk pipelines, (5) an expert review based on a similar pipeline, and (6) the design documentation for the pipelines. Witnesses were interviewed and there was a physical examination of the pipeline. Mr. Rakhimov of the Financial Police finally obtained an expert opinion from Mr. Baymaganbetov on 13 February 2009 about whether the pipelines were, indeed, trunk. Mr. Baymaganbetov reviewed four reports provided to him by the Financial Police and, although he was free to seek out other opinions, he did not. Claimants' four expert opinions were not shown to him because their independence could not be verified and they risked compromising his independence. Claimants' reliance on 5 opinions from other governmental agencies fared just as well, since



Claimants filed to provide the scope of the request for the issuance of those opinions, the agencies may have been involved in the design or other aspects of the pipeline and, most importantly, none of them were appointed in accordance with Art. 243 CPC. (RPHB 2 ¶¶ 151 – 207).

1173. To repeat from above, the conclusion that the at-issue pipelines were indeed trunk pipelines is both legally and factually correct. The Parties' witnesses agreed on the legal definition of a trunk pipeline, which is provided in the Law on Oil. Importantly, the Parties have agreed that the relevant section of pipeline extends beyond the Contract Area, for which KPM never had a license. Claimants' allegation that they had all of the licenses that they needed can only be true if they demonstrate that they have only field pipelines – a type of pipeline that cannot go beyond the Contract Area. Contrary to Prof. Suleymenov's opinion, the classification of a pipeline is not a matter of industry analysis or the visual size of the pipeline. The Parties' experts agree that it is a question of law. Since "*(i) the KPM Pipeline extends beyond the Contract Area (i.e. it is not a field / contractors pipeline), (ii) third party oil as well as commercial oil is carried by the pipeline, (iii) that the oil is commercial, and (iv) that the oil is transported to places of transshipment, transport, processing or consumption*", the pipeline is a trunk pipeline. Claimants' new assertion that the Law on Oil excludes pipelines that are involved in the single technological process of oil and gas production from the classification as "*main pipelines*" is incorrect and is based on a mishearing of Mr. Romanosov's testimony. (RPHB 2 ¶¶ 219 – 236).

1174. It is to be noted that Claimants always had the duty to obtain a license for operation of a trunk pipelines before operating one. Claimants knew of the licensing laws and it would have been easy for them to seek clarification if needed. Their most recent application was incomplete and Claimants chose not to procure a license. (RPHB 2 ¶¶ 208 – 218).

1175. Penal measures following the violation of a criminal statute cannot give rise to a compensatory taking. Mr. Cornegruta was prosecuted and convicted in accordance with due process and Kazakh law. His conviction cannot constitute an indirect expropriation, and Claimants have not demonstrated how his absence affected the "*promoting, financing, and managing*" of the investment. In this regard, the *Biloune* case, cited by Claimants, is easily distinguishable from this matter. There, the claimant (Biloune, the investor) had a central role in promoting, financing, and managing the investment, and was expulsed from the host state. Here, however, Claimants have not even attempted to show to what extent Mr. Cornegruta had a central role, or how his absence made it impossible to pursue KPM's investment activity. Claimants have only made the less forceful assertion, that he was only an employee. This case is, thus, clearly distinguishable from *Biloune*. Respondent rejects Claimants' assertion that it was "*hunting*" KPM and TNG senior officials. (R-I ¶¶ 35.17 – 35.18; R-II ¶¶ 911 – 913).

1176. Kazakh law uncontestedly provides for the recovery of income obtained by means of illegal activity. Such recovery is necessary to address unjust enrichment obtained by criminal means. As KPM earned income from its general manager's criminal behaviour, namely the illegal operation of a main pipeline without a license, it was the natural consequence that the court ordered the recovery of this income. Kazakh law foresees recovery of illegal income from a company, even



where the company is not named as a party in the criminal case, and there is no requirement that the Republic bring a civil claim in order to recover this unlawful income. The amount of illegal income received in the course of illegal entrepreneurial activity is unjust enrichment. (RPHB 2 ¶¶ 243 – 261).

1177. Claimants' criticism that the recovery was disproportionate misses the mark: the goal is to address and negate the unjust enrichment that results from the crime, not to punish the crime. The unjust enrichment is not limited to the hypothetical income for providing crude oil transportation services. Squire Sanders assessed the amount subject to recover to be reasonably over USD 80,000,000. (RPHB 2 ¶¶ 262 – 264).

1178. In response to cases cited by Claimants, Respondent states as follows:

914.    *In Benvenuti & Bonfant v. Congo the Tribunal held that the investor had been expropriated because the army had seized the premises of a bottling factory. The only relevance of the fact that the manager had fled the country due to the risk of criminal proceedings was that this was one of the arguments to refute Congo's allegation that the investor could return anytime to take repossession of his property.*

915.    *Likewise, the facts in Biwater Gauff (Tanzania) Ltd. v. Tanzania bear no resemblance to the case at hand. In this case, the investor's senior management was forcibly deported from Tanzania while simultaneously the premises of the investor were seized. This does not compare to the lawful prosecution and conviction of Mr. Cornegruta. (R-II ¶¶ 914 – 915).*

1179. In response to Claimants' allegation that they were deprived of the ability to prove reserves, Respondent states as follows:

916.    *The cumulative effect of Kazakhstan's alleged harassment campaign, including the refusal to execute the extension of Contract No. 302 did not deprive Claimants of the ability to prove reserves.*

917.    *The Republic has demonstrated that no such harassment campaign existed. The non-extension of Contract 302 cannot constitute an indirect expropriation. It is telling that Claimants' consider the non-extension to be both a direct and an indirect expropriation when in fact it does not constitute a taking at all. Contract 302 expired on 30 March 2009. Vain hope to prolong a contract cannot constitute a taking and as demonstrated above, Claimants did not obtain a right to prolong the contract. (R-II ¶¶ 916 – 917).*

1180. The 9 April 2009 letter did not oblige the MEMR to enter into an addendum for Contract 302. In any event, TNG's successful application for a renewal of its license would have been a pre-requisite to such an extension. The subsoil use contract and the license for subsoil use are different documents with different natures. The fact that the MEMR is both the Competent Authority and the Licensing Authority did not abolish the need to amend existing licenses, nor did it change the procedure for such amendments. Mr. Suleymenov's last minute expert submission provides no support for Claimants' unfounded allegation that the MEMR agreed to extend Contract 302 and to execute an extension. As explained



by Prof. Ilyassova, the decision of the Expert Commission to recommend extension is part of the Competent Authority's internal process and cannot be equated with a decision to actually extend, nor can the letter of 9 April 2009, since it was not ordered by the Minister. (RPHB 2 ¶¶ 292 – 305).

1181. In addition, Claimants would not have been able to prove reserves, as they allege. Even if the Contract 302 had been extended, TNG would have been bound by the working program of 14 October 2008 and the draft addendum of 30 April 2009, which only contained exploratory work on Munaibay and Bahyt. Neither contained a reference to the Interoil Reef. Claimants' allegation that TNG would not have been bound by these working programmes is contrary to the testimony of their own witnesses and their opening statement. These were not "*minimum*" working programs, but were working programs. Addendum 5 to contract 302, Art. 3.3 does not contain the word "*minimum*" – the relevant Law on Oil and the Subsoil Law in force from October 2008 to March 2011 and the terms of Contract 302 would have required changes to the work programme if the subsoil user intended to go beyond the agreed working program. (RPHB 2 ¶¶ 319 – 328).

1182. The non-extension of Contract 302 made no interference with Claimants' ability to use and dispose of their investments. The subsoil belongs to the State and, as of 30 March 2009, Claimants lost all right to that area because they failed to declare a commercial discovery. (RPHB 2 ¶¶ 329 – 330).

1183. The tribunal in *LG&E* respected the State's power to adopt measures having social or general welfare purposes. That tribunal stated that, such a measure must be accepted without the imposition of liability, except where such a measure was obviously disproportionate. The tribunal in *Tecmed* considered the issue of proportionality:

*[T]he Arbitral Tribunal will consider, in order to determine if they are to be characterized as expropriatory, **whether such actions or measures are proportional** to the public interest presumably protected thereby and to the protection legally granted to investments, taking into account that the significance of such impact has a key role upon deciding the proportionality. Although the analysis starts at the **due deference** owing to the State when defining the issues that affect its public policy or the interests of society as a whole, as well as the actions that will be implemented to protect such values, such situation does not prevent the Arbitral Tribunal, without thereby questioning such due deference, from examining the actions of the State in light of [the expropriation provision of the BIT] to determine whether such measures are reasonable with respect to their goals, the deprivation of economic rights and the legitimate expectations of who suffered such deprivation. **There must be a reasonable relationship of proportionality between the charge or weight imposed to the foreign investor and the aim sought to be realized by any expropriatory measure.** (R-I ¶¶ 35.7 – 35.8, partially quoted, emphasis maintained).*

1184. Respondent reminds the Tribunal that KPM and TNG repeatedly broke Kazakh law by making incorrect tax assessments and operating a trunk pipeline without a license. The audit requests were reasonable given the strong suspicions of wrongdoing. Respondent states that it was Claimants' own fault that the authorities started investigations. (R-I ¶ 35.14).



#### d.    Direct Expropriation

##### i.    Transfer of Title

1185. A direct expropriation requires a transfer of title. Here, Claimants have conceded that no transfer of title took place. Since there was no transfer of title, no direct expropriation occurred. (R-I ¶¶ 34.2 – 34.3; R-II ¶¶ 879 – 881, 888 – 890).

1186. Respondent at no point in time expropriated Claimants' assets. Given the numerous violations of the Subsoil Use Contracts, Respondent had no choice but to terminate the contracts and to transfer the contractual territory of KPM and TNG into trust management. Proceeds from the operation of the fields are held in an escrow account. (RPHB 2 ¶¶ 415 – 417).

1187. Respondent explains how the transfer of KPM and TNG to state custody did not constitute a transfer of title and, therefore, was not an expropriation:

> *34.5    [...] Upon termination of the Subsoil Use Contracts, the ownership rights of KPM and TNG automatically ceased to exist. Under Article 72(10) of the Subsoil Law (Exhibit R-152) and due to the circumstances set out in detail above, the assets then had to be transferred to KMG so that they would be taken into trust management.*

> *34.6    As explained above, and unlike in certain common law national jurisdictions, this does not entail any transfer of the title of the assets, although, under the provisions of the law, the trust manager is entitled to possess and use the facilities and equipment. This arrangement is set up so as to enable continuing production.*

> *34.7    Therefore, there is no transfer of title envisaged under article 72(10) of the Subsoil Law. Moreover, the subsoil user has the opportunity to have its contract reinstate. Where this is not possible or desired, the contract can be transferred to a new subsoil user with the assets. At this point, the payment of the subsoil users' costs and its property must be provided for in the new agreement.*

> *34.8    This does not amount to an expropriation. Rather, an inherent limitation in the rights held by KPM and TNG came to bear. Moreover, there are opportunities for compensation within provided for within the mechanism. (R-I ¶¶ 34.5 – 34.8).*

1188. Respondent presents that Claimants have mis-cited *Telnor v. Hungary*, which considered not a direct expropriation, but a creeping expropriation. Likewise, Claimants' citation of *Metalclad* is also misleading, as that tribunal did not differentiate between direct and indirect expropriation. Instead, the tribunal in *Metalclad* enumerated several actions that could amount to an expropriation – direct and indirect. It, therefore, cannot be relied upon to identify the requirements for a direct expropriation.

1189. Respondent argues that *Tecmed* concerns indirect *de facto* expropriation and accuses Claimants of inserting the quote "*direct expropriation*" in brackets



throughout their quotation of that text, and states that they, instead, should have inserted the phrase "*indirect expropriation*" to correctly quote the tribunal in that case. (R-II ¶¶ 882 – 887). Finally, the *Santa Elena* tribunal merely explained the general principles of expropriation and – without differentiating between direct and indirect expropriation – affirmed that in some cases (indirect expropriation cases), expropriation can occur without a formal transfer of title. (R-I ¶ 34.4).

1190. With respect to the LPG Plant, it is even more obvious that there was no expropriation since TNG still owns the plant and the plant was not transferred into trust management. (RPHB 2 ¶ 418).

## ii. Exercise of Regulatory Power

1191. International law recognizes that, even in cases involving a transfer of title, there is not always an "*expropriation.*" States, in an exercise of their sovereignty, can take measures without being obliged to compensate investors, as explained by the *S.D. Myers* tribunal. Expropriatory acts must be differentiated from valid governmental activity. Here, the termination of the Subsoil Use Contracts, the non-extension of Contract 302, and the transfer to trust management of KPM's and TNG's assets were dictated by and consistent with Kazakh law and, thus, were a legitimate exertion of the Republic's regulatory power. (R-I ¶¶ 34.10 – 34.13; R-II ¶¶ 891 – 892). The assets have been protected and the monies held in escrow, where they will remain until a new subsoil user is found. (RPHB 2 ¶ 373).

1192. First, the non-extension of Contract 302 cannot constitute an expropriation, as it did not take anything from the investor. Second, the termination of the Subsoil Use Contracts cannot be a direct expropriation, as it was mandated by Kazakh law. The same is true for the transfer of the contractual territory into trust management – an action that was a legal consequence of KPM's and TNG's misconduct. (R-II ¶¶ 893 – 895; RPHB 2 ¶¶ 329 – 330).

1193. Claimants explain that an action that is legal under local law cannot constitute a treaty breach unless that law itself breaches the treaty. Claimants have not argued otherwise and, thus, concede that the relevant Kazakh laws are in accordance with international law. This is true, despite Claimants' arguments that the Republic cannot rely on domestic law to legalize the taking because the Republic must still provide compensation. As explained, neither the Republic nor any other state entity ever owned the contractual territories. Any compensation will be in the contract entered into with the new subsoil user that would compensate KPM and TNG. (R-II ¶¶ 896 – 897).

1194. Finally, Respondent states that any claim for expropriation must fail, because Claimants' own actions and external events were relevant in the demise of the companies. (R-II ¶ 898).

1195. Claimants were in continuing and serious breach of Contracts 210 and 305 as a result of their operation of a trunk pipeline without a license, their breaches of tax laws, their failure to comply with KPM's and TNG's minimum working programs, among others. Claimants have not disputed that KPM and TNG were in violation of labor laws in early 2010. In addition, Claimants' treatment of the fields can accurately be described as "*barbaric.*" The actual work promised under the



working programs – like the drilling of wells - was not carried out, despite alleged financial investment in KPM and TNG (investment which, nevertheless, was insufficient from 2007 – 2009). Claimants' arguments that KPM and TNG were given "*a clean bill of health*" are without merit. Minister Mynbayev's testimony expressly confirmed that prior to the June 2010 inspections, Claimants were in breach. He also stated that, by July 2010, the situation was no longer tolerable. (RPHB 2 ¶¶ 339 – 349).

1196. The Republic, due to the breaches of environmental law, reports of Claimants' failure to pay salaries and reports of mass employee dismissals, and the poor conditions in the field, was obliged if not entitled to carry out inspections of KPM and TNG in June and July 2010. These inspections revealed additional serious violations of Contracts 210 and 305 by KPM and TNG. (RPHB 2 ¶¶ 350 – 352).

1197. The severity of the breaches of Contracts 210 and 305 left the Republic with no option but to act and serve notices of breach. Although they had previously been given opportunities to cure, their responses to the 14 July 2010 notice for breach on 19 July 2010 was inadequate and focused only on procedural reasons to challenge termination. For example, Claimants claimed "*force majeur*" for their failure to make payments related to KPM and TNG's historical costs, KPM's contributions to the Kazakh liquidation fund, and KPM's tax obligations due to the fact that KPM's accounts were frozen as a result of the execution of the recovery order for the operation of a pipeline without a license. The execution orders were not *force majeur* and, allegedly, they did not (as Claimants state) prevent Claimants from paying employees. Importantly – Squire Sanders also raised the issue of payment of historical costs by KPM and TNG, as well as other failures to meet obligations regarding the acquisition of goods, works, and services, in its June 2009 report. (RPHB 2 ¶¶ 353 – 358).

1198. In addition, Claimants neglected and mistreated the investment, having effectively abandoned it. There were reports of salaries not being paid, complaints about KPM and TNG's treatment of the fields, and reports that production had stopped. Claimants provide not support for their argument that these were "*post hoc*" justification for termination. There were quite clearly social problems and issues that were being experienced in June and July 2010, due to KPM and TNG's failure to pay wages. Claimants have misquoted Mr. Ongarbaev that there was no risk of unemployment, since employees would just be re-hired under trust management. Claimants quote GCA for support of the statement that the fields were in good condition, but this is inaccurate – GCA only referred to the facilities being "*adequate for the region*." (RPHB 2 ¶¶ 359 – 366).

1199. The Republic terminated Contracts 210 and 305 in accordance with the law. The Republic fully complied with Section 38 of the Law of Private Business when conducting inspections and Claimants always had the right to appeal the inspections reports. They failed to appeal within the permitted three days. Claimants' attempts to contest the very different Notices of Breach served under Subsoil Law 2010 cannot be said to be an appeal of the Acts of Inspection pursuant to the Law of Private Business. In any event, contrary to Claimants' position, a breach of the Law of Private Business would not result in a breach of Art. 72 of the Subsoil Law 2010, pursuant to which the Contracts were terminated. The two laws are different and there were grounds for termination arising from the monitoring of



KPM and TNG as well as for the inspections in June and July 2010. (RPHB 2 ¶¶ 367 – 368).

1200. Claimants' arguments, based on Mr. Suleymenov's testimony that there was a conspiracy behind the timing of the termination and the date the Subsoil Law 2010 was passed have not been proven. The law was heavily debated and took almost two years to pass. Mr. Suleymenov's opinion is irrelevant in this arbitration. (RPHB 2 ¶ 369).

1201. Claimants were given enough time to respond to the Notices of Breach and were aware of the many breaches set out therein. They participated in the July 2010 audit and were regularly involved in findings. The limited period for response was also justified by the breaches of monetary obligations and the requirement to provide information. Since production had nearly stopped, there was little chance of employees being paid, as senior managers left the country. Delay was not an option for the Republic. Claimants, however, made no attempt to seek an extension to the deadline and responded – insufficiently – within the period. (RPHB 2 ¶¶ 371 – 372).

## 3. The Tribunal

1202. It is the Tribunal's task to decide on the relief sought by Claimants, as recorded above in a separate chapter of this Award:

• *A declaration that Kazakhstan has violated the ECT and international law with respect to Claimants' investments;*

• *Compensation to Claimants for all damages they have suffered, as set forth in Claimants' Statement of Claim and Reply on Quantum and as further updated at the January 2013 Hearing and in Claimants' First Post-Hearing Brief, corresponding to the following amounts:*

1203. Regarding the first relief sought and repeated above, a declaration that Respondent has violated the ECT is possible already after a breach of the FET obligation has been found by the Tribunal.

1204. Regarding the second relief sought repeated above, if such damages are granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1205. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of Art. 13 by expropriation, if there are any further damages sought by Claimants not covered by the FET breach.

1206. As will be seen later in the chapters of this Award on Causation and Quantum, the FET breach has caused a taking of Claimants' investment, resulting in respective damages.



1207. In view of this, there is no need to examine whether the same results also from a breach of Art. 13 ECT.

1208. However, as will be seen and addressed in the chapter of this Award on Quantum, Art. 13 ECT provides some guidance regarding the calculation of damages.

## J.III.    **Respondent's Provision of Domestic Legal Remedies (Art. 10(12) ECT)**

### 1.    **Arguments by Claimants**

1209. Article 10(12) ECT obliges each Contracting Party to "*ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights with respect to Investments, investment agreements, and investment authorizations*." This obligation is distinct from customary international law, and is distinct but similar to the concept of denial of justice. Article 10(12) ECT was designed "*to prevent the travesties of justice that occurred in this case, by ensuring that an investor has an effective means to enforce its legal rights. Claimants had no ability to enforce their legal rights, and Kazakhstan is indisputably liable under the ECT for denying them the ability to do so*." (C-I ¶¶ 373 – 374, 379, partially quoted).

1210. The Tribunal in the *Chevron v. Ecuador* case stated that "*a failure of domestic courts to enforce rights 'effectively' will constitute a violation*" of the guarantee to provide effective means to assert claims and enforce rights. (C-I ¶¶ 373 – 374; C-II ¶ 548, partially quoted)

1211. The tribunal in *Chevron* also interpreted the "*effective means*" obligation as allowing the tribunal to examine the state's conduct, in addition to the system of laws and institutions in place. Claimants state that, in this way, the Tribunal is obliged to reassess the criminal case against Mr. Cornegruta. (C-I ¶¶ 375 – 376). Claimants explain as follows:

> 377.    *In the present case, the Tribunal need not assess the criminal case against Mr. Cornegruta and KPM de novo to determine that the Kazakh court issued decisions against Claimants that a "fair and impartial" Kazakh judge would never have reached. A fair and impartial judge would not have convicted KPM, which was not even named as a party in the criminal proceeding and could not have been, since criminal charges may not be brought against a company under Kazakh law. It would not have convicted KPM and Mr. Cornegruta when KPM had never operated a "main" pipeline, as acknowledged by the State itself in MEMR reports, and when Mr. Cornegruta was not an "entrepreneur" under Kazakh law but merely an employee of KPM. Additionally, a fair and impartial judge would have considered all the evidence before it. The Kazakh judge disregarded multiple expert reports from Claimants and based his decision solely on an unfounded and conclusory opinion from a Ministry of Justice employee.*

> 378.    *Further, a fair and impartial judge would have given KPM the opportunity to defend itself. It would not have confirmed the convictions on appeal and*



> *effectively prevented KPM from exercising its right to appeal.  (C-I ¶¶ 377 - 378).*

> 551.  *Finally, Kazakhstan's assertion that "it was legally correct and not to KPM's disadvantage that it was not a party to the [criminal] proceedings" is breathtaking.  Claimants do not deny that "a measure of deference" is to be "afforded to the domestic justice system."  However, Kazakhstan has far exceeded whatever "measure of deference" may exist under international law, as evidenced, inter alia, by its attempts to justify the findings of its courts ex post facto in the present arbitration.  [...].* (C-II ¶ 551).

1212. Kazakhstan's misconduct makes it liable to Claimants under the ECT and international law as Respondent has violated nearly every protection afforded foreign investors under the ECT and international law.  (C-I ¶¶ 380 – 383).

1213. Claimants state that Respondent is mistaken in its contention that Claimants cannot invoke Art. 10(12) ECT with regard to the Subsoil Use Contracts because they largely did not turn to courts or contractually agreed arbitral tribunals.  First, a foreign investor faced with a plethora of wrongful measures by a host state has the right to choose the forum with the more comprehensive jurisdiction.  Using the umbrella clause, international arbitration under the ECT is the appropriate choice since it covers both disputes relating to investments and contractual claims.  Moreover, the forum selection clauses in the Subsoil Use Contracts refer to the Arbitration Institute of the SCC. Second, Claimants have made a *bona fide* attempt to resolve their dispute before Kazakh courts, and this has been acknowledged by Respondent.  As to appeals, Claimants were either denied the possibility of appeal or were precluded from pursuing their pending law suits, at the latest by the July 2010 seizure of their investments.  Thus, Claimants utilized the means made available to them.  (C-II ¶¶ 548 – 550).

1214. At the Hearing on Liability, Mr. Condorachi explained Claimants' attempts to complain about the investigation, prosecution, and conviction of Mr. Cornegruta and KPM.  Respondent's witnesses also confirmed that there were at least 8 complaints from KPM and TNG, and one more from Terra Raf and Ascom.  Respondent's argument that KPM could have appealed, but failed to, is disingenuous since KPM was not a party and, therefore, could not appeal and, second, the Aktau City Court refused to provide KPM a certified copy of the judgment to enable them to appeal.  The evidence even shows that KPM challenged the court's refusal to send KPM this copy.  (CPHB 1 ¶¶ 205 – 210).  Kazakhstan's conduct in relation to the trial and the appeal violate its obligations under the ECT to provide effective means to assert claims and enforce rights.  (CPHB 2 ¶¶ 97 – 114).

1215. During the hearing, the judge refused to entertain Mr. Cornegruta's defense counsel's motion for a postponement in order to examine Mr. Baymaganbetov's evidence.  The trial transcripts also establish that the Financial Police were involved in the prosecution and influenced the trial process.  (CPHB 1 ¶¶ 201 – 204).

## 2.  **Arguments by Respondent**



1216. The text of Art. 10(12) ECT unambiguously establishes a legislative obligation to provide a fair and efficient system of justice, and does not encompass isolated failures of the judicial system in individual cases. (R-II ¶¶ 1108 – 1114, partially quoted).

1217. The availability of remedies hinders any claim if these remedies have not been pursued. Claimants, therefore, cannot bring a claim under Art. 10(12) ECT because they have failed to pursue remedies or exhaust appeals. As confirmed by other investment tribunals, the duty to exhaust remedies needs to be interpreted more strictly because of its specific meaning, which creates a legislative obligation to provide a fair and efficient system of justice. A high likelihood of success of these remedies is not required in order to expect a claimant to attempt them. (R-I ¶¶ 43.2 – 43.4, R-II ¶¶ 1125 – 1129, partially quoted; RPHB 2).

1218. Claimants conceded that they have not exhausted all remedies or appeals made available to them by Kazakh law. They have offered no evidence that pursuing such would have been ineffective or futile. With respect to their contract claims, they have not explained why they did not resort to the international arbitration proceedings as required in the Subsoil Use Contracts and in Contract 302. Contrary to their allegation, they did not have the right to choose the forum with the more comprehensive jurisdiction. The contract between the investor and the host state is the *lex specialis*, compared with the treaty between the two host states. Foreign investors must comply with exclusive forum selection clauses before they may rely on investment treaty guarantees. (R-I ¶¶ 40.1 – 40.4; R-II ¶¶ 1130 – 1134; RPHB 2 ¶ 374).

1219. Claimants did not appeal the Acts of Inspection of 15 July within the 3 days allowed as they could have under the Law of Private Business 2009. They, thus, have no basis to allege that they were denied the right to appeal the inspection reports. Claimants' contesting of the Notices of Breach served under the Subsoil Law 2010 are not appeals of the very different Acts of Inspection. In any event, Claimants were given enough time to respond to the Notices of Breach, and in any event, such allegations had been raised before. Claimants made no attempt to see an extension of either deadline. (RPHB 2 ¶¶ 368 – 372).

1220. Turning to Claimants' *Chevron* arguments, Respondent states that Claimants base their contention that *Chevron* is even applicable in this case on the allegation that case involved a similarly worded provision. Respondent compares these texts as follows (R-II ¶¶ 1110 – 1112, partially quoted, emphasis maintained):

> *1111.* *The relevant provision in the BIT between the USA and Ecuador, Article II(7), reads:*
>
> *Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations. (emphasis added)*
>
> *1112.* *In contrast, Article 10(12) of the ECT stipulates explicitly:*
>
> *Each Contracting Party shall ensure that its domestic law provides effective means for the assertion of claims and the enforcement of rights*



> *with respect to Investments, investment agreements, and investment authorizations.*

1221. That these provisions involve different requirements was confirmed by the *Amto v. Ukraine* tribunal, which clarified that the prerequisites of Art. 10(12) ECT are fulfilled if the foreign investor contends and proves legislative failures by the host state to provide a fair and efficient system of justice. (R-II ¶ 1115). This meaning of Art. 10(12) ECT is in accordance with the decision of the *Chevron* tribunal. Further still, even where tribunals have applied *Chevron* and considered Article II(7) of the BIT between the USA and Ecuador, tribunals have paid special attention to the legislative failures of a host state to provide a fair and efficient system of justice. (R-II ¶¶ 1116 – 1118).

1222. Claimants have neither contended nor proven that there was a legislative failure to provide a fair and efficient justice system, which is Claimants' responsibility under the *onus probandi* rule. With respect to the prerequisites carved out by the tribunal in *Amto v. Ukraine*, Claimants are required to contend and prove in particular that there was no legislation for the recognition and enforcement of property and contractual rights or that this legislation was not made in accordance with the constitution or was not publicly available or that there were no secondary rules of procedure so that the principles and objectives of the legislation could not be translated by Claimants into effective action in the domestic tribunals. (R-II ¶ 1119).

1223. Indeed, even if Art. 10(12) ECT extended to individual failures of the judicial system, Claimants would be required to prove procedural irregularity and interference, which they have not. With respect to the criminal proceedings against Mr. Cornegruta on behalf of KPM, Claimants' objection is that the proceedings were wrong in law. The Tribunal, however, is not a court of appeal for decisions of Kazakh courts. (R-II ¶¶ 1119 – 1123, 1135).

> *1135.   A tribunal's review of the host State's legislation is limited. This follows a fortiori from the fact, that even in cases which do not involve Article 10(12) of the ECT tribunals have concluded that their review of the decisions by local courts is limited. In Chevron v. Ecuador, for example, the tribunal stated that a measure of deference needs to be afforded to the domestic justice system and that the tribunal was not empowered to act as a court of appeal reviewing every alleged failure of the local judicial system de novo. (R-II ¶ 1135).*

1224. Claimants' argument that the *Chevron* decision allows the Tribunal to step into the shoes of the domestic courts and decide the merits of the case as would a fair and impartial judge relies on a statement that has been taken out of context. The *Chevron* tribunal did not assume the position of a host state judge in finding whether the assertion of claims clause had been breached. This Tribunal is not an appellate court. (R-I ¶¶ 40.6 – 40.7, 43.6 – 43.7).

1225. A tribunal's finding of a violation of 10(12) ECT is rare. The only published case in that respect is *Petrobart v. The Kyrgyz Republic*, which in any event is not convincing, since the Tribunal provided no reasons for its disregard of the express reference to domestic law in Art. 10(12) ECT. That case also involved a high degree of interference, which has not been alleged here. Cases where violations of



similar provisions have been found related to undue delays. In *Chevron*, there was an "*undue delay of judicial proceedings*" because Chevron's cases had been pending for 13 – 15 years. In *White Industries v. India*, a delay in jurisdictional proceedings of nine years and the Supreme Court's inability to hear a jurisdictional appeal for over five years amounted to undue delay. (R-II ¶¶ 1136 – 1141).

1226. Here, Claimants have neither contended nor proven that the criminal proceedings against Mr. Cornegruta on behalf of KPM suffered from undue delay. None of Claimants' allegations about the trial in any way being unfair or impartial is true – and the fact that the decision came out against Claimants does not automatically mean that they were unfair. While Respondent admits that certain evidence was excluded from trial, this was due to a number of reasons including the lack of attendance of witnesses at trial and non-compliance with procedures for appointing witnesses. None of the expert reports complied with Art. 243 CPC, which requires that experts be drawn from a limited pool of expertise. Claimants provided no evidence of KPM and TNG's requests for these opinions, making it impossible to divine the scope of their requests, and there was no guarantee that any of the bodies issuing opinions – some of which were involved in the design and construction of the pipelines – were independent from Claimants. (R-I ¶ 28; R-II ¶¶ 1140 – 1144; RPHB 2 ¶¶ 203 – 207).

1227. At the Hearing on Jurisdiction and Liability, Prof. Olcott demonstrated that the principles of justice in the Kazakh legal system are in place and are complied with sufficiently to prevent violations of due process. Prof. Olcott – who demonstrated her credibility by also criticizing some aspects of the Kazakh legal system – explained the training that judges receive as well as the transparency of decisions. That the Kazakh legal system complies with the legal principle of due process is also confirmed by the Global Integrity 2008 report. Although Claimants allege that the Kazakh judiciary does not meet Western standards, the Republic has the elementary principles of justice in place to prevent violations of due process. (RPHB 1 ¶ 486 – 495).

1228. Also at that Hearing, Claimants made the flawed contention that the trial against Mr. Cornegruta amounted to a denial of justice. While Respondent concedes that it is acknowledged that the FET standard includes the obligation not to deny justice in criminal proceedings, such a claim "*requires a manifest and gross failure to comply with the elementary principles of justice" that "offend[s] a sense of judicial propriety.*" Tribunals such as *Loewen v. U.S.* and *Thunderbird v. Mexico* confirm that his is a very high threshold, in absolute and in relative terms. For criminal proceedings, as elaborated in *Tokios Tokelés v Ukraine, "the sense of judicial propriety must be shocked by a manifest and gross failure to comply with elementary principles of justice.*" While this stands in stark contrast to the sophisticated legal framework in the Western world, this minimum standard has not been breached in the present case. With respect to the witnesses that "*were struck off*", Art. 311 CPC requires a witness to attend trial and to be examined in order that their evidence is accepted. None of the reports submitted complied with Kazakh law. Regarding the complaint that the criminal fine was assessed against KPM, this is consistent with Kazakh law and general principles of procedural fairness. KPM was always represented during the trial and had every opportunity to appeal. Regarding Claimants' allegation that the amount recovered was disproportionate to KPM's profits, this is not relevant in the denial of justice



analysis, which requires a manifest and gross violation of the elementary principles of justice. Finally, with respect to Claimants' contradictory complaint about the enforcement of the criminal fine, enforcement is a characteristic feature of the elementary principles of justice, not a failure to comply with those principles. (RPHB 1 ¶¶ 256 – 260; 496 – 520).

1229. Claimants could have appealed the 18 September 2009 decision against Mr. Cornegruta to the Supreme Court in Kazakhstan, but chose not to. KPM did not challenge the decision to not provide a copy of the hearing transcript or decision to KPM and its failure to appeal the decision – a decision that it always had access to – is not the fault of Respondent. (RPHB 2 ¶¶ 265 – 271).

### .3. **The Tribunal**

1230. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1231. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of Art. 10(12) ECT, if there is any other relief sought by Claimants not covered by the FET breach.

1232. Claimants' allegation of a breach of Art. 10(12) leads to no further relief sought than that resulting from the FET breach.

## J.IV. Whether Kazakhstan Provided the Most Constant Protection and Security to Claimants' Investments (Art. 10(1))

### 1. **Arguments by Claimants**

1233. The ECT offers a more robust level of protection than most BITs and Claimants' investment is entitled to such protection:

> 318. Article 10(1) of the ECT provides that investments "shall enjoy the most constant protection and security." This provision is similar to – but notably stronger than - the more commonly-used language in investment treaties that obligates host States to provide "full protection and security" to investments. [...]. (C-I ¶ 318).

1234. Earlier cases, like *AAPL v. Sri Lanka*, stated that the only "*due diligence*" required to be undertaken by the host state in order to provide "*most constant protection and security*" was to have reasonable measures of prevention in place. This was confirmed in *AMT v. Zaire*, which added that the host state, Zaire, also needed to comply with its own national laws. These cases have since been expanded upon, such as in the case *CME v. Czech Republic*, which expanded the definition so as to include full protection of licensing rights, among others. (C-I ¶¶ 320 – 325).



1235. Claimants state that, while the "*most constant protection and security*" standard was at one time invoked for failure to provide physical protection to an investment, the standard today clearly encompasses legal security. This has been demonstrated by consideration of the standard by several investment treaty tribunals, including *Biwarter Gauff v. Tanzania*, *Siemens v. Argentina*, *Vivendi II*, and *National Grid v. Argentina*. These tribunals found that the standard was wider than mere physical protection – especially in cases involving intangible assets. (C-I ¶¶ 319, 326 - 328; C-II ¶¶ 482 - 484).

1236. In addition to failing to provide legal security, Respondent failed to provide physical security, as demonstrated by "*Kazakhstan's callous arrest of Mr. Cornegruta, its attempts to arrest the other senior in-country managers of KPM and TNG, and its harassment of company staff during its investigations[,] [which] clearly undermined the physical security of Claimants' investments and rendered them an unsafe place to work. Kazakhstan's outright physical seizure of KPM and TNG in July 2010 amounts to a breach of its duty to provide both physical and legal protection and security.*" (C-II ¶ 485).

1237. Respondent cites no authority for its proposition that including "*legal security*" in "*most constant protection and security*" would make the standard identical to FET. Other tribunals have recognized the obligations to be separate. In any event, the fact that two protections rely on the same facts does not obviate the need for the Tribunal to consider each protection. (C-II ¶ 486).

1238. Claimants contend that Respondent has conflated the "*most constant protection and security*" standard with the obligation to provide effective means to assert claims and enforce rights under Art. 10(12) ECT. In making this argument, Respondent overlooks that it was the instigator and perpetrator of the violations. (C-II ¶ 488).

> 489. *Kazakhstan cites three cases to support its argument that the obligation to ensure the most constant protection and security is one of mere diligence or vigilance of the host State. However, the issue arose in those three cases because the respective tribunals needed to determine whether the acts in question were attributable to the host state and whether the state could have protected claimants. In the present case, Kazakhstan does not — and cannot — dispute that the misconduct complained of was perpetrated by Kazakhstan. There is no issue of state attribution in this case. As the Tribunal in Wena v. Egypt concluded, where the host State is itself the instigator or a participant in the violations, there is "no question" that the obligation was breached. As it is Kazakhstan itself that instigated and carried out the breach of the ECT's most constant protection and security standard, it is not relevant that the standard might also import a due diligence standard in respect of the conduct of others. (C-II ¶ 489).*

1239. Claimants provide examples of Respondent's deliberate conduct and argue that Respondent's failures to respond to Claimants' requests for assistance make these violations even more severe. (C-I ¶¶ 332 – 333):

> • *On January 19, 2009, Claimants filed complaints with the Western Regional Transport Prosecutor, the General Prosecutor's Office, the*



Ministry of Justice, and the MEMR against the Financial Police in respect to its illegal actions and to obtain the dismissal of the criminal case against KPM. The only answer Claimants received was a notice from the Financial Police that their complaints were dismissed and that a criminal case also being initiated against TNG.

- On March 18, 2009, Claimants submitted a new complaint with the General Prosecutor's Office regarding the illegal initiation of criminal cases against KPM and TNG. Claimants never received an answer to this complaint.

- In the period from October 2008-March 2009, Claimants wrote to the MEMR to obtain the extension of the exploration period for Contract No. 302 prior to its expiration on March 30, 2009. The extension was never granted, in violation of the Government's commitments.

- As per the request of the MEMR, on April 30, 2009, Claimants submitted addendum No. 9 to Contract No. 302 for the extension of the exploration period for execution by the MEMR. Claimants never received an answer to this request for an extension.

- On March 24 and 25, 2009, Claimants requested that Kazakhstan confirm that Terra Raf was the legitimate owner of TNG and confirm its prior waiver of its pre-emptive rights. Claimants never received an answer to this request.

- On April 26-27, 2009, Claimants filed complaints with the Regional Prosecutor's Office and the Western Regional Transport Prosecutor regarding the arrest of Mr. Cornegruta. Claimants never received an answer to their complaints.

- On May 7, 2009, Claimants appealed directly to President Nazarbayev to obtain the release of Mr. Cornegruta, protect the former and current management of KPM and TNG, and end the dispute. President Nazarbayev ignored the request and never responded.

- After Mr. Cornegruta was sentenced to four years in prison, his wife and Claimants obtained an undertaking from Moldova to request the transfer of Mr. Cornegruta to serve his sentence in his home country, closer to his family. However, the Kazakh Prosecutor General, at the request of the Financial Police, always requested further assurances from Moldova that he would indeed serve his sentence. In the end, Kazakhstan refused to extradite him.

- Kazakhstan improperly assessed alleged corporate back taxes and penalties against KPM and TNG in the amount of approximately USD 62 million. While KPM's and TNG's court challenges to those assessments were pending, Kazakhstan issued a bankruptcy notice on February 3, 2010.



- *On July 16, 2010, despite being only given three days to respond to the accusations of alleged violations of the Subsoil Use Contracts, KPM and TNG provided detailed explanations refuting the State's accusations. Claimants' timely responses were ignored, and Kazakhstan unilaterally repudiated the Subsoil Use Contracts. (C-I ¶ 332).*

1240. Kazakhstan failed to respond to Claimants' complaints, despite having the ability to do so, as it did upon receiving a hand-written complaint from four unknown residents of the Mangystau Region in July 2010. This conduct violates the most constant protection and security standard, as elaborated in *Siag v. Egypt* and *Wena Hotels v. Egypt*. (CPHB 2 ¶¶ 140 – 148).

1241. Kazakhstan's abrupt reversal of its 2007 commitment that it consented to the Gheso – Terra Raf transfer of TNG obliterated "*the agreed and approved security and protection*" of Terra Raf's ownership of TNG. This was in violation of Kazakhstan's duties to provide "*the most constant protection and security*" to Claimants' investments. In addition, Claimants have endeavored to have the MEMR withdraw its notices for breach of Contracts 210 and 302 for failure to honor the State's pre-emptive right, but Respondent took no action, effectively hanging an indefinite cloud over Claimants' reputation and title to TNG. (CPHB 2 ¶¶ 115 – 126).

1242. With regard to Kazakhstan's contention that "*Claimants have not attempted to show that Kazakhstan has failed to provide reasonable mechanisms of protection and that the facts put forward by Claimants are 'completely disconnected from Claimants' own legal understanding of the guarantee*", Claimants state that Respondent's assertion is contradicted by the facts. Claimants explain that "*[this] scheme was orchestrated by the President of Kazakhstan, other senior Government officials, and the Financial Police was carried out by officials, judges, and law enforcement and other agencies who, in violation of their duties and contrary to Kazakh and international law, conducted a campaign of harassment and coercion against Claimants from October 2008 until July 2010.*" Claimants' further arguments that Kazakhstan's conduct violated the most constant protection and security standard of the ECT are best taken from their own words: (C-II ¶ 491 – 492)

492. *[...] the pretext for Kazakhstan's conduct was a letter from President Voronin to President Nazarbayev that provided the justification for Kazakhstan's actions. President Nazarbayev seized upon the opportunity and ordered Kazakhstan's State organs to effectively destroy Claimants' investments in Kazakhstan.*

493. *In terms of physical security, Kazakhstan arrested and incarcerated Mr. Cornegruta, the general manager of KPM, on trumped-up criminal charges. The court decisions that sentenced Mr. Cornegruta to four years in jail and fined KPM in excess of US$ 145 million were entirely unfounded and unlawful because the provisions of Kazakh law relied on by the Kazakh courts did not, and could not, justify the reclassification of KPM's 18-km pipeline as a main pipeline. The ridiculous calculation of KPM's allegedly enormous "profits," and the sentencing of KPM — a non-party to the criminal trial – were further travesties of justice. Kazakhstan relied on the same frivolous legal grounds to initiate criminal*


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE
**683**

> *actions against four other general managers of KPM and TNG and threaten their arrest. Those four general managers had no choice but to flee the country. Kazakhstan also summoned, interrogated, and threatened a number of Claimants' key in-country personnel, based on the same manufactured allegations. Respondent also conducted searches and raids of KPM's and TNG's offices, all in clear violation of the most constant protection and security standard.*

> 494. *Furthermore, the Kazakh courts, the Prosecutor's Office, the Financial Police, and numerous Government officials rejected Claimants' repeated protests, requests for assistance, lawsuits, and appeals filed by Claimants, KPM, TNG, and Mr. Cornegruta. From the President of Kazakhstan to the Financial Police, from the Governor of the Mangystau Region to the MEMR (and its successor, the MOG), Kazakhstan colluded to deprive Claimants of their investments.*

> 495. *Those State organs, including the courts, the central Government, and local authorities, acting in blatant violation of Kazakh law and international law, also harassed and coerced Claimants by requesting payment of debilitating taxes and custom duties that were never due, by refusing to extend the exploration period of the Contract 302 Properties, and by reversing the State's prior waiver of its pre-emptive right for the transfer of TNG to Terra Raf. (C-II ¶¶ 492 – 495).*

1243. The intimidation, coercion, and threats by Kazakhstan, described in detail above, violate the standards of full protection and security. Other tribunals, like *Pope & Talbot v. Canada*, which found that the government's threat to refuse to grant future export quotas if the investor failed to cooperate with an audit, have found much less intense and less threatening conduct sufficient to constitute a violation of this standard. (CPHB 2 ¶¶ 49 – 51, 59).

## 2. Arguments by Respondent

1244. Contrary to Claimants' assertion, Article 10(1) ECT extends only to physical security and not to legal security. In addition, the prevailing view of tribunals in investment treaty arbitrations is that the standard encompasses solely physical protection and security. (R-II ¶¶ 957 – 960, 969 – 970).

1245. There are manifold reasons that tribunals have restricted the scope of the duty to provide full protection and security to only physical damage and violence. Some tribunals compare this duty with the customary international law duty relating to aliens to provide full protection and security of foreign nationals. Under customary international law, foreign nationals can expect to be protected from physical damage, but not from legal instability. This is because customary international law of aliens only establishes a minimum standard of protection. There is no reason to expect that *"legal security"* is included in the treaty, absent a statement to that effect. (R-I ¶¶ 36.3, 36.8 – 36.9; R-II ¶¶ 961 – 964).

1246. Respondent also contends that the standards FET and *"full protection and security"* have different substantive meanings. While the FET standard obliges the host state to abstain from a certain course of action, the full protection and security standard obliges the host state to actively create a framework which grants security.



Blurring these distinctions creates legal uncertainty. (R-I ¶ 36.11; R-II ¶¶ 965 – 967). A further argument is best taken from Respondent's words:

> *964.*    *Another reason for the need to restrict the scope of the provision of full protection and security to physical damage and violence is the fact that this guarantee must have a meaning beyond, and distinct from, the standard of fair and equitable treatment. Legal protection in terms of an investor's legitimate expectation and its interest in a stable and predictable business environment is already encompassed by the provision on fair and equitable treatment. Claimants' assumption that both provisions can be read as comprising legal protection although they are stipulated separately from each other violates the principle of systematic interpretation, whereby a legal system is self-consistent and therefore no provision can be contrary to another. Furthermore, Claimants' assumption violates the principle of effective interpretation, requiring a purpose and object oriented interpretation, because the separate stipulation of two provisions aims at establishing two distinct guarantees. (R-II ¶ 964).*

1247. *Siemens v. Argentina*, cited by Claimants in support of their contention that the standard of most constant protection and security includes legal security, is inapplicable here.    That case concerned the Argentina-Germany BIT which contained the term "*legal security*" in the relevant provision on full protection and security. The ECT does not expressly refer to legal security, and these facts have been ignored by Claimants. As Respondent states, "*by argumentum e contrario, Claimants' conveniently partial quotation of Siemens v. Argentina illustrates once more that the guarantee of most constant protection and security does not encompass legal security unless the investment treaty explicitly states otherwise. Rather, it requires the host state solely to provide protection from physical damage and violence.*" (R-II ¶¶ 971 – 972).

1248. The duty of ensuring most constant protection and security requires a host state to diligently implement reasonable measures of protection, and the Republic has provided such measures.   The broad consensus, as reflected in the *Noble v. Romania*, *AAPL v. Sri Lanka*, and *AMT v. Zaire* cases, is that reasonable measures are all that is required.  Claimants even acknowledge that these cases confirm this argument. The facts in the present case do not alter the general principle that the duty of full protection and security is restricted by a concept of reasonableness. (R-I ¶¶ 36.4 – 36.5; R-II ¶¶ 973 – 978).

1249. Respondent's response to Claimants' comparison between Art. 10(1) ECT and Art. 10(12) ECT is best taken from its own words:

> *981.*    *Whilst Article 10 (12) of the ECT requires the host state to implement reasonable measures of assertion of claims and enforcement of rights, Article 10(1) of the ECT requires the host state to implement reasonable measures of protection and security.  In particular, the guarantee under Article 10(12) of the ECT refers to the legislative obligation of a host State to provide a fair and efficient system of justice. This illustrates the systematic coherence of the individual provisions within the ECT, not their conflation. By drawing the comparison between Article 10(1) of the ECT and Article 10(12) of the ECT, Claimants thus reinforce the fact that the*



*implementation of reasonable measures is sufficient in terms of Article 10(1) of the ECT. (R-II ¶ 981).*

1250. Further still, an obligation to provide "*legal security*" would run contrary to the purpose of the ECT. It would be vague and host states would be unable to determine whether their legal framework was adequate for future tribunals to rule in its favor. Such a standard, as expressed by the *Saluka* tribunal, would dissuade host states from admitting foreign investments, thereby undermining the purpose of the Treaty. (R-I ¶ 36.10).

1251. Claimants have not challenged that the Republic possesses the necessary legal framework to provide protection from physical damage and violence to foreign investors and investments. In order to prevail, however, Claimants must prove the absence of reasonable measures. They have not met this burden. (R-I ¶ 36.12; R-II ¶ 982 – 984). Respondent explains:

> 985. *It is undisputed that Claimants and their assets have not been physically harmed and that not a single one of their representatives has been hurt. In particular, Mr. Cornegruta and the other senior in-country managers of KPM and TNG were not injured. As explained above, Mr. Cornegruta received a fair trial and the verdict was upheld upon appeal. The alleged harassment of company staff during the investigations did not result in any physical harm of the employees either. Although Claimants contend that the investigations rendered KPM and TNG an unsafe place to work, they have not offered any proof thereof because, again, not a single employee has been injured during these inspections and investigations. Apart from that, as has been established above, company staff have never been harassed but have rather experienced ordinary concomitants of lawful investigations. (R-II ¶ 985).*

1252. Further, Claimants' assets were not taken by use of force. Claimants' investments have not been taken, but rather have been held in trust management ever since they were abandoned by Claimants. To the extent that Claimants argue that their investments were taken by use of force, however, under the ruling in *SAUR International SA v. Republic of Argentina*, a take-over using police force does not violate the guarantee of full protection and security. (R-I ¶ 36.13; R-II ¶ 986).

1253. Finally, the facts pleaded by Claimants do not relate to the guarantee of most constant protection and security. Claimants have not proven that the alleged losses and injuries would have been prevented but for the alleged insufficiency of reasonable measures. As this has not been addressed by Claimants at all, Claimants have failed to establish a breach of the Art. 10(1) ECT guarantee of full protection and security. (R-I ¶¶ 36.2, 36.12 – 36.15; R-II ¶¶ 988 – 989).

### 3. The Tribunal

1254. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.



1255. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation to provide most constant protection and security to Claimants' investment according to Art. 10(1) ECT, if there is any other relief sought by Claimants not covered by the FET breach.

1256. Claimants' allegation of this further breach leads to no further relief than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1257. There is, therefore, no need to examine whether such a further breach has been shown.

### J.V.   Whether Kazakhstan Impaired Claimants' Investment Through Reasonable and Non-Discriminatory Measures (Art. 10(1) ECT) (Alternative Claim)

#### 1.   Arguments by Claimants

1258. Article 10(1) ECT provides that "*no Contracting Party shall in any way impair by unreasonable or discriminatory measures*" the "*management, maintenance, use, enjoyment or disposal*" of an investment. To prevail in their argument under Article 10(1) ECT, it is sufficient for Claimants that Respondent's actions were either "*unreasonable*" or "*discriminatory*." Claimants present that Respondent's actions were both. (C-I ¶¶ 352 – 353).

1259. Claimants present that, "*over the past several years, the Tribunals in BG Group v. Argentina; Siemens v. Argentina; ADC v. Hungary; Azurix v. Argentina; and Saluka v. Czech Republic have all determined that conduct of a host State violated an impairment clause, thereby breaching the relevant treaty.*" (C-II ¶ 517). While Respondent does not dispute that measures need only to be arbitrary to violate the ECT, Respondent nevertheless considers that this is a high threshold. Respondent's reliance on *ELSI* for the position that it is a high threshold is misguided. The definition of arbitrariness used in *ELSI* has faced criticism, since it does not accord with the ordinary meaning of the term as required by Art. 31(1) VCLT. None of the cases cited by Respondent have eschewed the ordinary meaning of the term or limited the notion of "*arbitrary*" treatment to Kazakhstan's narrow articulation of the standard. (C-II ¶¶ 518 – 520).

1260. The term "*reasonable*" - interpreted according to its ordinary meaning as required by the VCLT - means "*based on or using good judgment and therefore fair and practical.*" In *Saluka v. Czech Republic*, the tribunal stated that "*reasonableness*" requires a state's conduct to bear "*a reasonable relationship to some rational policy.*" Likewise, the tribunal in *CME* found the state's actions to be unreasonable because they were unjustified and improper. (C-I ¶¶ 355 – 357). Likewise, "*unreasonable*" has been found to refer to a wider scope of acts that are intentional, shocking or improper. (C-II ¶ 523). As the *EDF v. Romania* tribunal found, such unreasonable measures could include:



a. *a measure that inflicts damage on the investor without serving any apparent legitimate purpose;*

b. *a measure that is not based on legal standards but on discretion, prejudice or personal preference;*

c. *a measure taken for reasons that are different from those put forward by the decision maker;*

d. *a measure taken in willful disregard of due process and proper procedure. (C-II ¶ 523).*

1261. In this regard, Claimants present seven examples of Respondent's conduct and argue why these were actions that were arbitrary, shocking, and in willful disregard to the due process of law. (C-II ¶ 524; CPHB ¶¶ 60 – 70, 97 - 114).

* *Kazakhstan's "reclassification" of KPM's and TNG's pipelines as "main" pipelines, despite there being no "main" pipeline as acknowledged by numerous State authorities and agencies;*

* *Kazakhstan's arrest, conviction, and incarceration of Mr. Cornegruta, which did not serve any legitimate purpose, were not based on legal standards, and were carried out in willful disregard of due process and proper procedure;*

* *Kazakhstan's criminal verdict against the non-party KPM, freezing of KPM's assets, and barring of KPM from lodging an appeal against its conviction, which inflicted considerable damage on Claimants without serving any legitimate purpose and violated applicable legal standards, due process and proper procedure;*

* *Kazakhstan's retroactive reversal of its approval of the transfer of TNG to Terra Raf and waiver of its pre-emptive rights, which did not serve any legitimate purpose, had no legal basis, and violated due process; [see also CPHB 2 ¶¶ 115 – 126).*

* *Kazakhstan's refusal to extend TNG's exploration period in the Contract 302 Properties, notwithstanding its express approval of the extension (CPHB 2 ¶¶ 149 – 176);*

* *Kazakhstan's imposition of the Crude Oil Export Tax on KPM, which violated exemption and legal stabilization clauses in the Subsoil Use Contract and inflicted damage on Claimants without serving any legitimate purpose; and [see also CPHB 2 ¶¶ 127 – 139]*

* *Kazakhstan's wrongful and unilateral repudiation of KPM's and TNG's Subsoil Use Contracts without any justifiable basis and without providing the companies any opportunity to cure the alleged deficiencies. (C-II ¶ 524).*

1262. Regarding the retro-active reversal, Respondent did not have a pre-emptive right to TNG in 2003 and, in any event, Respondent consented to the transfer in 2007. The



retroactive refusal of consent clouded Claimants' title to TNG and its reputation and prevented Claimants from selling. (CPHB 2 ¶¶ 115 – 126).

1263. The main pipeline charges were, in any event, reverse-engineered fabrications. The Financial Police first alleged that KPM and TNG did not have main pipeline licenses. They then confirmed that they could impose a devastating penalty. Then they sought out an authority to opine that the companies were operating trunk pipelines. At the time, Kazakhstan knew that it could potentially recover 41 billion Tenge (approx. USD 350 million) if the pipelines could be considered "*main*." (CPHB 2 ¶¶ 61 – 68).

1264. A reverse-engineered criminal conviction would meet every definition of an unreasonable measure provided in *EDF v. Romania*. (CPHB 2 ¶ 69). The same is true for every act of indirect expropriation. (CPHB 2 ¶¶ 69 – 70).

1265. The criminal allegation of "*illegal entrepreneurial activity in an especially large amount*" under 190(2)(b) of the Kazakh Criminal Code was malicious and contrived. They contrived the operation of the main pipeline to satisfy the "*illegal entrepreneurial activity*" element of the crime. The second element, "*in an especially large amount*" was manufactured by manipulating instructions to the Tax Committee and calculating the "*illegal profits*" by including both the transport fee KPM earned from TNG for use of the pipeline, as well as KPM's entire revenues from the onward sales of oil. This is contrary to Kazakh law, which requires the deduction of lawfully obtained revenue from otherwise illegal activity. The proper calculation would have yielded 12,000 – 13,000 in illegal profits. The threshold for such a crime was USD 17,000. (CPHB 2 ¶¶ 80 – 84, 87).

1266. The term "*discrimination*", means "*differential treatment; especially, a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.*" It entails two elements: "*first, the measures directed against a particular party must be for reasons unrelated to the substance of the matter .... Second, discrimination entails like persons being treated in an inequivalent manner.*" (C-1 ¶¶ 358 – 359, partially quoted). Claimants present that Respondent agrees with Claimants' and the *Saluka* tribunal's definition of discrimination that "*State conduct is discriminatory, if (i) similar cases are (ii) treated differently (iii) and without reasonable justification.*" (C-II ¶ 525).

1267. Claimants argue that they have met their burden of proof regarding the similarity of cases to establish discriminatory treatment. The extraordinary campaign of harassment and coercion between October 2008 and July 2010, and the outright seizure in July 2010 was discriminatory because these actions singled out KPM and TNG. Respondent's actions were also discriminatory because they singled out Claimants for different treatment from other investors in Kazakhstan's oil and gas industry. Claimants present that no other investor's in-field gathering systems were reclassified as trunk pipelines, and that no other investors were subjected to criminal prosecution based on that charge. Neighboring companies, including KTM, operate similar pipelines as part of their in-field gathering system. Furthermore, "*if Kazakhstan's contention that a contractor's pipeline extending outside the Contract Area is a [trunk] pipeline were correct, hundreds of oil and gas companies in Kazakhstan would operate [trunk] pipelines, but only Claimants' companies have faced that charge.*" All of the information available to the



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF **689**

Tribunal suggests that the companies are comparable. Accordingly, as the tribunals in *Feldman v. Mexico* and *Nykomb* held, once *prima facie* evidence of *de facto* discrimination had been presented by the claimant, the burden of proof shifts to the respondent to rebut the presumption of discrimination. Respondent has not rebutted this presumption. (C-I ¶ 354 – 362; C-II ¶¶ 525 – 528).

1268. Respondent's violations of the ECT's impairment clause are beyond serious dispute. The *Saluka* tribunal defined "*impairment*" according to its ordinary meaning as required by Art. 31 VCLT as "*any negative impact or effect caused by measures taken by the host state*." While Respondent disputes that its conduct "*impaired*" Claimants' management, maintenance, use, enjoyment, and disposal of their investments, this is belied by the facts. By the time of Respondent's outright seizure of Claimants' investments in July 2010, Claimants' investments in KPM and TNG had already been impaired for twenty months. The intrusive audits following President Nazarbayev's 14 October 2008 order had just such a negative impact. Likewise, the 18 December 2008 repudiation of the unequivocal approval of the 2003 transfer of TNG to Terra Raf and the accompanying press release that accused Claimants of forgery damaged Claimants' ability to dispose of their assets. In addition, Respondent cannot deny the financial burden that the audits and inspections led by the Kazakh Financial Police had on Claimants. These audits resulted in the improper assessment of USD 62 million of alleged corporate back taxes in February 2009, the imposition of illegal export duties against KPM in December 2008, and an intrusive 13-month audit of KPM and TNG with respect to transfer pricing that began in November 2008. Respondent's refusal to execute the agreed upon extension of TNG's exploration period for Contract 302 prohibited Claimants from establishing the full market value of those properties. Finally, "*Kazakhstan's reclassification of the KPM and TNG gathering systems as [trunk] pipelines, which resulted in criminal proceedings against four then-existing and former general managers of KPM and TNG and a sham trial, conviction, and incarceration of Mr. Cornegruta, clearly impaired Claimants' ability to manage their investments. Top personnel left the country and the conviction itself was used to ultimately take over the companies. Similarly, Kazakhstan froze KPM's assets in an effort to execute the US$ 145 million judgment against KPM, thereby directly impairing Claimants' management, use, and enjoyment of KPM.*" (C-II ¶¶ 529 – 535; CPHB 1 ¶ 207; CPHB 2 ¶¶ 149 – 176).

1269. The Subsoil Use Law changed on 24 June 2010 and permitted Kazakhstan to terminate contracts when a contractor failed to cure two or more violations. Respondent's failure to offer Claimants an opportunity to cure the alleged contract violations was not in good faith. As explained above, these minor violations did not merit termination of the contracts, making the termination unreasonable. As explained at the hearing, KPM and TNG received notices of alleged infringements on 16 July 2010 and were required to cure by 19 July 2010. This was confirmed in Mr. Pisica's testimony. Even if the claims had been valid – and they were not – it would have been impossible for Claimants to cure within the time given. (CPHB 1 ¶¶ 278 – 293).

## 2. Arguments by Respondent

1270. Respondent explains that is has adhered to its obligations under Article 10(1) ECT at all times. Its measures were neither unreasonable nor discriminatory. The



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF **690**

management, maintenance, use, enjoyment, or disposal of Claimants' investments was not impaired in any way. (R-II ¶ 1009).

1271. Using Art. 31 VCLT, which requires that a treaty term shall be interpreted in accordance with the ordinary meaning of the term, Respondent states that the ordinary meaning of "*unreasonable*" is "*irrational; foolish; unwise; absurd; silly; preposterous; senseless; stupid*." Respondent submits that the Parties agree that the term "*unreasonable*" is interchangeable with the term "*arbitrary*." For this reason, the *ESLI* court's definition of the term "*arbitrary*" can be transferred onto the term "*unreasonable*" in the sense of Art. 10(1) ECT. (R-II ¶¶ 1011 – 1013). The *ELSI* court's definition was as follows:

*[B]y itself, and without more, unlawfulness cannot be said to amount to arbitrariness. [...] To identify arbitrariness with mere unlawfulness would be to deprive it of any useful meaning in its own right. [...] Arbitrariness is not so much something opposed to a rule of law, as something opposed to the rule of law. [...] It is a willful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety. (R-II ¶ 1012).*

1272. While Claimants have noted the similarities between the definition of "*unreasonable*" and "*arbitrary*", they overlook the conclusion that, given the similarities of both definitions, customary international law and the *ELSI* case both establish a high threshold for measures to be considered "*unreasonable*." (R-II ¶¶ 1013 – 1016). This is confirmed by scholars as well as by anecdotal evidence that, "*while 30 percent of arbitral tribunals find that certain state measures amount to unreasonable or arbitrary conduct over all, only 22 per cent of those applied the ELSI or a similarly high standard [...]. It is because of this high threshold established in the ELSI case that findings of unreasonableness or arbitrariness are rare.*" In three of the cases cited by Claimants, the tribunals did not find that the respective measures of the host state reached the allegedly low threshold of unreasonableness. These cases were *LG&E*, *National Grid PLC*, and *EDF v. Romania*. (R-II ¶¶ 1016 – 1018).

1273. It is untrue that the *ELSI* standard for arbitrary treatment has been "*the target of much criticism*." Rather, the overwhelming majority of scholars and tribunals have applauded the reasoning in the *ELSI* case. The tribunal in *Siemens v. Argentina* even adopted it as "*the most authoritative interpretation of international law*." (1019 – 1021).

1274. Respondent also presents an additional argument that "*unreasonableness*" is a high standard:

> *1022.   The adoption of a lower threshold would result in classifying all governmental regulations adversely affecting foreign investors as inherently suspect, thereby shifting the burden of proof from the foreign investor to the host state. Forcing host states to demonstrate that their measures were not unreasonable because there were no less restrictive alternatives available would clearly contradict the onus probandi rule. For this reason the ELSI standard is widely deemed to be the most authoritative interpretation of the term "unreasonable". Furthermore, in view of the vagueness of all definitions of "unreasonable", the legal assessment of whether a certain measure is unreasonable or not remains a*



> *subjective process prone to unequal treatment and misjudgement. This forms another reason why a high threshold is justified. (R-II ¶ 1022).*

1275. Respondent summarizes some case law on this point and presents how other tribunals have used the *ELSI* test. In *Genin v. Estonia* the test was further developed and refined, and the tribunal added the requirement "*willful disregard of due process of law*." The tribunal in *CME v. The Czech Republic* added a subjective element, that "*the host state's intention to deprive the investor of its investment as a pretext of a decision based on law*." Other tribunals, like *Enron v. Argentina* and *Sempra v. Argentina* considered the elements of arbitrariness, finding that "*regardless of intent, arbitrariness requires that some important measure of impropriety be manifest*." Finally, the tribunal in *Nobel v. Romania* found that an action would not be unreasonable if the proceedings of the kind in question are provided in all legal systems for much of the same reasons. By *argumentum e contrario*, only a measure which falls short of even such minimum standard will be unreasonable. (R-II ¶¶ 1023 – 1027).

1276. The Republic's measures did not reach the threshold of unreasonableness incorporated by the ordinary meaning of the term, let alone the one stipulated by the ICJ in *ELSI*. Respondent's actions and inactions were lawful and were not irrational or senseless or "*unreasonable*." The measures were not shocking to sense the judicial propriety in terms of the *ELSI* standard. This is confirmed by the fact that the Republic had no intention of depriving Claimants of their investments (unlike the respondent in the *CME* case), and the measures undertaken are provided for in all legal systems for much of the same reasons, just like Romania's measures in *Noble v. Romania*. (R-II ¶¶ 1028, 1037). Respondent's arguments related to each action alleged by Claimants are best taken from its own words:

> *1029. First, Claimants allege that the Republic's classification of KPM's and TNG's pipelines as trunk pipelines was unreasonable. However, Claimants had operated trunk pipelines without a licence. This was confirmed by the Republic's independent courts, warranting criminal proceedings and the levy of a fine. The due amount of this fine was equally assessed by an independent court. Also, the Republic only took enforcement measures and froze KPM's assets upon non-payment of the fine. In conclusion, the Republic applied the law correctly and its classification of KPM's and TNG's pipelines as trunk pipelines was not unreasonable. (see also RPHB 2 ¶¶ 151 – 218).*

> *1030. Claimants continue by suggesting it was unreasonable of the Republic to arrest, convict and incarcerate Mr. Cornegruta. As to arrest, Mr. Cornegruta had been identified by the Financial Police as the likely individual responsible on behalf of KPM for illegal entrepreneurship under Section 190(b) of the Criminal Code of Kazakhstan. The decision to arrest him was taken on valid ground by the court in accordance with the relevant provisions of the criminal code. As to the reasonableness of the decision to convict Mr. Cornegruta, [...] process was a key part of the way in which the decision and the later appeal of the decision against Mr. Cornegruta was taken. The actions of the various authorities were taken within the law.*



1031. *Subsequently, Claimants contend that the Republic's "criminal verdict against the non-party KPM" amounted to an unreasonable measure. However, as set out above, the recovery order was necessary in order to correct the unjust enrichment of KPM resulting from the criminal act of operating the main pipeline without a license. Importantly, contrary to Claimants' allegations, the recovery order was made in a perfectly proper procedure in which KPM was represented through its manager, Mr. Cornegruta. [see also RPHB 2 ¶¶ 243 – 264].*

1032. *Claimants also contend that it was unreasonable for the Republic to "retroactive[ly] revers[e] [its] approval of the transfer of TNG to Terra Raf and the waiver of its pre-emptive rights". However, Claimants actually failed to apply for the Republic's consent at the time of the transfer itself and they failed to prove that their belated request (after being prompted by the MEMR) was legitimate under Kazakh law. Furthermore, under Kazakh law, the Republic had the discretion to either approve or disapprove the transfer. Even if the Republic had approved of the transfer in the first place, a revocation of this approval was completely lawful because Claimants wrongly informed the Republic about the significant details of the transfer including the date when the transfer occurred, which impacted on whether a waiver to its pre-emptive right was required. Hence, the revocation of the alleged approval was not unreasonable. [see also RPHB 2 ¶¶ 272 – 281]*

1033. *Moreover, Claimants complain that the Republic's refusal to extend TNG's exploration period in the Contract 302 Properties was unreasonable. In fact, under Kazakh law, the Republic was not legally bound to extend or refuse to extend the exploration period in the Contract 302 Properties. Also, since the Republic had not signed the necessary addendum, Claimants could not rely on a prolongation of the exploration period. Thus, the refusal to extend TNG's exploration period in the Contract 302 Properties was not an unreasonable measure. [RPHB 2 ¶¶ 282 – 318]*

1034. *Claimants continue by alleging that the Republic's imposition of the Crude Oil Export Duties on KPM was another unreasonable measure. In reality, Claimants' invoked tax deductions which were provided for under Kazakh law or were withdrawn by the relevant authorities before any payment was made by KPM. This was confirmed by the independent Kazakh courts which found KPM to be liable for paying the Crude Oil Export Duties. Therefore, the Republic's assessment of Crude Oil Export Duties was lawful and not unreasonable.*

1035. *Finally, Claimants contend that it was unreasonable to repudiate KPM's and TNG's Subsoil Use Contracts. The Republic was entitled to terminate these contracts because of valid grounds for termination. Hence, the termination of KPM's and TNG's Subsoil Use Contracts cannot be deemed an unreasonable measure.*

1036. *In particular, as more specifically set out in the introduction to the section on direct expropriation, Claimants were in continuing and serious breach of the Contracts. In accordance with its rights to do so, the Republic*



> terminated the Contracts and Claimants' assets were taken into a specific
> trust arrangement. Claimants could have resolved this issue amicably by
> invoking one of the mechanisms in the Contracts or, indeed, complying
> with the voluntary mechanism in the Subsoil Law at article 72(10) for
> handing over of assets to the trust and appealing the decision in
> accordance with Article 73 of the Subsoil Law. The opportunity to resolve
> this issue in accordance with the Contracts themselves and/or the Subsoil
> Law was sidestepped by Claimants by filing substantive proceedings only
> five days after the terminations. It is difficult to see how this behavior can
> be considered unreasonable under the relevant test. (R-II ¶¶ 1029 – 1036,
> partially quoted; see also R-I ¶¶ 41.9 – 41.17).

1277. Respondent's measures were not discriminatory. As the Parties agree, a state's
conduct is discriminatory if similar cases are treated differently without reasonable
justification. Once the investor has demonstrated that its case and a reference case
are similar, the burden shifts to the host state to demonstrate that there is a
reasonable justification for the differential treatment. Here, Claimants have not
proven the similarity between the cases of classification of pipelines and the
conviction of Mr. Cornegruta and respective other cases. In particular, they have
not established that the pipelines owned by KTM have features which would
require their classification as trunk pipelines, nor have they demonstrated whether
KTM holds a trunk pipeline license. Further, Claimants have not named a single
case where authorities did not initiate criminal proceedings after they discovered
the operation of a trunk pipeline without a license. Instead, they continue to make
the baseless accusations that the Republic singled KPM and TNG out for some
campaign of harassment. (R-I ¶¶ 41.14 – 41.24; R-II ¶¶ 1038 – 1043).

1278. Respondent's conduct has not impaired Claimants' investments. Contrary to the
*onus probandi* rule, Claimants have failed to prove that the Republic's actions or
omissions had any negative impact on the management, maintenance, use,
enjoyment, or disposal of their investments, given Claimants' own mismanagement
of KPM and TNG. (R-II ¶¶ 1044 – 1045). Claimants have neither shown nor even
addressed whether the allegedly arbitrary measures caused their alleged loss. (R-II
¶ 1052). Respondent's arguments are best taken from their own words:

> 1046.   First, [...] companies of KPM's and TNG's size operating in the subsoil
> sector must be prepared [...] [for] audits and inspections. [They] were not
> subject to any more audits or inspections than other subsoil users.
> Further, when companies fail to comply with the law, they must expect to
> be subject to audits and inspections. [...] Those audits were no more
> intrusive than those undertaken at other companies that did not comply
> with the law. Claimants have not proven that the audits and inspections
> impaired Claimants' management, use and enjoyment of their investments,
> [as they have not proven how their daily management activities were
> affected, whether there was a cut in dividends or why they could not sell
> KPM and TNG].

> 1047.   Claimants continue by suggesting that a press release, which notified
> potential buyers that the Republic would assert a pre-emptive right over
> TNG and accused Claimants of having forged documents in order to
> defraud Kazakhstan, impaired the disposal of their investments. The so-
> called press release Claimants refer to is in fact the INTERFAX-



*KAZAKHSTAN news agency piece about the reversal of the pre-emptive rights waiver dated 18 December 2008. Claimants ignore that the reversal of the pre-emptive rights waiver was perfectly lawful. Moreover, they have not provided sufficient proof that it was this news agency piece that caused Credit Suisse to step back from providing the bridge loan. Finally, the news agency piece is not attributable to the Republic. For this reason the so-called press release did not impair Claimants' disposal of their investments.*

1048. *Furthermore, Claimants contend that the financial burden of corporate back taxes, export duties and the audit of KPM and TNG with respect to transfer pricing impaired Claimants' management, use and enjoyment of their investments. However, neither KPM nor TNG paid any of the corporate back taxes or transfer price taxes. Claimants have made no complaint and produce no evidence concerning payments of export duties by TNG. Furthermore, the evidence suggests that Claimants were not prevented from managing and enjoying their investments in the period in question. In any event, Claimants could not reasonably expect that no back taxes would be assessed and that the export duties would not be imposed because the Republic was entitled to the payment of these levies. Therefore, the financial burden resulting from these taxes did not impair Claimants' management, use and enjoyment of their investments.*

1049. *Subsequently, Claimants allege that the Republic's refusal to extend the exploration period for the Contract 302 Properties impaired the management, use and enjoyment of their investments because this prohibited Claimants from establishing the full market value of these properties. Claimants ignore that KPM and TNG could not reasonably expect the exploration period under Contract 302 to be extended because the Republic was free to decide whether to prolong the contract or not. Hence, the Republic's refusal to extend the exploration period for the Contract 302 Properties did not impair the management, use and enjoyment of their investments. [RPHB 2 ¶ 329 – 330]*

1050. *Also, Claimants complain that the "criminal proceedings against four then-existing and former general managers of KPM and TNG and a sham trial, conviction, and incarceration of Mr. Cornegruta" impaired the management, use and enjoyment of their investments because top personnel left the country and the Republic froze KPM's assets. Again, Claimants have failed to prove to the necessary standard how the criminal proceedings affected their daily management activities, whether there was a cut in dividends and how and why Claimants could no longer dispose of KPM and TNG. Therefore, it is not evident that the criminal proceedings really impaired Claimants' management, use and enjoyment of their investments. In particular, in respect of the repudiation of the alleged pre-emptive rights waiver, and the press release on the same day, Claimants have produced no evidence to suggest that the Republic was wrong in highlighting its concerns about the legality of Terra Raf's activities. As set out in the Statement of Defence at paragraphs 13.47I(ii) and (iii) it was perfectly appropriate to air its concerns to INTERFAX, given the suspicions that Claimants had. It cannot be concluded from this that*



*Claimants' investments were affected (or that if they were, that this was inappropriate). In respect of paragraph 534, Claimants have not produced any persuasive evidence that the top management left the country by reason of the Republic's investigations into Claimants' illegal activities or that this impaired their investments. (R-II ¶¶ 10–6 – 1050, summarized and partially quoted; see also R-I ¶¶ 41.25 – 41.30).*

1279. As recorded aboveRespondent also maintains that it terminated Contracts 210 and 305 in accordance with the law, and that Claimants failed to file a timely appeal or to request an extension, despite having ample time to do so. There was no conspiracy regarding the creation of the heavily debated Subsoil Law 2010, which took almost 2 years to pass. (RPHB 2 ¶¶ 367 – 372).

### 3. The Tribunal

1280. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1281. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation according to Art. 10(1) ECT not to impair by unreasonable or discriminatory measures Claimants' investment, if there are any further damages sought by Claimants not covered by the FET breach.

1282. Claimants' allegation of this further breach leads to no further relief sought than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1283. There is, therefore, no need to examine whether such a further breach has been shown.

### J.VI.    Respondent's Observance of Obligations It Entered Into With Respect to Claimants' Investments (Umbrella Clause in Art. 10(1) ECT)

### 1. Arguments by Claimants

1284. Article 10(1) ECT contains a broadly worded "*umbrella clause*." The purpose of this clause is to expand the reach of the ECT's protections to obligations that are not covered by the ECT's other substantive provisions. The plain language of the umbrella clause does not differentiate between contractual obligations and legislative/regulatory undertakings. Four language versions of the ECT clearly indicate that each Contracting Party shall observe any obligation that it has undertaken towards (or, in two ECT versions, has assumed with regard to) an investor or the investments of an investor of another Contracting Party. (C-I ¶¶ 363 – 370; C-II ¶ 537, 539, partially quoted).

