1285. That the umbrella clause does not differentiate between contractual obligations and legislative undertakings has been confirmed by a number of investment treaty tribunals, such as the *Eureko v. Poland* and the *Enron v. Argentina* tribunals that have confirmed that the umbrella provision extends to obligations undertaken through law and regulation. Furthermore, in light of the other terms of the ECT, including the ECT's definition of investment, it is indisputable that Kazakhstan undertook a number of contractual, legislative, and regulatory obligations with regard to Claimants and their investments, which are protected under the umbrella clause. (C-I ¶¶ 363 – 370; C-II ¶¶ 537, 539).

1286. Neither case on which Respondent relies to support its argument that a restrictive reading of the umbrella clause is necessary actually stands for that contention. The tribunal in *Al-Bahloul v. Tajikistan* held that the ECT umbrella clause "*is broadly stated, referring as it does to 'any obligation' and, as such, by the ordinary meaning of the words, includes both statutory and contractual obligations.*" Likewise, the *CMS* ad hoc committee held that an even broader reading was possible – looking toward the law of the host state and possibly international law. (C-II ¶ 538).

1287. Respondent's argument that the arbitration provisions in the Subsoil Use Contracts bar claims relating to those contracts under the umbrella clause is wrong, and it conflates contract claims with treaty claims. Here, Claimants assert that Kazakhstan breached its obligation to observe all obligations undertaken with respect to their investments, and that includes its contractual obligations. This is permissible under the ECT, which provides jurisdiction over disputes relating to an investment for contractual claims that may arise under the umbrella clause. Contractual forum-selection provisions, on the other hand, would naturally cover only contractual claims (those belonging to KPM and TNG, rather than to Claimants). Thus, the cases cited by Respondent – *SGS v. Philippines* and *Bureau Veritas* – are plainly inapplicable to the present cases. In those cases, the claimants were parties to the contracts at issue, making it not surprising that the tribunal found that they were bound by the contract. Here, Claimants are not parties to the contracts at issue. Further, the cases cited do not involve the types of government measures that were involved here – and the tribunals in *SGS v. Philippines* and *BIVAC v. Paraguay* were not asked to consider whether the breaches constituted international treaty violations. Finally, in the *BIVAC* case, the tribunal held that "*a forum selection clause should not be permitted to override the jurisdiction to hear Treaty claims of a tribunal constituted under that Treaty.*" (C-II ¶¶ 540 – 542).

1288. Turning to Respondent's focus on the contractual forum selection clause, a cause of action under the ECT is not subject to the exclusive jurisdiction clauses contained in the underlying contracts, regardless of whether the treaty claims relate to contractual issues. Claimants state that Art. 26 ECT allows foreign investors to choose between a contractually agreed forum for international arbitration before ICSID, UNCITRAL, or the SCC. The claimant's choice is not constrained by the forum selected in the contract. (C-II ¶¶ 543 - 545).

1289. Article 26(3)(c) ECT permits Contracting Parties to exclude international arbitration for violation of the umbrella clause, but Kazakhstan has not exercised this option. (C-II ¶ 544).



1290. Each of the following measures constitutes a distinct violation of the umbrella clause:

    *[1]*    *Kazakhstan "reclassified" KPM's and TNG's pipelines as "main" pipelines, in violation of the approvals by its state authorities and agencies for the design, construction, and operation of the "reclassified" pipelines as in-field pipelines pursuant to Kazakhstan's Law on Oil and relevant regulations;*

    *[2]*    *Kazakhstan arrested, convicted, and incarcerated Mr. Cornegruta, in violation of general principles of due process and Articles 12 and 16 of the Kazakh Constitution recognizing each person's human rights and freedoms;*

    *[3]*    *Kazakhstan issued a criminal verdict against the non-party KPM, froze KPM's assets, and barred KPM from lodging an appeal against its conviction , in violation of general principles of due process and of Article 77(3) of the Kazakh Constitution;*

    *[4]*    *Kazakhstan approved the transfer of TNG to Terra Raf and waived its pre-emptive rights, and then later rescinded its express approval and waiver;*

    *[5]*    *Kazakhstan refused to extend TNG's exploration period in the Contract 302 Properties although it had expressly approved the extension;*

    *[6]*    *Kazakhstan imposed the Crude Oil Export Tax on KPM, in violation of exemption and legal stabilization clauses in the Subsoil Use Contract;*

    *[7]*    *Kazakhstan imposed amortization rates at higher than contractually-agreed rates, in violation of clear amortization and legal stabilization provisions in the Subsoil Use Contracts;*

    *[8]*    *Kazakhstan wrongfully and unilaterally repudiated KPM's and TNG's Subsoil Use Contracts, in violation of the contract terms; and*

    *[9]*    *Kazakhstan illegally seized Claimants' investments, in violation of general principles of law and Articles 6 and 26 of the Kazakh Constitution protecting private property. (C-I ¶¶ 371 – 372; C-II ¶¶ 546 – 547, partially quoted; see generally CPHB 1 ¶¶ 122 – 422; CPHB 2 ¶¶ 97 - 114).*

1291. The 18 September 2009 judgment that sentenced Mr. Cornegruta to four years in prison and ordered the recovery of USD 145 million from non-party KPM constituted an egregious breach of Art. 10(1) ECT. Mr. Cornegruta was prevented from presenting evidence on his behalf and the judge relied on information provided by the Financial Police. With regard to KPM, there is no theory of "*quasi-criminal*" liability in Kazakhstan – Kazakhstan has blatantly misconstrued clause 27 of the Regulatory Decree of the Supreme Court of June 20, 2005, "On hearing of a civil action in criminal proceedings" and Article 371, section 1(10) CPC to show otherwise. At most, Kazakhstan could have received compensation for "*property damage*" in cases where no civil action was filed – and this is totally inapposite to Mr. Cornegruta's case, where there is no issue of property damage.


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE
698

In order to recover funds from a company for alleged criminal conduct, Kazakhstan would have had to have pursued a sanction under administrative law or file a civil suit. Simply imposing Mr. Cornegruta's fine on KPM was not an option. (CPHB 2 ¶¶ 97 – 114).

1292. Kazakhstan's 2007 commitments regarding Terra Raf's legal ownership of TNG (namely, that the State's pre-emptive right did not apply to the 2003 transfer) were breached in violation of the umbrella clause. (CPHB 2 ¶ 126).

1293. Respondent's "*spurious*" tax assessments violated the terms of the Subsoil Use Contracts and, likewise, were in violation of the ECT's umbrella clause. (CPHB 1 ¶ 261; CPHB 2 ¶ 139).

1294. When Kazakhstan failed to formalize the extension of Contract 302, which it expressed on 19 March 2009 and wrote on 9 April 2009, it breached the ECT's umbrella clause. The promise to extend the contract was an express "*obligation*", giving rise to a treaty obligation under the umbrella clause, as well as a legal obligation under Kazakh law to formalize the extension. Claimants legitimately expected the contract to be extended, as it had been in the past. TNG made a significant discovery in the Contract 302 properties at the Munaibay prospect, but retracted the application in October 2008 after determining that Contract 302 held greater reserves. It applied for an extension on 14 October 2008. The fact that Claimants retracted the declaration of the commercial discoveries – discoveries which would have given them the exclusive right to produce oil and gas from those fields – is a demonstration of their legitimate belief that the contract would be extended. Had the government been timely in addressing the application to extend, Claimants would have had the opportunity to undertake the appraisal work and declare commercial discoveries in the Contract area. Since the extension was promised, Claimants had no need to do further appraisal. (CPHB 1 ¶¶ 221 – 237, CPHB 2 ¶¶ 152 – 162, 176).

1295. This is not a pre-contractual dispute. Kazakhstan undertook to extend the contract, during the life of the contract. In the past, Kazakhstan granted an extension six months after the previous exploration had expired, with no consequence in the validity of the contract. Further, Kazakhstan treated the Contract 302 area as if the contract were still in force, ordering the sequestration of those assets on 30 April 2009 and remarking on the fulfillment of the work conditions of Contract 302 in 2010. Kazakhstan's actions demonstrate that it believed the contract to still be in force through 22 July 2010, when it formally terminated Contract 302. Respondent's failure to execute the addendum after expressly committing to is a violation of the umbrella clause. (CPHB 2 ¶¶ 163 – 171).

1296. Respondent's repudiation of the Subsoil Use Contracts was also in violation of the umbrella clause. There was no evidence that Claimants were in breach of any aspect of the Subsoil Use Contracts, the minimum work requirements or of Kazakh law, nor were they treating the fields badly. (CPHB 2 ¶ 191).

## 2.    **Arguments by Respondent**

1297. Contrary to Claimants' assertion, the scope of the umbrella clause is limited to contractual obligations and does not extend to alleged breaches of the Republic's



domestic law. According to the VCLT, the wording of the umbrella clause must be interpreted such that its scope is limited to contractual obligations. The language "*to enter into*" or "*to undertake to bind oneself*", interpreted according to its plain meaning as required by Art. 31(1) VCLT, illustrates the consensual nature of the obligations in question. In addition, the use of the term "*with*" further indicates contractual obligations because statutes and regulations are not concluded *with* an individual party in one individual case. (R-II ¶¶ 1053 – 1058).

1298. Article 31(1) VCLT clarifies that the context of each term is crucial. Thus, when taking into consideration the ordinary meaning of "*to enter into*", the reference to "*any obligation a party enters into*" means "*any obligation a party has undertaken to bind itself to perform by an agreement*" and thus "*any contractual obligation.*" (R-II ¶ 1059).

1299. Regarding the different language across each equally authoritative version of the ECT, Claimants contend that four versions of the ECT refer to "*obligations assumed with regard to*" whereas 2 versions can be translated to mean "*to enter into.*" Since all versions of the ECT are equally authentic, the ordinary meaning of these terms is significant:

> *1063.  The ordinary meaning of "to assume with regard to" in the context of Article 10(1) of the ECT is "to take upon oneself; undertake". When a party takes an obligation upon itself, the party commits voluntarily to performing the obligation. Therefore, both terms, "to enter into" and "to assume [with] regard to" contain an element of voluntary collaboration. This element of voluntary collaboration makes sense when referring to a contractual obligation because, self-evidently, both parties are free to enter into a contract. It makes no sense when referring to a statutory or regulatory obligation because these apply notwithstanding the intention of those involved. Furthermore, it is general linguistic usage to say that a party enters into a contract and assumes obligations with regard to a contract, but it is not commonly heard that a party enters into a statute or assumes obligations with regard to a regulation. (R-II ¶ 1063).*

1300. If four versions of the ECT limit the scope of the umbrella clause to contractual obligations, but two extend it to legislative, then there would be a difference in meaning between the texts. In such a situation, Article 33 VCLT demands that the Tribunal adopt the meaning which best reconciles the texts, having regard to the object and purpose of the Treaty. The "*contractual obligations only*" interpretation is, however, the common denominator of both meanings, best reconciling the texts. The Tribunal should adopt this meaning.  (R-I ¶¶ 39.3 – 39.5; R-II ¶¶ 1064 – 1065).

1301. The interpretation of Art. 10(1) ECT as only encompassing contractual obligations is supported by the object and purpose of the ECT, which is to promote long-term cooperation between investors and host states. If the umbrella clause were to encompass regulatory or statutory obligations, every breach of a host state's domestic law would form a breach of the ECT. Had the contracting parties to the ECT really wished to commit themselves to such a large extent, they would have amended the wording of the umbrella clause accordingly. Construing the scope of the umbrella clause to encompass statutory and regulatory obligations would alienate the contracting parties to the ECT and might ultimately cause them to



withdraw from the treaty. This would run counter to the ECT's purpose of promoting long-term cooperation of investors and host states. (R-II ¶¶ 1066 – 1067).

1302. Renowned scholars and tribunals alike have agreed that the scope of the umbrella clause is limited to contractual obligations. The *CMS v. Argentina*, which Claimants cite in their favor, clearly referred to consensual obligations under the law of the host state or under international law. Statutes and regulations are not of a consensual nature – only contracts are. Hence, the reasoning in CMS *v. Argentina* demonstrates, contrary to Claimants' assertion, that tribunals agree that the scope of the umbrella clause is limited to contractual obligations. This view was confirmed by the tribunal in *Al-Bahloul v. Tajikistan*, which had to deliberate on the umbrella clause in Article 10(1) ECT. *Eureko v. Poland* can be read to mean that the tribunal regarded any contractual obligations with regard to investments as encompassed by the scope of the umbrella clause – that tribunal did not even deliberate on whether statutory or regulatory conduct toward an investor constituted a breach of the umbrella clause. Further still, in *SGS v. Philippines*, the issue under consideration arose from consensual obligations. As for *LG&E v. Argentina* and *Enron v. Argentina*, the tribunals found that Argentina's Gas Law and its regulations were encompassed under the umbrella clause – but they contrasted them from legal obligations of a general nature. Those cases concerned specific promises made by the state concerning the laws, and those promises transformed the laws and regulations into obligations within the meaning of the umbrella clause. Respondent, thus, presents that all of the cases cited by Claimants in support of their reasoning either does not support Claimants' proposition, or contradicts it. There is no reported investment law decision where the scope of the umbrella clause was unconditionally extended to domestic law. (R-I ¶¶ 39.6 – 39.8; R-II ¶¶ 1068 – 1080).

1303. The exclusive arbitration agreements in the Subsoil Use Contracts, as well as in Contract 302, bar claims relating to these contracts under the umbrella clause. Those contracts' arbitration clauses oblige both parties to resort exclusively to international commercial arbitration once a dispute arises with respect to those agreements. Claimants have never referred the disputes regarding the Subsoil Use Contracts or Contract 302 to international commercial arbitration. Foreign investors need to comply with exclusive forum selection clauses before they may rely on the umbrella clause because this conforms to and enforces the maxim *pacta sunt servanda*. Therefore, the Subsoil Use Contracts and Contract 302 are utterly irrelevant in terms of the umbrella clause. (R-I ¶¶ 39.9 – 39.12; R-II ¶¶ 1081 – 1086, 1097).

1304. Tribunals in investment treaty arbitrations have ruled that foreign investors need to comply with exclusive forum selection clauses before they may rely on the umbrella clause. The tribunal in *SGS v. Philippines* clarified that a standard jurisdiction clause in an investment treaty between two states does not override the parties' binding selection of a forum to determine their contractual claims, because the contract between the parties needs to be regarded as *lex specialis* in relation to an investment treaty between two states. Respondent cites that this view has been confirmed by scholars and other tribunals, including *BIVAC v. Paraguay*, which added that contractual forum selection clauses needed to be regarded as a



"*voluntary waiver*" of resort to the umbrella clause. (R-I ¶¶ 39.9 – 39.12; R-II ¶¶ 1087 – 1095).

1305. Even if the Tribunal considers that the umbrella clause covers statutory and regulatory obligations and that the Subsoil Use Contracts and Contract 302 were relevant under the umbrella clause – which Respondent denies – the Republic nevertheless complied with domestic law. Each of the actions alleged by Claimants was consistent with and/or mandated by Kazakh law. (R-I ¶ 39.13; R-II ¶¶ 1098 – 1099).

1306. The classification of KPM's and TNG's pipelines as trunk pipelines was lawful. It was found that KPM were operating a trunk pipeline without the relevant licence. As a consequence, Mr. Cornegruta, KPM's representative, was found guilty of illegal entrepreneurship under Section 190(2)(b) of the Criminal Code of Kazakhstan. This decision was confirmed on appeal on 12 November 2009 by the Regional Court of Mangystau. It was Claimants that were in breach of Kazakh law, not the Republic. Due process and Art. 77(3) of the Kazakh Constitution were strictly adhered to in the investigation of the crime, as well as in the arrest, conviction, and incarceration of Mr. Cornegruta on behalf of KPM. The procedure of the recovery order – i.e. the recovery of illegal income of a company resulting from the crime of its manager – was at all times in accordance with Kazakh law. Procedural participation was safeguarded at all times through the presence of Mr. Cornegruta. (R-II ¶¶ 1100 – 1103; RPHB 2 ¶¶ 243 – 264).

1307. KPM and TNG were in serious breach of the terms of the Subsoil Use Contracts. Claimants were aware of these breaches and had unsuccessfully contested them in Kazakh courts. After notifying the companies of their breaches, the Republic rightly terminated the Subsoil Use Contracts in accordance with Kazakh law and the terms of the contracts themselves. The Republic's termination of KPM's and TNG's Subsoil Use Contracts did not violate the respective contract terms. Rather, it was Claimants who breached the contractual terms, thus leading to a legitimate termination. (R-II ¶ 1104).

1308. There was no seizure of Claimants' investments. There was a legitimate transfer into trust management in accordance with the Subsoil Law 2010, which is the lawful consequence following the termination of the Subsoil Use Contracts. This transfer in any event only took place well after Claimants had abandoned their investment. Since the Republic did not illegally seize Claimants' investments, it follows that the Republic did not violate general principles of law and Articles 6 and 26 of the Kazakh Constitution protecting private property. (R-II ¶ 1105, partially quoted; RPHB 2 ¶¶ 359 – 374).

1309. Regarding the transfer from Gheso to Terra Raf, there were 8 transfers that involved majority shares in TNG, the consequence being that none of the after-occurring transfers in TNG involving Claimants' companies was completed. Respondent's belated consent to one transfer does not cure all other previous failures. Thus, Respondent was fully justified in inquiring as to Claimants' position with respect to TNG. (RPHB 2 ¶¶ 272 – 281).

1310. At the Hearing on Quantum, Claimants alleged that the Republic's gas market breached the ECT's protections under the umbrella clause, as well as the FET and



impairment provisions of the ECT. This argument fails since the Republic never guaranteed an export market to Claimants. (RPHB 1 ¶¶ 698 – 700). This argument did not appear in Claimants' First Post-Hearing Brief and was not made in the final hearing. It appears that Claimants have dropped this claim. (RPHB 2 ¶¶ 423 – 424).

1311. The scope of the umbrella clause is limited to contractual obligations, as explained in *Siemens v. Argentina* to mean "*obligations [which] originate in a contract between the State party to the Treaty and the foreign investor*." (RPHB 2 ¶ 427).

1312. Claimants have attempted to argue that the non-extension of Contract 302 is a violation of the umbrella clause, but have failed to substantiate how such a claim could exist under investment law. Claimants have not demonstrated any reliance on the 9 April 2009 letter. In any event, Claimants have always accepted that Respondent was not under an obligation to extend Contract 302. Even if there had been no breach of the promise to extend the contract had not occurred, Claimants still would not have had a claim to develop the Contract 302 area because the contract would simply have terminated on 30 March 2009. Alternatively, even if the 9 April 2009 letter constituted a decision to agree to extend Contract 302 (which is denied), that was only a unilateral act, not a contract. Such unilateral acts are not covered by the umbrella clause. Additional steps, including an application for a new license, would have needed to be undertaken to perfect the extension. (RPHB 2 ¶¶ 292 – 305, 425 – 430).

### 3. The Tribunal

1313. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1314. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligations it entered into with respect to Claimants' investments by the Umbrella Clause in Art. 10(1) ECT), if there are any further damages sought by Claimants not covered by the FET breach.

1315. Claimants' allegation of this further breach leads to no further relief sought than that resulting from the FET breach. In fact, the protections granted in this regard and by the FET obligation overlap, though it may be arguable to which extent.

1316. There is, therefore, no need to examine whether such a further breach has been shown.

### J.VII. Whether Kazakhstan Violated Its Obligation to Permit Claimants to Employ Key Personnel of Their Choice

#### 1. Arguments by Claimants



1317. Claimants encourage the Tribunal to interpret Art. 11(2) ECT in good faith and under its ordinary meaning, pursuant to Art. 31(1) VCLT. (C-II ¶¶ 553 – 554). Claimants' argument is best taken from its own words, found at C-II ¶ 555:

> 555. *According to the ordinary meaning of Article 11(2) of the ECT, Claimants were entitled to employ any key in-country personnel they wished. However, Kazakhstan arrested and incarcerated Mr. Cornegruta, the general manager of KPM, on trumped-up criminal charges. Moreover, Kazakhstan relied on the same spurious legal grounds to initiate criminal actions against four other general managers of Claimants and threaten their arrest. Those four general managers had no choice but to flee the country. Kazakhstan also summoned, interrogated, and threatened a number of Claimants' key in-country personnel, based on the same manufactured allegations, so that Claimants had no choice but to recall all their key personnel from Kazakhstan. Therefore, Kazakhstan violated its obligation to permit Claimants to employ key personnel of their choice under Article 11(2) of the ECT. (C-II ¶ 555).*

1318. Mr. Condorachi's testimony confirmed that Claimants' management decided that it would be best if he and several other middle managers leave Kazakhstan, based on their previous dealings with the Financial Police and the imprisonment of Mr. Cornegruta. (CPHB 1 ¶ 270). In addition, as explained by Mr. Broscaru, after the 14 October 2008 order, construction on the LPG Plant slowed significantly because the non-Kazakh workers on the project were unable to renew their work permits. (CPHB 1 ¶ 358).

## 2. Arguments by Respondent

1319. Article 11(2) ECT permits foreign investors to employ key personnel of their choice, so long as such personnel have the required work and residence permits. It prevents a host State from enacting any domestic employment legislation or committing any forceful action that would prevent the foreign investor from hiring key personnel. As scholars agree, this provision is unambiguous and does not require interpretation. (R-II ¶¶ 1145 – 1147).

1320. In response to Claimants' argument that Art. 11(2) ECT needs to be interpreted using Art. 31(1) VCLT, Respondent disagrees that there is ambiguity in other terms, but agrees that the term "*key personnel*" could require interpretation, as it is not defined in the ECT or any other investment treaty. The ordinary meaning of "*key personnel*" refers to employees of the foreign investor which are indispensable to the running of the investment and/or are decisive to the success of the investment. The meaning of the term does not extend to other individuals. Claimants have not proven that Mr. Cornegruta or any of the other unnamed four general managers are part of such an exclusive group. It has not been alleged that these are essential personnel. (R-II ¶¶ 1151 – 1154).

1321. It is not true that the lawful interrogations and criminal proceedings against Mr. Cornegruta on behalf of KPM or against the other four managers forced Claimants to recall their key personnel from Kazakhstan. Respondent states, however, that it "*is notable that Claimants suggest that this should require the removal of their key personnel from the country. This suggests that Claimants are willing to assist their key personnel from facing the consequences of illegal behaviour. In turn this*



*suggests that the detention of Mr Cornegruta in April 2009 (on suspicion that he would flee the country) was well-founded.*" (R-II ¶¶ 1156 – 1159).

### 3.    The Tribunal

1322. As explained above in the chapter on expropriation of this Award, it is the Tribunal's task to decide on the relief sought by Claimants as recorded above in this Award. If such relief is granted on the basis of one particular ECT provision, there is no need for the Tribunal to examine further whether the same relief would also have to be granted on the basis of another ECT provision.

1323. Since, in a previous chapter of this Award, the Tribunal has come to the conclusion that Respondent is liable for breach of the FET standard in Art. 10(1), it only needs to examine a possible further breach of the obligation according to Art. 11(2) ECT to permit to employ key personnel according to Art. 11(2) ECT for Claimants' investment, if there are any further damages sought by Claimants not covered by the FET breach.

1324. Claimants' allegation of this further breach leads to no further damages sought than those resulting from the FET breach. There is, therefore, no need to examine whether such a further breach has been shown.

## K.       Causation

### K.I.       Law on Causation

#### 1.       Arguments by Claimants

1325. Claimants agree that, as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation flows from the host state's conduct. Tribunals have broad discretion in evaluating causation. As the tribunal in *Lemire v. Ukraine* explained, the element of causation requires the aggrieved party to "*prove that an uninterrupted and proximate logical chain leads from the initial cause ... to the final effect.*" As the *Lemire* tribunal explained, the causal link need not be direct, but can be established through a chain of connected events. The primary limitation on the principle of transitive causation is that the chain of events must be "*neither too remote nor too aleatory*." Classically, what is necessary is to prove that there is "*no [break] in the chain and [that] the loss can be clearly, unmistakably and definitely traced, link by link, to [the State's] act, [whereby] indirect losses are covered [so long as] in the legal contemplation, the [state's] action was the efficient and proximate cause and the source from which they flowed.*" The requirement of proximate cause is closely related to the foreseeability of injury – the wrongdoer could have foreseen that through successive links, the irregular act would finally lead to damage. (CPHB 2 ¶¶ 199 – 202).



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF **705**ERCE

1326. The state is also responsible for all harm that proximately flows from its wrongful actions, even if concurrent causes contributed to the harm. As the tribunal in *CME v. Czech Republic* explained, the only exception to this would be in cases of contributory fault.

1327. The burden then shifts to the state to prove that an intervening event – such as a factor attributable to the victim or a third party – caused the damage alleged. As the tribunal in *CME v. Czech Republic* explained, however, unless the injury can be shown to be severable in causal terms from that attributed to the state, the latter is held responsible. Kazakhstan, therefore, can only escape liability for the injuries that naturally flowed from its conduct if it can prove that an intervening cause completely superseded the effects of its actions into a severable injury, and not merely that other concurrent events contributed to or amplified Claimants' injury. (CPHB 2 ¶¶ 200, 203).

1328. Finally, as the Tribunal in *Lemire* found, it is often not possible for a claimant to prove with certainty what would have happened "*but for*" the State's wrongful actions. Thus, it is sufficient for the Claimants to prove that it was probable that they would have had a different outcome, but for the State's actions. (CPHB 2 ¶ 204).

## 2.    **Arguments by Respondent**

1329. Article 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation. In investment cases, Tribunals have reduced damages by a percentage reflecting the investor's role in the events leading to a loss. Even in the *MDT v. Chile* case, cited favorably by Claimants in their "*full compensation*" arguments, the Tribunal reduced the damages otherwise due by 50 % to reflect the investors' negligent conduct. Here, there is a clear correlation in time between the companies' financial troubles and Claimants' conduct. (R-III ¶ 436 – 440).

## 3.    **The Tribunal**

1330. The Parties agree, and so does the Tribunal, that, as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation is caused by the host State's conduct.

1331. The Tribunal further agrees with Respondent that Art. 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation. Indeed, in investment cases, Tribunals have reduced damages by a percentage reflecting the investor's role in the events leading to a loss.

1332. And the Tribunal agrees with Claimants that the burden then may shift to the state to prove that an intervening event – such as a factor attributable to the victim or a third party – caused the damage alleged, unless, as the tribunal in *CME v. Czech Republic* explained, the injury can be shown to be severable in causal terms from that attributed to the state.



### K.II. Whether Respondent's Breaches of the ECT Caused Claimants' Alleged Damages

#### 1. Arguments by Claimants

1333. The campaign of harassment and coercion that began in October 2008 and was publicized in December 2008 initiated a chain of events that irreparably harmed Claimants' investments and prevented Claimants from fully developing or alienating them from that moment forward.

1334. Claimants' search for bridge financing in November 2008 began on recommendation from Renaissance Capital. It was necessary in order to obtain a partial advance on the proceeds of the sale in order to reinvest them into other projects as soon as possible and, as Mr. Lungu explained, to protect against falling oil and gas prices. Further, although Kazakhstan sabotaged the Credit Suisse financing in December 2008, the liquidity position at KPM and TNG did not become problematic until the June 2009 Laren transaction. Respondent's argument about the "*going concern*" qualification issued by the auditors' is also disingenuous and expressly states that the "*going concern*" qualification was based on events after 31 March 2009. The reasons for this qualification were Kazakhstan's freezing of KPM and TNG's assets and Claimants' equity interests in KPM and TNG, the criminal investigations, and the USD 62 million back tax assessment. Finally, Claimants' financial position as of June 2009 was mainly due to Kazakhstan's conduct – it does not reduce the impact of Kazakhstan's interference on the Credit Suisse financing, but rather amplifies it. (CPHB 1 ¶¶ 405 – 408).

1335. Two events - the 18 December 2008 INTERFAX publication, which extensively quoted the MEMR's false accusations of forgery and violations of registration requirements, and the 15 December 2008 formal initiation of the criminal investigation against KPM – had a profoundly negative impact on Claimants' reputation and the value ascribed to their investments in capital markets. Based on those events, on 14 January 2009, Fitch ratings agency placed Tristan's long-term default rating and senior unsecured rating of B+ on the Rating Watch Negative. Fitch warned investors that the MEMR's cancellation of its pre-emptive rights waiver could result in the termination of TNG's Subsoil Use Contract. On 15 January 2009, Moody's placed Tristan's B2 rating on review for a possible downgrade, again based on both events. Accordingly, Kazakhstan's wrongful acts had a profound impact on the value of Claimants' investments not later than 14 January 2009. (CPHB 1 ¶¶ 346 – 357, 646 – 647; CPHB 2 ¶¶ 205 – 209).

1336. The INTERFAX article directly interfered with a specific financing transaction that Claimants were then negotiating with Credit Suisse. On 18 December 2008, Mr. Petrosius of Credit Suisse sent Mr. Lungu the INTERFAX article and requested his comments. After that, Credit Suisse refused to provide the bridge loan until Claimants resolved their disputes with the Kazakh government. Kazakhstan's argument that Claimants have not proven that the MEMR's actions caused the Credit Suisse loan to fall through is not persuasive. Moodys and Fitch confirmed that the MEMR's actions against KPM and TNG raised concerns to the companies' ability to service their existing debt. It would have been surprising if any lender would have gone forward with the new financing without resolution of the conflicts. (CPHB 2 ¶¶ 210 – 211).



1337. The financial crisis did not prevent the Credit Suisse transaction. Credit Suisse stated on 5 December 2008 – after the crisis erupted in September 2008 – that it aimed to execute the term sheet the following week. (CPHB 2 ¶ 212).

1338. The inability to receiving financing forced Claimants to enter into the Laren transaction in June 2009. It was a necessary transaction that was on horrible terms, which caused Moody's and Fitch ratings agencies to further downgrade Tristan's debt to the C level. Respondent's illogical and speculative argument that Claimants would have turned to the Laren loan sharks in August 2009 to refinance the Credit Suisse loan ignores the State's actions, completely. If Claimants had needed to refinance, they would have been able to do so on ordinary commercial terms, possibly even with Credit Suisse, on the same or better terms, since oil prices and credit markets had improved dramatically by that time. Respondent's argument that the Credit Suisse loan would not have helped Claimants to avoid the Laren loan is speculative and nonsensical. (CPHB 2 ¶ 213 – 214).

1339. The evidence that Kazakhstan's conduct interfered with Claimants' ability to sell their investments in KPM and TNG is overwhelming. First, the MEMR leak to INTERFAX clouded Claimants' title and reputation. Second, Kazakhstan sequestered Claimants' shares in KPM and TNG and KPM's and TNG's Subsoil Use Contracts, pipelines, and vehicles on 30 April 2009. Claimants were thereafter legally prohibited from selling their investments, through sale of either shares or assets. (CPHB 2 ¶¶ 233 – 235).

1340. The clouded title resulting from the INTERFAX press release interfered with Claimants' ability to sell KPM and TNG as of 30 April 2009, when Kazakhstan froze the shares in the companies. Kazakhstan's actions also affected several potential buyers in the Project Zenith sale process, to which Mr. Suleymenov testified. This affected price, as the RBS Report confirms that RBS and KMG E&P deducted liabilities attributable to Kazakhstan from their valuation. In addition, the KMG E&P confirmed its valuation by examining the trading price of the Tristan debt, which was also negatively affected by Kazakhstan's actions. (CPHB 1 ¶¶ 384 – 389).

1341. Kazakhstan's actions interfered with TNG's sales. Claimants inferred that Kemikal's sudden and inexplicable refusal to post bank guarantees that were required by its credit terms was part of Respondent's aggressive and hostile campaign to put pressure on Claimants. At the time, Kemikal was controlled by President Nazarbayev's son-in-law, Mr. Kulibayev. As a result, Claimants did not renew the contract with Kemikal when it expired at the end of 2008. Respondent frustrated TNG's attempts to find replacement buyers in summer 2009 in two ways. First, Respondent prevented TNG from selling gas on export markets (which required access to the CAC Pipeline, which required Claimants to sell through a Kazakh government affiliate, either Kemikal or KazRosGaz). Second, the arrest of Mr. Cornegruta and the inspections and harassment caused the management of TNG to devote much of their time responding to the State's harassment, rather than the day-to-day management of the company. Many managers wisely fled the country. As a result of being compelled not to renew the Kemikal contract and of being unable to find a replacement, TNG had to shut down production by 30 – 50% from March – July 2009, and by 100% for two weeks in



August 2009. TNG produced 17 BCF of gas and 311,000 barrels of condensate fewer than its own targets. (CPHB 2 ¶¶ 223 – 227).

1342. Advisors to the State controlled oil company, KMG EP, confirmed that the State's actions were material impediments to any acquisition of KPM and TNG. Squire Sanders recommended that KMG EP make the return of the companies' documents and the termination of the criminal proceedings and attachment orders a condition on any transaction. Those accounts posed an insurmountable obstacle to the sale of KPM and TNG to buyers other than KPM EP, who may have had the clout to stop the criminal actions. (CPHB 2 ¶ 236).

1343. PwC identified financial and tax issues that were directly attributable to Kazakhstan's wrongful actions as impediments to the purchase by KMG EP or, at least, issues to be considered in valuing KPM and TNG. The RBS valuation included USD 243.5 million in contingent liabilities, most of which are attributable to Kazakhstan. RBS disregarded the potential exposure of up to USD 1 billion in criminal fines, but suggested that those could be dealt with in the SPA – something only perhaps no other purchaser but KMG EP could have accomplished. Mr. Suleymenov testified that KMG EP valued the companies' equity in the range of negative USD 50 – 100 million after deducting the Tristan debt and contingent liabilities. Importantly, however, the Tristan debt alone would have been USD 111 million less but for Kazakhstan's action. Thus, KMG EP's valuation would have been positive, but for KMG EP's action. (CPHB 2 ¶¶ 237 – 238).

1344. The market price of the Tristan debt was negatively affected by Kazakhstan's illegal actions. It was also misquoted by Mr. Suleymenov, when he stated that the market price of the Tristan notes was only 25 – 28 cents on the dollar, when it was nearly double that on the date of the RBS valuation. Mr. Suleymenov acknowledged that the trading price of the Tristan notes no doubt incorporate Kazakhstan's actions. (CPHB 2 ¶ 239).

1345. Finally, when Claimants submitted the Cliffson transaction to the MOG for approval in 2010, the MOG conditioned the sale on the satisfaction on all legal obligations imposed by the state and the release of the sequestration orders. The sale could not be concluded. Claimants have proven that Kazakhstan's actions were the primary reasons that KMG EP did not buy KPM and TNG. Other potential buyers, like Total lost interest when the State precluded Claimants from completing the exploration well. Dr. Kim of KNOC testified that the inability of TNG to export gas was the principle reason that KNOC lost interest. Mr. Seitinger testified that OMV decided against the purchase for market reasons, but those were also influenced by Kazakhstan. Even with the global financial crisis, it is beyond serious doubt that KPM and TNG became unattractive assets as a result of Kazakhstan's actions, and that Kazakhstan is responsible for all of the injury to which its actions contributed. (CPHB 2 ¶¶ 240 – 245).

1346. The final expropriation in July 2010 caused the direct and egregious injury to Claimants, who thereby lost their remaining ability to sell the assets, to use them productively, and to direct the cash flows from those assets to the creditors. The seizure was just the final step in a series of actions starting in late 2008 that impaired Claimants ability to profitably and successfully operate, manage, control, and dispose of their investments. (CPHB 2 ¶ 246).



## 2. Arguments by Respondent

1347. Initially, Claimants argued that the inspections and investigations initiated in October 2008 had a severe impact on the operations of KPM and TNG. Now, however, they have abandoned that claim. At the hearing, Mr. Cojin even testified that the inspections and investigations "*could not disturb*" the people at TNG who were "*very busy with production.*" Instead, Claimants now focus on the lack of funding of KPM and TNG which they allege to have been caused by the Republic. (RPHB 2 ¶¶ 92 – 94, 126).

1348. Claimants now argue that the INTERFAX press item of 18 December 2008 caused an injury to Claimants' reputation and ability to get credit. It should be pointed out that in the first hearing, when asked about what caused the cashflow problems in 2009, Mr. Lungu made no mention of the pre-emptive rights waiver issue. Regardless, the INTERFAX item cannot be attributed to the Republic. It was not issued by the Republic. INTERFAX obtained the information from unofficial sources. Claimants have not shown that the Republic was in any way involved in the publication of the item. (RPHB 2 ¶¶ 95 – 97).

1349. Claimants' case that the pre-emptive rights waiver issue harmed their ability to secure financing boils down to the negotiations with Credit Suisse for a bridge loan (which could have collapsed for any number of reasons) and Mr. Lungu's non-credible and illogical testimony. Under Mr. Lungu's testimony, the Credit Suisse loan would have needed to be refinanced in August 2009 already – Claimants, thus, would have needed to turn to the Laren loan sharks in August 2009 instead of June 2009. To the extent that Claimants have argued that the INTERFAX item prevented them from getting financing on more commercial terms, Claimants have provided no evidence to support this, especially in light of the other problems relating to the drop in demand and the increase in need for capital expenditure. Finally, Respondent denies the unproven contention that Laren is not an affiliate of Anatolie Stati. (RPHB 2 ¶¶ 98 – 104).

1350. Respondent denies interfering with gas sales of KPM and TNG. The loss of Kemikal as a customer is not attributable to the Respondent since, as confirmed by PwC, that was due to Kemikal's own liquidity issues. Kemikal is a private company that was not acting in any kind of governmental capacity. It has not been managed by the State. (RPHB 2 ¶¶ 124 – 126).

1351. Claimants have not shown any legal authority in favor of lowering the standard of proof regarding the alleged interference with the sale of KPM and TNG. None of the causes complained of mentioned by Claimants played any role in the companies' decisions not to purchase KPM and TNG. Claimants' failure to sell the companies had nothing to do with the Republic's actions. Rather, it was caused by the lack of commercial activity of KPM and TNG. Any interest that may have existed on behalf of some market players vanished upon closer review of the companies. (RPHB 2 ¶¶ 135 – 137, 150).

1352. Anatolie Stati was dishonest in his testimony in both hearings. His testimony was inconsistent with that of other witnesses. In particular, he informed the Tribunal



that Kazakh authorities allegedly told Total EP and KNOC that it would not permit sale. The testimony of Mr. Chagnoux of Total EP and Dr. Kim of KNOC, however, confirmed that no such talks with Kazakh authorities had taken place. (RPHB 1 ¶¶ 112).

1353. Claimants' arguments regarding the involvement of KMG EP are confusing and fundamentally inconsistent. On the one hand, KMG EP was part of the alleged harassment campaign, and on the other, Claimants treat KMG EP as a purely commercial entity for the purpose of their alienability arguments. In any event, it was not State actions that led to the KMG EP decision not to go forward with the deal. "*As the RBS valuation showed, KMG EP assumed in the base case an enterprise value between USD 473 million and USD 751 million for KPM and TNG (taking into account potential synergy effects). At the same time, KPM and TNG were liable for USD 531.1 million in noteholder debt with an interest of 10.5%. In other words: There was a considerable likelihood that the equity value of KPM and TNG was negative even disregarding any other liability but the noteholder debt.*" Neither the pre-emptive rights waiver issue nor the sequestration of shares played any role. (RPHB 2 ¶¶ 146 – 149).

1354. Total E&P's ultimate lack of interest in purchasing KPM and TNG was that Total E&P was looking for situations in which they could add value or increase the reserves. In KPM and TNG, there was no such additional value. There is nothing incredible about this testimony and Claimants' attempts to discredit the witness, Mr. Chagnoux, are ridiculous. Mr. Chagnoux testified credibility and even discussed Total E&P's strategic decision to gain access to the data room by putting a value on the worthless LPG Plant. In any event, the Respondent did not hinder the sale by preventing Claimants from proving the resources in the Interoil Reef. TNG failed to prove these reserves, failed to drill deeply enough after the drill broke down, and failed to conduct a full and thorough 3D seismic analysis that covered the entire reef. Claimants, and not Respondent, are at fault. (RPHB 2 ¶¶ 138 – 142).

1355. In a fundamental reversal to Claimants' earlier positions, Claimants now agree that the lack of gas sales contracts caused KNOC to lose interest in KPM and TNG, despite testimony of their own witnesses, Anatolie Stati and Mr. Lungu, that the Kazakh authorities deterred KNOC. TNG's inability to secure gas contracts had nothing to do with the Republic. (RPHB 2 ¶¶ 143 – 145).

## 3.  The Tribunal

1356. As indicated above in this Award, the Tribunal notes that the Parties' submissions indicate that the Claimants' investment proceeded in a more or less normal fashion before the Order of the President of the Republic on 14/16 October 2008.

1357. Prior to the 14/16 October 2008 order, Claimants were involved in three-way negotiations, at the behest of Kazakhstan, beginning in 2007. On 7 May 2007, the MEMR, the Governor of the Mangystau Region, KMG, KazAzot, Ascom, KPM, and TNG entered into a MOU that TNG would sell certain volumes of gas to KazAzot first at near market prices followed by the international market price after



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COM**711**-

two years and, further, that through KazTransGas, TNG would be allowed to export certain volumes of gas at international market prices. (C-300). It was argued that TNG was ideally suited to be considered as the primary supplier to the ammonia-carbamide project as it was the fourth largest producer of gas, it was locally situated, and it was a reliable provider of gas in large quantities. Over the following year, extensive negotiations took place among the parties regarding such issues as prices, volumes, and other conditions of the agreement.

1358. Beginning in 2007, TNG, in addition to its efforts to pursue what became the Tri-Partite Agreement, had also pursued gas sales opportunities with Kemikal. Claimants argue that this entity was believed to be under the control of the son-in-law of President Nazarbayev, Mr. Timur Kulibayev. Deliveries to Kemikal began in October 2007 and continued throughout 2008.

1359. On 28 April 2008, the MEMR, KMG, TNG, KazTransGas, and KazAzot made a first agreement among TNG, KazAzot, and KazTransGas. (C-301). A further Tri-Partite Agreement followed between TNG, KazTransGas, and KazAzot setting out the formula for the price calculation, the volumes of gas concerned, and the conditions of supply and export. (C-302).

1360. TNG's Contract 302 initially had a six year term. As a result of flooding from the Caspian Sea basin, the MEMR extended the exploration term for two years and eight months, until 30 March 2009. The MEMR did not count this *force majeure* against the two permissible contract extensions, which in any event required consent of the Republic. (R-I ¶¶ 14.20 – 14.25; R-165). On 24 July 2008, TNG informed the Geology and Subsoil Use Committee of the MEMR that it had discovered an oil and gas field by drilling the Munaibay-1 well in the Contract 302 area. Anatolie Stati testified that during the summer of 2008, TNG purchased a more robust drilling rig in Georgia with the intention of resuming the completion of the Munaibay-1 well and further exploration of the Contract 302 area. (Tr. January 2013 Hearing Day 2 pp. 84, 114 – 115). On 11 August 2008, TNG applied to move to the appraisal phase for Munaibay. TNG withdrew the appraisal application on 10 October 2008 because it believed it was too early to begin appraisal. (C-0 ¶ 57; C-I ¶ 67; CPHB 1 ¶ 129; 234; CPHB 2 ¶ 151; C-66). Instead, on 14 October 2008, TNG notified the MEMR of its intention to exercise its contractual right to extend the exploration period by two further years pursuant to Contract 302. On 14 October 2008, TNG submitted its formal application to extend the exploration period Contract 302 by two years. Among other things, this application refers to the "*[d]iscovery of new HC deposits on depths of over 5-6 km…*" and "*large deeply submerged reef fields…*" (C-67, partially quoted). The Claimants say these are unmistakable references to the Interoil Reef structure and that this application further indicated TNG's plans to complete the Munaibay-1 well. (C-I ¶ 67; CPHB 1 ¶ 129, 234 – 235; CPHB 2 ¶ 151; R-I ¶ 31.68; R-II ¶ 416; C-66; C-67; Lungu Tr. January 2013 Day 1 pp. 250 – 251).

1361. Following the direction of President Nazarbayev on 14/16 October 2008, the Deputy Prime Minister promptly issued Order No. 6497 on 16 October 2008, which ordered the MEMR and the Tax and Customs Committees to conduct comprehensive and complex audits of KPM, TNG, and Kok Mai. These audits began on 28 October, 10 November, and 18 November 2008, respectively.



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE 712

1362. Under the direction and sometimes even the supervision of the Financial Police, KPM and TNG faced relentless inspections, including by:

- The Customs Committee (18 October 2008, C-11);

- The MEMR (20 October 2008, C-9);

- The Tax Committee (24 October 2008, C-10);

- The Geology Committee (28 October 2008, C-12);

- The Ecology Committee (28 October 2008, C-13);

- The MES (31 October 2008, C-14); and

- The National Bank of Kazakhstan (November 2008, C-15);

1363. KPM's former General Manager and subsequently Deputy General Manager of TNG, Alexandru Cojin, stated that these investigations and inspections were voluminous and harassing. He testified that the process began around November 2008 and continued for nearly two years. (WS Cojin ¶¶ 6 – 8). Similarly, KPM's and TNG's Technical Director, Victor Romanosov, testified that "*normal*" inspections in the field had previously occurred once yearly, but commencing in late 2008 and continuing thereafter, the frequency of these inspections increased to every quarter, such that, "*[a]s a result, [he] met with representatives from nearly a dozen agencies for weeks at a time every three months.*" (WS Romanosov 1 ¶ 26). These investigations were unprecedented for KPM and TNG. Claimants provided evidence that these actions became an almost daily intrusion into the operations of KPM and TNG, so much so that many staff members were more occupied with responding to the inspections than with their normal everyday responsibilities.

1364. The following events are also of relevance:

1365. In fall 2008, Kemikal – TNG's largest non-local customer – failed to post the bank guarantees that were part of its required payment terms. These terms were required because Kemikal's payment history was erratic and large arrears accrued. Accordingly, TNG did not renew the contract with Kemikal at the end of that year. It required collection efforts until June 2009 for TNG to receive payment from Kemikal.

1366. A 17 November 2008 Tri-Partite Agreement between TNG, KMG (who had replaced KazTransGas), and KazAzot memorialized their agreement on price, volumes, and related conditions of sale and export. (R-393). TNG and KMG signed this Tri-Partite Agreement. It was hand-delivered to KazAzot for its signature, but KazAzot never signed. Instead, in late November 2008, KazAzot requested that KMG perform another audit of the ammonia-carbamide complex project, especially regarding the delivery prices of gas. KazAzot allegedly indicated at that time that it would sign the Tri-Partite Agreement within six months, subject to the outcome of this audit.

1367. Claimants attempted to obtain a bridge loan to provide additional working capital in connection with their decision to put the companies on the market. On 5



December 2008, Credit Suisse sent Claimants a term sheet for a USD 150-175 million facility. (C-II ¶ 381). Respondent states that this shows that Claimants likely began looking for financing in November 2008. (R-II fn. 775).

1368. On 18 December 2008, the MEMR informed TNG that it was "*cancelling*" the State's explicit ruling of 20 February 2007 that allowed the 2003 transfer of TNG from Gheso to Terra Raf. The MEMR demanded that TNG submit a new application for the transfer. The notice required TNG to submit all documentation regarding Terra Raf's ownership within 10 days, and that failure to do so would result in the MEMR unilaterally terminating TNG's Subsoil Use Contracts for the Tabyl Block and the Tolkyn field. (CPHB 2 ¶¶ 38, 117; R-I ¶ 13.47; R-II ¶¶ 170 – 172; RPHB 1 ¶ 475 – 476; RPHB 2 ¶¶ 281, 377; C-134; C-140; C-424; Illyassova (12 August 2012) ¶ 7; WS Ongarbayev ¶ 5.7).

1369. The Parties agree that, on 18 December 2008, INTERFAX issued a press release containing allegations that the Claimants had altered documents in order to defraud the State of its pre-emptive right to purchase the companies.

1370. Immediately after its publication, Credit Suisse sent Mr. Lungu of Ascom the INTERFAX press release and requested an explanation. (C-625). After discussions, Credit Suisse informed Claimants that it would not provide the bridge loan until Claimants resolved their disputes with Kazakhstan. (C-II ¶ 381; CPHB 2 ¶¶ 117, 210 – 211; WS Lungu 1 ¶ 7).

1371. On 22 December 2008, TNG refused to submit the required application before the MEMR and lodged objections to the State's reversal of its consent to the 2003 transfer. (C-I ¶ 146; CPHB 2 ¶ 117; C-142).

1372. Anatolie Stati testified that, following the State's actions in relation to its revocation of its previous waiver of pre-emptive rights regarding the transfer to Terra Raf, beginning December 18, 2008, he concluded he should be careful regarding the Kazakhstan Government's intentions. (Tr. January 2013 Hearing Day 2, pp. 84, 114 – 115). Thus, although this rig was ready for transport in January 2009, the newly purchased heavier drilling rig was not brought into Kazakhstan. (CPHB 2 ¶¶ 228 – 232). Respondent argues that Claimants would have needed to remove old rig, move the new rig in, assemble the new rig, and drill to 6000m in 3 months. Even if they had a new rig, it is unrealistic that a discovery would have been made. Not even Claimants foresaw it would go so quickly, having submitted a working program on 14 October 2008 that foresaw 7 months to drill Munaibay-1 from 5200 – 6000m. RPHB ¶ 119; fn. 209).

1373. On 14 January 2009, the Fitch Ratings agency issued a Rating Watch Negative report for Tristan's long-term default rate. A Dow Jones release indicated that the Rating Watch Negative report reflected Fitch's concern of "*a potential negative impact relating to the latest actions of the Kazakh authorities on Tristan's financial standing and business prospects.*" The Dow Jones report referenced KPM being "*subject to a criminal investigation.*" (CPHB 1 ¶¶ 219, 349; CPHB 2 ¶¶ 38, 117; C-590). Although Respondent has argued that the Tristan Notes were risky from the outset, the Tribunal considers that the evidence reflects that Respondent's actions worsened the market's treatment of these notes, and this was explicitly noted by the ratings agencies.



1374. On 15 January 2009, Moody's reported a downgrade review of Tristan, as a result of the criminal investigation of KPM and the pre-emptive right claim concerning TNG. (CPHB 2 ¶¶ 38, 117; C-744).

1375. On 18 February 2009, Moody's downgraded the Tristan debt from B2 to B3 due to the "*amplified regulatory and operational risk*" posed by the unresolved criminal investigation of KPM and the pre-emptive right claimed by the State against TNG. (C-744).

1376. On 24 February 2009, the Financial Police seized KPM's corporate documents. (C-609).

1377. On 24 February 2009, TNG complained to MEMR regarding the negative effects that the December 2008 publication of Respondent's actions had had on its business and reputation. (CPHB 2 ¶ 117; R-II ¶ 171; C-619).

1378. On 27 February 2009, the State responded to TNG's objections to the 18 December 2008 notice, stating that the transfer of TNG to Terra Raf had breached the State's statutory pre-emptive right to acquire TNG. The State explained that TNG was, therefore, in breach of Contracts 210 and 302. The State demanded that TNG submit a new application for Kazakhstan's consent to the transfer and waiver of the State's pre-emptive purchase right. Failure to do so would result in termination of TNG's Subsoil Use Contracts. (C-0 ¶ 28, partially quoted; C-I ¶ 148; CPHB 2 ¶¶ 38, 117; C-146).

1379. On 3 and 4 March 2009, the Financial Police seized KPM's and TNG's corporate documents. (C-610; C-611; C-612).

1380. On 5 March 2009, Moody's downgraded the Tristan debt again, based on the worsening treatment of KPM and TNG by Kazakhstan and, in particular, the opening of a formal criminal investigation against TNG. (CPHB 2 ¶ 38; C-744).

1381. In a hand-delivered letter dated 18 March 2009, which Respondent states should be viewed as an attempt to provoke the Republic, TNG responded to the State's 27 February 2009 notice of breach and offered the State three alternatives: (1) revocation of the notice that purported to "*reverse*" the State's February 2007 decision; (2) TNG's reapplication for a transfer permit, if the State would agree to pay USD 1.347 billion in compensation if the permit were denied, or (3) referral of the dispute to the Arbitration Institute of the SCC and maintenance of TNG's status quo rights under the TNG Subsoil Use Contracts, pending a final arbitral decision. (C-0 ¶ 29; C-I ¶¶ 38, 149; CPHB 2 ¶ 117; R-I ¶¶ 9.75 – 9.76; C-41, WS Pisica 1 ¶ 31, WS Lungu 2 ¶ 42).

1382. On 19 March 2009, the day after this correspondence from TNG to MEMR, a group of representatives from KPM, TNG, Terra Raf, and Ascom met with the MEMR Executive Secretary, Mr. A. B. Batalov, at the offices of the MEMR. At this meeting, the State's actions against the Claimants since President Nazarbayev's 14/16 October 2008 Order were discussed. The Parties dispute whether Mr. Batalov assured the Claimants that all of these issues would be disposed of in favour of TNG and KPM, and that TNG's Subsoil Use Contracts would not be cancelled, if TNG would simply submit a new application for its transfer to Terra



Raf, and would permit the State to re-evaluate its prior consent. Mr. Batalov stated that, because the size and value of TNG had changed since the 2003 transfer to Terra Raf, the State would require a new and contemporary evaluation of TNG's books and assets (as of February 2007) in order to properly re-evaluate the transfer. KMG would conduct this new evaluation. Minutes of the meeting were prepared by Mr. Grigore Pisica and were offered to Mr. Batalov for his signature, but he refused to sign. (C-I ¶¶ 106, 150, 152, 177; R-I ¶ 13.47(e)(v), 21.1; C-42; C-111; Lungu 43 – 45; Pisica ¶¶ 32 – 37, 43).

1383. On 24 March 2009, KPM and TNG sent a complaint to President Nazarbayev. (CPHB 2 ¶ 142; C-631).

1384. On 24 March 2009, following the meeting with Mr. Batalov of the MEMR, TNG applied for a permit for the transfer of TNG's ownership to Terra Raf and for a written decision on the State's waiver of its pre-emptive rights. (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 332; C-147; Lungu ¶ 46; Pisica ¶ 38).

1385. On 25 March 2009, TNG sent the State a separate request for another formal, written decision regarding the right of TNG to transfer Terra Raf's ownership interests to a prospective third party buyer, including KMG, based upon a competitive bidding process and direct negotiations (C-0 ¶ 32, partially quoted; C-I ¶¶ 153, 154, 332; C-148; Pisica ¶ 38; Lungu ¶ 46).

1386. On 30 March 2009, Contract 302 expired. (R-II ¶ 411; C-53).

1387. On 2 April 2009, the Expert Commission passed a Decision, which recommended the extension of Contract 302 for two years. (CPHB 1 ¶ 236; CPHB 2 ¶ 151; R-I ¶ 31.70; R-163.2).

1388. On 9 April 2009, the MEMR issued a written statement to execute the extension of Contract 302 to 30 March 2011, which the Claimants allege that they requested on 9 March 2009, and which the Respondent states was requested on 24 March 2009. The Claimants allege that the MEMR notified TNG of its agreement to extend Contract 302 and undertook to execute the amendment by 2 July 2009. Respondent states that the adopted decision has the character of a recommendation and is only one of many legal actions required for a valid contract extension including, for example, that TNG needed to apply for a license renewal, as well. (C-0 ¶ 58; C-I ¶¶ 22, 178; R-I ¶¶ 31.71 – 31.73; C-II ¶ 241; CPHB 2 ¶ 151; R-II ¶¶ 413, 419 – 424; 436; RPHB 1 ¶ 323 – 325; C-27; C-27.2, R-163.1; R-163.2, Ongarbaev ¶ 7.2; Ongarbaev Day 6 pp. 67 – 68).¶

1389. Despite these potentially promising developments of 2 and 9 April 2009, which indicated that an extension may be forthcoming, the MEMR never renewed Contract 302. This matter lingered over the following months, during which time, TNG occasionally followed up – on 30 April 2009 and on 4 May 2009 – and received hints that the renewal would be forthcoming. As a result of the State's inaction, however, following the expiration of Contract 302 on 30 March 2009, TNG was prevented from exercising its contractual rights under Contract 302 and, therefore, prevented from further exploration of the Tabyl Block. The East Munaibay discovery, first claimed by TNG in July 2008 and later further re-



notified to the MEMR on 9 March 2009, along with a further notice of discovery in the Bahyt structure, remained unfulfilled.

1390. On 25 April 2009, the Financial Police arrested Mr. Cornegruta. (C-I ¶ 44, partially quoted; R-I ¶ 27.2; C-117; Exhibit 1 and 3 to Rakhimov 2).

1391. On 30 April 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts. The Claimants allege that the Financial Police issued no fewer than 10 orders for the sequestration of property, which resulted in freezing KPM's and TNG's shares, KPM's Contract 305, TNG's Contracts 210 and 302, KPM's field oil pipeline, TNG's field gas pipeline, TNG's condensate pipeline, and the companies' other property. (C-I ¶ 121; R-I ¶ 29.2; C-486; C-487; C-488; C-489; C-490; C-491; C-492; C-493; C-494; C-495; C-496; C-497; C-498; C-499; C-500; Condorachi ¶ 38). Those orders prevented KPM and TNG from selling or depreciating the value of those assets. (C-I ¶ 121; CPHB 1 ¶ 140).

1392. On 30 April 2009 and 4 May 2009, TNG followed up with the MEMR to inquire about the status of the Contract 302 extension.

1393. On 7 May 2009, Anatolie Stati wrote to President Nazarbayev to obtain the release of Mr. Cornegruta, to protect the former and current management of KPM and TNG, and to end the dispute. Around this date, Mr. Stati decided to pause construction on the LPG Plant and to reduce planned development efforts at Tolkyn and Borankol.

1394. On 15 May 2009, the Financial Police issued attachment orders in respect of KPM's and TNG's Subsoil Use Contracts and requested additional documents from KPM. (R-I ¶ 29.2; CPHB 2 ¶ 38).

1395. On 15 May 2009, the Financial Police notified KPM and TNG that they had seized the Claimants' equity interests in KPM and TNG two days before on 13 May 2009. The asset and equity seizures were designed to prevent KPM and TNG from selling or transferring their interests during the course of the criminal proceeding against Mr. Cornegruta. (C-I ¶ 121). In addition, the Financial Police requested additional documents from KPM. (C-668 and C-485). Respondent states that the Financial Police issued attachment orders. (R-I ¶ 29.2). Respondent does not admit that the Financial Police notified KPM and TNG that it had seized KPM's and TNG's equity interests on 13 May 2009. If the allegation is that Claimants were prevented from transferring their interests during proceedings, then that would be appropriate under the circumstances. (R-I ¶ 26.26(c)).

1396. On 12 June 2009, Terra Raf and Ascom filed petitions to lift the seizures. (C-0 ¶ 45; C-I ¶ 122).

1397. On 15 June 2009, Kazakhstan indicted Mr. Cornegruta. (C-454).

1398. By early summer of 2009, most of the senior management of KPM and TNG, in light of the case of Mr. Cornegruta, had fled Kazakhstan in order to avoid arrest. The assets of KPM and TNG were under seizure. Credit Suisse had refused to provide financing, and the companies urgently needed to renew financing



arrangements in order to meet their tax and interest obligations. It was against this setting that the Laren Loan Facility was negotiated. (CPHB 2 ¶ 213).

1399. On 16 June 2009, Claimants entered into the Laren Loan Facility, described in detail in the summaries of the Parties' positions, above.

1400. On 17 June 2009, the Financial Police publically announced that their investigative phase had concluded and that the four former and current managers of KPM and TNG would be prosecuted for having realized an "*illegal profit*" of 147 billion Tenge (approximately USD 980 million as of June 2009). (C-0 ¶ 45, C-II ¶ 602; CPHB 2 ¶ 38 (calling the 147 billion the potential fine); R-I ¶ 26.24; C-118).

1401. On 19 June 2009, the third tranche of the 2006 Bonds Project was issued, for USD 111.11 million. (R-I ¶ 9.59).

1402. On 27 June 2009, the Terra Raf and Ascom petitions to lift the seizures were denied. (C-0 ¶ 45; C-I ¶ 122).

1403. On 27 June 2009, the Regional Prosecutor's Office wrote to Ascom and Terra Raf noting that an international search was underway for Mr. Cojin. (CPHB 2 ¶ 38; RPHB 2 ¶ 191).

1404. On 2 July 2009, the MEMR's self-imposed deadline to extend Contract 302 expired, without an extension of that contract. (CPHB 2 ¶¶ 38, 151).

1405. On 10 July 2009, a Fitch Ratings press release indicated that market observers were concerned about "*weak corporate governance standards at Tristan.*" (RPHB 2 ¶ 61).

1406. In August 2009, Kazakhstan, the Governor of the Mangystau Region, KazAzot, and Mitsubishi confirmed their intention to go forward with the ammonia-carbamide complex. A few days after that announcement, on 26 August 2009, the Governor of the Mangystau Region asked Prime Minister Massimov to cancel TNG's and KPM's Subsoil Use Contracts. Claimants allege that this letter implicitly sought the transfer of TNG's assets to KazAzot. (C-I ¶ 61; C-293).

1407. Notwithstanding several attempts to obtain his release, Mr. Cornegruta remained incarcerated until the conclusion of "*his trial*" on 18 September 2009. Thereafter, following his conviction and sentence of four years, he remained in jail until he escaped.

1408. From the above chain of events, the Tribunal considers that Respondent's series of actions starting in October 2008, which are breaches of the FET standard of the ECT as found above in this Award and which were publicized beginning in December 2008, harmed Claimants' investments and prevented Claimants from proceeding with their investment from that moment, forward.

1409. This affected Claimants' search for bridge financing, which they began in November 2008 on recommendation from Renaissance Capital. Bridge financing, they state, was necessary at that time in order to obtain a partial advance on the



proceeds of the sale in order to reinvest them into other projects as soon as possible and, as Mr. Lungu explained, to protect against falling oil and gas prices.

1410. Thereafter, the 15 December 2008 formal initiation of the criminal investigation against KPM and the 18 December 2008 INTERFAX publication, which extensively quoted the MEMR's accusations of forgery and violations of registration requirements, had a profoundly negative impact on Claimants' reputation and the value ascribed to their investments in capital markets. This impact is easily understandable and obvious to the Tribunal. It is confirmed by the fact that, on 14 January 2009, the Fitch ratings agency placed Tristan's long-term default rating and senior unsecured rating of B+ on the Rating Watch Negative.

1411. In this context, Respondent's argument that the INTERFAX item cannot be attributed to the Republic as it was not issued by the Republic and INTERFAX obtained the information from unofficial sources, does not change the impact. Even if Claimants have not shown that the Republic was in any way involved in the publication of the INTERFAX item, it is obvious and not disputed by Respondent, that it was Respondent's actions starting in October 2008 that caused the publication.

1412. As well, Respondent's argument that, at the Hearing, Mr. Cojin testified that the inspections and investigations "*could not disturb*" the people at TNG who were "*very busy with production,*" does not change the negative impact of Respondent's chain of actions, as that impact is by no means limited to keeping the staff of Claimants from engaging in more work on their normal business.

1413. Further, the Tribunal is not persuaded by Respondent's argument that Claimants have not proven that the MEMR's actions caused the Credit Suisse loan to fall through. Moody's and Fitch confirmed that the MEMR's actions against KPM and TNG raised concerns about the companies' ability to service their existing debt. The Tribunal agrees with Claimants that it would have been surprising if any lender would have gone forward with the new financing without resolution of Claimants' conflicts with the government of Kazakhstan.

1414. It is apparent that, even before the trial of Mr. Cornegruta, the relentless onslaught of inspections and, eventually, charges against KPM's most senior officer had, when considered together with these pre-trial seizures of assets on 30 April 2009, seriously disabled Claimants' companies.

1415. The Parties agree, and the Tribunal also agrees, that Claimants were only able to weather the liquidity storm of summer 2009 by obtaining financing through the Laren Loan Facility. (RPHB 1 ¶ 58, CPHB 2 ¶ 257). The Parties agree, and the Tribunal also agrees, that the terms of the Laren Facility were terrible for Claimants. (CPHB 2 ¶ 213; RPHB 1 ¶ 60; RPHB 2 ¶ 69(e)). Likewise, the Parties agree, and the Tribunal also agrees, that had Claimants obtained financing from Credit Suisse in December 2008, they would not have needed to resort to other lenders in June 2009. (CPHB 1 ¶ 353; RPHB 2 ¶ 102; 961).

1416. What the Parties dispute is whether Respondent's actions caused Claimants to enter into the Laren Facility. The Tribunal finds that the Laren Facility, with its onerous terms, was arranged in June 2009 because it was necessary for KPM and TNG to



secure these funds and because Respondent's actions prevented them from doing so sooner. By June 2009, ordinary lenders would not lend to these companies on commercial terms. Although Claimants drove the best bargain they could, the cumulative effect of the barrage of inspections and the very public revelation in December 2008 of the alleged forgery and fraud said to have been committed in relation to the transfer to Terra Raf, as indicated above, led to the severe downgrades by Moody's and Fitch rating agencies. While the worldwide economic crisis was affecting these companies in late 2008 and early 2009, the State's aggressive and concerted actions, including the inspections, the criminal charges, and the asset seizures - even before Mr. Cornegruta's trial in August and September 2009 – forced Claimants to accept the "*horrendous*" Laren Facility.

1417. Furthermore, the Tribunal also notes that, despite TNG's apparent attempts to comply with Kazakhstan's requests, the State never responded to TNG's applications of 24 and 25 March 2009 – applications that the State requested. As a result, Kazakhstan's alleged pre-emptive rights claim lingered throughout the following two year period. It was, no doubt, a cloud on Terra Raf's ownership rights which created continuing difficulties for Claimants.

1418. The Claimants have also alleged that the inspections commencing in October 2008 interfered with their sales and marketing of gas. The Claimants argue that the evident relationships between President Nazarbayev and his son-in-law are reason enough to believe that the Kazakh State was the cause of the various difficulties they encountered in securing their gas sales and export rights commencing in the fall of 2008 and continuing into 2009. They point to the close relationships said to exist between KMG, under the chairmanship of Mr. Kulibayev, and the KazAzot resistance to signing the Tripartite Agreement after over two years of negotiations and the signature of the other two parties to the agreement. They also point to their difficulties with Kemikal, and its failure, at the critical time in the fall of 2008, to continue supplying bank guarantees to secure payment of its accounts. The Tribunal notes Respondent's argument that the loss of Kemikal as a customer is not attributable to the Respondent since that was due to liquidity issues of its own, and that Kemikal is a private company that was not acting in any kind of governmental capacity. However, Kemikal's sudden refusal to post bank guarantees that were required by its credit terms was a change of its earlier business pattern for which the Tribunal sees no other convincing explanation than that it was part of Respondent's aggressive actions against the Claimants, irrespective of whether in that context the fact that Kemikal was controlled by President Nazarbayev's son-in-law, Mr. Kulibayev, played a role.

1419. The Tribunal notes in the present context the Parties' dispute whether the actions of the Kazakh State prevented the owners of KMP and TNG from selling their investments. The Claimants were persistent in their pursuit of selling KPM and TNG, with or without Contract 302. In order to consider any possible contribution to relevant causation, the following paragraphs highlight in a summary fashion the additional events which surround the Claimants' on-going efforts to sell KMP and TNG and the impact of the State's actions on those efforts.

1420. In the early summer 2008, Claimants decided that they wished to explore selling KPM, the LPG Plant, and TNG, excepting its Contract 302 properties (the Tabyl



Block). This activity was called Project Zenith. The Claimants engaged the services of Renaissance Capital to assist them.

1421. On 18 July 2008, Renaissance sent a preliminary "teaser" invitation to 129 potentially interested buyers, including KMG. In mid-August 2008, Renaissance distributed the Information Memorandum to 41 parties that had expressed interest in these companies and their properties and had signed confidentiality agreements. KMG was one of those companies.

1422. On 29 August 2008, KPMG issued a complete Vendor Due Diligence presentation for Project Zenith.

1423. By 1 October 2008, Claimants had received 8 non-binding indicative bids from various entities, including from KMG EP in the amount of USD 754 million and from KNOC in the amount of USD 1.55 billion. The average of the 8 indicative offers was USD 1.05 billion.

1424. On 30 April 2009, however, the Financial Police obtained a pre-trial order for the sequestration and arrest of all the shares of both KPM and TNG (C-486; C-487; C-488; and C-489). By their terms, these orders not only sequestered these shares, but also stated that all interested persons should be informed. The subsequent Minutes of 13 May 2009 stated, among other things, that 100% of the share ownership in the "statutory capital" of KPM and TNG had been sequestered and that, *"It is prohibited to carry out any actions related to the alienation or transfer of the sequestered property (100% share ownership in the statutory capital) to third parties."*

1425. In addition to these difficulties, the Claimants were faced with on-going taxation claims by the State, as well as the State's efforts to collect on the judgement made by the court against KPM. On 18 September 2009, in addition to a 4-year prison term for Mr. Cornegruta, the criminal court ordered KPM to pay 21,675,578.00 Tenge (approximately USD 145,475,534.08) to the Kazakhstan state budget. On 30 September 2009, the Financial Police ordered the Aktau territorial customs body to conduct a new audit of KPM based on its failure to pay the Crude Oil Export Tax for its January 2009 exports. By December 2009, following a number of court procedures, the Specialized Interdistrict Economic Court issued a consolidation decision, rejecting KPM's and TNG's challenges to corporate back taxes. At the same time, the Financial Police pursued interrogations of KPM employees with respect to a potential tax assessment in relation to 2008 export taxes. In early 2010, KPM commenced a new action to challenge the Financial Police's claim that it owed 2008 export taxes on oil exports. On 31 March 2010, after having paid significant sums in relation to export taxes, KPM and TNG were successful before the Central Customs Committee which notified them that pursuant to their subsoil use contracts, they were not liable for export taxes from October 2008.

1426. A myriad of enforcement actions ensued. On 29 December 2009, the Aktau City Court issued a writ of execution against KPM for the execution of the criminal courts' order to pay the fine of approximately USD 145 million. In early 2010, the Aktau Division of the Enforcement Officers of the Mangystau Oblast issued a Decree on Initiating of the Enforcement Proceedings against KPM for the Recovery of Revenue for the amount of USD 145 million. Enforcement measures



followed this decree from January to June 2010, including seizures of various bank accounts on 10 January 2010, seizure and impounding of motor vehicles on 22 January 2009, a further order on 25 January 2010 of the Mangystau Oblast court with respect to the outstanding Writ of Execution for the payment of 21.6 billion Tenge, together with various additional audits to determine the particulars of remaining assets. By 3 February 2010, the Ministry of Finance notified KPM that it was being monitored for bankruptcy (as of 26 January 2010) for the sum of 3.8 billion Tenge, including interest relating to alleged back taxes and penalties for corporate taxes. On 19 February 2010, the Chief of the Aktau Territorial Department issued a further writ of execution while noting that previous collection orders had gone unfulfilled. This particular order (actually received on 1 March 2010) attached some 2,186 assets previously listed in the detailed inventory. On 23 February this same official issued a further order prohibiting KPM from executing import and export formalities regarding the transportation of oil. On 26 February 2010, this same official dismissed KPM's challenge to the writ of enforcement and issued an order "*to attach the oil pipeline from [the] OTP to Opornaya CRMB [Commoditiies and Raw Material Base of Opornaya Station] of 18 kilometers*" and KPM's accumulator oil tanks. This order also prohibited KPM from transferring oil to the main pipeline operated by KazTransOil once its accumulator tanks reached their capacity. Later, on 4 March 2010, the Chief of the Aktau Territorial Department, despite attachment of numerous accounts and assets, complained that these efforts had not so far been successful and, accordingly, he wished to change course by seeking an enforcement procedure to in-kind transfers of land lots, the 18km pipeline, KPM's Contract 305 over the Borankol field and KPM's subsoil use license No. 309. By 17 March 2010, the Acting Head of the Aktau Territorial Department of Judicial Executors relented and agreed with KPM to suspend the effect of the previous orders made on 23 and 26 February 2010 in order to avoid the suspension of production activity by KPM.

1427. In the meantime, in October, 2009, Starleigh had presented an initial bid of USD 450 million for Claimants' properties in Kazakhstan. Later, in November 2009, Starleigh reduced this bid by USD 100 million, ostensibly in recognition of the USD 145 million fine that had been imposed on KPM by the criminal court. Around this same time, KMG NC began to pursue a possible purchase of the Claimants' assets. At a meeting in Amsterdam in November 2009, the Claimants received an offer from KMG NC of USD 20 million for their equity interests in their companies (immediately following a meeting between KMG NC and representatives of certain of the noteholders in which they were supposedly offered 25 cents on the dollar for their notes). Subsequently, Starleigh made a further offer of USD 50 million on the assumption they could buy out the noteholders. Grand Petroleum offered to purchase KPM and TNG for USD 1.15 billion.

1428. On 13 February 2010, the Claimants successfully negotiated the sale of 100% of their shares and participatory interests in KPM and TNG to Cliffson Company S.A. The total value of that agreement, including buying out the companies' noteholders (including the purchase of Tristam), payment for the Claimants' equity interests, and assumption of liabilities was in the order of USD 920 to 930 million. Claimants say this was a reduced value for their assets in view of the impact of the criminal judgement and its enforcement against KPM. One condition of this potential sale was that the MOG would grant permission for the sale and waive the State's alleged pre-emptive right to purchase KPM and TNG. The MOG conditions



for approval of this potential sale included removal of the attachment orders as well as assurances concerning the financial solvency and technical and managerial capabilities of the Cliffson Company. The Respondent says it co-operated with the Claimants on this matter while the Claimants say that Kazakhstan did not co-operate.

1429. On 30 April 2010, the MOG responded to the Claimant's application, dated 12 April 2010, for approval of the intended sale of their assets to Cliffson Company. The MOG requested additional information regarding the terms of the proposed transaction, but more importantly, noted Kazakhstan's previous seizures of the companies' assets and stated that transfers of the shares of KPM and TNG were forbidden. The MOG stated that, as a result, the transaction would only be approved if KPM and TNG satisfied the requirements necessary to release the attachment of their shares.

1430. On 6 May 2010, the Cliffson Company signed an amendment to the SPA to extend the time for completing the transaction. On 1 June 2010 the MOG renewed its request for further information in relation to the Cliffson Company transaction. By 9 June 2010, however, the Court Execution Body of the Mangystau Region – the Acting Chief of Aktau Territorial Department of Judicial Executors - ordered the sale of KPM's assets as a single lot, so as to avoid any suspension of activities.

1431. On 15 June 2010, the Claimants wrote to Cliffson Company to express their concern that it was "*backing out*" of the proposed transaction. Shortly after, on 23 June 2010, the Claimants wrote to MOG in reply to MOG's earlier requests, on 30 April and 1 June, for further information in relation to the Cliffson Company transaction. The Claimants subsequently learned that Cliffson Company had submitted a letter to the MOG stating that it refused to purchase the interests in TNG and KPM under their 13 February 2010 agreement.

1432. It is the mandate of the Tribunal to decide on the Relief Sought by the Parties, no less, but also no more. The Tribunal notes that Claimants, in their Relief Sought as cited above in this Award, do not request a separate amount allegedly caused by their prevention from selling the investment, but rather base their amounts requested on alleged violations related to the Borankol and Tolkyn Fields and Munaibay Oil, to the Contract 302 Properties, and to the LPG Plant. Therefore, the Tribunal hereafter will focus on these claims and considers that it does not have to decide whether Respondent's actions prevented Claimants from selling their investments, unless this issue may become relevant for one of the claims raised. This will be taken into account in the Tribunal's examination of the respective claims hereafter.

**K.III.      Whether Claimants' Alleged Inexperience and Own Actions Led to the Demise of KPM and TNG (Intervening Cause)**

**1.      Arguments by Claimants**



1433. When the State argues that injury resulted from acts of the victim or the market, rather than its own wrongful acts, the burden is on the State to prove such an intervening cause. Respondent has not met that burden. Respondent argues that the Tristan debt structure, the financial crisis, the drop in oil prices, and the "*constant withdrawal of cash from the companies*" led to "*a severe underfunding of KPM and TNG and subsequently, to the companies no longer complying with their obligations under the Subsoil Use Contracts and Kazakh law. The eventual termination of the contracts was a logical consequence.*" While KPM and TNG experienced a short-term liquidity shortage in the first half of 2009, that problem was magnified by Kazakhstan's actions and, in any event, did not lead to the failure of the companies. There never were any lawful grounds for terminating the Subsoil Use Contracts of KPM and TNG, or seizing their assets. Claimants never abandoned their investments. (CPHB 2 ¶¶ 247 – 248).

1434. There is no credible evidence to support Respondent's argument that KPM and TNG were overleveraged prior to state action, and that that doomed them to fail after oil prices dropped due to the financial crisis. This argument is belied by the facts. Prior to 14 October 2008, KPM and TNG were neither insolvent nor overleveraged. Prof. Olcott's statement that the annual interest payment on the Tristan notes caused continuous and negative financial impact on KPM and TNG's operations is not credible and she was not qualified to make the statement. Likewise, Mr. Gruhn of Deloitte failed to perform any direct analysis of KPM and TNG's abilities to service their debt. Deloitte's argument concerning the trading value of the Tristan notes indicated financial distress is rubbish. As Howard Rosen of FTI explained, prior to the Lehman bankruptcy, Tristan notes were trading close to their USD 100 face value (at USD 95). The day immediately following, the trading price was USD 84.50 and the value steadily declined to around USD 65 on 14 October 2008. At the time, the markets were not trading on fundamentals, and investors sold securities for a variety of reasons, including raising cash to meet investor calls, to reduce risk, or simply due to panic. FTI analysed the finances of KPM and TNG and concluded that they were in good financial condition prior to October 2008, having respective current ratios of 3.1 and 3.0. (CPHB 1 ¶¶ 399 – 404; CPHB 2 ¶¶ 249 – 253).

1435. Kazakhstan partly caused and greatly exacerbated the liquidity problem that KPM and TNG experienced in 2009. When Kazakhstan argues that KPM and TNG only had USD 9 million in cash on hand at the end of September 2008, they ignore that they also held USD 22 million in inventory and USD 296 in trade receivables at that time. In total, their net working capital was USD 222 million. That was a solid cushion, and they were a very long way from insolvent. That the primary assets were in receivables did not create a liquidity issue, since KPM and TNG could use the prepayment provisions of the Vitol COMSA agreement as a revolving line of credit to manage their cash flow requirements. (CPHB 2 ¶¶ 254 – 255).

1436. In the first half of 2009, a number of factors nonetheless combined to produce a liquidity crunch, including (1) low prices and slow payments by customers, (2) reduction in gas and condensate sales due to the non-renewal of the Kemikal contract, and (3) Vitol's decision to stop funding LPG Plant, and to reduce the credit line under the prepayment terms of the COMSA agreements from USD 120 million to USD 40 million effective at the end of June 2009. As a result, Claimants



sought the Credit Suisse Loan, in order to protect the company in the event that prices should continue to decline. The decision to see bridge financing was not a sign of financial distress. Nevertheless, the cash problem came to a head in June 2009 when 2 large payments became due – the USD 22 million payment on the Tristan notes and an EPT of USD 25 million. The failure to make either of these payments would have jeopardized KPM and TNG, and this forced Claimants to seek out the Laren loan facility. (CPHB 2 ¶¶ 255 – 257).

1437. The market causes not attributable to Kazakhstan were temporary. The low oil price environment was over by the fourth quarter of 2009. 2008 was an anomalous year because oil climbed to unprecedented highs and shocking lows. The companies average realized gas price declined only 14.2 percent from 2008 – 2009. The 52.1% decline in the companies' gas sale revenue was due to reduced sales volumes, attributable to Kazakhstan's conduct. The companies nonetheless survived the temporary cash flow crisis and even continued paying employees. Even with low oil prices, KPM and TNG did not record substantial losses – KPM recorded a net loss of USD 13 million and TNG recorded a net profit of USD 9.4 million, after paying interest in Tristan debt. The companies were not overleveraged. (CPHB 1 ¶¶ 409 – 415). But for the actions of Kazakhstan, they would have been well positioned to rebound as oil prices climbed back toward historic highs in the second half of 2010. (CPHB 2 ¶¶ 258 – 261).

1438. The evidence shows that Claimants did not abandon their investments. Kazakhstan's argument that Claimants' stripped KPM and TNG of cash in preparation to abandon them is unsupported and wrong. KPM paid dividends in 2009 and 2010 to avoid seizure of the funds – not to prepare for voluntary abandonment. It was apparent that any money flowing into KPM's bank accounts was at risk to satisfy the USD 145 penalty illegal imposed on KPM on 18 September 2009. Further, allowing Tristan to collect funds that would otherwise have been frozen in KPM's bank accounts was reasonable. Tristan noteholders did not place Tristan in default based on those payments, indicating that the noteholders were satisfied with the steps that Claimants took to enable that coupon payment. Tristan Oil's payment of a USD 3.86 million bonus to Anatolie Stati is a non-issue, as he has a right to receive the profits of his investment. The payment did not exacerbate any liquidity problems at the end of 2009, because there were none. (CPHB 1 ¶¶ 416 – 422; CPHB 2 ¶¶ 262 – 264).

1439. The declaration of dividends was a reasonable effort to mitigate harm caused by Kazakhstan's actions. The assignment of receivables allowed Tristan to collect funds that otherwise may have been frozen and allowed Tristan to make the USD 28 million coupon payment in full. It prevented Tristan's default on the notes. (CPHB 2 ¶ 264).

1440. Claimants dispute Respondent's assertion that KPM and TNG had not collected USD 170 million in receivables from Montvale, because it invested funds from Vitol in certain non-liquid assets. In any event, this does not show that KPM and TNG's failure to collect receivables was part of a preparation to abandon the companies. (CPHB 2 ¶ 265).

1441. The evidence demonstrates that Claimants went to great lengths to protect their investments. The assignment of receivables prevented a default on the Tristan



notes. Claimants went to great lengths to pay KPM's employees after its accounts were frozen in 2010 by having TNG pay those employees from its accounts. The Laren loan was secured by a personal guarantee from Anatolie Stati and a pledge from Ascom of its assets in Iraq, and was necessary to keep the companies alive. Thus, Claimants made every effort to protect their assets, right up to seizure in July 2010. (CPHB 2 ¶ 266).

## 2.    Arguments by Respondent

1442. KPM and TNG's demise, which was unrelated to Respondent and was related to self-inflicted and external financial stress, ultimately led to the breaches of the Subsoil Use Contracts and to the termination of those contracts and the invocation of the trust regime. In particular:

    *(a)*   *Claimants mismanaged their assets on numerous occasions, for example by putting alarmingly incompetent personnel in charge of important tasks and by promising sales to business partners that they could have never made. The mismanagement went so far that market observers were concerned about "weak corporate governance standards at Tristan". The overall level of mismanagement comes as no surprise given that Claimants had no prior experience in oil and gas production and in the Kazakh or international markets.*

    *(b)*   *KPM's and TNG's business was very risky from the start, as was set out clearly in the Tristan note prospectus.*

    *(c)*   *KPM's and TNG's financing structure, which aimed at removing capital from the companies, made them vulnerable to situations of crisis*

    *(d)*   *Claimants took business decisions aimed only at short-term profit. In particular the ramping up of production at the end of 2007 was short sighted, as it led to a loss of available gas production for the LPG Plant and the allegedly expected possibility of gas export (which the Republic denies).*

    *(e)*   *In April of 2008, Claimants found out that their estimates for production from Borankol had been overstated by 300%. At the time, Claimants received the new Miller&Lents reserves report which set out 2P reserves of 24.6 MMboe. The earlier report by Ryder Scott had provided for 2P reserves of 72.4 MMboe. The effect of this loss was particular significant because Borankol is a predominantly oil producing field and oil production is much more valuable than gas production.*

    *(f)*   *KPM and TNG were already in severe financial difficulties as of Claimants' valuation date, as is evidenced by the development of the Tristan notes price.*

    *(g)*   *Severe drops in energy prices and in demand, in particular due to the loss of Kemikal as a customer, led to a very restricted cash position for KPM and TNG. At the same time, the need for capital expenditure increased markedly, putting further pressure on the companies.*



(h)     *Against this background, when uncontestedly legal tax demands were raised by the state in the summer of 2009, Claimants had to take out the horrendous Laren loan and issue new notes in the amount of USD 111.1 million in connection thereto.*

(i)     *Thereafter, Claimants deliberately chose to withdraw cash from KPM and TNG, all while not fulfilling the annual work programs. This was effectively the deliberate abandonment of the companies. (R-III ¶ 440; RPHB 2 ¶¶ 60 – 61).*

1443. KPM and TNG were in poor financial health prior to Claimants' valuation date. Importantly, the Tristan note trading price stood at USD 65.125 for a nominal value of USD 100, translating to a yield to maturity of 26.319%, indicating that the markets expected a default. While Claimants try to attribute this to the Lehman bankruptcy, that statement is misleading. At the same time, oil and gas prices strongly decreased, putting additional pressures on the companies' revenues and the market's risk perception made it difficult to obtain financing. Additional key financial figures indicate that KPM's and TNG's financial figures deteriorated prior to 14 October 2008, including their current ratios, (which decreased from 5.74 at year end 2007 to 3.06 on 30 June 2008), for example. (RPHB 2 ¶¶ 62 – 68).

1444. The PWC Due Diligence also confirmed that external circumstances were to blame for the demise of KPM and TNG. PwC found that the decline in condensate prices and the decline in oil prices were the key reasons for falling sales and profitability of TNG and KPM, respectively. The loss of Kemikal as a customer – which, contrary to Claimants' invention, was due to Kemikal's insolvency issues and not state action – also resulted in a drop in demand for Claimants' goods. Claimants' liquidity was further exacerbated by KPM and TNG's decision to have Montvale (the intermediary between KPM, TNG, and Vitol) invest USD 170 million from Vitol in non-liquid assets, rather than make payments on KPM and TNG's receivables. (RPHB 2 ¶ 69).

1445. These cash constraints caused KPM and TNG to stop their capital investment programs, putting them in breach of their annual work programs and causing them to stop the LPG Plant project. Thus, that work stoppage cannot be attributed to Respondent. An additional consequence of these cash constraints was the infamous Laren loan and the corresponding issuance of USD 11.1 million in new Tristan notes. (RPHB 2 ¶ 70).

1446. Regarding Claimants' criticisms of the PwC Due Diligence Report, Claimants could have objected to its introduction or have asked for an opportunity to produce counter evidence – they did not. PwC prepared a financial due diligence report that did not assess the legality of any state action, as that was beyond the scope of the report. PwC assessed all circumstances that could affect the financial situation, caused lawfully or unlawfully. (RPHB 2 ¶¶ 71 – 72).

1447. Claimants' contention that the auditor's going concern qualification in the Interim Report shows that the Republic's actions caused injury to Claimants is not true. Instead, the qualification demonstrates the severity of Claimants' situation due to the uncontestedly lawful tax claims (EPT which have never been objected to by



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE 727

KPM or TNG), the non-payment of which led to the freezing of KPM and TNG's accounts and the Montvale payment issue. (RPHB 2 ¶¶ 73 – 76)

1448. The oil price decline in 2008 and 2009 had a severe impact and was one of many factors affecting KPM and TNG. The drop in demand persisted through 2009, where Tolkyn was producing at 2005/2006 levels and then in 2010, when it produced at 2002 levels. At the same time, Claimants own evidence from Miller & Lents shows that Claimants needed an additional capital expenditure of USD 276.2 million to keep the estimated 2P production near the levels estimated in the 2008 Miller & Lents report. Thus, 2007 and 2009 are not comparable at all and 2009 was particularly volatile. Prices even dropped below USD 70/barrel in 2010. Claimants' argument that gas prices did not decline significantly is contradicted by Anatolie Stati's testimony. The objective evidence also shows that Anatolie Stati was lying when he stated that gas prices had been going up from summer 2008 to the beginning of 2009. (RPHB 2 ¶¶ 77 – 82).

1449. Claimants effectively abandoned the companies in 2009 and 2010, stripping as much cash from KPM and TNG as possible, issuing a USD 72 million dividend in 2009 and 2010 and transferring receivables to Ascom. These were paid in violation of the Tristan note indenture. As a result, KPM had no cash inflow. Claimants admit that they stripped the assets to avoid seizure by the State. Claimants have not proven that any of the USD 72 million was used to repay interest on the Tristan notes. Since the noteholders had not placed Tristan in default at that time, Claimants had not obligation to pay the interest. Claimants also suggested that the USD 72 million was used to repay Laren lenders and to keep paying KPM's employees, but this is also unproven. Finally, Claimants extension of the payment terms for Stadoil and General Affinities further stripped their assets. To date, Claimants have not clarified whether Stadoil or General Affinities ever made payments on the trade receivables. Accordingly, the evidence demonstrates that Claimants indeed abandoned KPM and TNG and only kept the companies on life support in order to force the Republic to terminate the contracts, so that Claimants could then advance these claims in arbitration. (RPHB 2 ¶¶ 83 – 90, 128).

1450. Claimants likely siphoned off more moneys by extending the due date on accounts receivables due from affiliated companies. Even the Tristan Oil Annual Report (2009) mentions that Claimants would cancel delivery for equipment to the LPG Plant, and then a third company, Perkwood Investments, would return the advance paid. Claimants have provided no trace of this money (USD 36,800,212) and likely pocketed it. Claimants would also divert cash to operating companies, such as by paying Anatolie Stati's CASCO double the market price to do work. There were also opaque service agreements with Ascom. Likely, there are other transactions, but Claimants' opaque financing structure makes it impossible to see those. FTI estimates that diverted monies could be as much as USD 226.6 million. (R-III ¶ 441; RPHB 1 ¶¶ 1038 – 1049; RPHB 2 ¶ 17).

1451. Assuming liability and causality, these financial difficulties have major implications for the calculation of damages and the selection of a valuation date.

### 3. The Tribunal



1452. As mentioned above, the Tribunal agrees with the Parties that

- as reflected in Art. 36 and 39 ILC Articles on State Responsibility, Claimants bear the burden of demonstrating that the claimed quantum of compensation is caused by the host State's conduct,

- Article 39 ILC Articles requires that the Claimants' conduct be taken into account in determining compensation,

- the burden may shift to the state to prove that a factor attributable to the victim or a third party caused the damage alleged, unless the injury can be shown to be severable in causal terms from that attributed to the State.

1453. The Tribunal has considered Respondent's arguments that KPM and TNG's demise was unrelated to Respondent and was caused by self-inflicted and external financial stress, ultimately leading to the breaches of the Subsoil Use Contracts and to the termination of those contracts and the invocation of the trust regime. Respondent adds a number of examples to prove that. In that regard, the Tribunal comes to the following conclusions.

1454. The evidence considered in the chapter above on the causation by Respondent's actions is so strong that, taking into account the above cited legal principles, the Tribunal concludes that the burden of proof has shifted to Respondent to show that, in spite of the causation by its own actions, Claimants caused or contributed in a relevant way to the damages that incurred to Claimants' investment. The Respondent has not been able to provide sufficient proof in this regard.

1455. As Claimants concede, KPM and TNG experienced a short-term liquidity shortage in the first half of 2009. But the Tribunal considers that this shortage was magnified by Kazakhstan's actions, and in any event did not lead to the failure of the companies. There is no convincing evidence to that KPM and TNG were over-leveraged prior to October 2008. The market causes not attributable to Kazakhstan were temporary. The low oil price environment was over by the fourth quarter of 2009. 2008 was an anomalous year because oil climbed to unprecedented highs and shocking lows. There is no convincing evidence that KPM and TNG would have become insolvent after oil prices dropped due to the financial crisis.

1456. Weighing the evidence submitted by the Parties, the Tribunal is not persuaded by the testimony of Prof. Olcott (who is not an economic expert) that the annual interest payment on the Tristan notes caused continuous and negative financial impact on KPM and TNG's operations. As Mr. Gruhn of Deloitte did not perform any direct analysis of KPM and TNG's abilities to service their debt, the Tribunal rather accepts FTI's testimony that the finances of KPM and TNG were in good financial condition prior to October 2008, having respective current ratios of 3.1 and 3.0.

1457. Respondent has also not provided sufficient evidence that Claimants abandoned their investments. Rather, Claimants' actions seem to have been caused by Respondent's measures. KPM paid dividends in 2009 and 2010 to avoid seizure of the funds by Respondent. It was apparent that any money flowing into KPM's bank accounts would be at risk of being taken to satisfy the USD 145 penalty imposed



on KPM on 18 September 2009. Further, allowing Tristan to collect funds is also understandable as these would otherwise have been been frozen in KPM's bank accounts. As well, the declaration of dividends, in the view of the Tribunal, seems to have been a reasonable effort to mitigate harm caused by Respondent's actions. The assignment of receivables allowed Tristan to collect funds that otherwise may have been frozen and allowed Tristan to make the USD 28 million coupon payment in full. It prevented Tristan's default on the notes.

1458. In view of these considerations, the Tribunal concludes that Respondent has not submitted sufficient evidence that Claimants' inexperience or own actions caused or contributed in a relevant way to the damages that occurred to Claimants' investment.

## L.        Quantum

### L.I.        Preliminary Considerations

1459. The Tribunal notes that Respondent has stated that its arguments made regarding damages are without prejudice to its position on jurisdiction and liability and to its position that no harassment campaign was ever started against Claimants. (R-III ¶ 15; R-I ¶¶ 34 *et seq.*, 35 *et seq.*, 47.2).

1460. Though the Tribunal found above that Respondent's primary breach of the ECT is that of Art. 10(1) to provide FET, since that breach resulted finally in a taking of Claimants' investment, some guidance can be provided by Art. 13 on expropriation regarding the date and measure for the calculation of damages. The second paragraph of Art. 13(1) ECT deals with "*compensation*" for a lawful expropriation and provides:

> "*Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment.*" (herein referred to as the "*Valuation Date*").

1461. From this provision, the Tribunal takes guidance to the effect that the damages to be awarded for what it has found above to be not a lawful expropriation, but rather a breach of the ECT, shall not be lower than what the ECT prescribes for a lawful expropriation.

### L.II.        Valuation Date

#### 1.        Arguments by Claimants

1462. The selection of the appropriate valuation date is critical for assessing damages and awarding Claimants the full reparation as set out by the PCIJ in *Chorzów* and as codified in Art. 31 of the International Law Commission Draft Articles on Responsibility of States for Internationally Wrongful Acts. (C-II ¶¶ 607 – 608).



1463. While the ECT provides that in cases of lawful expropriation, the State must pay *"prompt, adequate, and effective compensation"* amounting to the FMV of the investment at the time immediately prior to the expropriation, the ECT contains no rules for the standard of compensation for expropriations or other actions committed in violation of the ECT. Under customary international law on quantum, the Tribunal should award full reparation for the harm resulting from the state action. The FMV of the assets of KPM and TNG is the appropriate measure of damages for all of Claimants' claims, in light of the cumulative effect of Kazakhstan's numerous breaches of its obligations under the ECT. (CPHB 2 ¶¶ 268 – 273).

1464. In order to re-establish the situation that existed before the wrongful acts, Respondent must pay a sum that in the words of *Chorzów Factory*, would *"wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed."* Here, the act triggering or commencing the wrongful acts was the issuance of President Nazarbayev's 14 October 2008 order. The harassment campaign ensued immediately thereafter. There is a causal link between the campaign launched on 14 October 2008 and the seizure on 21 July 2010 that justifies setting the valuation date at the commencement of that campaign. Respondent has ignored the continuing injury to Claimants, including the active reduction in value of the properties and the impact that had on their efforts to sell the properties. (C-II ¶¶ 210 *et seq.*, 476 – 478, 580 – 583; 607 – 609; CPHB 2 ¶¶ 274 – 275).

1465. This principal of full compensation, with its corollary mandate for re-establishment of the situation that existed before a state's wrongful conduct, is equally at play in the adjudication of indirect expropriation cases. Where a state's conduct has involved two or more instances of identifiable expropriative measures, the selection of an early measure, even if less severe or direct than a later measure, will assure both equity and full compensation for the State's unlawful conduct. This principle was at play in *Sedco v. Iran*. The Tribunal in *Amoco International Finance Corp. v. Iran* also awarded the claimant compensation based on a date earlier than the liability date, using the date that the claimant lost control over the future management direction of the investments as the valuation date. The relevant element for a loss of control was not the appointment of outside managers, but the degree of interference by those managers with the owners' property rights or *'fundamental rights of ownership.'* While there were no temporary managers appointed in this case, the State's campaign deprived Claimants of their ability to freely alienate their investments and their ability to freely manage their capital expenditures for improvement of their investments. (C-II ¶¶ 610 - 613).

1466. Claimants' additional arguments are best taken form their own words:

> *615. Where, as in the present case, there is a campaign of unlawful, interfering measures by the State, with the commencement of that campaign being an unfair and inequitable order that implements a deliberate strategy of expropriation through conduct that indisputably violates multiple standards of treaty protection, and the conclusion of that campaign being direct expropriation, equity and full compensation fairly demand that the intentional commencement date of that campaign be chosen as the valuation date. Equity and full compensation are not served by choosing*



> *the date of final seizure for valuation, or by granting Kazakhstan a grace period between the date of its order to commence its expropriative campaign and some arguable date thereafter when that campaign ostensibly had its first measurable effects.*
>
> 616.   *The Tribunal should accordingly adopt October 14, 2008 as the proper valuation date, and assess the fair market value of Claimants' investments as of that date based upon the information then available to a willing buyer.*

1467. Professors Reisman and Sloane explain that, when considering an indirect expropriation, Tribunals should distinguish the "*moment of expropriation*" from the "*moment of valuation*." If, for example, the moment of expropriation were to be confused with the moment of valuation, a Tribunal would be unable to award full compensation and would allow the wrongdoing state to benefit from its unlawful conduct throughout the campaign of indirect expropriation. In effect, such a Tribunal would reward the unlawful conduct. (C-I ¶¶ 404 – 407). Claimants' arguments against using 21 July 2010 as the valuation date are best taken from their own words:

> 584.   *[…] Kazakhstan wants to pigeonhole Claimants' case into a classic claim of creeping expropriation under which alleged ownership-interfering actions by the State eventually "ripen" along a continuum into a taking. Misclassifying Claimants' case in this way provides Kazakhstan with an avenue to argue (unpersuasively) that no single action by the State during the course of its harassment campaign amounted to a State seizure — other than, of course, the State's ultimate seizure of Claimants' assets on July 21, 2010, which Kazakhstan then claims must be the valuation date if damages are to be awarded. Coupled with this argument is Kazakhstan's repeated and rote assertion that its harassment campaign was merely an appropriate exercise of State regulatory power, and that it was neither an intentional expropriative campaign nor executed in furtherance of a conspiracy to expropriate. Thus, under this argument, any diminution in the value or profitability of the assets to Claimants between October of 2008 and July of 2010 was not the fault of the State.*
>
> 585.   *By this argument, Kazakhstan is effectively contending that Claimants must itemize the loss caused by each discrete act in Kazakhstan's harassment campaign. […] Claimants do not contend that each particular event in Kazakhstan's harassment campaign caused the entirety of Claimants' losses. Rather, the combined effect of Kazakhstan's conduct caused Claimants to lose control over their investments, deprived them of the rights of autonomous stewardship and free alienability associated with ownership, and violated Claimants' rights to have their investments treated fairly and equitably and in accordance with the other substantive standards of protection in the ECT. (C-II ¶¶ 584 – 585).*

1468. There is no mechanical formula for determining whether one or more State actions amount to an indirect expropriation or a treaty violation. Here however, the harassment campaign that was initiated on 14 October 2008 was designed to (i) prevent Claimants from selling their properties to a third party, (ii) make normal daily operations an effective impossibility, and (iii) create an extremely risky



investment environment to stop Claimants from continuing to make capital outlays for development of their investments. This harassment campaign met its intended purpose: to devalue and impair the investments. Professors Reisman and Sloane would agree: where the intent to expropriate can be proven, the State's intent to expropriate should be given significant weight in the assessment of the proper valuation date. The campaign was expropriatory and violated the ECT. (C-II ¶¶ 210 *et seq.*, 586 – 603, 614 – 616).

1469. The tribunals in *CMS v. Argentina* and *Vivendi v. Argentina* recognized that the task of putting claimants into the position they would have occupied but for the State's wrongful conduct necessarily involves uncertainty. The tribunal must consider how events far into the future may have developed but for the state's actions. As a result, and as confirmed by the annulment committee in *Rumeli v. Kazakhstan*, tribunals have broad discretion in establishing the appropriate quantum for compensation, and it is not a simple matter to be resolved on burden of proof. Once the tribunal is satisfied that the claimant has suffered some damage as a result of breach, the determination of damage is a matter of the tribunal's informed estimation. This is true for all of Kazakhstan's violations of the ECT, since they collectively led to the single injury of the impairment and taking of Claimants' investments. (CPHB 2 ¶¶ 270 – 272).

1470. As confirmed by Mr. Rosen's testimony at the Hearing on Quantum, the 14 October 2008 date is necessary to fully compensate Claimants for the injuries caused by Kazakhstan's violations of the ECT and international law. Respondent's valuation date does not account for any of the value-depressing effects of the State's actions, including the diminution in value caused by the allegations that the State made against KPM and TNG or the effect of actions taken against Claimants' reputation and ability to sell the investments free from state interference. 14 October 2008, or at least shortly thereafter, was the last day that Claimants had an opportunity to sell their investments in an open and unrestricted market. (CPHB 1 ¶¶ 426 – 430).

1471. Claimants note that Respondent has made no mention of other possible dates – like the 18 December 2008 reversal of the 20 February 2007 share transfer approval. In Respondent's effort to push the date forward all the way to 21 July 2010, Respondent only globally describes some aspects of its harassment campaign and summarily states that these could not have had any impact on operations or value of Claimants' assets. (C-II ¶ 594).

1472. In addition, on 14 October 2008, TNG notified MEMR of its intention to extend the exploration in the Contract 302 by two years. (C-I ¶ 175).

1473. The 14 October 2008 valuation date would not give Claimants double compensation, as asserted by Respondent. Claimants did not earn hundreds of millions of dollars between the valuation dates. Deloitte never stated that KPM and TNG earned anything at all between the valuation dates. Instead, Deloitte said that production was assumed by FTI have a value of USD 226.6 million (later USD 302.3 million). Deloitte purports to calculate the amount that KPM and TNG would have earned in between the valuation dates, but for the interference by Kazakhstan. The amount that KPM and TNG could have earned but for interference should not be deducted from the valuation because there was


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF **733**

interference. KPM and TNG did not produce as much oil and gas as they could have. Moreover, Kazakhstan impeded Claimants' efforts to sell the companies. Deducting this amount would improperly deny Claimants compensation for injuries that Kazakhstan caused during that time. (CPHB 1 ¶¶ 431 – 434).

1474. Regarding the distributions after 14 October 2008, KPM assigned USD 81.2 million in receivables to Tristan Oil and Ascom in the form of loan payments and dividends in 2009. Not only did Claimants reinvest more than this in the companies, those funds represented profits that KPM and TNG earned prior to 14 October 2008. At the end of September 2008, KPM and TNG combined had 221.5 million in net working capital and more than USD 367 in retained earnings on their balance sheets. (CPHB 1 ¶¶ 431, 435; CPHB 2 ¶ 288).

1475. Furthermore, an award based on 14 October 2008 would not overcompensate Claimants, since Claimants have not included working capital in their enterprise valuation. Claimants request damages in the amount of assets that Kazakhstan seized on the day it began its campaign to devalue and seize them. This is equivalent to a hypothetical asset sale – i.e., what Kazakhstan would have had to pay, had it purchased them on that date. Since Claimants have not included the working capital that KPM and TNG subsequently distributed to Claimants, there is no reason to reduce damages, since there is no double counting. (CPHB 1 ¶¶ 431, 436 - 437).

1476. It was never disputed or concealed that KPM paid USD 72 million in dividends in 2009 and 2010. After Kazakhstan imposed the unlawful USD 145 million criminal penalty in September 2009, Claimants prudently prevented cash from unnecessarily flowing into KPM and TNG. This was lawful under the ECT, which allows Claimants to retain profits. Claimants are not claiming damage in respect of these profits. The USD 72 million in receivables that KPM distributed as dividends, and the USD 143.4 million in uncollected receivables were generated prior to 14 October 2008. On 30 September 2008, KPM and TNG had a combined net working capital of USD 222.6 million. (CPHB 2 ¶ 290 – 294).

1477. There is no evidence to support Respondent's allegation that Claimants transferred hundreds of millions of dollars out of the Republic and did not subject it to Kazakh taxation. (CPHB 1 ¶ 438).

1478. Respondent's valuation date of 22 July 2010 fails to respond to Claimants' claims and fails to account for how the State's actions depressed the value of Claimants' investments, including the crippling diminution in value and alienability of KPM and TNG and the interference with normal business operations. Other tribunals have recognized that a state's wrongful actions can impair and depress an investor's assets long before the State actually acquires them. In *Santa Elena v. Costa Rica*, the tribunal adopted the date of the decree to expropriate that claimant's property, even though the date of actual expropriation was years later. The issue for the Tribunal is whether the State's conduct "*blights the possibility for the owner reasonably to exploit the economic potential of the property*." The state's intent to expropriate is relevant to the determination of the valuation date, since after that date, the investor's ability to develop its investment is lost. In this regard, Respondent's argument that it did not express an intent to expropriate on 14 October 2008 is unpersuasive, as the evidence establishes an intent at the highest


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE 734

levels of government to deprive Claimants of their investment in 2008. A reasonable investor in the position of Claimants would have understood it as such. (CPHB 2 ¶¶ 276 – 282).

1479. The *Kardassopoulos v. Georgia* award also supports Claimants' valuation date. That tribunal premised its valuation date on the decree that cast doubt on the validity of the investor's concession, rather than on the later expropriatory decree. This Tribunal should follow that approach and award damages in the amount of what Claimants should have been paid if the state had observed its international obligations. Scholarly opinion from Prof. Reisman and Sloane also support this approach. (CPHB 2 ¶¶ 283 – 287).

1480. It is common for tribunals, as demonstrated in *Gemplus and Talsud v. Mexico*, *Santa Elena v. Costa Rica*, *Tecmed v. Mexico*, *CMS v. Argentina*, *Siemens v. Argentina*, and *Azurix v. Argentina* not to adopt either of the parties' valuation dates or damages calculations outright, but to nonetheless award damage once injury is proven. (CPHB 2 ¶¶ 295 – 300). For the sake of argument, even if the Tribunal were to adopt Kazakhstan's valuation date, it would not be bound to use Kazakhstan's valuation. (CPHB 2 ¶ 303).

1481. The RBS Assessment for KMG EP on 31 July 2009 (valuation of October 2009) contains substantial evidence on which the Tribunal could base its assessment of damages. Based on this report, the Tribunal could select 18 December 2008 (date of MEMR's challenge to Claimants' ownership of TNG), 30 April 2009 (state sequestration of Claimants' KPM and TNG shares and assets) or 18 September 2009 (judgment against Mr. Cornegruta). The RBS valuation, however, post dates all of the non-governmental factors that Kazakhstan argues harm the FTI valuation, and the Cliffson transaction executed on 13 February 2010. (CPHB 1 ¶¶ 581 – 582).

## 2. Arguments by Respondent

1482. Claimants' intention on setting an early valuation date should be readily apparent: an earlier valuation date helps inflate the claim by allowing the Tribunal to disregard negative developments that ultimately caused KPM and TNG to fail, including the drop in oil prices and demand. Moreover, the earlier the valuation date, the bigger the reserves in the Borankol and Tolkyn fields. Deloitte has calculated that 29.6% of Claimants' Borankol claim and 49.4% of Claimants' Tolkyn claim are based on cash flows occurring in the time in between the Parties' valuation dates. (RPHB 1 ¶¶ 1102 – 1104).

1483. Respondent states that "*the Tribunal can only rely on 14 October 2008 as the valuation date if it actually finds that there was a harassment campaign against Claimants. [...] there was no such harassment campaign.*" (R-III ¶ 37; RPHB 2 ¶¶ 375 – 382).

1484. Claimants' date of 14 October 2008 is far too early and should be rejected by the Tribunal. The Parties are in agreement: "*14 October 2008 is a date on which no state measures against KPM and TNG were executed. No contracts were cancelled on this day. No searches were conducted. No judgments were rendered. No promises were given or broken.*" The only event was President Nazarbayev



forwarded a letter from President Voronin to authorities, asking them to thoroughly investigate President Voronin's accusations. That is not proof of a campaign against Claimants, instead, it is a courtesy required between CIS Heads of State. It is unclear that Claimants even knew about the Order until a considerable time thereafter. In any event, Claimants' argument that the letter of 14 October 2008 constituted a violation of the ECT is absurd. (R-I ¶ 47.8; R-II ¶¶ 272 – 279; R-III ¶¶ 14 – 19; 36 – 37, 46; RPHB 1 ¶¶ 1105 – 1107).

1485. Under international law, as held in the cases of *International Technical Products v. Iran*, *Tippets*, *Philips Petroleum v. Iran*, and *Santa Elena v. Costa Rica*, the valuation date is to be determined in reference to the actual expropriatory effect. According to international practice for cases of indirect expropriation and as explained in the ICSID case *Santa Elena v. Costa Rica* and in *Azurix v. Argentina*, the valuation date must be the date at which the deprivation of property rights has turned out to be irreversible. Here, the only date at which Claimants possibly could have been deprived of their ownership rights in KPM and TNG was 21 July 2010. In the *Sedco v. NIOC*, on which Claimants rely, there was a much harsher interference than alleged in the present case. Claimants' selective citation of Professors Reisman and Sloan completely disregards their denunciation of improperly early valuation dates. Finally, Claimants' reliance on the full compensation principle as set out in the *Chorzów* case to support an improperly early valuation date is unacceptable. The *Chorzów* requirement to "*wip[e] out the effects of the expropriatory state action presupposes that there are measures with actual effect on the companies, not mere purported intentions of state bodies.*" Under that principle, Claimants must rely on conduct, not on alleged intentions. (R-III ¶¶ 24 – 32, 37 – 44; RPHB 1 ¶¶ 1108 – 1111).

1486. An unduly early valuation date would have the consequence of providing double compensation. KPM and TNG were producing oil until the 21 July 2010 termination of the contracts (also undermining the earlier valuation date). An improperly early valuation leads to double counting this income. For 2009, KPM's financial statements demonstrate that KPM earned at least USD 81,235,291 from the sale of oil. (R-I ¶ 47.3, R-III ¶¶ 45, 442 – 446). In 2010, KPM distributed dividends in the amount of USD 71.9 million, paid by assigning trade receivables to Ascom. Claimants have provided no evidence that this amount originated in profits earned prior to 14 October 2008 or that Ascom reinvested any of the money received (which would be contrary to Claimants' admission that they tried to take out the money to protect that they could). The only money that may have been reinvested was a coupon payment made by Tristan in the amount of USD 28 million. KPM and TNG also extended the due date of accounts receivables due from Stadoil Ltd. and General Affinity in the amount of USD 143.4 – money which was never paid. Since Claimants did not prepare financial statements for 2010, one cannot evaluate whether other significant cash outflow may have also occurred. An advance in the amount of USD 36,800,212 related to the LPG Plant has, likewise, not been accounted for. In any event, while the Republic has never argued that Claimants made profits during the relevant time period, FTI assumed that TNG's and KPM's production from 14 October 2008 to 21 July 2010 would have amounted to USD 226.6, corrected to USD 302.3 in Deloitte's Additional note. (R-III ¶¶ 442 – 446; RPHB 2 ¶¶ 883 – 892).

