1742. Since the LPG Plant has a negative enterprise value, Claimants are, at best, entitled to the salvage value of its components. Prof. Marboe and the World Bank agree that it is recommended to use "*the salvage value for the valuation of companies which do not have a proven record of profitability.*" Likewise, this measure has been used by arbitral tribunals if they consider the business to lack future prospects, due to an expropriation (*Eastman Kodak v. Iran*) or due to social and economic changes in wake of the Iranian Revolution (*Sola Tiles v. Iran*). The tribunal in *Sedco v. IMICO* used the salvage value to determine FMV in wake on an expropriation. *Tavakoli v. Iran* also considered valuation based on the liquidation value. Claimants' expert FTI even acknowledged that salvage value must be used when it stated "*we assume that the plant would not continue to operate under negative cash flow conditions and would be sold to another producer of natural gas.*" (R-III ¶¶ 153 – 162; see also R-I ¶¶ 53.18 – 53.20).

### 3. The Tribunal

1743. First, in addition to an application of the Tribunal's considerations in the chapter on causation above in this Award, the Tribunal has no doubt that Respondent's actions found above to be in breach of the ECT, in particular were a cause for the delay and then discontinuance of Claimants' completion of the LPG Plant.

1744. In fact, President Nazarbayev himself confirmed this in his Instruction of 19 November 2009 (C-23, attached to Blagovest letter). And, this was further confirmed by MEMR in its Report on its inspections of January 2010 (C-599, Minutes of Inspection of TNG, January 25 – February 5, 2010, at 23).

1745. The Tribunal is not persuaded by Respondent's and their experts' conclusion that the LPG Plant is a failed project and must be considered to have a negative value and no damages at all can be claimed by Claimants. If that were so, Respondent would not have been ready to invest further expenses in the completion of the Plant, after Respondent had taken control of the Plant. However, there were obviously plans to complete it. Publicly available information indicates that Respondent was in fact preparing to open the LPG Plant in 2012. In a document entitled "*List of Investment projects of the Mangistauskoi Region, which are being supervised in 2011,*" there is a specific reference to the LPG Plant under "*Regional Projects*" The project is identified as having a cost of USD 315 million (47 billion Tenge) and it was expected to start up in the first half of 2012 with a capacity of 7 mcm of gas per day (2nd FTI Report § 7.7 and fns. 138 and 139). Respondent's argument that it cannot be identified with this document is not persuasive. The LPG Plant was also listed on website of Kazakhstan's Embassy in Israel under the caption "*Large Investment Projects in Kazakhstan through 2012*" with the same project costs (FTI 2nd Report § 7.7 and fn140).

1746. Regarding the value of damages caused by Respondent's action, the Tribunal has taken note of the various extensive arguments submitted by the Parties relying on their respective experts' reports. However, the Tribunal considers that it does not have to evaluate these reports and the very different results they reach. In the view of the Tribunal, the relatively best source for the valuation in the period of the valuation date accepted by the Tribunal are the contemporaneous bids that were made for the LPG Plant by third parties after Claimants' efforts to sell the LPG Plant, both before and after October 14, 2008. Prospective purchasers bid on the



Plant, not as scrap but obviously as prospectively operational. This is reflected in the undisputed indicative offers made by interested buyers in 2008, which valued the LPG Plant at USD 150 million on average. In this context, the Tribunal is not persuaded by Respondent's argument that these offers did not reflect the anticipated price bidders were ready to pay, but were only strategic offers to gain access to the data room. In this context, the Tribunal attributes a limited evidentiary value to the testimony of Respondent's witnesses from KNOC and Total E&P, since these foreign companies remain active investors in Kazakhstan and, thus, for understandable reasons, have an interest to maintain a good relationship with the government of that country.

1747. On the other hand, the Tribunal considers it to be of particular relevance that an offer was made for the LPG Plant by state–owned KMG at that time for **USD 199 million**. The Tribunal considers that to be the relatively best source of information for the valuation of the LPG Plant among the various sources of information submitted by the Parties regarding the valuation for the LPG Plant during the relevant period of the valuation date accepted by the Tribunal, the Tribunal.

1748. Therefore, this is the amount of damages the Tribunal accepts in this context.

## L.VII.     The Parties' Arguments Concerning the Tristan Notes

### 1.     Arguments by Claimants

1749. Claimants explain the Tristan note structure:

> *571.    The notes that were issued by Tristan Oil Ltd., [...]  provided a portion of the capital for construction and operation of the KPM and TNG oil and gas assets [...]  Tristan issued notes with a face value of US$ 531.1 million, which matured on January 1, 2012. While Tristan is the nominal principal obligor on those notes, Tristan is a special purpose entity that was created solely for the purpose of raising capital through the note issuance to fund KPM and TNG. It has no operating assets with which to repay the notes. The expectation of all parties involved, including the Tristan noteholders, was that KPM and TNG oil and gas operations would provide the funds to repay the principal and interest on the Tristan notes. Consequently, KPM and TNG guaranteed repayment of all obligations under the Tristan notes. (C-II ¶ 571).*

1750. Tristan has an integral relationship to Claimants, TNG, and KPM – and this relationship was recognized in Respondent's Statement of Defense.     Any disposition of Claimants' interest in, or assets of, KPM and TNG requires arrangements to satisfy the Tristan note principal and interest held outside of, but guaranteed by, TNG and KPM.  This was reflected in indicative offers received in Project Zenith.  (C-III ¶¶ 91 – 92, partially quoted; *see also* C-II ¶¶ 572 - 575).

1751. That Claimants are allowed to claim for damages to the noteholders if Claimants are liable to the noteholders for such alleged damages is permissible was conceded by Respondent in its Rejoinder on Quantum.  The only issue before the Tribunal is



whether there is a causal link between the State's illegal conduct and the companies' inability to satisfy their debts. (CPHB 1 ¶¶ 602 – 606).

1752. In large part, Respondent's arguments with regard to the Tristan debt rest on the assumption that the Tristan debt is true third-party debt for which Claimants have no liability. This is incorrect, as "*Claimants: (1) have always been obligated to repay the Tristan noteholders from the proceeds of any award; (2) further reinforced that obligation through the Sharing Agreement, and (3) have repeatedly, consistently, and unequivocally undertaken before this Tribunal (and for the avoidance of doubt, hereby commit and undertake yet again) to repay the Tristan noteholders from the proceeds of any award under the procedures set out in the Sharing Agreement.*" Ascom and Terra Raf are also liable to repay the Noteholders, pursuant to Section 6 of the Pledge Agreement. (CPHB 1 ¶¶ 617 – 620, partially quoted; CPHB 2 ¶ 321).

1753. Claimants explain that they are responsible for the Tristan debt, which was issued with a fact value of USD 531.1 million and matured on 1 January 2012. Under the note structure, Tristan issued the notes. Tristan is an SPV with no assets that loaned the proceeds of those notes to KPM and TNG. The expectation was that KPM and TNG would repay the notes from their profits. KPM and TNG guaranteed repayment of all obligations under the notes. Ascom and Terra Raf also pledged 100% of their Participation Interests in KPM and TNG (all of their equity in the companies) and the money to be received with respect to those interests as security for the Tristan notes. Contrary to Respondent's reading of the Pledge Agreements, the claims would not be limited to the value of the shares pledged. Section 6(b) of the Pledge Agreements broadly applies to any and all dividend and other payment or distributions of any kind relating to the Participatory Interest, without restriction. This language is broad enough to include the benefit of payments Claimants receive as compensation for Kazakhstan's mistreatment of expropriation of the companies. (CPHB 1 ¶¶ 621 – 625).

1754. Claimants also point out that "*as Squire Sanders noted in its legal due diligence review for KMG E&P, transfer of the participation interests pursuant to the Pledge Agreements is subject to the State's preemptive right under Article 71 of the Subsoil Law. That raises the prospect that Ascom and Terra Raf may be unable to deliver their Participation Interests in KPM and TNG to the noteholders, and instead would receive compensation from Kazakhstan for those shares upon the State's exercise of its preemptive right. It thus stands to reason that a key purpose of the provision in Section 6(b) was to ensure that the noteholders received the benefit of any payments from Kazakhstan in respect of Ascom and Terra Raf's Participation Interests in KPM and TNG. That is exactly what an award in this arbitration would represent, albeit as the result of violations of the ECT rather than through the legitimate exercise of Kazakhstan's preemptive right.*" (CPHB 1 ¶ 625).

1755. Claimants reject Respondent's interpretation of the Pledge Agreement as it would require Claimants to press unreasonable, aggressive arguments in an effort to "stiff" creditors to mitigate losses and reduce damages that Respondent must pay. (CPHB 1 ¶ 626).

1756. The Sharing Agreement is only relevant insofar as it confirms Claimants' intention to perform their contractual obligations to the Tristan noteholders – it has no bearing



on the calculation of damages due as of the valuation date. The Pledge Agreements always obligated Ascom and Terra Raf to turn over any proceeds of this arbitration to the Tristan noteholders. The Sharing Agreement simply reorders the respective priorities of the Claimants and the Participating Noteholders so that Claimants will share in any proceeds of this arbitration. On 14 February 2013, the Sharing Agreement was accepted by 99.8% of the noteholders, effectively amending the notes and related security arrangements for all noteholders. The Sharing Agreement did not create or materially alter Claimants' obligations regarding the Tristan debt. Instead, it was a renegotiation of Claimants' existing obligations and not a voluntary assumption of new liability. The suggestion that Claimants voluntarily assume liability to share 70% of any award when they had no obligation to do so is absurd. The Sharing Agreement does not materially reduce Claimants' basic liability under the Tristan debt, either. It is a private matter between Claimants and the noteholders and has no bearing on Kazakhstan at all. (CPHB 1 ¶¶ 626 – 630, 632; CPHB 2 ¶¶ 325 - 327).

1757. The fundamental purpose and effect of the Sharing Agreement is to provide both sides with a clear set of agreed rights and obligations for the event that the award in this arbitration is less than requested by Claimants. In such event, Claimants will share in the award and, if noteholders have recovered at least 70% of the amount outstanding, will receive a total release in 2016. In exchange, the noteholders will ensure that Claimants are incentivized to pursue collection of any award (which may not be in Claimants' interest if Claimants are not to receive proceeds), and also to receive a right to approve any settlement. The Sharing Agreement changes the order of allocation of any award proceeds between Claimants and noteholders, until the noteholders are fully repaid. (CPHB 1 ¶¶ 631, 636).

1758. Claimants explain how, against the background of the Sharing Agreement, awarding equity would unjustly enrich Respondent at Claimants' expense.

> *[...] if the assets of KPM and TNG that Kazakhstan seized had a fair market value of US $1 billion and the outstanding Tristan debt were US $531 million, the value of Claimants' equity in KPM and TNG would be US $469 million. If the Tribunal awarded just the equity value (US $469 million in this example), that entire amount would go to satisfy Ascom and Terra Raf's liability to the Tristan noteholders under Section 6 of the Pledge Agreements (without considering the impact of the Sharing Agreement, which is discussed below). In other words, an award of equity value would in fact give Claimants less than the full value of their equity because some (and perhaps all) of the award would go to satisfy liabilities to third parties that, but for Kazakhstan's violations, would have been satisfied with the profits of KPM and TNG. In contrast, an award of the enterprise value (US $1 billion in this illustrative example) would satisfy Ascom and Terra Raf's liability to the Tristan noteholders, leaving Claimants with the value of their equity interest in KPM and TNG (US $469 million in the example), free and clear of all debts. Thus, an award of enterprise value is the proper measure of compensation to put Claimants in the position they would have occupied but for Kazakhstan's violations.*

> *[...] an award of equity value would unjustly enrich Kazakhstan by allowing it to obtain assets unencumbered by liabilities for a fraction of their value. In the same example, for instance, an award of equity value*



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE
**800**

> *would allow Kazakhstan to obtain assets worth US $1 billion while paying only US $469 million to Claimants. Claimants' subsequent payment to the noteholders under the Pledge Agreements would effectively eliminate any claims that the noteholders may have against the assets of KPM and TNG, or against Kazakhstan itself (to the extent that the noteholders have any claims directly against Kazakhstan, which to date they have never asserted). Thus, an award of equity value in this illustrative example would allow Kazakhstan to keep assets worth US $1 billion while paying only US $469 million, and without facing any further liabilities. In contrast, an award of the enterprise value (US $1 billion in this example) would require Kazakhstan to pay the full value of the assets its expropriated, and would not subject Kazakhstan to any further liability (because any claims of the noteholders would be extinguished by Claimants' performance of their obligations under the Pledge Agreements). (CPHB 1 ¶¶ 634 – 635).*

## 2.  Arguments by Respondent

1759. The principal on the Tristan notes must be deducted from the asset values calculated by Claimants' expert since, due to the peculiarities of the securing mechanisms, Claimants can practically no longer be liable for and cannot claim the noteholders' alleged damage. Under Claimants' own case, due to the alleged breach of the ECT, Claimants are practically not liable to the noteholders. In any event, Claimants do not have standing to claim the noteholders' alleged damage. Further, the shares must be worthless, due to Respondent's allegedly illegal action. Thus, any claim by noteholders could not create a loss for Claimants. Assuming that there was a breach of the ECT, this would amount to a financial gain, advantageous to Claimants. Thus, it does not matter that Respondent did not assume or perform KPM's and TNG's guarantee obligations, as Claimants allege. (R-III ¶¶ 379 – 383, 389 – 390; RPHB 2 ¶¶ 923, 945).

1760. Even if Claimants were not freed from liability, their claim for recovery of the Tristan note principal would fail. Under the *Chorzów* principles, which the Parties agree apply here and according to which "*compensation must wipe out the effect of the allegedly expropriatory state action*" (looking to the situation that would have existed absent the alleged breach of international law), Respondent is not liable for the Tristan note principal. With or without breach, Tristan Oil would have been liable for the Tristan note principal and Claimants would have been acting as guarantors for the debt. There was no worsening of the situation through the Respondent's allegedly illegal actions. Claimants must have been aware of this, only including a claim for principal in passing in their Reply Memorial on Quantum. (R-III ¶¶ 392 – 393; RPHB 1 ¶ 1068; RPHB 2 ¶¶ 940 – 941).

1761. Under the *Chorzów* principles, compensation is to be achieved according to the FMV of an asset. The FMV takes the asset's debt into account. After all, a willing buyer would never simply pay the enterprise value, since debt infringes on the buyer's ability to realize profits from the purchase. The so-called Sharing Agreement entered into on 17 December 2012 foresees that proceeds from an award in this arbitration will be shared between Claimants and the noteholders in a roughly 30% / 70% split. Claimants effectively admit that the equity and not the enterprise value is the appropriate tool to value the assets when they base their claim on the idea that the Sharing Agreement acts as a security for the debt.



Case 1:15-mc-00081-P1 Document 19-13 Filed 04/27/15 Page 6 of 44

Page **386** of **414**

However, they essential argue that, if the debt is not added, the amount awarded would immediately go to the noteholders, leaving nothing for Claimants. Notably, Claimants did not try to gross up their claim by adding the debt that they continue to owe for taxes, which would also be deduced from an award. Investment practice strongly disfavors tax gross-ups, even when those are based the argument that an award in their favor would be subject to higher levels of taxation than the profits they would have been expected to make without interference. (RPHB 1 ¶¶ 1056, 1068 – 1074, 1097 – 1098).

1762. It should also be noted that Claimants do not allege that they are liable for noteholder debt no matter what. Instead, they state that that liability would only come into existence with an award. Then, they attempt to gross up the award by adding this debt to their damages. Claimants were never liable for the debt. It is not the case that Claimants had been supposed to hold the cash flows created by KPM and TNG and would then forward those to noteholders. Instead, repayment would go through Tristan, who is not a Claimant. (RPHB 1 ¶ 1078; RPHB 2 ¶¶ 941 – 942). Section 6 of the Terra Raf and Ascom Pledge Agreements create no liability for those Claimants toward noteholders. It only refers to dividends and distributions and, therefore, excludes payments from a hypothetical award. (RPHB 2 ¶¶ 945 – 948).

1763. The claim for recovery for interest and penalties must also fail. It has not been shown that any Tristan noteholder has brought a claim against Claimants for the note interest, penalties, or principal or that Claimants have paid anything to noteholders. Absent this proven damage, the claim must be dismissed. None of the Claimants remain liable for any of the noteholder debt, not even as a result of the Pledge Agreements. Under Section 6 of Ascom's and Terra Raf's Pledge Agreements, KPM and TNG only pledged to pay shareholders as part of a payout of equity. Payments by third parties (such as a payment of an award), are not dividends or distributions, meaning that, therefore, the noteholders are not entitled to them. (R-III ¶ 394; R-I ¶¶ 57.1 – 57.3; RPHB 1 ¶¶ 1075 - 1076).

1764. In any event, any liability based on the Sharing Agreement is Claimants and not Respondent's. Respondent cannot be held liable for Claimants' unilateral action. (RPHB 1 ¶¶ 1077, 1188).

1765. In response to Claimants' allegation that, if the Tribunal does not award the Tristan rate, it should include interest that has accrued on the Tristan notes since 14 October 2008, Respondent states that this allegation does not hold water. Even without a breach of international law, Tristan Oil would have been liable for the note principal, and for the interest payments. Further, Respondent cannot be liable for interest between 14 October 2008 and 1 July 2010, since Tristan only failed to make interest payments starting on 1 July 2010. Finally, since Claimants have never specified the amount of interest that accrued during the time period, Claimants' claims related to Tristan Note Interest should be rejected in their entirety. (RPHB 2 ¶¶ 1014 – 1018).

1766. Even if the Claimants had suffered damage, a debt gross up is contrary to international law and arbitral practice (as demonstrated in *Impregilo v. Pakistan* and Dr. Stern's dissent in the *Occidental* case, and *PSEG v. Turkey*) and would enable the noteholders to circumvent jurisdictional and substantive hurdles of their



ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE **802**

own potential claims. There is no reason to assume that the Parties to the ECT intended that individuals could attach themselves onto another individual's claim to circumvent the ECT's requirements. Like in *Impregilo* where the investor was not permitted to present claims of his joint venture partner, here, too, the Claimants should not be permitted to present this claim on behalf of noteholders. Claimants attempt to vest this Tribunal with jurisdiction to decide on the interpretation of the pledge agreements, even though they have agreed in those pledges that an ICC tribunal will have jurisdiction. Respondent's general offer to arbitrate contained in the ECT does not entail an offer to have matters regarding the interpretation of private contracts be arbitrated as well. In addition, if Claimants are successful, it will have the practical consequence that Claimants serve for the noteholders to realize the noteholders' claim. (RPHB 1 ¶ 1085 – 87; RPHB 2 ¶¶ 934 – 939, 944, 950).

1767. Even if there were such a claim from a noteholder, the Claimants have failed to prove causation, namely that the alleged action of Respondent prevented timely payments to be made on the Tristan notes. Instead, any damages suffered could have been caused by a variety of reasons, including the economic crisis, falling oil prices, poor business decisions, or the Guarantors' debt overload. (R-III ¶¶ 395 – 396; R-II ¶ 723).

## 3. The Tribunal

1768. The Tribunal recalls its considerations above in this Award in the chapter on the treatment of debts. In particular, it recalls the following conclusions regarding the Tristan Notes:

1769. Regarding the Tristan Notes as the by far largest debt, Respondent expressly agreed in its Rejoinder on Quantum (R-III ¶ 383) that, insofar as Claimants remain responsible for the Tristan debt, enterprise value is the correct measure of damages. While Respondent's statement at the May 2013 hearing may perhaps be understood as changing that position, it did not attempt to reconcile its prior statement and the Tribunal still agrees with Respondent's earlier position.

1770. Based on the information before it, the Tribunal concludes that Ascom and Terra Raf are still liable to repay the noteholders pursuant to Section 6 of the Pledge Agreement. That provision expressly includes in the payments to be made to the pledgeholder "*other payment or distribution of any kind*." The Tribunal sees no reason why this general language should be restricted to payments of KPM and TNG alone as Respondent has argued at the May 2013 hearing (Tr. day 1, pp. 246 and 247). Quite to the contrary, if Claimants, in the present arbitration, would not claim the value of the Tristan debts, they might be held liable for not pursuing the interests of the pledgeholders.

1771. Having again examined the Parties' specific arguments summarized above regarding the Tristan Notes, the Tribunal confirms that these conclusions need not be changed and that no reduction of any damages found is due to the Tristan Notes.

## L.VIII.    Moral Damages

### 1.    Arguments by Claimants


ARBITRATION INSTITUTE
OF THE STOCKHOLM CHAMBER OF COMMERCE
**803**

1772. Respondent has conceded that "*moral damages are permissible*" and that they may be awarded in the following exceptional cases in investment treaty arbitrations, such as where:

   – *the State's actions imply physical threat, illegal detention or other analogous situations in which the ill-treatment contravenes the norms according to which civilized nations are expected to act;*

   – *the State's actions cause a deterioration of health, stress, anxiety, other mental suffering such as humiliation, shame and degradation, or loss of reputation, credit and social position; and*

   – *both cause and effect are grave or substantial. (C-II ¶ 617, quoting from R-I ¶ 55.2).*

1773. The events here, including the prosecution and imprisonment of KPM's in-country manager, were exactly those which would warrant the Tribunal, in its discretion, to award moral damages, **in an amount of at least 10% of the total compensatory damages awarded to Claimants**. (C-III ¶¶ 95 - 97). While it is an exceptional remedy, this is a case where such an award is appropriate:

   *96.    There are only a modest number of investment treaty cases on record in which a state's mistreatment of an investor was so severe, intentional, and multi-faceted as Kazakhstan's treatment of Claimants in this dispute. There are even fewer cases on record in which that treatment was admittedly ordered by the Respondent's Head of State and carried out by dozens of state organs and instrumentalities over a period of years. Claimants have demonstrated that the mistreatment they suffered, while exceptional by investment treaty standards, was part of a "playbook" that Kazakhstan's rulers have employed in similar contexts. Claimants have also shown that awards of moral damages are becoming increasingly accepted in investment treaty practice, as demonstrated by the recent award in Desert Line v. Yemen. (C-III ¶ 96).*

1774. Respondent's idea that a moral damages awarded requires a precise repeat of the events at issue in *Desert Line* is nonsense. Rather, Respondent has identified a framework within which moral damages can be awarded, and Respondent's conduct fits that framework. Here, there was an actual, illegal imprisonment and a threat that all of Claimants' general managers would meet the same fate. By July 2010, Respondent had succeeded in driving Claimants' key personnel from Kazakhstan out of fear of imprisonment. It was the stress and anxiety to *Desert Line's* executives and the injury to *Desert Line's* credit, reputation, and prestige that caused that Tribunal to award moral damages. The parallels between that case and this one are striking. The fact that Mr. Cornegruta escaped from the false imprisonment does not absolve Respondent of liability. This Tribunal has discretion in awarding a figure that it finds most appropriate to compensate for the harm suffered by Claimants, and is not limited to the USD 1 million awarded in *Desert Line*. (C-II ¶¶ 619 – 623; C-I ¶¶ 453 – 464; CPHB 1 ¶ 659).

1775. Claimants remind the Tribunal that the claim for moral damage is a claim for Claimants' moral suffering. Claimants suffered through years of Kazakhstan's misconduct. Respondent has not disputed Mr. Cojin's testimony that KPM and



ARBITRATION INSTITUTE OF THE STOCKHOLM CHAMBER OF **804**

TNG's managers worked in Kazakhstan under threats and harassment, while being targeted, monitored, and followed by the Financial Police, before they were finally forced to flee the country. Kazakhstan has a responsibility to compensate Claimants for the stress, anxiety, mental anguish, and reputational harm that it imposed on them through its intimidation tactics, false criminal accusations, defamation, and the ultimate seizure of its assets. (CPHB 1 ¶¶ 658 – 663). The Tribunal should exercise its discretion to award substantial moral damages to Claimants. (CPHB 2 ¶ 395).

## 2.    **Arguments by Respondent**

1776. Claimants' claim for moral damages is disingenuous, at best. First, that the Republic's actions with respect to Mr. Cornegruta and the search of KPM's and TNG's premises on 6 May 2009 were legal and proper. This bars any claim for moral damages. The allegation that it was an aggressive and intimidating raid is based only on Mr. Stejar's statements, which lacked credibility and contradicts the testimony of Mr. Rakhimov. Second, Claimants have not suffered any moral harm that would warrant an award for moral damages in the amount claimed. (R-III ¶¶ 499 – 501; RPHB 2 ¶¶ 1025 – 1031).

1777. While the Parties agree that moral damages may be awarded in exceptional circumstances, these do not exist in the present case. The *Lemire* requirements have not been fulfilled. Further, this case is distinguishable from the *Desert Line* case, where armed tribes attacked the investor's premises and the Yemeni military put the premises under siege. The 6 May 2009 search, as demonstrated in unchallenged witness testimony, was conducted by "*unarmed officers [who] took [the] utmost care to carry out the search without creating more disturbance than necessary*." Accordingly, it cannot serve as the basis for a claim of moral damages. (R-III ¶¶ 502 – 507; R-I ¶ 55.2).

1778. An award of moral damages would only benefit Anatolie and Gabriel Stati – neither of whom has suffered any more harm in the present case. The person who allegedly suffered moral harms, Mr. Cornegruta, is apparently not on speaking terms with Anatolie. Stati and has not been involved in this arbitration. Moral damages to Messrs. Stati, as a result of Mr. Cornegruta's imprisonment, have not been proven. (R-III ¶¶ 508 – 513, 1028).

1779. Claimants have since toned down their initial demands for compensation, the previous calculation of which was extraordinary and reminiscent of US-style punitive damages. Claimants are claimed moral damages of at least **USD 272.87 million** (10% of the claimed USD 2,728.2 million). Not only has no investment award for moral damages ever come close to such an amount, there is no case that points to moral damages being calculated as a percentage of the compensatory damages award. Indeed – there is no necessary connection between the tangible and moral harm allegedly suffered (i.e. "*there is no connection between the financial losses following from the assets being taken into trust management and the alleged stress and anxiety supposedly following from the May 2009 search or the imprisonment of Mr. Cornegruta*."). (R-III ¶¶ 514 – 518; R-I ¶¶ 55.2 – 55.3, RPHB 2 ¶ 1031).



1780. Insofar as these damages are disguised punitive damages, there is no basis in international law for such an award, and tribunals have firmly rejected claims for punitive damages in the past. (R-III ¶ 518).

### 3. The Tribunal

1781. The Parties agree that a claim for moral damages can only be justified in investment treaty cases in very exceptional circumstances.

1782. Therefore, Claimants, having the burden of proof, must meet a very high threshold to show a liability for moral damages.

1783. Indeed, as Claimants concede, there are only a modest number of investment treaty cases on record in which a state's mistreatment of an investor was so severe, intentional, and multi-faceted as Kazakhstan's treatment of Claimants in this dispute. There are even fewer cases on record in which that treatment was admittedly ordered by the Respondent's Head of State and carried out by dozens of state organs and instrumentalities over a period of years.

1784. Obviously, the present case is distinguishable from the *Desert Line* case, where armed tribes attacked the investor's premises and the Yemeni military put the premises under siege. The Tribunal further agrees with Respondent that the *Lemire* requirements have not been fulfilled.

1785. While, above in this Award in the chapter on liability, the Tribunal has identified a timeline of conduct by Respondent that it considers must be viewed together and concluded to be a breach of its ECT obligation to provide FET, the Tribunal did not accept Claimants' characterization that this was a "*playbook*" by Respondent. And even if this were so, this would not by itself mean that moral damages are due.

1786. Without having to go into detail on the general question whether and under which exceptional circumstances awarding moral damages might be justified in investment treaty cases, the Tribunal concludes that Claimants have not fulfilled their burden of proof for facts that would make it necessary to examine that question any further.

### L.IX. Tax Claims

#### 1. Arguments by Claimants

1787. Claimants do not address tax issues in their Reply Memorial on Quantum and state that tax assessments are not at issue in the Quantum Hearing. Claimants do not seek to recover any tax payments as damages. They protest the inclusion of the Balco expert report and argue that the tax assessments, which were part of the harassment campaign, were part of the liability phase. Neither the Deloitte report, the Balco report nor the Rahimgaliev witness statement relies on the validity of the tax assessments for valuation calculations. The report and the second Rahimgaliev witness statement are an improper backdoor attempt to get liability issues heard in this quantum hearing. (C. ltr. to Tribunal 10.12.12). Claimants' arguments concerning the validity of the tax assessments are found at C-II ¶¶ 233 – 236.



1788. Respondent's tax claim is part of Respondent's campaign to harass Claimants. Deducting it from amounts owed to Claimants would be contrary to international law. In any event, USD 62 million (USD 81.2 million in CPHB 2) is not the actual amount that Claimants would owe if Kazakhstan's legal argument were correct. Respondent has not presented evidence of the actual amount that the net tax debt would be, even if the legal argument were correct. (CPHB 1 ¶¶ 648 – 649; CPHB 2 ¶ 133).

1789. The USD 62 million tax claim was manufactured and, as Scott Horten and PwC confirm, is part of a well-recognized strategy that Kazakhstan uses to pursue investors who have fallen out of favor with the President. The claim is incorrect on the merits. Claimants were entitled to use the rate contained in Art. 20, and that contained in Art. 23 Tax Law contradicts the clear wording of the Subsoil Use Contracts. Even if Respondent were correct, however, the back taxes owed would be less than USD 62 million, as Prof. Balco agreed, since the issue would not be whether, but when, the drilling expenses could be deducted. Kazakh domestic courts resolved this issue in favor of Claimants, making this issue largely academic. (CPHB 1 ¶¶ 238 – 261).

1790. Procedurally, Respondent has raised this issue as a counterclaim. It has done this belatedly and solely to reduce the compensation owed to Claimants. If the Tribunal nevertheless decides to consider this claim, Kazakhstan bears the burden of proving that the position is correct (that taxes are lawfully owed), as well as the amount of taxes owed. Kazakhstan has proven neither. The corporate income tax dispute is a cash-flow issue that exclusively concerns the timing of deductions for drilling expenses – even if Kazakhstan's arguments were correct, Claimants would likely only owe a small fraction of the sum claimed because KPM and TNG could deduct all or nearly all of the drilling expenses, by today. (CPHB 2 ¶¶ 133 – 134).

## 2.   **Arguments by Respondent**

1791. In part, Claimants' damages are based on an alleged improper assessment of taxes and duties against them. Tax issues have a significant impact on valuation. Respondent maintains that the assessments were made in accordance with the law and that Respondent is not liable for them.   Respondent also applied the appropriate amortization rate. This is supported by Mr. Balco's expert report. (R-III ¶¶ 366 – 373).

1792. Any claim will need to be set off against the amount which Claimants owe Respondent due to their failure to correctly declare their taxable income. (R. ltr. to Tribunal 13.12.12). For KPM from the period 1 January 2005 to 31 December 2007, an additional 3,257,446.00 thousand Tenga was payable. For TNG for the same period, TNG is liable to pay an additional 5,906,027.2 thousand Tenga. (R-III ¶ 368).

1793. In its First Post Hearing Brief, Respondent calculated that KPM and TNG are liable for more than USD 81.2 million in tax debt, including penalties. Claimants admit that corporate back taxes were never paid by KPM or TNG. Claimants' dispute relates to the question of which amortization rate to apply to the companies' exploration expenses for 2005 – 2007. The tax committee applied the rate set out in Art. 23 of the applicable tax law (25%), but Claimants allege that the 100% rate



set out in Art. 20 should have been applied. Squire Sanders and PwC have confirmed that Respondent has applied the correct 25% rate. This was also confirmed in the expert report by Prof. Balco, which was not contested by Claimants. (RPHB 1 ¶¶ 1057 – 1061; RPHB 2 ¶¶ 963 – 965).

1794. Claimants wrongfully focused on the types of activities (own-account construction), rather than the purpose of the activities, which is the focus of the Kazakh Tax Code and the Subsoil Use Agreements. The Tax Code offers different depreciation rates on expenses relating to exploration and extraction, and those related to processing, including own-account construction and acquisition of equipment. This distinction is clear when viewing the grammatical interpretation in the Russian version of Art. 20 and 23 of the Tax Code. The language of the Tax Code and the Subsoil Use Agreements is consistent. None of Claimants' expenses referred to production (processing of new materials). Thus, Prof. Balco concluded that KPM's and TNG's expenditures were for exploration. The applicable tax depreciation rate for exploration under Art. 23 is 25%. (RPHB 2 ¶¶ 966 – 974).

1795. Respondent explained that the Tax Committee's February 2009 assessment did not constitute a reversal of a prior tax assessment, and this was confirmed by Mr. Rahimgaliev in the Hearing on Quantum, as well as in Claimants' own vendor due diligence of August 2008 which sets out the periods and types of taxes for which audits had been conducted. (RPHB 1 ¶¶ 1061 – 1062).

1796. Kazakh courts have confirmed the correctness of the Tax Committee's position. A clear look at the decision of the Supreme Court of 3 November 2010 overruling the decisions of the appellate and cassation courts demonstrates that Claimants' position was not vindicated, but rather was groundless. The Supreme Court's decision was reasoned and based on the proper construction of the relevant legislative position. The Court did not change a previous position, as alleged by Prof. Maggs. The decisions cited by Prof. Maggs (10 June 2008 and 11 February 2009) addressed only the point in time at which a taxpayer may claim an incentive. Neither case concerned whether the 100% depreciation rate could be applied to own-account construction expenditures. (RPHB 2 ¶¶ 975 – 982).

1797. Even if the relevant wells were fixed assets, KPM and TNG would have had to have applied different depreciation rates. Claimants failed to identify which wells were put into operation to either the Tax Committee or to the Kazakh courts. Claimants have also not provided a calculation for the impact of higher deductions in later years. They have the burden to prove these deductions. Accordingly, the amount of at least USD 81.32 million of tax debt, as calculated by PwC, is unchallenged. (RPHB 2 ¶¶ 983 – 987).

### 3.    The Tribunal

1798. The Tribunal recalls its timeline, above in this Award in the chapter on liabilty of Respondent's conduct, through which it found Respondent to be a breach of its ECT obligation for FET. It further recalls its conclusions, above in this Award in the chapter on the relevance of debts, insofar as they deal with tax assessments.

1799. There is no doubt that an investor must pay taxes in the host country, as assessed by law. However, there is also no doubt that these tax assessments may be



abusively made in breach of the ECT. All of the alleged back tax obligations were created by and during Respondent's conduct after October 2008 which this Tribunal found above to be a string of measures in breach of the ECT. Indeed, the tax assessments were a major part of this string of measures. As the disputed tax assessments were all retro-active assessments for back taxes which had not been assessed during the earlier period before October 2008 when relations between Respondent and the Claimants were still normal, Respondent has the burden of proof that these disputed back tax assessments after October 2008 were not part of this breaching conduct.

1800. KPM and TNG prevailed in their court challenges of the tax assessments. The only appellate decision in favour of Respondent was issued after the seizure of the investment in a review process alleged by Claimants to have been conducted without their knowledge or participation. The decision of the Supreme Court of 3 November 2010 overruling the decisions of the appellate and cassation courts does not appear to the Tribunal to show a fair and independent assessment. Rather, the Tribunal tends to agree with Prof. Maggs that the Court changed a previous position compared to previous decisions cited by Prof. Maggs (10 June 2008 and 11 February 2009). This decision of the Supreme Court, in the judgment of the present Tribunal, is not sufficient to fulfill Respondent's burden of proof that the assessment would have been the same without Respondent's breaching conduct.

1801. Therefore, the Tribunal concludes that no deduction for Claimants' tax obligations are to be made from the damages found to be due for the ECT breaches.

## L.X.      Relevance of Cliffson SPA and Other Factors in Establishing Fair Market Value (FMV)

### 1.      Arguments by Claimants

1802. The best evidence of the value of Claimants' investments as of 21 July 2010 is the actual, then-pending Cliffson transaction – a deal that would have closed, but for Respondent's interference. Claimants ask the Tribunal to contrast the low values that Respondent has assigned to the assets with the terms of the arm's length Cliffson transaction, which was pending at the time of the seizure. Claimants and Cliffson executed a comprehensive SPA on 13 February 2010 for all of Claimants' equity interests in TNG, KPM, and Tristan to Cliffson for USD 267 million, and Cliffson agreed to assume all of those companies' liabilities, totaling more than USD 655 million. This places the entire value of the deal for Claimants' distressed assets at approximately **USD 924 million**. All that stood in the way of this deal was (1) Respondent's waiver of pre-emptive rights and (2) MOG approval. In response to Claimants' applications and document submissions, Respondent initiated a final inspection blitz that led to the expropriation of Claimants' assets on 22 July 2010. (C-III ¶¶ 5 – 7; CPHB 1 ¶¶ 586, 596; CPHB 2 ¶ 371).

1803. The Cliffson transaction remained pending until at least 7 June 2010 when Cliffson sent a letter to the MOG stating that it no longer wished to pursue the transaction. Cliffson did not inform Claimants of this letter, and Claimants only saw this letter when it was produced in this arbitration. (CPHB 1 ¶ 587).



1804. Respondent has argued that Claimants' story regarding the Cliffson negotiations is not credible. Anatolie Stati never stated that the first time Claimants had discussions with the principals was in February 2010. The Cliffson transaction was an arm's length transaction. Discussions began in November 2009 with an Assaubayev company called Grand Petroleum, which had access to the Project Zenith data room. The only unusual aspect to the negotiations with the Assaubayevs was the preliminary MOU that the Aussabayevs executed in November 2009 that included a preliminary price commitment, which was later changed. The MOU shows that the Aussabayevs were insiders who knew the value of the assets that they were purchasing and that they knew that they were purchasing them at a distressed value. (CPHB 1 ¶¶ 588 – 592; CPHB 2 ¶¶ 371 – 373).

1805. The fact that the transaction did not close was a result of Respondent's action. Respondent's representation that Cliffson failed to take steps necessary to close the deal mischaracterizes the evidence. Anatolie Stati's letter of 9 March 2010 is no indication that Cliffson had backed away from its obligations. The letter focused on Cliffson's failure to perform its obligations in the Side Letter agreement to bring a halt to the governmental harassment of KPM and TNG. Cliffson repeatedly told Claimants that they were working on obtaining government approval. The fact that government approval never came is a good indication that the government's harassment campaign was very effective and that Cliffson was unsuccessful in ending it. It is not evidence that it had re-evaluated its decision to purchase. In any event, as FTI explained, absent a reason to believe that Cliffson's re-evaluation of value was the reason that the transaction did not close, the agreed price is a reliable indicator of the value of the non-consummated transaction. (CPHB 1 ¶¶ 593 – 596; CPHB 2 ¶ 373).

1806. Claimants' letter to Cliffson of 15 June 2010 reflects concern that Cliffson backed out of the transaction to because Kazakh authorities were planning to auction KPM's assets to satisfy the criminal penalty. (CPHB 2 ¶ 375).

1807. In previous submissions, Claimants have argued that the bids received in Project Zenith are a fair indication of the FMV of the properties, absent the State's harassment and indirect expropriation measures. (C-I ¶ 73). Regarding Project Zenith, Claimants only argue that the offers received there serve as evidence that the right to export / the future receipt of international export prices was reasonably contemplated in 2008. (C-III ¶ 10). Claimants maintain that Respondent has not shown that the bids received in that project were in any way inaccurate or incomplete. (C-II ¶ 399).

## 2. Arguments by Respondent

1808. Rather than provide a valuation for the correct date of 21 July 2010, Claimants instead refer to the Cliffson SPA of 13 February 2010 and allege that this SPA reflects a value of USD 924 million for KPM and TNG. (R-III ¶ 397). Respondent's summary is best taken from its own words.

    (a)    *The Cliffson SPA is no reflection of the fair market value. From its contents and from the little time the parties took to enter into it, the Cliffson SPA appears as a highly atypical agreement that raises doubts as*



>       *to whether there were serious negotiations regarding the value of the*
>       *companies and as to whether a proper due diligence was conducted. It can*
>       *hence not be described as an arm's length transaction.*
>
> (b)   *In fact, from documentary evidence and the statements made by Claimants'*
>       *witnesses at the hearing, it appears that soon after the conclusion of the*
>       *SPA, Cliffson itself realized that it had agreed to an inappropriately high*
>       *purchase price. As a result, Cliffson tried to wiggle its way out of the SPA*
>       *later on.*
>
> (c)   *In any event, the Cliffson SPA does not contain information sufficient in*
>       *order to allow a proper assessment of its value. (R-III ¶ 398).*

1809. Regarding the argument that Cliffson had insufficient time to properly assess KPM's and TNG's value, the evidence shows that not more than 13 days of due diligence and negotiations were conducted before the SPA was concluded, and Cliffson was granted no guarantees or company-specific information. This is atypical for a contract valued at nearly USD 1 billion – in fact, Total E&P and KMG EP needed substantially more time - six months and four months, respectively - to come to their decision. The brevity and vagueness of the SPA also reveals a lack of proper due diligence. For example, major contracts and licenses, pending lawsuits, major debt, and other characteristics of the companies that could be important for their value are either not mentioned at all or are not set out in any detail. This lack of specificity is atypical of a proper M&A transaction. Thus, the Cliffson SPA was not likely an arm's length transaction. Even if the Cliffson deal was a fair market transaction at arm's length, however, the Cliffson SPA does not provide sufficient information for a proper valuation. Any calculation reached by FTI cannot be accepted as the actual value of the Cliffson SPA. (R-III ¶¶ 397 – 405, 412; RPHB 1 ¶¶ 997, 1003). In addition, at the Hearing on Quantum, Claimants introduced a new background to the Cliffson transaction, one that would have it date back to September 2009. This is not credible. (RPHB 2 ¶ 8).

1810. That the Cliffson transaction cannot be seen as an arm's length transaction, conducted on a reasonable information basis is supported by Mr. Lungu's testimony when he stated that Cliffson simply relied on information from the government and looked at KMG EP due diligence documents to assess the potential of the deal, without ever assessing Claimants' data room. The only part of that testimony that Mr. Lungu could know for sure was the proposition that the Assaubayev family did not assess the data room – everything else was speculation or invention. If the Assaubayev family had seen the KMG EP due diligence, they would not have made an offer based on a supposed enterprise value of USD 1.15 billion as alleged at the Hearing on Quantum, or USD 920 million as initially alleged. The Assaubayevs cannot have had access to the KMG EP valuation. (RPHB 1 ¶¶ 1116 – 1020; RPHB 2 ¶¶ 865 – 866).

1811. Cliffson also attempted to hinder the closing of the SPA, concluding that it had agreed to pay more than FMV. Under the SPA, two important closing conditions needed to occur: (1) the Republic had to waive its pre-emptive rights and (2) the MOG had to approve the transfer. Although Cliffson was responsible for making the necessary applications, Claimants made them – and then only 2 months after the SPA was concluded. Cliffson's lack of cooperation was apparent and recognized by Claimants. Cliffson did not provide the information required by the



MOG for approval or by the Republic for the waiver, possibly in breach of section 4.2 of the SPA, as recognized by Anatolie Stati. Cliffson effectively hindered the deal from being closed. (R-III ¶¶ 406 – 411).

1812. Claimants continue to withhold details of the circumstances of the Cliffson deal. At the Hearing on Quantum, both Anatolie Stati and Mr. Lungu were caught in lies regarding when they had made contact with the family behind Cliffson. They revealed strange details about changes in the purchase price that, if true, should have been revealed at an earlier time because they would have supported a higher damages price, supported negative inferences with regard to KMG EP's valuation. The fact that these details were first elaborated in direct testimony shows that Claimants wished to avoid serious cross examination on those matters. Mr. Calancea was also evasive about questions. The story that has been given continues not to add up. In addition to Anatolie Stati and Mr. Lungu contradicting each other, Mr. Lungu's statement also contradicted prior documents on the record. His statement that Claimants were unaware of Cliffson's desire to "*back out*" is contradicted by the evidence and is inconsistent with Claimants' Opening Presentation at the Hearing on Quantum. (RPHB 1 ¶¶ 116, 998 – 1015; RPHB 2 ¶ 865 – 867).

1813. Claimants now argue that the Cliffson transaction actually began in November 2009 with a MOU between Grand Petroleum and Claimants. No documentation has been provided of this, despite the fact that Claimants would have been entitled to submit so much under PO-10. (RPHB 2 ¶ 869).

1814. Respondent has demonstrated that the Republic's authorities cooperated with Claimants in the process of obtaining state consent and the waiver of preemptive rights. Claimants, however, failed to provide sufficient documentation to the authorities – documents which remain outstanding to date. At the Hearing on Quantum, Mr. Lungu's testimony demonstrated Claimants' admission that it was ultimately Cliffson that backed out of the transaction, due to their own financial troubles. This makes their previous arguments about state impediments irrelevant. (RPHB 1 ¶¶ 998 – 1001; RPHB 2 ¶ 870).

1815. Claimants' arguments that are based on Anatolie Stati's letter of 9 March 2010 misstate that evidence. That letter shows that Claimants were accusing Cliffson of not taking the necessary steps for the implementation of the SPA, meaning that Cliffson was backing out of the transaction. It indicated a lack of progress on both the implementation of the SPA and the Side Letter. (RPHB 2 ¶ 871).

1816. Respondent denies that Cliffson was obliged to work back channels to obtain governmental approval for the sale. Not only would such an obligation be unenforceable, there is no documentation of such an obligation. (RPHB 2 ¶ 872).

1817. Finally, Respondent objects to Claimants' suggestion that the Tribunal should exercise its discretion to increase the amount of damages based on the Cliffson SPA. There is no basis in international law for a discretionary increase of damages. (RPHB 2 ¶ 873).

1818. Regarding basing a recovery on an alleged FMV, as Respondent reiterated in the Hearing, the non-binding offers made during the first phase of Project Zenith also



cannot serve as an indication of Claimants' properties' FMV as of October 2008. The representatives of KNOC, Total E&P, KMG EP, and OMV have confirmed that their bids did not represent FMV. Instead, as confirmed by Mr. Chagnoux's, Mr. Seitinger's, and Dr. Kim's testimony, they were made to gain access to the data room and were pushed up by Renaissance Capital. As confirmed by Mr. Suleymenov's testimony at the Hearing on Quantum, their bids were made based on limited information and they were often made for strategic and not valuation driven reasons. Dr. Kim of KNOC and Mr. Seitinger of OMV confirmed at the Hearing on Quantum that their bids were the result of optimistically high gas price assumptions, which were driven by the Renaissance Capital Information Memorandum and its reference to the KazAzot Tripartite Agreement. The Information Memorandum admittedly "*does not purport to be comprehensive*" and "*has not been independently verified*" and is based in part on unaudited financial statement. Thus, it is not a basis to produce a FMV. Even representatives of KNOC, Total E&P, and KMG EP testified that the information was not sufficient to make a FMV decision. In any event, bidders made bids for reasons that had nothing to do with FMV. As Claimants admitted at the Hearing on Quantum, bidders bid for strategic reasons, often after pressure from Renaissance Capital, in order to gain access to the data room. The only bids that somewhat matched the indicative value were those for Tolkyn, but those were inflated by unverified assumptions. In FTI's Additional Expert Report of 25 January 2013, Claimants claim an unrealistic FMV for USD 197 million for Borankol and USD 497 million for Tolkyn. (R-II ¶¶ 447 – 450; RPHB 1 ¶¶ 974 – 986; RPHB 2 ¶¶ 803 – 806).

1819. Indicative offers were also based on the reserves estimates in the 2008 Miller & Lents Report, which were massively overstated as compared to the estimates provided by Ryder Scott and GCA in this arbitration. "*The 2008 Miller & Lents Report provided for 2P reserves of 141.3 mmboe. Even Ryder Scott estimated 2P reserves of only 97.7 mmboe as of their valuation date. Assuming the highly overstated Ryder Scott estimates were correct, the indicative bids would thus still be based on a reserves report which overstated 2P reserves by further 40%. Importantly, the overstatement related primarily to the estimates for valuable liquids production from the Tolkyn field.*" (RPHB 2 ¶ 806).

1820. The offers made based on the Information Memorandum and the vendor due diligence ranged from USD 0.55 billion to USD 1.55 billion. Regarding the individual assets the ranges were as follows:

   *(a)*     *USD 90 mn and USD 248 mn for Borankol;*

   *(b)*     *USD 367 mn and USD 1.067 bn for Tolkyn; and*

   *(c)*     *USD 70 and USD 280 for the LPG Plant. (R-III ¶ 451).*

1821. These ranges show that they do not reflect a FMV. At most, the indicative offers could show that Claimants have overvalued their assets. Other circumstances include Claimants' ramping up of production in 2008, the 2008 spike in oil prices, and the non-conclusion of the Tripartite Agreement. (R-III ¶¶ 455 – 471; RPHB 1 ¶¶ 974 – 975). Claimants rely on favorable bids and ignore circumstances that show that these bids were above FMV, as well as lower bids. (R-III ¶¶ 452 – 454). The bids do not support Claimants' and FTI's valuation suggestions. This has not been addressed by Claimants. (RPHB 2 ¶¶ 807 – 808).



1822. Finally, even though these bids were exaggerated, Claimants' claims in this arbitration exceed what the bidders were offering. This is particularly true for the LPG Plant – the highest bid for that was USD 280 million, and Claimants have increased their estimate of the prospective value of that plant to USD 408.3 million. For the Borankol field, Claimants claim USD 231.5 million, even though the average of the indicative bids was USD 151.8. (R-III ¶¶ 472 – 475).

1823. At the Hearing on Quantum and as explained above, Claimants put forward arguments about alternative valuation methods, including the comparable transactions analysis, the comparable companies' analysis, and the "*implied value based on market value of debt*" methods. Each of these strongly supports Deloitte's and disproves FTI's findings. (RPHB 1 ¶ 1021).

### 3.  The Tribunal

1824. The Tribunal has taken note of the extensive submissions by the Parties on their different views regarding the relevance of the Cliffson SPA and other factors in establishing FMV.

1825. However, the Tribunal's considerations in the Award, above, rely for the valuation of the damages due on factual and legal grounds that are independent from the above issues disputed between the Parties. Therefore, while the Tribunal understands why the Parties have been involved in that dispute, it need not enter into an examination of these issues for its decisions on the claims raised.

## L.XI.  Credibility of the Parties' Experts

### 1.  Arguments by Claimants

1826. GCA and Deloitte's work is utterly unreliable. GCA's work is largely a "*black box*" - it failed to produce the working papers underlying its conclusions because none exist. Instead, the documents and data that GCA produced were nearly all created by someone else – either Ryder Scott or State institutes. Only 20 megabytes of the 20,810 megabytes of data produced were GCA's own independent work product. The scant original work produced for Contract 302 – the Prospect Risk Assessment and the Crystal Ball documents – are deficient. Respondent's argument that they are more thorough and revealing than Ryder Scott's demonstrate a profound ignorance of the prospect evaluation process, which involves seismic research and interpretation. If GCA had provided the maps upon which they relied, one could give them credit for documentation of the work, but their supporting documentation consisted of a piece of paper with number and no explanation of their origin. (CPHB 2 ¶¶ 330 – 331, 338 – 339).

1827. Ryder Scott produced 6510 megabytes of original, independent work product. (CPHB 2 ¶ 331)

1828. The Deloitte TCF valuation was not tested by cross-examination, and Kazakhstan has explained that there was no reliance on it. Mr. Gruhn testified that the Deloitte GmbH report was completely independently prepared. There are, however, numerous differences between these two valuations, and Deloitte GmbH must explain the bases for these differences, which to date have not been explained.



These include the gas price scenarios, the LPG Plant scrap value, and the value of the Contract 302 properties. Combined, these resulted in a reduction of the total calculation of the damages from USD 229 – 237 million to USD 186 million – a decrease of approximately 20%. Claimants provide the following chart to demonstrate the differences (CPHB 1 ¶¶ 505 – 512):

| Differences in NPV Between Deloitte DCF and Deloitte GmbH | | | |
|---|---|---|---|
| **Property** | **Deloitte TCF** | **Deloitte GmbH** | **Difference in Dollars** |
| Tolkyn | US $121 million | US $123.2 million | Increase US $2.2 million |
| Borankol | US $16 million | US $62.8 million | Increase US $46.8 million |
| LPG Plant | US $24 to $32 million | US $ (89.1 million) | Decrease US $113.1 to $121.1 million |
| Munaibay Oil | US $68 million | US $ (297.7 million) | Decrease US $365.7 million |
| **Total NPV** | **US $229 to $237 million** | **US $(200.8 million)** | **Decrease US $429.8 to $437.8 million** |
| **Total Deviation in NPV** | | | **US $527.8 to $535.8 million** |

## 2. Arguments by Respondent

1829. Claimants have attempted to argue that the RBS Report fully accounted for the impact of market factors, the effects of the global financial crisis, the effect of a year of additional production in KPM and TNG, the watering in the fields, the effects of additional compression costs according to GCA, and the effect of lower reserves in the Miller Lents report. This is not, however, the difference between the RBS and FTI values. Rather, those values differ in terms of asset value assumptions. None of the factors listed by Claimants' counsel depressed RBS's valuation. Claimants' depiction of the RBS values is devastating not for Respondent, but for Claimants and FTI. (RPHB 2 ¶¶ 825 – 838).

1830. Ryder Scott has proven to be a partisan instrument of Claimants, rather than independent experts. First, they were fully complicit in Claimants' procedural ambush at the Hearing on Quantum, where Claimants introduced a wholly new "*Interoil Reef*" case based on 3D seismic data introduced in Ryder Scott's direct testimony. Ryder Scott failed to put this data on the record for one and a half years



and the late introduction of this data hindered any meaningful cross examination of Ryder Scott. Ryder Scott was fully complicit in that they deliberately concealed their change in the GCOS estimate while the experts were preparing their joint issue list. They signed off on the statement that there was "*general agreement*" on the GCOS for the Contract 302 Area. Then, at the Hearing, they revealed that they had 3D data and then departed from their "*general agreement*" on the GCOS. This is not the behavior of an independent part-appointed expert, but rather proves that Ryder Scott was willing to engage in partisan maneuvers and not to act with the aim of assisting the Tribunal in finding the truth.    Second, Ryder Scott demonstrated their willingness to uncritically adopt Claimants' findings as their own.    At the hearing, they presented the findings in the "*Project Munaibay 3D*" presentation, prepared by Claimants, as their own findings.   This was confirmed by Mr. Nowicki's testimony about drilling depths under cross-examination on 2 May 2013.   It was apparent that Ryder Scott had not expected that there would be another expert report concerning the 3D interpretation or that they would be subject to cross-examination on that matter.  (RPHB 2 ¶¶433 – 442).

1831. Mr. Nowicki of Ryder Scott was forced to admit to making further incorrect statements.    While he stated in his CV that he had "*provided expert witness testimony for various arbitration hearings*", he admitted that the present arbitration was the first in which he gave testimony. He tried to mislead the Tribunal that the 3D structure was merely an update of the earlier 2D interpretation and not a complete disproval of the 2D structure. Ryder Scott also ignored issues that would hurt his clients' position, such as the H2S issue and the faulting in the crest of the "*Interoil Reef*." His statements about the closure of the reef "*in my mind, I know that there has to be more to that reef. It doesn't just end where the data ends*" is contradicted by the documentation and is also telling.   This proves his lack of forthrightness and independence.  (RPHB 2 ¶¶ 445 – 448).

1832. Ryder Scott makes methodological errors including basing its Interoil Reef estimates on gas columns that are world record beating size, without demonstrating closure and does not take account of faulting.  (RPHB 2 ¶ 449).

1833. FTI's analysis is severely flawed:

    (a)    *FTI incorrectly mixed the nominal and the real terms approach. FTI had to concede this severe and obvious methodological mistake and as a result, had to correct their overall value estimate by a stunning USD 379 million.*

    (b)    *FTI ignored known and quantified risks in their Contract No. 302 valuation, thus concealing valuable information from the Tribunal and violating good valuation practice. Deloitte GmbH have calculated that if GCoS and ECoS had been applied by FTI, the value of Contract No. 302 would be reduced in the order of 90%. FTI's "prospective valuation" is nothing but an attempt to "anchor" a high value with the Tribunal and it is not aimed at providing any useful expertise.*

    (c)    *FTI arbitrarily reduced its inflation rate assumptions from one report to another, with the clear intention to inflate asset values.*

    (d)    *FTI added almost USD 50 million to Claimants' claim by way of arbitrary rounding.*



(e)     *FTI arbitrarily reduced its country risk premium, even though KPM's and TNG's financial statements explicitly mentioned country risk. FTI thus minimised their discount rate and overstated values.*

(f)     *FTI created a 63.8% overstatement of their estimated market value for the Munaibay oil discovery through a series of severe calculation mistakes.*

(g)     *FTI applied the same discount rate for their "prospective valuation" of the LPG Plant as for their other valuations. This is inconsistent as FTI applied different taxes to the LPG Plant.*

(h)     *FTI admittedly assumed incorrect administration costs with regard to the Contract 302 Development.*

(i)     *FTI underestimated the variable distribution costs for KPM, thus overstating Borankol's value by a further USD 3.3 million. The same mistake occurred in the EMV calculation for Munaibay Oil and in the "prospective valuation" of the Contract 302 Properties.*

(j)     *FTI based its gas price assumptions on an unsigned draft contract which they interpreted against its wording. Thus, FTI applied prices that were never agreed upon to Contract No. 302 gas volumes that very likely do not exist.*

(k)     *FTI made serious mistakes in their comparable companies and comparable transactions analysis, such as using transactions that closed prior to the financial crisis without adjusting for the effects thereof.*

(l)     *FTI conducted an entirely unrecognised, illogical and empirically disproved valuation method for its "Implied Market Value of Debt" analysis. (RPHB 2 ¶ 451; see also ¶¶ 453 - 474).*

1834. Throughout these proceedings, FTI has made corrections in the amount of USD 841 to its value estimates. (RPHB 2 ¶¶ 463 – 464). This is small compared to the USD 530 million in changes that Claimants have stated make the Deloitte GmbH and the Deloitte TCF valuations "*completely unreliable.*" (RPHB 2 ¶ 465).

|  | Statement of Claim (million USD) | Δ | Reply on Quantum (million USD) | Δ | Hearing on Quantum (million USD) | Δ | 1st PHB (million USD) |
|---|---|---|---|---|---|---|---|
| Borankol Field | 193 | + 38.5 | 231.5 | - 33.49 | 197.01 |  | 197.013 |
| Tolkyn Field | 561 | - 52.6 | 508.4 | - 29.47 | 478.93 |  | 478.927 |
| LPG Plant (cost) | 208.5 | + 36.5 | 245 |  | 245 |  | 245 |
| Contract 302 (prospective) | 1,766 | - 186 | 1,580 | - 132 | 1,448 | + 188.9 | 1,636.9 |



| LPG      Plant (prospective) | 344 | + 64.3 | 408.3 | - 79.2 | 329.1 | | 329.1 |
| --- | --- | --- | --- | --- | --- | --- | --- |

1835. Deloitte and GCA have provided solid work that remains intact and reliable and should be used by this Tribunal for the purposes of damage calculation. Claimants' and their experts' criticism completely ignore the explanations given and documents provided by GCA and Deloitte GmbH. Ryder Scott criticized GCA's reports, stating that they "*saw nothing in the GCA reports that led them to believe that GCA did independent geological, petrophysical or seismic analysis*" This criticism is undermined by GCA's provision of GCOS sheets, Crystal Ball Sheets, and other supporting documentation. Furthermore, there are no "*wild swings*" in the GCA reports. One need only to look at the appendices to the GCA reports to see that the amendments to the forecasts were minor, excepting the Munaibay Oil estimate. All changes were explained. GCA provides detailed cost estimates (which FTI hid from the Tribunal). Their approach in independently auditing the available data was sufficient for estimating a FMV. (RPHB 2 ¶ 443 – 444; 475 – 484).

1836. Deloitte GmbH's work was of far better quality and was more reliable than FTI's. FTI's criticisms were baseless and could often have been avoided if FTI had not ignored explanations given by Deloitte GmbH. (RPHB 2 ¶¶ 486 – 488).

1837. Regarding the differences between Deloitte GmbH and Deloitte TCF valuations, Deloitte GmbH has explained why they applied different gas pricing assumptions than did Deloitte TCF. As explained, the reason that Deloitte GmbH had not provided a scrap value was because they had not received the working files from Deloitte TCF. Claimants' criticisms regarding the valuation of Munaibay Oil are completely hypocritical. Respondent refuses any allegation of bad faith in submitting the Deloitte TCF valuation. (RPHB 2 ¶¶ 489 – 493).

### 3.    The Tribunal

1838. The Tribunal has taken note of the submissions by the Parties on their different views regarding the professional methods and credibility of the experts who have submitted reports and testified in the hearings of this case.

1839. However, the Tribunal's considerations in the Award above rely, for the valuation of the damages due, on factual and legal grounds that are mostly independent from the conclusions of the Parties' experts. In those few instances where the Tribunal has relied on information or evaluation provided by the Parties' experts, the Tribunal has no hesitation to do so and such reliance is not impacted by the general doubts the Parties have expressed regarding the professional methods and credibility of the experts. Therefore, while the Tribunal understands why the Parties have raised concerns regarding the experts, the Tribunal need not enter into an examination of these issues for its decisions on the claims raised.

## L.XII.    Interest

### 1.    Arguments by Claimants



1840. An award of interest is appropriate to fully compensate Claimants for the injury caused by Kazakhstan. Claimants request that the Tribunal award pre-award and post-award interest, compounded annually, to the value of each of the separate elements of Claimants' damages claim from 14 October 2008 to the date that Respondent pays the Award in full. Awarding compound interest in investment treaty cases is the standard practice, since that is the norm in commercial financing transactions, making such necessary to fully compensate Claimants for the loss of opportunity to invest the funds. The rate that the Tribunal selects should accord with the general principle of "*full reparation*" for the injuries inflicted by Kazakhstan, as noted in the *LG&E v. Argentina* and the *Funnekotter v. Zimbabwe* decisions. The rate elected should be appropriate to compensate Claimants for the full period of time that they have been deprived of the value of their investments. (C-III ¶¶ 80 - 81, partially quoted; CPHB 1 ¶ 650, CPHB 2 ¶ 390).

1841. Claimants suggest applying, at minimum, a rate akin to Kazakhstan's sovereign debt or borrowing rate to the compensation owed. This would reflect the fact that, in effect, Respondent's taking has forced Claimants to loan Respondent the amount of compensation that Respondent would have paid. At maximum, the rate should be the cost for commercial loans for investments in the Kazakh market during the relevant time period (i.e., 10.5%, as exemplified in the rate for the Tristan notes during the relevant period). Setting such a range is a reasonable application of the *Chorzów* is also consistent with the approaches of other arbitral tribunals, including *Funnekotter, Wena Hotels,* and *Impregilo S.p.A.* (C-III ¶¶ 82, 86, 87).

1842. Respondent has conceded that interest may be appropriate and suggested the rate of 6%, based on US Treasury Bills. This approach is inappropriate because it does not reflect the rate that Claimants would have earned by investing the amount due. Claimants are not in the business of investing in US Treasury bills and instead invest in areas of the world, like Iraq and Southern Sudan, which have the potential for enormous returns. The interest should be tailored toward what an investor like Claimants could have earned by investing the funds. In *Sylvania v. Iran*, the Tribunal observed that it could be appropriate to derive an interest rate that would have been common in the investor's own country. Thus, looking to the U.S. Treasury Bill rate is inappropriate, and the rate from a commercial bank in Moldova is more appropriate. While there is a currency component to commercial interest rates, that is not a reason to apply the US Treasury Bill rate. Moldovan commercial banks accept USD, and can apply interest to those deposits, following the "*investment approach.*" (CPHB 1 ¶ 655 – 657; CPHB 2 ¶ 394).

1843. Claimants would have maintained the debt and would have paid it off, but for Kazakhstan's conduct. Claimants also incurred debt that they would not have otherwise incurred, absent Kazakhstan's actions. The interest on the Laren loan was 35% until it was paid off in 2011. The Tristan note interest rate is 10.5%. 10.5%, thus, conservatively reflects Claimants' actual borrowing costs. To compensate Claimants' injury, the Tribunal should award interest at the rate of 10.5% on the entire award. Further, if the Tribunal does not award interest at least the 10.5% Tristan note rate, then it should include as a component of the award the interest that has accrued on those notes since 14 October 2008. (C-III ¶¶ 88 – 90; CPHB 1 ¶¶ 650 – 654; CPHB 2 ¶¶ 391 – 393).

## 2.   Arguments by Respondent



1844. Respondent refutes Claimants' range of interest rates arguments, stating that these represent a contradiction to Claimants' reasoning for an award of interest and are contrary to arbitral practice. (R-III ¶¶ 476 – 478).

1845. Claimants have provided no evidence that the Tristan note rate would be an example of typical interest for a commercial loan in Kazakhstan at the time, which Respondent denies. Second, neither the commercial loan rate nor the sovereign debt rate plays any role in the determination of interest rates for an award. (R-III ¶¶ 479 – 480).

1846. Respondent disagrees with Claimants' contentions that the 10.5% interest rate on the Tristan notes is the borrowing cost attributable to Respondent's conduct. Claimants are not liable for any of the noteholder debt and, to the extent that they are based on the Sharing Agreement, the Republic cannot be liable for that unilateral action. There is, therefore, nothing that could justify the 10.5% interest rate. In addition, the interest rate owed pursuant to the Sharing Agreement is the rate that is set by the Tribunal in a potential Award. Thus, at least as of 1 January 2012, 10.5% is not a reflection of Claimants' borrowing costs – the Tribunal is free to determine those costs, freely. (RPHB 1 ¶¶ 1010 – 1013).

1847. The Parties agree that the claim for interest arises from the principle of "*full compensation.*" On this premise, the interest calculation must be based on what Claimants could have earned by investing the amounts due under the Award – what the Respondent did or could have done with the money in the meantime is irrelevant. (R-III ¶¶ 484 – 486). Applying the principles established in *Siemens v. Argentina*, *LG&E v. Argentina*, *Chevron v. Equator*, and *CSOB v. Slovak Republic*, Respondent states as follows:

    (a)   *Claimants have never stated that they wanted and less even that they would have been able to give out to anyone a loan at a rate typical "for commercial loans for investments in the Kazakh market during the relevant time period". Claimants are not a bank operating in Kazakhstan. They do not need to be "fully compensated" with regard to the interest a bank in Kazakhstan could have achieved with a commercial loan.*

    (b)   *Likewise, there is no reason to assume that Claimants would have invested any sum under a potential damages award into Kazakh state bonds. Given what Claimants themselves claim to have been their experience with the Kazakh government, this seems in fact very unlikely. (R-III ¶¶ 481 – 483, partially quoted).*

1848. Interest rates for typical conservative and risk-adverse investments should be applied. This is confirmed by arbitral practice and is in line with the purpose of "*full compensation.*" The use of risky investments as the baseline for a calculation is particularly inappropriate and would force the Tribunal to decrease the return rates of that investment with view to the increased risks. (R-III ¶¶ 487 – 489).

1849. Respondent submits that the low-risk re-investment rate that the Tribunal should use for guidance is the rate for 6 month US Treasury Bills. Since one of the most important factors in determining the interest rate for a debt is the currency of that debt, the rate of the national bank supervising that currency is relevant. Awarding based on typical USD interest rates for a risk-adverse investment would be in line



with other arbitral decisions whose only contact with the USA was that damages were awarded in USD. Further, US Treasury Bills do not yield compound interest. But, using the 6 months rate, it would be appropriate to compound interest semi-annually. The Republic clarified that it has never generally accepted the appropriateness of compound interest. Alternatively, an interbank offering rate based on various large banks would be an appropriate benchmark. The Tribunal should consider averages from multiple institutions or from countries and financial institutions with high credit standing, and should also consider the duration to maturity of the financial instrument. Using these factors, either the 6 month US Treasury Bill rate or the interbank offering rate (i.e. Libor, 6 months) would be appropriate. (R-III ¶¶ 490 – 494; RPHB 2 ¶¶ 1021 – 1024).

1850. Claimants' use of the interest rate offered by a specific Moldovan commercial bank, "*Victoriabank*" is not appropriate, as demonstrated by Deloitte. First, the interest rate offered by one specific commercial bank depends on the credit standing of that bank. Second, the circumstances of that bank have nothing to do with the situation of the present case. Third, FTI's alleged investment approach (A Moldovan Company to hold its money at one single Moldovan Bank) is doubtful, since prudent investors spread their assets. (RPHB 2 ¶¶ 1019 – 1020).

1851. No interest of any kind can be awarded for Claimants' loss of opportunity claim with respect to the Contract 302 properties. This follows from the principle that there may not be double compensation. (R-III ¶¶ 495 – 497). Respondent's argument is best taken from its own words:

> *497.    The awarding of damages for loss of opportunity – equal to the awarding of damages for lost profits – is based on the presumption that capital had been invested and that this investment would have created future profits. However, capital invested in a way to create future profits cannot create an additional amount of interest at the same time. Or in other words: the future profits claimed are already the "interest" on the investment. Additional interest is not possible have rejected the application of a commercial or a sovereign debt rate. (R-III ¶ 497).*

### 3.    The Tribunal

1852. The Parties agree that, on damages awarded, interest is due. The Tribunal agrees as well.

1853. As the Tribunal has found above that the correct date for the valuation of damages is 30 April 2009, this is also the date from which interest shall be calculated.

1854. Regarding the rate of interest, the Tribunal agrees with Respondent that according to arbitral practice in comparable cases, the rate of a conservative investment should be used. As Respondent rightly has pointed out (R-III ¶ 493) as the damages will be awarded in US-Dollars, as confirmed by previous arbitral practice, the Tribunal considers that the rates of 6 months US treasury bills over the relevant period are the appropriate rate.

1855. Regarding the question whether compound interest is due, Respondent's comments are not quite consistent. While, in its last submission (RPHB 2 ¶ 1024), Respondent denies that any compound interest should be awarded, the Tribunal



rather agrees with Respondent's comment in its Rejoinder (R-III ¶ 494) that Claimants could be expected to reinvest their interest gains every 6 months and that, therefore, interest has to be compounded semi-annually.

## L.XIII. Summary of Tribunal's Conclusions Regarding Quantum

1856. Based on the foregoing and as explained above, the Tribunal has accepted the following quantum of damages to be paid from Respondent to Claimants. First, the Tribunal has found in Claimants' favor for the following amounts:

| Section | Title | Amounts |
|---------|-------|---------|
| L.IV. | Quantum Related to Borankol and Tolkyn Fields (Combined Asset Value) | USD 277,800,000.00 |
| L.V. | Quantum Related to Contract 302 Properties (Claimants' Out of Pocket Investment Expenses) | USD 31,330,000.00 |
| L.VI. | Quantum Related to the LPG Plant | USD 199,000,000.00 |
| | **SUBTOTAL** | **USD 508,130,000.00** |

1857. The Tribunal has also found that certain debts need to be deducted from this amount:

| Section | Title | Amounts | |
|---------|-------|---------|---|
| L.III. | Treatment of Debt | | |
| | Reachcom Facility Agreement | USD | 335,624.00 |
| | Limozen Facility Agreement | USD | 10,049,442.00 |
| | Reachcom Receivables Purchase Agreement | USD | 59,853.00 |
| | **SUBTOTAL** | **USD** | **10,444,899.00** |

1858. Since the only evidence that the Parties have provided regarding these debt amounts is the FTI Consulting Second Expert Report (28 May 2012), that is what the Tribunal uses to define the values of these debts.

1859. Subtracting the subtotal of debts (USD 10,444,899.00) from the subtotal of compensation due (USD 508,130,000.00), the Tribunal concludes that the net amount to be paid by Respondent to Claimants amounts to **USD 497,685,101.00**.

1860. This net amount is to be paid from Respondent to Claimants with interest, defined as the rate of 6 months US Treasury Bills from 30 April 2009 to the date of payment, compounded semi-annually.

1861. In addition to these amounts, the Tribunal decides on the arbitration costs, below.



## M. Arbitration Costs

### M.I. Arguments by Claimants

1862. Claimants request that the Tribunal award them all costs and expenses associated with this arbitration, including attorneys' fees and expenses, experts' fees and expenses, and fees and expenses of the Tribunal and the SCC, pursuant to Art. 44 of the SCC Arbitration Rules. Article 44 embodies the "*loser pays*" rule, and, for the reasons already set out above, Claimants should prevail and Respondent should pay in this arbitration. (C-III ¶ 98; C Costs ¶¶ 2 – 3; C Costs Reply ¶¶ 2 – 3). Claimants request that the Tribunal award Claimants the entirety of their costs in this arbitration, **USD 17,950,992.87**, plus compound interest on the costs award at a reasonable rate until Respondent pays in full. Claimants further request that the Tribunal deny Respondent's request for costs. (C Costs ¶ 30; C Costs Reply ¶¶ 18 – 19).

1863. The severity of Respondent's misconduct in the events leading to this arbitration also weighs in favor of the Tribunal awarding Claimants the full costs incurred in pursuing an international legal remedy for the injuries suffered. (C Costs ¶¶ 4 – 7; C Costs Reply ¶ 3).

1864. Respondent's gross procedural misconduct greatly increased Claimants' legal fees and expenses and added nearly one year to the procedural calendar. Respondent's violation of PO-2 forced Claimants to prepare the bulk of their Reply submission without the aid of those documents. The late submission of 30,000 pages of materials resulted in significant delay and the quasi-bifurcation of the proceeding. Respondent's withholding of the four critical diligence and valuation reports for thirteen months, in violation of PO-2 and PO-3, exacerbated Claimants' expenses. Respondent held Claimants to prove and respond to positions that Respondent knew to be contradicted by crucial, contemporaneous evidence. In addition, Respondent increased costs by submitting lengthy, confusing, and contradictory written pleadings. Respondent's case materially changed throughout its submissions, requiring Claimants to submit new evidence to disprove it. Absent the untimely submission of the false contention regarding the Interoil Reef, the May 2013 Hearing would not have needed to include expert testimony on that subject. Respondent's misconduct is similar to and indeed worse than the respondent's misconduct in *ADC v. Hungary*, where the tribunal found an award of Claimants' legal expenses was justified. Here, Claimants should not be forced to bear the costs of Respondent's poor planning and its unwillingness/inability to follow the Tribunal's instructions. (C Costs ¶¶ 8 – 21; C Costs Reply ¶¶ 4 – 5).

1865. Claimants incurred **USD 17,950,992.87** in total costs, fees, and expenses in this arbitration. These costs were reasonable in light of the complexity of the case (involving 10 pleadings, 97 witness statements and expert reports, and over 1100 exhibits), its duration, and the harm that Respondent caused to Claimants' investments. The legal fees are in line with market rates and the fees of the experts are tailored to the scope and complexity of the issues addressed. The total costs comprise less than 2% of the quantum claimed. The table, found at C Costs ¶ 23, summarizes Claimants' costs. (C Costs ¶¶ 22 – 27).



| CATEGORY | AMOUNT (IN US$) |
|---|---|
| **Legal Fees & Expenses** | |
| • King & Spalding | $ 12,337,787.80 |
| *Fees Expenses* (including, *inter alia*, hearing expenses, court reporting, and interpreter fees) | $ 887,203.72 |
| • Bulboaca & Asociatii<br>*Fees and Expenses* | $ 396,569.41 |
| **Experts' Fees & Expenses** | |
| • FTI | $ 1,514,932.87 |
| • Ryder Scott | $ 877,458.14 |
| • Professor Adnan Amkhan Bayno | $ 174,886.48 |
| • Scott Horton | $ 104,244.00 |
| • Professor Maidan Suleymenov | $ 89,437.00 |
| • Professor Aleksey Malinovskiy | $ 37,226.82 |
| • Professor Peter Maggs | $ 33,731.14 |
| **Claimants' Out-of-Pocket Costs and Expenses** (including, *inter alia*, client representatives' travel, translation, and other logistical expenses) | |
| • Translation services | $ 28,429.84 |
| • Travel expenses | $ 39,085.18 |
| • Industry and legal consultant expenses | $ 2,600.00 |
| **SCC Payments** | $ 1,425,448.95 |
| **TOTAL** | **$ 17,950,992.87** |

1866. Claimants note that the Parties have submitted very similar cost claims, with Claimants claiming USD 17,950,993 and Respondent claiming USD 17,625,116. It should be noted, however, that Claimants have already paid USD 1,425,449 of the SCC's and the Tribunal's advances, and Respondent has only paid USD 42,411. (C Costs Reply 14, stating USD 42,411 in reference to the advances. This is likely a typo, since the advance that Respondent states that it paid amounted to USD 38,991.00 and was reported on the line above the USD 42,411 amount, which was for the Hearing Center). It is clear, therefore, that if the Parties had shared the



costs equally as they were supposed to, Claimants' overall costs claim would be approximately USD 1 million less than Respondent's. Each Party would have paid USD 733,930 in SCC advances, thereby reducing Claimants' claim to USD 17,259,474 and increasing Respondent's claim to USD 18,316,635. This shows not only the reasonableness of Claimants' claim, but also underscores that a significant portion of the costs claimed are directly attributable to Respondent's misconduct. (C Costs ¶¶ 28 – 29; C Costs Reply ¶ 14).

1867. Claimants, contrary to Respondent's argument, have not changed their relief sought. The Statement of Claim was clear that the claim for the Contract 302 properties was one for loss of opportunity. There is authority that the Tribunal may exercise its discretion to fix the amount of damages. This has had no effect on the costs of the proceeding. Second, there was no "*surprise*" introduction of 3D Seismic Data, nor did the production increase the costs of this proceeding. Claimants properly submitted the 3D seismic in order to rebut Respondent's argument made in December 2012 that Claimants had no intention to explore the Interoil Reef. There was no reason to submit the 3D seismic prior to that. Fundamentally, however, this introduction did not increase Respondent's costs – effort to review and analyse the data would have been expended even if the data had been submitted earlier. Importantly, the submission of the 3D seismic had nothing to do with the necessity of the May 2013 Hearing, which occurred because the Parties jointly requested an opportunity for oral closing arguments, in January 2013. The additional costs by addressing the 3D seismic at that hearing were incremental, at best. (C Costs Reply ¶¶ 6 – 9).

1868. Respondent's additional allegations of misconduct are intended only to distract the Tribunal. With regard to the new documents submitted on 20 September 2012 and the Sharing Agreement, those were submitted with the Tribunal's permission. (C Costs Reply ¶¶ 10 – 11).

1869. While Respondent now argues that it would have submitted the KMG EP Due Diligence documents sooner, there is no evidence that KMG considered the documents confidential. In any event, that confidentiality had been waived when it disclosed those to Respondent's counsel and experts. Regarding the so-called "disappearance" of Laura Hardin, that is a non-issue – Ms. Hardin left the employment of FTI in June 2012. The circumstances of her departure were beyond Claimants' knowledge or control. It was immaterial because her partner, Howard Rosen, who was involved in the preparation of all of the damages reports, appeared and gave testimony. In any event, this stands in juxtaposition to Respondent's misconduct regarding the Deloitte TCF report. (C Costs Reply ¶¶ 12 – 13).

1870. Some of the costs claimed by Respondent, including the USD 600,000 for the Deloitte TCF Report, and USD 270,000 for Prof. Olcott, and the USD 60,000 for Neftegazkonsult are related to Respondent's procedural misconduct and are particularly objectionable. Respondent's costs for its quantum and geology experts, Deloitte GmbH and GCA, substantially exceed Claimants' cost submissions for FTI and Ryder Scott, and are particularly excessive when compared to the quality of those reports. (C Costs Reply ¶¶ 15 – 16).

## M.II.   Arguments by Respondent



1871. Respondent requests the Tribunal to order Claimants to reimburse the Republic for, *inter alia*, the fees and expenses of the experts, consultants, witnesses, and legal counsel. (R-III ¶ 519).

1872. Respondent has incurred **USD 17,625,116.33** in legal fees, expert fees, costs in this arbitration, which it summarizes in the following table (R Costs ¶ 19):

| | |
|---|---|
| **Attorneys fees until 21 June 2013** | **USD 11,660,999.61** |
| **Attorneys expenses until 21 June 2013** | **USD 446,023.06** |
| **Experts** | |
| **Professor Tietje** | **USD 43,807.50** |
| **Professor Olcott** | **USD 270,000.00** |
| **Professor Didenko** | **USD 50,000.00** |
| **Professor Kogamov** | **USD 50,000.00** |
| **Professor Ilyassova** | **USD 53,875.00** |
| **Professor Balco** | **USD 42,646.25** |
| **Deloitte & Touche GmbH** | **USD 2,151,775.50** |
| **Deloitte TCF** | **USD 600,000.00** |
| **Gaffney Cline & Associates** | **USD 1,217,255.67** |
| **Marc Latman** (expert for New York securities law) | **USD 13,412.50** |
| **Neftegazkonsult** | **USD 60,000.00** |
| **Richard Butler** (expert for witness testimony) | **USD 17,158.88** |
| **Professor Zhanaidarov** (expert for Kazakh civil law) | **USD 37,418.23** |
| **Hassans International Law Firm** (experts for Gibraltar law) | **USD 5,210.70** |
| **Mangat Thapar** | **USD 51,703.74** |
| **Paul Rogers (cost expert)** | **USD 1,651.44** |
| **Government representatives** (travel costs, hotel expenses, allowance) | **USD 102,779.64** |
| **Witnesses** (travel costs, hotel expenses, allowance) | **USD 63,678.81** |
| **Translations** | **USD 474,180.06** |
| **Courier** | **USD 14,807.26** |
| **Copy** | **USD 50,134.75** |



| Costs of the arbitration | |
|---|---|
| **SCC additional advance** | **USD 38,991.00** |
| **ICC Hearing Centre** | **USD 42,410.66** |
| **Court Reporter** | **USD 29,749.02** |
| **Interpretation Costs** | **USD 35,447.05** |
| | |
| **Total costs** | **USD 17,625,116.33** |

1873. Claimants have forced Respondent to spend three years defending baseless allegations in four hearings, numerous written submissions, and further correspondence. They have blown this case out of proportion and submitted new and contradictory expert opinions and last minute evidence before each hearing. That they changed their claim from their USD 1.4 billion and then put the valuation "*at the discretion of the Tribunal*" is an additional example of how they blew up their claim. Their initial and deliberate ignorance of the complexity of this case was the cornerstone for delay in these proceedings. (R Costs ¶¶ 1 – 4; R Costs Reply ¶¶ 4 – 5).

1874. Claimants' procedural conduct was far from exemplary. Although the first two FTI reports were co-authored by Laura Hardin, Claimants refused to offer her for cross examination and likely never intended to. (RPHB 2 ¶¶ 1041 – 1050). Claimants' procedural misconduct also caused Respondent to incur significant loss, giving the Respondent the right to demand reimbursement of all costs incurred as a result. In particular, their abuse related to the Munaibay 3D seismic rendered much of Respondent's preparation obsolete and subsequently caused additional costs in excess of **USD 500,000**. Respondent's experts, GCA, were forced to study these by surprise in less than 2 months, rather than 2.5 years. Counsel was forced to recruit and coordinate with new experts and GCA's experts had to come to a second hearing. Claimants attempt to make Respondent responsible for the belated introduction of 3D seismic data, but this was Claimants' doing. Whether intentional or not, the delayed introduction of the 3D seismic data led to significant additional costs and delay, for which Claimants are responsible. (R Costs ¶¶ 5 – 11; R Costs Reply ¶¶ 6 – 7).

1875. Claimants' other procedural misconduct, including the disruptive submission of new documents before hearings and outside of the procedural timetable, their ex-post attempt to justify its position in a "*debt gross-up*", the Request to Compel Production of 2 January 2013, and their baseless objections to expert testimony also led to further additional costs and created mounting time pressure for Respondent. (R Costs ¶ 12; RPHB 2 ¶¶ 1041 *et seq.*).

1876. Claimants' arguments that Respondent should pay their costs, in particular every single accusation of procedural misconduct, are without merit. In addition, Claimants' argument that the Respondent espoused positions that it knew to be untrue is particularly far-fetched. The KMG EP Due Diligence documents support Respondent's position. There are sections in that report where the opinions expressed are different from the Respondent's and its experts' views, but that is merely because the due diligence reports are exactly what they purport to be: the



professional opinion of the authors of those reports. The Respondent was previously barred from submitted the KMG EP Due Diligence documents by KMG EP's refusal to disclose the documents. (R Costs ¶¶ 13 – 18; R Costs Reply ¶¶ 8 – 10).

1877. Claimants' expert, FTI, made numerous baseless allegations, thereby forcing Deloitte to rebut them, since a diligent expert report must address the other side's arguments, no matter how far-fetched. If Claimants consider that their costs and expenses are appropriate, they cannot deny that this holds true for the Respondent's costs and expenses. (R Costs Reply ¶ 11).

## M.III.          The Tribunal

1878. The relevant provisions regarding the costs of arbitration are provided in Art. 43 and 44 SCC Rules.

1879. Pursuant to Art. 43.2, by its letter of 12 December 2013, the SCC Board has determined the costs of this arbitration, and pursuant to Art. 43.4, these are included in this Award as follows:

Karl-Heinz Böckstiegel
| | |
|---|---|
| Fee | EUR 400 000 |
| Per diem | EUR 8 500 |
| Expenses | EUR 11 730,39 |
| Secretary | EUR 60 672,74 |

David R Haigh, QC
| | |
|---|---|
| Fee | EUR 240 000 |
| Per diem | EUR 12 500 |
| Expenses | EUR 20 857,61 |

Sergei Lebedev
| | |
|---|---|
| Fee | EUR 240 000 |
| Per diem | EUR 12 500 |
| Expenses | EUR 2 710,24 |

Stockholm Chamber of Commerce
| | |
|---|---|
| Administrative fee | EUR 60 000 |

1880. According to Art. 43.5, "*the Arbitral Tribunal shall, at the request of a party, apportion the Costs of the Arbitration between the parties, having regard to the outcome of the case and other relevant circumstances.*" Further, regarding the costs incurred by a party, Art. 44 provides the Tribunal a similar discretion at the request of a party, to order one party to pay any reasonable costs incurred by another party, including the costs of legal representation, again "*having regard to the outcome of the case and other relevant circumstances.*"

1881. Such requests for the application of both provisions have been made by the Parties in this case and the Tribunal, therefore, has to decide on them.

1882. The Tribunal is aware of a certain practice in investment treaty arbitration that each party bears its own costs and that the parties divide tribunal costs equally. That



practice is not binding on this Tribunal, which prefers the more recent practice in investment arbitration of applying the general principle of "*costs follow the event.*" That approach is the more compelling one in the present case which is governed by the SCC Rules that expressly contemplate the rule of "*costs follow the event*" in Art. 43.5 and 44 by their emphasis on "*the outcome of the case.*" This conclusion is supported by both sides' arguments that the unsuccessful side in this arbitration should have to bear the full amount of tribunal costs as well as the other side's costs of legal representation.

1883. Regarding the present case, the Tribunal takes into account that Claimants requested a total relief of more than USD 1 billion plus what they call a discretionary portion in the range of USD 1.5 billion, of which this Award only grants an amount in the range of USD 0.5 billion, i.e. some 20%. On the other hand, Claimants prevail on jurisdiction, liability, causation, and part of quantum, all of which were the major objects of the dispute and made up by far the greatest part of the work of the Parties and of the Tribunal in this procedure.

1884. Therefore, the Tribunal concludes that Respondent shall pay to Claimants 50% of Claimants' costs of legal representation. For the same reasons, the Tribunal concludes that, of the arbitration costs for the SCC and the Tribunal as quoted above, Respondent has to bear ¾ and Claimants ¼.

1885. As both sides come out with very similar total costs of their legal representation, the Tribunal accepts the amounts of costs claimed by both sides as reasonable. Both Parties have included in their cost claims the deposits they paid to the SCC for arbitration costs. According to Claimants, they have paid total deposits of USD 1,425,448.95 to the SCC. According to Respondent, it has paid what it calls an "*SCC additional advance*" of USD 38,991.00, though no other deposit payment is mentioned. During the procedure, the SCC has informed the Tribunal by its letters of 11 October 2010 and 20 June 2012 of some of the deposits paid by the Claimants. The SCC did not inform the Tribunal of any deposit payments made by Respondent. With its decision of 12 December 2013, the SCC did not inform the Tribunal of the total deposits paid by the Parties, but pointed out that it will determine the exact amounts due by each Party in its settlement of accounts with the Parties. The SCC costs decision was denominated in Euro, while the Parties have submitted their costs claims in USD. The total arbitration costs set by the SCC amount to EUR 1,069,470.98, of which ¾ are to be borne by Respondent, according to the Tribunal's above ruling. This amounts to EUR 802,103.24. The Tribunal, therefore, concludes that Respondent shall pay to Claimants ½ of Claimants' full cost claim of USD 17,950,992.87, in an amount of **USD 8,975,496.40.** Obviously, this amount comprises the above awarded 50% of Claimants' costs of legal representation and the USD 712,724.47 portion of the EUR 802,103.24 SCC costs which Respondent shall bear. The remaining accounting of the deposits will have to be done between the SCC and the Parties.

**(The Decisions of the Tribunal are placed on a separate page of this Award hereafter.)**



## N.    Decisions

For the Reasons set out above in this Award, the Tribunal hereby decides, declares, and awards as follows:

1. The Respondent has violated its obligations under the Energy Charter Treaty with respect to the Claimants' investments.

2. Subtracting the subtotal of debts (USD 10,444,899.00) from the subtotal of compensation due (USD 508,130,000.00), the Tribunal decides that Respondent shall pay to Claimants a net amount of USD 497,685,101.00.

3. This net amount is to be paid from Respondent to Claimants with interest, defined as the rate of 6 months US Treasury Bills from 30 April 2009 to the date of payment, compounded semi-annually.

4. Regarding the costs of arbitration, the Tribunal decides:

   4.1. Of the costs of arbitration as determined by the Arbitration Institute of the Stockholm Chamber of Commerce (SCC), Respondent shall bear ¾ and Claimants ¼. These arbitration costs will be drawn from the advances paid by the Parties to the SCC.

   4.2. Further, Respondent shall pay to Claimants 50% of Claimants' costs of legal representation, i.e. an amount of USD 8,975,496.40.

5. All other claims are dismissed.

Place of Arbitration: Stockholm (Sweden)

David R. Haigh QC
(Co-Arbitrator)
Dissenting with regard to Sections
L.IV., L.V., and L.XIII of the Award

Prof. Sergei N. Lebedev
(Co-Arbitrator)
Dissenting with regard
to Section H.I. of the Award

Prof. Karl-Heinz Böckstiegel
(Chairman of Tribunal)

19.12. 2013

**ARBITRATION INSTITUTE OF**

**THE STOCKHOLM CHAMBER OF COMMERCE**

Certified true copy of original

Natalia Petrik, Legal Counsel

Date  28 January 2014

**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

# KING & SPALDING

King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, TX 77002-5213
Tel: +1 713 751 3200
Fax: +1 713 751 3290
www.kslaw.com

Reginald R. Smith
Direct Dial: +1 713 751 3226
rsmith@kslaw.com

January 8, 2014

Dr. Patricia Nacimiento
Norton Rose LLP
Stephanstrasse 15
60313, Frankfurt, Germany

Joseph Tirado
Winston & Strawn LLP
CityPoint One Ropemaker Street
London
EC2Y 9HU
United Kingdom

**Re:   SCC Arbitration V (116/2010) - Anatolie Stati, et al. v. Kazakhstan**

Dear Counsel:

I refer to the Award issued in the above-referenced arbitration on December 19, 2013. Claimants calculate the total current amount of the Award, including interest through January 8, 2014, to be US $510,414,150. Interest will continue to accrue until the Award is paid, at the current rate of US $1,099 per day (through April 30, 2014, when the principal balance and interest rate will be updated pursuant to the Tribunal's direction to compound semi-annually). Please let me know promptly if you disagree with these calculations.

Claimants hereby request that your client immediately pay the full amount of the award, including interest through the date that final payment is made. Please notify your client to use the following account information for wire transfer of the funds:

Wilmington Trust, National Association
ABA: 031100092
Account: 103303-000
Ref: Tristan Security Agency
Attn: Alecia Anderson, Global Capital Markets

Sincerely,

Reginald R. Smith

Moldovan investors win record damages against Kazakhstan - News - Arbitration News, Features and Reviews - Global Arbitration Review

Case 1:15-mc-00081-P1   Document 19-13   Filed 04/27/15   Page 36 of 44



UK Edition

King & Spalding Firm-wide | IP | My Account | Log In Using Alternate Account

| News | Journal | Surveys | Reviews | Know-How | Events | Shop |

HOME ▶ NEWS ▶ ARTICLE

# Moldovan investors win record damages against Kazakhstan

Sebastian Perry  •  Thursday, 9 January 2014  *(2 weeks ago)*

An SCC tribunal has ordered Kazakhstan to pay over half a billion dollars plus interest to Moldovan oil and gas investors – the largest award on record under the Energy Charter Treaty.



Anatolie Stati

In an award on 23 December, a panel chaired by German arbitrator **Karl-Heinz Böckstiegel** held that Kazakhstan breached the ECT's fair and equitable treatment standard through a series of actions culminating in the seizure of the claimants' local oil and gas operations in 2010.

The panel, seated in Stockholm, awarded US$506 million plus interest to the claimants – Moldovan businessman Anatolie Stati, along with his son Gabriel and their companies, Moldova's Ascom Group and Gibraltar-registered Terra Raf Trans Traiding.

The outcome was announced in press releases yesterday by Ascom subsidiary Tristan Oil and the claimants' law firm, King & Spalding. The award has not yet been published.

But the panel, which also included **David Haigh QC** of Canada (appointed by the claimants) and **Sergey Lebedev** of Russia (appointed by Kazakhstan) rejected claims for an additional US$1.7 billion in lost profits and a claim for moral damages.

Counsel to Kazakhstan say the total value of the claim, with interest, was around US$5 billion, suggesting that the claimants only prevailed on 10 per cent of their claim.

The award notes that Haigh dissented from the majority on a number of damages issues; while Lebedev also dissented on jurisdiction. Neither arbitrator supplied a separate opinion.



📄 **Buy this article (PDF)**

💬 No comments | Comment on article

✉ Email this article

📶 Latest News RSS

Search

Advanced Search                                    Search

| News | Journal |

**Latest News**

▸ Sands resigns from panel over Pinochet challenge

▸ PRIME hears proposed reforms to ISDA clauses

▸ Foley Hoag promotes from El Salvador team

▸ Indian court sends cricket fraud claims to ICC

▸ Who's sitting at ICSID?

More News

Moldovan investors win record damages against Kazakhstan - News - Arbitration News, Features and Reviews - Global Arbitration Review

Case 1:15-mc-00081-P1   Document 19-13   Filed 04/27/15   Page 37 of 44

The claimants, who acquired two Kazakh companies in 1999 with licences in the Borankol and Tolkyn oil fields, say they invested hundreds of millions of dollars over a decade to turn them into successful exploration and production businesses. But beginning in 2008, they said they were subjected to "burdensome inspections and audits" by various agencies, leading to allegations of illegal conduct and criminal charges against company executives. This culminated in the state's cancellation of the companies' subsoil use contracts and the seizure of their assets, which are now controlled by state entity KazMunaiGas. They lodged the SCC claim in 2010.

Kazakhstan was initially represented in the arbitration by Curtis Mallet-Prevost Colt & Mosle. However, the firm withdrew from the case in 2011 and was replaced by a team from Norton Rose Fulbright led by Frankfurt-based partner **Patricia Nacimiento** and then partner **Joe Tirado** in London. Tirado stayed on as co-counsel after he moved to Winston & Strawn last year. Russian practitioner **Igor Zenkin** also worked on the case but did not appear at the hearings, which took place in October 2012.

The case also saw the involvement of damages experts from FTI Consulting on the claimants' side and Deloitte's Frankfurt office on behalf of Kazakhstan.

Nacimiento and Tirado told *GAR*, "The tribunal has largely rejected claimants' claims. Of the initial claim of around US$5 billion including moral damages and interest, the tribunal awarded little more than 10 per cent. The tribunal fully rejected a claim for loss of opportunity in the range of US$1.7 billion, just as it rejected the claim for moral damages. With regard to the two main assets, the tribunal also followed the state's arguments in that claimants' valuation was considerably overstated."

They add that Kazakhstan is considering whether to seek annulment of the award in the Swedish courts.

In its press release, King & Spalding suggests the result is the third-largest award ever issued under an investment treaty – coming after the US$1.8 billion award issued last year in favour of Occidental Petroleum against Ecuador; and the US$867 million award in favour of Czech bank CSOB against Slovakia in 2004. The firm says it is also the largest Energy Charter Treaty award on record, beating a US$30 million award obtained by Sweden's Nykomb Synergetics against Latvia in 2003.

The result marks a departure from recent investment claims against Kazakhstan, in which the state has avoided damages altogether. In

**- 833 -**

Moldovan investors win record damages against Kazakhstan - News - Arbitration News, Features and Reviews - Global Arbitration Review

Case 1:15-mc-00081-P1   Document 19-13   Filed 04/27/15   Page 38 of 44

November, an ICSID panel hearing a US$1.29 billion claim by AES found the state in breach of the ECT for reforms to its electricity sector but declined to award any damages. In the past year-and-a-half, it has also prevailed on jurisdiction in a US$1.5 billion claim by Kazakh banking investors; a billion-dollar claim by oil company Caratube (since resubmitted); and a claim by Dutch investors in the poultry sector.

The award also represents another coup for King & Spalding, which last month helped secure an ICSID award for US$250 million in damages and interest in favour of naturalised Swedish citizens Ioan and Viorel Micula and their companies. Partners **Reggie Smith** and **Ken Fleuriet**, who led the work on the *Stati* case, were also part of the King & Spalding team working for the Micula brothers, alongside Shearman & Sterling.

*Anatolie Stati, Gabriel Stati, Ascom Group SA and Terra Raf Trans Traiding Ltd v Kazakhstan* (SCC case)

Tribunal

- **Karl-Heinz Böckstiegel** (Germany)

- **David Haigh QC** (Canada) (appointed by claimants)

- **Sergei Lebedev** (Russia) (appointed by respondent)

Counsel to the claimants

- King & Spalding

  Partners **Reggie Smith** and **Kevin Mohr** and counsel **Ric Toher** in Houston; partner **Ken Fleuriet**, senior lawyer **Heloise Herve** and senior associate **Amy Frey** in Paris; and associates **Alexandra Rotar** and **Valeriya Subocheva** in Moscow

Counsel to Kazakhstan

- Norton Rose Fulbright (from early 2011)

  Partner **Patricia Nacimiento** in Frankfurt and associates **Max Stein**, **Anastasia Maltseva** and **Natalia Nikiforova** in Frankfurt; and associates **Simon Ramsden** and **Nikhil Lakhani** in London

- Winston & Strawn (from October 2012)

  Partner **Joe Tirado** in London (stayed on as co-counsel when he left

Moldovan investors win record damages against Kazakhstan - News - Arbitration News, Features and Reviews - Global Arbitration Review

Case 1:15-mc-00081-P1    Document 19-13    Filed 04/27/15    Page 39 of 44

Norton Rose)

- Curtis Mallet-Prevost Colt & Mosle (until early 2011)

- **Igor Zenkin** in Moscow (from May 2011)

---

**Comments**                                           COMMENT TERMS & CONDITIONS



Your name

Make Comment Anonymous                                      Post Comment

*When making anonymous comments, we do record information about you; however, we will never display the information externally.*

Back to top

---

 **Law Business Research Ltd** ↗
87 Lancaster Road, London
W11 1QQ, UK

© Law Business Research Ltd 1998-2014. All rights reserved.
Company No.: 03281866 - IMPORTANT: Please read our Terms of Use.



| | |
|---|---|
| Home | Know-how |
| News | Events |
| Journal | Shop |
| Current Issue | Subscribe to GAR |
| Issues | Advanced Search |
| Surveys | GAR News Briefing |
| Reviews | Advertising |

| |
|---|
| Lost Password? |
| About |
| Contact |
| Help |
| Terms & Conditions |
| Privacy & Cookie Policy |
| Accessibility |



Norton Rose Fulbright LLP · Stephanstraße 15 · 60313 Frankfurt am Main

**Professor Karl-Heinz Böckstiegel**
Parkstrasse 38
51427 Bergisch-Gladbach
Frankenforst, Germany
(email: kh@khbockstiegel.com)

**David Haigh, QC**
Burnett, Duckworth & Palmer LLP
2400, 525 – 8 Avenue S.W.
Calgary, Alberta T2P 1G1
Canada
(email: drh@bdplaw.com)

**Professor Sergei N. Lebedev**
Staroalexeevskaya Str., 16/49
129626 Moscow, Russia
(email: snlebedev@gmail.com)

Norton Rose Fulbright LLP
Rechtsanwälte
Stephanstraße 15
60313 Frankfurt am Main

Tel    +49 (0)69 505096 0
Fax   +49 (0)69 505096 100
nortonrosefulbright.com

Dr. Patricia Nacimiento
Assistant:  Karolina Pelka
Tel      +49 (0)69 505096 117
Fax     +49 (0)69 505096 100
patricia.nacimiento@nortonrosefulbright.com

17 January 2014

cc.

**Mr. Kenneth Fleuriet and Ms. Heloise Herve**
King & Spalding
12 Cours Albert 1er
75008 Paris
France
(email: KFleuriet@KSLAW.com; HHerve@KSLAW.com)

**Mr. Reginald Smith**
King & Spalding
1100 Louisiana
Suite 4000
Houston, TX 77002
USA
(email: RSmith@KSLAW.com)

**Ms. Katherine Simpson**
(via email: Ksimpson.llm@hotmail.com)

**Anatolie Stati, Gabriel Stati, Ascom Group S.A. and Terra Raf Trans Traiding ltd. vs. Republic of Kazakhstan (SCC Arbitration V (116/2010)) – Request for Correction**

Dear Members of the Tribunal

In accordance with Article 41 SCC Rules Respondent requests two corrections:

1. There seems to be a clerical mistake in the first sentence of paragraph 962 of the award, which states:
"*Kemikal, which was TNG's largest non-local customer, which was under the control of the son-in-law of President Nazarbayev, Mr. Timur Kulibayev, through intervening entities he was said to control, namely, Gaz Impex and KazRosGas.*"

2. In paragraph 1419 of the award, the Tribunal refers to KMP instead of KPM: "*The Tribunal notes in the present context the Parties' dispute whether the actions of the Kazakh State prevented the owners of KMP and TNG from selling their investments.*"

Sincerely yours

Dr. Patricia Nacimiento

Partner

2

SCC Arbitration V (116/2010)


**ARBITRATION INSTITUTE**
OF THE STOCKHOLM CHAMBER OF COMMERCE

# Correction
### Dated 17 January 2014
### according to Section 32 of the Swedish Arbitration Act to the
## AWARD
### dated 19 December 2013

The Arbitral Tribunal:

**David R. Haigh QC (Co-Arbitrator)**
**Prof. Sergei N. Lebedev (Co-Arbitrator)**
**Prof. Karl-Heinz Böckstiegel (Chairman)**

Ms. Katherine Simpson (Secretary to the Tribunal)

**Claimants:**                          Anatolie Stati
                                         Gabriel Stati
                                         Ascom Group S.A.
                                         Terra Raf Trans Traiding Ltd.

**Claimants' counsel:**                  Reginald R. Smith
                                         Héloise Hervé
                                         Kenneth Fleuriet
                                         King & Spalding
                                         Bulboaca Asociatii

**Respondent:**                          Republic of Kazakhstan

**Respondent's counsel:**                Dr. Patricia Nacimiento
                                         Matthew Buckle
                                         Norton Rose Fulbright LLP

                                         Joseph Tiredo
                                         Winston & Strawn London

                                         Professor I. Zenkin
                                         Moscow Regional Collegium
                                         of Advocates

1.      After rendering the Award dated 19 December 2013, the Tribunal discovered
that its Decisions did not sufficiently specify the costs of arbitration as required by the
Swedish Arbitration Act. Therefore, the Tribunal informed the Parties by mail dated
13 January 2014 that the Tribunal would correct the Award in accordance with Art.
41 SCC Rules and Section 32 of the Swedish Arbitration Act.

**ARBITRATION INSTITUTE OF THE**
**STOCKHOLM CHAMBER OF COMMERCE**
Certified true copy of original

Natalia Petrik, Legal Counsel
Date _28 January 2014_

2.    The Tribunal hereby makes the following correction of its Decisions in section N of the Award regarding the costs of Arbitration:

2.1. At the beginning of sub-section 4, the following is added:

4.01. The Parties are jointly and severally liable to pay the arbitration costs.

4.02. The arbitration costs have been determined as follows:

Chairman: Fee EURO 400,000.00 plus total expenses of EURO 80,903.13

Co-Arbitrator Haigh: Fee EURO 240,000.00 plus total expenses of EURO 33,357.61

Co-Arbitrator Lebedev: Fee EURO 240,000.00 plus total expenses of EURO 15,210.24

The Administrative Fee of the SCC amounts to EURO 60,000.00.

4.03.    A Party may bring an action against the award regarding the decision on the fee(s) of the arbitrator(s) within three months from the date upon which the party received the award. Such action shall be brought before the District Court of Stockholm, Sweden.

Subsections 4.1 and 4.2 of the Decisions remain unchanged.

Place of Arbitration: Stockholm (Sweden)

David R. Haigh QC
(Co-Arbitrator)

Prof. Sergei N. Lebedev
(Co-Arbitrator)

Prof. Karl-Heinz Böckstiegel
(Chairman of Tribunal)

**ARBITRATION INSTITUTE OF THE**
**STOCKHOLM CHAMBER OF COMMERCE**

Certified true copy of original

Natalia Petrik, Legal Counsel
Date _28 January 2014_



**SCC Arbitration V (116/2010): 1. Anatolie Stati 2. Gabriel Stati 3. Ascom Group S.A. 4. Terra Raf Trans Traiding Ltd.**
**v.  The Republic of Kazakhstan**

**By the Arbitral Tribunal:**
**David R. Haigh QC**
**Prof. Sergei Lebedev**
**Prof. Karl-Heinz Böckstiegel (Chairman)**

26 January 2014

# Procedural Order (PO) No.12
### Regarding Respondent's Request for a Correction of the Award

1. The Tribunal has taken note of Respondent's letter of 17 January 2014.

2. In an Award of 414 pages, even after careful proofreading, it is difficult to assure that not a single typing error or other clerical mistake remains in the final text.

3. The two clerical mistakes indicated by Respondent in paragraphs 962 and 1419 of the Award are easily recognizable for the Parties, who are well acquainted with the circumstances and players relevant in this case. In the context of the reasoning where these two paragraphs are placed, the two clerical mistakes do not cause any change of or create any misund**erstanding regarding the Tribunal's reasoning**, let alone the **Tribunal's decisions.**

4. According to the last sentence of Art. 41(1) SCC Rules, a formal correction of the Award is only appropriate *"if the Arbitral Tribunal considers the request justified".* In view of the above considerations, the Arbitral **Tribunal does not come to that conclusion with regard to the Respondent'**s application. Therefore, the Tribunal concludes that there is not any need or obligation to start the complex and costly correction procedure provided for in Art. 41 SCC Rules in this regard.

5. **For these reasons, the Respondent's Request** is denied.

On behalf of the Tribunal

Karl-Heinz Böckstiegel
Chairman of Tribunal